## AFFIDAVIT OF TONY EDWARD SAVAGE

IN THE CASE OF <u>BYNUM, et al. v. DISTRICT OF COLUMBIA</u>, 02-956 (RCL)

1. I was first employed by the District of Columbia Department of Corrections ("DOC") on July 23, 1984.

2. Until my termination on January 31, 2003, I had been employed by DOC as a Legal Instruments Examiner, GS-8, Step 9. I had been a Legal Instruments Examiner since 1985.

3. During the almost 20 years that I was employed by the Department of Corrections, there has never been a policy and procedures manual for Legal Instruments Examiners such as myself, and for supervisors, to utilize in determining how to deal with the many different and complicated situations which routinely arise regarding the release of an inmate, such as situations in which an inmate is held pending multiple charges from different jurisdictions, and some but not all of the charges are dismissed while others remain pending. DOC has issued publications and conducted training on certain aspects of inmate release, such as implementation of the Sentencing Reform Amendment Act ("SRAA"), or how to enter computer data into the JACCS system, but DOC has never issued a comprehensive policy and procedures manual which instructs Legal Instruments Examiners how to deal with complicated multi-jurisdictional issues or apparently conflicting court orders or statutory provisions. These situations are handled on a case-by-case basis, based on unwritten past practice, instructions from DOC supervisors and, in the past, in consultation with legal authorities from the Courts of the District of Columbia and Agencies from other jurisdictions.

1

1346-401158

1449-501067

0028- 001

4. After DOC received unfavorable publicity starting in 2000, DOC Director Odie Washington took steps to try to deal with the ongoing problem of erroneous inmate releases. Director Washington hired as a consultant, Charles Kim, who had been an industrial engineer with Boeing Aircraft. Mr. Kim's goal was to model DOC's inmate release program on Boeing's production line. A key component of this new procedure was that when a Legal Instruments Examiner such as myself received an inmate file from a supervisor, the actions we were to take with respect to the file were to be clearly apparent from the documents in the file. We were not allowed to exercise any discretion, to the point that in May 2002 the telephones which had always been at our desks were physically removed from our desks so that we could no longer call outside agencies to obtain information or to consult with them regarding how to handle a particular release situation.

5. Mr. Kim had been conducting classes regarding his new procedure in conjunction with Cheryl Warner, the previous Chief of the Records Office, who had been removed from her position regarding a previous incident in which a deaf inmate had been wrongfully held at the Jail for 22 months without a conviction. Having been removed from her position as Chief of the Records Office, Ms. Warner was then hired by DOC as a consultant to work with Mr. Kim.

6. The new system proposed by Mr. Kim did not really address many of the problem issues we had to deal with on a routine basis, because Mr. Kim's system was based upon the JACCS computer program. JACCS is a computer data entry program, not a policy and procedures program.

7.      On June 10, 2002 I received for processing the file of inmate Donald J. Shields. I received Mr. Shields' file from Virginia Bowie. It was a thin file with few documents. On that date Ms. Bowie was performing the duties of both Acting Supervisor and Review Examiner. DOC policy requires each release to be signed off on both by the Legal Instruments Examiner who processed the release documents (such as myself) and by a senior level Examiner as the Review Examiner, and a final review of the Supervisor. Thus, with respect to Mr. Shields' release, Ms. Bowie was both the Review Examiner and the Supervisor who conducted the final review.

8.      When I reviewed Mr. Shields' file I noticed that although he was eligible for release for the District of Columbia charge pending against him, drinking beer in public, there was a detainer against him, which detainer had been filed by the Metro Transit Police due to an outstanding robbery warrant for him in Prince George's County.

9.      I told Ms. Bowie that Mr. Shields was not eligible for release because there was an outstanding detainer against him. Ms. Bowie told me that the Department of Corrections did not honor Metro Transit Police detainers unless they were entered into the system through the D.C. Metropolitan Police Department. I told Ms. Bowie that I did not believe that was correct; I told her that the Metro Transit Police detainer based on the outstanding Prince George's County robbery warrant should be honored. Ms. Bowie specifically ordered me to prepare release documents for Mr. Shields. She also signed off on the release documents as the Review Examiner and the Supervisor which is required to effectuate the actual release.

-3-

10. I processed the paperwork for Mr. Shields to be released, as I had been specifically ordered to do so by Ms. Bowie. However, since the Metro Transit Police detainer based on the Prince George's County robbery warrant had not been cleared, I did not delete that detainer from the JACCS system, even though Mr. Shields was to be released. Thus, notice of the detainer was still in the JACCS system when Ms. Bowie reviewed the paperwork and signed off on the release of Mr. Shields. The outstanding Metro Transit Police detainer was also listed in the case jacket.

11. When I reported to work the next morning, June 11, 2002, I heard that someone had determined that Mr. Shields had been improperly released. My regular supervisor, Benjamin Ellis, and I went to Ms. Bowie and spoke with her. Ms. Bowie defended the release of Mr. Shields. She said that Metro Transit Police detainers were not honored by DOC unless they were processed through MPD. She stated that his release was proper and that she did not have to call anyone or consult with anyone regarding the release.

12. After this conversation with Ms. Bowie and Mr. Ellis, I went to a JACCS training class at the Reeves Center, which class was being jointly conducted by Mr. Kim and Ms. Warner. A number of other employees from the Records Office were also in attendance at the class. Also present at the class was Ronald Watkins, who had worked in the Records Office as a Lead Legal Instruments Examiner, until he was detailed to CTF in November 2001.

-4-

13. Shortly after the class started, Valerie Emerson, the Acting Chief of the Records Office, stated that there had been another improper release of an inmate. She stated that inmate Donald J. Shields had been improperly released and that I was responsible for the improper release. She stated that I should have known that DOC has honored detainers from the Metro Transit Police since 1991. She stated that there was a memo to that effect.

14. Mr. Watkins spoke up and asked where was the memo and how could the Examiners be expected to remember everything, because there was no policy and procedures manual. Mr. Watkins said that management was responsible for the series of improper releases. At that point Ms. Emerson said that Ms. Bowie was not responsible for the improper release of Mr. Shields, because she did not see the detainer, but Mr. Savage did. At that point I stated that I was not responsible for the improper release because Ms. Bowie reviewed the file and she was both the supervisor and the Review Examiner. Ms. Emerson then said that I should have called to check on the status of the detainer. At that point Mr. Watkins spoke up and asked how I could have called since the telephones had been removed from the desks. At this point Mr. Kim asked Ms. Warner to address the proper procedures to be followed. Mr. Watkins spoke up and asked how Ms. Warner could address the problem since she had been removed from her position because she was not able to deal with the problem when she was Chief of the Records Office. Mr. Watkins then stated words to the effect that this had gone on long enough, that there was one incident after another, and it was time for the Inspector General's Office to become involved and he was going to speak to the Inspector General about this case.

15. Later that afternoon, about lunchtime, when Deborah Thomas, Althea Hayes and I rode back to CDF with Mr. Watkins, I saw Mr. Watkins with an individual whom I did not know, but whom I subsequently learned was an OIG investigator.

16. The next day, June 12, 2002, the man whom I had seen with Mr. Watkins the previous afternoon came to CDF. He told me that he was an investigator from OIG and that he wanted to question me about the release of Donald Shields. He told me this was very serious. He placed me under oath, and told me that failure to tell the truth would be perjury. He took a sworn statement from me. The information that I provided to him was consistent with the information in this Affidavit. The OIG investigator told me that he was going to speak with Ms. Bowie and Mr. Ellis about the release of Mr. Shields and would continue his investigation.

17. Some weeks later, I believe in July 2002, two investigators from DOC Office of Internal Affairs ("OIA") came and basically repeated the process of investigation that OIG investigator had done in June. I questioned why DOC was following up on the OIG investigation, but was told by the OIA investigator it was a separate matter.

18. After the DOC OIA investigators came and questioned me about the Shields release, Ms. Bowie came and spoke to me. It was known that she was leaving DOC for the Federal Bureau of Prisons. (She left in September 2002). When Ms. Bowie spoke to me on that occasion in July 2002, she told me that Valerie Emerson, the Acting Chief of the Records Office, had told her that M.L. Brown, the Deputy Director of DOC, had told Ms. Emerson to tell Ms. Bowie that she never saw the detainer in the Shields' file and that I never told her that there was a detainer against Mr.

-6-

1346-401163

1449-501072

0028- 006

Shields, During that conversation in July 2002 Ms. Bowie told me that there was no detainer against Mr. Shields in the file and that she and I had never had the conversation when I told her about the detainer. I told Ms. Bowie that was wrong and she knew it. She told me that her position was that she had never seen a detainer against Mr. Shields and that I had never told her about it. She also said it was not on the JACCS printout.

19. In addition to being a veteran Legal Instruments Examiner at DOC, I was also a Shop Steward for the Fraternal Order of Police/Department of Corrections Labor Committee, the Union for DOC employees ("FOP"). In September 2002 Director Washington and other DOC senior managers attended a Union Board of Directors meeting that was held in the DOC Director's conference room at the Grimke Building. I attended that meeting in my capacity as FOP Shop Steward. There had been another improper release of an inmate in late July, which also resulted in adverse publicity for DOC. At the FOP Board meeting in August, I told Director Washington that there needed to be a policy and procedures manual for the Examiners so these problems would not continue. Mr. Washington stated that there should be a manual, but DOC has not had a manual since 1965. He further stated that he did not know how to resolve the problem and neither did his staff. He also said that I (Mr. Savage) did not know how to solve the problem either.

20. There was another improper inmate release in September 2002. On September 30, 2002 I wrote to Chief Judge King of the Superior Court and told him that I believed that the DOC position regarding its efforts to deal with improper inmate releases was a hoax and that the manual being developed by Mr. Kim which was supposed to resolve the problem consisted of nothing more

-7-

than data entry procedures; it was not a policy and procedures manual. I addressed my letter to Chief Judge King through the DOC chain of command, and sent it out to each addressee by fax.

21. On October 4, 2002, four days after I faxed my letter to Chief Judge King through the DOC chain of command, I was placed on administrative leave with pay, pending further notice, by M.L. Brown, the Deputy Director of DOC.

22. On October 12, 2002 I wrote a letter to Mr. Brown, stating that while I believed the substance of my letter to Chief Judge King was correct, the tone was probably inappropriate. I requested that I be allowed to return to work.

23. On October 23, 2002 I was sewed with an Advance Notice of Proposed Removal from Deputy Director Brown. The reason proposed for my removal was the improper release of inmate Donald J. Shields on June 10, 2002.

24. The proposal that I be terminated based on the Shields' release was sent to a DOC Hearing Officer, Delores Thomas. I wrote to Ms. Thomas. I told her that Ms. Bowie knew about the detainer and she ordered me to prepare release documents for Mr. Shields notwithstanding the detainer. Ms. Thomas sustained the proposed removal on the basis that there was in fact a detainer against Mr. Shields, and I should have followed up on it and I should have known about the 1991 memo, so therefore I was responsible for the improper release.

-8-

1346-401165

1449-501074

0028- 008

25. By letter dated January 28, 2003 Director Washington terminated, my employment effective January 31, 2003, based on the proposal by Mr. Brown.

26. I have filed suit, pro se, in the U.S. District Court for the District of Columbia, alleging retaliation and violation of my constitutional rights, Civil Action No. 03-0184.

## COURT RETURNS

27. Unless indicated otherwise, the following statements are based on my professional knowledge as a Legal Instruments Examiner, assigned to the D.C. Jail Records Office and personal knowledge from my experience working in the DC Jail Records Office and talking with other Department of Corrections employees and with District of Columbia Superior Court personnel during the course of my duties.

28. During the period of time I worked in the Records Office at the DC Jail, from 1998, (closure of Medium Security) until my termination on January 31, 2003, on every week day that court was in session, inmates in the custody of the DC Department of Corrections were transported from the DC Jail and/or the CTF facility to the District of Columbia Superior Court and the District of Columbia District Court for hearings in their court cases.

29. During this period of time, the number of inmates in the custody of the DC Jail transported from the DC Jail and the CTF to the District of Columbia Superior Court and the District of Columbia District Court for hearings in their court cases averaged about 100 per day Monday through Thursday and on any given Friday about 200 inmates.

-9-

1346-401166

1449-501075

0028- 009

30. Some of these inmates transported to court for hearings in their cases became entitled to release in the case (or cases) they went to court on that day because the judge ordered their release in that case (or cases) or the case(s) was terminated because of dismissal, acquittal, or being sentenced to time served or a period of detention shorter than the period of time they had already been held, or for some other reason.

31. Of these inmates who became entitled to release in the case (or cases) they went to court on that day, some remained subject to Department of Corrections custody because they had other pending cases on which they were being held, or they were subject to detainers or warrants.

32. Generally speaking, it was the practice of the DC Jail to continue to detain any person in Department of Corrections custody, even after all the local cases on which he was being detained were over, if he was subject to a detainer or warrant.

33. However, many of the inmates transported to court for hearings in their cases who became entitled to release in the case (or cases) they went to court on that day were also thereby entitled to release from Department of Corrections custody because there were no other local cases on which they were being held, and they were not subject to any detainers or warrants.

34. During the period from fall of 1999 to the summer of 2000, I was assigned to the D.C. Superior Court Cell Block, in official capacity of a Legal Instruments Examiner/ Liaison responsible for review of all court order releases documents and certification of the actual release from the courthouse in conjunction with having communicated with the Records Office to perform NCIC checks and clearance.

-10-

1346-401167

1449-501076

0028- 010

35. During this period, some of the inmates transported to court for hearings in their cases who became entitled to release in the case (or cases) they went to court on that day were released directly from the courthouse, and some were transported back to the DC Jail to be processed out.

36. The NCIC checks and clearance process was otherwise known as a "run down" process, i.e., for every person who received a court release in the cases or cases he went to court that day, would telephone the Records Office to request a "run down" as to whether there existed outstandings warrants or detainers or any other documents which would otherwise prevent his/her release from custody and telefax a copy of the release order(s).

37. The purpose of having telefaxed a copy of the court order release documents was to enable the Records Office to flag the release should the NCIC "run down" indicate outstanding warrants and detainers.

38. The reason why some of the inmates transported to court for hearings in their cases who became entitled to release in the case (or cases) they went to court on that day and were also entitled to release from Department of Corrections custody were released directly from the courthouse, and some were sent back to the DC Jail to be processed out, is founded upon the major reason of the Records Office could not process all the request in a timely manner which cause the Superior Court Cell Block to become overcrowded. In addition on some days but not very often inmates who went to court and were ordered release in their cases were returned the DC Jail because the Courtroom Marshals held the release orders in their possession and did not submit the documents for Records Office "run downs" until the end of that Marshals day.

-11-

39. Sometime after the summer of 2000, a new policy was implemented under which no persons entitled to release by virtue of their court appearances were released from either courthouse. Under the new policy, all inmates transported from the DC Jail to the Superior Court or the federal District Court for a hearing were returned to the DC Jail following the hearing.

40. The reason the Marshals implemented the new policy was because the Records Office could not process the "run downs" in a timely manner to prevent the Superior Court Cell Block from overcrowding and the Records Office complained that the Marshals were holding the court order releases and other court documents until the end of the day.

41. Another contributing factor in the Records Office in delay or processing "run downs" for release is that during this period of time the Records Office did not have sufficient trained and experienced staff to process each days court paper work on the same day the court issued it, and so the Records Office was always running a few days behind in processing paper work.

42. Inmates in the custody of the DC Jail transported from the DC Jail to the District of Columbia Superior Court or the District of Columbia District Court for hearings in their court cases who returned to the DC Jail from the courthouse were called "court returns".

43. Based on my professional experience by having been assigned to the DC Jail R&D Unit I know that it was the practice of the DC Jail to re-book every single court return into the DC Jail upon his arrival into the DC Jail from court.

44. Also based on my professional knowledge from working in the R&D Unit, I know that it was the practice of the DC Jail to subject all persons transported to the DC Jail, including court returns booked into the DC Jail following court hearings, to blanket strip searches that included inspecting the person's genitals and buttocks and anus, prior to admitting them to the general prison population including the cell block areas.

45. Also based on my personal knowledge from working in the DC Jail Records Office, I would say that during the period of time running from January 1, 1999 up to the date I stopped working in the Records Office, January 31, 2003, during any given week, the number of court returns returning from either the District of Columbia Superior Court or the District of Columbia District Court who were entitled to release from Department of Corrections custody because all they had no other pending cases on which they were being held, or they were not subject to detainers or warrants, at a minimum of 1 per day and on average 5 per day. This is a conservative estimate and the numbers could reach as many as 15 inmates on any given Friday.

## JACCS

46. The following statements are based on my experience working in the DC Jail Records Office and talking with District of Columbia Superior Court personnel during the course of my duties.

47. There are a number of fields that are common to both JACCS and the District of Columbia Superior Court Criminal Information System "CIS" database including PDID and

-13-

DCDC. The DC Jail collects the PDID from each intake and enters it into JACCS. Every DC Jail intake is issued a DCDC and that number is entered into JACCS as the unique identifier for that intake.

48. JACCS can generate a report showing, for each inmate, the date the last case on which the person was held in the DC Jail was "cleared" or disposed, and also the date on which that inmates was actually released from the custody of the DC Jail on that date.

49. JACCS can also generate a report showing whether an inmate was subject to a detainer on the date the last case on which the person was held in the DC Jail was "cleared" or disposed of.

I, T. Edward Savage, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on May 2, 2003.

T. EDWARD SAVAGE