UNITED STATES DISTRICT COURT

OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARL A. BARNES, et al<br><br>            Plaintiffs<br><br>v.<br><br>GOVERNMENT OF THE DISTRICT OF COLUMBIA,<br><br>            Defendant | Civil Action No:   **06-315 (RCL)**<br><br>Next Event: None scheduled |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RULE 56(f) MOTION TO DENY DEFENDANT'S MOTION WITHOUT PREJUDICE, OR ALTERNATIVELY, FOR EXTENSION OF TIME IN WHICH TO COMPLETE DISCOVERY

## FACTS

Defendant District of Columbia has resumed since at least approximately January 1, 2006 a practice of holding inmates in the DC Jail[1] or CTF or halfway houses for periods of time from 1 day to several months after judicial officers (judges and magistrates of the District of Columbia Superior Court and the District of Columbia District Court) ordered them released.  Plaintiffs' Exhibits ## 1-14,

16-22, 37-42 (affidavits of persons overdetained during the class period) (a

comprehensive list of exhibits filed to date is attached), Plaintiffs' Exhibit # 38

(affidavit of Jeffrey Owens, overdetained 96 days). The District of Columbia

Department of Corrections (sometimes "DOC") has also resumed since

approximately January 1, 2006 the practice of subjecting court returns ordered

released at their court appearances (and who are not subject to any other cases on

which they are being detained, holds or warrants) to suspicionless strip searches

after a judicial officer has ordered them released.  Plaintiffs' Exhibits ## 1-14 and

16-18, 37-42.

**APPLICABLE LAW**

**1.      Rule 56(f) motions are granted in this Circuit as a matter of course**

**where, as here, a party files a motion for summary judgment before entry of a**

**scheduling order**

Rule 56(f) motions are granted in this Circuit as a matter of course as long as

the moving party has been pursuing discovery diligently, Berkeley v. Home Ins.

Co., 68 F.3d 1409 (D.C. Cir. 1995), especially where discovery is ongoing, Bynum

v. District of Columbia, 215 F.R.D. 1, 2 (D.D.C. 2003)(any motion for summary

judgment in case premature until close of discovery process);  Cobell v. Babbitt, 30

---

1 The Department of Corrections houses inmates in the DC Jail or CTF or halfway
houses.  Generally, depending on context, the use of the term DC Jail in this

F. Supp. 2d 24, 28-29 (D.D.C. 1998) (summary judgment motion premature when filed before close of discovery under scheduling order) (subsequent history but no adverse treatment on this point), or has not even commenced, Loughlin v. United States, 230 F. Supp. 2d 26, 51 (D.D.C. 2002) (premature to grant summary judgment where non-movant has not yet conducted discovery).  Dismissing a summary judgment without prejudice is especially appropriate where, as here, the case is factually complex and the defendant filed its summary judgment motion before a scheduling order has even been entered.  Bynum, 215 F.R.D. at 2 (decision by summary judgment disfavored when additional development of facts might illuminate issues of law requiring decision); Loughlin, 230 F. Supp. 2d at 51.

In this case, the Court has not even entered a Scheduling Order.  Therefore, summary judgment would be premature because plaintiffs' establish that the plaintiffs cannot at this time present essential facts needed to justify their position in this case, but that plaintiffs will be able to present such facts after discovery. Cobell, 30 F. Supp. 2d at 28-29.

Moreover, denial without prejudice or a continuance is especially appropriate where, as here, the discovery plaintiff needs to oppose the motion is within the exclusive possession of the moving party.  Carmona v. Toledo, 215 F.3d 124, 133-134 (1st Cir. 2000) (entry of summary judgment for defendants police

_____

motion includes all three facilities.

supervisors reversed because plaintiff could not respond to motion because

defendants did not respond to discovery, and information plaintiff needed was in

possession of defendants). Plaintiffs have a right to conduct an investigation into

the factual basis of Paige Ireland's conclusions.  Fed. R. Civ. P. 56(f).  Otherwise,

defendants could end every case before it began by, as here, filing a motion for

summary judgment based on a conclusory affidavit before discovery began.

Edmond v. Consumer Protection Division Office of Attorney General of Maryland,

934 F.2d 1304 (4th Cir. 1991) (defendant cannot offer affidavits in support of

summary judgment motion and then invoke 5th Amendment privilege to avoid

depositions and other discovery).

## 2.    Defendant District of Columbia Submitted a Single Affidavit In Support Of Its Motion for Partial Summary Judgment That Does Not Meet the Requirements of Rule 56(e)

The only evidence Defendant District of Columbia submitted in support of

its motion for partial summary judgment is a single affidavit from a single person

(Records Office administrator Paige Ireland) containing self-serving, conclusory,

and sometimes purely hearsay statements that do not meet the requirements of Rule

56(e) because, for the most part, the allegations in the affidavit are not made on

personal knowledge, do not set forth facts that would make them admissible in

evidence, and do not affirmatively show that the affiant is competent to testify to

the matters stated therein. The affiant states that she prepared the affidavit based on the institutional files of the named plaintiffs but the files are not part of the record because the District did not attach them as exhibits or attach summaries that satisfy FRE 1006. As an evidentiary matter, the allegations in the affidavit are objectionable because they are hearsay, and the affidavit does not indicate they were made on personal knowledge. Such an affidavit standing alone is insufficient to support a claim for summary judgment.

Plaintiff is not waiving evidentiary objections to allegations in the Ireland declarations by not making them here. Plaintiffs will make evidentiary objections when plaintiffs respond to the motion on the merits or in a separate motion to strike the affidavit.

3.    **Plaintiffs cannot respond to challenges to the lengths of their overdetentions until plaintiffs can obtain discovery**

Plaintiffs cannot respond to challenges to the lengths of their overdetentions until plaintiffs can obtain discovery on the named plaintiffs' institutional files.

Thus far, plaintiffs have been able to obtain documents needed to analyze the District's contentions regarding the length of overdetentions of the named plaintiffs' only for Mr. Williams. (Counsel for the District provided the Department of Corrections' institutional file for Mr. Williams to undersigned

counsel on Friday, 7/28/06.) However, as set forth below, the District's analysis of

Mr. Williams' overdetention is flawed. Ms. Baker, counsel for the District,

contends on the basis of Ms. Ireland's affidavit that he was overdetained for only

two when, as a matter of fact, the documents show he was overdetained from

2/8/06 until 3/1/06, a total of 21 days. The flaws in the District's analysis of Mr.

Williams' overdetention cast doubt on the District's analysis of the lengths of

overdetention of the other named plaintiffs as well. Plaintiffs also need discovery

to establish the <u>Monell</u> claims pled in the Second Amended Complaint.

**4.    Plaintiffs have submitted affidavits sufficient to show that discovery will
enable them to produce affidavits and other Rule 56(e) evidence sufficient to
oppose the District's motion for summary judgment**

Plaintiffs' legal theory is that (1) the named plaintiffs were overdetained; (2)

the District has a custom of overdetaining persons incarcerated by the District; and

(3) and the District is deliberately indifferent to the overdetentions because the

District maintains a release system "that simply delays all releases until the system,

in its sweet time, and with the resources it chooses . . . is ready to make releases."

<u>See</u> <u>Berry v. Baca</u>, 379 F.3d at 768.

Plaintiffs pled the sufficient facts in support of this theory in their second

amended complaint at ¶ ¶ 34, 36, 37, 72 and 80-81 under Fed. R. Civ. P. 8.

<u>Atchison v. District of Columbia</u>, 73 F.3d 418, 423 (D.C. Cir. 1996)(plaintiff

satisfies Rule 8 in § 1983 <u>Monell</u> claims by alleging (i) failure to train (ii) and an

unusually serious instance of misconduct that on its face raises doubts about its

training policies); <u>Miller v. Caldera</u>, 138 F. Supp. 2d 10, 12 (D.D.C. 2001) ("A

complaint ... need not allege all that a plaintiff must eventually prove.") <u>citing</u>

<u>Atchinson</u>, 73 F.3d at 421-22.

   Plaintiffs also have previously submitted in support of their motion to certify

affidavits from the named plaintiffs and approximately 15 other persons who have

been overdetained in the class period which plaintiffs incorporate by reference

here. Plaintiffs' Exhibits ## 1-14, 16-22 (affidavits of persons overdetained in the

class period). Plaintiffs submit herewith affidavits from six more persons who have

been overdetained. Plaintiffs' Exhibits ## 37-42 (affidavits of persons overdetained

in the class period).  Plaintiffs have also submitted affidavits from named Plaintiff

Peterson (Plaintiffs' Exhibit # 30) and Lead managing counsel William Claiborne

(Plaintiffs' Exhibit # 29). The affidavit of the Records Office administrator Paige

Ireland and affidavits submitted by plaintiffs establish that the District has tolerated

for years a system that cannot reliably and promptly transmit release date on in-

custody defendants from the courtroom to the Records Office. These affidavits are

sufficient justify plaintiffs contention that the named plaintiffs were overdetained,

and that the District there is a custom of overdetentions and the District is

deliberately indifferent to it, and that discovery will produce "additional

development of facts [which] might illuminate the issues of law requiring

decision." <u>Bynum</u>, 215 F.R.D. at 2.

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND WHY IT IS FLAWED; MS. IRELAND'S AFFIDAVIT AND THE DISTRICT'S MOTION ESTABLISH DISTRICT HAS NO FUNCTIONING INMATE MANAGEMENT SYSTEM</u>

The District's motion in large part is based on the contention that the named

plaintiffs' lengths of overdetention (and in the case of Mr. Malloy, the fact of his

overdetention) are overstated.  Motion at pages 5-6. However, the District's

method of calculating overdetentions is flawed, as an examination of the District's

analysis of Mr. Williams' overdetention shows, because the District calculates

overdetentions from the time the Records Office receives release orders until the

time of release, rather than from the time the Superior Court judges issue release

orders until the time of release, and the District believes the DOC rather than the

Government of the District of Columbia is the proper defendant; the District is

using DC Code § 24-211.02(b)(6) (Central Detention Facility may not between

10:00 pm and 7:00 am) to hide a release system "that simply delays all releases

until the system, in its sweet time, and with the resources it chooses . . . is ready to

make releases."  The District has no functioning inmate management system. For

example, as Ms. Ireland's affidavit shows, the District has no system for promptly

and reliably communicating release decisions about in-custody defendants from the Superior Court courtrooms where judges make the release decisions to the Records Office where staff process the release orders, so the District is unable to make prompt releases.

## 1.    District's motion for summary judgment

The District's motion contends:

(1)    the named plaintiffs were not overdetained as long as plaintiffs claim in their second amended complaint (and, the District contends, Toney Malloy was not overdetained at all), District's motion at pages 5-6;

(2)    in any event, the named plaintiffs' overdetentions do not rise to a constitutional violation, District's motion at 11;

(3)    the named plaintiffs' overdetentions were isolated events rather than caused by any policy or custom of the District, District's motion at 11.

## 2.    Defendant's method of calculating overdetentions is flawed

The District's motion in large part is based on the contention that the named plaintiffs' lengths of overdetention (and in the case of Mr. Malloy, the fact of his

overdetention) are overstated.  Motion at pages 5-6. However, the District's

method of calculating overdetentions is flawed.  The District contends that it is not

responsible for overdetentions until the **Records Office** receives the release orders

or other judicial paperwork ordering an inmate's release. District's motion at pages

5 and 6 and in footnotes 1-6. For example, on page 6 and in footnote 6 the District

Maurice Williams was overdetained for only 2 days because the Department of

Corrections did not receive the Superior Court release order (entered by a Superior

Court judge on 2/8/06) until 3/1/06. But, the cases universally hold that

overdetentions involving release orders (as opposed to releases after a period of

confinement) are measured from the time the judge issues the release order and not

from the time the jail receives the release order. Jones v. Cochran, 1994 U.S. Dist.

LEXIS 20625 (S.D. Fla. 1994)(three hours); Arline v. City of Jacksonville, 359 F.

Supp. 2d 1300 at 8 (M.D.Fla.2005) (approximately two and a half hours); Parilla v.

Eslinger, 2005 U.S. Dist. LEXIS 34747 (D. Fla. 2005)(approximately five hours

after court ordered released and 14 hours after family paid bond); Young v. City of

Little Rock, 249 F.3d 730 (8th Cir. 2001)(1/2 hour); Lewis v. O'Grady, 853 F.2d

1366, 1370 (7th Cir. 1988); Berry v. Baca, 379 F.3d at768.

　　　This seems to be because the District seems to think that the defendant in the

case is the Department of Corrections and not the District of Columbia.

### 3.    Plaintiffs' overdetention definition follows the law and excludes persons overdetained by variable, daily factors not attributable to the collapse of the inmate management system

Overdetentions of in-custody defendants ordered released at court hearings in excess of a few hours are presumptively unreasonable, and must be justified by the defendant. This is especially true where there is a pervasive and persistent pattern of overdetentions, as here. District courts have held that post-release detentions of just a few hours are actionable under the fourth and fourteenth amendments. Jones v. Cochran, 1994 U.S. Dist. LEXIS 20625 (S.D. Fla. 1994)(three hours); Arline v. City of Jacksonville, 359 F. Supp. 2d 1300 at 8 (M.D.Fla.2005) (approximately two and a half hours); Parilla v. Eslinger, 2005 U.S. Dist. LEXIS 34747 (D. Fla. 2005)(approximately five hours after court ordered released and 14 hours after family paid bond). Courts of Appeals have held that post-release detentions ranging from ½ hour, Young v. City of Little Rock, 249 F.3d 730 (8th Cir. 2001), to 11 hours, Lewis v. O'Grady, 853 F.2d 1366, 1370 (7th Cir. 1988), to 29 hours, Berry v. Baca, 379 F.3d at768, are actionable.

Generally, the reasonableness of an overdetention is based on the facts and circumstances of the overdetention.  Therefore, Plaintiffs overdetention class definition accommodates the fact that the Constitution allows defendant some time to perform the administrative functions incident to processing an inmate's release

from custody by excluding people held less than the time needed to perform administrative processing-out functions[2] (about eight hours). Thus, the Overdetention Class definition does not treat someone as overdetained until midnight of his Release Date and so the Overdetention Class definition sets an overdetention "floor" of midnight of the Release Date. This definition excludes persons overdetained by variable, daily factors not attributable to the collapse of the inmate management system (e.g. bus breakdowns, large numbers of court returns that day). Since persons whose overdetention is attributable to daily variables such as bus schedules are excluded, the class definition leaves only persons whose unconstitutional overdetention is attributable to the problems of the inmate management system. Thus, the class definition also obviates the need for individualized inquiries into the cause of overdetentions in individual cases.

**4.      Maurice Williams' Overdetention**

Maurice Williams was overdetained in the DC Jail from 2/8/06 to 3/1/06. Ms Baker, counsel for the District, errs when she says on page 6 of the District's motion that Mr. Williams was over detained for only two days.

**1.      District's Account Of Maurice Williams' Overdetention**

---

[2] The actual time defendant is allowed to process the release of someone ordered release is the crux of the overdetention claim. The Atlanta Journal Constitution newspaper article attached as Plaintiffs' Exhibit # 43 says that most large

Ms. Ireland in her affidavit says the following about Mr. Williams:

**Maurice Williams**. This inmate was held on three charges. He was sentenced on February 27, 2006 on two charges to time served, but DOC did not receive that release order until March 1, 2006. That order indicated a release date of February 8, 2006. Inmate Williams was released on March 1, 2006. True and correct copies of documents regarding inmate Williams are attached hereto as Exhibit "E" and made a part hereof.

Counsel for the District relies on this affidavit to conclude that Mr. Williams was over detained for 2 days. District's motion at page 6.  Footnote six of the District's motion tracks the language of Ms. Ireland's affidavit but does not explain why she concludes that Mr. Williams was over detained only 2 days.

### 2.     Plaintiffs' Analysis Of Maurice Williams' Overdetention

An analysis of the publicly available records relating to Mr. Williams' February 2006 detention indicates that Mr. Williams should have been released on 2/8/06, and that he was held illegally in the DC Jail from 2/8/06 until 3/1/06. Nothing in the copy of Mr. Williams' Department of Corrections file provided by counsel for the District to undersigned counsel affects this analysis. The events resulting from Mr. Williams arrest and incarceration on 2/2/06 in chronological order and the documents establishing the chronology are:

---

metropolitan counties in Georgia make releases in 3 to 8 hours. LA County makes releases in about 8 hours.

**February 1, 2006 Background**: As of February 1, 2006 Mr. Williams was on probation[3] on two cases, 04cmd6502 and 05cmd9764.

**February 2, 2006 arrest, presentment and detention on traffic charge**: On 2/1/06 or 2/2/06 Mr. Williams was arrested and charged with several traffic offenses in case 06ctf2022. A copy of the Superior Court docket sheet in case 06ctf2022 is attached as Plaintiffs' Exhibit # 34. The docket sheet in 06ctf2022 (pages 4, 5, and 6 of Plaintiffs' Exhibit # 34) shows that at presentment on 2/2/06 the presentment Court (Judge McCarthy) ordered Mr. Williams held on a "five day hold" because he was on probation in cases 04cmd6502 and 05cmd9764 at the time of his arrest and presentment in 06ctf2022. Pursuant to D.C. Code § 23-1322(a)(1)(C) the presentment judge must order an arrested person arrested while on probation held for at least 5 business days if the judge finds probable cause and must also direct the prosecuting attorney to notify the probation officer or sentencing court. The docket sheet in 06ctf2022 (page 6 of Plaintiffs' Exhibit # 34) shows that a detention hearing in 06ctf2022 was scheduled for 2/8/06. The detention order in case 06ctf2022 (page 7 of Plaintiffs' Exhibit # 34) shows Mr. Williams was due back in Superior Court on 2/8/06. The presentment Court also

---

3 The Honorable James E. Boasberg of the Superior Court had sentenced Mr. Williams to probation on these cases on 9/29/05 in a plea deal in which Mr. Mr. Williams had pled guilty to 04cmd6502 and 05cmd9764 and the government had dismissed 04cmd5291.

directed the prosecutor to notify Mr. Williams' probation officer of the traffic re-arrest in 06ctf2022.

**February 3, 2006 probation report recommending show cause in misdemeanor cases**: The probation officer in cases 04cmd6502 and 05cmd9764 filed a report dated 2/3/06 with the sentencing judge in cases 04cmd6502 and 05cmd9764 recommending a show cause. Plaintiffs' Exhibit # 35, pages 3-5. The probation report in cases 04cmd6502 and 05cmd9764 does not recommend incarceration. Id at page 5.

**February 8, 2006 five day hold dissolved; no detention order on any case; illegal detention begins; illegal strip search**: A five day hold hearing was held pursuant to D.C. Code § 23-1322 (d)(1) on 2/8/06. Plaintiffs' Exhibit # 34, page 8. The Court **did not order**[4] **holds** in either 04cmd6502 or 05cmd9764. Moreover, the Court ordered Mr. Williams released in 06ctf2022. Plaintiffs' Exhibit # 34, page 9. The docket sheet reads: "Release Order – Jail sent on: 2/8/2006 18:51:24." The 2/8/06 release order in 06ctf2022 is at page 10 in Plaintiffs' Exhibit # 34. At this point, the detention order holding Mr. Williams in 06ctf2022 – the only order holding Mr. Williams – was dissolved by the release order at page 10 in Plaintiffs' Exhibit # 34. But, the Records Office did not process the release order in

06ctf2022. In fact, the Records Office continued to show Mr. Williams subject to a hold in 06ctf2022.

**February 14, 2006 show cause order issued:** On 2/14/06, Judge Boasberg issued a show-cause order in 05-9764 and a copy was mailed to Mr. Williams' address. The docket sheets for 04cmd6502 (Plaintiffs' Exhibit # 32) and 05cmd9764 (Plaintiffs' Exhibit # 33) show that no detention order for either of these two cases had been issued since the 2/2/06 re-arrest in 06ctf2022 or the 2/28/06 five day hold hearing.

**February 27, 2006 Mr. Williams sentenced to time-served on misdemeanor probation cases but not released; illegal detention continues; illegal strip search**: On 2/27/06 Judge Boasberg sentenced Mr. Williams to time-served and extended his probation on 04cmd6502 (Plaintiffs' Exhibit # 32, page 8) and 05cmd9764 (Plaintiffs' Exhibit # 33, page 3). But, instead of being released, Mr. Williams was returned to DC Jail, and subjected to a strip search.

**March 1, 2006 Mr. Williams finally released; illegal strip search**

---

4 It is clear from the docket sheets in 04cmd6502 and 05cmd9764 that Mr. Williams was not ordered held in these cases because the docket sheets do not indicate any holds were ordered.

**5.     District is hiding its dysfunctional inmate management system behind DC Code § 24-211.02(b)(6)**

Additionally, the District of Columbia law embargoing releases from the "Central Detention Facility" between 10:00 pm and 7:00 am, DC Code § 24-211.02(b)(6), is not a defense to overdetentions when the District stops processing releases between 10:00 pm and 7:00 am. The District is hiding behind the statute to protect itself from liability for a release system "that simply delays all releases until the system, in its sweet time, and with the resources it chooses . . . is ready to make releases." See Berry v. Baca, 379 F.3d 764, 768 (9th Cir. 2004).  The statute embargos **releases** at night, not the **processing** of releases at night.  But, the District does not continue processing releases overnight so that it is ready to make releases at 7:00 am. Instead, the District halts all release activity, including the processing of releases, and not just opening the jailhouse doors during that time, so that rather than being able to make releases as soon as the black out time is over, it just starts processing releases at that time, so persons arriving at the jail too late to be released on the day the of their Release Dates must wait until the evening of the next day to get release. See footnotes 3, 4 and 5, District had release orders for plaintiffs Barnes, Hawkins and Peterson on one day but did not make releases until the next day, because of release-embargo in DC Code § 24-211.02(b)(6). As applied, the statute is unconstitutional.

**6.    There is a pattern of overdetentions caused by lack of an effective inmate management systems that states a Monell claim under § 1983**

Finally, the District contends that the overdetentions of the named plaintiffs are isolated incidents rather than result of a custom of overdetentions. District's motion at 11.  But, Paige Ireland's affidavit does not assert facts in support of the District's contention. The affidavit merely asserts that Mr. Peterson's overdetention was caused by a computer malfunction, page 2, and lists administrative tasks involved in making releases, page 8.  But, the mere existence of a single computer malfunction or the existence of administrative tasks that must be performed before releasing inmates does not establish the non-existence of a custom of overdetentions that is the moving force of the overdetentions.  What is important is the District's response over time. In fact, as described below, the District's own affidavit contains facts establishing that the District maintains a release system "that simply delays all releases until the system, in its sweet time, and with the resources it chooses . . . is ready to make releases," <u>Berry v. Baca</u>, 379 F.3d at 768, because there is a pattern of the DC Jail admitting inmates without court paperwork and of the Records Office of not receiving releases until days or weeks after judges issued them.

**7.      The District's own affidavit tends to establish Plaintiffs' Monell claim because it establishes that the District does not have a reliable system for promptly communicating release data about in-custody defendants to the Records Office**

According to Ms. Ireland's affidavit, 4 of the 5 named plaintiffs' overdetentions involved release orders that did not make it the Records Office on a timely basis.  Paragraph 4 of the affidavit says that a judge ordered Dernard Hawkins released on 2/15/06 but the Records Office did not receive a copy of the release order until late on the evening of 2/21/06. Paragraph 5 says that a judge ordered David Peterson released on 2/19/06 but the DC Jail did not release him until it received an order on 2/21/06. Paragraph 6 says that Carl Barnes was admitted to the DC Jail on 2/15/06 but that documents necessary to calculate his release date did not arrive until 2/17/06.  Paragraph 6 implies that a judge issued a release order on 2/8/06 ordering Mr. Williams released (and Plaintiffs' Exhibit # 34, page 10, copy of the release order, and page 9, docket entry, confirms that the judge issued a release order on 2/8/06) but the Ireland affidavits says that the Records Office did not receive the release order until 3/1/06.  These facts (along with two of the new affidavits from overdetained persons submitted in support of this Rule 56(f) motion from persons who say that DC Jail staff told them or their families that their overdetention was due to not having court paperwork, Plaintiffs'

Exhibit ## 37 and 40) establish that the District does not have a reliable system for transmitting release data about in-custody defendants from the Superior Court courtrooms where release decisions about in-custody defendants are made to the Records Office where release decisions are processed.

**8.      The District's own affidavit establishes that the DC Jail regularly admits court returns without judicial paperwork**  Failure to receive release orders and admitting court returns without judicial paperwork are flip sides of the same coin. If the Records Office does not receive release orders for days, then it stands to reason that the DC Jail and CTF must be admitting court returns back into their facilities without paperwork or (in the case of court returns sent to court for more than one case) without all paperwork from all their cases. Therefore, a corollary of the Records Office receiving release orders days and weeks after judges issue them is that the DC Jail is admitting court returns back into the DC Jail without release or commitment orders. This problem of the Records Office not receiving release orders issued by the Superior Court judges in a timely manner and the DC Jail admitting court returns without judicial orders in all cases is a major cause of overdetentions at the DC Jail. For example, in Mr. Williams' case, the only detention order holding him was superseded[5] by a release order issued

---

[5] In the case of a person held in a pre-conviction status on a commitment order, the basis for the detention expires when the court enters a release order.  Slone v.

2/8/06 and the Ireland affidavit says that the Records Office did not receive it until 3/1/06, 21 days later. This means that on 2/8/06 the DC Jail admitted Mr. Williams and booked him back into the jail without any judicial orders. He remained in the DC Jail by virtue of the original 2/2/06 detention order until his release on 3/1/06.

Booking Mr. Williams back into the DC Jail on 2/8/06 without court paperwork had the additional consequence of making it impossible for Jail staff to identify him as a court return entitled to release and so divert him to the off site facility where he could be out-processed without being strip searched. Mr. Williams was subjected to illegal strip searches on 2/8/06, 2/27/06 (when he was returned to the DC Jail after his probation hearings) and upon discharge.

Accepting inmates from Superior Court without court orders is one of the major causes of overdetentions at the DC Jail because the DC Jail does not maintain its own calendaring system for court events for un-sentenced inmates. The Superior Court would not have called for Mr. Williams for another court event in either 06ctf2022 or 04cmd6502 and 05cmd9764 because Superior Court records showed Mr. Williams as released in all of these cases. This is exactly how Joseph Heard was overdetained for two years in the DC Jail. Mr. Heard went from the DC Jail to Superior Court for a court event, the Superior Court judge dismissed his last

---

Herman, 983 F.2d 107 (8th Cir. 1993) (prison official who refused to release inmate after court order suspended sentence violated inmate's due process rights).

court case, but Mr. Heard was returned to the DC Jail without a release order. The Records Office put him back in jail, and the DC Jail forgot about him because the Superior Court never called for him (his case had been dismissed) and the DC Jail does not keep a calendaring system for inmates, or run checks on un-sentenced persons held more than 60 days without a court event.

This problem of overdetention orders issued by Superior Court judges not reaching the Records Office and the corresponding Department of Corrections admitting inmates without commitment or release orders or other paperwork issued by a judge is an ancient one. In July 2002 the Chief Judge of the Superior Court Rufus King issued Administrative Order No. 02-22 (dated July 25, 2002) noting that "occurrence of erroneous and/or late releases from the D.C. Jail has increased over the past several months," and ordering that US Marshals (1) not remove any in-custody defendant from the courtroom until the appropriate paperwork has been completed by the courtroom clerk and signed off on by the judge; and (2) not return any in-custody defendants to the DC Jail unless the Marshals had "paperwork in all [their] corresponding cases." "Handling of In-Custody-Defendants," Administrative Order No. 02-22, District of Columbia Superior Court, Chief Judge Rufus King, III, July 25, 2002.  Superior Court website, http://www.dccourts.gov/dccourts/docs/02-22.pdf. copy attached as Plaintiffs' Exhibit # 31.

The American Correctional Association's Standards for Adult Local Detention Facilities require an inmate population accounting system that includes records on the admission, processing, and release of inmates. American Correctional Association's Standards for Adult Local Detention Facilities, 3d ("ACA Standards"), 3-ALDF-1F-04. ACA Standards 3-ALDF-1F-01 to 11 are attached as Plaintiffs' Exhibit 36. The ACA Standards also require a detention facility to record for every person booked into the facility booking information including the date and duration of confinement, and a copy of the court order or other basis of confinement. ACA Standards 3-ALDF-1F-07. The ACA Standards also require a detention facility to make a determination for every person admitted to the facility that the inmate is legally committed to the facility. Id.

**9.      Problems with communicating release data from Superior Court to Records Office caused in part by the system the District has set up to handle the release of in-custody defendants ordered released at a court event at the Superior Court**

Problems with communicating release data from the Superior Court courtrooms to the Records Office is caused in large part by the system the District has set up to handle the release of in-custody defendants ordered released at court events at the Superior Court. The District of Columbia inmate management system for managing the flow of in-custody defendants to and from the District of

Columbia Superior Court courthouse for court hearings has three components: (1) the Superior Court system (now Courtview and before late 2005 CIS), (2) the Department of Corrections system (now JACCS and before October 2000, CRYSIS), and (3) transmittal of Superior Court orders between the Superior Court courtroom and the Records Office. This system is actually a combination of two separate, parallel paper driven offender management systems linked by a "sneaker" network in which the systems communicate via paper hand-carried from Superior Court to the DC Jail by the transport officers. The structure of the system invites both "redundancy" problems (the Jail starts the booking process from scratch without using booking data already compiled by the MPD and the Superior Court) and "data transmission" errors (delayed, misplaced, lost court orders) because each of the Superior Court and the Department of Corrections has its own "booking" protocol for obtaining intake information from offenders, its own paper system for processing and storing data obtained from offenders, and its own computer system, and communication between the two systems is by a "sneaker network," that is, hand carried documents, rather than by electronic transmission. As described below, many of the problems inherent in this system are exacerbated by the lack of electronic communication between the two systems, which requires that paperwork be hand carried between the two systems, and which inhibits a unified booking system. An electronic solution is needed to fix the problem. An electronic solution is workable. The MPD and the Superior Court have a unified booking system in

which data about persons arrested and booked into the MPD computerized booking

database is transmitted electronically to the Superior Court system, obviating lost

data and the need to book the same person twice.

This type of system, a "paper-driven system, which is nearly defenseless to

clerical error, is ultimately doomed to produce over-detentions and mistaken

releases." Los Angeles County Sheriff's Department 7th Semiannual Report[6],

Special Counsel Merrick J. Bobb (April 1997) at 4-5 (describing Los Angeles

County inmate management system identical to the District of Columbia system)

_____

[6] In 1993 the Los Angeles County Board of Supervisors appointed a special
counsel (Merrick Bobb) and staff to conduct ongoing monitoring and critical
review of the Los Angeles County Sheriff's Department's ("LASD") performance
and to publish semiannual reports setting forth their findings. At the request of the
Board and the sheriff, special counsel has also participated in the formulation and
implementation of risk and liability management strategies with the LASD.

Since at least April 1997, in the 7th Semi-annual report, the special counsel
has devoted a great deal of attention to the Los Angeles County Jail. The Los
Angeles Jail is the largest jail in the world, serving 42 courthouses in a geographic
area the size of Switzerland. The Los Angeles County has the same type of system
as the District of Columbia for moving inmates to and from the jail and the
courthouses for court appearances. The courts have a different computer system
from the jail, and these is no electronic communication between the two systems.
Court orders are hand carried by sheriff's deputies between the courthouses and the
jail on the buses that carry inmates back and forth to court. Until 2001, when the
sheriff changed his practices in response to a series of class action lawsuits, the
sheriff transported all court returns back to the jail after court, and strip searched
all court returns, even those entitled to release by virtue of their court appearances,
before processing releases. The jail developed a program for identifying likely
releases, and releasing them from the courthouse. The court release program is
discussed below.

(available at http://lacounty.info/7th_Shrf_Rpt.pdf).  The outmoded system has a structure that simply cannot support the weight of the daily flow of inmates going between the courthouses and the DC Jail.  Moreover, the system is poorly administered, mainly because of problems in the DC Jail's Records Office, which compounds the structural problems.

**10.** **Returning court returns to the DC Jail or CTF for processing before release rather than making court house releases exacerbates the overdetention problem and creates the strip search problem**

Returning court returns to the DC Jail or CTF for processing before release rather than making court house releases exacerbates the overdetention problem because frequently the DC Jail or CTF admit court returns without court paperwork, as Ms. Ireland's affidavit and Chief Judge King's administrative order show.  Upon his arrival at the DC Jail, the in-custody defendant is booked back into the DC Jail, subjected to a strip search and a visual body cavity search, and detained or released depending on an examination of his court orders, his institutional file and a check of warrants and detainers.  The processing of a court returns paperwork sometimes happens on the same day that he returned from court, but frequently does not happen until the next day or much longer. The only reason the District does not make courthouse releases is because the Records Office cannot provide reliable release data on a same-day basis.

**11.    Electronic Solutions to problem and lessons from the LA County Jail**

The key to solving the overdetention problem and the strip search problem

within the current structure is (1) implementing a system for promptly and reliably

communicating release data from the courtrooms to the Records Office; (3) fixing

the Records Office so that it can track inmates and generate reliable release

information; and (3) releasing court returns entitled to release by virtue of their

court appearances directly from the courthouse.  Of course, the ultimate solution

lies in the introduction of global booking and tracking system for use by the MPD,

the Superior Court and the DOC. As the Bobb Report said of the similar system

employed by LA County:

> "what is needed is a consolidated information system fed by timely
> and accurate information from the courts, the district attorney, local,
> state, and federal databases, and from data within the Sheriff's
> Department itself.  In order to perform due diligence on an inmate for
> purposes of identification, classification, assignment to a CBAC,
> provision of adequate medical and mental health care while in jail, or
> release, it is necessary to be able to access complete and
> comprehensive data.  We call on the Board of Supervisors to order a
> detailed plan for developing the needed automated data system
> described above."

Los Angeles County Sheriff's Department 7th Semiannual Report, at 28-29.

The Los Angeles Jail recently solved a similar overdetention problem.  LA

County maintained the same kind of inmate management system as the District of

Columbia, that is, a court computer and a jail computer connected by sheriff's

deputies transporting inmates and their paperwork between the courthouse and the jail (actually an inmate reception center that processed all intakes into the various jails). The sheriff transported all in-custody defendants back to the jail after their court appearances, even those ordered released, to process their paperwork and to run checks for warrants and detainers on the inmates before releasing them. Like the DC Jail, the LA county subjected all court returns to blanket strip searches. Like the DC Jail, the LA county jail suffered from a premature release problem.

LA County discovered that the key to relieving the overdetention and premature release problem was releasing court returns entitled to release from the courthouse. A standing committee on the LA County sheriffs' office that has been studying the jail and issuing reports and recommendations since 1996 found that sending court returns back to the Jail for release (1) exacerbated the overdetention problem, because many overdetentions result from illegible, misplaced or lost court orders connected with court returns, and committing court returns back into the DC Jail only further taxes an already overburdened system; and (2) created the strip search problem in the first place, because if court returns entitled to release by virtue of their court appearances were released from the courthouse they would not have to go back to the Jail, and thus would not present a security issue.

The 2003 17th Semi-annual report explains in detail how instituting a court release program reduced overdetentions and erroneous releases and completely eliminated the illegal strip search problem.  http://lacounty.info/mbobb17.pdf.

WHEREFORE, Plaintiffs respectfully moves this Court to grant the relief requested above.

Respectfully submitted,

_____/sig/_____
WILLIAM CLAIBORNE
D.C. Bar # 446579
717 D Street, N.W.
Suite 210
Washington, DC 20004
Phone: 202/824-0700
Fax: 202/824-0745