United States General Accounting Office

# GAO

## Testimony

Before the Subcommittee on the District of Columbia, Committee on Government Reform, House of Representatives

For Release on Delivery
Expected at 10:00 a.m. EDT
Friday, May 11, 2001

# D.C. CRIMINAL JUSTICE SYSTEM

# Better Coordination Needed Among Participating Agencies

Statement of Richard M. Stana, Director, Justice Issues





GAO
Accountability * Integrity * Reliability

GAO-01-708T

1449-501957

0045- 001

Madam Chairwoman and Members of the Subcommittee:

I am pleased to be here today to discuss our recent report on the District of Columbia (D.C.) criminal justice system.[1] The D.C. criminal justice system has a unique structure consisting of D.C., federal, and federally funded D.C. agencies. In addition, over 30 law enforcement agencies other than the Metropolitan Police Department (MPDC) have a presence in D.C. To maximize their effectiveness, these agencies need to coordinate their efforts. However, we found that because of the different sources of funding, reporting structures, and organizational perspectives of the various agencies involved in the D.C. criminal justice system, it has been difficult to take a coordinated approach to identifying and addressing problem areas that balances competing institutional interests. One reason for this is that the costs of coordinating activities and taking corrective actions may fall on one or more federally funded agencies, while any savings may accrue to one or more D.C. funded agencies, or vice versa. In the absence of a single hierarchy and funding structure, agencies have generally acted in their own interests rather than in the interest of the system as a whole.

The Criminal Justice Coordinating Council for the District of Columbia (CJCC) is the primary venue in which D.C. criminal justice agencies can identify and address interagency coordination issues. CJCC was created in 1998 by the agreement of its members[2] and was funded by the D.C. Control

---

[1] *D.C. Criminal Justice System: Better Coordination Needed Among Participating Agencies* (GAO-01-187, Mar. 30, 2001).

[2] Members include the D.C. Mayor; Deputy Mayor for Public Safety and Justice; Chairman, D.C. Council; Chairman, Committee on Judiciary, D.C. Council; Corrections Trustee; Corporation Counsel; Chief Judge, Superior Court of the District of Columbia (Superior Court); U.S. Attorney for the District of Columbia; Chief, MPDC; Chairman plus a member of the D.C. Financial Responsibility and Management Assistance Authority (commonly called the D.C. Control Board); Director, D.C. Youth Services Administration; Director, District of Columbia Pretrial Services Agency (Pretrial Services); Director, Public Defender Service for the District of Columbia (Defender Service); Director, D.C. Department of Corrections (DOC); Director, Federal Bureau of Prisons (BOP); Chairman, U.S. Parole Commission; and the Acting Director, Court Services and Offender Supervision Agency for the District of Columbia (Court Services).

**1449-501958**

0045- 002

Board. The D.C. Control Board[3] did not fund CJCC for fiscal year 2001, and CJCC's sole remaining staff member is funded by a grant. CJCC has had some success in improving agency coordination, mostly in areas such as data sharing among agency automated data systems where all participants stood to gain from a coordinated approach to a problem. In problem areas where a solution would help one agency possibly at the expense of another, CJCC has been less successful mainly because it lacked the authority to compel agencies to address the issues. However, on balance CJCC has provided a valuable independent forum for discussions of issues affecting multiple agencies.

Our report recommended that Congress fund an independent Criminal Justice Coordinating Council (CJCC) that, among other things, would assist criminal justice agencies in coordinating initiatives to improve the system's operations. In addition, we recommended that CJCC report annually to Congress, the Attorney General, and the D.C. Mayor on its activities, achievements, and issues not yet resolved and why.

## Background

The criminal justice process—from arrest through correctional supervision[4]—in any jurisdiction is generally complex and typically involves a number of participants, including police, prosecutors, defense attorneys, courts, and corrections agencies. Because of the large number of agencies involved, coordination among agencies is necessary for the process to function as efficiently as possible within the requirements of due process. That is, all involved agencies need to work together to ensure proper and efficient system operations, identify any problems that emerge, and decide how best to balance competing interests in resolving these problems. The unique structure and funding of D.C.'s criminal justice system, in which federal and D.C. jurisdictional boundaries and dollars are blended, creates additional coordination challenges. As shown in table 1,

---

[3]Under the statutory terms of its creation, D.C. Control Board activities are to be suspended after the certification of certain specified preconditions. For example, one such requirement is that the Authority certifies that the District has recorded 4 consecutive years of balanced budgets. In fiscal year 2000, D.C. was expected to record its fourth consecutive year of balanced budgets or budget surpluses. On the basis of a projected fourth consecutive year of D.C. budget surpluses, Congress reduced the Control Board's fiscal year 2001 budget, anticipating that the Board would be phasing out its operations in 2001. The Board subsequently decided not to fund CJCC for fiscal year 2001.

[4]Correctional supervision refers to criminal justice system supervision for convicted defendants, including probation, incarceration, and postprison parole or supervised release.

the D.C. criminal justice system consists of four D.C. agencies principally funded through local D.C. funds, six federal agencies, and three D.C. agencies principally funded through federal appropriations.

Table 1: D.C. Criminal Justice System Agencies and Their Principal Source of Funding

| D.C. agencies, D.C. funded | Federal agencies, federally funded | D.C. agencies, federally funded |
|---|---|---|
| Metropolitan Police Department | Office of U.S. Attorney for D.C. | Superior Court |
| Office of Corporation Counsel | Bureau of Prisons | Public Defender Service |
| Department of Corrections | U.S. Marshals Service | Office of the Corrections Trustee |
| Office of the Chief Medical Examiner | U.S. Parole Commission | |
| | Court Services and Offender Supervision Agency for D.C. | |
| | D.C. Pretrial Services Agency | |

Source: GAO analysis.

## D.C.'s Unique Structure Presents Additional Coordination Challenges

According to most officials we interviewed and our own analyses, an overarching problem within the D.C. criminal justice system has been the lack of coordination among all participating agencies. Typically, federal and nonfederal criminal justice systems include the following stages: (1) arrest and booking, (2) charging, (3) initial court appearance, (4) release decision, (5) preliminary hearing, (6) indictment, (7) arraignment, (8) trial, (9) sentencing, and (10) correctional supervision. Most stages require the participation of several agencies that need to coordinate their activities for the system to operate efficiently while also meeting the requirements of due process. That is, all involved agencies need to work together to ensure that their roles and operations mesh well with those of other agencies and to identify any problems that emerge and decide how best to resolve them.

Table 2 shows the stages in D.C.'s criminal justice system and the agencies that participate in each stage. As shown in the table, 7 of the 10 stages typically involve multiple agencies with different sources of funding, which results in different reporting structures and different oversight entities. For example, as many as six agencies—one D.C. (MPDC), three federal (the U.S. Attorney's Office for the District of Columbia (USAO), U.S. Marshals Service, and D.C. Pretrial Services Agency), and two federally funded D.C. agencies (Superior Court and Public Defender Service (Defender Service)—need to coordinate their activities before the

arrestee's initial court appearance for a felony offense can occur.[5] At the latter stages of the system, an offender's sentencing and correctional supervision may require the participation of as many as eight agencies—one D.C.-funded agency (the Department of Corrections (DOC), five federal agencies (USAO, Federal Bureau of Prisons (BOP), U.S. Marshals Service, U.S. Parole Commission, and the Court Services and Offender Supervision Agency (Court Services)), and two federally funded D.C. agencies (Superior Court and Defender Service). At any stage, the participation of other agencies might also be required.[6] In addition, the reporting and funding structure for these participating agencies often differs. For example, USAO, the U.S. Marshals Service, BOP, and the U.S. Parole Commission ultimately report to the U.S. Attorney General and are funded by the appropriations subcommittee that funds the Department of Justice;[7] MPDC and the Office of the Corporation Counsel (Corporation Counsel) ultimately report to the D.C. Mayor; and Superior Court, Defender Service, Pretrial Services, and Court Services are independent of both D.C and the U.S. Department of Justice, submit their budgets to Congress, and are funded by the appropriations subcommittee for D.C.

---

[5] USAO prosecutes felony and serious misdemeanor violations committed by adults in D.C. Corporation Counsel would typically not be involved in prosecutions of adult felony offenses.

[6] For example, the D.C. Office of the Chief Medical Examiner may potentially be used for such purposes as linking a particular suspect to a crime or court testimony regarding autopsy results or toxicological tests.

[7] Subcommittee on the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies, Committee on Appropriations. The House and Senate have subcommittees with identical jurisdictions.

Table 2: D.C. Criminal Justice Agencies Involved in Processing a "Typical" Case Through the Stages of the Criminal Justice System

| Type of agency/ funding | Stages of the criminal justice process (from left to right) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Arrest & booking | Charging | Initial court appearance | Release decision | Prelim. Hearing | Indictment | Arraign-ment | Trial | Senten-cing | Correc-tional super-vision |
| D.C./ D.C. | MPDC | MPDC OCC | OCC | DOC | MPDC OCC | MPDC | | MPDC OCC | | DOC |
| Federal/ federal | | USAO | USAO USMS PSA | USMS PSA | USMS USAO PSA | USMS USAO PSA | USMS USAO PSA | USMS USAO PSA | USMS USAO CSOSA | USMS BOP USPC CSOSA |
| D.C/ federal | | Sup.Ct | Sup.Ct PDS | Sup.Ct PDS | Sup.Ct PDS | Sup.Ct PDS | Sup.Ct PDS | Sup.Ct PDS | Sup.Ct PDS | |

Legend: MPDC = Metropolitan Police, D.C.; OCC = Office of Corporation Counsel; USAO = U.S. Attorney's Office; USMS = U.S. Marshals Service; Sup. Ct = D.C. Superior Court; PDS = Public Defender Service; PSA = Pretrial Services Agency; DOC = Department of Corrections; BOP = Federal Bureau of Prisons; USPC = U.S. Parole Commission; CSOSA = Court Services and Offender Supervision Agency.

Note 1: Any specific case is prosecuted by either Corporation Counsel or USAO, not both. However, in specific circumstances, a case may be referred at some point in the process from one office to the other for prosecution.

Note 2: Defendants who are eligible for a court-appointed attorney may, depending upon several factors, be provided a PDS attorney, or a private attorney. D.C. courts' budget funds private, court-appointed attorneys for criminal defendants.

Note 3: Information from the D.C. Office of the Chief Medical Examiner may potentially be used at any stage in the process from arrest through trial. In addition, forensic evidence and testimony may also be provided by federal agencies that perform certain forensic analyses for D.C., such as the Federal Bureau of Investigation (FBI), Drug Enforcement Administration, or Bureau of Alcohol, Tobacco and Firearms.

Source: GAO analysis of D.C. criminal justice agencies' funding and responsibilities.

## Lack of Coordination Among Agencies

According to most officials we interviewed and our analyses, an overarching problem within the D.C. criminal justice system has been the lack of coordination among all participating agencies. Agency officials pointed to several major problem areas, each the subject of recent studies that have identified coordination issues. The areas included

- scheduling of court cases, which has resulted in the inefficient use of officer, attorney, and court personnel time;
- information technology, which uses more than 70 different systems that are not linked to facilitate the sharing of information;

- correctional supervision, in which poor communication among agencies has led to monitoring lapses with tragic consequences; and
- forensics, in which the sharing of responsibilities among agencies increases the possibility of evidentiary mishaps resulting from lapses in coordination.

### Court Case Scheduling

The scheduling of court cases has had adverse affects on several criminal justice agencies involved in case processing. As shown in table 2, MPDC, prosecutors, Defender Service, U.S. Marshals Service, Pretrial Services, Court Services, and Superior Court could be involved in the court-related processing of a case from the preliminary hearing to the trial and subsequent sentencing. Representatives from several of these agencies are typically required to be present at court trials and hearings. Because specific court times are not established, individuals who are expected to appear in court are required to be present when the court first convenes in the morning. These individuals might be required to wait at the courthouse for some period of time for the case to be called, if (1) more trials or hearings are scheduled than can be conducted, (2) any one of the involved individuals is not present or prepared, or (3) the case is continued for any number of reasons. MPDC recorded that during calendar year 1999 its officers spent 118 full-time staff years in court-related activities such as preliminary hearings and trials. While MPDC officials stated that officers often spent many hours at court waiting for cases to be called, data were not available on the proportion of the 118 full-time staff years that were attributable to actual court time compared to the time spent waiting for cases to be called, including cases that were rescheduled.

CJCC selected the Council for Court Excellence and the Justice Management Institute[8] to conduct a detailed study of criminal justice resource management issues, with particular emphasis on court case processing and the utilization of police resources. In its March 2001 report, the Council for Court Excellence and the Justice Management Institute concluded that major changes were needed in the D.C. criminal justice caseflow system to improve the system's efficiency. Among other things, the report found inefficiencies and counterproductive policies at every stage in case processing. The report also concluded that little use was

---

[8]The Council for Court Excellence and the Justice Management Institute are not-for-profit research organizations that, among other things, evaluate court-related programs and functions.

**1449-501963**

0045- 007

being made of modern technology in the arrest, booking, papering,[9] and court process that could improve system operations.

The Council for Court Excellence and the Justice Management Institute identified priority areas for system improvements, such as redesigning court procedures in misdemeanor cases, improving the methods used to process cases from arrest through initial court appearance by automating the involved processes, and improving the systems used to notify police officers about court dates. Congress provided $1 million for fiscal year 2001 to implement some of the recommended case management initiatives, such as a differentiated case management system for misdemeanors and traffic offenses, the papering pilot project between MPDC and Corporation Counsel, and a mental health pilot treatment project for appropriate, nonviolent pretrial release defendants in coordination with the D.C. Commission on Mental Health Services.

### Criminal Justice Information Systems

D.C.'s criminal justice system is complex, with more than 70 different information systems in use among the various participating agencies. These systems are not linked in a manner that permits timely and useful information sharing among disparate agencies. For example, it is very difficult to obtain data to determine the annual amount of time MPDC officers spend meeting with prosecutors about cases in which prosecutors eventually decide not to file charges against the arrestee. We determined that such an analysis would require data about: (1) MPDC arrests, (2) MPDC officer time and attendance, (3) charges filed by USAO or Corporation Counsel, and (4) Superior Court case dispositions. Such data are currently maintained in separate systems with no reliable tracking number that could be used to link the information in each system for a specific case and no systematic exchange of information. This lack of shared information diminishes the effectiveness of the entire criminal justice system. For example, according to a CJCC official, there is no immediate way for an arresting officer to determine whether an arrestee is on parole or for an arrestee's community supervision officer to know that the parolee had been arrested. Such information could affect both the charging decision and the decision whether or not to release an arrestee from an MPDC holding cell.

---

[9] Papering refers to the face-to-face meeting between an officer knowledgeable about an arrest and a Corporation Counsel or USAO attorney to determine whether or not to prosecute a case.

|  | In 1999, CJCC attempted to address problems with D.C. criminal justice information systems by preparing, among other things, an Information Technology Interagency Agreement that was adopted by CJCC members. The agreement recognized the need for immediate improvement of information technology in the D.C. criminal justice system and established the Information Technology Advisory Committee (ITAC) to serve as the governing body for justice information system development. ITAC recognized that it was difficult for a single agency involved in the criminal justice system to access information systems maintained by other agencies, and pursued developing a system that would allow an agency to share information with all other criminal justice agencies, while maintaining control over its own system. ITAC devised a District of Columbia Justice Information System (JUSTIS).<br><br>In July 2000, CJCC partnered with the D.C. Office of the Chief Technology Officer in contracting with a consulting firm to design JUSTIS based on modern dedicated intranet and Web browser technology. When completed, JUSTIS is to allow each agency to maintain its current information system, while allowing the agency to access selected data from other criminal justice agencies. |
|---|---|
| Correctional Supervision | Effective correctional supervision, which includes probation, incarceration, and post-prison parole or supervised released for convicted defendants, requires effective coordination among participating agencies. In D.C., the stage of the criminal justice system referred to as correctional supervision involves several agencies, including: (1) Superior Court, which sentences convicted defendants and determines whether to revoke a person's release on community supervision; (2) Court Services, which monitors offenders on community supervision; (3) DOC, which primarily supervises misdemeanants sentenced to D.C. Jail or one of several halfway houses in D.C.;[10] (4) BOP, which supervises felons incarcerated in federal prisons; (5) the U.S. Parole Commission, which determines the prison |

---

[10]DOC still has control over three prison facilities within the Lorton Correctional Complex, which is to be closed by December 31, 2001, under the terms of the D.C. Revitalization Act.

release date and conditions of release for D.C. inmates eligible for parole;[11] and (6) the U.S. Marshals Service, which transports prisoners.

Gaps in coordination among agencies may lead to tragic consequences, such as those that occurred in the case of Leo Gonzales Wright, who committed two violent offenses while under the supervision of D.C.'s criminal justice system. Wright, who was paroled in 1993 after serving nearly 17 years of a 15-to-60 year sentence for armed robbery and second degree murder, was arrested in May 1995 for automobile theft charges, which were later dismissed. In June 1995, Wright was arrested for possession with intent to distribute cocaine. However, he was released pending trial for the drug arrest, due in part to miscommunication among agencies. Wright subsequently committed two carjackings, murdering one of his victims. He was convicted in U.S. District Court for the District of Columbia and is currently serving a life without parole sentence in federal prison at Leavenworth, KS.

The outcry over the Wright case resulted in two studies, including a comprehensive review of the processing of Wright's case prepared for the U.S. Attorney General by the Corrections Trustee in October 1999. The report included 24 recommendations to help ensure that instances similar to the Wright case do not occur. In July 2000, the Corrections Trustee issued a progress report on the implementation of recommendations from the October 1999 report. According to the Corrections Trustee, while not all recommendations in the October 1999 report have been fully implemented, progress has been made in addressing several of them. For example, with funds provided by the Corrections Trustee, DOC has purchased a new jail-management information system for tracking inmates and implemented a new policy on escorted inmate trips. In addition, in January 2000, the Corrections Trustee began convening monthly meetings of an Interagency Detention Work Group, whose membership largely parallels that of CJCC. The group and its six subcommittees have focused on such issues as the convicted felon designation and transfer process, and parole and halfway house processing.

---

[11]Inmates convicted in Superior Court prior to the implementation of the new D.C. sentencing guidelines were generally sentenced to a range of years, such as 10 to 20 years. Such inmates could be eligible for parole after serving a specified minimum number of years. Under the terms of the D.C. Revitalization Act, the U.S. Parole Commission is now responsible for determining the parole, or prison release, date for such inmates (Public Law 105-33, Sec. 11231). Under the new sentencing guidelines, which abolished parole, inmates will have to serve at least 85 percent of their sentence before being eligible for release.

|  |  |
|---|---|
|  | In addition to the studies and the actions of the Corrections Trustee, CJCC and Court Services are addressing the monitoring and supervision of offenders. CJCC has begun to address the issues of halfway house management and programs that monitor offenders. Court Services is developing a system in which sanctions are imposed whenever individuals violate conditions of probation or parole. |
| Forensic Capacity and Coordination | Forensics is another area where lack of coordination can have adverse effects.[12] D.C. does not have a comprehensive forensic laboratory to complete forensic analysis for use by police and prosecutors. Instead, MPDC currently uses other organizations such as the FBI, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco and Firearms, and a private laboratory to conduct much of its forensic work. MPDC performs some forensic functions such as crime scene response, firearms testing, and latent print analysis. The Office of the Chief Medical Examiner, a D.C. agency, performs autopsies and certain toxicological tests, such as the testing for the presence of drugs in the body. Coordination among agencies is particularly important because several organizations may be involved in handling and analyzing a piece of evidence. For example, if MPDC finds a gun with a bloody latent fingerprint at a crime scene, the gun would typically need to be examined by both MPDC and the FBI. In order to complete the analysis, multiple forensic disciplines (e.g., DNA or firearm examiners) would need to examine the gun. If the various forensic tests were coordinated in a multidisciplinary approach, forensic examiners would be able to obtain the maximum information from the evidence without the possibility of contaminating it. Such contamination could adversely affect the adjudication and successful resolution of a criminal investigation. |
|  | In April 2000, the National Institute of Justice (NIJ) issued a report on the D.C. criminal justice system's forensic capabilities. The report concluded that D.C. had limited forensic capacity and that limitations in MPDC prevented the effective collection, storage, and processing of crime scene evidence, which ultimately compromised the potential for successful resolution of cases. NIJ-identified deficiencies included, among other things: |

---

[12]Forensics involves a number of disciplines, such as latent prints, firearms/toolmarks, forensic biology (including DNA), toxicology, drug analysis, questioned documents, and trace evidence.

**1449-501967**

0045- 011

- out-of-date technology;
- lengthy delays in processing evidence;
- ineffective communications in the collection, processing, and tracking of evidence from the crime scene; and
- ineffective communications between forensic case examiners and prosecutors.

The NIJ report supported the development of a centralized forensic laboratory that would be shared by MPDC and the D.C. Office of the Chief Medical Examiner. The report did not examine the costs to build a comprehensive forensic laboratory. In his fiscal year 2002 proposed budget, the Mayor has allocated $7.5 million for the development of a forensics laboratory that is designed to be a state-of-the-art, full-service crime laboratory, medical examiner/morgue facility, and public health laboratory that meets all applicable National Lab Standards. We did not independently evaluate the costs and benefits of a comprehensive forensic laboratory. However, such a facility could potentially improve coordination by housing all forensic functions in one location, eliminating the need to transport evidence among multiple, dispersed locations.

## A Coordination Case Study: The Initial Stages of Case Processing

A principal area where D.C.'s unique structure has led to coordination problems is case processing that occurs from the time of arrest through initial court appearance. As shown in table 2, as many as six agencies need to coordinate before an arrested person's initial court appearance for a felony offense can occur.[13] However, we identified several aspects of the current process where a lack of coordination posed problems. For example, unlike many other major metropolitan jurisdictions, prosecutors in D.C. require an officer who is knowledgeable about the facts of the arrest to meet personally with them before they determine whether to formally charge an arrestee with a felony or misdemeanor crime.[14] This process is called papering. During calendar year 1999, papering required the equivalent of 23 full-time officers devoted solely to these appearances, ultimately reducing the number of officers available for patrol duty by an

---

[13]The USAO prosecutes felony and serious misdemeanor violations committed by adults in D.C. Corporation Counsel would typically not be involved in prosecutions of adult felony offenses.

[14]Corporation Counsel and MPDC have agreed to participate in a pilot project in which officers will not be required to meet face to face with prosecutors to charge 17 minor offenses.

equal amount. Efforts in 1998 and 1999 to revise the papering process failed in part because the costs and benefits of the changes under consideration were perceived by one or more participating agencies to be unevenly distributed. We focused our review on offenses prosecuted by the USAO because during 1999 they accounted for over 85 percent of MPDC officer hours expended on papering.

USAO's requirement that MPDC officers personally meet with prosecutors in order to make a charging decision appears to be unusual, particularly for misdemeanors. A 1997 Booz-Allen and Hamilton survey found that in 30 of 38 responding jurisdictions (51 were surveyed), police officers were not required to meet with prosecutors until court (i.e., trial), and in 3 cities officers were not required to appear in person until the preliminary hearing. In addition, we reviewed the charging processes in Philadelphia and Boston. Neither of these cities required face-to-face meetings with prosecutors for processing most cases. According to USAO officials, the current papering process is critical for USAO to make an initial charging decision correctly. Both USAO and MPDC officials said that the paperwork submitted to USAO for charging decisions has been of uneven quality.[16]

## Attempts Have Been Made to Change Initial Stages of Case Processing in D.C.

In the past decade, several attempts have been made to change the initial stages of case processing in D.C. These efforts—which were made by MPDC, Corporation Counsel, and USAO, in conjunction with consulting firms—involved projects in the areas of night papering, night court, and officerless papering. However, the involved agencies never reached agreement on all components of the projects, and each of the projects was ultimately suspended. The Chief of MPDC has publicly advocated the establishment of some type of arrangement for making charging decisions during the evening and/or night police shifts.

### Night Papering and Night Court

Currently, both USAO and Corporation Counsel are only open to paper cases during typical workday hours, that is, generally from about 8:00 a.m. to 5:00 p.m., Monday through Saturday. Night papering could permit officers on evening and night shifts to generally present their paperwork to prosecutors during their shifts. Night court refers to conducting certain

---

[16]There were no data to determine whether the quality of the paperwork was generally better for misdemeanors than for felonies.

|  |  |
|---|---|
|  | court proceedings, such as initial court appearance, during a late evening or night shift. Night papering would require USAO and Corporation Counsel charging attorneys to work evening hours, and night court would involve a much broader commitment of D.C. Superior Court resources as well as the participation of other agencies. |
|  | **Officerless Papering** |
|  | Officerless papering would not require an officer to appear in person before the prosecutor, and provisions could be made for the prosecutor to contact the officer to clarify issues, as needed. In March 2001, MPDC and Corporation Counsel began an officerless papering pilot program for 17 minor offenses prosecuted by Corporation Counsel. |
| Obstacles to Changing Initial Case Processing Stages | In the absence of an automated system for completing and transmitting the forms required for documenting arrests and making charging decisions, simple entry errors resulting from entering the same information multiple times can hamper the initial stages of case processing. USAO has cited such problems as one reason that officers should be required to meet face to face with prosecutors for papering decisions. To the extent that the police do not have a reliable process for reviewing and ensuring the completeness and accuracy of the paperwork submitted to prosecutors, USAO is likely to continue to resist efforts to institute officerless papering. |
|  | Even if these issues were to be successfully addressed, the distribution of costs among the participants in any revised system would still likely pose an obstacle to change. The costs of the current system of processing cases from arrest through initial court appearance are borne principally by MPDC—primarily a locally funded D.C. agency—not USAO or D.C. Superior Court, both of which are federally funded. On the other hand, instituting night papering would likely reduce MPDC's costs, while increasing the costs borne by USAO, Corporation Counsel, and/or D.C. Superior Court, depending upon the approach taken. |
| **CJCC Has Had Some Success as a Coordinating Mechanism** | CJCC is the primary venue in which D.C. criminal justice agencies can identify and address interagency coordination issues. Its funding and staffing have been modest—about $300,000 annually with four staff. CJCC has functioned as an independent entity whose members represent the major organizations within the D.C. criminal justice system. According to many criminal justice officials we spoke with, during its nearly 3-year existence, CJCC has had some success in improving agency coordination, |

mostly in areas where all participants stood to gain from a coordinated approach to a problem. In problem areas where a solution would help one agency possibly at the expense of another, CJCC has been less successful mainly because it lacked the authority to compel agencies to address the issues. However, on balance, CJCC has provided a valuable independent forum for discussions of issues affecting multiple agencies.

The D.C. Control Board[16] did not fund CJCC for fiscal year 2001, and CJCC's sole remaining staff member is funded by a grant. It is not known whether CJCC will continue to formally exist, and if it exists, how it will be funded, whether it will have staff, and whether it will remain independent or under the umbrella of another organization, such as the D.C. Mayor's office. Recently, the Mayor included $169,000 in his fiscal year 2002 proposed budget to fund CJCC. While we welcome the Mayor's support for CJCC, we believe that for CJCC to be most successful it must be viewed as independent by participating agencies.

CJCC has not been required to formally report on its activities, including areas of focus, successes, and areas of continuing discussion and disagreement. The transparency provided by an annual report would help to spotlight areas of accomplishment and continuing disagreement and could assist with oversight by those responsible for funding individual CJCC members.

## Initiatives to Improve the D.C. Criminal Justice System

As of November 2000, CJCC and other agencies involved in the D.C. criminal justice system reported 93 initiatives for improving the operation of the system. Most of these initiatives were ongoing; consequently, their impact had not yet been evaluated. However, we found numerous instances where participating agencies did not agree on an initiative's goals, status, starting date, participating agencies, or results to date. This lack of agreement underscores a lack of coordination among the participating agencies that could reduce the effectiveness of these initiatives.

---

[16] Under the statutory terms of its creation, D.C. Control Board activities are to be suspended after the certification of certain specified preconditions. For example, one such requirement is that the D.C. Control Board certifies that the District has recorded 4 consecutive years of balanced budgets. In fiscal year 2000, D.C. was expected to record its fourth consecutive year of balanced budgets or budget surpluses. On the basis of a projected fourth consecutive year of D.C. budget surpluses, Congress reduced the Control Board's fiscal year 2001 budget, anticipating that the Board would be phasing out its operations in 2001. The Board subsequently decided not to fund CJCC for fiscal year 2001.

1449-501971

0045- 015

## Conclusions

Every criminal justice system faces coordination challenges. However, the unique structure and funding of the D.C. criminal justice system, in which federal and D.C. jurisdictional boundaries and dollars are blended, creates additional challenges.

CJCC has played a useful role in addressing such coordination challenges, especially in areas where agencies perceived a common interest. However, CJCC's uncertain future could leave D.C. without benefit of an independent entity for coordinating the activities of its unique criminal justice system. Funding CJCC through any participating agency diminishes its stature as an independent entity in the eyes of a number of CJCC's member agencies, reducing their willingness to participate. Without a requirement to report successes and areas of continuing discussion and disagreement to each agency's funding source, CJCC's activities, achievements, and areas of disagreement have generally been known only to its participating agencies. This has created little incentive to coordinate for the common good, and all too often agencies have simply "agreed to disagree" without taking action. Furthermore, without a meaningful role in cataloging multiagency initiatives, CJCC has been unable to ensure that criminal justice initiatives are coordinated among all affected agencies to help eliminate duplicative efforts and maximize their effectiveness.

## Matters For Congressional Consideration

In our March 30, 2001, report,[17] we recommended that Congress consider:

- Funding an independent CJCC—with its own director and staff—to help coordinate the operations of the D.C. criminal justice system. Congressional funding ensures that CJCC will retain its identity as an independent body with no formal organizational or funding link to any of its participating members.
- Requiring CJCC to report annually to Congress, the Attorney General, and the D.C. Mayor on its activities, achievements, and issues not yet resolved and why.
- Requiring that all D.C. criminal justice agencies report multiagency initiatives to CJCC, which would serve as a clearinghouse for criminal justice initiatives and highlight for CJCC members those initiatives that warrant further discussion and coordination. This reporting requirement

---

[17] *D.C. Criminal Justice System: Better Coordination Needed Among Participating Agencies* (GAO-01-187, Mar. 30, 2001).

could help improve interagency coordination, promote the adoption of common goals, and help reduce redundant efforts.

Madam Chairwoman, this concludes my prepared statement. I would be pleased to answer any questions that you or other Members of the Subcommittee may have.

## Contacts and Acknowledgment

For further information regarding this testimony, please contact Richard Stana or William Jenkins, Jr. at (202) 512-8777. Individuals making key contributions to this testimony included Mark Tremba and Geoffrey Hamilton.