1 of 1 DOCUMENT

UNITED STATES GENERAL ACCOUNTING OFFICE

GAO Report

D.C. CRIMINAL JUSTICE SYSTEM

Better Coordination Needed Among Participating Agencies

Report to Congressional Committees

March 30, 2001

*GAO-01-187*

**LENGTH:** 78294 words

United States General Accounting Office
Washington, DC 20548

The Honorable Mike DeWine
Chairman
The Honorable Mary L. Landrieu
Ranking Member
Subcommittee on the District of Columbia
Committee on Appropriations
United States Senate

The Honorable George V. Voinovich
Chairman
The Honorable Richard J. Durbin
Ranking Member
Subcommittee on Oversight of Government Management, Restructuring, and the District of Columbia
Committee on Governmental Affairs
United States Senate

The Honorable Joe Knollenberg
Chairman
The Honorable Chaka Fattah
Ranking Minority Member
Subcommittee on the District of Columbia
Committee on Appropriations
House of Representatives

The Honorable Constance A. Morella
Chairman
The Honorable Eleanor Holmes Norton
Ranking Minority Member
Subcommittee on the District of Columbia

**1449-501974**

0046- 001

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Committee on Government Reform
House of Representatives

Congressional, media, and internal scrutiny in recent years has disclosed problems with the D.C. criminal justice system. Some of these problems are the result of coordination problems among multiple agencies. An example is the case of Leo Gonzales Wright, who committed two violent offenses, including a murder, in part because lapses in interagency coordination led to his inappropriate release from supervision of the D.C. criminal justice system.

The criminal justice process--from arrest through correctional supervision n1--in any jurisdiction is generally complex and typically involves a number of participants including police, prosecutors, defense attorneys, courts, and corrections agencies. Because of the large number of agencies involved, coordination among agencies is necessary for the process to function as efficiently as possible within the requirements of due process. That is, all involved agencies need to work together to ensure proper and efficient system operations, identify any problems that emerge, and decide how best to balance competing interests in resolving these problems. The unique structure and funding of D.C.'s criminal justice system, in which federal and D.C. jurisdictional boundaries and dollars are blended, creates additional coordination challenges. The D.C. criminal justice system consists of four D.C. agencies principally funded through local D.C. funds, six federal agencies, and three D.C. agencies principally funded through federal appropriations. Seven of the 10 stages of D.C.'s criminal justice system require coordination among agencies funded by different sources.

    n1 Correctional supervision refers to criminal justice system supervision for convicted defendants, including probation, incarceration, and postprison parole or supervised release.

The fiscal year 2000 District of Columbia Appropriations Act n2 mandated that we conduct a study of the D.C. criminal justice system. In response to the act and discussions with your offices, we obtained information from D.C.'s criminal justice agencies and, as agreed with the committees of jurisdiction, focused on the following objectives:

. Assess how the structure of the D.C. criminal justice system has affected coordination.
. Assess the mechanisms that exist to coordinate the activities of the system.
. Describe current initiatives by federal and D.C. agencies for improving the operation of the D.C. criminal justice system.

    n2 District of Columbia Appropriations Act, 2000 (P. L. 106-113, 113 Stat. 1501, 1532 (1999)).

In addition, the committees of jurisdiction requested that we provide information on D.C. criminal justice agencies, the D.C. Revitalization Act's impact on these agencies, and the case flow processes in D.C.

**Results in Brief**
Because of the different sources of funding, reporting structures, and organizational perspectives of the various agencies involved in the D.C. criminal justice system, it has been difficult to coordinate systemwide activities, reach agreement on the nature of systemwide problems, and take a coordinated approach to addressing problem areas that balances competing institutional interests. One reason for this is that the costs of coordinating activities and taking corrective actions may fall on one or more federally funded agencies, while any savings may accrue to one or more D.C. funded agencies, or vice versa. In the absence of a single hierarchy and funding structure, agencies have generally acted in their own interests rather than in the interest of the system as a whole. According to most officials we interviewed and our

**1449-501975**

0046- 002

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

own analyses, an overarching problem within the D.C. criminal justice system has been the lack of coordination among all participating agencies. Agency officials pointed to several major problem areas, each the subject of recent studies that have identified coordination issues:

. scheduling of court cases, which has resulted in the inefficient use of officer, attorney, and court personnel time;
. information technology, which uses more than 70 different systems that are not linked to facilitate the sharing of information;
. correctional supervision, in which poor communication among agencies has led to monitoring lapses with tragic consequences; and
. forensics, in which the sharing of responsibilities among agencies increases the possibility of evidentiary mishaps resulting from lapses in coordination.

A principal area where D.C.'s unique structure has led to coordination problems is case processing that occurs from the time of arrest through initial court appearance. We reviewed this process as a case study of coordination among D.C. criminal justice agencies. As many as six agencies need to coordinate before an arrested person's initial court appearance for a felony offense can occur. However, we identified several aspects of the current process where a lack of coordination posed problems. For example, unlike many other major metropolitan jurisdictions, prosecutors in D.C. require an officer who is knowledgeable about the facts of the arrest to meet personally with them before they determine whether to formally charge an arrestee with a felony or misdemeanor crime. n3 During calendar year 1999, this requirement required the equivalent of 23 full-time officers devoted solely to these appearances, ultimately reducing the number of officers available for patrol duty by an equal amount. This requirement appears unusual, particularly for misdemeanor cases. A 1997 survey found that in 30 of 38 metropolitan areas responding, officers were not required to meet with prosecutors in misdemeanor cases until court. Although changes to the D.C. process could result in improvements in overall system efficiencies, efforts in 1998 and 1999 to revise the process failed in part because the costs and benefits of the changes under consideration were perceived by one or more participating agencies to be unevenly distributed. Generally, the proposed changes would have decreased costs for the D.C. Metropolitan Police Department (MPDC) but increased costs for the U.S. Attorney's Office for the District of Columbia (USAO) and some other participants.

      n3 D.C.'s Office of the Corporation Counsel (Corporation Counsel) and MPDC have agreed to participate in a pilot project in which officers will not be required to meet face-to-face with prosecutors to charge 17 minor offenses.

The Criminal Justice Coordinating Council for the District of Columbia (CJCC) is the primary venue in which D.C. criminal justice agencies can identify and address interagency coordination issues. CJCC was created in 1998 by the agreement of its members n4 and was funded by the D.C. Control Board. CJCC worked with the 15 participating agencies to study numerous issues, including positive identification of arrestees, halfway house operations, and drug testing and treatment of defendants. During its 2 1/2-year existence, CJCC has had some success in improving agency coordination, mostly in areas such as data sharing among agency automated data systems where all participants stood to gain from a coordinated approach to a problem. In problem areas where a solution would help one agency possibly at the expense of another, CJCC has been less successful mainly because it lacked the authority to compel agencies to address the issues. However, on balance CJCC has provided a valuable independent forum for discussions of issues affecting multiple agencies.

      n4 Members include the D.C. Mayor; Deputy Mayor for Public Safety and Justice; Chairman, D.C. Council; Chairman, Committee on Judiciary, D.C. Council; Corrections Trustee; Corporation Counsel; Chief Judge, Superior Court of the District of Columbia (Superior Court); U.S. Attorney for the District of Columbia; Chief,

**1449-501976**

0046- 003

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

MPDC; Chairman plus a member of the D.C. Financial Responsibility and Management Assistance Authority (commonly called the D.C. Control Board); Director, D.C. Youth Services Administration; Director, District of Columbia Pretrial Services Agency (Pretrial Services); Director, Public Defender Service for the District of Columbia (Defender Service); Director, D.C. Department of Corrections (DOC); Director, Federal Bureau of Prisons (BOP); Chairman, U.S. Parole Commission; and the Acting Director, Court Services and Offender Supervision Agency for the District of Columbia (Court Services).

The D.C. Control Board n5 did not fund CJCC for fiscal year 2001, and CJCC's sole remaining staff member is funded by a grant. We are asking Congress to consider funding CJCC--with its own director and staff--to help coordinate the operations of the D.C. criminal justice system, and to require CJCC to report annually to Congress, the Attorney General, and the D.C. Mayor on the results achieved and issues that require further attention. The transparency provided by an annual report would help to spotlight areas of accomplishment and continuing disagreement and could assist with oversight by those responsible for funding individual CJCC members.

n5 Under the statutory terms of its creation, D.C. Control Board activities are to be suspended after the certification of certain specified preconditions. For example, one such requirement is that the Authority certifies that the District has recorded 4 consecutive years of balanced budgets. In fiscal year 2000, D.C. was expected to record its fourth consecutive year of balanced budgets or budget surpluses. On the basis of a projected fourth consecutive year of D.C. budget surpluses, Congress reduced the Control Board's fiscal year 2001 budget, anticipating that the Board would be phasing out its operations in 2001. The Board subsequently decided not to fund CJCC for fiscal year 2001.

As of November 2000, CJCC and other agencies involved in the D.C. criminal justice system reported 93 initiatives for improving the operation of the system. These initiatives covered a wide range of issues that addressed aspects of the criminal justice process from arrest through correctional supervision. Most of these initiatives were ongoing; and, consequently, their impact had not yet been evaluated. However, we found 62 instances where participating agencies did not agree on an initiative's goals, status, starting date, participating agencies, or results to date. This lack of agreement underscores a lack of coordination among the participating agencies that could reduce the effectiveness of these initiatives. To improve interagency coordination and promote the adoption of common goals, we are asking Congress to consider requiring that all D.C. criminal justice agencies report multiagency initiatives to CJCC, which would serve as a clearinghouse for these initiatives and highlight for CJCC members those initiatives that warrant further discussion and coordination.

**Scope and Methodology**

To assess how the structure of the D.C. criminal justice system affected systemwide operations, we first compiled a detailed description of the system's structure, including its unique attributes. In doing this, we conducted interviews with and obtained and reviewed documents and data from, among other agencies, MPDC, Superior Court, USAO, Corporation Counsel, CJCC, the U.S. Department of Justice, the D.C. Mayor's Office, D.C. Council, Court Services, Pretrial Services, Corrections Trustee, Defender Service, U.S. Marshals Service, and the D.C. Office of the Chief Medical Examiner. We then compiled a list of potential issues. After discussing these potential issues with the committees of jurisdiction, it was agreed that we would rely on other studies for some issues, such as scheduling of cases in Superior Court and forensics, that were the subject of ongoing or recent reviews. We also excluded juvenile justice, an area that involved noncriminal justice agencies such as the D.C. Department of Human Services. However, as requested, we did develop a description of the juvenile justice case flow process (see app. VI). As a case study of coordination issues, we examined D.C.'s method of processing cases from arrest through initial court appearance before Superior Court--an area of concern for many D.C. criminal justice system officials. We compared this process to the

**1449-501977**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

methods used in Philadelphia and Boston. These cities were judgmentally selected because they were both large East Coast cities that had recently revised their methods of processing cases from arrest through initial court appearance.

To assess the mechanisms that exist to coordinate the D.C. criminal justice system, we interviewed agency officials and reviewed agency organizational charts, policies, and procedures. To identify initiatives planned or under way to improve D.C.'s criminal justice process, we requested that each CJCC member agency with responsibilities for adult offenders provide us with a list of initiatives, as of November 2000, and include the goal of each initiative, other participating agencies, the status of the initiative, and any results to date plus any planned or completed evaluations of each initiative. n6 We compared the information provided by participating agencies about individual initiatives to determine whether they were in agreement and contacted agencies to clarify and reconcile these differences. A more detailed description of our objectives, scope, and methodology is found in appendix I.

n6 We did not request initiatives from the D.C. Council or the D.C. Control Board because they are not criminal justice agencies, and we did not include the D.C. Youth Services Administration because the focus of this review is adult offenders.

We performed our work between October 1999 and December 2000 in accordance with generally accepted government auditing standards. We requested written comments on a draft of this report from the Mayor of D.C., Chair of the D.C. Council, Chair of the D.C. Control Board, Chief of the Metropolitan Police Department, U.S. Attorney General, U.S. Attorney for D.C., D.C. Corporation Counsel, Chief Judge of Superior Court of D.C., U.S. Marshal of the Superior Court for D.C., Interim Director of Court Services and Offender Supervision Agency for D.C., Director of D.C. Pretrial Services Agency, D.C. Corrections Trustee, Chief Medical Examiner of D.C., Director of the D.C. Department of Corrections, and the Director of Public Defender Service for D.C.

### Structure of the D.C. Criminal Justice System

The D.C. criminal justice system involves a number of D.C. agencies, federal agencies, and private organizations. n7 These agencies and organizations are funded with congressionally appropriated federal funds and local D.C. funds. Table 1 shows the agencies of the D.C. criminal justice system, whether the agencies are D.C. or federal agencies, and each agency's principal source of funding.

n7 Private organizations include individuals or organizations who are not members of public agencies, but who participate in the criminal justice process, including (1) private attorneys appointed by the D.C. Courts through the D.C. Criminal Justice Act (D.C. Code Title 11, Sections 2601-2609) to represent eligible criminal defendants; (2) private forensic laboratories that perform analysis for D.C. cases; and (3) contract halfway house facilities.

Table 1: D.C. Criminal Justice System Agencies and Their Principal Source of Funding

| D.C. agencies, D.C. funded | Federal agencies, federally funded | D.C. agencies, federally funded |
|---|---|---|
| Metropolitan Police Department | Office of U.S. Attorney for D.C. | Superior Court |
| Office of Corporation | Bureau of Prisons | Defender Service |

1449-501978

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Table 1: D.C. Criminal Justice System Agencies and Their Principal Source of Funding

| D.C. agencies, D.C. funded Counsel | Federal agencies, federally funded | D.C. agencies, federally funded |
|---|---|---|
| Department of Corrections | U.S. Marshals Service | Office of the Corrections Trustee |
| Office of the Chief Medical Examiner | U.S. Parole Commission | |
| | Court Services and Offender Supervision Agency for D.C. | |
| | D.C. Pretrial Services Agency | |

Source: GAO analysis.

Appendix II provides additional information on the agencies involved in the D.C. criminal justice system.

The current structure of the D.C. criminal justice system reflects a number of changes that the National Capital Revitalization and Self-Government Improvement Act of 1997 n8 (D.C. Revitalization Act), as amended, made to D.C.'s criminal justice system. The D.C. Revitalization Act brought a number of D.C. functions, such as sentenced felon incarceration and community supervision, that are normally the responsibility of states rather than cities or counties, under federal funding. Areas affected by the D.C. Revitalization Act included (1) Pretrial Services, (2) Defender Service, (3) Superior Court, (4) sentencing, (5) incarceration, and (6) offender community supervision and parole. Specifically, within the time schedule specified in the D.C. Revitalization Act, these changes included

. federally funding Superior Court, Pretrial Services, and Defender Service;
. transferring sentenced felons from D.C.'s Lorton Correctional Complex to BOP custody and supervision;
. transferring responsibility for parole decisions from the D.C. Parole Board to the U.S. Parole Commission; and
. creating a new federal community supervision agency, Court Services, n9 for those convicted of crimes in D.C. courts.

n8 The National Capital Revitalization and Self-Government Improvement Act of 1997 was enacted as title XI of the Balanced Budget Act of 1997 (Public Law 105-33, 111 Stat. 251, 734 (1997)).

n9 Court Services officially assumed its duties as a federal agency on August 5, 2000.

Appendix III includes details on certain changes made by the D.C. Revitalization Act, as amended.

In many ways, the structure of the D.C. criminal justice system is unique. For example:

. Because of its status as the nation's capital, over 30 law enforcement agencies other than MPDC have a significant presence in D.C. These include the U.S. Capitol Police, the Federal Protective Service, the U.S. Secret Service, and the U.S. Park Police. These and other agencies may make arrests for crimes committed within D.C., and MPDC assists

**1449-501979**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

these other law enforcement agencies by performing functions such as fingerprinting, photographing, and housing arrestees prior to their initial court appearance.
. D.C. has two prosecutors for local crimes. USAO prosecutes felonies, such as homicide or armed robbery, and "serious" misdemeanor violations committed by adults in D.C. Examples of the types of misdemeanors prosecuted by USAO include petty theft, assault, weapon offenses, and narcotics possession. Corporation Counsel, a D.C. agency, prosecutes "minor" misdemeanor violations, such as drinking in public or disorderly conduct, in addition to criminal traffic offenses and offenses committed by children.
. The Criminal Division of Superior Court is responsible for processing matters that are in violation of the D.C. Code and some related U.S. Code provisions, and municipal and traffic regulations. USAO may, at its discretion, prosecute certain eligible criminal offenses in either Superior Court or U.S. District Court for D.C. In practice, however, USAO brings a large majority of criminal prosecutions in Superior Court. According to a D.C. USAO official, D.C. is the only jurisdiction in the United States in which USAO may prosecute crimes in both local and federal courts.
. Only in D.C. does BOP assume responsibility for all felony offenders sentenced to prison terms in local (i.e., state, county, and city) courts.

The D.C. criminal justice system also has different case flow processes for handling arrestees, depending on which agency is prosecuting the case and the status of the arrestee. Appendix IV contains a detailed description of the process for cases prosecuted by USAO. Appendix V contains a detailed description of the process for cases prosecuted by Corporation Counsel. Appendix VI contains a detailed description of the process for juvenile cases.

D.C.'s Unique Structure Presents Additional Coordination Challenges
According to most officials we interviewed and our own analyses, an overarching problem within the D.C. criminal justice system has been the lack of coordination among all participating agencies. Its different sources of funding, reporting structures, and organizational perspectives have complicated the task of coordinating systemwide activities, reaching agreement on the nature of systemwide problems, and taking a coordinated approach to addressing any problem areas that balances competing institutional interests. One reason for this is that the costs of coordinating activities and corrective actions may fall on one or more federally funded agencies, while any savings may accrue to one or more D.C. funded agencies, or vice versa. In the absence of a single hierarchy and funding structure, agencies have generally acted in their own interests rather than in the interest of the system as a whole.

Typically, federal and nonfederal criminal justice systems include the following stages: (1) arrest and booking, (2) charging, (3) initial court appearance, (4) release decision, (5) preliminary hearing, (6) indictment, (7) arraignment, (8) trial, (9) sentencing, and (10) correctional supervision. Most stages require the participation of several agencies which need to coordinate their activities for the system to operate efficiently while also meeting the requirements of due process. That is, all involved agencies need to work together to ensure that their roles and operations mesh well with those of other agencies, and to identify any problems that emerge and decide how best to resolve them.

Table 2 shows the stages in D.C.'s criminal justice system and the agencies that participate in each stage. As shown in the table, 7 of the 10 stages typically involve multiple agencies with different sources of funding, which results in different reporting structures and different oversight entities. For example, as many as six agencies--one D.C. (MPDC), three federal (USAO, U.S. Marshals Service, and Pretrial Services), and two federally funded D.C. agencies (Superior Court and Defender Service)--need to coordinate their activities before the arrestee's initial court appearance for a felony offense can occur. n10 At the latter stages of the system, an offender's sentencing and correctional supervision may require the participation of as many as eight agencies--one D.C.-funded agency (DOC), five federal agencies (USAO, BOP, U.S. Marshals Service, U.S. Parole Commission, and Court Services), and two federally funded D.C. agencies (Superior Court and Defender Service). At any stage, the participation of other agencies might also be required. n11 In addition, the reporting and funding structure for these participating agencies often differs. For example, USAO, the U.S. Marshals Service, BOP, and the U.S. Parole Commission ultimately report to the U.S. Attorney General and are funded by the appropriations subcommittee that funds the Department of Justice; n12 MPDC and Corporation Counsel ultimately report to the D.C. Mayor; and Superior Court, Defender Service, Pretrial Services, and Court Services are independent of both D.C and the U.S. Department of Justice, submit their budgets to Congress, and are funded by the appropriations subcommittee for D.C.

**1449-501980**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

n10 USAO prosecutes felony and serious misdemeanor violations committed by adults in D.C. Corporation Counsel would typically not be involved in prosecutions of adult felony offenses.

n11 For example, the D.C. Office of the Chief Medical Examiner may potentially be used for such purposes as linking a particular suspect to a crime or court testimony regarding autopsy results or toxicological tests.

n12 Subcommittee on the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies, Committee on Appropriations. The House and Senate have subcommittees with identical jurisdictions.

Table 2: D.C. Criminal Justice Agencies Involved In Processing a "Typical" Case Through the Stages of the Criminal Justice System

Stages of the criminal justice process (from left to right)

| Type of agency/ funding | Arrest & booking | Charging | Initial court appearance | Release decision | Prelim. Hearing |
|---|---|---|---|---|---|
| D.C./ D.C. | MPDC | MPDC OCC | OCC | DOC | MPDC OCC |
| Federal/ federal | | USAO | USAO USMS PSA | USMS PSA | USMS USAO PSA |
| D.C/ federal | | Sup.Ct | Sup.Ct PDS | Sup.Ct PDS | Sup.Ct PDS |

Table 2: D.C. Criminal Justice Agencies Involved In Processing a "Typical" Case Through the Stages of the Criminal Justice System

Stages of the criminal justice process (from left to right)

| Type of agency/ funding | Indictment | Arraignment | Trial | Sentencing | Correc- tional super- vision |
|---|---|---|---|---|---|
| D.C./ D.C. | MPDC | | MPDC OCC | | DOC |
| Federal/ federal | USMS USAO PSA | USMS USAO PSA | USMS USAO PSA | USMS USAO CSOSA | USMS BOP USPC CSOSA |
| D.C/ federal | Sup.Ct PDS | Sup.Ct PDS | Sup.Ct PDS | Sup.Ct PDS | |

Legend: MPDC = Metropolitan Police, D.C.; OCC = Office of Corporation Counsel; USAO = U.S. Attorney's Office; USMS = U.S. Marshals Service; Sup. Ct = D.C. Superior Court; PDS = Public Defender Service; PSA = Pretrial Services Agency; DOC = Department of Corrections; BOP = Federal Bureau of Prisons; USPC = U.S. Parole Commission; CSOSA = Court Services and Offender Supervision Agency.

Note 1: Any specific case is prosecuted by either Corporation Counsel or USAO, not both. However, in specific circumstances, a case may be referred at some point in the process from one office to the other for prosecution.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Note 2: Defendants who are eligible for a court-appointed attorney may, depending upon several factors, be provided a PDS attorney, or a private attorney. D.C. courts' budget funds private, court-appointed attorneys for criminal defendants.

Note 3: Information from the D.C. Office of the Chief Medical Examiner may potentially be used at any stage in the process from arrest through trial. In addition, forensic evidence and testimony may also be provided by federal agencies that perform certain forensic analyses for D.C., such as the Federal Bureau of Investigation (FBI), Drug Enforcement Administration, or Bureau of Alcohol, Tobacco and Firearms.

Source: GAO analysis of D.C. criminal justice agencies' funding and responsibilities.

Coordinating D.C.'s Systemwide Operations Has Been Difficult
While most participating agencies recognize the need to coordinate their activities, agency officials and our analyses of agency data point to a lack of coordination as an overarching problem. Agencies have often been reluctant to coordinate activities where their own interests do not align with those of other agencies. One reason for this reluctance is that some actions that could help achieve greater systemwide efficiency might not benefit each agency equally, and in fact could benefit one agency at the expense of another. n13 As a result, agreement on actions to benefit systemwide efficiency has been slow.

n13 On at least one occasion, agency differences led to litigation in federal courts. See, for example, *United States v. District of Columbia, 897 F. 2d 1152 (D.C. Cir. 1990).*

Through discussions with D.C. criminal justice officials and our own analysis, we identified many examples where coordination lapses have hindered system operations. In some cases, the problem has been identified and a coordinated approach to resolving the problem is under way. In other cases, the problems persist. To better illustrate the coordination problem, in the following sections we highlight the issues surrounding four problem areas, as well as any corrective actions planned or under way. We also conducted a case study of coordination among the various agencies involved in case processing from the arrest through initial court appearance because a number of D.C. criminal justice officials identified this process as problematic.

Court Case Scheduling
The scheduling of court cases has had adverse affects on several criminal justice agencies involved in case processing. As noted in table 2, MPDC, prosecutors, Defender Service, U.S. Marshals Service, Pretrial Services, Court Services, and Superior Court could be involved in the court-related processing of a case from the preliminary hearing to the trial and subsequent sentencing. Representatives from several of these different agencies are typically required to be present at court trials and hearings. Because specific court times are not established, individuals who are expected to appear in court are required to be present when the court first convenes in the morning. These individuals might be required to wait at the courthouse for some period of time for the case to be called, if (1) more trials or hearings are scheduled than can be conducted, (2) any one of the involved individuals is not present or prepared, or (3) the case is continued for any number of reasons. MPDC recorded that during calendar year 1999 its officers spent 118 full-time staff years in court-related activities such as preliminary hearings and trials. While MPDC officials stated that officers often spent many hours at court waiting for cases to be called, data were not available on the proportion of the 118 full-time staff years that were attributable to actual court time compared to the time spent waiting for cases to be called, including cases that were rescheduled.

CJCC selected the Council for Court Excellence and the Justice Management Institute n14 to conduct a detailed study of criminal justice resource management issues, with particular emphasis on court case processing and the utilization of police resources. In its March 2001 report, the Council for Court Excellence and the Justice Management Institute concluded that major changes were needed in the D.C. criminal justice caseflow system to improve the system's efficiency. Among other things, the report found inefficiencies and counterproductive policies at every stage in case

1449-501982

processing. The report also concluded that little use was being made of modern technology in the arrest, booking, papering, n15 and court process that could improve system operations. The Council for Court Excellence and the Justice Management Institute determined that an unnecessarily large number of police officers were notified to appear for prosecutorial and court-related proceedings. The Council for Court Excellence and Justice Management Institute found that during September 2000 an average of 670 MPDC officers a day appeared for these proceedings, costing MPDC approximately $ 823,000 in overtime costs.

n14 The Council for Court Excellence and the Justice Management Institute are not-for-profit research organizations that, among other things, evaluate court-related programs and functions.

n15 Papering refers to the face-to-face meeting between an officer knowledgeable about an arrest and a Corporation Counsel or USAO attorney to determine whether or not to prosecute a case.

The Council for Court Excellence and the Justice Management Institute identified priority areas for system improvements, such as redesigning court procedures in misdemeanor cases, improving the methods used to process cases from arrest through initial court appearance by automating the involved processes, and improving the systems used to notify police officers about court dates. Congress provided $ 1 million for fiscal year 2001 to implement some of the recommended case management initiatives, such as a differentiated case management system for misdemeanors and traffic offenses, the papering pilot project between MPDC and Corporation Counsel, and a mental health pilot treatment project for appropriate, nonviolent pretrial release defendants in coordination with the D.C. Commission on Mental Health Services.

Criminal Justice Information Systems
D.C.'s criminal justice system is complex, with more than 70 different information systems in use among the various participating agencies. These systems are not linked in a manner that permits timely and useful information sharing among disparate agencies. For example, as the information systems are currently maintained, it is very difficult to obtain data to determine the annual amount of time MPDC officers spend meeting with prosecutors about cases in which prosecutors eventually decide not to file charges against the arrestee. We determined that such an analysis would require data about: (1) MPDC arrests, (2) MPDC officer time and attendance, (3) charges filed by USAO or Corporation Counsel, and (4) Superior Court case dispositions. All of this information is currently maintained in separate systems with no reliable tracking number that could be used to link the information in each system for a specific case and no systematic exchange of information. This lack of shared information diminishes the effectiveness of the entire criminal justice system. For example, according to a CJCC official, there is no immediate way for an arresting officer to determine whether an arrestee is on parole, or for an arrestee's community supervision officer to know that the parolee had been arrested. Such information could affect both the charging decision and the decision whether or not to release an arrestee from an MPDC holding cell.

In 1999, CJCC attempted to address problems with D.C. criminal justice information systems by preparing, among other things, an Information Technology Interagency Agreement that was adopted by CJCC members. The agreement recognized the need for immediate improvement of information technology in the D.C. criminal justice system and established the Information Technology Advisory Committee (ITAC) to serve as the governing body for justice information system development. ITAC recognized that it was difficult for a single agency involved in the criminal justice system to access information systems maintained by other agencies, and pursued developing a system that would allow an agency to share information with all other criminal justice agencies, while maintaining control over its own system. ITAC devised a District of Columbia Justice Information System (JUSTIS).

In July 2000, CJCC partnered with the D.C. Office of the Chief Technology Officer in contracting with a consulting firm to design JUSTIS based on modern dedicated intranet and Web browser technology. On August 31, 2000, the consulting firm delivered to CJCC and the D.C. Office of the Chief Technology Officer a draft version of a blueprint for

1449-501983

0046- 010

a finalized JUSTIS. When completed, JUSTIS is to allow each agency to maintain its current information system, while allowing the agency to access selected data from other criminal justice agencies.

Initially, Court Services, Pretrial Services, and MPDC will pilot JUSTIS by allowing a portion of each agency's data to be shared with other D.C. criminal justice system agencies. The initial operation is to be evaluated and changes can be made before the JUSTIS model is finalized. According to a CJCC official, after any necessary modifications are complete, ITAC plans to implement JUSTIS throughout the D.C. criminal justice system. While JUSTIS, if implemented, would allow D.C. criminal justice agencies to share data, it would not assure the quality of data that was being shared. For example, if an arrestee's name and/or social security number are entered incorrectly into the system, the corresponding data would be inaccurate.

In addition to the JUSTIS project, CJCC's Data Group, composed of representatives of nine agencies involved in the D.C. criminal justice system, has outlined a program to implement a unique fingerprint-supported tracking number in the system. A unique identifier will be assigned upon the initiation of case processing to ensure that all entries related to a particular case--from arrest through disposition of those charges, and corrections actions in response to those charges-- are linked. The unique identifier can ensure that each case is properly linked to an individual's criminal history record. The goal is to store the information linked through the tracking number in a central D.C. criminal justice repository. According to a CJCC official, CJCC has begun an initiative in cooperation with other D.C. and federal criminal justice agencies to develop the legislative foundation for the long-term support of an integrated D.C. criminal justice information repository that meets Department of Justice standards and federal regulations.

Correctional Supervision
Effective correctional supervision, which includes probation, incarceration, and post-prison parole or supervised released for convicted defendants, requires effective coordination among participating agencies. In D.C., the stage of the criminal justice system referred to as correctional supervision involves several agencies including: (1) Superior Court, which sentences convicted defendants and determines whether to revoke a person's release on community supervision; (2) Court Services, which monitors offenders on community supervision; (3) DOC, which primarily supervises misdemeanants sentenced to D.C. Jail or one of several halfway houses in D.C.; n16 (4) BOP, which supervises felons incarcerated in federal prisons; (5) the U.S. Parole Commission, which determines the prison release date and conditions of release for D.C. inmates eligible for parole; n17 and (6) the U.S. Marshals Service, which transports prisoners.

> n16 DOC still has control over three prison facilities within the Lorton Correctional Complex, which is to be closed by December 31, 2001, under the terms of the D.C. Revitalization Act.

> n17 Inmates convicted in Superior Court prior to the implementation of the new D.C. sentencing guidelines were generally sentenced to a range of years, such as 10 to 20 years. Such inmates could be eligible for parole after serving a specified minimum number of years. Under the terms of the D.C. Revitalization Act, the U.S. Parole Commission is now responsible for determining the parole, or prison release, date for such inmates (Public Law 105-33, Sec. 11231). Under the new sentencing guidelines, which abolished parole, inmates will have to serve at least 85 percent of their sentence before being eligible for release.

Gaps in coordination among agencies may lead to tragic consequences, such as those that occurred in the case of Leo Gonzales Wright, who committed two violent offenses while under the supervision of D.C.'s criminal justice system. Wright, who was paroled in 1993 after serving nearly 17 years of a 15-to-60 year sentence for armed robbery and second degree murder, was arrested in May 1995 for automobile theft charges, which were later dismissed. In June 1995, Wright was arrested for possession with intent to distribute cocaine. However, he was released pending trial for the drug arrest, due in part to miscommunication among agencies. Wright subsequently committed two carjackings, murdering one of his victims. He was convicted in U.S. District Court for the District of Columbia and is currently serving a life without parole sentence in federal prison at Leavenworth, KS.

The outcry over the Wright case resulted in two studies, including a comprehensive review of the processing of Wright's case prepared for the U.S. Attorney General by the Corrections Trustee in October 1999. The report included 24 recommendations to help ensure that instances similar to the Wright case do not reoccur. In July 2000, the Corrections Trustee issued a progress report on the implementation of recommendations from the October 1999 report. According to the Corrections Trustee, while not all recommendations in the October 1999 report have been fully implemented, progress has been made in addressing a number of them. For example, with funds provided by the Corrections Trustee, DOC has purchased a new jail-management information system for tracking inmates and implemented a new policy on escorted inmate trips. In addition, in January 2000, the Corrections Trustee began convening monthly meetings of an Interagency Detention Work Group, whose membership largely parallels that of CJCC. The group, and its six subcommittees, have focused on such issues as the convicted felon designation and transfer process, and parole and halfway house processing.

In addition to the studies and the actions of the Corrections Trustee, CJCC and Court Services are addressing the monitoring and supervision of offenders. CJCC has begun to address the issues of halfway house management and programs that monitor offenders. Court Services is developing a system in which sanctions are imposed whenever individuals violate conditions of probation or parole.

Forensic Capacity and Coordination

Forensics is another area where lack of coordination can have adverse effects. [n18] D.C. does not have a comprehensive forensic laboratory to complete forensic analysis for use by police and prosecutors. Instead, MPDC currently uses other organizations such as the FBI, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco and Firearms, and a private laboratory to conduct much of its forensic work. MPDC performs some forensic functions such as crime scene response, firearms testing, and latent print analysis. The Office of the Chief Medical Examiner, a D.C. agency, performs autopsies and certain toxicological tests, such as the testing for the presence of drugs in the body. Coordination among agencies is particularly important because several organizations may be involved in handling and analyzing a piece of evidence. For example, if MPDC finds a gun with a bloody latent fingerprint at a crime scene, the gun would typically need to be examined by both MPDC and the FBI. In order to complete the analysis, multiple forensic disciplines (e.g., DNA or firearm examiners) would need to examine the gun. If the various forensic tests were coordinated in a multidisciplinary approach, examiners would be able to obtain the maximum information from the evidence without the possibility of contaminating it. Such contamination could adversely affect the adjudication and successful resolution of a criminal investigation.

[n18] Forensics involves a number of disciplines, such as latent prints, firearms/toolmarks, forensic biology (including DNA), toxicology, drug analysis, questioned documents, and trace evidence.

In April 2000, the National Institute of Justice (NIJ) issued a report on the D.C. criminal justice system's forensic capabilities. The report concluded that D.C. had limited forensic capacity and that limitations in MPDC prevented the effective collection, storage, and processing of crime scene evidence, which ultimately compromised the potential for successful resolution of cases. NIJ-identified deficiencies included, among other things:

. out-of-date technology;
. lengthy delays in processing evidence;
. ineffective communications in the collection, processing, and tracking of evidence from the crime scene; and
. ineffective communications between forensic case examiners and prosecutors.

The NIJ report supported development of a centralized forensic laboratory that would be shared by MPDC and the D.C. Office of the Chief Medical Examiner. The report did not examine the costs to build a comprehensive forensic laboratory. We did not independently evaluate the costs and benefits of a comprehensive forensic laboratory. However,

such a facility could potentially improve coordination by housing all forensic functions in one location, eliminating the need to transport evidence among multiple, dispersed locations.

A Coordination Case Study: The Initial Stages of Case Processing

D.C.'s unique structure has also led to coordination problems in the initial stages of case processing that occur from the time of arrest through initial court appearance. We reviewed this process as a case study of coordination among D.C. criminal justice agencies and the difficulties of balancing competing institutional interests. As many as six agencies-- one D.C. (MPDC), three federal (USAO, U.S. Marshals Service, and Pretrial Services), and two federally funded D.C. agencies (Superior Court and Defender Service)--need to coordinate before an arrested person's initial court appearance for a felony offense can occur. As is true of all stages of D.C.'s criminal justice process, the actions of each participating agency affect the other participants in the process. Appendix IV includes a description of D.C.'s criminal justice process--from arrest through sentencing--for cases USAO prosecutes. Appendix VII contains a more detailed description of the process from arrest through initial court appearance. Here we discuss issues of police-prosecutor coordination during the charging process.

Both USAO and Corporation Counsel require a police officer knowledgeable about the facts of an arrest to physically report to the prosecutor's office for papering. In D.C., papering is the stage of case processing at which officers present their arrest reports to a prosecutor and explain the circumstances of the arrest. For each arrest, prosecutors determine whether the case should be prosecuted ("paper" the case) or not ("no-paper" the case). We focused our study on USAO cases because they are more numerous, typically more complicated, and require significantly more officer time. In 1998, USAO cases (felony and misdemeanor) constituted 64 percent of the criminal cases brought to Superior Court for disposition. n19 In addition, the cases prosecuted by USAO accounted for 87 percent of the 47,810 police hours recorded for papering during 1999.

> n19 According to the D.C. Courts 1998 Annual Report, there were 51,712 total criminal cases for disposition, including pending cases, new filings, reinstated cases, and cases transferred in. There were 33,338 USAO cases (9,633 felony indictments and 23,705 misdemeanors) brought for disposition in 1998. There were 18,374 Corporation Counsel cases (7,343 misdemeanor and 11,031 traffic offenses) brought for disposition in 1998.

As part of their duties, police officers in all jurisdictions generally must make appearances to provide information about cases at a number of criminal justice proceedings, including grand jury testimony, preliminary hearings, pretrial witness conferences, and trials. In addition to these appearances, USAO and Corporation Counsel prosecutors require that MPDC officers personally meet with prosecutors in order to make a charging decision for all cases. This requirement, particularly for misdemeanors, appears to be unusual. A 1997 Booz-Allen and Hamilton survey found that in 30 of 38 responding jurisdictions (51 were surveyed), police officers were not required to meet with prosecutors until court (i.e., trial), and in 3 cities officers were not required to appear in person until the preliminary hearing. Four cities required officers to meet with prosecutors on a case-dependent basis, and one city was in the process of changing its charging procedures. Corporation Counsel and MPDC have agreed to initiate a pilot project in March 2001 in which officers are not required to appear in person for 17 minor offenses. There is currently no similar pilot planned for misdemeanors prosecuted by USAO.

According to USAO officials, the current papering process is critical for USAO to make an initial charging decision correctly. Making an initial charging decision correctly benefits (1) USAO by allowing them to more effectively prosecute "good" cases; (2) arrestees by ensuring that individuals are not inappropriately charged with a crime; and (3) the criminal justice system by allowing USAO to weed out "poor" cases, which would otherwise languish in the system consuming many agencies' resources. To ensure that it has all the information required for making informed charging decisions, USAO requires that officers appear in person to provide information about the arrest that may be missing from the arrest reports, inaccurate in the reports, or corollary to information recorded in the reports.

The purpose of the paperwork that police present to USAO attorneys is to provide evidence that there is probable cause to (1) believe that a crime has been committed and (2) that the person(s) arrested committed the crime. Police documentation could provide evidence that establishes probable cause, but prosecutors may decline to file charges because, for example, they do not believe the evidence would be sufficient to prove the arrestee's guilt "beyond a reasonable doubt," the standard required for conviction of a crime in court. The prosecutor's goal is to prevail in those cases selected for prosecution.

Both USAO and MPDC officials said that the paperwork submitted to USAO for charging decisions has been of uneven quality. n20 In the past, MPDC has responded to USAO concerns about the quality of arrest paperwork by conducting report writing training sessions for sergeants, requiring all officers to take annual in-service report writing training, and adopting the use of a new form to document officers involved in an arrest.

n20 There were no data to determine whether the quality of the paperwork was generally better for misdemeanors than for felonies.

Prosecutors--federal and nonfederal--generally have considerable discretion in selecting which cases they will prosecute. Within its prosecutorial discretion, USAO could decide not to file charges for a number of reasons unrelated to the completeness and accuracy of the police paperwork submitted to prosecutors. According to data USAO provided to MPDC, USAO declined to file charges for 3,270 cases during the period from November 1999 through June 2000. Of the 3,270 cases in which USAO declined to file charges, USAO listed police-related problems, including paperwork problems, in 8 percent of the cases; problems with witness or victim cooperation or credibility in 20 percent; problems with evidence or proof in 70 percent; and a variety of other reasons in 2 percent of the cases.

Problems With the Current Process
Several problems exist with D.C.'s current method of processing cases from arrest through initial court appearance. These include

. **Lack of automation inhibits process reform.** In order to document an arrest, officers are required to complete several forms by hand or typewriter. Most forms contain a similar set of basic information about the incident, the arrestee, or the arresting officer (e.g., time of arrest, arrestee's name, and arresting officer's name). For example, to document a drug arrest in which narcotics were seized and property was removed from the arrestee, an officer would have to complete 10 forms, write or type his/her name 8 times, the arrestee's name and charges 5 times, and the arrestee's full address and social security number 4 times. This increases the potential for entry error resulting in inconsistent entries for the same information on different forms. Reducing the number of forms required would itself require the cooperation and coordination of MPDC, USAO, Corporation Counsel, Pretrial Services, Defender Service, and Superior Court. However, linking the existing forms in an automated system would permit an officer to type such information once, after which relevant fields in each report would automatically display the required duplicative information. USAO has noted that problems in the accuracy and completeness of the forms submitted by officers for charging decisions are one reason that its prosecutors require a personal meeting with officers to make a charging decision. More accurate paperwork could increase prosecutors' willingness to use the paperwork as a source of charging decisions, at least for a number of misdemeanors.

. **Paperwork delays may slow case processing.** Paperwork problems, including physical movement of paperwork between various locations, may delay case processing. There is no electronic mechanism, such as a connected automated system, for transferring arrest paperwork from MPDC to the appropriate prosecuting office and then to the courts. Arrest paperwork may be misplaced as it is physically transported between agencies, and the initial court appearance may be delayed because some of the required paperwork is missing. Any resulting delays in the initial court appearance may increase the time that those detained spend in jail prior to their initial court appearance.

. **Required meetings with prosecutors keep officers off the street.** Before a papering decision is made, both USAO and Corporation Counsel prosecutors require that an officer knowledgeable about the facts of the arrest meet with an attorney for papering. In addition, the papering process requires officers to spend time at the prosecutor's office performing clerical duties, such as making copies and assembling documents in file jackets. On-duty officers who make arrests between 3:00 p.m. and 7:00 a.m. are required to meet with prosecutors the morning after an arrest to paper the case. All off-duty officers who appear for papering receive a minimum of 2 hours compensatory time. During 1999, MPDC officers spent the equivalent of 23 full-time staff years in meetings with prosecutors for papering decisions. In other words, the time required for these meetings was the equivalent of taking 23 full-time officers off the streets.

Using an MPDC sworn officer's average salary, 23 full-time officers cost about $ 1,262,000. n21 However, it would take more than 23 additional full-time officers to replace the duty hours devoted to the meetings with prosecutors. This is because (1) an officer is available for duty only a portion of the entire 2,080-hour work year, which includes vacation and training time, and (2) the data do not take into account that off-duty officers who appeared for less than 2 hours actually received 2 hours of compensatory time for their papering appearances. Although the principal participants in the charging decision are MPDC, USAO, and Corporation Counsel, reducing the hours that officers spend in meetings with prosecutors for charging decisions would require the cooperation and coordination of a number of D.C. criminal justice agencies.

n21 According to MPDC, for fiscal year 2000, the average hourly salary, including benefits, is $ 26.39. When this hourly rate is multiplied by 2,080 hours the total is $ 54,891 per year. For 23 years, the total officer cost would be $ 1,262,498.

Philadelphia and Boston Have Each Made Coordinated Efforts to Improve Initial Charging Process
During the past few years, criminal justice agencies in Philadelphia and Boston have each made coordinated efforts to improve their collective efficiency in processing arrestees. Both cities have turned to automation to improve the process from arrest to initial court appearance, and both involved the cooperation of multiple agencies in developing their automated systems. In Philadelphia participants continue to meet weekly to review arrestee processing statistics and discuss possible improvements to the system. Neither Philadelphia nor Boston requires face-to-face meetings with prosecutors for processing most cases. Prosecutors principally rely on the automated system for the information needed to make charging decisions.

Philadelphia employs a software system and videoconferencing to process arrestees from the point of arrest through initial court appearance. The system, which was developed through collaboration among Philadelphia criminal justice system agencies, allows the Philadelphia Police Department, the District Attorney's Charging Unit, Philadelphia Municipal Court, and Pretrial Services to send and receive information electronically. In addition, the system is able to track a defendant's physical location and length of time in the system.

The software was developed in conjunction with Philadelphia Municipal Court's implementation of videoconferencing for the initial court appearances. The courtroom, which operates 24 hours a day, 365 days a year, uses video cameras, monitors, and software that make it possible to conduct live hearings, eliminating the need to transport prisoners to a central location. Defendants are held at one of eight booking stations throughout the city.

Rather than have police officers meet face-to-face with charging attorneys to reach a charging decision, Philadelphia charging attorneys review police paperwork submitted electronically. If charging attorneys need additional information, they will contact police for clarification or missing information.

As in Philadelphia, Boston has also turned to automation to improve the efficiency of its processing of arrestees. In the spring of 2000, the Boston Police Department, Boston Municipal Court, and the Suffolk County District Attorney's Office implemented a pilot project designed to automate the charging process by electronically linking the three agencies. Boston's new system allows the Boston Police Department to electronically file applications for criminal

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

complaints (i.e., charging documents) to Municipal Court for review and acceptance prior to the initial court appearance. The system contains all of the information that is typically available in paper form and allows users to track the status of complaints. In Boston, arresting officers are not required to attend face-to-face meetings to charge cases.

The Philadelphia and Boston experiences illustrate the need for cooperation in crafting process changes and the benefits that could result from the greater use of automation. Of course, any specific D.C. changes would need to reflect D.C. statutory and other requirements governing case processing. For additional information on arrestee processing in Philadelphia and Boston, see appendix VII.

Attempts Have Been Made to Change Initial Stages of Case Processing in D.C.
In the past decade, several attempts have been made to change the initial stages of case processing in D.C. These efforts--which were made by MPDC, Corporation Counsel, and USAO, in conjunction with consulting firms--involved projects in the areas of night papering, night court, and officerless papering. However, the involved agencies never reached agreement on all components of the projects, and each of the projects was ultimately suspended. The Chief of MPDC has publicly advocated the establishment of some type of arrangement for making charging decisions during the evening and/or night police shifts.

**Night Papering and Night Court**

Night papering and night court refer to the extension of papering meetings and court hearings into the evening and night hours. Night papering could permit officers on evening and night shifts to generally present their paperwork to prosecutors during their shifts. Currently, both USAO and Corporation Counsel are only open to paper cases during typical workday hours, that is, generally from about 8:00 a.m. to 5:00 p.m., Monday through Saturday. Night court refers to conducting certain court proceedings, such as initial court appearance, during a late evening or night shift. Night papering would require USAO and Corporation Counsel charging attorneys to work evening hours, and night court would involve a much broader commitment of Superior Court resources as well as the participation of other agencies (such as MPDC, USAO, Corporation Counsel, Pretrial Services, Defender Service, and U.S. Marshals Service).

**Officerless Papering**

Officerless papering refers to a papering process where prosecutors base their charging decisions principally upon the paperwork submitted by officers. In such circumstances, officers would not generally be required to appear in person before the prosecutor, and provisions could be made for the prosecutor to contact the officer to clarify issues, as needed. MPDC and Corporation Counsel have agreed to begin an officerless papering pilot program in March 2001 for 17 minor offenses prosecuted by Corporation Counsel. Until an electronic transmission mechanism is available, any officerless papering system would require arrest paperwork to be physically transported to prosecutors for review. n22

n22 According to the Corrections Trustee, a planned second phase of the pilot project would include electronic data transmission and videoconference-capable telephones.

Obstacles to Changing Initial Case Processing Stages
In the absence of an automated system for completing and transmitting the forms required for documenting arrests and making charging decisions, simple entry errors resulting from entering the same information multiple times can hamper the initial stages of case processing. Such errors must be remedied before charging decisions can be completed. USAO has cited such problems as one reason that officers should be required to meet face-to-face with prosecutors for papering decisions. To the extent that the police do not have a reliable process for reviewing and assuring the completeness and accuracy of the paperwork submitted to prosecutors, USAO is likely to continue to resist efforts to pilot or institute officerless papering.

**1449-501989**

0046- 016

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Even if these issues were to be successfully addressed, the distribution of costs among the participants in any revised system would still likely pose an obstacle to change. The costs of the current system of processing cases from arrest through initial court appearance are borne principally by MPDC--primarily a locally funded D.C. agency--not USAO or Superior Court, both of which are federally funded. Police officers, for example, currently perform a number of clerical functions associated with processing the paperwork for charging decisions. On the other hand, the costs of instituting night papering would be borne primarily by USAO, Corporation Counsel, and/or Superior Court, depending upon the approach taken, not MPDC. Indeed, this approach would likely reduce MPDC's costs, principally the cost of compensation time for evening duty officers who must meet with prosecutors during off-duty hours. The fact that costs--the current costs and those associated with potential changes--are not equally shared among the participating agencies makes it more difficult to reach consensus on whether and how to change the current system.

Nevertheless, a program that incorporates the benefits of automation and some form of officerless papering for at least some USAO-prosecuted misdemeanors could increase the number of hours that MPDC officers are available for patrol. Depending upon the changes made, there could also be benefits in reduced time to process cases and reduced costs for transporting documents and arrestees among different locations. Yet, without agreement or a coordinated approach these benefits will not be realized.

**CJCC Has Had Some Success as a Coordinating Mechanism**
Many criminal justice officials we spoke with noted that CJCC has improved the coordination, cooperation, and dialogue among agencies and has fostered discussion. Although CJCC was created to respond to criminal justice issues that extend beyond the scope of any one agency, the organization has no formal authority over member agencies and its future is uncertain. CJCC was created by the agreement of its members in 1998 to meet the need for better coordination among all of D.C.'s criminal justice agencies, identify ideas of mutual interest, and mobilize resources to improve the D.C. criminal justice system. The D.C. Control Board funded CJCC through fiscal year 2000. Anticipating the Control Board's suspension of activities in fiscal year 2002, Congress reduced the Board's fiscal year 2001 funding. The Board subsequently decided not to fund CJCC in fiscal year 2001.

CJCC's mission is to address coordination difficulties among D.C. criminal justice agencies. Its funding and staffing have been modest--about $ 300,000 annually with four staff. CJCC has functioned as an independent entity whose members represent the major organizations within the D.C. criminal justice system. CJCC members have typically met every 4 to 6 weeks and have formed numerous teams to address criminal justice  issues, such as drugs, juvenile justice, halfway houses, information technology, and identification of arrestees. CJCC staff have coordinated meetings, provided data and statistics, summarized workgroup findings, performed best practices reviews, and provided other information and support to D.C. criminal justice agencies. Hence, CJCC has served as a centralized mechanism for collecting and disseminating information and statistics about D.C.'s criminal justice system.

CJCC workgroups and teams have succeeded in developing proposals and project plans for several issues. For example, CJCC's Positive Identification Workgroup has been working on a project to determine how to implement fingerprinting protocols. One issue being reviewed by the workgroup is whether to expand positive identification fingerprinting to all arrestees. CJCC, through its technology committee, has been successful in establishing a draft blueprint for data sharing in part because the initiatives have been funded through grants and in part because each participating agency potentially stands to benefit from the changes being considered.

However, CJCC's ability to effect cooperation among the various agencies has been limited because it has no formal authority or power over any member agency. In 1998 and 1999, for example, CJCC attempted to assist efforts by MPDC, USAO, and Corporation Counsel to reform the process for determining whether to charge arrestees. However, USAO would not agree to participate in the project unless certain conditions were met, and the project was ultimately suspended. In this case, the costs and potential benefits--financial and organizational--of the changes under consideration were perceived by one or more of the involved agencies to be unevenly distributed.

Currently, CJCC faces an uncertain future. Its funding expired on September 30, 2000, and in that same month the Executive Director of CJCC was appointed as Deputy Mayor for Public Safety and Justice. CJCC's one remaining staff member is funded by a grant. Although various CJCC working groups continue to meet, it is not known whether CJCC will continue to formally exist, and if it exists, how it will be funded, whether it will have staff, and whether it will remain independent or under the umbrella of another organization, such as the D.C. Mayor's office.

**1449-501990**

CJCC members expressed concern about the future of CJCC and where it could appropriately be housed without compromising its essential independence. According to some D.C. criminal justice officials, CJCC's independence was a key characteristic that brought agencies to the table to discuss issues that affected more than one agency. Officials representing both USAO and Superior Court have stated that they would be reluctant to participate in a CJCC that was under the umbrella of the Mayor's office because it was not clear that CJCC could be truly independent.

CJCC has shown that it can provide a valuable forum for discussion of multiagency issues and serve as a catalyst for action. However, regarding the more contentious issues, such as papering, CJCC's members have generally agreed to disagree. Proposed solutions have been unable to bridge differing institutional interests and the fact that the costs of proposed solutions were unevenly distributed among agency participants. CJCC has not been required to formally report on its activities, including areas of focus, successes, and areas of continuing discussion and disagreement. Consequently, its activities, achievements, and areas of disagreement have generally been known only to its participating agencies. Oversight agencies--such as congressional appropriations committees and the D.C. Council-- have had little information on systemic issues affecting the D.C. criminal justice agencies under their jurisdiction.

### Current Initiatives for Improving the Criminal Justice System
Currently, the agencies that make up the D.C. criminal justice system are involved in numerous initiatives to improve system operations. In response to our survey, as of November 2000, CJCC and other agencies reported 93 initiatives planned or under way for improving the D.C. criminal justice system. These initiatives cover a wide range of aspects of the criminal justice process, from arrest through correctional supervision. Table 3 summarizes the initiatives by subject area.

Participating agencies have reported some success with these initiatives. An example of a corrections subject area initiative is the one led by Pretrial Services and DOC to review and reform halfway houses operations. A goal of this initiative is to improve public safety by strengthening coordination, cooperation, and management among relevant criminal justice agencies. According to agency officials, the initiative has reduced the time to obtain a warrant for halfway house walkaways from 7 business days to 1 business day. As a second example, USAO has led an initiative to enhance crime prevention and law enforcement activity by allowing cooperation through agreements between federal agencies and MPDC. These agreements may span all areas of law enforcement, from equipment sharing to allowing federal law enforcement officers to patrol areas immediately surrounding the federal agencies' jurisdictions. Since most of the 93 initiatives were ongoing at the time of our review, we were unable to evaluate their collective impact on systemwide operations.

Appendix VIII includes a listing of D.C. criminal justice initiatives, as of November 2000.

Table 3: Summary of Number and Subject Area of Ongoing D.C. Criminal Justice Initiatives, as of November 2000

| Subject area | Total | Example of initiative in subject area |
|---|---|---|
| Community Justice / Safety | 9 | Expansion of Community Prosecution: Goal is to enhance USAO responsiveness to each community's needs while collaborating with community's police district. |
| Corrections (initiatives to implement the D.C. Revitalization Act) | 13 | Develop System for Obtaining Information on Inmates and Parolees: Goal is to receive background and criminal offense information on a consistent basis to conduct hearings. |
| Other Corrections Initiatives | 11 | Presentencing Investigations of DOC Inmates: Goal is for BOP and Court Services to reach a consensus on what is required in presentencing investigations to properly classify inmates. |

1449-501991

0046- 018

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Table 3: Summary of Number and
Subject Area of Ongoing D.C.
Criminal Justice Initiatives,
as of November 2000

| Subject area | Total | Example of initiative in subject area |
|---|---|---|
| Courts | 1 | Improve Systemic Resource Management Through Process Reform: Goals are to reduce police overtime costs and increase available "street time" for officers; reduce unnecessary burdens on other justice agencies, victims, and witnesses; and decrease disposition time of cases. |
| Defender Services | 3 | Improving Indigent Defense Services Under the CJA Act: A goal is to ensure that the quality of legal representation received by indigent defendants is not compromised. |
| Drugs | 9 | Expanding Drug Testing and Treatment: Goal is to reduce drug use by people under correctional supervision. |
| Fingerprinting | 1 | Fingerprinting Arrestees: Goals are to investigate feasibility of fingerprinting all arrestees for identification purposes and creating a criminal history repository. |
| Firearms | 1 | Operation Ceasefire: Goal is to increase federal prosecution of firearms offenses. |
| Forensics | 2 | D.C. Forensic Lab Working Group: Goal is to provide a state of the art forensic laboratory for D.C. |
| Gang Violence | 1 | Creation of Gang Prosecution and Intelligence Section: A goal is to develop strategies and procedures to increase prosecution of violent gangs. |
| Information Technology | 14 | Installation of an Automated Jail Information Management System: Goal is to provide D.C. Jail with an on-line, automated system. |
| Juvenile Justice | 5 | Youth Violence Intervention Team: Goals are to prevent serious offenses committed by youth, and provide services. |
| Policing | 6 | USAO's Civil Rights Unit: Goals are to investigate allegations of excessive use of force by police, to prosecute such matters when appropriate, and to educate the public about hate crimes in order to encourage crime reporting. |
| Pretrial Services | 5 | Explore Graduated Sanctions: Goals are to |

1449-501992

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Table 3: Summary of Number and
Subject Area of Ongoing D.C.
Criminal Justice Initiatives,
as of November 2000

| Subject area | Total | Example of initiative in subject area |
|---|---|---|
| | | create a range of graduated sanctions responsive to risk of pretrial defendants, and to ensure public safety. |
| Victims Services | 4 | Victims Services Plan: A goal is to develop an infrastructure of services to meet the needs of crime victims, including a Victims Services Center. |
| Miscellaneous | 2 | |
| Initiatives Started Prior to 1997 | 6 | Executive Task Force: The goal of the task force, which is chaired by USAO and comprised of the heads of all local and federal law enforcement entities located in D.C., is to enhance communication between federal agencies and MPDC. |
| Total | 93 | |

Source: GAO analysis of agency-provided data.

Although the initiatives show that coordinated efforts among agencies can improve the D.C. criminal justice system, we found 62 instances in which agencies did not agree on the goals, status, date started, participating agencies, or results of the initiatives other agencies reported. A number of these differences resulted from agencies' suggested changes to a draft of appendix VIII. For example, while USAO noted that it is part of the Community Justice Partnerships initiative, Court Services did not identify USAO as a participating agency. For the Fingerprinting Arrestees initiative, Superior Court requested that we change a description of the goals provided by Pretrial Services. DOC noted that it had its own victims services initiative and that it intended to proceed alone on that initiative. A DOC official said DOC was unsure about the details of victims services initiatives by MPDC or the D.C. Mayor's office. When the agencies responsible for an initiative cannot agree on such fundamental questions as who is taking part in the initiative or even on the goals of the initiative, it becomes apparent that coordination is lacking. This lack of coordination could reduce the effectiveness of these initiatives. In addition, CJCC has not played a role in coordinating these initiatives. Without some form of coordination, confusion about various aspects of initiatives is likely to continue, which could ultimately diminish their effectiveness.

**Conclusions**
Effective coordination of the many agencies that participate in a criminal justice system is key to overall success. Although any criminal justice system faces coordination challenges, the unique structure and funding of the D.C. criminal justice system, in which federal and D.C. jurisdictional boundaries and dollars are blended, creates additional challenges. Almost every stage of D.C.'s criminal justice process presents such challenges, and participating agencies are sometimes reluctant to coordinate because the costs of implementing needed changes may fall on one or more federally funded agencies, while any savings accrue to one or more D.C. funded agencies, or vice versa. In the absence of a single hierarchy and funding structure, agencies have generally acted in their own interests rather than in the interest of the system as a whole.

CJCC was established and staffed as an independent entity to improve systemwide coordination and cooperation. During its 2 1/2-year existence, CJCC has served as a useful, independent discussion forum at a modest cost. It has had notable success in several areas where agencies perceived a common interest, such as developing technology that permits greater information sharing. It has been less successful in other areas, such as papering, where forging consensus on the need for and the parameters of change has been difficult. Without a requirement to report successes

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

and areas of continuing discussion and disagreement to each agency's funding source, CJCC's activities, achievements, and areas of disagreement have generally been known only to its participating agencies. This has created little incentive to coordinate for the common good, and all too often agencies have simply "agreed to disagree" without taking action. Further, without a meaningful role in the establishment of multiagency initiatives, CJCC has been unable to ensure that criminal justice initiatives are designed to identify the potential for joint improvements, and that they are carefully coordinated among all affected agencies.

These factors notwithstanding, on balance, CJCC has achieved some successes at a modest cost and served as a useful, independent forum for discussing issues that affect multiple agencies. CJCC's future is uncertain because its funding source, the D.C. Control Board, is scheduled to disband and key CJCC officials have departed. This could leave D.C. without benefit of an independent entity for coordinating the activities of its unique criminal justice system. Funding CJCC through any participating agency diminishes its stature as an independent entity in the eyes of a number of CJCC's member agencies, reducing their willingness to participate.

## Matters for Congressional Consideration

We recommend that Congress consider:

. Funding an independent CJCC--with its own director and staff--to help coordinate the operations of the D.C. criminal justice system. Congressional funding ensures that CJCC will retain its identity as an independent body with no formal organizational or funding link to any of its participating members.
. Requiring CJCC to report annually to Congress, the Attorney General, and the D.C. Mayor on its activities, achievements, and issues not yet resolved and why.
. Requiring that all D.C. criminal justice agencies report multiagency initiatives to CJCC, which would serve as a clearinghouse for criminal justice initiatives and highlight for CJCC members those initiatives that warrant further discussion and coordination. This reporting requirement could help improve interagency coordination, promote the adoption of common goals, and help reduce redundant efforts.

## Agency Comments

We requested comments on our draft report from 15 agencies, n23 and received written comments on our conclusions and recommendations from 8 of these agencies. n24 These eight agencies supported the concept of CJCC and agreed that CJCC has been a valuable tool for improving coordination among D.C. criminal justice agencies. These agencies generally supported our first recommendation that Congress provide funding to continue the work of an independent CJCC. However, these agencies were generally silent on our second recommendation, which would require CJCC to report annually to Congress, the Attorney General, and the D.C. Mayor. The only comment was from the D.C. Mayor's office, which noted that the reporting requirement would increase public scrutiny of D.C. criminal justice agencies.

n23 These 15 agencies are listed in the Scope and Methodology section of the letter.

n24 We did not receive written comments from the Chief Medical Examiner of D.C., the Chair of the D.C. Council, the Chair of the D.C. Control Board, and the Director of DOC. We received written technical comments from the Department of Justice and Court Services. The U.S. Marshal of the Superior Court for D.C. told us that he had no comments on the report.

With respect to our third recommendation, several agencies expressed concern about having CJCC review D.C. criminal justice initiatives involving more than one agency. The U.S. Attorney for D.C., for example, suggested that CJCC's review and coordination role regarding initiatives should be limited to those that have a significant impact on multiple agencies in the criminal justice system. Otherwise, the recommendation, if implemented, could hamper each agency's ability to implement policies and practices within its appropriate sphere of activity. Along these lines, the Director of Pretrial Services stated that it was important that every voice be heard before decisions are made, but it should not be required that all agencies have common goals for every initiative.

1449-501994

0046- 021

We continue to believe that CJCC needs to have a role in resolving the types of coordination problems we found in our review. Our intent in making the recommendation was to better ensure that multiagency criminal justice initiatives are designed to maximize their potential for joint improvements, resolve apparent duplication and disagreement regarding roles and responsibilities, and promote the adoption of common goals and measures of success. Having agencies report multiagency initiatives to CJCC would also allow CJCC to maintain a comprehensive database of ongoing initiatives. To limit CJCC's role to initiatives that have a "significant impact" invites debate on what is and is not significant. Moreover, the fact that agencies did not agree on something as fundamental as the agency with lead responsibility for a number of initiatives suggests a gap in communication and understanding of participating agency roles and responsibilities. We have modified the wording of our recommendation to better reflect our intent that CJCC serve as a clearinghouse for multiagency initiatives, highlighting for CJCC members issues that warrant further discussion and coordination.

The U.S. Attorney for D.C. took issue with our characterization of night papering and officerless papering. She noted that night papering had been tried in the late 1980s and that the effort was cancelled because too few cases were presented for papering. The night papering project she referred to was limited to the evening hours before 10 p.m., and given the time required to complete the paperwork needed to make a charging decision, the number of evening arrests that this project could consider for papering was limited. With respect to officerless papering, the U.S. Attorney noted that her office has offered to work with MPDC on a pilot project for officerless papering. However, she cited practical, nonbudgetary reasons that officerless papering had not yet been piloted, and said that USAO and MPDC were unable to agree on the steps required to initiate it. For its part, MPDC said it appreciated our discussion of the papering process with USAO. In addition to the costs of the process in terms of officer time, the Chief of MPDC said that papering may deter officers from making lower-level arrests.

We did not specifically advocate the adoption of any of the papering processes used in other locations. Evidence exists to support or rebut the arguments made by various agencies regarding the merits and drawbacks of the current process. The debate concerning the papering issue has persisted for over a decade, and previous efforts to resolve it have been limited to discussions among D.C. criminal justice system agencies and have been unsuccessful. This is exactly the type of issue that could benefit from a broader perspective and increased visibility, and it underscores the need for CJCC to shed light on this and other complex issues in its annual reports to Congress, the Attorney General, and the D.C. Mayor. The high-level visibility of these reports could further impel agencies to seek resolution of contentious issues affecting the operation of the D.C. criminal justice system.

Ten of the 15 agencies provided additional information and technical suggestions, which we evaluated and incorporated as appropriate. The eight letters that contain comments other than clarifications and technical suggestions are printed in appendixes IX through XVI.

We are sending copies of this report to the Honorable John Ashcroft, Attorney General; the Honorable Rufus King, III, Chief Judge of the D.C. Superior Court; the Honorable Anthony A. Williams, Mayor of the District of Columbia; the Honorable Linda W. Cropp, Chair of the D.C. Council; Dr. Alice M. Rivlin, Chair of the D.C. Control Board; Charles H. Ramsey, Chief, MPDC; Robert R. Rigsby, D.C. Corporation Counsel; Dr. Jonathan L. Arden, Chief Medical Examiner of the District of Columbia; Wilma A. Lewis, U.S. Attorney for D.C.; Todd W. Dillard, the U.S. Marshal of the Superior Court for the District of Columbia; Cynthia E. Jones, Director of Defender Service; Jasper E. Ormond, Interim Director of Court Services; Susan W. Shaffer, Director of Pretrial Services; John L. Clark, Corrections Trustee; and Odie Washington, Director of DOC. Copies will also be made available to others upon request.

If you or your staff have any questions concerning this report, please contact me or William Jenkins Jr., on (202) 512-8777. Key contributors to this assignment were Mary Hall, Geoffrey Hamilton, Mary Catherine Hult, Donald Jack, Michael Little, and Mark Tremba.

Richard M. Stana
Director, Justice Issues

**CONTENTS:**
Letter                                                                                              1

**1449-501995**

0046- 022

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

| | | |
|---|---|---|
| Appendix I | Objectives, Scope, and Methodology | 35 |
| Appendix II | Agencies and Organizations Associated With the District of Columbia Criminal Justice System | 39 |
| Appendix III | D.C. Revitalization Act and Its Impact on District of Columbia Criminal Justice System Agencies | 49 |
| Appendix IV | Adult Offenses Prosecuted by the Office of the United States Attorney for D.C. | 57 |
| Appendix V | Adult Offenses Prosecuted by the Office of the Corporation Counsel | 94 |
| Appendix VI | Juvenile Offenses Prosecuted by the Office of the Corporation Counsel | 110 |
| Appendix VII | Initial Stages of Case Processing in the District of Columbia, Philadelphia, and Boston | 124 |
| Appendix VIII | District of Columbia Criminal Justice System Improvement Initiatives | 138 |
| Appendix IX | Comments From the Executive Office of the Mayor for D.C. | 188 |
| Appendix X | Comments From the D.C. Metropolitan Police Department | 190 |
| Appendix XI | Comments From D.C. Superior Court | 191 |
| Appendix XII | Comments From the U.S. Attorney for D.C. | 193 |
| Appendix XIII | Comments From the D.C. Corporation Counsel | 198 |
| Appendix XIV | Comments From the D.C. Corrections Trustee | 199 |
| Appendix XV | Comments From the Public Defender Service for D.C. | 200 |
| Appendix XVI | Comments From the D.C. Pretrial Services Agency | 202 |

Tables

| | | |
|---|---|---|
| Table 1: | D.C. Criminal Justice System Agencies and Their Principal Source of Funding | 7 |
| Table 2: | D.C. Criminal Justice Agencies Involved In Processing a "Typical" Case Through the Stages of the Criminal Justice System | 11 |
| Table 3: | Summary of Number and Subject Area of Ongoing D.C. Criminal Justice Initiatives, as of November 2000 | 29 |
| Table 4: | Agencies and Organizations Associated With the District of Columbia Criminal Justice System and Their Funding Sources | 39 |
| Table 5: | Reported Number of MPDC Officer Appearances, by Prosecuting Office and Type of Appearance, for Criminal Proceedings Begun in Calendar Year 1999 | 129 |

1449-501996

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

| | | | |
|---|---|---|---|
| Table 6: | MPDC Recorded Officer Time for Appearances, by Type, for Criminal Proceedings Begun in Calendar Year 1999 | 130 | |
| Table 7: | MPDC Recorded Officer Time for Appearances, by Type, for Criminal Proceedings Begun in Calendar Year 1999 for Cases Prosecuted by Corporation Counsel and USAO | 131 | |
| Table 8: | Reasons Recorded by USAO Attorneys for Cases in Which USAO Decided Not to File Formal Criminal Charges, November 1999 through June 2000 | 132 | |
| Table 9: | Number of Instances in Which One Agency Did Not Agree With the Information Provided by Another Agency Concerning an Initiative | 138 | |
| Table 10: | Closure of Lorton Correctional Complex Facilities | 145 | |

**Figures**

| | | | |
|---|---|---|---|
| Figure 1: | Typical Case Flow Process for Adult Felonies Prosecuted by the U.S. Attorney's Office | 90 | |
| Figure 2: | Typical Case Flow Process for Adult Misdemeanors Prosecuted by the U.S. Attorney's Office | 92 | |
| Figure 3: | Typical Case Flow Process for Adult Misdemeanors Prosecuted by the Office of the Corporation Counsel | 108 | |
| Figure 4: | Typical Case Flow Process for Offenses Committed by Children and Prosecuted by the Office of the Corporation Counsel | 122 | |

**Abbreviations**

| | |
|---|---|
| ACANS | Automated Computer Assisted Notification System |
| ACC | Assistant Corporation Counsel |
| AFIS | Automated Fingerprint Identification System |
| AFTC | Accelerated Felony Trial Calendar |
| ATF | Bureau of Alcohol, Tobacco and Firearms |
| AUSA | Assistant U.S. Attorney |
| BOP | Federal Bureau of Prisons |
| CAN | Community Alert Network |
| CANS | Court Appointment Notification System |
| CAPPS | Community Action Proactive Prosecution System |
| CCB | Central Cellblock |
| CIS | Court information system |
| CJA | Criminal Justice Act |
| CJCC | Criminal Justice Coordinating Council |
| CJIS | Criminal Justice Information System |
| CLWG | Criminal Legislation Working Group |
| CORE | Court-Imposed Pretrial Conditions of Release |
| CVCP | Crime Victim Compensation Program |
| D.C. | District of Columbia |
| DEA | Drug Enforcement Administration |
| DEFY | Drug Education for Youth |
| DOC | District of Columbia Department of Corrections |
| DOJ | Department of Justice |
| DWI | Driving while intoxicated |
| EACC | Electronic Application for Criminal Complaint |
| FBI | Federal Bureau of Investigation |

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

| | |
|---|---|
| HIDTA | High Intensity Drug Trafficking Area |
| HUD | Department of Housing and Urban Development |
| III | Interstate Identification Index |
| IJIS | Integrated Justice Information System |
| IRS | Internal Revenue Service |
| ITAC | Information Technology Advisory Committee |
| JACCS | Jail and Community Corrections System |
| JUSTIS | Justice Information System |
| MOU | Memorandum of Understanding |
| MPDC | Metropolitan Police Department of the District of Columbia |
| NATF | Nuisance Abatement Task Force |
| NCIC | National Crime Information Center |
| NCSC | National Center for State Courts |
| NCVC | National Center for Victims of Crime |
| NIJ | National Institute of Justice |
| NOVA | National Organization for Victim Assistance |
| OCCR | Office of Citizen Compliant Review |
| OIG | Office of Inspector General |
| OMB | Office of Management and Budget |
| OPM | Office of Personnel Management |
| PARS | Preliminary Arraignment System |
| PDID | Police Department Identification Number |
| PFP | Policing for Prevention |
| PINS | Persons in Need of Supervision |
| PPS | Partnership for Problem Solving |
| RIP | Rapid Indictment Program |
| RFP | Request for Proposal |
| ROC | Regional Operations Command |
| SCDIP | Superior Court Drug Intervention Program |
| TACIS | Time and Attendance Court Information System |
| USAO | Office of the United States Attorney for the District of Columbia |
| VBVPI | Value-Based Violence Prevention Initiative |
| WALES | Washington Area Law Enforcement System |

**APPENDIX-I:**
**Objectives, Scope, and Methodology**

A provision of the District of Columbia (D.C.) Appropriations Act (P.L. 106-113) for fiscal year 2000 directed us to conduct a study of the D.C. criminal justice system. To identify the agencies involved in D.C.'s criminal justice system and their roles and responsibilities, we reviewed relevant legislation, such as the National Capital Revitalization and Self-Government Improvement Act of 1997 (D.C. Revitalization Act), which altered some of the responsibilities and/or funding of D.C. criminal justice agencies. We also reviewed previous studies of D.C. criminal justice agencies and their operations, agency documents on policies and procedures, and relevant agency budgets for fiscal year 2000 and requests for fiscal year 2001. In addition, we interviewed officials in the following agencies: the U.S. Attorney's Office (USAO) for the District of Columbia, the Metropolitan Police Department of the District of Columbia (MPDC), Superior Court of the District of Columbia (Superior Court), Public Defender Service for the District of Columbia (Defender Service), District of Columbia Pretrial Services Agency (Pretrial Services), Court Services and Offender Supervision Agency for the District of Columbia (Court Services), Office of the Corporation Counsel for the District of Columbia (Corporation Counsel), Office of the District of Columbia Chief Medical Examiner (Medical Examiner), U.S. Marshals Service, Office of the Corrections Trustee for the District of Columbia, and the Criminal Justice Coordinating Council for the District of Columbia (CJCC). We also interviewed officials from the Council for Court Excellence and the Justice Management Institute.

**1449-501998**

0046- 025

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

We generally asked each of the agency officials interviewed to identify (1) any prior studies of one or more parts of D.C.'s criminal justice system and (2) the most important problems facing the system. On the basis of our review of available documents and these interviews, we identified five major problem areas as follows:

. The process used by USAO and Corporation Counsel n1 to determine whether those arrested would be formally charged with a crime (which participants referred to as the "papering" process) was perceived to be problematic. Issues included the completeness and accuracy of police paperwork submitted to prosecutors and compensatory time off for police officers, who were required to meet with prosecutors in person to discuss their paperwork and the circumstances of the arrest.
. The process used to schedule or "calendar" cases in Superior Court was perceived to be inefficient and resulted in long waiting times for police officers, witnesses, attorneys, and others scheduled to appear in court. MPDC officials said that the process resulted in significant police overtime costs.
. The juvenile justice system was perceived to have numerous, complex, interrelated problems.
. A principal issue in the process for collecting and evaluating forensic evidence, such as clothing fibers, tissue, and hair samples, was whether a central forensic facility would significantly enhance D.C.'s forensic capacities. Currently, forensic tests are performed by federal and D.C. agencies.
. Officials told us that existing criminal justice databases did not necessarily have accurate, reliable data and that their structure impeded the sharing of data among criminal justice agencies.

n1 USAO prosecutes felonies, such as homicide and armed robbery, and "serious" misdemeanors committed by adults in D.C. Corporation Counsel prosecutes "minor" misdemeanors, such as drinking in public or disorderly conduct, in addition to criminal traffic offenses and offenses committed by children.

On the basis of our document reviews and interviews, each of these problems appeared to affect multiple D.C. criminal justice agencies, although not always the same ones.

In our initial survey work, we also found that a number of initiatives had been proposed or were under way to address a variety of D.C. criminal justice issues. After discussing our initial findings with the committees of jurisdiction, we focused on the following objectives:

. assess how the structure of the D.C. criminal justice system has affected coordination;
. assess the mechanisms that exist to coordinate the activities of the system; and
. describe current initiatives by federal and D.C. agencies for improving the operation of the D.C. criminal justice system.

We did not focus on court case scheduling because CJCC had selected the Council for Court Excellence and Justice Management Institute to conduct a study of this issue. The problems officials noted in the juvenile justice system extended beyond criminal justice agencies (e.g., counseling and/or residential care) and we limited the scope of our review to D.C. criminal justice agencies. We also gathered available data on D.C.'s current forensic capabilities and practices and the potential need for a central, comprehensive forensic laboratory in D.C. We reviewed a recent National Institute of Justice (NIJ) report on D.C.'s forensic capabilities and interviewed an NIJ official and a local forensic official who served on the NIJ assessment team. However, we were unable to obtain data that could be used to document the effects of the District's current forensic practices that would be remedied by a central, comprehensive forensic facility. Because CJCC had a major initiative under way to address the automated data systems within the D.C. criminal justice system, we limited our work to describing this initiative and the problems it is designed to address.

To assess how the structure of the D.C. criminal justice system affected coordination, we interviewed officials in each of the offices mentioned above and reviewed available written policies, procedures, and descriptions of the case flow process. We also reviewed the provisions of the D.C. Revitalization Act, which federalized some D.C. criminal justice agencies, such as Defender Service and Court Services. From these sources we drafted three separate case flow

**1449-501999**

0046- 026

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

descriptions: (1) cases prosecuted by USAO, (2) cases prosecuted by Corporation Counsel, and (3) juvenile cases, and we discussed the responsibilities of each agency in each process. These drafts were reviewed by the participating agencies for accuracy and amended as appropriate.

We reviewed the charging process with USAO, Corporation Counsel, MPDC, and Pretrial Services officials--the principal participants in the process. We reviewed available policies and procedures at the participating agencies and observed the process at each agency, from the initial paperwork completed by police officers following an arrest through the decision by USAO or Corporation Counsel to file or not file formal charges. Because of the unique structure of the D.C. criminal justice system, there are no jurisdictions whose criminal justice structures and processes are comparable to those of D.C. However, we reviewed prior studies of the process and interviewed officials in Philadelphia and Boston, two large East Coast cities that have recently revised their methods of processing cases from arrest through initial court appearance. Both Philadelphia and Boston have a large annual number of misdemeanor and felony arrests, but their papering systems are more automated than D.C.'s process.

We also reviewed the available monthly reports (November 1999 through June 2000) that USAO provided to MPDC on its papering decisions. These reports identified, by case, the reasons assistant U.S. Attorneys declined to file charges against arrestees. We did not verify the data in these monthly reports. Using spreadsheets, we analyzed these reports by offense and police district to identify any variances or patterns by offense and police district. We discussed the results of this analysis with USAO and MPDC officials. We also discussed an initiative designed to reduce the amount of police officer time expended on the papering process for criminal misdemeanor cases prosecuted by Corporation Counsel with MPDC and Corporation Counsel officials. Available data could not be used to analyze officer time expended on "papered" versus "nonpapered" cases by offense.

To identify existing mechanisms to coordinate the multiagency activities of the D.C. criminal justice system, we interviewed D.C. criminal justice agency officials and reviewed agencies' organizational charts and policies and procedures.

To identify initiatives planned or under way for improving the operation of D.C.'s criminal justice system, we contacted D.C. criminal justice agencies and the Department of Justice agencies that provided criminal justice assistance to D.C. (e.g., forensic testing for drugs). We asked each agency to describe (1) its initiatives, if any; (2) the purpose of each initiative; (3) the status of each initiative; and (4) any plans to evaluate the results of each initiative. We summarized these initiatives, obtained clarification or additional information where needed, provided our summary to each agency for its review and comment, and incorporated their changes as appropriate.

We did our work between October 1999 and December 2000 in Washington, D.C.; Philadelphia; and Boston, in accordance with generally accepted government auditing standards.

**APPENDIX-II:**
**Agencies and Organizations Associated With the District of Columbia Criminal Justice System**
The D.C. criminal justice system involves a number of D.C. agencies, federal agencies, and private organizations. These agencies and organizations are funded through congressionally appropriated federal and local funds and/or private sources. This appendix presents basic descriptive information on these agencies and organizations. n1

       n1 In addition to the agencies and organizations discussed in this appendix, there are numerous other law enforcement agencies operating within the boundaries of the District of Columbia that present their arrestees to the D.C. Metropolitan Police Department for processing.

Through discussions with the Executive Director of the District of Columbia Criminal Justice Coordinating Council (CJCC) and review of CJCC documentation, we identified various District, federal, and private organizations associated with the D.C. criminal justice system, either directly or indirectly. We met with representatives from most of these

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

organizations and obtained their views and comments on the operations of the D.C. criminal justice system and where they saw need for improvement. Responsibilities and funding for some of these agencies was affected by the National Capital Revitalization and Self-Government Improvement Act of 1997 (D.C. Revitalization Act). n2

n2 This act was enacted as Title XI of the Balanced Budget Act of 1997, Public Law 105-33.

Table 4 identifies the sources of funding for the various D.C. and federal agencies and private organizations that we identified as being associated with the D.C. criminal justice system.

Table 4: Agencies and Organizations Associated With the District of Columbia Criminal Justice System and Their Funding Sources

| Agencies/Organizations | Funding source(s) |
| --- | --- |
| District of Columbia | |
| Metropolitan Police Department | Local, federal, private and other, intradistrict |
| Office of the Corporation Counsel | Local, federal, private and other, intradistrict |
| Department of Corrections | Local, federal, private and other, intradistrict |
| Office of the Chief Medical Examiner | Local, federal, private and other, intradistrict |
| Office of the Corrections Trustee | Federal |
| Public Defender Service | Federal |
| Superior Court | Federal |
| Criminal Justice Coordinating Council | Local |
| Federal | |
| Office of the United States Attorney for the District of Columbia | Federal |
| U.S. Marshals Service | Federal |
| Federal Bureau of Prisons | Federal |
| U.S. Parole Commission | Federal |
| Court Services and Offender Supervision Agency for the District of Columbia | Federal |
| District of Columbia Pretrial Services | Federal |

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Table 4: Agencies and Organizations Associated With the District of Columbia Criminal Justice System and Their Funding Sources

| Agencies/Organizations Agency | Funding source(s) |
|---|---|
| Private | |
| Council for Court Excellence | Individuals, law firms, businesses, and foundations |
| The Justice Management Institute | Federal grants, state/local contracts, and contributions |

Note: Description of D.C. agencies' funding sources:

Local--Includes tax and nontax revenue not earmarked for a particular purpose.

Federal funding provided by the federal government to support federally established programs or grants for a particular purpose.

Private and other--Funding from other sources including private grants and charges for services that are retained by the agency to cover the cost associated with the service provided.

Intradistrict--An accounting mechanism to track payments for services provided by one D.C. agency to another D.C. agency.

### District of Columbia Agencies

Metropolitan Police Department
The mission of MPDC is to prevent crime and the fear of crime, as it works with others to build safe and healthy communities throughout the District of Columbia. The Office of the Chief of Police, the Operations Division, and the Office of Corporate Support are responsible for organizing MPDC and deploying resources to achieve MPDC's mission and goals. According to MPDC documents, these responsibilities include establishing professional standards for members that ensure a higher level of integrity and ethical conduct than is generally accepted of others. The Chief and his staff are responsible for ensuring that all operations of MPDC are oriented toward serving the needs of a diverse community, as well as the federal interests associated with Washington's unique role as the Nation's Capital.

### Operations Division

The Operations Division oversees all operations in the MDPC. Headed by the Executive Assistant Chief, Operations is organized into three Regional Operations Commands (ROC); a Special Services Command; and an Operations Command; Executive Protection; and Central Crime Analysis.

The ROCs encompass the seven D.C. police districts. ROC North includes the 2nd and 4th districts; ROC Central includes the 1st, 3rd, and 5th districts; and ROC East includes the 6th and 7th districts. Each ROC is commanded by a regional assistant chief whose office is located within the community being served. The 7 districts are further subdivided into 83 Police Service Areas, which are individual neighborhoods within the districts.

The Special Services Group includes specialized units, such as Emergency Response, Major Narcotics, Special Operations, and Major Crash Investigations that have unique training, resource, and operational needs.

The Operations Command was established to ensure a 24-hour a day departmentwide command presence to respond to and oversee major incidents that require MPDC presence at any location in the city, at any time of the day.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Corporate Support**

This new structure centralizes critical business functions of MPDC with the goal of streamlining the delivery of services in three main areas: human services, business services, and information technology. Corporate Support is headed by a civilian senior executive director. The units oversee most of the administrative and technical functions that are critical to MPDC's success.

Office of the Corporation Counsel
The mission of the Office of the Corporation Counsel is to fairly prosecute those who violate the law, defend or initiate civil action, protect the rights of citizens of D.C., provide expert legal advice and counsel, and to review and advise on commercial transactions. Due to D.C.'s unique status, which involves aspects of state, county, and local government functions, Corporation Counsel provides a variety of legal services, including matters typically handled by State Attorneys General, District or State's Attorneys, and City or County Attorneys.

To accomplish its varied responsibilities, the Corporation Counsel's work is carried out by six major clusters: (1) the Office of Public Protection and Enforcement, (2) the Office of Government Operations, (3) the Office of Management and Operations, (4) the Office of Torts and Equity, (5) the Commercial Division, and (6) the Appellate Division. The Office of the Public Protection and Enforcement handles, among other things, the prosecution of "minor" adult misdemeanor offenses, all criminal traffic offenses, and all misdemeanor and felony offenses committed by children.

Department of Corrections
The mission of DOC is to ensure public safety and uphold the public's trust by providing for the safe and secure confinement of pretrial detainees and sentenced inmates. DOC carries out its mission through four major organizational divisions: (1) Office of the Director, (2) Deputy Director for Operations, (3) Deputy Director for Institutions, and (4) Deputy Director for Administration and Program Services.

DOC is transforming itself from operating similar to a state/county prison system to operating similar to a city/county jail system in accordance with the D.C. Revitalization Act. This legislation calls for the transfer of all felons sentenced pursuant to the D.C. Code incarcerated at the Lorton Correctional Complex to the Federal Bureau of Prisons (BOP) facilities by December 31, 2001. DOC will remain responsible for inmates incarcerated at Lorton until December 31, 2001, or the date the last inmate housed there has been transferred to BOP. The D.C. Revitalization Act also established the District of Columbia Corrections Information Council to provide BOP with advice and information on matters affecting D.C. sentenced felons. However, the Council was never actually funded or established.

Office of the Corrections Trustee
During the transition period, an independent Office of the Corrections Trustee was established and a Corrections Trustee selected to oversee financial operations of the DOC until BOP has incarcerated all felons sentenced under the D.C. Code. The Office of the Corrections Trustee is charged with a broad mandate for financial oversight of the operations of the DOC and has been the primary source of DOC's funding since October 1997. For fiscal year 2001, Congress provided the Corrections Trustee funds to help implement improvements and efficiencies in the disposition of D.C. criminal cases.

The Corrections Trustee is required to report annually to Congress on behalf of D.C. and federal agencies on the progress of the transfer of convicted felons from D.C.'s Lorton correctional complex to BOP custody. The Corrections Trustee also prepared the Leo Gonzalez Wright report commissioned by the Attorney General for filing with the U.S. District Court for the D.C. According to the Corrections Trustee, as a result of the report, the Deputy Attorney General requested that the Corrections Trustee coordinate implementation of the report's recommendations with all affected federal and D.C. agencies. In January 2000, the Corrections Trustee organized an interagency committee of 15 federal and D.C. criminal justice agencies to improve the coordination and logistical planning of various detention-related processes. The committee's membership largely overlaps that of the CJCC.

Office of the Chief Medical Examiner
The District of Columbia Office of the Chief Medical Examiner is located under the D.C. Department of Health. The mission of the Office of the Chief Medical Examiner is to conduct and report on the medical investigation of all known or suspected homicides, suicides, accidental deaths, medically unattended deaths, and deaths that might constitute a

threat to the public health and safety. The Office of the Chief Medical Examiner is to be staffed and on call 24 hours a day to determine a cause of death, a manner of death, and investigate the circumstances surrounding all deaths that occur within the District of Columbia.

Public Defender Service

The mission of Defender Service is to provide quality legal service to indigent individuals in order to get them completely and permanently out of the criminal justice system. The agency carries out its mission through the Legal Services program and the Criminal Justice Act (CJA) office. As noted in its fiscal year 2001 budget submission, Defender Service attorneys handle a number of cases charging the most serious offenses. Additionally, Defender Service attorneys are trained to be criminal law "experts," who are forbidden by statute from engaging in the private practice of law. Defender Service provides support in the form of training, consultation, and legal reference services to members of the local bar appointed as counsel in criminal, juvenile, and mental health cases involving indigent individuals. Defender Service is governed by an 11-member Board of Trustees appointed by a panel consisting of the Chief Judge of the U.S. District Court for the District of Columbia, the Chief Judge of the D.C. Court of Appeals, the Chief Judge of the Superior Court, and the Mayor. The Board appoints the Director and Deputy Director of Defender Service.

Superior Court of the District of Columbia

The mission of the Superior Court of the District of Columbia is to provide fair, accessible, timely, and effective justice for all who appear before it or use its services. The D.C. Court of Appeals, Superior Court, and the Court System constitute the judicial branch of the D.C. government. Superior Court, the largest of these entities, is a trial court of general jurisdiction with responsibility for local trial litigation functions, including civil (civil actions, landlord tenant, and small claims), criminal (felonies, misdemeanors, traffic, city ordinance violations, and criminal tax cases), family (juvenile, domestic relations, neglect and abuse, adoption, and child support), probate, and tax matters. The criminal division of the Superior Court handles the vast majority of adult criminal cases prosecuted by both the USAO and the Corporation Counsel in the District of Columbia.

The financing of the District of Columbia Courts was transferred to the federal government by the D.C. Revitalization Act.

Criminal Justice Coordinating Council

The CJCC is an expansion of the Memorandum of Understanding (MOU) Partners that was established in December 1996 to oversee a comprehensive reform of the MPDC. During this reform process, as MPDC demonstrated significant and lasting progress in its operations, the MOU Partners began to informally expand its membership and agenda to address more comprehensive, systemwide criminal justice issues. CJCC was formally organized on May 28, 1998. According to a CJCC official, its creation was an acknowledgement by member organizations that reducing crime and improving the quality of life in the city is the responsibility of all member agencies and other city resources.

The mission of CJCC is to serve as the forum for identifying issues and their solutions, proposing actions, and facilitating cooperation that will improve public safety and the related criminal and juvenile justice services for D.C. residents, visitors, victims, and offenders. The CJCC draws upon local and federal agencies and individuals to develop recommendations and strategies for accomplishing this mission. Its guiding principles are creative collaboration, community involvement, and effective resource utilization. It seeks to develop targeted funding strategies and comprehensive management information through integrated information technology systems and social science research to reach its goal.

The CJCC is comprised of 18 members. Members include the Mayor; Deputy Mayor for Public Safety; Chair, City Council; Chair, City Council Committee on the Judiciary; Corrections Trustee; Acting Director, Court Services; D.C. Corporation Counsel; Chief Judge, Superior Court; U.S. Attorney for the District of Columbia; Chief of Police, MPDC; Chairperson and another member, District of Columbia Financial Responsibility and Management Assistance Authority; Director, Youth Services Administration, Department of Human Services; Director, Pretrial Services; Director, Defender Service; Director, DOC; Director, BOP; and Chair, U.S. Parole Commission.

Federal Agencies

1449-502004

U.S. Attorney for the District of Columbia
The U.S. Attorney's Office for the District of Columbia is the largest of the 94 U.S. Attorney Offices and has unique federal and local responsibilities. It has over 350 Assistant U.S. Attorneys and over 350 support personnel. It is responsible for the prosecution of federal crimes and all serious local crimes--felonies and certain misdemeanors--committed by adults in the District of Columbia. It also represents the United States and its departments and agencies in civil proceedings in federal court in the District of Columbia.

The mission of this office is to enforce the criminal laws of the United States and the District of Columbia, represent the interests of the United States in civil litigation, and respond to the public safety needs of the community.

The office is organized into a number of separate divisions and sections. These include

**Superior Court Division,** which includes six sections: (1) Misdemeanors, (2) Grand Jury/Intake, (3) General Felonies, (4) Sex Offenses and Domestic Violence, (5) Homicide, and (6) Community Prosecution.

**U.S. District Court Criminal Division,** which includes 5 sections: (1) Narcotics, (2) Economic Crimes, (3) Transnational/Major Crimes, (4) Public Corruption/Government Fraud, and (5) Gang Prosecution and Intelligence.

**Civil Division,** which represents the United States and its departments and agencies at both the trial and appellate levels in civil actions filed in this jurisdiction.

**Appellate Division,** which is responsible for handling all appeals from criminal convictions in the D.C. Court of Appeals and the U.S. Court of Appeals for the District of Columbia Circuit.

**Special Proceedings Section,** which handles postconviction prisoner petitions, release hearings, expungement hearings, and other specialized proceedings.

**Administrative Division,** which provides policy and procedural direction and central services support for the office of all areas of management and administration.

U.S. Marshals Service
The mission of the U.S. Marshals Service is to protect the federal courts and ensure the effective operation of the judicial system. Within D.C., the U.S. Marshals Superior Court District of Columbia office was created to provide the D.C. courts with the same services that all other U.S. Marshals Services' districts provide to U.S. District Courts. Documentation provided by the U.S. Marshals Superior Court District of Columbia states that the office also serves as the de facto sheriff's office for the District of Columbia. Among the duties performed by the U.S. Marshals in the District are handling prisoners appearing before the D.C. Superior Court and grand jury presentations, providing security for court officers, and serving eviction notices and judicial warrants of all types on D.C. residents.

Federal Bureau of Prisons
The mission of BOP is to protect society by confining offenders in controlled environments of prisons and community-based facilities that are safe, humane, and appropriately secure, and which provide work and other self-improvement opportunities to assist offenders in becoming law abiding citizens. The D.C. Revitalization Act requires the closing of D.C.'s correctional facilities in Lorton by the end of 2001, and in general, the transfer of felon inmates sentenced pursuant to the D.C. Code and residing at Lorton to penal or correctional facilities operated or contracted for by BOP. After Lorton is closed, DOC is responsible for, among other things, the operation of the D.C. Jail and overseeing the operation of the Correctional Treatment Facility. BOP is responsible for the D.C. sentenced felon inmate population.

U.S. Parole Commission
The mission of the U.S. Parole Commission is to ensure the public safety by exercising its authority regarding the release and supervision of criminal offenders under its jurisdiction in a way that promotes justice. The Parole Commission makes decisions to grant or deny parole to federal and D.C. Code prisoners serving sentences of more than 1 year, sets conditions of parole, supervises parolees and mandatory releasees, recommits parolees in the event of violations of the conditions of supervision, and determines the termination of supervision pursuant to the Parole Commission and Reorganization Act of 1976.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

In August 1998, the Parole Commission became responsible for, among other things, granting and denying parole to District of Columbia inmates in D.C. and BOP prisons. Under the D.C. Revitalization Act, the Parole Commission is required to exercise its parole authority over D.C. felony offenders pursuant to D.C.'s parole laws and regulations that may be different from federal parole laws and regulations. The D.C. Revitalization Act also, in general, gave the Parole Commission the authority to amend or supplement any regulations interpreting or implementing D.C. parole laws with respect to felons.

Court Services and Offender Supervision Agency
Court Services (formerly known as Offender Supervision, Defender and Courts Services) was established by the D.C. Revitalization Act, as amended, and assumed responsibility for D.C. government functions related to pretrial services, parole, probation, and supervised release. Court Services shall carry out its responsibilities on behalf of the court or agency having jurisdiction over the offender being supervised. The legislation originally had Pretrial Services and the Defender Service both functioning as independent entities within Court Services. The District of Columbia Courts and Justice Technical Corrections Act of 1998 (Public Law 105-274, Oct. 21, 1998), removed the Public Defender Service from Court Services jurisdiction. Under the terms of the D.C. Revitalization Act, Court Services is federally funded and officially assumed its duties as a federal agency on August 5, 2000. The Director of Court Services is nominated by the President of the United States by and with the advice and consent of the U.S. Senate.

The mission of Court Services is to increase public safety, prevent crime, reduce recidivism, and support the fair administration of justice in close collaboration with the community. Court Services is responsible for supervising individuals within the community who are on probation, parole, or supervised release. n3

n3 Parole and supervised release are forms of post-prison community supervision. Those offenders on probation have been placed on probation in lieu of incarceration.

Pretrial Services Agency
Pretrial Services functions as an independent entity within Court Services. The mission of Pretrial Services is to assist the trial and appellate levels of both the federal and local courts in determining eligibility for pretrial release by providing background information on the majority of arrestees. Pretrial Services is also responsible for supervising conditions of pretrial release and reporting on compliance or lack thereof to the court. According to a Pretrial Services official, Pretrial Services operates a forensic laboratory that provides drug testing for persons on pretrial release, probation, parole, or supervised release. Pretrial Services is advised by an Executive Committee that includes the four chief judges of the local and federal trial and appellate courts, the U.S. Attorney for the District of Columbia, the Director of Defender Service, and the acting Director of Court Services.

The Director, Court Services, shall submit, on behalf of the Pretrial Services Agency and with the approval of its Director, an annual appropriation request to the Office of Management and Budget (OMB). The Director of Pretrial Services is appointed by the Executive Committee.

Private Agencies
The private organizations discussed below are organizations that are doing a study of the D.C. caseflow management, with a major goal being the increase of police presence in the community through reducing the time police officers now spend in court and prosecutors' offices.

Council for Court Excellence
The Council for Court Excellence is a nonprofit, nonpartisan civic organization founded in Washington, D.C., in 1982. The Council works to improve the administration of justice in the local and federal courts and related agencies in the Washington metropolitan area and in the nation by

**1449-502006**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

. identifying and promoting specific court reforms,

. improving public access to justice, and

. increasing public understanding and support of our justice system.

The Justice Management Institute
The Justice Management Institute is a nonprofit organization that provides services to courts and other justice system agencies throughout the United States and abroad. Its mission is to improve the overall administration of justice by helping courts and other justice system institutions and agencies achieve excellence in leadership, operations, management, and services. Its activities are concentrated in four main areas: (1) technical assistance, (2) education and training, (3) research, and (4) information dissemination. The Justice Management Institute is currently assisting the Council for Court Excellence on a broad-scale criminal caseflow management project that, among other things, is looking at the time MPDC officers spend in court and prosecutors' offices.

**APPENDIX-III:**
**D.C. Revitalization Act and Its Impact on District of Columbia Criminal Justice System Agencies**
The National Capital Revitalization and Self-Government Improvement Act of 1997 (D.C. Revitalization Act) n1 made changes to several D.C. programs, including programs in the D.C. criminal justice system. The criminal justice programs affected by the legislation include (1) corrections, (2) sentencing, (3) offender supervision and parole, (4) District of Columbia Courts, and (5) Pretrial Services Agency (Pretrial Services) and Public Defender Service (Defender Service). The District of Columbia Courts and Justice Technical Corrections Act of 1998 n2 amended various sections of the D.C. Revitalization Act relating to D.C. criminal justice system programs.

n1 The National Capital Revitalization and Self-Government Improvement Act of 1997 was enacted as title XI of the Balanced Budget Act of 1997 (Public Law 105-33, 111 Stat. 251, 734 (1997)).

n2 Public Law 105-274, 112 Stat. 2419 (1998).

The following summary reflects certain changes to the statutory framework of the D.C. criminal justice system as a result of the D.C. Revitalization Act, as amended.

**Corrections**

Federal Bureau of Prisons
The D.C. Revitalization Act provided for the closure of the D.C. Lorton Correctional Complex and the transfer of sentenced felons to the federal Bureau of Prisons (BOP). The legislation required that, by October 1, 2001, all felons sentenced to incarceration pursuant to (1) the D.C. Truth in Sentencing Commission issued "Truth-In-Sentencing" requirements or (2) the D.C. Code, be designated by BOP to a facility operated by or contracted for by BOP. The legislation also required that the Lorton Correctional Complex be closed by December 31, 2001, and that the felony population sentenced pursuant to the D.C. Code residing at Lorton be transferred to a facility operated by or contracted for by BOP. BOP is to acquire land and construct new facilities at BOP selected sites or contract for appropriate bed space. The D.C. Department of Corrections (DOC) is, in general, to remain responsible for those inmates housed at Lorton until December 31, 2001, or until the last inmate has been transferred to BOP, whichever is earlier. n3 After this date, the D.C. DOC will no longer be responsible for various functions related to housing a felony population. The D.C. Revitalization Act authorized the establishment of a three-member D.C. Corrections Information Council to provide BOP with advice and information regarding matters affecting D.C. sentenced felons. However, the Council was never funded or established.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

n3 Also see *District of Columbia: Issues Related to the Youngstown Prison Report and Lorton Closure Process* (GAO/GGD-00-86, Apr. 7, 2000), which provides additional details regarding the closing of the Lorton Correctional Complex.

As of March 2000, BOP had awarded contracts for the construction of two correctional facilities to house D.C. inmates. However, several stop-work orders were issued for one of the facilities. BOP has also contracted to transfer some D.C. inmates to non-BOP correctional facilities.

As of March 2001, five of the seven Lorton facilities have been closed--Medium Security, Occoquan, Minimum Security, Maximum Security, and Youth. The two remaining facilities, Central and Modular, are scheduled to close in December 2001.

Corrections Trustee
Pursuant to the federal government assuming responsibility for persons convicted of a felony offense under the D.C. Code housed at the Lorton Correctional Complex, the Attorney General, in consultation with certain D.C. and court officials, was required to select a Corrections Trustee, an independent officer of the D.C. government. The Trustee is to oversee financial operations of DOC until such time as BOP has transferred all felons sentenced under the D.C. Code residing at Lorton to a facility operated by or contracted for by BOP. Corrections Trustee responsibilities include (1) financial oversight of DOC and allocation of funds as enacted in law or as otherwise allocated, including funds for short term improvements necessary for the safety and security of staff, inmates, and the community; (2) purchase of any necessary goods or services on behalf of DOC; and (3) to work with BOP to establish a priority employment consideration program to facilitate placement for displaced DOC employees. The Corrections Trustee is to propose funding requests each fiscal year to the President and Congress. Upon receipt of federal funding, the Corrections Trustee is to provide an advance reimbursement to BOP of those funds identified by Congress for construction of new prisons and major renovations. BOP will be responsible and accountable for determining how these funds are used for renovation and construction. Both DOC and BOP shall maintain accountability for funds reimbursed from the Corrections Trustee, and shall provide expense reports by project at the request of the Corrections Trustee.

On September 26, 1997, the Attorney General announced the appointment of the D.C. Corrections Trustee.

**Sentencing**

Truth in Sentencing Commission
The Truth in Sentencing Commission was established as an independent agency to make recommendations, within 180 days after enactment of the D.C. Revitalization Act, to the D.C. Council for amendments to the D.C. Code with respect to the sentences to be imposed for all felonies committed on or after 3 years of passage of the D.C. Revitalization Act. The Commission members were to include seven voting members with knowledge and responsibility with respect to criminal justice matters: Attorney General (or designee); two judges of the Superior Court of the District of Columbia; and one representative each from the D.C. City Council, the D.C. government executive branch, Defender Service, and the Office of the U.S. Attorney for the District of Columbia. Single representatives from BOP and the D.C. Office of Corporation Counsel shall serve as nonvoting ex officio members.

In 1998, the D.C. Council created an advisory body by enacting the Advisory Commission on Sentencing Establishment Act of 1998. The D.C. Council approved the sentencing guidelines recommended by the Commission on July 11, 2000.

**Offender Supervision and Parole**

Parole
No later than 1 year after the date of enactment of the D.C. Revitalization Act, the U.S. Parole Commission shall assume jurisdiction and authority of the Board of Parole of the District of Columbia to grant and deny parole and to impose conditions upon an order of parole in the case of any imprisoned felon who is eligible for parole or reparole

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

under D.C. Code. The U.S. Parole Commission shall have exclusive authority to amend or supplement any regulation interpreting or implementing the parole laws of D.C. with respect to felons.

On the date of establishment of the Court Services and Offender Supervision Agency (Court Services), n4 the

. U.S. Parole Commission shall assume any remaining powers, duties, and jurisdiction of the Board of Parole of the District of Columbia, including jurisdiction to revoke parole and to modify the conditions of parole, with respect to felons;

. Superior Court of the District of Columbia shall assume the jurisdiction and authority of the Board of Parole of the District of Columbia to grant, deny, and revoke parole, and to impose and modify conditions of parole, with respect to misdemeanants; and

. Board of Parole established in the District of Columbia Board of Parole Amendment Act of 1987 shall be abolished.

n4 The agency was established and named the District of Columbia Offender Supervision, Defender, and Courts Services Agency in the D.C. Revitalization Act. The District of Columbia Courts and Justice Technical Corrections Act of 1998 (Public Law 105-274, 112 Stat. 2419 (1998), renamed the agency the Court Services and Offender Supervision Agency.

Pretrial Services, Parole, Adult Probation, and Offender Supervision Trustee n5

n5 Public Law 105-274 provisions removed Defender Service from Court Services Trustee and Court Services Agency jurisdiction.

A trustee will be appointed by the Attorney General in consultation with the Chair of the D.C. Control Board and the Mayor, who will be responsible for the reorganization and transition of functions and funding relating to pretrial services, parole, adult probation, and offender supervision.

Beginning with appointment and continuing until establishment of Court Services, the trustee shall

. have the same powers and duties as the Director of Court Services;

. have the authority to direct actions of all agencies of the District of Columbia whose functions will be assumed by Court Services and the D.C. Board of Parole;

. exercise financial oversight over all D.C. agencies whose functions will be assumed by Court Services and the D.C. Board of Parole, and allocate funds to these agencies as appropriated by Congress and allocated by the President;

. receive and transmit to Pretrial Services all funds appropriated for such agency; and

. receive and transmit to Defender Service all funds appropriated to such agency.

On September 26, 1997, the Attorney General announced the appointment of the D.C. Pretrial Services, Parole, and Offender Supervision Trustee. The trusteeship ended on August 4, 2000, with the certification of the agency by the Attorney General as an independent federal executive agency.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Court Services and Offender Supervision Agency
Court Services was established in the executive branch of the federal government, to be headed by a director appointed by the President, by and with the advice and consent of the Senate, for a term of 6 years. In general, the agency is to provide supervision, through qualified supervision officers, for offenders on probation, parole, and supervised release pursuant to the D.C. Code. The agency is to carry out its responsibilities on behalf of the court or agency having jurisdiction over the offender being supervised. An interim director has led Court Services since the trusteeship ended on August 4, 2000. As of March 2001, a permanent director had not been appointed.

The agency is responsible for the following individuals.

**Released offenders** -- The agency shall supervise any offender released from imprisonment for any term of supervised release imposed by the Superior Court of the District of Columbia. Such offender shall be subject to the authority of the U.S. Parole Commission until completion of the term of supervised release.

**Probationers** -- The agency shall supervise all offenders placed on probation by the Superior Court of the District of Columbia, subject to appropriations and program availability.

**Parolees** -- The agency shall supervise all individuals on parole pursuant to the D.C. Code. The agency shall carry out the conditions of release imposed by the U.S. Parole Commission or, with respect to a misdemeanant, by the Superior Court of the District of Columbia.

The D.C. Revitalization Act further provided that Pretrial Services shall function as an independent entity within the agency. (Defender Service was also to function as an independent entity within Court Services; however, provisions of Public Law 105-274 removed Defender Service from the jurisdiction of Court Services and the trustee.)

The director of Court Services shall submit, on behalf of Pretrial Services and with the approval of the Director of Pretrial Services, an annual appropriation request to the Office of Management and Budget (OMB). Such request shall be separate from the request for the agency. (A similar provision for Defender Service was removed by Public Law 105-274. However, Public Law 105-274 added a provision that the director of the agency shall receive and transmit to the Defender Service all funds appropriated for such agency.)

In addition, there are authorized to be appropriated n6 in each fiscal year such sums as may be necessary for the following

. Pretrial Services;

. supervision of offenders on probation, parole, or supervised release for offenses under the D.C. Code;

. operation of the parole system for offenders convicted of offenses under the D.C. Code; and

. operation of the Pretrial Services, Parole, Adult Probation, and Offender Supervision Trusteeship.

n6 The D.C. Revitalization Act originally provided that such funds were authorized to be appropriated "through the State Justice Institute." Public Law 105-274 deleted the phrase "through the State Justice Institute."

**District of Columbia Courts**
The administration and financing of the District of Columbia Courts (i.e., Superior Court of the District of Columbia, District of Columbia Court of Appeals, and the District of Columbia Court System) is transferred to the federal government. Funding for these courts is authorized to be appropriated for payment to the Joint Committee on Judicial

**1449-502010**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Administration in the District of Columbia, which shall include in its budget submission to OMB and Congress, the budget and appropriations requests of these courts.

## Pretrial Services and Defender Service

Pretrial Services
The D.C. Revitalization Act amended various D.C. Code provisions regarding Pretrial Services. For example, the D.C. Revitalization Act provided that a seven-member executive committee would advise the agency. The Chief Judges of the U.S. Court of Appeals for the District of Columbia Circuit and the U.S. District Court for the District of Columbia, in consultation with other executive committee members would appoint a director for the agency who shall be a member of the D.C. bar.

The D.C. Revitalization Act also provided information relating to

. the duties and compensation of the director;

. the director's employment of a chief assistant and other personnel necessary to conduct the business of the agency;

. the requirement for the director to submit an annual report to the executive committee and Court Services Director on the agency's administration of its responsibilities for the previous fiscal year and a statement of financial condition, revenues, and expenses; and

. that funding and appropriations for the agency will be received and disbursed by the Court Services Director to and on behalf of Pretrial Services.

Defender Service
The D.C. Revitalization Act amended various sections of the D.C. Code relating to Defender Service. For example, the D.C. Revitalization Act required the appointment of a director and deputy director by the Chief Judges of the U.S. Court of Appeals for the District of Columbia Circuit and the U.S. District Court for the District of Columbia. The D.C. Revitalization Act also called for the director to assume responsibility for preparing an annual report on Defender Service's operations and arrange for an independent audit. These amendments added by the D.C. Revitalization Act regarding Defender Service were subsequently repealed by Public Law 105-274. The District of Columbia Courts and Justice Technical Corrections Act also provided that Defender Service shall submit an annual appropriations request to OMB. Also, under the provisions of Public Law 105-274, the Court Services Director is to receive and transmit to the Defender Service all funds appropriated for Defender Service.

## APPENDIX-IV:
## Adult Offenses Prosecuted by the Office of the United States Attorney for D.C.

Appendix IV describes the typical case flow for offenses prosecuted in the Superior Court of the District of Columbia (Superior Court) by the Office of the United States Attorney for the District of Columbia (USAO). n1 USAO is responsible for prosecuting felony and serious misdemeanor violations committed by adults in D.C. ("U.S. offenses"). USAO prosecutes misdemeanors such as petty theft, assaults, weapons offenses, and narcotics possession. The Office of the Corporation Counsel for D.C. (Corporation Counsel) is responsible for prosecuting "minor" misdemeanor violations ("D.C. offenses"), such as drinking in public or disorderly conduct, in addition to criminal traffic offenses, n2 and offenses committed by children. The case flow process for D.C. offenses is described in appendix V, and the case flow process for offenses committed by children is described in appendix VI.

n1 USAO prosecutes criminal offenses in either Superior Court or U.S. District Court for D.C., depending on the nature of the criminal conduct. Because a large majority of criminal prosecutions are brought in Superior Court, the scope of our review was limited to those cases.

n2 D.C. Code, section 23-101 outlines the conduct of prosecutions. Section 23-101 provides, in part, that:

**1449-502011**

0046- 038

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

(a) Corporation Counsel is responsible for prosecutions for violations of all police or municipal ordinances or regulations, and violations of all penal statutes in the nature of police or municipal regulations, where the maximum punishment is a fine only or imprisonment not exceeding 1 year, unless otherwise noted.

(b) Corporation Counsel is responsible for prosecutions for violations relating to disorderly conduct (D.C. Code, section 22-1107) and violations relating to lewd, indecent, or obscene acts (D.C. Code, section 22-1112).

(c) USAO for D.C. is responsible for prosecutions for all other criminal prosecutions, except as otherwise specified.

This case flow process description reflects process-related information as described to us by relevant agency officials. We did not verify the accuracy of the information provided to us. As such, we did not test to determine if the descriptions of the processes were functioning as was described to us. We recognize that there may be aspects of a specific case that make its processing unique, and that there may be exceptions in the normal progression of the stages in the justice system. However, this description will focus on the case flow process for a typical adult case, prosecuted by USAO, as it progresses through the basic stages of the criminal justice system.

Police Arrest and Booking

Most cases begin with an incident and subsequent arrest. Police officers may become aware of an incident as a result of a civilian report of a crime or through observation of suspected criminal activity. Civilians may call a nonemergency police department number or call a 911 dispatcher to report a crime. Typically, the 911 dispatcher is to ask a caller for limited information regarding the incident, and then issue a radio communication to the appropriate police district transmitting the information provided by the caller.

In D.C., over 30 law enforcement agencies other than the Metropolitan Police Department of the District of Columbia (MPDC), such as the U.S. Capitol Police and the U.S. Park Police, may make arrests for crimes committed within D.C. However, MPDC makes a large majority of arrests in D.C. Arrests can be made with or without an arrest warrant.

Arrest warrants are issued by the court when MPDC submits an application for a warrant (a complaint that may be supported by an affidavit) showing there is probable cause to believe that an offense has been committed and that the person named in the complaint has committed the offense. With warrantless arrests, the arresting officer must have probable cause that the person to be arrested has committed or is committing an offense. Arrests resulting from an arrest warrant are processed similarly to warrantless arrests.

Arrest on Scene

Different scenarios may occur at the scene of a suspected crime, depending on the type of offense the suspect allegedly committed and the manner in which the officer became aware of the incident. Typically, an officer is to perform several standard tasks when investigating an incident. These tasks may include (1) calling a dispatcher with the suspect's vehicle tag number, (2) calling the dispatcher to check for outstanding warrants, (3) conducting any field tests, (4) taking statements from witnesses or victims, or (5) calling a dispatcher to send a detective to the scene.

Release on Detention Journal

If at the arrest scene MPDC determines that the arrestee is entitled to be released without being charged, an officer should take information necessary to make an entry in the detention journal, n3 provide the arrestee with a copy of an "Information to Arrestee Released Without Charge" (PD 731) form, and authorize the release of the arrestee at the scene. The officer should also make an entry in the detention journal and assist in preparing a Detention Report (PD 728). MPDC most often releases arrestees on detention journal in situations within the prosecutorial jurisdiction of USAO, although detention journal release is also available for situations within the prosecutorial jurisdiction of the Corporation Counsel.

n3 Each organizational element of MPDC that maintains an arrest book should also maintain a detention journal, in which officers record information on individuals who have been arrested, then released without charge.

Transport Arrestee
After a person is arrested, physically secured, and searched on the scene, s/he is to be transported to a police district station for processing. The arresting officer could either transport the arrestee him/herself, or call a dispatcher to request a transport vehicle, which is a secured car. It typically could take at most 15 minutes for a transport vehicle to arrive.

Police District Stations
MPDC is operationally divided into three Regional Operations Commands (ROC), which are subsequently divided into seven police districts. Officers are assigned to one of the seven districts, known as "1D" through "7D," or to one of several specialized units, such as Major Narcotics or Vice. Within each district, patrol officers are assigned in teams to Police Service Areas, which are geographically manageable, neighborhood-based subsets of the district. n4

n4 There are 83 Police Service Areas throughout the 7 police districts.

In each district, there is typically one building, or station, used for processing arrestees. At the district station, processing the arrestee includes: (1) collecting and cataloguing property, (2) interviewing the arrestee and completing the standard arrest paperwork, (3) completing a background check, (4) booking the arrest, (5) fingerprinting and identifying the arrestee, and (6) determining if the arrestee is eligible for release.

Collect and Catalogue Property
At the district station, the arresting officer should conduct an additional search of the suspect and collect all property in his/her possession. Officers may be required to complete several property and evidence forms, depending on the property and evidence seized from the arrestee.

. **Prisoner's Property Receipt (PD 58)** - The PD 58 inventories the property collected from the arrestee, and allows the arrestee to authorize a third party to claim the property.

. **Property Envelope (PD 14)** - The PD 14 is a plastic envelope for prisoner's property.

Any evidence recovered by police officers should be documented on a variety of police forms. The evidence should be turned over to the station's designated "property clerk," who is to obtain the evidence from the arresting officer and maintain temporary custody of the evidence in the property office. The arresting officer should also make an entry in one of several logbooks (i.e., there may be separate logbooks for drugs, evidence, vehicles, and prisoners' property). The evidence is assigned a book and page number, which can be used later to locate the entry in the book. Evidence should later be transported to a central MPDC property office, where it is to remain until needed in court. The following forms are required to document evidence:

. **Property Record (PD 81)** - The PD 81 identifies property placed in the custody of the MPDC Property Division.

. **Evidence Envelope (PD 95)** - A PD 95 is a plastic bag used for each item confiscated that is considered evidence (e.g., weapons or cash).

**1449-502013**

**0046- 040**

. **Report of Drug Property Collected, Purchased, or Seized Drug Enforcement Administration (DEA) Form 7** -- If drugs were confiscated, the officer is to complete a Form 7. Drug evidence is assigned both a property number and a DEA lab number. Typically, drug evidence and associated paperwork is placed inside a "heat sealed" evidence bag and deposited in a secured "drug mailbox" in the district station. An officer from the Major Narcotics Branch should collect the drug evidence daily from the district drug mailboxes. The officer is to check the information in the drug logbook with the sample and sign that s/he has collected the drugs. The drugs are sometimes initially tested at the district station.

. **Property Tag (PD 285)** -A PD 285 is a tag attached to an item that is too large to be put in a property envelope.

Interview Arrestee and Complete Arrest Paperwork
The arresting officer is to take the arrestee to a processing area or workroom at the district station. There, the officer questions the arrestee about the incident and could begin preparing the arrest paperwork. n5 MPDC has several different forms used for reporting offenses, arrests, and other steps of processing the arrestee. For every arrest made, the arresting officer is required to complete the following forms:

. **Arrest/Prosecution Report (PD 163)** - The PD 163 is the basic prosecution report that contains the arrestee's background information (name, physical description, address, date of birth, employment, and the names of relatives); information about the arrest; witnesses; and charges, and a factual narrative about the arrest incident.

. **MPDC Court Case Review (PD 168)** - The PD 168 lists all of the officers involved in the investigation of the arrest and describes how each individual was involved (i.e., arresting officer, chain of custody). The information is used to determine which officers need to be subpoenaed to testify about the case.

. **MPDC Warning As To Your Rights card (PD 47)** -- Prior to being interviewed, the arrestee will be read his/her *Miranda* rights and asked whether s/he is willing to answer questions and to waive his/her rights to have counsel present. The arrestee is asked to sign the PD 47 indicating his/her response. n6 The officer conducting the interview and an additional witness also must sign the Miranda card.

n5 D.C. Code section 4-140 provides for a 3-hour limit for interrogation following arrest. Pursuant to the requirements of section 4-140, if within 3 hours following arrest, it appears that the arrestee is entitled to be released without charge (such as when an alibi is offered, checked, and found to be valid), the watch commander shall designate an officer to obliterate the arrest book entry and transfer the appropriate information to the detention journal, causing the release of the arrestee.

n6 The PD 47 is based on the U.S. Supreme Court's decision in *Miranda v. Arizona, 384 U.S. 436 (1966)*.

The arresting officer also may be required to complete additional forms, depending on the alleged offense and the arrest situation. MPDC Incident-Based Event Report (PD 251) contains information about the incident and is a public document. The MPDC Supplement Report (PD 252) contains information about the suspect, solvability factors, stolen property, and an officer narrative, and it can be used internally by MPDC, as well as by USAO and defense counsel.

Once the questioning of a prisoner is completed, submitted, and approved, the prisoner is permitted one telephone call, and then moved to a holding cell while the booking process is completed. The arresting officer's contact with the arrestee typically ends at this point.

Complete a Background Check
MPDC uses two primary criminal history records databases to conduct background checks: the Washington Area Law Enforcement System (WALES) and the National Crime Information Center (NCIC) system. WALES contains some local criminal background information and is connected to NCIC, which is maintained by the Federal Bureau of

Investigation (FBI) and contains national data. The officer conducting the background check can be connected to NCIC through WALES.

An officer can query WALES using the arrestee's name, birth date, sex, and race. WALES will display identifying information about the individual, including outstanding warrant information and any criminal justice identification numbers that may exist nationwide. The name of the officer who conducted the background check and whether the arrestee had an outstanding warrant should be recorded on the PD 163.

Book the Arrest
A booking officer is responsible for booking the arrest, which refers to the process of entering the arrest information from the PD 163 into the Criminal Justice Information System (CJIS). n7 CJIS is MPDC's computer system that contains information on arrests for all individuals who are arrested in D.C. Data fields in CJIS correspond to questions on the PD 163, and CJIS is set up with code menus. Except for the narrative description about the arrest (the statement of facts), the booking officer is to enter the majority of the information from the PD 163 into CJIS.

n7 CJIS is a D.C. system and not linked to other national databases that contain criminal justice information.

CJIS automatically generates an arrest, or booking, number, which is a counter number assigned to each arrest by an "arrest unit" per year (e.g., the arrest number 030002083 would be automatically generated for the 2,083rd arrest in 3D this year). The booking officer should obtain the arrest number in order to (1) complete the standard arrest paperwork and (2) begin the fingerprinting process.

Photograph and Fingerprint Arrestee
MPDC only positively identifies n8 arrestees who are charged with U.S. offenses. The identification process is conducted using LiveScan machines that electronically capture fingerprints, mugshots, and arrest information. There is a LiveScan machine in each of the district stations and at the Central Cellblock (CCB) at MPDC Headquarters. All of the LiveScan machines are electronically linked to an Automated Fingerprint Identification System (AFIS), which is also located at MPDC Headquarters. LiveScan automatically verifies fingerprints and arrest information contained in AFIS. The system operates like e-mail, with the districts e-mailing information to and from AFIS.

n8 Positive identification is identification of an individual using biometric characteristics, which are unique and not subject to change, such as fingerprints, voiceprints, or retinal images. Positive identification is to be distinguished from identification using name, sex, and date of birth, as these characters could be altered (as on a document), or may not be unique.

LiveScan Process. First, the booking officer is to enter information from the PD 163 into LiveScan. The arrest number connects the arrest in CJIS to the information in LiveScan. Next, the booking officer is to take the arrestee's photographs (front and left profile), which are stored electronically. Finally, the booking officer is to scan the arrestee's fingerprints into LiveScan. When the booking officer is finished, LiveScan informs the officer whether the fingerprints were scanned out of sequence or if a fingerprint needs to be rescanned.

After the booking officer enters all of the information and fingerprints into LiveScan, s/he is to send the information to AFIS. AFIS automatically reads the arrestee's fingerprints and compares a selected number of prints in the database in order to identify the arrestee's fingerprints. If the arrestee had previously been arrested for a U.S. offense, AFIS

1449-502015

identifies the arrestee through the submitted fingerprints and retrieves the individual's Police Department Identification (PDID) Number. n9 The PDID is a six-digit permanent identification number assigned to an individual when s/he is first arrested for an offense that is within the prosecutive jurisdiction of USAO. An individual keeps the same PDID throughout all subsequent involvement in the D.C. criminal justice system. n10

n9 If an individual's fingerprints are not in the AFIS database, a technician in the Automated Fingerprint Section at MPDC will check the manual files of fingerprints to see if there is a match with the arrestee's fingerprints.

n10 Whatever name the arrestee gave to MPDC at the time of his/her first arrest in D.C. is designated as his/her "true name" for identification and charging purposes. The true name, even if incorrect, remains with an individual unless changed by a court order.

If the arrestee has never been arrested for a U.S. offense, AFIS assigns the arrestee a new PDID. AFIS sends the information about the arrestee's name and PDID back to the LiveScan machine at the district station. According to MPDC, AFIS takes several minutes to complete a single search for a fingerprint match, whereas a person manually searching a print would take anywhere from 15 to 45 minutes, depending on the classification and clarity of the print. n11 It typically takes AFIS 20 to 30 minutes to complete the identification process for a single arrestee, depending on the number of requests that AFIS is processing. n12

n11 If the LiveScan system is not operational, the Automated Fingerprint Section at MPDC is responsible for verifying fingerprint and identification information on arrestees. For manually processed arrests, the Section verifies the arrestee's name, PDID, fingerprints, and photographs using paper files and fingerprint cards.

n12 When there is a backlog of fingerprints, AFIS typically takes longer to match the fingerprints and identify the arrestee.

When the booking officer receives the identification information from AFIS, s/he is to write the PDID and the AFIS Search Identification Number, a tracking number automatically assigned to each search that AFIS completes, on the PD 163. Next, the booking officer is to verify the information in LiveScan, confirm the arrestee's charged offense, and enter the PDID number into LiveScan. When the booking officer has reviewed all of the information, s/he is to send a confirmation to AFIS. LiveScan can automatically generate two fingerprint cards--one to be sent to AFIS and one to be sent to the FBI--and an armband for the arrestee. The armband has the arrestee's name, PDID, photograph, sex, and race.

Finally, the booking officer should update the arrest information in CJIS as needed and enter the arrestee's PDID.

Determine Eligibility for Release
From the district station, an arrestee may be released on citation, released on bond, locked up, or, in some instances, transported to a hospital.

**Citation Release.** For certain misdemeanor offenses, an arrestee may be eligible for citation release, which allows the arrestee to be released on his/her own recognizance. Arrestees are given a citation appearance date to appear in court 4 to 6 weeks from the date of arrest. In order to be eligible for a citation release, the arrestee must live within a 25-mile radius, show means of support, and have three references attesting to his/her identity.

**1449-502016**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

The arresting officer is to complete a Citation Release Determination Report (PD 778) while questioning the arrestee. If the officer determines that the arrestee qualifies for citation release, a Citation to Appear (PD 799) is prepared indicating the date and time the arrestee is to appear in court, the charge(s) against the arrestee, the penalty for not appearing, and acknowledgement by the arrestee of the citation. If the arrestee has picture identification, s/he can be released from the station. If the arrestee does not have picture identification and there is no one at the station who can positively identify the arrestee, s/he is locked up.

**Bond Release.** If an individual is not eligible for citation release, police determine if s/he can be released on bond. There is a bond schedule and the arrestee either pays the appropriate bond amount or is locked up. Bond release is rarely used in D.C.

**Lockup Arrests.** MPDC does not release arrestees prior to the initial court appearance if they are arrested for a felony offense. Lockup is typically used for individuals charged with a felony offense; however, it is also used for arrestees charged with misdemeanors who cannot prove their identification for purposes of citation release, and who otherwise are not eligible, or do not have the available funds to post and forfeit collateral or pay a bond amount. Arrestees can be locked up prior to their initial court appearance at the district station, at CCB, or at the U.S. Marshals Service cellblock, depending on the time of the arrest.

**MPDC Lockup List.** A lockup list, which is a list of individuals who were detained after arrest, is generated in MPDC's CJIS system. The lockup list is a real-time document, meaning that it is updated throughout the day as individuals are arrested and the arrests are entered into the CJIS system. A new lockup list can be generated at any time; however, the lockup list is generated three times per day (9:30 a.m., 11:30 a.m., and 3:30 p.m.) to distribute to those agencies that do not have access to CJIS. n13

n13 CJIS is not linked to all criminal justice information systems in D.C.; some agencies have access to CJIS information through terminals located in their offices.

The initial list, the 9:30 a.m. list, typically contains 80 to 90 percent of the cases for a day. The remaining cases are typically divided between the 11:30 a.m. and 3:30 p.m. lists. During a typical week, the number of arrestees per day can range from 60 to 130. n14

n14 According to USAO, Monday lockup lists have the highest number of arrestees because of arrests from Saturday and Sunday; typically there are about 90 to 130 arrestees on the Monday lockup list. Tuesdays are the slowest day with between 50 and 60 arrestees, and Wednesday through Friday varies from 80 to 100 arrestees. Saturdays vary, as well, but are typically lower, with between 60 and 70 people on the list.

Hospital Cases
If an arrestee has visible bruises or abrasions or complains of illness, two officers are to transport him/her to D.C. General Hospital. When transporting an arrestee to the hospital, officers should complete an Arrestee's Injury/Illness Report (PD 313). At D.C. General Hospital, arrestees are housed in a guarded "strong room" while they wait to see a doctor. If the doctor releases the arrestee, s/he is to be transported back to the district station or to CCB to continue the booking process. If an arrestee is admitted to the hospital, an officer from the district station's Crime Scene Search Unit is to go to the hospital to fingerprint the arrestee. The Crime Scene Search Unit officer should take the PD 163 and the

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

fingerprint to the CCB for verification of the arrestee's identity. After the arrestee is identified, CCB processes the paperwork, adds the arrestee to the lockup list, and forwards the paperwork for processing. According to MPDC officials, about three or four arrestees per day are transported to the hospital but not admitted, and about two arrestees per week are admitted to the hospital.

Transport Locked up Arrestees From the District Station
The time of day when the booking process is completed determines where the arrestee will be transported if s/he is locked up before the initial court appearance. If processing is complete by the cut-off time, then the arrestee is transported to the U.S. Marshals Service cellblock, where s/he is held until her/his initial court appearance, which will occur the same court workday. n15 Arrestees are to arrive at the U.S. Marshals Service cellblock by the cut-off times of 3:00 p.m. during the week, 2:30 p.m. on Saturdays, and 10:30 a.m. on holidays.

n15 The U.S. Marshals Service cellblock does not house prisoners overnight, so only arrestees who arrive by the cut-off times will be able to have initial court appearances the same day.

If the processing is not completed by the cut-off time, the arrestee will be held overnight at either an MPDC district station or at CCB, n16 and will be transported to the U.S. Marshals Service cellblock to appear in court on the next court workday. For arrestees held overnight, MPDC may begin to transport arrestees to the U.S. Marshals Service cellblock at approximately 6:00 a.m., when the U.S. Marshals Service begins accepting arrestees.

n16 If an arrestee has not been positively identified at the district station, s/he is to be transported to CCB.

Arrest Paperwork to CCB
After the district station, the arrestee and the arrest paperwork are sent to separate locations. n17 The arrest paperwork for arrestees who are released on citation may be mailed or transported to MPDC's Court Liaison Division. All of the arrest paperwork for locked up arrestees is transported from the districts to the CCB, which then sends the paperwork to the Court Liaison Division.

n17 Before LiveScan was implemented in the district stations, all arrestees were brought to CCB to be fingerprinted and identified. Currently, arrestees may be identified at CCB if there is an overflow at the district stations, if the person is difficult to fingerprint, or if the LiveScan is not operational. The CCB also processes arrestees for other police agencies in D.C. The following is the booking process at CCB: (1) Arrestees are to be searched, walked through a metal detector, weighed, measured, and thumbprinted. (2) Officers may conduct background checks using WALES and NCIC if the criminal record check has not been completed. (3) The booking officer either LiveScans the arrestee or forwards the arrest paperwork to the Automated Fingerprint Section to verify the name, PDID, and fingerprint of the arrestee, and to determine if additional photographs need to be taken. (4) The booking officer should then transfer the arrestee to a holding cell. (5) The original copy of the PD 163, a photo identification card, and an armband are to be returned to the booking officer who can then link the arrest paperwork to the lockup list.

**1449-502018**

Processing in the U.S. Marshals Service Cellblock
When arrestees arrive at the U.S. Marshals Service cellblock, a deputy is to check each arrestee's armband against his/her vansheet n18 to verify that the correct person is being locked up, bring the arrestees into the cellblock area, remove the arrestees' handcuffs, search the arrestees, and transfer them to holding cells.

n18 A vansheet contains the arrestee's name, armband number, lockup number, and other identifying information, and should be generated for each arrestee.

Several events that involve different criminal justice agencies can occur at the U.S. Marshals Service cellblock. The Pretrial Services Agency (Pretrial Services) conducts drug tests and interviews arrestees. The Criminal Justice Act (CJA) Office of the Public Defender Service for the District of Columbia (Defender Service) interviews arrestees to determine their financial eligibility for court-appointed counsel. Finally, a defense attorney may interview arrestees.

Pretrial Services Drug Test
Pretrial Services is to test arrestees charged with U.S. offenses (both misdemeanors and felonies) for cocaine, opiates, and PCP. n19 After arrestees are transferred to a holding cell, drug surveillance officers from the Adult Drug Unit at Pretrial Services request that arrestees voluntarily submit to a drug test. According to Pretrial Services, about 80 to 85 percent of arrestees agree to take the test; however, if the arrestee does not agree, s/he is typically ordered by a judicial officer to submit to a drug test at the initial hearing. Pretrial Services is to advise defendants that the results of the test are typically used to determine conditions of release. There is about a 30-minute turnaround time to obtain drug test results. After the drug test, the arrestees are to be transferred into the interview room n20 of the U.S. Marshals Service cellblock.

n19 Pretrial Services does not test arrestees charged with U.S. offenses for marijuana at lockup, but adds marijuana to the testing protocols as a condition of release.

n20 There are 10 seats in the interview room, and both Pretrial Services and CJA representatives may interview arrestees in the same area.

Pretrial Services Interview
Pretrial Services is to interview all arrestees charged with U.S. offenses who are detained prior to the initial court appearance. The interview may occur at the district station where the arrest occurred, or in the U.S. Marshals Service cellblock. n21

n21 Pretrial Services interviewers may travel to the selected district stations to interview arrestees who have been identified by MPDC and who are to be locked up at the station overnight. According to Pretrial Services, interviewers travelling to the district stations typically complete interviews for 35 to 40 percent of the arrestees who are on the initial lockup list.

1449-502019

At the U.S. Marshals Service interview room, Pretrial Services officers are to interview arrestees who they did not interview at the district stations, and any newly arrested individuals. Interviewers should read a statement indicating how the interview information will be used before the arrestee answers any questions. Pretrial Services interviewers ask questions about the arrestee's current residence, family ties, employment, health, criminal history, substance abuse, and other court cases. Criminal records are to be investigated through WALES, NCIC, the Interstate Identification Index (III) system, and National Law Enforcement Telecommunications System. n22 Demographic and personal information is to be verified through personal references, probation, parole, and other pretrial services officers, and an arrestee's criminal history is confirmed through other criminal justice and law enforcement agencies. The results of the Pretrial Services interview are ultimately compiled in a bail report, containing a release recommendation, which is distributed at arraignment/ presentment, and used by the court to determine conditions of release.

n22 III is maintained by the FBI and is an identification index to persons arrested for felonies or serious misdemeanors under state or federal law. Searches can be made on the basis of name and other identifiers. The National Law Enforcement Telecommunications System provides for the interstate exchange of criminal justice-related information between local, state, and federal criminal justice agencies.

CJA Interview

CJA representatives are to interview arrestees on the lockup list at the U.S. Marshals Service cellblock to determine if they are eligible for court-appointed counsel. The interviewers are to ask the arrestees about their employment, income, marital status, and number of dependents. Based on the arrestee's answers, and referring to the Department of Labor poverty guidelines, the interviewer can determine whether the arrestee is eligible for court-appointed counsel and whether the arrestee can contribute a portion of the attorney's fees. n23 Examiners are to conduct interviews three times per day, as each lockup list is generated.

n23 When defendants have been determined ineligible for court-appointed counsel, the examiners advise them of their ineligibility and may appoint an attorney to represent the arrestee at presentment/arraignment. According to Defender Service officials, under no circumstance is the appointed attorney compensated with CJA funds. Ineligible defendants can at that point either negotiate a fee with the appointed attorney or obtain their own attorney.

Defense Counsel Interview

The defense attorney should check a copy of the lockup list to see which cases s/he has been assigned, and then should go to the U.S. Marshals Service cellblock to meet with his/her client. The attorney is to review the Pretrial Services bail report and the charges with the defendant, explain what will happen at the initial court appearance, and explain what will likely happen with respect to the release decision.

Arrestee Moved to a Holding Cell

After being interviewed, arrestees are to be moved to one of the six holding cells located directly behind the Arraignment Courtroom, courtroom C-10, to wait for their case to be called. If an arrestee's attorney did not meet with the arrestee in the interview room of the U.S. Marshals Service cellblock, s/he may meet with the arrestee in the cellblock behind courtroom C-10.

USAO Charging

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

After arrest and booking, USAO must determine whether to charge the arrestee with a crime in Superior Court. USAO requires that a police officer who is knowledgeable about the facts of the arrest to physically report to USAO for "papering." Papering is the stage of the charging process during which officers present their arrest reports to a prosecutor and explain the circumstances of the arrest. USAO decides for each arrest whether the case should be prosecuted (papered) or not (no-papered). The following describes the charging process for lockup arrests.

Officer Checks in at Court Liaison Division at MPDC
The officer is required to check in at Court Liaison Division n24 by 7:30 a.m., the court day after an arrest that resulted in a lockup. Under certain circumstances an officer may obtain permission for "late papering," in which case the officer is required to arrive in the USAO Intake office by 11:00 a.m. Officers normally paper cases on the same court day if the arrest occurs during the day and the arrestee is processed before the cutoff time.

       n24 The Court Liaison Division is open from 7:00 a.m. until 6:00 p.m., Monday through Friday, and from 7:00 a.m. until 3:00 p.m., Saturdays and holidays.

At Court Liaison Division, the officer is to complete a Court Appearance Worksheet (PD 140), which lists information about all of the court appearances the officer must make on a given day, and then wait in line for a Court Liaison Division clerk. The Court Liaison Division clerk is to time-stamp the PD 140, initial it, return one copy to the officer, check the officer into the Time and Attendance Court Information System (TACIS), and then give the officer the original arrest paperwork (PD 163). The officer is then to go to USAO to paper the case.

Officer Assembles USAO Case Jacket
After checking in with Court Liaison Division, the arresting officer should go to the USAO Intake office, which is typically open from 7:30 a.m. to 5:30 p.m., and is located in the basement of the Superior Court Building in room C-195. n25 At USAO, the arresting officer is to photocopy the arrest paperwork and assemble the USAO case jacket that contains all of the relevant police paperwork. n26 This paperwork typically includes (1) a PD 163, (2) a green fingerprint card, (3) a copy of the Court Appointment Notification System notice, and (4) various other reports depending on the specifics of the arrest. USAO requires that officers make five copies of all paperwork prepared for a case. Officers are to drop off the PD 163 and accompanying paperwork through a window chute into the Intake office, and then wait to meet with a USAO attorney.

       n25 Depending on the offense, the officer may have to pick up additional paperwork that is not at the Court Liaison Division before going to paper the case. For example, the officer must obtain a Test Fire Certificate from the Firearms Identification Unit if a gun was seized during the arrest.

       n26 Some officers may choose to prepare the arrest paperwork package at the district station if time permits and a copy machine and supplies are available.

Criminal Analysts Conduct Background Check
USAO employs two to three criminal history analysts who complete a criminal records check on each arrestee on the lockup list. As soon as the arrestees are added to the lockup list, the analysts can begin to conduct criminal history record checks using federal criminal records databases, such as WALES, NCIC, and the III system. The analysts should determine if the arrestee has a criminal record, identify all of the arrestee's outstanding charges, and search for any local outstanding warrants. USAO typically does not begin papering a case until an arrestee has been positively identified and all background checking has been completed.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Screener Interviews Officer n27

> n27 According to MPDC, the screening could take 15 to 20 minutes once the officer gets to see the screener. However, depending on the number of cases to be papered, the officer may have to wait to see the screener. According to USAO, it is common for the screener to have to wait for the officers to appear and their paperwork to be ready.

When the background check is complete, the officer is to meet with a screener, who is a supervising or senior attorney. There are typically three Grand Jury/Intake screeners who review violence misdemeanor and felony cases other than those involving domestic violence, n28 and one Sex Offense/Domestic Violence screener to review cases involving these offenses. The screener is to review the paperwork and discuss the case with the officer to determine whether to paper the case.

> n28 Before noon, there are three Grand Jury/Intake screeners: two senior attorneys and one of the three Section Deputy Chiefs. In the afternoon, the two senior attorneys screen cases.

Papered Cases

If the screener decides to paper the case, s/he should also complete a "screener sheet" and determine the following:

. **The lead charge** - The screener may choose to charge the arrestee with a more or less serious crime than the arresting charge, depending on the circumstances of the arrest.

. **The bond recommendation** - The screener can make a decision regarding what position USAO is to take on conditions of release pending trial.

. **The USAO prosecution section that should handle the case** - There are several USAO sections that could handle a case: Misdemeanor Trial, Sex Offenses/Domestic Violence, Grand Jury/Rapid Indictment Program (RIP), Community Prosecution, Homicide, or U.S. District Court section.

. **The type of case and Police Service Area designation** - The screener should indicate on the USAO case jacket the type of case (e.g., felony, misdemeanor, or domestic violence), and label the case with a "Lead Charge Police Service Area" sticker that indicates the Police Service Area in which the arrest occurred.

. **Additional papering work required** - The screener may make suggestions to the papering attorney about the case. For example, a screener might suggest filing an affidavit or warrant with the court, requesting a jail cell search of the defendant's clothing, coordinating with other attorneys on related cases, or obtaining laboratory analyses.

No-papered Cases

If the screener determines to no-paper the case, the officer continues to the next step of the process. According to USAO, about 30 percent of cases are not papered.

CJIS and Priority Cases

Regardless of whether the case is papered, the screener should enter the case information and papering outcome into CJIS. At this point, other involved agencies with access to CJIS may know which cases USAO intends to prosecute.

**1449-502022**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

The screener also designates if the case is a "priority" case. Priority cases are those that are screened prior to 10:00 a.m., and should therefore be ready for the initial hearing (i.e., papered by USAO, and the offender interviewed by Pretrial Services and appointed counsel). This designation alerts all of the involved agencies and defense counsel that these cases should be called in the morning court session, and that Pretrial Services, CJA, and defense counsel interviews should be conducted expeditiously.

Officer Obtains Court Jacket From Court Clerk
After meeting with the screener, the arresting officer is to go to the representative from Superior Court, who is located in the USAO Intake office, to pick up a court jacket for the case. The court representative should issue either a felony or misdemeanor court jacket with a pregenerated court docket number, beginning with an "F" in felony cases or an "M" in misdemeanor cases to each arrest. The court representative manually matches the court docket number with the arrestee's lockup number.

Papering Attorney Papers Case n29

n29 According to MPDC, meeting with the papering attorney could take 30 minutes to an hour; however, the entire papering process could take up to 2 to 3 hours. USAO estimated that depending on the type of case, papering could take from 20 to 25 minutes for a simple case (e.g., a solicitation of prostitution) to 60 to 90 minutes for a more complicated case (e.g., a search warrant case with five defendants). Depending on the number of cases waiting to be papered, there may be a delay for the officer to see the papering attorney.

Next, the officer is to meet with an Assistant U.S. Attorney (AUSA) who is responsible for papering the case. The papering attorney is to complete the USAO case jacket, interview the officer to find out more information about the case, enter information about the case into the USAO computer system, and prepare the charging document and other documents needed to prosecute the case. n30

n30 For example, the AUSA may request radio runs for relevant recorded calls, request any photographs taken at the police station, or ask for the arresting officer's notes.

No-papered Cases
If the screener determined to no-paper the case, the papering attorney is to complete a "no-paper" slip containing information about the case and the reason for no-papering the case. The officer is able to move to the next step of the process.

USAO Computer System
There are separate forms, or screens, in the USAO computer system for different offenses that the AUSA papering the case uses to guide the interview with the officer. Information entered about the case includes information about chain of custody, the circumstances of the arrest, the specific involvement of the officers on the scene, and the arrestee and his/her actions.

Charging Document Preparation
In misdemeanor cases, charges against an arrestee are brought by way of an "information," a one-page document that states the nature of the alleged crime and the corresponding statutory code section for the charged offense, the date of occurrence, victim information, if any, and information about the defendant. The information is the only document that needs to be filed to bring a misdemeanor case to trial. In felony cases, charges against an arrestee are initially brought

**1449-502023**

0046- 050

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

by way of a "complaint, "which is similar to an information, except that a police officer must swear to the allegations in a complaint. The complaint is only the initial charging document that permits a felony case to go forward for the initial court appearance.

The AUSA is to manually fill out the charging document, and then forward it to a legal technician in the USAO Intake office. The legal technician is to type a duplicate version of the charging document and generate labels for the court and case jackets.

Misdemeanor Offenses
Typically, there are three to five AUSAs who paper misdemeanor cases. During papering, the AUSA in the misdemeanor trial section typically prepares the discovery packet and the plea offer. The AUSA should also delete any witness information from the PD 163 and include the PD 163 in the discovery packet.

Domestic Violence Cases
AUSAs in the Sex Offense/Domestic Violence section paper cases involving domestic violence and sex offenses. n31 Domestic violence cases may be complicated because of issues such as protecting the safety of the victim and witnesses and obtaining stay-away orders. In addition, these cases can also involve children and/or allegations of child abuse and neglect. The Sex Offense/Domestic Violence section coordinates with the Domestic Violence Intake Center throughout the papering process. The Center meets with the victim and coordinates the civil and criminal sides of the case. It typically takes 30 to 45 minutes to paper a misdemeanor domestic violence case, and 10 minutes to no-paper a case. Felony domestic violence cases can take over 60 minutes to paper. Domestic violence cases are called in court after 3:00 p.m. to afford the victim adequate time to obtain a civil protection order in appropriate cases.

n31 According to USAO, the Sex Offense/Domestic Violence section typically papers 100 cases out of 125 to 150 cases per week, and there are about 10 to 15 domestic violence cases called in presentment /arraignment court per day.

Screener Reviews the Charging Document
After meeting with the papering attorney, the officer is to return to a screener who reviews the information in the jacket and signs the charging document. The screener also should review and sign the officer's PD 140. A series of time intervals, from 7:30 a.m. to 6:00 p.m., are preprinted on the PD 140; the screener uses these to indicate how long the officer was papering the case.

Officer Swears to the *Gerstein* to the Court Clerk
Next, the officer is to return to the court representative to drop off both of the case jackets and to swear to the *Gerstein* statement and the charging document. *Gerstein* refers to a Supreme Court decision that outlines the requirements for a judicial determination of probable cause prior to the imposition of any "significant restraint of pretrial liberty." This judicial determination requires a sworn statement by the arresting officer of the facts offered to establish probable cause to believe that an offense occurred and that the defendant is the person who committed it. n32 The officer is to swear to the *Gerstein* statement and sign and date three copies of the statement. The court representative then is to seal and sign each of the copies.

n32 The *Gerstein* statement is only required for arrestees whose conditions of release constitute a significant restraint on pretrial liberty, but is completed in almost all of the cases.

**1449-502024**

0046- 051

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

When the USAO case jacket is given to the court representative, s/he should screen the paperwork to ensure that everything is complete and should note the time that the case was actually papered and delivered to the court. If the paperwork is not complete the case is to be returned to USAO staff for correction.

The case is then transported to the Court Intake office where court staff should download identification information and charges from the CJIS system to the court's database. It is also at this time that the case number is to be entered into the court computer, a judicial calendar is to be assigned, n33 and the CJA interview sheet is to be inserted into the court case jacket.

n33 In both misdemeanor and felony cases the trial calendar should be randomly assigned at the time the case is first received in the court intake office.

Officer Checks Out at Court Liaison Division
After the officer has completed the papering process, s/he should return to the Court Liaison Division to check-out. The officer is to return the PD 140 to the Court Liaison Division clerk, who is to verify that the form has been completely filled out. The Court Liaison Division clerk is to time-stamp and return a copy of the PD 140 to the officer, and then check the officer out in TACIS.

Citation Release
Arrests in which the arrestee is released on citation are also papered. While the papering process is the same, because the citation has been issued 4 to 6 weeks before the first court appearance, MPDC officers should appear sometime prior to the court date to paper the case. Once a citation case is papered, it is to be immediately forwarded to the court. The court should enter all of the information into Superior Court's database in order to have the cases prepared to go into court on the date of the citation return.

Initial Court Appearance--Presentment/Arraignment n34

n34 According to the Criminal Division, approximately 100 arrestees are presented or arraigned in the Superior Court in a typical workday.

An arrestee has a right to an initial hearing before a court or magistrate "without unnecessary delay," typically within 48 hours of his/her arrest. Depending on whether the offense is a felony or a misdemeanor, the initial hearing is called a presentment or an arraignment, respectively. Because a defendant cannot be formally arraigned, or charged, with a felony offense until after a grand jury returns an indictment, the initial hearing for felony offenses is called a presentment. The government presents the defendant with the charges that it intends to indict. For misdemeanors, the hearing is called an arraignment and the defendant is formally charged and is called upon to answer the charges, almost always by entering a plea of not guilty and requesting a trial. Arrestees charged with U.S. offenses are initially charged with an offense in Arraignment Court in courtroom C-10. n35

n35 Arraignment Court operates Monday through Saturday from about 10:00 a.m. to 7:00 p.m.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Cases Ready for Presentment/Arraignment
Cases are typically called in Superior Court in the order in which they are ready. A case is considered ready for presentment/arraignment only after the following events have been completed.

Commissioner Takes the Bench
Typically, the judicial officer in the presentment court is a Superior Court Commissioner with powers similar to a federal court magistrate. There are 15 commissioners who rotate through arraignment court for 1 week at a time.

USAO Papers the Case
The case has been papered by USAO, and there are completed USAO and court jackets ready at courtroom C-10 for the initial court appearance. The United States is represented in arraignment court by AUSAs assigned to the Grand Jury Section, except in cases handled by specialized sections, such as Homicide or Sex Offenses.

Pretrial Services Completes a Bail Report
After a representative from Pretrial Services interviews the arrestee in the U.S. Marshals Service cellblock (prior to the initial court appearance), Pretrial Services is to assemble a case folder and generate a bail report for each arrestee. n36 The bail report is used to determine conditions of release and it outlines current information from the arrestee's case; demographic, health, and substance abuse information; pending cases and compliance with release conditions, if any; probation and parole status, if any; and any convictions. n37 According to Pretrial Services officials, Pretrial Services recommends the least restrictive, nonfinancial conditions that should ensure the arrestee's reappearance in court and the safety of the community.

n36 Pretrial Services should complete the following prior to generating a bail report: (1) obtain the arrestee's prior Pretrial Services record; (2) conduct criminal records checks; (3) call the arrestee's references to verify his/her personal information; (4) compare the criminal records information and the information from the interview; (5) search for pending cases, open warrants, probation, and parole information; and (6) formulate a release recommendation.

n37 There are four copies of the bail report. One copy is provided to each of the following: the defense attorney, USAO, the commissioner, and Pretrial Services. The defense attorney and USAO typically pick up the bail report prior to the hearing.

Defense Counsel Has Been Appointed
Defendants who are eligible for court-appointed counsel may be represented by attorneys from Defender Service or by attorneys appointed under the Criminal Justice Act (CJA attorneys). It is estimated that about 95 percent of defendants receive court-appointed counsel by either the Defender Service or CJA attorneys.

In general, Defender Service attorneys are assigned cases that are high profile (in the media, important to the community), very serious (murder), or that involve multiple defendants. n38 Defender Service attorneys are eligible for appointment based on whether they are "picking up" cases. Defender Service provides several attorneys each day to pick up cases based on each attorney's level of experience. Thus, they also handle more routine felonies and a few misdemeanors.

n38 Defender Service may not accept some cases meeting these criteria if there is a conflict of interest. For example, a Defender Service attorney can represent only one client if the client is charged with several codefendants. The other codefendants will be assigned to CJA attorneys.

**1449-502026**

0046- 053

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Effective July 31, 2000, n39 the only attorneys who are eligible for CJA appointment are those on an approved list issued by the Court. This list consists of 250 attorneys authorized to handle U.S. cases and 85 attorneys authorized to handle D.C. cases. About 30 percent of the cases that CJA attorneys are assigned to are serious matters and 70 percent are assigned to minor offenses. Also effective July 31, 2000, the Chief of the CJA program no longer makes any recommendations to the judges about whom to appoint as counsel. Instead, judges assume full responsibility for the appointment of counsel. Currently, the Deputy Presiding Judge of the Criminal Division and other judges with particular knowledge about the operation of the CJA program are making the CJA counsel appointments.

n39 Prior to July 31, 2000, the Chief of CJA reviewed the list of arrestees on the lockup list and made recommendations about the appointment of counsel to the Presiding Judge or the Deputy Presiding Judge of the Criminal Division. Prior to recommending an attorney, the Chief determined whether the arrestee was involved in a pending case. If the arrestee was not involved in a pending case, the Chief recommended counsel, based on several factors, including the availability of attorneys, the attorney's qualifications and reputation, and the severity of the charge. The Chief sent the initial recommendation list of attorney appointments as well as a list of available attorneys to a judge, who reviewed the list and decided the final assignments.

U.S. Marshals Service Transfers Arrestee to Courtroom
The U.S. Marshals Service typically moves three arrestees at a time from the holding cells located directly behind C-10 into the courtroom as their cases are about to be called.

Arraignment/Presentment Hearing
At the hearing, the court is to determine whether the defendant should be released, and/or what the conditions of release should be. After the court clerk reads the charges in the case, the commissioner is to review the charging document and the *Gerstein* statement and ask the defendant if s/he understands the charges against her/him. Charges should be dropped for cases that USAO no-papers, and the arrestee is released. The presentment/arraignment typically takes a couple of minutes, although the hearing may be longer if the charge is a more complicated offense, such as a first-degree murder charge.

Release Decision
If USAO is requesting that the defendant be detained prior to trial, or if any significant restraints are placed on his/her liberty, USAO must make at least a showing of probable cause. This is done by way of a statement of facts, the *Gerstein* statement, sworn to by the police officer. If the court determines that the *Gerstein* statement is not sufficient to support a finding of probable cause, USAO may request 24 hours to "perfect" the *Gerstein*. This should generally result in the defendant being held until the next court business day when USAO is to be given a second opportunity to present a *Gerstein* statement that can establish probable cause.

If the court finds that USAO has presented sufficient evidence to establish probable cause to believe the defendant committed the offense, the court is to then set the appropriate conditions of release for the defendant.

If, however, the court finds no probable cause to believe the defendant committed the offense, based on the evidence presented, the defendant, if being held on the charge, is released. The case is not dismissed and evidence may be presented to the grand jury for its consideration.

There are several release options and conditions of release that a judicial officer may order. A Pretrial Services representative is to complete a release order (signed by the defendant, defense counsel, and the commissioner) that

1449-502027

0046- 054

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

outlines the ordered conditions of release. The following are possible conditions of release that may be ordered by a judicial officer.

**Release on personal recognizance.** In most minor misdemeanor cases, the judicial officer orders that the defendant be released on his/her personal recognizance. The defendant signs a notice, called a "buck slip," for citation releases that are continued on personal recognizance without any conditions. For lockup cases processed at presentment/arraignment and released on personal recognizance, the defendant is required to sign a release order, which contains the next appearance date.

**Third-party custody.** Third-party custody is an arrangement whereby a defendant is released to the custody of a third party, such as a relative, friend, employer, or an organizational custodian, which is a community-based organization that provides supervision services for released defendants. The third party is to pledge his or her best efforts to see that the defendant complies with the conditions of release and returns for further court appearances.

**Release on bond (cash/surety).** There are basically two types of bonds--cash and surety bonds. A cash bond allows the defendant to post the full amount of the bond, in cash, to the court to guarantee his/her appearance on the next scheduled court date. The court may also order that only 10 percent of the total amount of the bond be posted, in cash, with the court to secure the release of the defendant. [40] This is done to ensure that indigent individuals can be released in certain cases. If the defendant does not appear the bond will be forfeited in the full amount of the set bond. If only 10 percent has been posted, the 10 percent will be immediately forfeited, and the court can require the defendant or the person who posted the bond to pay the remaining amount to the court.

[40] Ten percent bonds are commonly imposed, but the court may require varying amounts of deposit for percentage bonds (e.g., 5 percent, 15 percent, 20 percent, or 50 percent).

The other type of bond is a surety bond. A surety bond can only be posted by a bondsman who has been previously approved by the court to act in that capacity. The surety does not produce cash, but signs an agreement with the court that they will take custody of the defendant and that they will pay the full value of the bond if the defendant fails to appear in court. If the defendant does not appear, the bondsman will have to pay the full face value of the bond to the court. Bonds may be issued as "cash/surety" to give defendants the greatest flexibility on how to secure their release.

Pretrial Services Monitoring
The judicial officer may order that Pretrial Services supervise the defendant and ensure that the defendant follow certain release conditions, which may include: (1) returning to Pretrial Services within 24 hours with verification of his/her address, (2) abiding by any stay-away orders, (3) reporting to Pretrial Services by telephone or in person with some designated frequency, (4) abiding by a curfew, and/or (5) refraining from committing any violation or criminal offense. Most of the defendants charged with drug offenses or nonviolent felony offenses are released into the community while awaiting trial.

Pretrial Services Drug Testing and Treatment
Depending on the results of the drug test taken in the U.S. Marshals Service cellblock, interview findings, or prior drug history available to Pretrial Services, the judicial officer may order Pretrial Services drug monitoring and/or treatment.

Drug Testing
Pretrial Services should recommend an evaluation (drug test) if the defendant declines to take a drug test at lockup, has no history of substance use (i.e., no record of use in the past 30 days), or denies substance use at the Pretrial Services interview. If the defendant is released and the judicial officer orders a drug test, after presentment/arraignment the defendant reports to the Adult Drug Unit to provide a urine sample. The defendant is given a telephone number to call the next day to receive the test results.

1449-502028

0046- 055

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Monitoring

If the defendant tests positive (either at lockup n41 or after arraignment/presentment), admits use, or has tested positive in the past 30 days, the judicial officer typically orders the defendant enrolled in "Program Placement," which is weekly drug testing and Pretrial Services monitoring. The defendant is to be tested weekly until s/he has 12 consecutive negative tests. Continued use or failure to comply with the drug testing condition may result in referral to a drug treatment program.

n41 According to Pretrial Services, about 45 to 50 percent of the defendants test positive at lockup.

Treatment

If the defendant is in drug treatment at the time of arrest, Pretrial Services generally recommends that the judicial officer order maintenance of treatment. If the treatment is with another agency (not Pretrial Services), the defendant may be ordered to weekly testing with Pretrial Services in addition to maintaining the other agency's program.

Pretrial Services Heightened Supervision Program

The Heightened Supervision Program is administered by Pretrial Services to supervise high-risk defendants. In the Heightened Supervision Program, defendants are required to submit to and/or enroll in drug testing, report to their case manager once per week, and observe a specified curfew. The program has a specific schedule of graduated sanctions for increased supervision that are instantly and automatically imposed for certain violations, leading up to a request for a show-cause hearing before a judicial officer for repeated or serious violations.

Pretrial Services Intensive Supervision Program

The Intensive Supervision Program supervises high-risk defendants placed in a Department of Corrections (DOC) halfway house for a specified period of time with eventual release to the community. Once in the community, the defendant has weekly contact with a case manager, submits to drug testing and treatment when appropriate, and has a curfew. Violation of release conditions should result in the defendant returning to the halfway house for 2 weeks, leading to a request for a show-cause hearing before a judicial officer for repeated or serious violations.

Pretrial Services Restrictive Community Supervision Program

The Restrictive Community Supervision Program supervises pretrial defendants in the DOC work release program. Defendants reside in DOC and city-contracted halfway houses. Pretrial Services provides defendants with case management and drug testing and treatment when appropriate, and shares compliance and supervision information with DOC.

Detention

Detention is the highest level of supervision. If the defendant is detained, s/he is remanded into the custody of the U.S. Marshals Service and is returned to the U.S. Marshals Service cellblock to await transport to the Central Detention Facility (D.C. Jail). A defendant can be detained because the charged offense is a crime of violence, or because the defendant was on probation or parole. There is a review of any release conditions at each court appearance, based on the behavior of the defendant with respect to his/her conditions of release.

Post-Release Interview

In the post-release interview, which occurs immediately after arraignment, a Pretrial Services representative is to review the conditions of release with the defendant and penalties for noncompliance, rearrest, and failure to appear. The defense attorney typically stays with the defendant while release conditions are explained, after which point the attorney is to return to court for his/her next hearing.

Typical Outcomes of Presentment/Arraignment

Misdemeanor Cases

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

In a misdemeanor case, the presentment serves as the formal arraignment, at which the defendant is notified of the charges, called upon to make a plea, and may make a jury demand (if applicable). The defendant typically pleads not guilty, and conditions of release pending trial are established. In the vast majority of misdemeanor cases, defendants are released at arraignment. The defendant signs a form pledging to return for trial, and a trial date is set, typically 30 to 45 days after arraignment.

Felony Cases
For felony cases, the defendant is notified of the charges against him/her, a preliminary hearing date is set, the judge who will handle the remainder of the proceedings in the case is assigned, and conditions of release until the preliminary hearing are established.

Overview of Court Proceedings
There are basically two different categories of offenses adjudicated in D.C. Superior Court-- felony and misdemeanor. For calendar and case management purposes, the Court has established three felony calendars: (1) Felony I, (2) Accelerated Felony, and (3) Felony II calendars, and manages the types of cases differently. Misdemeanor cases can be distinguished as U.S. Misdemeanors, D.C. Misdemeanors, and Traffic cases. All are technically misdemeanors; however, they are prosecuted by different offices and calendared in different ways. D.C. Misdemeanors and Traffic Cases are discussed in appendix V. The typical court case flow for felonies is discussed in this section, and the typical court case flow for U.S. misdemeanors is discussed later in the Misdemeanor Cases section in this appendix.

Felony I
The most serious offenses (first-degree murder and serious sexual assaults) are on the Felony I calendars. Felony I calendars were established because the court realized that management of the most serious cases requires more intense judicial activity and greater flexibility to conduct lengthy trials. These calendars were specifically designed so that each calendar would carry a small number of cases. These cases carry the maximum penalty under D.C. law, which is up to life imprisonment without parole.

Serious Felony (Accelerated Felony Trial Calendar - "100-day Cases")
The Accelerated Felony Trial Calendar (AFTC) is for cases, other than first-degree murder and serious sexual assaults, in which the accused is held without bond. These offenses include those designated as "Dangerous Crimes" or "Crimes of Violence" such as assault with intent to kill, armed robbery, burglary, aggravated assault, kidnapping, and armed carjacking. n42

n42 See D.C. Code Section 23-1331.

The AFTC calendars were designed primarily to deal with preventive detention cases, which would have to be tried within 100 days. Defendants placed in pretrial detention have a statutory right to have an "accelerated" trial date (100 days from the date they were first detained). Again because these were very serious crimes, which might involve long trials, the calendars were designed to carry a limited number of cases.

Felony I and Accelerated Felony cases are assigned to a specific judge, who handles all subsequent matters in the case, including the preliminary hearing. Accelerated Felony cases are assigned to the U.S. Attorney's Community Prosecution Major Crimes Section.

Felony II (General Felony)
The remaining felony cases fall in the Felony II category. The offenses that fall in this category consist of mostly drug distribution, assaults with weapons resulting in moderately serious injury, and firearms and property offenses.

Felony II calendars were originally designed to carry the less serious cases where defendants were not being preventively detained. According to Superior Court officials, changes in the law have resulted in a large number of

1449-502030

cases where the defendant is being preventively detained (primarily drug distribution cases) being set on the Felony II calendars. Those defendants who are detained are typically held because they are on parole or probation. n43 In general, these cases, which require shorter proceedings, are usually resolved by a plea of guilty, thus avoiding a trial.

n43 Defendants who are rearrested while they are still under parole or probation supervision, or have cases pending pre-trial, are subject to a 3 to 5 day detention period. This is a mandatory detention and should be granted when the prosecutor requests the hold. Under D.C. Code Section 23-1322, the preventive detention statute, there is a rebuttable presumption that a defendant charged with a dangerous or violent crime with other certain conditions (i.e., while armed, after having been previously convicted of a violent or dangerous crime) should be preventively detained.

Felony II cases are assigned to individual calendars for all purposes except for the preliminary hearing/preventive detention hearing. These hearings are conducted by a commissioner sitting in the preliminary hearing courtroom.

Preliminary Hearing
Next, the preliminary hearing is to be held anywhere from 3 to 20 days after presentment, depending on the type of offense and the release condition ordered at the presentment/arraignment hearing. The preliminary hearing is an evidentiary hearing where the court determines whether there is probable cause to believe that an offense was committed and that the defendant committed it. At the preliminary hearing, USAO calls police officers to testify n44 and presents evidence to establish probable cause.

n44 If the police officer does not appear to testify, the case is dismissed and the defendant is released. USAO typically still brings the case before the grand jury.

If the judge finds probable cause that the accused committed a crime, the case is sent to a grand jury. If the judge does not find probable cause or if USAO is not ready to present evidence, the complaint is dismissed n45 and the defendant is released. n46 In addition, the court is to review the level of supervision required. If the defendant is not detained at D.C. Jail, the court may release the defendant into Pretrial Services' Heightened, Intensive, or Restrictive Supervision Programs.

n45 A case could be dismissed at the preliminary hearing/preventive detention hearing because the officer does not show up to testify or because USAO is not ready to present the case. If a case is dismissed, USAO can still rebring the case to the grand jury.

n46 Super. Ct. Crim. R. 5 (d)(1).

Preventive Detention Hearing

If the defendant is detained as a result of the presentment/arraignment, the preliminary hearing is called a preventive detention hearing. Depending on the statutory basis for the detention request, preventive detention hearings are scheduled in either 3 or 5 days.

Superior Court Drug Intervention Program (SCDIP)
SCDIP is a collaborative effort between Pretrial Services and Superior Court. Treatment for nonviolent defendants is conducted in-house by Pretrial Services and includes graduated sanctions imposed by the Court for drug testing violations. SCDIP graduates who plead or are found guilty of felony offenses will very likely receive probation.

Grand Jury Indictment
In D.C., unless a defendant waives grand jury consideration, a felony charge can only be brought pursuant to a grand jury indictment. Prosecutors are to conduct witness conferences and present evidence to a grand jury to assist the grand jurors in determining whether there is probable cause to believe that a defendant has committed a crime and should be brought to trial. If so, the grand jury issues an indictment (a written statement of the charges against the defendant) to the court.

The grand jury process occurs in the period immediately following papering of a felony case, and may last for weeks and even months as the investigation of the case requires. [47] If the defendant can be indicted before the preliminary hearing, s/he will be, and the preliminary hearing is no longer necessary because the grand jury has already made a determination of probable cause. The preliminary hearing date is converted to an arraignment hearing and the defendant is arraigned on the indictment.

[47] Typically, it takes 15 to 20 days for a grand jury to return an indictment on a drug case, whereas for Felony I cases, USAO has 9 months to indict a case. An indictment needs to be returned within 90 days in all preventive detention cases or the defendant will be released from custody.

Grand Jury Original
It is also possible in some cases for the grand jury to conduct an investigation and initiate criminal proceedings on its own. It then issues what is called a "grand jury original" indictment. If the subject of the indictment is not already in custody, the Court may issue an arrest warrant.

Rapid Indictment Program (RIP)
RIP cases are standard cases with similar basic fact patterns, such as a standard distribution of cocaine case or an unauthorized use of a vehicle, in which a single officer can testify before the grand jury about the facts of the case. RIP cases typically do not require investigation or civilian witnesses. The goal of the RIP program is to indict cases before the preliminary hearing. During the papering process, at screening, RIP cases are scheduled for grand jury presentment, [48] which usually occurs within 10 calendar days.

[48] A senior AUSA in the Grand Jury section presents RIP cases to the Grand Jury for indictment. RIP cases are typically not assigned to a particular AUSA until after indictment, at which point the AUSA takes over the case.

Arraignment Hearing

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

After the charges are formally filed by indictment, there is an arraignment hearing where the defendant is formally charged with the felony offense(s) found by the grand jury, advised of his/her constitutional rights, and asked to enter a plea to the charges.

Status Hearing
After the defendant is arraigned, a status hearing typically occurs within a few weeks. At the status hearing, the defendant may agree to a plea bargain, the case may be dismissed, or the judge will set a trial date. If the defendant enters a guilty plea, the judge may accept or reject the plea. If accepted, no trial is held and the defendant is sentenced at this hearing or at a later date. If the defendant enters a not guilty plea, the trial date would be set for 2 to 3 months away, depending on the judge's calendar and whether the defendant is detained. n49 For preventive detention cases, the trial date is to be set for 100 days from when the defendant was originally locked up.

n49 A trial date may be set; however, only in a small percentage of cases (5 to 10 percent) will a trial actually occur, because later in the process cases may be dismissed or the accused may elect to enter a guilty plea.

Trial
If the defendant pleads not guilty, a trial is to take place and a judge or jury decides if the defendant is guilty or not guilty. Felony cases are typically jury trials, the length of which varies depending on the type of offense. For example, Felony I trials can last from 2 weeks to 2 months. A case can be settled through a plea agreement, dismissed, continued to a second trial date, or adjudicated with the defendant being found guilty or not guilty. If a case is continued, the second trial date will typically be scheduled for 30 to 60 days after the first trial. After a guilty verdict, the court is to order a presentence investigation report from Court Services and Offender Supervision Agency (Court Services), and the presumption is that the defendant should be detained pending sentence. The court also sets a date for the sentencing hearing.

Sentencing Hearing
After a guilty verdict or plea, the judge will sentence the defendant. The Pre-Sentencing Investigation report gives a judge complete information about the defendant that will be necessary in determining an appropriate sentence. The court can impose incarceration, restitution, community service, fines, or probation. An assessment under the D.C. Victims of Violent Crime Compensation Act is also required for all offenses of which the accused is adjudicated guilty. For offenses committed after August 5, 2000, the sentence must include a period of supervised release.

Offenders who are sentenced to incarceration are sent to D.C. Jail pending transfer to a facility to serve their sentences. By 2001, all felons sentenced to incarceration under the D.C. Code are to be designated to facilities operated or contracted by the Federal Bureau of Prisons.

If a defendant is not sentenced to incarceration, s/he is to be released and supervised by Court Services, which is involved with determining a defendant's conditions of probation after sentencing. If the offender violates a condition of his/her probation, the sentencing judge may hold a revocation hearing. The general result of a probation revocation is that the defendant may be sentenced to a period of jail time because s/he was not successful on probation.

Misdemeanor Cases
Misdemeanor cases prosecuted by USAO constitute over half of all criminal cases in D.C. Superior Court. Defendants are rarely detained prior to trial, and the court proceedings for misdemeanor cases are typically much simpler than those for felony cases. There is not a status hearing for misdemeanor offenses, and USAO has a long-standing agreement with MPDC that USAO will not normally conduct witness conferences for misdemeanor cases prior to the day of trial.

1449-502033

0046- 060

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

The court typically sets trial dates for U.S. misdemeanors 30 to 45 days from arraignment. n50 Misdemeanor trials typically do not have juries and last 1 to 2 hours. While misdemeanors are almost always resolved by dismissal or plea agreement, several events can happen at the trial:

1. The case can be continued and a new trial date set.

2. The case can be dismissed for want of prosecution because a government witness is not present, or if for some other reason the government is not prepared to try the case.

3. The defendant can also be placed in a diversion program, successfully complete the program, and have his/her case dismissed. If the defendant fails to successfully complete the program the case would be set for trial.

4. The case may be placed on the stet docket, an informal diversion program typically offered to defendants charged with minor crimes such as unlawful entry. In these cases, the government may agree to suspend the prosecution of the case for a period of time. If the defendant refrains from certain actions (i.e., contact with the complaining witness, no rearrests, etc.,) or takes certain actions (i.e., pay restitution) in that set period of time the government agrees to dismiss the case completely. Stet docket cases are typically set for a status hearing 3 to 9 months from the date of the agreement to place the case on the stet docket.

5. SCDIP (Drug Court) -- Eligible pretrial defendants charged with nonviolent misdemeanor offenses may have their charges dismissed as part of the Superior Court Drug Court Misdemeanor Diversion Program if they complete the SCDIP program in 4 to 9 months.

6. The defendant can agree to a plea agreement. USAO estimates that 85 to 90 percent of misdemeanor cases generate guilty pleas.

7. The judge can hear the case on its merits.

8. If the defendant fails to appear, the court can issue a bench warrant. It is estimated that about 10 to 15 percent of defendants fail to appear at misdemeanor trials.


n50 For U.S. misdemeanor drug offenses, it typically takes 35 to 40 days to get the drug test results back from the DEA laboratory.


Defendants convicted of misdemeanors are rarely incarcerated upon conviction, although those who are sentenced to incarceration would serve their sentences in D.C. Jail.

Figures 1 and 2 depict the typical case flow processes for (1) adult felonies and (2) misdemeanors prosecuted by the USAO.

**Figure 1: Typical Case Flow Process for Adult Felonies Prosecuted by the U.S. Attorney's Office**

[SEE FIGURE IN ORIGINAL]

Note: At any point in the process, a defendant could be referred to D.C. Superior Court Drug Intervention Program (Drug Court) or could have his/her bond conditions reviewed. In addition, depending on the case, the Office of the Chief Medical Examiner could perform forensic analysis for the case.

Source: Criminal Justice Coordinating Council and agencies involved in the D.C. criminal justice system.


**1449-502034**

**Figure 2: Typical Case Flow Process for Adult Misdemeanors Prosecuted by the U.S. Attorney's Office**

[SEE FIGURE IN ORIGINAL]

Source: Criminal Justice Coordinating Council and agencies involved in the D.C. criminal justice system.

**APPENDIX-V:**
**Adult Offenses Prosecuted by the Office of the Corporation Counsel**

Appendix V describes the typical case flow for offenses prosecuted in the Superior Court of the District of Columbia (Superior Court) by the Office of the Corporation Counsel for the District of Columbia (Corporation Counsel). Corporation Counsel is responsible for prosecuting "minor" misdemeanor violations (D.C. offenses), criminal traffic offenses, n1 and offenses committed by children. Examples of misdemeanor offenses within the prosecutive jurisdiction of Corporation Counsel include "quality of life" misdemeanors, such as drinking in public or possession of an open container of alcohol. Criminal traffic offenses n2 include offenses such as leaving the scene of an accident, driving while intoxicated (DWI), no permit, and speeding 30 miles over the limit. The Office of the United States Attorney for the District of Columbia (USAO) is responsible for prosecuting felony and serious misdemeanor violations committed by adults in D.C. (U.S. offenses). The case flow process for U.S. offenses is described in appendix IV. The case flow process for offenses committed by children is described in appendix VI.

n1 D.C. Code, section 23-101 outlines the conduct of prosecutions. Section 23-101 provides, in part, that:

(a) Corporation Counsel is responsible for prosecutions for violations of all police or municipal ordinances or regulations, and violations of all penal statutes in the nature of police or municipal regulations, where the maximum punishment is a fine only or imprisonment not exceeding 1 year, unless otherwise noted.

(b) Corporation Counsel is responsible for prosecutions for violations relating to disorderly conduct (D.C. Code, section 22-1107) and violations relating to lewd, indecent, or obscene acts (D.C. Code, section 22-1112).

(c) The Office of the U.S. Attorney for D.C. is responsible for all other criminal prosecutions, except as otherwise specified.

n2 Corporation Counsel and the Bureau of Traffic Adjudication have mutually exclusive jurisdiction over traffic matters. The Bureau of Traffic Adjudication handles all civil traffic infractions, and the Corporation Counsel handles all criminal traffic violations.

This case flow process description reflects process-related information as described to us by relevant agency officials. We did not verify the accuracy of the information provided to us. As such, we did not test to determine if the descriptions of the processes were functioning as was described to us. We recognize that there may be aspects of a specific case that make its processing unique and that there may be exceptions in the normal progression of the stages in the justice system. However, this description will focus on the case flow process for a typical adult case, prosecuted by Corporation Counsel, as it progresses through the basic stages of the criminal justice system.

**Incident**
Most cases begin with an incident and subsequent arrest. However, at the incident a police officer has the option of arresting the violator or giving the violator a ticket for certain enumerated offenses. The completed ticket lists the charge and advises of the fine that must be paid at one of the police districts within 15 days. When the violator pays the fine, s/he may elect to forfeit the collateral or stand trial. In the event that the violator fails to pay the fine or elects to stand trial, the officer is notified to report to Corporation Counsel to paper the case.

**Police Arrest and Booking**

**1449-502035**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Police Arrest
In D.C., over 30 law enforcement agencies other than the Metropolitan Police Department of the District of Columbia (MPDC), such as the U.S. Capitol Police and the U.S. Park Police, may make arrests for crimes committed within D.C. However, MPDC makes a large majority of arrests in D.C.

Arrests can be made with or without an arrest warrant. Arrest warrants are issued by Superior Court when MPDC submits an application for a warrant (a complaint that may be supported by an affidavit) showing there is probable cause to believe that an offense has been committed and that the person named in the complaint has committed the offense. n3 With warrantless arrests, the arresting officer must have probable cause that the person to be arrested has committed or is committing an offense. Arrests resulting from an arrest warrant are processed similarly to warrantless arrests.

n3 To obtain an arrest warrant, an officer is to complete an application for the warrant and bring it to Corporation Counsel. An Assistant Corporation Counsel (ACC) reviews the warrant to determine whether probable cause exists for the arrest. If the facts in the warrant support a finding of probable cause, the ACC places the charge(s) on the warrant and signs the document. A case jacket is prepared in the same manner as any other case papered in the office. Once the ACC approves the warrant, an information, i.e., the charging document, is prepared and signed by the ACC. The officer takes both the information and the warrant to a judge who reads it in the officer's presence. The officer swears to the facts and signs the warrant. The judge then decides whether to issue the warrant based upon a finding of probable cause. If there is a finding of probable cause, the judge signs the warrant and a warrant is issued for the arrest of the person named.

Processing at the District Station
After a person is arrested, physically secured, and searched on the scene, s/he is to be transported to a police district station for processing. The arrest process for D.C. offenses is generally the same as that for U.S. offenses; n4 however, there are some differences in the processing of D.C. and U.S. offenses. Most notably, arrestees who are charged with D.C. offenses typically (1) are not positively identified using LiveScan n5 as are arrestees for U.S. offenses; (2) are not given Police Department Identification (PDID) Numbers; and (3) may be eligible to post and forfeit, or pay a fine, after an arrest.

n4 See appendix IV, for a detailed description of how MPDC processes and books cases.

n5 LiveScan machines electronically capture fingerprints, mugshots, and arrest information, and are linked electronically to an Automated Fingerprint Identification System (AFIS). LiveScan automatically verifies fingerprints and arrest information contained in AFIS.

Fingerprinting and PDID
MPDC typically does not positively identify n6 arrestees who are charged with D.C. offenses. There are, however, two circumstances in which an individual arrested for a D.C. offense will be positively identified, and thus given a PDID number n7--first, if an arrestee is arrested for both a D.C. and a U.S. offense, and second, if an arrestee cannot be identified (i.e., "John Doe").

1449-502036

0046- 063

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

n6 Positive identification is identification of an individual using biometric characteristics, which are unique and not subject to change, such as fingerprints, voiceprints, or retinal images. Positive identification is to be distinguished from identification using name, sex, and date of birth, as these characters could be altered (as on a document), or may not be unique.

n7 The PDID is a six-digit permanent identification number assigned to an individual when s/he is first arrested for an offense that is within the prosecutive jurisdiction of USAO. An individual keeps the same PDID number throughout all subsequent involvement in the D.C. criminal justice system.

An individual who is arrested for a D.C. offense may already have a PDID number because of a prior arrest. In those cases where there is not a PDID number, MPDC relies on a computer name check to determine if the individual has any previous arrests or outstanding warrants. If a person gives an incorrect name or a minor spelling error occurs, an individual's prior involvement in the justice system may not be discovered.

Determine Eligibility For Release--Post and Forfeit
Depending on the nature of the arrest and the results of the criminal history check, police are to determine if an individual is eligible for one of the following: to post and forfeit, for citation release, or for bond release.

**Post and Forfeit**. Arrestees are eligible to post and forfeit (i.e., pay a fine) if they are arrested for 1 of about 25 to 30 selected offenses. These offenses are generally considered to be minor offenses, such as panhandling, driving without a permit, altered tags, urinating in public, and disorderly conduct. MPDC and Corporation Counsel require that the arrestee have no prior arrests for the same charge within the preceding 12 months to qualify for post and forfeit.

In addition, arrestees do not need to verify their identity in order to post and forfeit. There are two opportunities for an arrestee to elect to post and forfeit: at the police district station and at Superior Court through Corporation Counsel.

At the district station, MPDC may offer an arrestee the opportunity to post and forfeit. If the person is eligible and elects to post and forfeit, s/he pays a designated fine for the offense and is released from the district station. An individual can change his or her mind within 90 days and have the case heard in court. A defendant who chooses to do so is not allowed a second opportunity to post and forfeit for the offense. If the defendant chooses to let the post and forfeit stand, the case does not go to court, but the post and forfeit is considered a conviction as the arrest and payment are recorded. n8 An eligible arrestee, who has not previously declined the opportunity to post and forfeit, may elect to do so at his or her initial court appearance (arraignment). If the arrestee chooses this option, he or she pays the fine and the case is over.

n8 If the person pays the fine at the district station, MPDC sends the receipt to Superior Court. While Superior Court does not open a case or assign a docket number, the incident information and the defendant's name are updated in the court's database.

An arrestee may elect to post and forfeit at his/her initial court appearance (i.e., arraignment). When Superior Court is open, Corporation Counsel can offer post and forfeit to arrestees who had been locked up after arrest. n9 If the arrestee accepts Corporation Counsel's offer, s/he pays the fine and the case is over. All of the cases that Corporation Counsel posts and forfeits are officially considered to be papered.

1449-502037

0046- 064

n9 The decision to offer an arrestee the opportunity to post and forfeit is made difficult by the fact that these defendants are not positively identified during the arrest process. At best, Corporation Counsel can use the individual's name and date of birth as a means of identification.

**Citation Release.** If the individual is not eligible to post and forfeit, police typically will determine if the individual is eligible for a citation release. For certain misdemeanor offenses, an arrestee may be eligible for citation release, which allows the arrestee to be released on his/her own recognizance. Arrestees are given a citation appearance date to appear in Superior Court 4 to 6 weeks from the date of arrest. In order to be eligible, the arrestee must live within a 25-mile radius, show means of support, and have three references attesting to his/her identity.

The arresting officer is to complete a Citation Release Determination Report (PD 778) after questioning the arrestee. This form is used to determine if the arrestee can be granted a citation release. If the officer determines that the arrestee qualifies for citation release, a Citation to Appear (PD 799) is prepared indicating the date and time the arrestee is to appear in Superior Court, the charge(s) against the arrestee, the penalty for not appearing, and acknowledgement by the arrestee of the citation. If the arrestee has picture identification, s/he can be released from the station. If the arrestee does not have picture identification and there is no one at the station who can positively identify the arrestee, s/he is locked up.

**Lockup Arrests.** Lockup is typically used for individuals charged with a felony offense; however, it is also used for arrestees charged with misdemeanors who cannot prove their identification for purposes of citation release, and who otherwise are not eligible, or do not have the available funds to post and forfeit collateral or pay a bond amount. Arrestees are locked up prior to their first court appearance (i.e., arraignment) at either the district station, MPDC's Central Cellblock (CCB), or at the U.S. Marshals Service cellblock depending on the time of the arrest.

MPDC Lockup List
A lockup list, which is a list of individuals who were detained after arrest, is generated in MPDC's CJIS system. There are typically 15 to 20 arrestees charged with D.C. offenses on the lockup list per day.

**Transport Arrestee From the District Station**
The time of day when the booking process is completed determines where the arrestee will be transported if s/he is locked up before the initial court appearance. If processing is completed by the cut-off time, then the arrestee can be transported to the U.S. Marshals Service cellblock, where s/he is held until her/his initial court appearance, which should occur the same court workday. n10 Arrestees are to arrive at the U.S. Marshals Service cellblock by the cut-off times of 3:00 p.m. during the week, 2:30 p.m. on Saturdays, and 10:30 a.m. on holidays.

n10 The U.S. Marshals Service cellblock does not house prisoners overnight, so only arrestees who arrive by the cut-off times will be able to have initial court appearances the same day.

If the processing is not completed by the cut-off time, the arrestee can be held overnight at either an MPDC district station or at CCB, n11 and will be transported to the U.S. Marshals Service cellblock to appear in court on the next court workday. For arrestees held overnight, MPDC may begin to transport arrestees to the U.S. Marshals Service cellblock at approximately 6:00 a.m., when the U.S. Marshals Service begins accepting arrestees.

n11 If an arrestee has not been positively identified at the district station, s/he is to be transported to CCB.

**Processing in the U.S. Marshals Service Cellblock**
While the U.S. Marshals Service processing of arrestees for D.C. offenses does not vary from how arrestees for U.S. offenses are processed, there are differences in the involvement of other criminal justice agencies. As compared with arrestees who are arrested for U.S. offenses, Pretrial Services Agency (Pretrial Services) does not interview or drug test arrestees charged with D.C. offenses.

Representatives from the Criminal Justice Act (CJA) office of Defender Service are to interview arrestees on the lockup list at the U.S. Marshals Service cellblock to determine if they are eligible for indigent counsel. The interviewers ask the arrestees about their employment, income, marital status, and number of dependents. Based on the arrestee's answers, and referring to the Department of Labor poverty guidelines, the interviewer can determine whether the arrestee is financially eligible for counsel and whether the arrestee can contribute a portion of the attorney's fees.

**Corporation Counsel Charging**
After arrest and booking, Corporation Counsel must determine whether to charge the arrestee with a crime in Superior Court. "Papering" is the stage of the charging process at which police officers present their arrest reports to a prosecutor and explain the circumstances of the arrest. For each arrest, a police officer who is knowledgeable of facts of the arrest is required to go to Corporation Counsel to paper the case. Corporation Counsel is to determine whether the case should be prosecuted (paper the case) or not (no-paper the case).

According to a Corporation Counsel official, Corporation Counsel papering is typically quicker and requires less paperwork than the USAO papering process. As a result, if an officer has to paper both a Corporation Counsel and a USAO charge, s/he is told to paper the D.C. offense before papering the U.S. offense. The officer is to paper the D.C. offense at Corporation Counsel and the U.S. offense at USAO.

Officer Checks in at the Court Liaison Division
The officer is required to check-in at the Court Liaison Division n12 by 8:00 a.m., the court day after an arrest that resulted in a lockup. Officers normally paper cases on the same court day if the arrest occurs during the day and the arrestee is processed before the cutoff time.

      n12 The Court Liaison Division is open from 7:00 a.m. until 6:00 p.m., Monday through Friday, and from 7:00 a.m. until 3:00 p.m., Saturdays and holidays.

At the Court Liaison Division, the officer is to complete a Court Appearance Worksheet (PD 140), which lists information about all of the court appearances the officer must make on a given day. Next, the officer is to wait in line for a Court Liaison Division clerk. The Court Liaison Division clerk is to time-stamp the PD 140, initial it, return one copy to the officer, check the officer into the Time and Attendance Court Information System (TACIS), and then give the officer the original arrest paperwork (PD 163). The officer can now go to Corporation Counsel to paper the case.

Obtaining Additional Records
It is currently the police officers' responsibility to obtain the appropriate reports for arrests that require evidence of driving records. These offenses include, for example, no permit and operation after suspension or revocation cases. Officers should obtain the required records prior to going to Corporation Counsel to paper an arrest.

Officer Arrives at Corporation Counsel and Assembles the Case Jacket

**1449-502039**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

After checking in with the Court Liaison Division, the officer goes to the Corporation Counsel office located in the Judiciary Center on Fourth Street. The office is open to paper cases from 8:00 a.m. until 4:30 p.m., Monday through Friday, Saturday from 7:30 a.m. to 3:00 p.m., and holidays from 7:30 a.m. to 10:30 a.m.

At Corporation Counsel, the arresting officer is to photocopy the arrest paperwork and assemble the Corporation Counsel case jacket that contains all the relevant police paperwork. n13 This paperwork typically includes: (1) the Arrest/Prosecution Report (PD 163); (2) the Miranda waiver (PD 47); (3) a copy of the Court Appointment Notification System (CANS) notice; and (4) various other reports, depending on the specifics of the arrest. Next, the officer is to complete the Corporation Counsel case jacket, including the defendant's name, charge(s), arrest and papering dates, and release information and court date.

n13 Some officers may choose to prepare the arrest paperwork package at the district station if time permits and if there are available supplies.

Officer Meets With an Attorney to Paper the Arrest
Next, the officer is to meet with an ACC to paper the case. Because mornings are the busiest times for papering, there are usually two ACCs papering cases until 11:00 a.m., and one ACC thereafter.

Like USAO, Corporation Counsel papers arrests that result in lockups, citation releases, and bond releases. If an arrestee is locked up after an arrest, the time of the arrest determines when the case is papered. Typically, cases papered in the morning are from arrests that occurred after 3:00 p.m. the day before. Papering for citation cases is typically scheduled in advance. MPDC is to generate a list of citation release cases, and police officers go to Corporation Counsel on the specified date to paper the case. Once a citation case is papered, it is to be immediately forwarded to Superior Court, where all of the information is to be entered into the Superior Court information system (CIS). This is done in order to have the cases prepared to go into court on the date of the citation return. A daily list of individuals released on bond is also to be drawn up, and officers are required to appear at the Corporation Counsel the following day to paper the case.

Review of the Arrest Information
The ACC is to read the arrest information and the sworn statement of facts, and interview the police officer about the arrest. The ACC then determines whether there was probable cause for the police arrest and whether the elements of a case are present. At that point, the ACC can decide whether or not to paper the case. Currently, Corporation Counsel only requires supervisory review of complicated cases.

No-Papered Cases
According to Corporation Counsel officials, the majority of no-papered cases are not papered because Corporation Counsel believes that the elements of a crime have not been met. Corporation Counsel typically handles between 170 and 200 cases per week, and no-papers about 5 to 8 percent of these cases.

Cases that are no-papered are concluded with the review by the ACC. The Corporation Counsel's office is to report the no-papered cases to the Superior Court clerk of the court, who assigns the case a number and records this information. Other than this transfer of information, no action is taken.

Papering Guidelines
ACCs use certain guidelines to assist in effectively papering cases. One such guideline requires that ACCs include secondary charges to particular cases. For example, an ACC should include an operating while impaired charge with a DWI arrest, or a failure to exhibit a permit with a no permit charge, when appropriate. In these cases, a judge could find guilt in either one or the other of the charges, depending on the available evidence.

Complete Case Jacket

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

After interviewing the officer, the ACC could ask the officer to supplement the statement of facts in the PD 163 to make it more complete. The ACC should make sure that the necessary papers and reports are present and in order in the case jacket. The ACC should also staple any additional information, such as a traffic ticket or the *Miranda* rights form, n14 to the inside of the case jacket. The ACC then is to complete the remaining information on the case jacket, listing comments on the case based on the interview with the officer.

n14 A form indicating whether the arrestee has waived the right to remain silent and decline to answer police questions until speaking with his or her attorney. The form is based on the U.S. Supreme Court's decision in *Miranda v. Arizona, 384 U.S. 436 (1966).*

Complete Worksheet
For certain charges, the ACC should complete a worksheet that breaks down the elements of the case. Charges that have a separate worksheet are typically those charges for which Corporation Counsel handles a high volume of cases and includes the following offenses: driving while intoxicated, disorderly conduct, hit and run, and reckless driving. There are specific questions for each charge that has its own worksheet. The ACC is to ask the officer preprinted questions, write the officer's answers on the worksheet, and include the worksheet in the case jacket for the prosecutor to use during trial.

Swear to *Gerstein* Statement
The officer swears to the information on the *Gerstein* statement, the factual narrative about the arrest, and signs it. *Gerstein* refers to a Supreme Court decision that outlines the requirements for a judicial determination of probable cause prior to the imposition of any "significant restraint of pretrial liberty." This judicial determination requires a sworn statement by the arresting officer of the facts that are offered to establish probable cause to believe that an offense occurred and that the defendant is the person who committed it. n15 The ACC, as an officer of the court, is to ask the officer if the statements in the arrest report narrative are true to the best of his/her knowledge. The officer swears to and signs the statement, and then the ACC is to sign the statement.

n15 The *Gerstein* statement is only required for arrestees whose conditions of release constitute a significant restraint of pretrial liberty, but is completed in almost all of the cases.

Sign Out Officer on PD 140
The ACC should write the arrestee's name and information on a log sheet that Corporation Counsel uses to track the outcomes of arrests, and complete and sign appropriate forms for each charge papered or not papered. Finally, the ACC is to sign the officer out on his or her PD 140. A series of time intervals, from 7:30 a.m. to 6:00 p.m., are preprinted on the PD 140 and the ACC uses these to indicate how long the officer was papering the case.

The ACC is to place the case jacket in the corresponding tray for citation release or lock-up. Corporation Counsel employees who are going to Superior Court transport the case jackets to the Court Intake office for preparation for arraignment.

Officer Checks Out at the Court Liaison Division
After the officer has completed the papering process, s/he should return to the Court Liaison Division to "check-out." The officer is to return the PD 140 to the Court Liaison Division clerk who verifies that the form has been completely

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

filled out. The Court Liaison Division clerk is to time-stamp and return a copy of the PD 140 to the officer, and then check the officer out in TACIS.

**Initial Court Appearance--Misdemeanor Arraignment**
An arrestee has a right to an initial hearing before a court or magistrate "without unnecessary delay," typically within 48 hours of his/her arrest. Arrestees are initially charged with an offense in the Superior Court Arraignment Courtroom 115. At the arraignment, the paperwork is presented to the commissioner, the individual is offered an opportunity to admit or deny the offense, and the commissioner determines the conditions of release. The attorneys may exchange any information or discovery packages, and the commissioner sets a trial date.

 CJA Attorneys
While the CJA office appoints attorneys to both defendants charged with D.C. offenses and U.S. offenses, CJA attorneys typically represent the former--defendants charged with D.C. offenses. (See app. IV for a description of how attorneys are assigned to cases.) The Defender Service typically does not handle D.C. offenses or traffic violations unless the offense is associated with a more serious charge.

Probable Cause
Superior Court is permitted to hold an individual for 24 hours for the purpose of allowing Corporation Counsel to perfect the *Gerstein* statement. If Corporation Counsel does establish probable cause, the case moves forward with the court setting the trial date. If Corporation Counsel does not establish probable cause, the judge can dismiss the case.

Citation Release Cases -- Arrestee Fails to Appear
For citation release cases, at the time of arrest, the officer should give the arrestee a date to appear in Superior Court for arraignment. The arrestee is to sign the citation to appear (PD 799), which includes the court date. The PD 799 allows the commissioner to file a bench warrant if the defendant does not appear on the court date. If the PD 799 is misplaced, then the commissioner is to file a judicial summons requiring the individual to appear on another court date, typically 45 days in the future. If the defendant does not appear at the next scheduled date (after the commissioner files a judicial summons), the ACC may request a bench warrant and submit the *Gerstein* statement to the commissioner, who uses it to ascertain if there is probable cause to issue a bench warrant for the defendant's arrest.

Misdemeanor Arraignment Release Decisions
Pretrial Services does not interview Corporation Counsel clients to gather information for use in arraignment decisions. The following are possible conditions of release that may be ordered by a commissioner:

Release on Personal Recognizance
In most minor misdemeanor cases, the commissioner orders that the defendant be released on his/her personal recognizance. The defendant is to sign a notice, called a "buck slip," for citation releases that are continued on personal recognizance without any conditions. For lockup cases processed at presentment/arraignment and released on personal recognizance, the defendant must sign a release order, which indicates that s/he is to appear in Superior Court at the next trial date.

Third-Party Custody
Third-party custody is an arrangement whereby a defendant is released to the custody of a third party, such as a relative, friend, employer, or an organizational custodian, which is a community-based organization that provides supervision services for released defendants. The third party pledges his or her best efforts to see that the defendant complies with the conditions of release and returns for further court appearances.

Bond (Cash/Surety)
Cash or surety bonds are very rare in cases prosecuted by the Corporation Counsel. Money bonds are most often requested and imposed when an arrestee does not appear for trial. Upon appearance, various conditions of release are usually set to assure the offenders appearance as required. If the offender is on probation or parole, or has a pending felony matter, the ACC may ask that the arrestee be held for 5 days to determine the arrestee's probation or parole status, or compliance with conditions of release. If the arrestee presents a substantial risk of flight, the ACC may request the arrestee be held without bond.

**1449-502042**

0046- 069

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Diversion Programs
Offenders charged with the quality of life offenses and no prior record may be eligible for the Corporation Counsel's quality of life diversion program. If the defendant successfully completes the program, charges are dropped. An individual charged with DWI can participate in the statutory DWI diversion program if the case meets the following criteria:

. defendant cooperated,

. defendant had a blood alcohol level no greater than 0.2 percent,

. defendant had no charges for which s/he cannot post and forfeit,

. there was no accident with an injury,

. defendant had no prior arrests for DWI, and

. defendant signs up for diversion within 5 days of the service of the eligibility notice (this time can be extended if there was a legitimate unforeseen circumstance that prevented the defendant from signing up).

Superior Court probation runs the Indecent Exposure Diversion Program, which was administratively created. Superior Court decided to implement the program, and all of the parties involved (defense counsel, USAO, and Corporation Counsel) agreed to it. To participate in the program, the defendant must (1) admit involvement and (2) have no prior arrests for indecent exposure.
If the defendant successfully completes the program, charges are dropped. If, however, the defendant does not comply with the program, the case goes to trial.

**Overview of Superior Court Proceedings**
There are basically two different categories of offenses adjudicated in Superior Court, felonies and misdemeanors. For calendar and case management purposes, the Court has established three felony calendars: (1) Felony I, (2) Accelerated Felony, and (3) Felony II calendars, and manages the types of cases differently. Misdemeanor cases can be distinguished as U.S. misdemeanors, D.C. misdemeanors, and traffic cases. All are technically misdemeanors; however, they are prosecuted by different offices and calendared in different ways. The typical court case flow for D.C. misdemeanors and traffic cases is discussed in this section, and the typical court case flow for felonies and U.S. misdemeanors is discussed in appendix IV.

Status Hearing
A status hearing is to occur after the initial court appearance. The following events may occur at a status hearing:

. A case can be dismissed.

. In the rare instance where a defendant should have been allowed to post and forfeit but was not, s/he may be given the opportunity to post and forfeit.

. The status hearing can be used to determine if cases that were diverted have been successfully completed or not. If an individual has successfully completed diversion, the case is dismissed. However, if the individual did not successfully complete diversion, the case is to be set for trial.

. The judge may set a date for the disposition hearing or a trial.

Disposition Hearing
A disposition hearing is similar to a status hearing. A defendant may enter a plea at the disposition hearing, or Superior Court may set a trial date.

Trial

1449-502043

0046- 070

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Trials for D.C. and traffic offenses are typically set for 45 to 60 days after arraignment. At the trial, the defendant may enter a plea, the case may be dismissed, or the court may render a verdict. A guilty verdict or plea changes the status of the offender regarding danger to community and flight risk. After a guilty verdict, sentence may be imposed. If the case is continued for sentencing, the judge may reexamine the conditions of release. The defendant could be detained, sent to a halfway house, released on bond, or released with a notice to appear on a date certain at the sentencing hearing.

Sentencing
At the sentencing hearing, the judge is to determine the appropriate sentence based on available information. This sentence could include jail time. Defendants sentenced for D.C. misdemeanor and criminal traffic offenses are transferred to the official custody of the Department of Corrections and the D.C. Jail.

Figure 3 illustrates the typical case flow process for adult misdemeanors prosecuted by Corporation Counsel.

**Figure 3: Typical Case Flow Process for Adult Misdemeanors Prosecuted by the Office of the Corporation Counsel**

[SEE FIGURE IN ORIGINAL]

Source: Criminal Justice Coordinating Council and agencies involved in the D.C. criminal justice system.

**APPENDIX-VI:**
**Juvenile Offenses Prosecuted by the Office of the Corporation Counsel**
Appendix VI describes the typical case flow for offenses committed by children and prosecuted in the Superior Court of the District of Columbia (Superior Court) by the Office of the Corporation Counsel for the District of Columbia (Corporation Counsel).

This case flow process description reflects process-related information as described to us by relevant agency officials. We did not verify the accuracy of the information provided to us. As such, we did not test to determine if the descriptions of the processes were functioning as was described to us. We recognize that there may be aspects of a specific case that make its processing unique and that there may be exceptions in the normal progression of the stages in the justice system. However, this description will focus on the case flow process for a typical case involving a child, as it progresses through the basic stages of the juvenile justice system.

**Initial Contact**
There are three primary paths of intake into D.C.'s juvenile justice system: (1) pre-petition custody orders (arrest warrants), (2) police arrests on scene, and (3) Persons in Need of Supervision (PINS) cases. Pre-petition custody orders and arrests typically involve delinquency offenses, [n1] and PINS cases involve status offenses. [n2]

[n1] A delinquency offense is an act or conduct, which is declared by statute or regulation to be an offense for which juveniles may be charged (delinquency offenses do not include traffic offenses for persons over the age of 16).

[n2] Status offenses, which include running away from home, underage drinking, ungovernability, truancy, and curfew violations, are considered offenses only when committed by a child (i.e., an adult could not be arrested for committing the same act).

**Delinquency Offenses**
A delinquency offense, or a violation of a law, may come to the attention of police through either a reported crime or through direct observation of a suspected illegal act. The officer must then assess the incident, identify parties involved as witnesses, victims, and potential suspects, and possibly apprehend those suspects for purposes of further

1449-502044

0046- 071

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

investigation. Depending on the incident, officers can either obtain a pre-petition custody order or arrest the suspect on the scene.

### Pre-Petition Custody Order

Police obtain a pre-petition custody order in some arrests. A police officer presents the case to Corporation Counsel for review and an affidavit in support of a custody order is drawn up and signed. A custody order may be issued when a judge has determined on the basis of the sworn affidavit that there is probable cause to believe the child has committed an offense. n3 The case is entered into the Washington Area Law Enforcement System (WALES) by court employees, and the police arrest the child based on the custody order issued by the judge.

n3 See D.C. Code § 16-2306; Super. Ct. Juv. R. 4.

### Police Arrest

Police arrest on scene, without a custody order, the majority of the time. When a suspected offense has been committed, the officer will decide the nature of the charge based upon the facts of the case. Before arresting the child, the officer must have probable cause to believe that the specific elements of the crime are met by facts. Assuming these criteria are met, the officer will place the child under arrest and transport him/her to the Metropolitan Police Department of the District of Columbia (MPDC) Youth Processing Center, located on 6th Street and New York Avenue. The child is remanded to the custody of MPDC's Youth and Preventive Services Division and booked for the offense committed.

### PINS Cases

A child may also become involved with the D.C.'s juvenile justice system by committing a status offense. Children who commit status offenses are referred to PINS. The police may be involved in a PINS case, for example, if an officer picks up a runaway on the street. Parents and guardians may also report to police complaints alleging that a child is beyond control (ungovernability). Often, Superior Court Social Services Division (Social Services) is involved with truancy offenses, and assumes the role of a police agency, or referring agency, for prosecution purposes.

### Youth Processing Center

All arrested children, except truant youths, are brought to the Youth Processing Center, where it typically takes a police officer about 4 hours to process a child. MPDC processing of a child is similar to that for adults; however, a police officer must remain with the child at all times.

Based on the charge and the circumstances of the offense, MPDC may decide to dismiss the arrest with no charges, divert the arrest, release the child to a parent/guardian, or transport the child to intake screening.

### Dismissal With No Charges

MPDC retains the authority to dismiss charges made at the time of arrest when there is insufficient evidence to charge. In these instances, the child is released from police custody, no formal charges are brought, and no arrest number is assigned. In cases that result in a dismissal with no charges, a Juvenile Contact Report (PD 379-C) is prepared to document the detention.

### Police Diversion

When police divert an arrest, the arrest is never referred to Corporation Counsel (and therefore never eligible for prosecution). MPDC's Early Intervention Program is currently the only program used for police diversion cases. It is only used for children living in D.C.; children from other jurisdictions are released to their parent/guardian pending a court hearing. Children charged with felony, narcotics, and weapons offenses are not eligible to participate.

### Release to a Family Member or Guardian

A child may be released to the custody of a parent/guardian with a signed notice to return to the intake unit for screening/preliminary investigation. If released, the child must return for an intake screening typically within 4 days.

1449-502045

0046- 072

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Intake**
If MPDC chooses not to release the child, MPDC transports the child to Superior Court for screening by Social Services. Depending on the time of day and date of arrest, the child may be brought to one of two different locations in Superior Court. When court is not in session, MPDC transports the child to a holding facility located in the basement of the Superior Court Building B (Central Processing Facility). If court is in session, MPDC transports the child to the juvenile cellblock at Superior Court. n4

n4 Superior Court is open to accept children Monday through Saturday from 6:00 a.m. to 3:00 p.m.

**Social Services Screening**
The intake of a child, physically occurring at either the Central Processing Facility or Superior Court, begins with receipt of the police complaint (PD 379) alleging delinquency or PINS behavior. Admission procedures are handled by the Department of Human Services' Youth Services Administration when Superior Court is closed, or the U.S. Marshals Service if Superior Court is open. n5

n5 The only exception to this is "at-risk" children, which are considered to be juveniles who are under 13 years of age who are not charged with a delinquency offense, or juveniles who are at risk due to an extenuating circumstance, such as a mental health issue. The Youth Services Administration is responsible for the custody of all children determined to be at risk.

Social Services' Central Processing team conducts an initial screening to determine what action should be taken in a child's case. During this screening, the team reviews the child's social and criminal history, family situation, and circumstances pertaining to the charge.

**Court Is Not In Session**
When court is not in session, the screening occurs at the Central Processing Facility, and the team also determines whether the child should be released to a parent/guardian or held for an initial hearing.

Children who are released to a parent/guardian from the Central Processing Facility are given notice to return in 3 to 5 days for a preliminary investigation interview with Social Services. If the determination is made to release the child, but a parent/guardian cannot be contacted, the child is transported to Harambe House, a nonsecure detention facility. Harambe House will try to contact a parent/guardian or bring the child home. If Harambe House cannot contact a parent/guardian, they will house the child and transport him/her to court for the initial hearing.

Children who are held for an initial hearing are transported to Oak Hill Youth Center if there is sufficient time to transport the child back to Superior Court for the initial hearing. If there is not enough time, the child is held at the Central Processing Facility until transported to the Superior Court at approximately 7:00 a.m.

**Social Services Recommendation**
Following the initial screening, a probation/intake officer assigned to the case reviews all information, interviews the child and the parent(s)/guardian(s) when possible, and contacts pertinent members of the community who may provide additional information. The probation/intake officer then delivers a recommendation on whether or not to petition the case to Corporation Counsel and prepares a report to be presented to the court orally at the initial hearing. The probation

officer's report provides recommendations for pretrial release status, which may include pretrial detention, shelter care, community-based placement, or release to the custody of parents or guardians pending trial.

Corporation Counsel Papering
"Papering" refers to the documents (papers) needed, as well as the process, for filing a petition against a child in Superior Court. Corporation Counsel decides for each case whether to file a petition, (i.e., paper the case). For each papering decision, Corporation Counsel requires MPDC officers n6 who are knowledgeable about the facts of the case to appear with any witnesses. For children arrested when court is not in session, the police officer is required to come to Corporation Counsel at 8:00 a.m. the next morning, excluding Sundays, to paper the case.

n6 According to Corporation Counsel officials, MPDC is the referring agency in about 80 percent of juvenile arrests. However, Corporation Counsel papers cases referred from all of the police agencies in D.C.

The Corporation Counsel papering attorney interviews the officer to determine if a crime was committed, if the child committed the crime, and if Corporation Counsel can prove that the child committed the crime. At this time, a decision is made whether to transfer the case to adult court, to no-paper the case (to not file a petition), or to paper (file a petition) and forward the case. Corporation Counsel reviews the Social Services recommendation before deciding whether to bring charges.

**Transfer to Adult Criminal System**
The decision to transfer an individual to adult criminal court occurs at papering. There are two mechanisms that allow a child to be prosecuted in an adult criminal court: (1) prosecution of certain offenses and (2) judicial transfer.

Prosecution of Certain Violent Offenses
The Office of the U.S. Attorney for the District of Columbia (USAO) has discretion to prosecute, as an adult, individuals who are at least 16 years old and who are charged with certain offenses (i.e., murder, first-degree sexual abuse, first-degree burglary, armed robbery, or assault with intent to commit any of those offenses). n7 Under statute, USAO's acceptance of jurisdiction means that the individual is to be considered an adult and prosecuted in the adult criminal system. n8

n7 See D.C. Code § 16-2301(3).

n8 Once a child is "certified" as an adult, the child is generally considered an adult with respect to subsequent delinquent acts, unless the child is found not guilty or the case is dismissed and the child is still under 18 years of age, then subsequent offenses may continue to be classified as juvenile offenses.

Operationally, after an arrest on scene, police complete both a child and an adult set of paperwork. As a practical timesaving matter, the police officer typically brings the arrest paperwork to Corporation Counsel first for review. According to Corporation Counsel officials, Corporation Counsel generally has a good understanding of which cases USAO will accept. After Corporation Counsel review, USAO decides whether they will accept jurisdiction.

Judicial Transfer
Judicial transfer is the second mechanism by which children can be prosecuted in the adult criminal system. If certain conditions are met (i.e., the individual is at least 15 years old and the alleged offense is a felony) Corporation Counsel

can initiate procedures to transfer the child to adult criminal court. n9 If Corporation Counsel decides to request a transfer of the case, a transfer hearing occurs. n10

n9 See D.C. Code § 16-2307.

n10 A small percentage of cases are judicially transferred to adult court; however, more often USAO accepts the cases that may be transferred pursuant to D.C. Code § 16-2301(3). In certain other jurisdictions cases involving children are transferred via prosecutor discretion or judicial transfer, but in D.C. both mechanisms exist.

**No-Paper (No Petition Filed)**
Cases may be "no-papered" for several reasons.

Dropped Charges
Cases may be "no-papered" if Social Services and Corporation Counsel determine that the case is not suitable for prosecution. In these instances, the case is closed and the child is released without further court action. In some circumstances, Corporation Counsel may not be able to "prove" otherwise provable cases because of certain practical issues. For example, Corporation Counsel officials noted that Corporation Counsel does not have power to compel testimony prior to trial (i.e., they do not have pretrial subpoena power).

In instances where Corporation Counsel needs additional time to investigate their case and to establish probable cause, if Corporation Counsel shows good cause for why they cannot file a petition, they can request up to a "5-day hold" on the filing of the petition. n11 Corporation Counsel officials described that an example of good cause would be if a witness was in the hospital and could not immediately be interviewed.

n11 See D.C. Code § 16-2312(g).

Court Diversion
In certain cases, court diversion may result from an agreement between Corporation Counsel, Social Services, and the child. At the initial screening interview, Social Services may determine that the child should be diverted from further judicial processing. Social Services would notify Corporation Counsel to determine if the child met the guidelines for diversion. For example, Corporation Counsel and Social Services might agree that a first-time offender of a minor crime could be successfully rehabilitated without bringing charges. The child would be allowed to enter a diversion program, for which Social Services would determine the program requirements, for 6 to 12 months. Corporation Counsel would proceed to put the case together as if it was going to be papered; however, if the child successfully completes the program, no charges are brought. If the child does not successfully complete the program, Corporation Counsel could then bring the charges.

**Adjudication**
If Corporation Counsel and Social Services agree to file a petition (the case is papered), the case is forwarded for an initial hearing in the new referrals court.

Initial Hearing
The initial hearing is the child's first appearance in a courtroom following his/her arrest and intake interview. Corporation Counsel and Social Services make their recommendations regarding the pretrial placement of the child. The

presiding judge considers their recommendations, in addition to those made by the defense attorney, in determining whether to approve a consent decree, detain the child, or release the child to a parent/guardian.

The initial hearing usually occurs within 3 days of the preliminary investigation interview with Social Services for children released from the Central Processing Facility. For children held after the initial intake, the initial hearing usually occurs after papering (later the same day, or early the next morning). If the child is detained, the initial hearing must occur within 24 hours, except if the child is arrested after the cut-off time on Saturday, then the initial hearing is to occur on Monday.

Drug Court qualifications may be addressed at the initial hearing. If the child is found eligible the case will be set for a status hearing within 2 weeks on the Juvenile Drug Court calendar.

Consent Decree
A consent decree is a court-approved agreement between the involved parties through which the child is placed under court supervision for 6 months. n12 According to a Corporation Counsel official, consent decrees are offered to slightly more needy children or for slightly more serious (but nonviolent) offenses. For a consent decree, Corporation Counsel would file the petition, and the court would postpone the hearing for 6 months. For that time, the consent decree program operates like a diversion program, with Social Services monitoring the child's progress to see if s/he is in violation of the consent decree. If the supervision is successfully completed, the case can be closed without an adjudication of delinquency. If the child does not abide by the conditions, the program time can be extended, or the case can be reinstated and set for a status hearing and/or for trial. For both court diversion and consent decree cases, a child is assigned a probation officer. According to a Corporation Counsel official, Social Services regularly presents Corporation Counsel with requests to reinstate petitions. Also, Corporation Counsel often finds out if a child is not abiding by her/his conditions when s/he violates a consent decree by picking up a new charge.

n12 See D.C. Code § 16-2314; Super. Ct. R. 104.

Detention
If the judge decides to detain the child instead of releasing him/her to a parent/guardian, the probable cause/detention hearing will occur at the initial hearing. Corporation Counsel must present evidence to support the allegations found within the petition. If based on the evidence presented the judge does not find probable cause to support further detention, the child is immediately released pending trial. If a child is detained, his/her trial must be scheduled within a 30-day period and the child may be placed in either a secure or nonsecure setting (i.e., shelter care or Oak Hill).

Release to Parent/Guardian
For those children released into the custody of a parent/guardian, the judge determines to whom the child is to be released and the conditions of release. n13 Prior to being released, the child is given notice to return to court for additional proceedings.

n13 Minors may not be released without a parent or guardian present.

Status Hearing
Typically, a status hearing occurs a couple of weeks after the initial hearing; however, if the child is detained the status hearing occurs within 5 days. Corporation Counsel has 30 days to try a case; however, the time may be extended for a

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

total of 45 days for serious offenses (such as murder or first-degree sexual assault). A detained child may also be held for additional 30-day periods, if good cause is shown for each extension.

At the status hearing, a trial date will be set. Also, any pretrial issues with the case may be resolved. A plea offer may be extended. Motions or discovery questions may be raised; however, motions are usually, but not always, heard the day of the trial. With few exceptions, Corporation Counsel prosecutes cases under the same rules associated with the adult criminal court. Children have the same constitutional guarantees as adults; there are Fourth, Fifth, and Sixth Amendment motions; and the same rules of evidence apply. There are some differences. In adult and delinquency cases, the standard of proof for a conviction/involvement is proof beyond a reasonable doubt; in PINS cases, the standard of proof is preponderance of evidence. In addition, there are no jury trials for children.

Bench Trial
In delinquency and PINS cases, the case is presented to a judge. The child can be found not involved (i.e., not guilty); the child can be found involved (i.e., guilty); or the case can be dismissed after adjudication. n14

n14 The judge may also decide that the offense was an isolated incident and that the child poses no threat to the community. In these instances, the judge may decide to dismiss the case.

Pursuant to D.C. Code 16-2317(d) and Super. Ct. Juv. R. 48(b) a case may also be dismissed at the bench trial, or at any other hearing, because a judge finds the child is not in need of care or rehabilitation. The judge determines whether care or rehabilitation will be helpful to the child. The child may not need services because s/he is already receiving services from another agency or due to a prior disposition. Children found to be not involved are released in that case.

For children found to be involved, the disposition/sentencing date is set. The court may order preparation of an in-depth social summary report prior to the disposition of the case to aid in sentencing. If the child is detained at Oak Hill or Shelter Placement past adjudication, the disposition hearing must be held within 15 days.

Social Summary Report
The purpose of the social summary report, which results from a predisposition investigation conducted by Social Services, is to determine the circumstances influencing the child's behavior in order to arrive at an appropriate disposition. The social summary report also contains a recommendation from Social Services as to whether the child can function in the community, and if so, under what conditions of supervision. The disposition report includes prior involvement, dispositions, status of compliance, family history and status, mental health issues, substance abuse issues, educational status, compliance, pretrial summary, and recommendations.

Typically, the first disposition hearing is 15 days after the bench trial if the child is securely detained. If the child is not detained, the disposition hearing is typically 5 to 6 weeks later.

**Postadjudication**

Disposition Hearing
The disposition hearing is the sentencing hearing, at which a judge determines whether a child found involved in an offense at his/her trial, is in need of care and rehabilitation and, if so, what the treatment plan should be. The disposition could be probation for 1 year, which may be extended, or commitment to the Youth Services Administration until the child is 21 years old. n15

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

n15 The judge may also decide that the offense was an isolated incident and that the child poses no threat to the community. In these instances, the judge may decide to dismiss the case.

Probation

If the disposition is probation, the child remains under the jurisdiction of the court. If applicable, the court would be responsible for referring a child to needed services. The majority of adjudicated children are given probation. Typically, children placed on probation are those deemed by a judge as not posing a threat to the community and who show potential for rehabilitation. Fines, restitution, n16 and community service are possible conditions of probation, but these conditions are rare given the financial status of the child and his/her immediate custodian. In addition to prohibiting the commission of subsequent violations, conditions of probation may also include curfews, carrying an attendance card, individual counseling, family counseling, n17 drug tests and treatment, electronic monitoring, intensive supervision, and reporting to a probation officer.

n16 The court may require the child to make restitution in a reasonable amount or to pay a fine of up to $ 300. See Super. Ct. Juv. R. 112.

n17 The court can require a parent/guardian to attend family counseling.

**Revocation petition**. If the probation officer alerts Corporation Counsel that the child is suspected of violating his/her conditions of probation, or if the child is arrested on a new charge, Corporation Counsel can file a petition to revoke probation (a revocation petition). A Corporation Counsel revocation petition can, but may not necessarily, result in the child's disposition/sentence being modified. Once the court receives notice of a probation violation, the court will notify counsel and schedule a probation revocation hearing. If the child is found by the court to have violated probation, the court may extend the period of probation, modify the terms and conditions of the probation order, or enter certain other disposition orders. n18 If the child completes probation successfully, the probation case is closed and the court record is updated to reflect the successful completion of probation.

n18 See D.C. Code § 16-2327, SCR-Juv. 32(h).

Commitment

If the disposition is commitment, the Youth Services Administration assumes jurisdiction of the child. n19 Typically, children who are judged as posing threats to the community or who require a more structured setting in order to be rehabilitated at the time of disposition are committed to the Youth Services Administration. A judge may sentence a child to commitment in the Oak Hill Youth Center, a group home, or a residential care setting.

n19 Corporation Counsel officials noted that it was rare to have a system where, after disposition, there is a bifurcation of the care system.

**1449-502051**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Oak Hill Youth Center is a secure facility and has capacity for about 170 children. A majority of the children at Oak Hill are pending trial. Group homes are nonsecure, local facilities with staff supervision that house committed children. Residential care placements are out-of-home placements in facilities located out of the D.C. area. There is a range of facilities to which children are sent, and the physical plant of the facilities can resemble aspects of college campuses, hospitals, or prisons. The child is supposed to receive whatever therapy or services prescribed in the Social Services plan.

After Care
After the period of commitment is completed, a child may be placed on after care status, which is monitoring comparable to parole in the adult system.

Figure 4 illustrates the typical case flow process for offenses committed by children and prosecuted by Corporation Counsel.

**Figure 4: Typical Case Flow Process for Offenses Committed by Children and Prosecuted by the Office of the Corporation Counsel**

   [SEE FIGURE IN ORIGINAL]

Source: Criminal Justice Coordinating Council and agencies involved in the D.C. criminal justice system.

**APPENDIX-VII:**
**Initial Stages of Case Processing in the District of Columbia, Philadelphia, and Boston**

This appendix provides a detailed description of the method of processing cases from arrest through initial court appearance in the District of Columbia (D.C.), including coordination issues associated with the process. We selected this process as a case study to illustrate the coordination problems that the D.C. criminal justice system faces with its mix of D.C., federal, and federally funded D.C. agencies. This appendix also includes descriptions of case processing in Philadelphia and Boston--two large East Coast cities that recently revised their methods of processing cases from arrest through initial court appearance--and discusses the potential application of these cities' experience to D.C.

**Method of Processing Cases From Arrest to Initial Court Appearance in the District of Columbia**
Processing a case from arrest to initial court appearance is a multistep process that may involve the Metropolitan Police Department of the District of Columbia (MPDC), the Office of the Corporation Counsel (Corporation Counsel), the U.S. Attorney's Office for the District of Columbia (USAO), U.S. Marshals Service, District of Columbia Pretrial Services Agency (Pretrial Services), Public Defender Service for the District of Columbia (Defender Service), and Superior Court of the District of Columbia (Superior Court). MPDC is responsible for arresting and booking the arrestee, which includes interviewing the arrestee, completing the standard evidence and arrest paperwork, completing a background check, fingerprinting the arrestee, and determining if the arrestee is eligible for release pending initial court appearance.

After arrest and booking, prosecutors, either USAO or Corporation Counsel, depending on the offense, are to determine whether to charge the arrestee with a crime. In D.C., prosecutors require a police officer who is knowledgeable about the facts of the arrest to physically report to the prosecutor's office for "papering." In D.C., papering is the stage of the charging process at which officers present their arrest reports to a prosecutor and explain the circumstances of the arrest. For each arrest, prosecutors then determine whether the case should be prosecuted ("paper" the case) or not ("no-paper" the case).

Both USAO and Corporation Counsel require officers to appear for a face-to-face meeting with prosecutors to paper cases. n1 However, we focused on USAO cases because they are more numerous, typically more complicated, and require significantly more officer time. In 1998, USAO cases (felony and misdemeanor) constituted 64 percent of cases brought to Superior Court for disposition. n2 Additionally, as shown later in table 7, the cases prosecuted by USAO accounted for 87 percent of the police hours recorded for papering--about 20 of the 23 full-time staff years expended during 1999 for papering.

**1449-502052**

n1 D.C. prosecutors in Corporation Counsel and MPDC have agreed to initiate a pilot project in March 2001 in which officers are not required to appear in person for 17 minor offenses.

n2 According to the D.C. Courts 1998 Annual Report, there were 51,712 total cases for disposition, including pending cases, new filings, reinstated cases, and cases transferred in. There were 33,338 USAO cases (9,633 felony indictments and 23,705 misdemeanors) brought for disposition in 1998. There were 18,374 Corporation Counsel cases (7,343 misdemeanor and 11,031 traffic offenses) brought for disposition in 1998.

The following steps are to occur for each arrest that police officers present to USAO for papering. Some of these steps are clerical in nature and would not necessarily have to be performed by police officers.

The officer is to check in at the Court Liaison Division at MPDC Headquarters, where s/he is to complete paperwork documenting her/his required court appearances for the day, check in with a Court Liaison Division clerk, and collect the arrest paperwork necessary to charge an arrestee with a crime.

The officer is to go to the USAO Intake Office, which is open Monday through Saturday from about 7:30 a.m. to 5:30 p.m. At the Intake Office the officer is to photocopy the arrest paperwork and assemble the USAO case jacket containing all of the relevant police paperwork, while USAO is to complete a criminal record check on each arrestee.

When the criminal record check is complete, the officer is to meet with a screening attorney who is to review the arrest paperwork and determine whether to prosecute the case.

The officer is to collect a Superior Court case jacket from the Superior Court representative situated in the USAO Intake Office.

The officer is to then meet with a second attorney (papering attorney) who is to complete the papering process. If the screening attorney determined to paper the case, the papering attorney is to complete the USAO case jacket, interview the officer to obtain additional information about the case, and prepare the charging document and other paperwork required for prosecution. If the screening attorney determined to no-paper the case, the papering attorney is to complete a brief form indicating that USAO has declined to prosecute the case.

The officer is to return to the screening attorney who is to review the information, sign the charging document, if applicable, and sign the officer's timesheet to indicate the length of time the officer has been in the Intake Office.

The officer is to return to the Superior Court representative to drop off both case jackets and to swear that the statement of facts in the arrest report and the charging document are true.

After the officer is finished at the Intake Office, s/he is to return to the Court Liaison Division to submit his/her timesheet to the Court Liaison Division clerk.

Several agencies, other than MPDC and USAO, are involved in processing a case prior to the initial court appearance. All arrestees who are locked up after arrest are brought to the U.S. Marshals Service cellblock prior to their initial court appearance. At the U.S. Marshals Service cellblock, Pretrial Services conducts drug tests and interviews arrestees, n3 examiners from the Criminal Justice Act (CJA) office interview arrestees to determine their financial eligibility for indigent defense counsel, and a defense attorney may interview arrestees.

1449-502053

0046- 080

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

n3 Pretrial Services interviews and administers drug tests for arrestees who are arrested for felonies and serious misdemeanors, offenses within the prosecutive jurisdiction of USAO. Drug tests are voluntary; however, a judge may order an arrestee to take a drug test if s/he initially declined to take one.

The arrestee's initial court appearance is conducted at Superior Court, which conducts these hearings from about 10:00 a.m. to about 7:00 p.m., Monday through Saturday.

## Problems With the Process

There are several problems with D.C.'s current method of processing cases from arrest through initial court appearance. A principal effect of the current method of processing cases is that it reduces the number of officers available for patrol duty. For example, an on-duty officer who makes an arrest during the beginning of his or her daytime 8-hour shift could possibly spend the remaining portion of that shift processing the arrest (including meeting with the prosecutor). Problems with the initial stages of case processing include (1) forms that must be completed manually, (2) delays that may occur as a result of processing the paperwork and transporting it among different locations, and (3) prosecutors' requirement that officers must appear to paper the case.

### Officers Must Manually Complete Multiple Forms

In order to document an arrest, officers are required to complete several forms, including an arrest report, an incident report, a court notification report, a Miranda rights form, n4 property or evidence reports, and any reports specific to the arrest situation. Most forms contain a similar set of basic information about the incident, the arrestee, or the arresting officer (e.g., time of arrest, arrestee's name, and arresting officer's name). Because the forms are not automated, officers must either write or type this basic information multiple times to complete the documentation required for a single arrest. For example, to document a drug arrest in which narcotics were seized and property was removed from the arrestee, an officer would have to complete 10 forms, write or type his/her name 8 times, the arrestee's name and charges 5 times, and the arrestee's full address and social security number 4 times. In contrast, if the forms were linked in an automated system, an officer would simply have to type such information once and relevant fields in each report would automatically display the required duplicative information. Reentering the same information several times on different forms increases the opportunity for entry error with the result that the same information, such as the arrestee's social security number, may not be identical on all of the forms.

n4 A form indicating whether the arrestee has waived the right to remain silent and decline to answer police questions until speaking with his or her attorney. The form is based on the U.S. Supreme Court's decision in *Miranda v. Arizona, 384 U.S. 436 (1966).*

### Paperwork Delays May Slow Case Processing

Paperwork problems or the physical movement of arrestees may delay case processing. Arrest paperwork may be misplaced as it is physically transported between agencies, and the initial court appearance may be delayed because some of the required paperwork is missing. Officers are to transport the arrest paperwork for arrestees who are locked up after arrest from the police district station where it originates to MPDC's Central Cellblock (CCB). The paperwork is then to be transferred from CCB to the Court Liaison Division where officers are to collect it before going to the prosecutor's office. There is no electronic mechanism, such as a connected automated system, for transferring arrest paperwork from MPDC to the appropriate prosecuting office. The following paperwork, none of which is submitted electronically, is to be presented to the hearing commissioner n5 at the initial court appearance: (1) prosecutor's case jacket with MPDC arrest paperwork and charging documents, (2) Pretrial Services bail report outlining release recommendations, (3) Superior Court case jacket, and (4) a document specifying the assignment of defense counsel. In addition, the arrestee is to be present at the initial court appearance, which in a majority of cases requires involvement from both MPDC and the U.S. Marshals Service. Arrestees who are locked up after arrest can be detained at one of

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

MPDC's district stations or at the CCB, before being transported by MPDC to the U.S. Marshals Service cellblock located in the basement of Superior Court. The U.S. Marshals Service then is to bring arrestees from the U.S. Marshals Service cellblock to the courtroom for their initial court appearance.

n5 In D.C., hearing commissioners, who are judicial officers with certain powers similar to magistrates, preside over initial court appearances.

The longer the process from arrest to initial court appearance, the longer arrestees who are locked up pending their initial court appearance must remain in detention. Because charging decisions are made only during the day, depending on the time of arrest, arrested citizens may be locked up overnight before the initial court appearance at which probable cause issues are addressed. Additionally, arrestees whom USAO has decided not to charge with a crime must still be presented before a commissioner prior to being released. If, for instance, an individual is arrested for a felony offense at 4:00 p.m. on a Saturday afternoon, s/he would typically not have an initial court appearance until Monday at 10:00 a.m. If USAO declined to paper the case, the arrestee would have been locked up for over 36 hours before being released by a commissioner.

Required Meetings With Prosecutors Keep Officers Off the Street
Before a charging decision is made, both federal (USAO) and D.C. (Corporation Counsel) prosecutors require that an officer knowledgeable about the facts of the arrest meet with an attorney for papering. The papering requirement requires that the officers spend time at the prosecutor's office, part of which is spent performing clerical duties. On-duty officers who make arrests between 3:00 p.m. and 7:00 a.m. are required to meet with prosecutors the morning after an arrest to paper the case. All off-duty officers, who appear for papering, receive a minimum of 2 hours compensatory time.

In calendar year 1999, MPDC's database recorded 146,543 officer appearances in criminal proceedings begun in that year (see table 5). More than half of these total appearances were for trial proceedings, and about 15 percent were for papering appearances. Of the recorded 22,307 papering appearances, 17,651 (about 79 percent) were for meetings with USAO prosecutors.

Table 5: Reported Number of MPDC Officer Appearances, by
Prosecuting Office and Type of Appearance, for Criminal Proceedings
Begun in Calendar Year 1999

|  | Prosecuting office | | | |
| --- | --- | --- | --- | --- |
| Type of appearance | OCC[a] | USAO[a] | Total | Percent of total appearances[b] |
| Papering | 4,656 | 17,651 | 22,307 | 15.2 |
| Grand jury | n/a[c] | 23,394 | 23,394 | 16.0 |
| Preliminary hearing | n/a[c] | 3,521 | 3,521 | 2.4 |
| Witness conference | 25[c] | 20,477 | 20,502 | 14.0 |
| Trial | 4,528 | 72,291 | 76,819 | 52.4 |
| Total | 9,209 | 137,334 | 146,543 | 100.0 |

Legend: OCC = D.C.'s Office of Corporation Counsel; USAO = U.S. Attorney's Office for D.C.; n/a = not applicable

1449-502055

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Table 5: Reported Number of MPDC Officer Appearances, by
Prosecuting Office and Type of Appearance, for Criminal Proceedings
Begun in Calendar Year 1999

Prosecuting office

| Type of appearance | OCC<a> | USAO<a> | Total | Percent of total appearances<b> |
|---|---|---|---|---|

Note: Table excludes appearances for juvenile court, civil cases,
and warrants.

<a>OCC prosecutes criminal traffic offenses and minor misdemeanors,
such as drinking in public. USAO prosecutes all other misdemeanors
and all felonies.

<b>Individual entries may not add to total due to rounding.

<c>Felony charges are required to be brought by a grand jury
indictment. Misdemeanor charges may, but are not required to be
brought by grand jury indictment. Typically, OCC cases progress
from the initial court appearance directly to trial, bypassing the
preliminary hearing.

Source: GAO analysis of MPDC data.

For calendar year 1999, MPDC reported that officers spent 404,217 hours in appearances for criminal proceedings begun in that year, of which 47,810 hours (about 12 percent) were for papering appearances--the equivalent of about 23 full-time officer staff years (at 2,080 hours per staff year). The average reported hours per papering appearance were 2.1 and the median was 1.7. Actual hours per papering appearance ranged from 0.02 to 12.4 hours (see table 6). Off-duty officers who were recorded as appearing for less than 2 hours would receive 2 hours of compensation time for their appearance.

Table 6: MPDC Recorded Officer Time for
Appearances, by Type, for Criminal Proceedings
Begun in Calendar Year 1999

| Type of appearance | Total recorded appearances | Total recorded hours | Total staff years<a> | Percent of total hours |
|---|---|---|---|---|
| Papering | 22,307 | 47,810.4 | 23.0 | 11.8% |
| Grand jury | 23,394 | 74,275.6 | 35.7 | 18.4% |
| Preliminary hearing | 3,521 | 11,207.1 | 5.4 | 2.8% |
| Witness conference | 20,502 | 36,660.0 | 17.6 | 9.1% |
| Trial | 76,819 | 234,263.7 | 112.6 | 58.0% |
| Total | 146,543 | 404,216.8 | 194.3 | 100.0% |

Legend: n/a = not applicable.

Note 1: Table excludes appearances for juvenile
court, civil cases, and warrants.

1449-502056

Table 6: MPDC Recorded Officer Time for
Appearances, by Type, for Criminal Proceedings
Begun in Calendar Year 1999

| Type of appearance | Total recorded appearances | Total recorded hours | Total staff years[a] | Percent of total hours |
|---|---|---|---|---|

Note 2: Columns may not add to total due to
rounding.

[a]Staff years calculated using 2,080 hours = 1
staff year.

Source: GAO analysis of MPDC data.

Table 6: MPDC Recorded Officer Time for
Appearances, by Type, for Criminal Proceedings
Begun in Calendar Year 1999

| Type of appearance | Recorded hours per appearance | | | |
|---|---|---|---|---|
| | Average | Median | Low | High |
| Papering | 2.1 | 1.7 | 0.02 | 12.4 |
| Grand jury | 3.2 | 2.4 | 0.02 | 11.7 |
| Preliminary hearing | 3.2 | 2.8 | 0.02 | 11.0 |
| Witness conference | 1.8 | 1.2 | 0.02 | 10.8 |
| Trial | 3.0 | 2.3 | 0.02 | 13.4 |
| Total | 2.8 | n/a | 0.02 | 13.4 |

Legend: n/a = not applicable.

Note 1: Table excludes appearances for juvenile
court, civil cases, and warrants.

Note 2: Columns may not add to total due to
rounding.

[a]Staff years calculated using 2,080 hours = 1
staff year.

Source: GAO analysis of MPDC data.

Table 7 shows data for MPDC officer appearances separately for cases prosecuted by Corporation Counsel and USAO. As shown in the table, the cases prosecuted by USAO accounted for 87 percent of the police hours recorded for papering--about 20 of the 23 full-time staff years for this activity.

Using an MPDC sworn officer's average salary, 23 officer years is roughly equivalent to about $ 1,262,000. [n6] It would take more than 23 additional officers to replace the duty hours devoted to the meetings with prosecutors. This is because (1) an officer is available for duty only a portion of the entire 2,080-hour work year, which includes vacation and

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

training time, and (2) the data do not take into account that off-duty officers who appeared for less than 2 hours actually received 2 hours of compensatory time for their papering appearance.

n6 According to MPDC, for fiscal year 2000, the average hourly salary, including benefits, is $ 26.39. When this hourly rate is multiplied by 2,080 hours the total is $ 54,891 per year. For 23 years, the total officer cost would be $ 1,262,498.

Table 7: MPDC Recorded Officer Time for Appearances, by Type, for Criminal Proceedings Begun in Calendar Year 1999 for Cases Prosecuted by Corporation Counsel and USAO

| Type of appearance | Total number of recorded appearances | Total recorded hours | Total staff years[a] |
|---|---|---|---|
| Corporation Counsel cases | | | |
| Papering | 4,656 | 6,311.6 | 3.0 |
| Witness conference | 25 | 41.6 | 0.02 |
| Trial | 4,528 | 9,851.4 | 4.7 |
| Subtotal OCC | 9,209 | 16,204.6 | 7.8 |
| USAO cases | | | |
| Papering | 17,651 | 41,498.8 | 20.0 |
| Grand jury | 23,394 | 74,275.5 | 35.7 |
| Preliminary hearing | 3,521 | 11,207.1 | 5.4 |
| Witness conference | 20,477 | 36,618.4 | 17.6 |
| Trial | 72,291 | 224,412.3 | 107.9 |
| Subtotal USAO | 137,334 | 388,012.1 | 186.5 |
| Total | 146,543 | 404,216.7 | 194.3 |

Legend: n/a = not applicable

Note 1: Table excludes appearances for juvenile court, civil cases, and warrants.

Note 2: Columns may not add to total due to rounding.

[a]Staff years calculated using 2,080 hours = 1

1449-502058

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Table 7: MPDC Recorded Officer Time for Appearances,
by Type, for Criminal Proceedings Begun in Calendar
Year 1999 for Cases Prosecuted by Corporation
Counsel and USAO

| Type of appearance staff year. | Total number of recorded appearances | Total recorded hours | Total staff years[a] |
|---|---|---|---|

Source: GAO analysis of MPDC data.

Table 7: MPDC Recorded Officer Time for Appearances,
by Type, for Criminal Proceedings Begun in Calendar
Year 1999 for Cases Prosecuted by Corporation
Counsel and USAO

| Type of appearance | Recorded hours per appearance | | | |
|---|---|---|---|---|
| | Average | Median | Low | High |
| Corporation Counsel cases | | | | |
| Papering | 1.4 | 1.0 | 0.02 | 9.4 |
| Witness conference | 1.7 | 1.0 | 0.3 | 6.0 |
| Trial | 2.2 | 1.9 | 0.02 | 9.9 |
| Subtotal OCC | 1.8 | n/a | 0.02 | 9.9 |
| USAO cases | | | | |
| Papering | 2.4 | 2.0 | 0.02 | 12.4 |
| Grand jury | 3.2 | 2.4 | 0.02 | 11.7 |
| Preliminary hearing | 3.2 | 2.8 | 0.02 | 11.0 |
| Witness conference | 1.8 | 1.2 | 0.02 | 10.8 |
| Trial | 3.1 | 2.4 | 0.02 | 13.4 |
| Subtotal USAO | 2.8 | n/a | 0.02 | 13.4 |
| Total | 2.8 | n/a | n/a | n/a |

Legend: n/a = not applicable

Note 1: Table excludes appearances for juvenile
court, civil cases, and warrants.

Note 2: Columns may not add to total due to
rounding.

[a]Staff years calculated using 2,080 hours = 1
staff year.

1449-502059

0046- 086

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Table 7: MPDC Recorded Officer Time for Appearances,
by Type, for Criminal Proceedings Begun in Calendar
Year 1999 for Cases Prosecuted by Corporation
Counsel and USAO

| Type of appearance | Total number of recorded appearances | Total recorded hours | Total staff years[a] |
|---|---|---|---|

Source: GAO analysis of MPDC data.

### Reasons USAO Requires Officers to Appear

According to USAO officials, the current papering process is critical for USAO to make an initial charging decision correctly. Making an initial charging decision correctly benefits (1) USAO by allowing them to more effectively prosecute "good" cases; (2) arrestees by ensuring that individuals are not inappropriately charged with a crime; and (3) the criminal justice system by allowing USAO to screen out "poor" cases, which would languish in the system consuming resources from everyone if they were not weeded out. USAO cannot make an initial charging decision correctly if it does not have all of the information about the arrest. USAO requires that officers physically appear to paper the case in order to gather information about the arrest that may be missing from the arrest reports, inaccurate, or corollary to information recorded in the reports. In the past, MPDC has responded to USAO concerns about the quality of arrest paperwork by conducting report writing training sessions for sergeants, requiring all officers to take annual in-service report writing training, and adopting the use of a new form to document officers involved in an arrest. Prosecutors--federal and nonfederal--generally have considerable discretion in selecting which cases they will prosecute. According to data USAO provided to MPDC, USAO declined to file charges--did not paper--3,270 cases during the period from November 1999 through June 2000. Of the 3,270 cases in which USAO declined to file charges, USAO listed police-related problems, including paperwork problems, in 8 percent of the cases; problems with witness or victim cooperation or credibility in 20 percent; problems with evidence or proof in 70 percent; and a variety of other reasons in 2 percent of the cases (see table 8). The two most frequently cited reasons for not filing charges--"insubstantial injury or amount" and "insufficient evidence to prove case"--together accounted for about 40 percent of the cases that USAO declined to prosecute. Within its prosecutorial discretion, USAO could decide not to file charges for reasons such as these, even though the police paperwork may have been complete and accurate.

Both USAO and MPDC officials said that the paperwork submitted to USAO for charging decisions has been of uneven quality. However, there were no data to compare the quality of the paperwork for misdemeanors and felonies. The purpose of the paperwork that police present to USAO attorneys is to provide evidence that there is probable cause to (1) believe that a crime has been committed and (2) that the person(s) arrested committed the crime. Police documentation could provide evidence that establishes probable cause, but prosecutors may decline to file charges because, for example, they do not believe the evidence would be sufficient to prove the arrestee's guilt "beyond a reasonable doubt," the standard required for conviction of a crime in court. The prosecutor's goal is to prevail in those cases selected for prosecution.

Table 8: Reasons Recorded by USAO Attorneys for Cases in Which USAO
Decided Not to File Formal Criminal Charges, November 1999 through
June 2000

| Disposition reason | Total number | Percent of total |
|---|---|---|
| Police problems | | |
| Appropriate officer no show | 35 | 1.1 |
| Lab number not available | 91 | 2.8 |
| Test fire not performed | 3 | 0.1 |
| Police paperwork missing or incorrect | 13 | 0.4 |
| Search and seizure problems | 98 | 3.0 |

1449-502060

0046- 087

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Table 8: Reasons Recorded by USAO Attorneys for Cases in Which USAO
Decided Not to File Formal Criminal Charges, November 1999 through
June 2000

| Disposition reason | Total number | Percent of total |
|---|---|---|
| Fifth amendment problems | 1 | * |
| Insufficient investigation by police | 5 | 0.2 |
| Other police problems | 6 | 0.2 |
| Subtotal | 252 | 7.7% |
| Witness problems | | |
| Victim failed to appear, uncooperative, or unavailable | 413 | 12.6 |
| Witness failed to appear, uncooperative, or unavailable | 20 | 0.6 |
| Victim credibility problems | 88 | 2.7 |
| Witness credibility problems | 43 | 1.3 |
| Victim does not want to prosecute | 71 | 2.2 |
| Other witness problems | 23 | 0.7 |
| Subtotal | 658 | 20.1% |
| Evidence or proof problems | | |
| Insubstantial injury or amount | 668 | 20.4 |
| Insufficient nexus of defendant to contraband or offense | 172 | 5.3 |
| Identification problems: Weak identification | 5 | 0.2 |
| Weak case: Insufficient evidence to prove case | 634 | 19.4 |
| Evidence contradictory | 80 | 2.4 |
| Good defense | 252 | 7.7 |
| Better handled as a civil case | 24 | 0.7 |
| Insufficient evidence of intent, knowledge, or scienter | 132 | 4.0 |
| Drugs negative; FT or DEA report | 4 | 0.1 |

1449-502061

0046- 088

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Table 8: Reasons Recorded by USAO Attorneys for Cases in Which USAO Decided Not to File Formal Criminal Charges, November 1999 through June 2000

| Disposition reason | Total number | Percent of total |
|---|---|---|
| Firearm inoperative or broken | 3 | 0.1 |
| Essential element of offense missing | 30 | 0.9 |
| No history of violence | 17 | 0.5 |
| Criss-cross (cannot determine whom to charge because of contradictory statements about events and no witnesses) | 270 | 8.3 |
| Other evidence or proof problems | 11 | 0.3 |
| Subtotal | 2,302 | 70.4% |
| Procedural or jurisdiction issues | | |
| Presentment delay | 1 | * |
| Crime outside D.C.; better prosecuted elsewhere | 6 | 0.2 |
| Other procedural issues | 4 | 0.1 |
| Subtotal | 11 | 0.3% |
| Miscellaneous | | |
| To be handled as a grand jury original | 37 | 1.1 |
| To facilitate another prosecution | 6 | 0.2 |
| Other miscellaneous | 4 | 0.1 |
| Subtotal | 47 | 1.4% |
| Total | 3,270 | 100.0% |

Legend: * = less than 0.1 percent.

Note 1: Columns may not add to total due to rounding.

Source: GAO analysis of USAO data.

**D.C.'s Process for Prosecutorial Charging Decisions, Particularly for Misdemeanors, Appears to Be Unusual**
As part of their duties, police officers in all jurisdictions generally must make appearances to provide information about cases at a number of criminal justice proceedings, including grand jury testimony, preliminary hearings, pretrial witness conferences, and trials. In addition to these appearances, USAO and Corporation Counsel prosecutors require that MPDC officers personally meet with prosecutors in order to make a charging decision for all cases. This requirement, particularly for misdemeanors, appears to be unusual.

1449-502062

0046- 089

In December 1997, Booz-Allen and Hamilton (Booz-Allen) surveyed 51 jurisdictions to determine how they typically processed misdemeanors. Booz-Allen staff contacted either the District Attorney's Office and/or the police department and asked how and to what extent officers were involved from the point of arrest to trial, and whether officers were required to formally or informally meet with prosecutors before appearing for trial. In 30 of the 38 jurisdictions that responded to the survey, officers were not required to meet with prosecutors until court (i.e., trial), and in 3 cities, officers were not required to appear until the preliminary hearing. Four cities required officers to meet with prosecutors on a case-dependent basis, and one city was in the process of changing its charging procedures.

Philadelphia and Boston Rely on Automation in Processing Arrestees
Philadelphia and Boston, two large urban jurisdictions we visited, do not typically require face-to-face meetings during the charging process. Philadelphia and Boston are using automation to improve the efficiency of their processing of arrestees. Both cities have developed cooperation and coordination among criminal justice agencies to implement their automated systems.

Philadelphia Uses Interactive Automation and Videoconferencing
In contrast to D.C., Philadelphia has implemented a highly automated system to process arrestees. During 1996, the Philadelphia Police Department, the Philadelphia County District Attorney's Charging Unit (Charging Unit), and the Philadelphia Municipal Court (including the Pretrial Services Agency) jointly began implementing two key automated programs--a software system and videoconferencing--in an effort to improve the processing of arrestees.

Philadelphia's automated system for processing arrestees resulted from collaboration of, among others, the Philadelphia Police Department, the District Attorney's Office, Municipal Court, and Pretrial Services officials. The group was formed in response to lawsuits filed to expedite arrestee processing and was led by the President Judge of Municipal Court. The group's collaboration resulted in the creation of the Preliminary Arraignment System (PARS). Officials told us that the group continues to meet weekly to review arrestee processing statistics and discuss possible improvements to the system.

PARS is a Windows-based computer software program that automates the paperwork and defendant processing required from the point of arrest to initial court appearance. PARS allows the Philadelphia Police Department, the Charging Unit, Municipal Court, and Pretrial Services to send and receive all paper-based information electronically and instantly. The system was also designed to track the defendant's physical location and length of time in the system. Six interfaces between PARS and other computer systems (e.g., other criminal record repositories) allow for continual data transmission and sharing.

PARS was developed in conjunction with Municipal Court's implementation of videoconferencing for the initial court appearances. The courtroom, which operates 24 hours a day, 365 days a year, uses video cameras, monitors, and software that make it possible to conduct live hearings. Videoconferencing eliminates the need to transport prisoners to a central location--the arraignments are held at one of eight booking stations throughout the city. The defendant speaks through a telephone and can see the judicial officer, the prosecutor, the public defender, and him/herself on a quad-screen monitor. A telephone handset located by the public defender allows counsel to interrupt the audio speaker system to either silence, or have a private consultation with, the defendant. Also, a police officer standing near the defendant can hear the process through an external speaker.

Unlike D.C., Philadelphia does not require officers to meet face-to-face with charging attorneys to reach a charging decision. Charging attorneys review police paperwork submitted electronically via PARS. If charging attorneys need additional information, they will contact police for clarification or missing information. If the Charging Unit's decision not to charge the arrestee was based on incomplete or unclear information in the arrest report, police will be notified and have the opportunity to fix the police report and resubmit the case by way of an affidavit.

Philadelphia criminal justice officials noted that PARS and video arraignments have improved the processing of arrestees. Despite a significant increase in the number of arrests processed during the past few years, the case processing time from arrest to release on bail or jail has not increased proportionally. PARS has also dramatically reduced duplication because once a case is charged, the system will not allow another person to accidentally recharge the same case. PARS has reduced data entry mistakes, which previously occurred when data were entered multiple times in

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

multiple systems. In addition, videoconferencing has eliminated the need to transport prisoners to a central location, eliminating the problems and costs that the transportation created.

Boston Pilot Uses Automation for Key Paperwork

As in Philadelphia, Boston has also turned to automation to improve the efficiency of its processing of arrestees. In the spring of 2000, the Boston Police Department, Boston Municipal Court (Court), and the Suffolk County District Attorney's Office (District Attorney) implemented a pilot project designed to automate the charging process by electronically linking the three agencies. The Electronic Application for Criminal Complaint (EACC) system allows the Boston Police Department to electronically file applications for criminal complaints (i.e., charging documents) to the Court for review and acceptance prior to the initial court appearance. The EACC system contains all of the information that is typically available in paper form, including information about the defendant, the offense, the witness, the complainant (i.e., the police officer in arrest-generated cases). EACC is also capable of providing information about whether the District Attorney, the clerk magistrate, and probation have reviewed a complaint.

After arrest, the application for complaint and police reports are reviewed by a Boston Police Department duty supervisor and may be electronically submitted to Court. Next, the application for complaint is reviewed by one of several prosecuting police officers stationed at the Court. The prosecuting officers either approve the application for complaint and forward it to the District Attorney or return the application for complaint to the duty supervisor/arresting officer for any needed corrections. Police officers who make the arrests are not required to attend face-to-face meetings to charge the case.

In Boston, the clerk magistrate determines whether to charge a case. The District Attorney performs a screening function and reviews the application for complaint and either (1) forwards the application to the clerk magistrate, (2) makes suggestions about changing the application and returns the application to the police supervisor of cases, or (3) rejects the application entirely. If a case is forwarded to the clerk magistrate, he reviews the case to ascertain whether probable cause exists and ultimately decides whether to generate a criminal complaint. If the clerk magistrate issues a criminal complaint, an initial court appearance is held at the Court, Monday through Friday from 8:30 a.m. to 4:30 p.m. On Saturdays and Sundays, when the Court is closed, a representative from the clerk magistrate's office is on-call to review cases in which an arrestee is not admitted to bail to make a probable cause and/or a bail determination. Although the pilot was ongoing at the time of our visit, Court officials noted that EACC was already providing benefits. All involved agencies were able to see exactly what stage an application for criminal complaint was. The system reduced the possibility of data entry errors because information was only entered once. Efficiency was improved because the complaint arrives at the Court prior to the arrestee, thereby reducing the amount of time the arrestee waits in lockup.

The Boston and Philadelphia examples show the potential uses of automation and technology in improving efficiency and information sharing. Of course, any similar efforts in D.C. would need to reflect D.C.'s specific statutory and other case processing requirements.

## APPENDIX-VIII:
### District of Columbia Criminal Justice System Improvement Initiatives

We contacted 15 agencies n1 participating in or supporting the District of Columbia (D.C.) criminal justice system for information on current initiatives to improve the operations of the D.C. criminal justice system. We asked about each initiative's goals, status, starting date, participating agencies, and results to date, if any, as of November 2000. We did not validate this information. In some cases, more than one agency provided information about a specific initiative, and individual agencies did not always agree on the particulars of a specific initiative. Table 9 details, by agency, those instances in which one agency disagreed with the information provided by another agency concerning an initiative.

n1 These agencies were the Federal Bureau of Prisons (BOP), the Superior Court of the District of Columbia (Superior Court), the Office of the Deputy Mayor for Public Safety and Justice for the District of Columbia, the Criminal Justice Coordinating Council for the District of Columbia (CJCC), District of Columbia Department of Corrections (DOC), the Office of the Chief Medical Examiner for the District of Columbia, the

**1449-502064**

0046- 091

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Public Defender Service for the District of Columbia (Defender Service), the Office of the Corrections Trustee (Corrections Trustee), the U.S. Attorney's Office (USAO) for the District of Columbia, the Metropolitan Police Department of the District of Columbia (MPDC), Court Services and Offender Supervision Agency for the District of Columbia (Court Services), District of Columbia Pretrial Services Agency (Pretrial Services), the Drug Enforcement Administration (DEA), the U.S. Parole Commission, and the Office of Justice Programs-U.S. Department of Justice.

Table 9: Number of Instances in Which One Agency Did Not Agree With the Information Provided by Another Agency Concerning an Initiative

Area of disagreement

| Agency | Goal | Status | Date started | Participating agencies | Results | Total |
|---|---|---|---|---|---|---|
| BOP | 0 | 0 | 0 | 1 | 0 | 1 |
| CJCC | 1 | 2 | 0 | 1 | 4 | 8 |
| DOC | 4 | 5 | 1 | 4 | 9 | 23 |
| Corrections Trustee | 0 | 0 | 0 | 0 | 1 | 1 |
| Defender Service | 0 | 0 | 0 | 2 | 1 | 3 |
| Pretrial Services | 0 | 0 | 0 | 0 | 1 | 1 |
| Superior Court | 5 | 2 | 0 | 12 | 2 | 21 |
| USAO | 1 | 1 | 0 | 2 | 0 | 4 |
| Total | 11 | 10 | 1 | 22 | 18 | 62 |

Note: Table does not include those seven agencies that agreed with all of the information on initiatives provided by other participating agencies.

Source: GAO analysis of D.C. criminal justice agency data for 93 initiatives.

The information in this appendix provides a picture of the range of initiatives planned or under way. Some of these initiatives, such as those involving the transfer of prisoners from D.C.'s Lorton Prison to BOP custody, were mandated by the National Capital Revitalization and Self-Government Improvement Act of 1997 (D.C. Revitalization Act). Others were initiated by one or more agencies to address a specific aspect of D.C.'s federal criminal justice system.

The following are summaries of the 93 current D.C. criminal justice system initiatives, arranged by the subject of the initiative (e.g., corrections, firearms). The lead agency for each initiative is highlighted in bold print.

**Community Justice/Safety**

**Capital Communities**
**Goal:** To help six neighborhoods in six different wards n2 to overcome barriers to achieving the goals identified in the Mayor's Plan for Building and Sustaining Healthy Neighborhoods.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

n2 The six capital communities are (1) Georgia Avenue and Hobart Place, NW; (2) Ninth and O Streets, NE; (3) Montello Avenue and Queen Street; (4) Division Avenue and Nannie Helen Buroughs Road, NE; (5) Sixteenth and D Streets, SE; and (6) Forrester Street and Galveston Place, SW.

**Status:** Ongoing.

**Date started:** Summer 1999.

**Participating agencies:** City Administrator's Office, Department of Consumer and Regulatory Affairs, Department of Employment Services, Department of Housing and Community Development, Department of Public Works, MPDC, Corporation Counsel, **Office of the Deputy Mayor for Public Safety and Justice**, and USAO.

**Results reported by participants:** The data collected showed significant declines in many Part I n3 crimes within the six neighborhoods.

n3 Part I crimes refer to the first tier classification of criminal offenses in the Federal Bureau of Investigation's (FBI) Uniform Crime Reporting Program. Part 1 offenses include homicide, forcible rape, robbery, aggravated assault, burglary (breaking or entering), larceny-theft (except motor vehicle theft), motor vehicle theft, and arson.

**Community Defender Program**
**Goal:** To provide legal services to indigent people in their own communities and to educate people about their legal rights and responsibilities. This initiative is to include (1) workshops in neighborhood schools and community centers to educate at-risk youth; (2) workshops to teach community members how to deescalate encounters with law enforcement officials; and (3) efforts to encourage mediation and other alternative dispute techniques to resolve matters within the community.

**Status:** Planning and development.

**Date started:** 1998.

**Participating agencies: Defender Service.**

**Results reported by participants:** The Defender Service has opened the community office and has begun to provide indigent criminal defense services. It has also conducted a number of presentations to alert the community of services provided by the office.

**Community Justice Partnerships**
**Goal:** To combine the resources of Court Services, MPDC, and the community to enhance supervision of adult offenders on probation or parole community supervision in D.C.; improve offender accountability; and develop community networks to solve problems and prevent crime.

**Status:** Ongoing.

**Date started:** November 1998.

**Participating agencies: MPDC, Court Services, and USAO.**

**1449-502066**

**Results reported by participants:** Court Services and MPDC launched the first partnership in Police Service Area 704 in Southeast D.C. in late November 1998. During calendar year 1999, they compared stated goals and objectives to actual results.

**Expansion of Community Prosecution**
**Goal:** To enhance the responsiveness to the needs of the various communities served by USAO and improve the ability to tailor strategies and resource allocations to the particular crime problems in each of those communities. In its effort to achieve these goals, USAO has undertaken a reorganization, which has resulted in a structural overhaul of the Superior Court. In November 1999, USAO expanded the Fifth District pilot project to all seven police districts. The Assistant U.S. Attorneys (AUSA) are responsible for prosecuting serious crimes in designated Police Service Areas within their respective police districts. In addition, AUSAs are expected to build and maintain communications and ties with the police who work in those districts and members of those communities.

**Status:** Ongoing.

**Date started:** November 1999.

**Participating agencies:** MPDC and **USAO.**

**Results reported by participants:** According to USAO, benefits of the new structure include increased AUSA familiarity with the crime problems in their particular neighborhoods, as well as the persons responsible for those problems and the witnesses and sources with information useful to the prosecution of those persons. This, in turn, allows AUSAs and their MPDC partners to better target resources on the prevention and prosecution of the particular crimes that plague those neighborhoods, and increases community confidence in the responsiveness of law enforcement to their needs.

**Neighborhood-Based (Police Service Area) Case Realignment Strategy**
**Goal:** To plan and execute comprehensive case realignment process by Police Service Area in order to enable the Community Supervision Officer to make individual neighborhoods, as opposed to an office, the place of supervision.

**Status:** The initial plan is complete, and Court Services is currently making adjustments as necessary.

**Date started:** November 1998.

**Participating agencies: Court Services.**

**Results reported by participants:** Too early to evaluate results.

**Nuisance Abatement Task Force (NATF)**
**Goal:** To identify, inspect, post, abate, and/or raze all nuisance properties within D.C. In addition, the task force has worked to eradicate dangerous and abandoned properties and to facilitate safer and cleaner neighborhoods. NATF now functions as the Neighborhood Services Program's primary response arm for critical nuisance properties within D.C.

 **Status:** Ongoing.

**Date started:** December 1999.

**Participating agencies:** MPDC, Fire and Emergency Medical Services, Department of Consumer and Regulatory Affairs, Department of Housing and Community Development, Department of Housing and Regulatory Affairs, Department of Public Works, Corporation Counsel, Office of Tax and Revenue, **Office of the Deputy Mayor for Public Safety and Justice,** and USAO.

**Results reported by participants:** No information provided.

**Office of Citizen Complaint Review (OCCR)**
**Goal:** To provide the public with an independent and impartial forum for the review and resolution of complaints against officers in an effective, efficient, and fair manner. OCCR is an independent agency functioning under the Office of the Deputy Mayor for Public Safety and Justice.

**Status:** Ongoing.

**Date started:** July 2000.

**Participating agencies:** Corporation Counsel, MPDC, **Office of the Deputy Mayor for Public Safety and Justice**, and USAO.

**Results reported by participants:** OCCR is currently in the process of securing staff, office space, physical resources, and creating a strategic plan.

**Pilot Reentry System**
**Goal:** To reintegrate released offenders into the community so that they will become law abiding and productive members of society, thereby reducing crime and enhancing public safety.

**Status:** Ongoing.

**Date started:** July 2000.

**Participating agencies:** D.C. Justice Grant Administration, University of the District of Columbia, **Court Services**, and Department of Justice (DOJ).

**Results reported by participants:** Too early to determine.

**School and Community-Based Outreach Programs**
**Goals:** To (1) enhance the educational opportunities of Amidon Elementary School students through mentorship, tutorial, and other programs; (2) provide recreational, positive role-models, one-on-one mentorships, and educational opportunities for children at Garrison Elementary School through the Superior Court's Elementary Baseball Program; (3) emphasize to youth throughout D.C. the devastating impact of drugs, firearms, and gun violence, and discuss and highlight positive alternatives and role models; (4) teach youths in all D.C. high schools, through the Superior Court Domestic Violence Initiative, about the impact of domestic violence and empower them to take effective steps to eradicate domestic violence from our communities; and (5) build strong partnerships with community-based organizations aimed at improving D.C.'s neighborhoods.

**Status:** Ongoing.

**Date started:** 1993 (Amidon); 2000 (Operations Ceasefire In-School Education Program).

**Participating agencies:** MPDC; Superior Court, Bureau of Alcohol, Tobacco and Firearms (ATF); and **USAO.**

**Results reported by participants:** Ceasefire Outreach Teams visited schools in the latter part of the 1999-2000 school year. The program will continue during the 2000-2001 school year. This year over 400 Amidon students were served by over 50 volunteers from USAO.

**Corrections: Initiatives to Implement the D.C. Revitalization Act**

**Assessment and Management Reform Plan for DOC**
**Goal:** To develop and assist in the implementation of a management reform plan for DOC to meet the requirements of the D.C. Revitalization Act.

**Status:** The plan was completed on November 25, 1997.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Date started:** September 1997.

**Participating agencies: BOP**; private agencies (e.g., National Council on Crime and Delinquency, Pretrial Services Resource Center); Pulitzer/Board and Associates; and Creative Management Service.

**Results reported by participants:** No information was provided.

**Classifying D.C.-Sentenced Felons**
**Goal:** To have all D.C.-sentenced felons classified (e.g., by appropriate security level) by October 1, 2000.

**Status:** Ongoing.

**Date started:** September 1999.

**Participating agencies:** DOC and **BOP.**

**Results reported by participants:** As of September 30, 2000, BOP had classified over 6,300 inmate files forwarded by DOC. BOP anticipates completing classification of the remaining files in March 2001. BOP continues to work with DOC to obtain the remaining files, which either need clarification or have not yet been received from DOC. All newly sentenced felons are being classified by BOP.

To assist BOP in achieving this goal, DOC adopted and implemented BOP's classification system, trained all case management staff, reclassified the entire felon inmate population, classified all new intakes, and forwarded the results to BOP. DOC delivered over 6,000 inmate files to BOP for review along with detailed medical information and separations data. DOC also screened all 4,000 inmates classified for pending court cases, significant medical issues, pending parole matters, or approaching release dates. This information has been forwarded to BOP.

**Closure of the Lorton Correctional Complex**
**Goal:** To close the Lorton Correctional Complex by December 31, 2001.

**Status:** Ongoing.

**Date started:** September 1997.

**Participating agencies: DOC**, BOP, U.S. Marshals Service, and Corrections Trustee.

**Results reported by participants:** Since the enactment of the D.C. Revitalization Act, DOC has closed six institutions (see table 10). As of March 15, 2001, the total remaining beds at the Lorton Correctional Complex was 2,066.

Table 10: Closure of Lorton Correctional Complex Facilities

| Institution | Number of beds | Date closed |
|---|---|---|
| Medium Security Facility | 1,000 | September 20, 1997 |
| Minimum Annex | 200 | March 20, 1998 |
| Occoquan Facility | 1,200 | May 16, 1999 |
| Minimum Security Facility (Male) | 500 | July 30, 1999 |
| Youth Center | 1,000 | January 26, 2000 |
| Maximum Security Facility | 626 | January 31, 2001 |

**1449-502069**

Source: DOC, Corrections Trustee, and BOP.

**Designation of D.C. Felons to BOP Custody**
**Goal:** To efficiently and effectively designate D.C. Code felons to BOP custody.

**Status:** Ongoing.

**Date started:** May 2000.

**Participating agencies:** Corrections Trustee, Superior Court, **BOP**, Court Services, U.S. Marshals Service, and U.S. Parole Commission.

**Results reported by participants:** In September 2000, BOP began scoring all newly sentenced D.C. felons. At the time of our review, BOP was designating existing DOC inmates who were medium security or below. BOP was primarily focusing on inmates expected to still be in custody as of December 31, 2001. As of April 2001, BOP is planning to begin designating high-security inmates. As of September 2000, Superior Court began requesting BOP designations for all newly sentenced felons.

**Develop a System for Obtaining Background and Criminal Offense Information on Inmates and Parolees**
**Goal:** To receive information needed on a consistent basis to conduct hearings. To ensure that it does not release individuals to the community without knowing exactly who they are and what they have done, the U.S. Parole Commission requires each case to have a presentence report or another official document, which describes the confining offense behavior. The U.S. Parole Commission also requires a comprehensive arrest and conviction history as well as descriptions and dispositions of all cases involving serious assaults, whether they resulted in convictions or not.

**Status:** Ongoing.

**Date started:** October 1998.

**Participating agencies: U.S. Parole Commission**, DOC, Court Services, Superior Court, MPDC, and Corrections Trustee.

**Results reported by participants:** The U. S. Parole Commission's initiative has resulted in enhanced cooperation among other criminal justice entities including MPDC, DOC, USAO, Court Services, Superior Court, and state and federal law enforcement agencies. This has enabled the U.S. Parole Commission to docket an increased number of parole cases in accordance with their parole eligibility dates and make informed release decisions.

**Establishment of Rules, Guidelines, and Procedures for the Supervision and Revocation Function to Start August 5, 2000**
**Goal:** To have an effective parole monitoring and revocation mechanism that ensures public safety through (1) effective supervision and (2) the establishment of a swift but fair revocation process that imprisons all parolees who threaten public safety.

**Status:** Implemented.

**Date started:** August 1998.

**Participating agencies:** U.S. Parole Commission.

**Results reported by participants:** The revocation process and its speed has recently been the subject of some controversy. As of February 2001, a federal court class action lawsuit challenging certain aspect of the process was pending.

**Housing D.C. Felons Transferred to BOP in Privately Operated Facilities**

**1449-502070**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Goal:** To procure and award contracts to house sentenced D.C. felons in privately operated prisons in accordance with the D.C. Revitalization Act.

**Status:** Ongoing.

**Date started:** November 1997.

**Participating agencies:** DOC and **BOP.**

**Results reported by participants:** Contracts for two privately operated prisons have been awarded. The first contract is currently delayed pending the resolution of environmental and legal issues.

**Medical Acuity Needs of D.C.-Sentenced Felons**
**Goal:** To evaluate all sentenced felons to determine their impact on medical referral centers and to plan for an orderly transfer to BOP; provide DOC medical staff with parameters for processing general program inmates and information regarding tuberculosis criteria; and minimize the impact of infectious diseases upon BOP inmates and staff.

**Status:** Ongoing.

**Date started:** May 1998.

**Participating agencies:** BOP and Corrections Trustee.

**Results reported by participants:** BOP is continuing to work with DOC to identify inmates requiring BOP medical center referrals. BOP also worked with DOC in providing relevant medically related information to the transfer of DOC inmates into BOP custody. At the time of our review, over 700 charts had been reviewed.

To assist BOP in evaluating the acuity of sentenced felons for placement in medical referral centers, DOC supplied the Corrections Trustee with a listing of acute and chronic classification of various categories of medical problems, such as dialysis, HIV/AIDS, and tuberculosis.

**Meetings to Achieve Transfer of Inmates From DOC to BOP Custody**
**Goal:** To transfer all DOC-sentenced felons in BOP custody by December 31, 2001, as required by the D.C. Revitalization Act. Efficient and effective designation of D.C. code felons to BOP custody.

**Status:** Ongoing.

**Date started:** November 1999.

**Participating agencies:** BOP, DOC, Corrections Trustee, Court Services, Superior Court, U.S. Marshals Service, and U.S. Parole Commission.

**Results reported by participants:** Through February 13, 2001, BOP had accepted 4,291 D.C. inmates. Of these, 3,072 remained in BOP custody, including 276 inmates that were in BOP custody prior to passage of the D.C. Revitalization Act.

Beginning on May 8, 2000, DOC and/or U.S. Marshals Service prepared referral packages for BOP on newly sentenced D.C. Code Youth Rehabilitation Act, female, male, minimum, and low security felons for designation and transfer to BOP. As of September 11, 2000, the U.S. Marshal's Office for D.C. Superior Court began preparing referral packages on all newly sentenced D.C. Code felons. DOC provides jail credit, medical, and separation data to D.C. Superior Court, U.S. Marshals Service, on each of these referrals.

**Priority Consideration Program for DOC Staff**
**Goal:** To employ eligible, interested, and qualified DOC staff within BOP.

**1449-502071**

**0046- 098**

**Status:** Ongoing. DOC was participating in the Priority Placement Consideration Task Force, which meets monthly to discuss processing/progress concerns, status updates, and planning for upcoming events. These events include (1) career transition center open house, (2) job fairs, (3) on-site recruitment and interview sessions, and (4) workshops and seminars. Employees are provided with resume and employment application preparation, interview techniques training, and job search assistance to include on-line submissions.

**Date started:** July 1997.

**Participating agencies:** Corrections Trustee, DOC, Office of D.C. Personnel, Metropolitan Area Reemployment Services Center for D.C., Department of Employment Services, BOP, and Office of Personnel Management (OPM).

**Results reported by participants:** BOP expanded the program to encompass all existing BOP correctional facilities. BOP has received a total of 33 applications, and had hired 4 persons affected by reductions in force and 16 others.

**Special Management Inmates (Cooperating Witness/Former Law Enforcement Officers)**
**Goal:** To identify inmates with safety or security concerns and place them in BOP custody upon completion of their court matters.

**Status:** Ongoing.

**Date started:** April 1997.

**Participating agencies:** BOP and DOC.

**Results reported by participants:** BOP has accepted 71 cases referred by DOC.

**Training: Introduction to BOP Functions**
**Goal:** To educate D.C. and federal judicial branch personnel on BOP's designation process, drug treatment and education programs, treatment and placement of Youth Rehabilitation Act offenders, and significance of pre-sentencing investigation reports and judicial recommendations.

**Status:** Ongoing.

**Date started:** June 2000.

**Participating agencies:** BOP, Court Services, Federal Judicial Center, and U.S. Parole Commission.

**Results reported by participants:** Results include: (1) a presentation to Superior Court judges regarding the transition and BOP policies and programs; (2) a tour of the Federal Correctional Institution in Fairton, NJ, for Superior Court and federal court judges; (3) a tour of the Federal Correctional Institution in Petersburg, VA, for Superior Court courtroom clerks; and (4) meetings with staff of the Federal Judicial Center to develop an agenda for training of D.C. and federal judicial branch personnel.

**Transfer of High-Security Inmates**
**Goal:** To designate and transfer up to five high-security inmates per month from DOC to BOP custody.

**Status:** Ongoing. DOC continues to submit detailed referral packages for BOP review, which include legal, behavioral, medical, treatment program, and separation information.

**Date started:** March 2000.

**Participating agencies:** BOP, Court Services, and DOC.

**Results reported by participants:** According to BOP, it has accepted 32 high-security inmates, of which 21 have been accepted for transfer to the Administrative Maximum Security Facility in Florence, CO, or the U.S. Penitentiary in

1449-502072

0046- 099

Marion, IL. DOC stated it had referred over 60 cases to BOP, of which 18 had been designated and transferred to either the Florence or the Marion facilities.

**Other Corrections Initiatives**

**Contract Community-Based Bed Space**
**Goal:** To procure 400 additional community corrections center beds for use by D.C. inmates released from BOP custody.

**Status:** Ongoing.

**Date started:** September 1999.

**Participating agencies: BOP and the Interagency Detention Task Force.** [4]

[4] Superior Court noted that BOP is not the lead agency and should be deleted; rather, the Interagency Detention Task Force headed by the Corrections Trustee is the lead agency.

**Results reported by participants:** Since September 1999, BOP has contracted for 205 additional beds, and there are currently solicitations for 325 beds.

**Establishment of a DOC-Wide Internal Controls Program**
**Goal:** To develop and implement a system to continuously assess program performance, internal controls quality, and mission accomplishment for all disciplines and offices in DOC. To achieve and maintain program accountability and prioritize program improvements by identifying areas that appear most vulnerable to waste, fraud, and abuse.

**Status:** The policy revision, audit guideline development, and cross training phases are ongoing. BOP continues to provide DOC staff with hands-on exposure to audit practices in a correctional environment. Approximately 140 staff had participated. Twenty to thirty additional staff will participate between now and the close of fiscal year 2001. In the summer of 1999, scheduled program-specific audits were canceled by DOC. In lieu of program-specific audits, DOC completed audits of the entire operations at the Central Detention Facility, the Central Treatment Facility, the Maximum Security Facility, and the Community Correctional Center.

**Date started:** September 1998.

**Participating agencies: DOC,** Corrections Trustee, U.S. Department of Agriculture Graduate School, Government Auditing Institute (training purposes only), and BOP.

**Results reported by participants:** Although an official evaluation has not been conducted, Corrections Trustee staff try to identify areas needing improvement and communicate this information to the Office of Internal Controls Manager. One of the recurring deficiencies communicated by the Corrections Trustee was DOC's failure to provide copies of audit reports for fiscal year 2000.

**Establishment of the Interagency Detention Work Group**
**Goal:** To establish a multiagency committee to improve the coordination and logisitcal planning for various detention related processes, such as dual jurisdiction cases, Superior Court's felon designation and transfer process, and parole and halfway house inmate processing.

**Status:** Ongoing.

**1449-502073**

0046- 100

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Date started:** January 2000.

**Participating agencies:** CJCC n5, DOC, Pretrial Services, Defender Service, Executive Office of the Mayor, Superior Court, Court Services, BOP, **Corrections Trustee**, U.S. District Court, Federal Public Defender Office, USAO, U.S. Marshals Service, and U.S. Probation Office.

n5 According to Superior Court officials, CJCC should not be listed as a participating agency.

**Results reported by participants:** The backlog of inmate designations from Federal Court to BOP facilities has largely been eliminated. A new written policy on dual code cases was implemented in March 2000 by representatives of the U.S. Marshals Service, BOP, and the U.S. Probation Office. Also, in February 2000, USAO developed new procedures that eliminated duplicative and confusing case numbers for cases transferred from Superior Court to Federal Court.

**Improving DOC Case Management Practices**
**Goal:** To provide a comprehensive written assessment of DOC case management practices.

**Status:** The assessment has been completed; responses to recommendations are ongoing.

**Date started:** March 1999.

**Participating agencies:** Corrections Trustee, n6 DOC, and **BOP.**

n6 DOC indicated that Corrections Trustee was not a participating agency.

**Results reported by participants:** An assessment report was submitted in April 1999 containing 33 recommendations. DOC has implemented 23 recommendations; 5 others are in progress; 2 were not implemented because the Lorton closure plan made the recommendations moot; and 3 were not adopted because DOC did not agree with them.

**Oversight for Contract Community Corrections Centers**
**Goal:** To (1) establish a Community Corrections Office in D.C. to process all requests for designations and provide oversight for contract community corrections centers located in D.C., and (2) facilitate liaison with Superior Court, U.S. District Court for D.C., the U.S. Marshals Service, U.S. Probation Office for D.C, and Court Services.

**Status:** Ongoing.

**Date started:** March 2000.

**Participating agencies: BOP.**

**Results reported by participants:** Permanent offices were expected to be open by April 2001. BOP was continuing to work with other components to ensure open lines of communications.

**Oversight Program for DOC Detention Facilities**
**Goal:** To assist DOC in developing an oversight program for its detention facilities.

**1449-502074**

0046- 101

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Status:** Ongoing.

**Date started:** February 1999.

**Participating agencies: BOP,** Corrections Trustee, and DOC.

**Results reported by participants:** To gain practical application knowledge of BOP's oversight process, selected DOC staff have actively participated in program reviews at various BOP institutions and Community Corrections offices.

**Presentencing Investigations of DOC Inmates**
**Goal:** To reach a consensus on what is required in presentencing investigations to properly classify inmates.

**Status:** Ongoing.

**Date started:** May 2000.

**Participating agencies:** Superior Court, **Court Services,** and BOP.

**Results reported by participants:** BOP and Court Services have not yet reached a consensus on the requirements for the presentence investigation report. BOP and Court Services plan to continue working closely together to refine this document.

**Review and Reform of DOC Halfway House Operations**
**Goal:** To review and reform halfway house operations and related procedures to improve public safety and strengthen coordination, cooperation, and management among relevant criminal justice agencies.

**Status:** DOC is responsible for notifying Superior Court of work release infractions of defendants placed in the pretrial/sentenced misdemeanants work release program at halfway houses. Pretrial Services is taking the lead to ensure that defendants are drug tested on a regular basis and referred to drug treatment when necessary. Pretrial Services also assists with communications between DOC and Superior Court, keeping Superior Court apprised of halfway-house infractions, escapes, and noncompliance with conditions of release.

**Date started:** March 1999.

**Participating agencies:** CJCC, Corporation Counsel, Superior Court, **DOC,** MPDC, Corporation Counsel, Corrections Trustee, Court Services, Defender Service, **Pretrial Services,** BOP, USAO, and U.S. Marshals Service.

**Results reported by participants:** According to agency officials, the initiative has reduced the time to obtain a warrant for halfway house walkaways from 7 business days to 1 business day. During the fourth quarter of fiscal year 2000, 39 defendants in the pretrial work release program were found to be in need of treatment, and 33 of those defendants were placed in outpatient, inpatient, or detoxification treatment programs. By the close of the quarter, six defendants were still awaiting placement.

**Telephone Calls Management System**
**Goal:** To provide vital parole information by telephone to the general public, attorneys, caseworkers, and staff from other D.C. and federal agencies.

**Status:** Ongoing.

**Date started:** April 2000.

**Participating agencies: U.S. Parole Commission** and Lucent Technologies.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Results reported by participants:** The system was developed to manage an immediate problem within the U.S. Parole Commission. A greater problem still exists with the management of calls among D.C. agencies and the U.S. Parole Commission.

**Videoconferencing for D.C. Parole Hearings**
**Goal:** To develop a pilot videoconferencing system to allow victims and witnesses in D.C. criminal cases to provide information and participate in parole hearings without having to travel to the prison.

**Status:** Ongoing.

**Date started:** Fiscal year 1999.

**Participating agencies:** Defender Service, DOC, BOP, and **U.S. Parole Commission.**

**Results reported by participants:** The U.S. Parole Commission acquired the videoconferencing equipment during fiscal year 1999. The system was expected to be operational by January 2001.

**Violence Prediction Scale to Guide Parole Release Decisions for D.C. Offenders**
**Goal:** To permit the U.S. Parole Commission to identify and keep potentially violent offenders in prison on a systematic basis, while maintaining a rate of parole grants (35 percent at initial hearings) that avoids prison overcrowding.

**Status:** Implemented.

**Date started:** December 1997.

**Participating agencies:** D.C. Board of Parole, Connecticut Board of Pardons and Paroles, contract researcher, and **U.S. Parole Commission.**

**Results reported by participants:** The new system has withstood court challenges, and executive hearing examiners have found a low rate of prisoners whose risk factors were not adequately accounted for by the guidelines. Although it is too early to draw conclusions, the U.S. Parole Commission expects the rate of violent recidivism by paroled offenders to decline significantly over the next decade as a result of this and other initiatives.

**Courts**

**Improve Systemic Resource Management Through Process Reform**
**Goal:** To reduce police overtime costs and increase available "street time" for officers; reduce unnecessary burdens on other justice agencies, victims, and witnesses; and decrease disposition time of cases.

**Status:** Corporation Counsel was conducting a pilot electronic papering program to eliminate or reduce the practice of having police officers appear in person before an Assistant Corporation Counsel in order for a case to be papered. Superior Court has worked with the Council for Court Excellence and the Justice Management Institute to develop a plan to improve case flow management in the Criminal Division of Superior Court.

**Date started:** January 2000.

**Participating agencies:** CJCC, D.C. Trial Lawyers Association, MPDC, Office of the Deputy Mayor for Public Safety and Justice, Corrections Trustee, Superior Court, Court Services, Defender Service, Pretrial Services, and USAO.

**Results reported by participants:** Pilot was scheduled to commence on March 19, 2001.

**Defender Services**

**Criminal Justice Act (CJA) Reforms**

**1449-502076**

0046- 103

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Goal:** To examine the way Superior Court utilizes CJA funds in order to provide a more efficient and cost-effective use of resources while at the same time providing competent legal services to indigent defendants.

**Status:** Ongoing.

**Date started:** 1999.

**Participating agencies:** Defender Service and **Superior Court.**

**Results reported by participants:** Superior Court established an eligibility list of 250 CJA attorneys who may receive CJA appointments in cases brought by the United States, and a CJA eligibility list of 85 attorneys for cases brought by D.C. At the same time, more cases are being referred to the Defender Service in light of its increased funding and staffing levels.

Defender Service received support for a fiscal year 2001 funding initiative to improve eligibility investigation determination process. This is likely to increase the dollar value of defendant contribution orders, as additional potential sources of income available to defendants may be revealed through the investigation.

**Improving Indigent Defense Services Under CJA**
**Goal:** To ensure that the quality of legal representation received by indigent defendants is not compromised and assist Superior Court in resolving the recurring budgetary crisis with indigent defense services.

**Status:** Ongoing.

**Date started:** July 2000.

**Participating agencies: Defender Service**, D.C. Court of Appeals, Superior Court, their governing body, the Joint Committee on Judicial  Administration, n7 Association of Criminal Defense Lawyers, and the Superior Court Trial Lawyers Association.

n7 Superior Court noted that D.C. Court of Appeals and Superior Court should be deleted from participating agencies, and Joint Committee on Judicial Administration should be added.

**Results reported by participants:** While various aspects of the agency's efforts on this initiative were still being developed, the agency developed and conducted a summer training series during which members of the CJA bar received training provided by Defender Service staff and guest lecturers. A variety of sessions were videotaped and the tapes were available for review.

Providing Representation Before the U.S. Parole Commission
**Goal:** To alleviate the already strained financial resources of the Superior Court's CJA budget, Defender Service has agreed to provide legal representation to nearly all parolees facing revocation before the U.S. Parole Commission.

**Status:** Ongoing.

**Date started:** August 2000.

**Participating agencies: Defender Service**, Court Services, U.S. Parole Commission, BOP, and other agencies.

**Results reported by participants:** Defender Service was in the process of completing a major research and education project for Defender Service attorneys, area law school clinical programs handling revocation matters, and the CJA bar.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Defender Service was also compiling a comprehensive "how to" manual of relevant case law, regulations, and other materials.

**Drugs**

Assembly of Drug Team [n8]

> [n8] CJCC recommended that this initiative be deleted because it is covered in several other initiatives: (1) Expanded Narcotics Trafficking Investigations and Prosecutions, (2) Intelligence Sharing, (3) Expanding Drug Testing and Treatment in the Criminal Justice System, (4) Expansion of Drug Testing for Defendants and Offenders Under Supervision of Pretrial Services and Court Services, (5) Sanction-Based Drug Treatment Program, and (6) Superior Court Drug Intervention Program.

**Goal:** To identify and implement means to reduce drug use by people under criminal justice supervision by 10 percent annually over the next 4 years.

**Status:** Court Services began their pilot program in June 2000, to track the rate of drug use, treatment placement, and rearrests among parolees living in three Patrol Service Areas. Pretrial Services launched their pilot program in September 2000, tracking persons arrested in the same Patrol Service Areas. Some data tracking ceased as of September 30, 2000, due to termination of CJCC's contract funds.

**Date started:** February 2000.

**Participating agencies: CJCC, Pretrial Services, Court Services,** Superior Court, DOC, Department of Health, Corrections Trustee, MPDC, Defender Service, and USAO.

**Results reported by participants:** Preliminary findings by Court Services and by Pretrial Services indicate that a significant proportion of both populations engaged in some illegal drug use. As part of the process, offenders and defendants were placed in sanctions programs, including drug testing and steps to assess and place them into an appropriate treatment modality. The project's short time span prevented the report of any definitive data on the rate of rearrests among the targeted population.

Cross Border Initiative
**Goal:** To significantly reduce drug trafficking and related violent crime on the borders of D.C., including the criminal misuse of firearms in targeted neighborhoods and sustain reductions for a minimum of 1 year.

**Status:** Ongoing.

**Date started:** June 1999.

**Participating agencies:** MPDC, **DEA,** and Prince George's County Police Department.

**Results reported by participants:** Eighty-seven arrests; assets seized worth $ 148,000. Drugs seized: crack cocaine (448 grams); heroin (4 grams); marijuana (54,048 grams); LSD (1 gram); MDMA (10 grams); PCP (56 grams); and Khat (73,100 grams).

Drug-Related Nuisance Property Task Force
**Goal:** To combat crime and other problems associated with nuisance properties through the use of criminal, forfeiture, civil, and administrative remedies, with the objective of eliminating these properties as locations for drug dealing, prostitution, trash, dumping, and other activities that degrade the quality of life in the surrounding neighborhoods.

**Status:** Ongoing.

**Date started:** October 1999.

**Participating agencies:** D.C. Department of Public Works, D.C. Department of Consumer & Regulatory Affairs, D.C. Housing Authority, MPDC, Department of Housing and Urban Development (HUD), and **USAO.**

**Results reported by participants:** According to DOJ, nuisance conditions had been abated at eight properties. At six locations, settlement agreements or consent decrees were in place to ensure compliance with applicable laws.

Expanded Narcotics Trafficking Investigations and Prosecutions
**Goal:** To reduce the availability and abuse of illegal drugs in D.C., increase prosecutions of asset forfeiture and money laundering offenses, and increase prosecutions of interstate drug traffickers.

**Status:** Ongoing.

**Date started:** November 1999.

**Participating agencies:** MPDC, ATF, DEA, FBI, **USAO,** and other federal law enforcement agencies.

**Results reported by participants:** USAO says it has successfully initiated a number of ongoing investigations of narcotics suppliers.

Intelligence Sharing
**Goal:** To identify the highest level of drug traffickers in D.C. and collect information regarding the drug trade in D.C. Within DEA's Washington Division Office Strategic Intelligence Group, the Cash Flow Task Force uses financial leads and drug intelligence to identify new drug trafficking targets.

**Status:** Ongoing.

**Date started:** July 1998.

**Participating agencies: DEA,** Internal Revenue Service (IRS), and USAO.

**Results reported by participants:** The Strategic Intelligence Group has (1) collected intelligence information on drug trafficking activities in D.C.; (2) identified new and emerging drug trafficking targets; and (3) shared intelligence information, which has led to the initiation of investigations.

Expanding Drug Testing and Treatment in the Criminal Justice System
**Goal:** To reduce measured drug use by people under criminal justice supervision by 10 percent each year for the next 5 years by drug testing and offering drug treatment to persons in need in the justice system.

**Status:** Implementation of a pilot program has begun for selected populations for whom resources are currently available. Analysis was under way to determine the feasibility of expanding the program to additional populations with existing resources.

**Date started:** October 1999.

**Participating agencies: CJCC,** Superior Court, MPDC, Corrections Trustee, Office of the Mayor for Public Safety and D.C. Department of Health-Addiction Prevention and Recovery Administration, Court Services, Pretrial Services, and USAO.

**Results reported by participants:** Too early to assess efficacy.

Expansion of Drug Testing for Defendants and Offenders Under Supervision of Pretrial Services and Court Services

**1449-502079**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Goal:** To increase the ability of Pretrial Services and Court Services to institute drug testing as a release condition and supervision tool for individuals under criminal justice supervision.

**Status:** Ongoing.

**Date started:** Fall 1999.

**Participating agencies:** Court Services and **Pretrial Services.**

**Results reported by participants:** Between fiscal year 1999 and fiscal year 2000, the number of post-conviction offenders tested increased by 41 percent, and the number of drug tests per probationer increased from 4 to 6. During the same time period, the number of samples from pretrial defendants and juvenile respondents processed by the forensic toxicology drug-testing laboratory increased by approximately 4 percent.

Sanction-Based Drug Treatment Program
**Goal:** To provide drug treatment to pretrial defendants using sanctions for immediate corrective action for testing and treatment noncompliance to reduce substance abuse and resultant criminal behavior.

**Status:** Ongoing.

**Date started:** Fall 1999.

**Participating agencies:** **Superior Court,** Court Services, and **Pretrial Services.**

**Results reported by participants:** During fiscal year 1999, 1,106 pretrial defendants in sanction-based treatment programs submitted drug tests. That number increased to 1,394 defendants in fiscal year 2000.

Superior Court Drug Intervention Program (SCDIP)
**Goal:** To harness the power of the judiciary to coerce addicted defendants to address their addiction by participating in drug treatment and provide a structured environment where the defendant is held accountable for his or her own actions and the consequences for violations are swift and certain.

**Status:** Ongoing.

**Date started:** Demonstration project commenced January 1994. Current SCDIP commenced February 1997.

**Participating agencies:** PSA, Superior Court, USAO, and Defender Service.

**Results reported by participants:** During fiscal year 2000, 117 of the 279 defendants placed in the drug court program successfully graduated.

**Fingerprinting**

Fingerprinting Arrestees
**Goal:** To investigate the feasibility of fingerprinting all arrestees for identification purposes and developing a criminal history repository.

**Status:** Conducting analysis of fingerprinting and record-keeping processes for the D.C. criminal justice system.

**Date started:** May 2000.

**Participating agencies:** Superior Court, DOC, Corporation Counsel, Corrections Trustee, **CJCC,** Court Services, Defender Service, Pretrial Services, USAO, and Youth Services Administration.

**1449-502080**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Results reported by participants:** MPDC has begun fingerprinting certain Corporation Counsel charges. In addition, CJCC's Technology Committee was working to develop a criminal history tracking system, including the implications of such a system for those arrested of misdemeanors prosecuted by OCC.

**Firearms**

Operation Ceasefire-Firearms Reduction Program
**Goal:** To increase federal prosecution of firearm offenses, establish an ATF regional crime gun center, modify the defendant debriefing program, heighten enforcement of probation and parole conditions, and build a comprehensive media outreach and education program.

**Status:** Ongoing.

**Date started:** November 1999.

**Participating agencies:** MPDC, ATF, **USAO**, and other law enforcement agencies.

**Results reported by participants:** From January to March 2000, USAO filed approximately 50 cases in U.S. District Court involving firearms charges. Approximately 105 defendants charged with weapons and/or drug offenses were debriefed pursuant to the Operation Ceasefire project. USAO said that over 10 defendants had signed the new cooperation agreement and were actively assisting law enforcement. Based on firearms trafficking intelligence gathered by ATF and MPDC, USAO initiated a number of ongoing investigations of firearms traffickers for prosecution.

**Forensics**

D.C. Forensic Lab Working Group
**Goal:** To provide a state-of-the-art forensic laboratory for D.C.

**Status:** Ongoing.

**Date started:** June 1998.

**Participating agencies: MPDC**, Office of the Chief Medical Examiner, National Institute of Justice (NIJ), and USAO.

**Results reported by participants:** The project is in the cost-assessment phase.

Forensic Services Assessment for D.C., Final Report
**Goal:** To provide honest broker baseline data about the current forensic capabilities and capacities in D.C.

**Status:** The report has been completed.

**Date started:** Spring 1999.

**Participating agencies:** NIJ, Office of Law Enforcement Standards/NIST, OPD, and USAO.

**Results reported by participants:** The report found numerous deficiencies and made both short- and long-term recommendations for addressing these deficiencies. There are no current plans to evaluate the recommendations in the report.

**Gang Violence**

Creation of Gang Prosecution and Intelligence Section
**Goals:** The initiative includes the following:

. develop strategies and procedures to identify, investigate, and prosecute the most significant violent gangs in D.C.;

**1449-502081**

0046- 108

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

. increase federal law enforcement participation in joint investigations to identify, target, and prosecute violent gangs in D.C.;
. coordinate intra-office information sharing and investigations in order to identify and target violent gangs in D.C.;
. coordinate and share information among law enforcement agencies (MPDC, FBI, DEA, and ATF) in order to identify and target violent gangs for investigation and prosecution;
. develop and implement an intelligence database;
. develop and implement geographical data concerning criminal activity in D.C.;
. develop and implement increased access to data regarding subjects and targets of criminal investigations;
. increase and improve access to court computers;
. increase and improve USAO access to law enforcement intelligence databases; and
. coordinate joint intelligence gathering efforts among local and federal law enforcement agencies in D.C., Maryland, and Virginia.

**Status:** The Gang Prosecution and Intelligence Section is fully staffed except for two paralegal specialist positions. Ten AUSAs had been assigned to the section.

**Date started:** Spring 1999.

**Participating agencies: USAO, MPDC, ATF, FBI, DEA, and High Intensity Drug Trafficking Area (HIDTA) staff.**

**Results reported by participants:** Working with the FBI Safe Streets Task Force, USAO prosecuted significant gang cases. USAO's intelligence operations include (1) establishing an ongoing relationship with HIDTA and arranging for the installation of computers and software to organize intelligence information; (2) organizing information within USAO relating to Operation Ceasefire debriefings, ongoing investigations, and cooperating witnesses; (3) establishing on-line computer access to various databases; and (4) installing software to map criminal activity in D.C.

**Information Technology**

Automated Community Alert Network (CAN)
**Goal:** To provide DOC staff members and the residential communities surrounding the D.C. Jail and the D.C. Correctional Complex at Lorton, VA, with round-the-clock notification of emergency situations at the prison. The CAN computerized network telephones residents living near Lorton to inform them of the emergency and the reason for the sounding of the siren. The system will make three attempts to contact any busy or unanswered phone number.

**Status:** Fully operational.

**Date started:** 1989.

**Participating agencies: DOC.**

**Results reported by participants:** No results provided.

Automated Computer Assisted Notification System (ACANS)
**Goal:** To reduce overtime costs incurred by MPDC officers in connection with court and related appearances. The ACANS system would provide USAO with access to MPDC officers' work and leave schedules, thus allowing them to coordinate officers' appearances for witness conferences, grand jury, and court during regular duty hours, thus reducing the need for overtime compensation. Officers would electronically receive notification of court appearances and cancellations, reducing the amount of time and resources currently needed to accomplish the necessary notifications.

**Status:** Pending implementation of adequate automation by MPDC.

**Date started:** December 1996.

**Participating agencies: MPDC and USAO.**

**1449-502082**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Results reported by participants:** No information provided.

Automation of Defender Service Functions
**Goal:** To create a comprehensive automation system to simplify agency operations and functions, including:

. developing an automated case management and tracking system;
. developing software to assist the Court with CJA eligibility and attorney assignment;
. developing a Web site to better communicate with the Court, the CJA bar, and other criminal justice agencies in D.C. and nationally; and
. creating data links to obtain and share information from other criminal justice agencies.

**Status:** This case management system is 90 percent completed. The initial phase was implemented in the summer of 2000. Defender Service expects to fully implement the system by the end of 2001.

**Date started:** February 2000

**Participating agencies: Defender Service.**

**Results reported by participants:** The business process portion of this effort has enabled Defender Service to identify data collection and reporting areas that will be strengthened through full implementation of the new system.

Automation of the Death Investigation Process
**Goal:** To automate the Office of the Chief Medical Examiner by purchasing and customizing a propriety software system designed specifically for forensic applications. This will affect the entire death investigation process including reporting, investigation (death scene and other), documentation of evidence and examination (autopsy), and creation of appropriate reports; it will also create an electronic record-keeping system. Other features to be developed will include workflow automation, to allow for tracking of information, documents, and correspondence (and statistical analysis of work completion and efficiency), and digital imaging with archiving. The results of this project will include greatly increased efficiency in the business processes, monitoring and tracking of data and correspondence, better statistical analysis and improve reporting, images that can be used and transmitted more easily, and enhanced quality of autopsy reports.

**Status:** Ongoing. Product and vendor evaluation/selection, contracting, and procurement have been completed. Initial meetings between the vendor and D.C. had been held, and a scheduling of milestones and completion data were expected.

**Date started:** July 2000.

 **Participating agencies: Office of the Chief Medical Examiner.**

**Results reported by participants:** No information provided.

Develop a Legislative Foundation for an Integrated Criminal Justice Information System Central Repository
**Goal:** To develop a legislative foundation that provides long-term support for the establishment and operation of a D.C. Criminal Justice Information System Central Repository.

**Status:** The initiative is under way.

**Date started:** May 2000.

**Participating agencies: CJCC**, Court Services, MPDC, Corporation Counsel, Corrections Trustee, Superior Court, Defender Service, Pretrial Services, and USAO.

**Results reported by participants:** The Information Technology Advisory Committee established a Criminal Justice Information System (CJIS) Legislation Working Group (CLWG) in May 2000. The CLWG included representatives of

**1449-502083**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

all major D.C. criminal justice agencies and a representative from the City Council. The CLWG drafted a CJIS law for consideration of the Advisory Committee and included it in a final report prepared in September 2000.

Develop a System to Share the Text of Individual Paroling Decisions Needed By Other D.C. Criminal Justice Agencies
**Goal:** To develop an information system that would allow Court Services, MPDC, Superior Court, DOC, and USAO to view text on individual paroling decisions.

**Status:** Ongoing.

**Date started:** January 1999.

**Participating agencies: U.S. Parole Commission.**

**Results reported by participants:** The system has been implemented and can be implemented by D.C. justice agencies at no charge.

Enhancing Privacy and Security of Justice Agency Information Systems
**Goal:** To develop a multiagency foundation for privacy and security practices to support day-to-day activities of justice agencies, enhance long-term plans, and meet D.C. and federal laws and regulations.

**Status:** Ongoing.

**Date started:** September 1999.

**Participating agencies: CJCC,** Corporation Counsel, Office of the Chief Technology Officer, Corrections Trustee, MPDC, BOP, Defender Service, Pretrial Services, USAO, and Youth Services Administration.

**Results reported by participants:** In May 2000, participants completed a comprehensive report detailing security policy considerations for justice agency executives in D.C. The subjects outlined in this report will be considered during the development of a District of Columbia Justice Information System (JUSTIS) security plan.

Improve the Quality of Criminal Justice Record Information Through Implementation of a District-Wide Tracking Number
**Goal:** To improve the completeness and accuracy of justice information by implementing a methodology to link all data representing each individual justice processing cycle of an offender.

**Status:** The analysis process has just been initiated.

**Date started:** May 2000.

**Participating agencies:** DOC, Superior Court, MPDC, **Corporation Counsel,** Court Services, Defender Service, Pretrial Services, and USAO.

**Results reported by participants:** Not yet implemented.

Information Technology Integration
**Goal:** To develop and implement JUSTIS to support interagency data access, data sharing, and automated notification without disrupting the existing systems of the individual federal and local criminal and juvenile justice agencies.

**Status:** KPMG delivered a draft blueprint for JUSTIS on August 31, 2000. Plans are to pilot the program in several agencies, evaluate the results, and make any needed changes prior to systemwide implementation.

**Date started:** April 1999.

**1449-502084**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Participating agencies: CJCC**, Youth Services Administration, MPDC, Corrections Trustee, Office of the Chief Technology Officer, Superior Court, BOP, Court Services, Pretrial Services, U.S. Parole Commission, Defender Service, and USAO.

**Results reported by participants:** JUSTIS remains on schedule and within budget. The statement of work for JUSTIS Phase 2 has been completed and reviewed.

Installation of An Automated Jail Information Management System
**Goal:** To provide the Central Detention Facility (D.C. Jail) with an on-line, fully automated jail information management system that will substantially increase efficiency and reduce the potential for errors in jail operations, such as during inmate release processing. The system will automate virtually every aspect of an inmate's stay at the jail. It will also have the capability to interface with other law enforcement networks to share information, pinpoint the locations of offenders, and possibly ensure against erroneous releases.

**Status:** Ongoing. DOC began implementing the system in October 2000. DOC user groups are meeting weekly to identify and resolve issues.

**Date started:** May 8, 2000.

**Participating agencies: DOC**, Corrections Trustee, and MPDC.

**Results reported by participants:** In October 2000, DOC successfully introduced the Jail and Community Corrections System (JACCS).

Integrated Justice Information System (IJIS)
**Goal:** To create an integrated database to replace the current 18 separate legacy systems now operating in Superior Court. The integrated database should eliminate redundant data collection practices, improve identification of related cases across branch and divisional lines, enhance case-flow management and public service, provide more efficient case processing, and enhance data sharing and coordination with other justice system partners.

**Status:** Ongoing. An analysis has been completed with technical assistance by a National Courts advisory group. A request for proposal (RFP) was being prepared and the organizational framework for an integration project, including an advisory committee, a number of working groups, and a dedicated project manager were under way.

**Date started:** 1998.

**Participating agencies: Superior Court.**

**Results reported by participants:** In September 2000, the National Center for State Courts (NCSC) completed a requirement analysis for the IJIS project. The court was striving to implement NCSC's recommendations and was working with NCSC to complete an RFP. After obtaining Congressional approval of the design plan, the court will publish the RFP. The target date for vendor selection is June 2001.

National Criminal History Improvement Program
**Goal:** To develop and implement an integrated criminal justice information system that meets the goals and objectives of the Brady Bill, the National Child Protection Act, and other associated and related requirements.

**Status:** Mitretek Corporation has been awarded a contract to develop the system.

**Date started:** January 1998.

**Participating agencies:** D.C. Courts, Court Services, **MPDC**, Pretrial Services, and USAO.

**Results reported by participants:** Initial design of records management system is finished.

**1449-502085**

0046- 112

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

National Sex Offender Registry Program
**Goal:** To develop and implement a sex offender registry that meets the needs of law enforcement and the public, particularly victims of sexual assault and other sexually deviant crimes.

**Status:** Ongoing. In July 2000, D.C. enacted the Sex Offender Registration Act of 1999, which placed the sex offender registration function with Court Services and the community notification function with MPD.

**Date started:** July 1998.

**Participating agencies:** D.C. Courts, **MDPC**, Corrections Trustee, Court Services, Pretrial Services, and USAO.

**Results reported by participants:** No information provided.

New USAO Computer Systems
**Goal:** To develop computer systems, such as Community Action Proactive Prosecution System (CAPPS), to enhance coordination and collaboration within the D.C. criminal justice arena. To develop and deploy information systems to improve management of citizen contacts, including nuisance property, other complaints, requests for information, and community meetings.

**Status:** All projects are ongoing.

**Date started:** January 2000.

**Participating agencies:** Executive Office for USAO, Office of Chief Technology Officer, and **USAO**.

**Results reported by participants:** CAPPS was implemented in August 2000.

**Juvenile Justice**

Discretionary Grant for Youth Court
**Goal:** To convert Superior Court's existing youth court from an isolated demonstration program to the cornerstone of a community system. This will be achieved by increasing the size of the jury pool and the number of hearings, and by expanding the number and range of community placements. In addition, Superior Court will transfer current oversight of the youth court from the Time Dollar Institute to a community structure, and develop a governance system with shared ownership and responsibility for implementation of the youth court.

**Status:** The grantee is working to complete the delivery of services to clients recently placed into the Youth Court Program.

**Date started:** January 1999.

**Participating agencies: Superior Court.**

**Results reported by participants:** Not yet implemented.

Drug Court Implementation Initiative
**Goal:** To serve 300 to 500 youth, develop a drug testing collection site, and establish a family services component and a management information system.

**Status:** The juvenile drug court is fully operational. As of the time of our review, 46 participants had received medical evaluation. Forty-four were enrolled in the Alliance for Concerned Men's mentor program, and youth were involved in cultural enrichment and therapeutic recreational activities. The Management Information System was in the testing phase.

**Date started:** September 1998.

**1449-502086**

0046- 113

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Participating agencies:** D.C. Public School's Comprehensive School Health Program, **Superior Court**, and Pretrial Services.

**Results reported by participants:** On February 4, 2000, the first graduation was held for 27 youths.

Juvenile Education Initiative
**Goal:** To more fully address the needs of children and get them out of the delinquency system before they follow the all-too-common path into the adult system.

**Status:** When the 1999 Omnibus Appropriations Act limited the amount of fees that could be collected by private attorneys representing children with special education needs under the Individuals With Disabilities Education Act *(20 U.S.C. § 1400* et. seq.), many children were left without representation. With the additional fiscal year 2000 funding, the Defender Service now represents nearly 200 juveniles in special education matters.

**Date started:** 1999.

**Participating agencies: Defender Service.**

**Results reported by participants:** Defender Service reported an increase in delivery of services provided to children requiring special education needs.

Youth Violence Initiative [9]

[9] According to CJCC, this entry (Youth Violence Initiative) and another entry (Youth Violence Intervention Team) described the same initiative. CJCC recommended deleting the second entry (Youth Violence Intervention Team) because (1) it was one component of the first initiative (Youth Violence Initiative) to achieve the goals described in the first and (2) it falls under the larger umbrella of the first initiative. The first initiative (Youth Violence Initiative) listed the Office of the Deputy Mayor as the lead agency; the second entry (Youth Violence Intervention Team) listed MPDC as the lead agency.

**Goal:** To achieve the following by June 22, 2001:

. Reduce the number of youth-on-youth homicides by 10 percent.

. Reduce the number of shootings in which the victim(s) are members of the population targeted by this effort in Wards 7 and 8 by 10 percent.

. Reduce the number of youth within the targeted population who recidivate for serious and violent crime while under Court Services, Youth Services Administration or Court Social Services, Juvenile Probation custody in Wards 7 and 8 by 10 percent.

. Reduce the number of open, unsolved violent crimes in Wards 7 and 8 by 10 percent.

**Status:** Ongoing.

**Date started:** June 2000.

**Participating agencies:** Court Social Services, Superior Court, Juvenile Probation, MPDC, Youth Services Administration, Juvenile Parole Unit, Department of Parks and Recreation Roving Leaders/Urban Rangers, Corporation

**1449-502087**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Counsel, USAO, D.C. Public Schools Security Unit, Faith/Community-based entities, **Office of the Deputy Mayor for Public Safety and Justice,** and Court Services.

**Results reported by participants:** Too early to evaluate.

Youth Violence Intervention Team
**Goal:** To prevent the small percentages of youth who commit serious and violent crime from victimizing the larger segment of youth in D.C., reduce the number of juvenile homicide victims, and provide effective intervention services to youth who have traditionally not responded well to such efforts.

**Status:** Implemented.

**Date started:** June 2000.

**Participating agencies: MPDC**; Court Social Services, Juvenile Probation; Youth Services Administration's Juvenile Parole Unit; Corporation Counsel; D.C. Parks and Recreation's Roving Leaders/Urban Rangers program; D.C. Public Schools Security Unit; D.C. Boys and Girls Clubs; Court Services; USAO; other government, religious, grassroots, and nonprofit organizations.

 **Results reported by participants:** Too early to evaluate.

**Miscellaneous**

HUD Housing Fraud Initiative
**Goal:** To review and investigate all HUD programs, with a view towards ensuring that they are being operated efficiently, and free from fraud, waste, and abuse. The initiative will ensure that the government is getting its money worth from the HUD programs; propose administrative changes in programs where weaknesses are identified; and file civil and criminal cases where appropriate.

**Status:** Ongoing.

**Date started:** Fall 1999.

**Participating agencies: HUD**, USAO, FBI, U.S. Postal Inspectors, D.C. Inspector General's Office, and Corporation Counsel.

**Results reported by participants:** No information provided.

Legislation
**Goal:** To propose--and work with the Council to enact--legislation that will improve the criminal justice system and thereby better service the residents and citizens of D.C. Also respond to requests from the Council to comment on pending legislation.

**Status:** Ongoing.

**Date started:** March 1998.

**Participating agencies:** Council of the District of Columbia and **USAO**.

**Results reported by participants:** No specific examples provided.

**Policing**

D.C. Bias Crimes Task Force

**1449-502088**

0046- 115

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Goal:** To increase community awareness of the Bias-Related Crimes Act of 1989 and the protection it provides for victims of hate crimes, available victim resources, the need to report hate crimes, and the procedures for making such reports; deter perpetrators of hate crimes; and strengthen the partnership between police, prosecutors, and community organizations in responding to hate crimes.

**Status:** Ongoing. The Task Force meets monthly.

**Date started:** February 1996.

**Participating agencies:** Corporation Counsel, Anti-Defamation League, the Asian Pacific American Bar Association, Gay Men and Lesbians Opposing Violence, the Greater Washington Urban League and Ayuda, MPDC, a Washington Latino organization, FBI, **USAO**, U.S. Park Police, U.S. Capitol Police, U. S. Secret Service, INS, and D.C. Public Schools.

**Results reported by participants:** At the request of members of the D.C. Bias Crimes Task Force, a D.C. public relations firm created a hate crime public information campaign, which included public service announcements, a hate crime brochure, and campaign posters for placement on billboards, buses, subway stations, etc. The Task Force has also sponsored several conferences to educate law enforcement about ways to combat hate crimes.

Joint Investigative Task Force
**Goal:** To do the following:

. jointly pursue a comprehensive, vigorous, and proactive approach to investigating and prosecuting allegations of police criminal misconduct;
. review the status of pending investigations of police misconduct and identify means to ensure that they are handled expeditiously and with highest priority;
. create a database to track ongoing investigations and allegations of police misconduct;
. develop investigative plans and approaches to attack criminal misconduct by police officers;
. work with MPDC to develop an ongoing system of integrity checks for MPDC officers; and
. identify a regular forum for meeting and sharing intelligence information about police criminal misconduct cases and investigations among the principal law enforcement offices engaged in investigating such cases.

**Status:** Ongoing.

**Date started:** March 1998.

**Participating agencies:** D.C. Office of Inspector General, FBI, MPDC's Office of Internal Affairs, **USAO**.

**Results reported by participants:** The number of police officer convictions for criminal misconduct increased from 5 in 1997 to 9 in 1998 and 13 in 1999. There is now systematic tracking and reporting of all police misconduct cases with USAO. Interaction and intelligence sharing among the various law enforcement agencies have greatly improved through regular meetings and discussions, and joint investigations by participating agencies have been carried out or are ongoing.

Partnerships for Problem Solving (PPS)
**Goals:** (1) To develop curricula and materials to train police officers, community volunteers, and agency representatives throughout D.C. in the methods and tools for neighborhood problem solving; and (2) establish at least one active problem-solving group in each Police Service Area that includes community volunteers, police officers, and agency representatives.

**Status:** PPS is an integral part of the Policing for Prevention (PFP). It provides structure for partnership among city agency, community, police, and other community stakeholders. It introduces people to the five-step problem-solving process: (1) target a problem, (2) understand the problem, (3) create a plan, (4) take action and review progress, and (5) celebrate and create a lasting community presence. MPDC continues to provide training opportunities to its members and the communities it serves.

**1449-502089**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Date started:** A pilot PPS training program that focused on the finalized police-community problem-solving model was instituted in July 1999.

**Participating agencies: MPDC**, D.C. community and agency representatives, and the Mid-Atlantic Police Training Institute.

**Results reported by participants:** MPDC's PPS training program has reached a total of 34 Police Service Areas, 700 police officers, and 300 community volunteers since its inception. In addition, 1,900 police officers have been introduced to the problem-solving model as part of their inservice training at MPDC's Institute of Police Science, and 36 individuals have been provided with Training of Trainers in 25 Police Service Areas.

Police Coordination Act
**Goal:** To enhance crime prevention and law enforcement activity by allowing for cooperative agreements between federal agencies and MPDC. These agreements may span all areas of law enforcement, from sharing of equipment and radio frequencies to sending federal personnel to patrol in areas immediately surrounding their agencies' jurisdictions.

**Status:** In October 2000, a cooperation agreement between MPDC and Amtrak was signed. Discussions with other agencies about agreements are ongoing.

**Date started:** May 2000.

**Participating agencies: USAO.**

**Results reported by participants:** The federal agencies and MPDC are satisfied with the level of their cooperation regarding sharing of equipment, joint radio frequencies, and prisoner processing.

PFP
**Goal:** To (1) focus law enforcement to disrupt or terminate chronic crime, reduce fear, and build community confidence in MPDC; (2) establish neighborhood problem solving to facilitate the active involvement of the community and government services to stabilize the neighborhoods; and (3) provide long-term intervention by focusing on underlying social and economic conditions that generate crime and disorder.

**Status:** PFP has required an extensive philosophical and training commitment by MPDC members during 2000. In doing so, MPDC has implemented what will be an ongoing initiative in all districts.

**Date started:** Spring 2000.

**Participating agencies: MPDC**; D.C. agencies responsible for social, health, education and economics; and private nonprofit groups.

**Results reported by participants:** In-service training and PFP implementation in the districts have been completed.

USAO's Civil Rights Unit
**Goal:** To investigate allegations of excessive use of force by the police and prosecute such matters when appropriate. Also, to educate the public regarding hate crime to encourage reporting of such crimes and to effectively investigate and prosecute those crimes.

**Status:** After about 1 year in operation, USAO's Civil Rights Unit is becoming an efficiently functioning unit.

**Date started:** USAO's Civil Rights Unit was formed in March 1999 and became staffed with two AUSAs in June 1999. In August 1999, a third AUSA was added to the staff.

**Participating agencies:** FBI Civil Rights Enforcement Squad; MPDC Office of Professional Responsibility's Force Investigation Team; DOJ's Civil Rights Division, Criminal Section; and USAO.

**1449-502090**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Results reported by participants:** Enhanced communication and improved working relationship with DOJ's Civil Rights Division, Criminal Section, and law enforcement agencies responsible for investigating police excessive force matters; decrease in the amount of time required to resolve police excessive force matters referred for investigation; expanded scope of matters subject to review and investigation by USAO.

**Pretrial Services**

D.C. Pretrial Systems Project
**Goal:** To identify the full range of issues and problems with the operation and management of the current pretrial system, particularly with the use of halfway houses for defendants; to develop accurate, detailed information on how the D.C. pretrial system operates; and to develop consensus among subcommittee members regarding specific, desired policy changes that will address their key concerns with the pretrial system.

**Status:** Ongoing current resources will support development efforts through November 2000.

**Date started:** May 1999.

**Participating agencies:** Superior Court, USAO, Corporation Counsel, Defender Services, CJCC, Pretrial Services, Corrections Trustee, and **BOP's National Institute of Corrections**.

**Results reported by participants:** Still in development.

Diversion Programs for Low-Level Misdemeanor Offenses
**Goal:** To create a series of diversion programs in D.C. to divert these cases from the system in a way that does not result in an excessive accumulation of legal fees and also addresses the minor misdeeds of the defendant and helps improve the community. Unlike many other major metropolitan areas around the country, D.C. has very few diversion programs for people charged with petty, "quality of life" offenses (e.g., loitering, public drinking, and unlawful entry).

**Status:** Defender Service has collected two sets of national standards on diversion programs, and prepared a comprehensive chart of current diversion programs in D.C. Defender Service is in the process of collecting materials from around the country on successful diversion programs. The specific types of diversion programs under consideration include mental health diversion, welfare-to-work diversion, and community service diversion. Corporation Counsel has created a diversion program for defendants who commit "quality of life" offenses.

**Date started:** Not provided. Corporation Counsel diversion program began in January 2001.

**Participating agencies: Defender Service**, CJCC, and Council for Court Excellence. The planning committee will consist of representatives from USAO, Superior Court, Corporation Counsel, Pretrial Services, the D.C. Commission on Mental Health Services, the D.C. Department of Employment Services, the D.C. Department of Public Works, Court Services, Corrections Trustee, and other local agencies and organizations.

**Results reported by participants:** Still in early stages of development. Too early to determine the effect of Corporation Counsel diversion program.

Enforcement of Court-Imposed Pretrial Conditions of Release (CORE)
**Goal:** To monitor persons who are subject to conditions of release--such as stay-away and curfew orders--and prosecute those who violate those conditions on charges of criminal contempt.

**Status:** Ongoing.

**Date started:** 1998.

**Participating agencies:** MPDC, Superior Court, **USAO**, U.S. Park Police, U.S. Secret Service, and U.S. Capitol Police.

**1449-502091**

0046- 118

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Results:** Since the inception of the CORE Program, USAO has prosecuted approximately 256 contempt cases for violations of pretrial release conditions, of which 95 thus far have resulted in conviction by trial or guilty plea.

Enhance Pretrial Services Risk/Needs Assessment
**Goal:** Develop and implement a revised risk/needs instrument to facilitate pretrial decisionmaking in 100 percent of pretrial cases.

**Status:** Development of revised instrument by Pretrial Services Risk Assessment Committee in progress.

**Date started:** February 2000.

**Participating agencies:** DOC, Corporation Counsel, USAO, Corrections Trustee, MPDC, Superior Court, Court Services, Defender Service, **Pretrial Services,** and U.S. Marshals Service.

**Results:** Still in development.

Explore and Investigate Graduated/Administrative Sanctions Responsive to Risk of Pretrial Defendants
**Goal:** To create a range of graduated/administrative sanctions that are responsive to the risk of the pretrial defendant and ensure the public's safety.

**Status:** Committee discussions in progress.

**Date started:** June 2000.

**Participating agencies:** Superior Court, DOC, Corrections Trustee, MPDC, Corporation Counsel, Court Services, Defender Service, **Pretrial Services,** USAO, and U.S. Marshals Service.

**Results reported by participants:** Still in development.

**Victims Services**

DOC Victims Services
**Goal:** To provide improved services to victims through education, compensation, and notification. Identified detainees participating in the program shall be made responsible for the obligation to their victim(s).

**Short-term goals:**

. review and ensure full implementation of the Mayor's Order 82-155, dated August 26, 1982, and D.C. Law 4-100 regarding the D.C. Victims of Violent Crime Compensation Act of 1981;
. establish a victimization office and hotline; and
. hire a victimization counselor.

**Long-term goals include:**

. develop victim notification categories; and
. develop a process for notifying victim(s) or victim's family members.

**Status:** Ongoing.

**Date started:** October 2000.

**Participating agencies: DOC,** DOJ, Corporation Counsel, D.C. Office of Personnel, District Services Administration, Office of the Deputy Mayor for Public Safety and Justice, D.C. Superior Court, and U.S. District Court.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Results reported by participants:** DOC, in consultation with Corporation Counsel, is reviewing the current Victims Laws and the Mayor's order to ascertain how quickly they can be fully implemented in DOC. A request for hotline telephone service is to be forwarded to the General Services Administration. Initial contact made with the DOC's Technology Center.

MPDC Victims Services
**Goal:** Short-term goals:

. ensure that MPDC is meeting its obligation to the Crime Victim Compensation Program (CVCP) by developing a process that supports a renewed effort to inform crime victims of the CVCP program;
. in collaboration with the National Center for Victims of Crime (NCVC), initiate a pilot effort to provide practical emergency assistance to victims of burglary;

**Long-term goals include:**

. improve MPDC's services to victims of crime by developing a comprehensive strategy/program that is aligned with the assumptions and approaches of PFP;
. ensure that all police officers are trained in basic crisis intervention techniques; and
. develop a comprehensive training strategy to ensure consistency throughout recruit in service and roll call training venues; Status: Ongoing.

**Date started:** January 2000.

**Participating agencies: MPDC,** National Organization for Victim Assistance (NOVA), NCVC, International Association of Chiefs of Police, USAO, Superior Court, and funded by a grant from Office for Victims of Crime through D.C. Mayor's Office.

**Results reported by participants:** The CVCP informational effort is ongoing. A grant proposal has been submitted to establish a dedicated Victim Assistance Unit in MPDC. MPDC has developed training in collaboration with NOVA that focuses on first officer response to victims of crime and includes issues related to the trauma of victimization.

Victims Services Plan
**Goal:** To develop an infrastructure of services to meet the needs of crime victims. The program will support a Victims Services Center that will coordinate and serve as a central referral system for victims of crime in D.C.

**Status:** Plan was completed and submitted to Congress.

**Date started:** May 2000.

**Participating agencies:** CJCC; Corporation Counsel; Office of the Deputy Mayor for Children, Youth, and Families; **Office of the Deputy Mayor for Public Safety and Justice;** and USAO.

**Results reported by participants:** None reported.

Pretrial Mental Examination Committee (Committee)
**Goal:** To coordinate the delivery of pretrial mental examination services to defendants facing criminal charges at Superior Court. Monitor bed space at the John Howard Pavilion and D.C. Jail mental health wards to ensure that bed space is used in the most efficient manner. Ensure coordination of all involved agencies to facilitate Superior Court receiving necessary services to prevent trial delays.

**Status:** Committee meets quarterly, with special meetings as required.

**Date started:** 1970s.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Participating agencies:** Corporation Counsel, DOC, Superior Court, Defender Services, USAO, U.S. Marshals Service, and Commission on Mental Health Services.

**Results reported by participants:** The Committee has been able to eradicate and control prior serious waiting lists for bed space, which resulted in lengthy trial delays. The Committee has formulated new court procedures for pretrial criminal mental evaluations that will help ensure the timely processing of cases and efficient coordination of services by the multiple agencies involved.

**Initiatives Started Before 1997**

Domestic Violence Section and Court
**Goal:** To coordinate the civil and criminal justice system for domestic violence victims; create a dedicated violence unit within USAO focused on the aggressive prosecution of all intrafamily offenses; and increase the success of domestic violence prosecutions.

**Status:** USAO's domestic violence unit now consists of 10 misdemeanor-level AUSAs, each of whom handles exclusively domestic violence criminal cases. The Domestic Violence Court system handles all misdemeanor (and related civil) domestic violence cases. There is a plan to add felony judges to the Court.

**Date started:** April 1996.

**Participating agencies:** Corporation Counsel, Superior Court, MPDC, Court Services, **USAO**, Emergency Domestic Relations Project, and the D.C. Coalition Against Domestic Violence.

**Results reported by participants:** The preliminary results of the State Justice Institute evaluation indicate a high level of victim satisfaction with the domestic violence intake process. The prosecution rate of domestic violence criminal cases has risen from about 20 percent to 70 percent of all cases presented. Cases are regularly tried without the victim being called as a witness. The overall conviction rate of cases proceeding to trial is approximately 65 percent.

Elder Fraud/Financial Exploitation Initiative
**Goal:** To initiate a referral system for cases of financial exploitation and use of the federal criminal laws creatively to charge those responsible and to recapture as much of the victim's property as possible.

**Status:** Ongoing.

**Date started:** 1996.

**Participating agencies: U.S. Secret Service, FBI, MPDC,** USAO, D.C. Office on Aging, Legal Counsel for the Elderly, D.C. Adult Protective Services. Other agencies are called upon as needed: IRS, U.S. Postal Inspection Service, Corporation Counsel, and Office of D.C. Child and Family Services.

**Results reported by participants:** Enhanced interagency cooperation has resulted in several pending investigations, one of which, for example, involves millions of dollars and multiple victims. Bankers are now also evaluating and sending cases to appropriate agencies.

Executive Task Force
**Goal:** The Executive Task Force, chaired by USAO and comprised of the heads of all federal and local law enforcement entities located in D.C., is designed to enhance communication between federal agencies and MPDC.

**Status:** No funding had been provided.

**Date started:** Pre-1997.

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Participating agencies: USAO,** Corporation Counsel, MPDC, ATF, DEA, FBI, IRS, Metro Transit Police, Naval Criminal Investigation Service, U.S. Capitol Police, U.S. Customs Service, Food and Drug Administration, DOJ, INS, U.S. Marshals Service, U.S. Park Police, U.S. Postal Inspection Service, and U.S. Secret Service.

**Results reported by participants:** The Executive Task Force served as a forum for discussing issues relevant to interagency law enforcement efforts. Among other matters discussed during 2000 was planning for demonstrations against the meeting of the International Monetary Fund.

Operation Weed and Seed
**Goal:** To develop a community-based, multi-agency approach to combating violent crime, substance abuse, and gang-related activity in high-crime neighborhoods. On the "Weed" side, local and federal law enforcement work together with designated Weed and Seed prosecutors by engaging in a coordinated strategy aimed at ridding targeted neighborhoods of violent crime, gang activity, drug use, and drug trafficking. The "Seed" strategy focuses on revitalization, which includes prevention, intervention, and treatment services, followed by neighborhood restoration.

**Status:** Ongoing. In fiscal year 2001, the Executive Office for Weed and Seed initiated efforts to improve the law enforcement and community revitalization elements of D.C. Weed and Seed such as working with MPDC to provide training to help improve homicide clearance rates.

**Date started:** The District's Weed and Seed was established in 1992. There are now over 200 sites nationwide.

**Participating agencies:** Department of Consumer and Regulatory Affairs, Department of Employment Services, Department of Housing and Community Development, D.C. Housing Authority, Department of Public Works, Department of Recreation and Parks, Corporation Counsel, MPDC, Court Services, Health and Human Services, the FBI, Office of Justice Grants Administration, and **USAO.**

**Results reported by participants:**

. Safe Summer 1996-2000. Since 1996, over $ 383,287 has been raised and awarded to over 200 youth serving organizations throughout the city.
. Value-Based Violence Prevention Initiative (VBVPI). Grantees used funds to provide stipends for youth workers, hire instructors for parenting skills and G.E.D. courses, and provide meals to program participants.
. Community Prosecution. As a result of the Fifth District Community Prosecution Pilot Project, reported crime dropped from 10,036 in 1994 to 6,535 in 1998. The Fifth District also fell from having the second highest number of reported crimes in D.C. in 1996 to having the fifth highest in 1999. USAO aims to repeat this progress in the other six police districts.
. Drug Education For Youth (DEFY). Over 90 youth have successfully graduated from the DEFY program since its inception in 1997.

HUD/DOJ Public and Assisted Housing Task Force
**Goal:**

. Bring together community policing and community prosecution through the creation of a HUD toolbox, which will enable police officers to access HUD information and resources to solve problems in public and assisted housing.
. Create a strong partnership among the HUD/DOJ Public Housing Task Force, the D.C. Housing Authority Receiver, and the tenants themselves.
. Coordinate law enforcement intervention with facility upgrades and management improvement so that residents associate law enforcement officers with both crime reduction and enhanced living conditions.
. Develop management and resident initiatives through a Family Investment Center operated by the housing authority.
. Establish increased police visibility and presence, including a full-time community police officer.
. Bring civil actions against property owners and managers for allowing conditions that threaten residents' health and safety, as well as for abuses such as equity-skimming and false certifications of compliance with housing quality standards.

**1449-502095**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

. Use HUD and HIDTA resources to geo-code electronically all HUD-assisted properties in D.C., thus making it possible to overlay housing sites with crime patterns from police department databases, and to build a strategic database of information in support of community policing and community prosecution.

**Status:** Ongoing.

**Date started:** 1996.

**Participating agencies:** USAO, HUD and the HUD Inspector General, MPDC, D.C. Housing Authority Police, FBI, DEA, and ATF.

**Results reported by participants:** A significant reduction in drug and violent crime in the first two public housing areas targeted.

Health Care Fraud Task Force
**Goal:** Prosecute health care fraud by providers, recipients, or outsiders; coordinate investigations and investigative resources; facilitate information sharing on health care fraud trends, data mining techniques, and priorities; and educate task force members on topics relevant to investigating health care fraud.

**Status:** Ongoing.

**Date started:** 1993.

**Participating agencies:** D.C. Medicaid Fraud Control Unit; Corporation Counsel; FBI; Department of Health and Human Services' Office of Inspector General (OIG); Office of Personnel Management's OIG; USAO; U.S. Postal Service OIG; U.S. Postal Inspection Service; Blue Cross/Blue Shield; GEICO; other private insurance companies and OIG offices; and AARP.

**Results reported by participants:** Numerous health care fraud prosecutions, both criminal and civil, have resulted in dozens of convictions and millions of dollars in restitution and civil recoveries. The reaccredidation of the D.C. Medicaid Fraud Control Unit in 2000 and its partnership with the D.C. OIG should significantly increase the number of criminal and civil referrals in coming years.

**APPENDIX-IX:**
**Comments From the Executive Office of the Mayor for D.C.**

**GOVERNMENT OF THE DISTRICT OF COLUMBIA EXECUTIVE OFFICE OF THE MAYOR**

**MARGRET NEDELKOFF KELLEMS**
Deputy Mayor for Public Safety and Justice

February 22, 2001

Richard M. Stana
Director, Justice Issues
United States General Accounting Office
441 G Street, NW
Washington, DC 20001

Dear Mr. Stana:

Thank you for the opportunity to comment on your draft report entitled, "D.C. Criminal Justice System: Better Coordination Needed Among Participating Agencies." Because I believe that your report accurately describes the numerous criminal justice agencies in the District of Columbia, their overlapping jurisdictions, and the consequent coordination problems associated with the current structure, I have opted to limit my comments to the substance of your recommendation.

**1449-502096**

0046- 123

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

I believe that your assessment of the largest barrier to more effective criminal justice responses in the District is fundamentally sound. Improved public safety outcomes and management within the District requires improved coordination among local and federal criminal justice agencies. The report points out that one major reason for the current state of coordination is "that the costs of coordinating activities and taking corrective actions may fall on one or more federally funded agencies, while any savings may accrue to one or more D.C. funded agencies, or vice versa."

The report also notes that there is no single oversight body to which all of the criminal justice agencies in the District respond. The mix of locally and federally funded agencies in the District creates a criminal justice system with distinct funding and reporting structures. A related point, which is not explicitly stated in the document, is that these distinct funding and reporting structures reflect the latent political structure in the District. The distinct funding and reporting structures represent distinct political constituencies to which the criminal justice agencies are accountable. Whereas, local criminal justice agencies are ultimately accountable to the Mayor and therefore the citizenry, federal agencies must respond to the direction of the Attorney General, whose mandate is influenced by a broader public. This structure creates an asymmetry in the political constituencies and therefore the incentives to which locally and federally funded agencies must respond. This is not to say that federal agencies are not responsive to local constituencies in the District. To be sure, there are numerous examples of federal criminal justice agencies making extraordinary efforts to accommodate local communities. Nevertheless, this asymmetry in constituencies represents another potential barrier to coordination in the District.

To increase the coordination among agencies, you recommend that Congress consider the following: 1) funding a new independent entity with its own staff to help coordinate the operations of the D.C. criminal justice system; 2) requiring that the CJCC report to Congress, the Attorney General, and the D.C. Mayor; and 3) requiring that this new independent entity review all D.C. criminal justice initiatives that could involve multiple agencies to ensure unity of purpose.

As chair of the CJCC, Mayor Williams is fully committed to efforts to build strong relationships and increase coordination among criminal justice agencies in the District. He recognizes the challenges in our system and is committed to resolving them so that the citizens of the city receive the highest quality administration of justice. In light of that, I commend your recommendation to create an agency that has the leverage to promote reform. I note, however, that the entity you describe has clear limitations. Although the reporting requirement would carry the force of increased public scrutiny of criminal justice agencies, the new body would have no more formal authority to compel agencies to cooperate than does the current CJCC. It would still be the case that the success of the agency to a large extent would fall outside of its own internal capacity and that implementing coordinated efforts would ultimately fall upon the local agencies.

To the extent that this new entity will succeed, it will depend on how well it is able to overcome the obstacles you mention: the cost of coordination and the uneven distribution of benefits. Obviously, additional staff resources in the new entity represent one potential way to overcome some of the costs of coordination. It has been my experience, however, that to the extent that reforms have taken root in the District through the CJCC, it has been not only because of coordination resources, but equally because the member agencies have felt ownership over the body. As reporting to the new entity you describe becomes a requirement, criminal justice agencies might perceive it to be threatening and respond on a perfunctory basis. Nonetheless, I concur in your basic premise that there must be a coordinating organization and that it must have dedicated resources.

Again, I appreciate the opportunity to provide comments on your report, and I thank the members of your team who worked long and hard to collect and analyze so much information about the District's justice system. Their findings, their insights, and their research will be of tremendous benefit to the justice community as we work to achieve meaningful and lasting reforms in our system.

Sincerely,

Margret Nedelkoff Kellems

Deputy Mayor for Public Safety and Justice

**APPENDIX-X:**

**1449-502097**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Comments From the D.C. Metropolitan Police Department**

**GOVERNMENT OF THE DISTRICT OF COLUMBIA METROPOLITAN POLICE DEPARTMENT**

February 27, 2001

Richard M. Stana, Director
Justice Issues
United States General Accounting Office
Washington, D.C. 20548

Dear Mr. Stana:

The Metropolitan Police Department has reviewed your draft report on the D.C. Criminal Justice System. We find it to be accurate.

I appreciate you highlighting the papering process with the U.S. Attorney. In addition to the cost of this process in terms of officer time, it may also act as a deterrent to officers for making lower level arrests.

I have a great deal of respect for the men and women of the U.S. Attorney Office and know that we can work together to improve the criminal justice system in the District of Columbia.

Thank you for the good work.

Sincerely,

Charles H. Ramsey,
Chief of Police

P.O. Box 1606, Washington, D.C. 20013-1606

**Appendix XI—Comments From D.C. Superior Court**

**Superior Court of the District of Columbia Washington, D.C. 20001**

(202) 879-1600

Rufus King, III, Chief Judge

Superior Court of D.C.

Washington, DC 20001-2131

Facsimile: (202) 879-7830

February 20, 2001

Richard M. Stana, Director, Justice Issues
General Accounting Office
Washington, DC 20548
(C/o Mark Tremba by facsimile, No. (202) 512-8692

Re: D.C. Criminal Justice System: Better Coordination Needed Among Participating Agencies.

Dear Mr. Stana,

The Superior Court is grateful for the opportunity to review the Draft Report of the GAO on the D.C. Criminal Justice System. It is clear that no effort was spared to provide a thorough and constructive description of the system and to identify areas where improvements may be made. The work of the GAO provides a helpful guide to the court and the other criminal justice agencies as they work toward a stronger system in the future.

**1449-502098**

The following are comments on the GAO Draft Report. They reflect my view that the CJCC has provided a very valuable forum for discussion of criminal justice issues. An essential characteristic of the CJCC has been that it was funded by the "Control Board", and therefore no single agency had authority over the proceedings or dictated the agenda. While the existing structure will not outlive the Control Board itself, it is important that any successor not become a "superagency" which dictates to the different criminal justice agencies what the agenda should be or how problems which involve more than one agency should be approached.

For that reason where the report points to the lack of hierarchy as a primary shortcoming of the CJCC, I have suggested instead that the lack of a hierarchical structure has been the basis for what effectiveness the Council has achieved. The most important thing to preserve in any newly constituted council is that it remain a council of independent agencies who are able to recognize their responsibilities to different funding authorities. Far better to risk some lack of progress on some of the more contentious issues than to kill off the spirit of cooperation which has enabled the Council to accomplish the several successful efforts so far. Moreover, by encouraging a coordinated approach to any budget requirements of multi agency projects, Congress can help eliminate the biggest impediment to cooperation, even on the more contentious projects. For example, Congress could signal its approval for all agencies to try to agree on the funding which would be necessary for the US Attorney's Office and the MPD to implement a change in the papering process.

I hope these comments are helpful, and I look forward to working on the many suggestions contained in the report.

Sincerely,

Rufus King, III

Chief Judge

The specific comments reflecting the foregoing views are attached.

### Appendix XII—Comments From the U.S. Attorney for D.C.

#### U.S. Department of Justice

United States Attorney

*District of Columbia*

*Judiciary Center*

*555 Fourth St. N.W.*

*Washington, D.C. 20001*

March 6, 2001

Mr. Richard M. Stana
Director, Justice Issues
United States General Accounting Office
Washington, D.C. 20548

Dear Mr. Stana:

I am submitting, at Mark Tremba's request, this amended version of the letter I submitted on February 22, 2001. Per Mr. Tremba's instructions, I have omitted the technical changes that I recommended in the earlier letter, which I understand have been incorporated into the final report. The following are my substantive comments on your draft report.

. On page 27, the report reads:

In the past, several attempts have been made to change the initial stages of case processing in D.C. These efforts -- which were made by MPDC, Corporation Counsel, and USAO, in conjunction with consulting firms -- involved projects in the areas of night papering, night court, and officerless papering. However, the involved agencies never

**1449-502099**

0046- 126

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 200:

reached agreement on all components of the projects, and each of the projects was ultimately suspended. The Chief of MPDC has publicly advocated the establishment of some type of arrangement for making charging decisions during the evening and/or night police shifts.

Night Papering

The report is inaccurate in its suggestion that night papering was never implemented in the District of Columbia. In fact, at MPD's request, this Office implemented and staffed night papering for four years -- from January 1986 to December 1989. The Office ultimately abandoned the program when it became clear that the number of cases papered during the expanded hours did not justify the necessary commitment of staff and resources from our Office and the Superior Court. That cost-benefit analysis and an explanation of the practical problems of papering cases after business hours were described in an October 11, 1995, letter from then United States Attorney Eric H. Holder, Jr., to John Hill, Executive Director of the D.C. Financial Responsibility and Management Assistance Authority (copy enclosed). To ensure completeness and accuracy, this historical perspective should be reflected in the report.

In addition, by referring solely to Chief Charles Ramsey's public advocacy of night papering, the report paints an incomplete picture of the more recent resurgence of the night papering concept. As the enclosed correspondence reflects, by letter dated August 30, 2000, I responded to Chief Charles Ramsey's August 25, 2000, letter to me on the subject by expressing certain concerns regarding the proposal and suggesting that a meeting be convened to discuss its costs and benefits. ("I suggest that we meet as soon as possible to discuss this matter further.") I received no response to either the letter or the suggestion for a meeting to discuss night papering. Accordingly, we request that you expand on your observation on page 27 that "the Chief of MPDC has publicly advocated" the concept, by adding the following: "While the U.S. Attorney has expressed concern -- based, in part, on her Office's prior experience with night papering -- regarding the efficacy of the proposal, she has nevertheless expressed to MPD a willingness to discuss the subject on its merits. To date, the Chief of Police has not responded to the U.S. Attorney's offer to discuss the feasibility of night papering."

Officerless Papering

The report makes numerous references to "officerless papering," the practice of papering a case without a face-to-face meeting between the arresting officer and the prosecutor screening the case. n1 On page 4, the report cites efforts in 1998 and 1999 to change the case processing system and implement officerless papering, and explains that such efforts failed because of the allocation among the relevant agencies of the "costs" of adopting such a procedure.

It is not accurate to say that budgetary "costs" are either a factor in this Office's consideration of officerless papering or a reason that the current practice requires officer interviews at the intake stage. Rather, there are a number of practical reasons -- completely unrelated to "costs" -- why officer interviews are necessary in the majority of criminal cases and why officerless papering has not yet been implemented for any cases in this jurisdiction.

First, it bears reminding that the purpose of the officer interviews at the intake stage is to ensure that the USAO screener has all the information necessary to make an informed and responsible papering decision. That information includes: (1) the facts surrounding the arrest; (2) the circumstances relating to potential suppression issues -- such as the factual basis for a Terry stop or a car search; (3) the substance of a defendant's post-arrest

statements; and (4) the results of tests performed on guns or drugs that were seized from arrested subjects. Without that information -- in accurate and complete form -- we cannot be confident that we are making fair and sound papering decisions, and that we are bringing prosecutions only against those defendants for whom we have a prosecutable case. n2

Second, we have not historically received police paperwork that is sufficiently complete and accurate to obviate the need for officer interviews. This problem goes beyond typographical errors that can be alleviated through automation, as discussed on pages 23-24 of the report, to deficiencies in the substance of the written police report. According to your report, we no-papered eight percent of the arrests between November 1999 and June 2000 because of problems with the police and their paperwork (page 23). Undoubtedly, that number would be significantly higher if the arresting officers were not present to make up for the failings of the paperwork.

Third, there are aspects of our criminal justice system that pose obstacles to officerless papering that are not found in other systems around the country. Unlike Philadelphia, whose system your report cites as an example worth emulating, the District of Columbia requires that an officer swear to a Gerstein statement of the facts prior to presentment on the charge, a function that currently is performed only at the District of Columbia Superior Court. Also, we focus more attention than other systems on evaluating cases, identifying those with questionable merit and weeding them out of the system at the intake stage. While these efforts might necessitate face-to-face interaction with the arresting officers at the intake stage, they are critical for streamlining the process.

Fourth, another practical obstacle is the lack of a reliable communications system whereby our prosecutors could contact an arresting officer for clarification about paperwork the officer produced. According to page 26 of your report, prosecutors in Philadelphia review arrest paperwork electronically and simply contact the officer when clarification or missing information is needed. Such a procedure works only if the police department can arrange for that communication. At this point, MPD does not have all its members on a unitary communication system by which we could reliably contact officers with papering questions.

Lastly, it is important to note that, despite the report's observation on page 26 that "there is currently no [officerless papering] pilot planned for misdemeanors prosecuted by USAO," this Office has made concerted efforts to coordinate such a pilot project with MPD. In 1998, a group of supervisors in this Office began meeting with MPD personnel to discuss undertaking such a pilot project. In 1999, we took steps towards initiating a pilot officerless papering project with MPD in shoplifting and prostitution cases. As part of the project, our intake supervisors evaluated the paperwork in those two categories of misdemeanor cases and provided written comments to MPD on each case we reviewed. The agreement that we had with MPD was that MPD would use these written comments about the deficiencies we identified in the paperwork to develop training about paperwork preparation. MPD ultimately did not act on our comments or develop the training that would have ensured the uniformly reliable paperwork that is a prerequisite for officerless papering. Accordingly, the project has stalled. As we have maintained from the outset, if police paperwork can be prepared in a way that it provides the information we need to handle cases effectively, and a reliable means of contacting officers for follow-up questions can be instituted, then officerless papering could be a viable option in certain types of cases. n3

I assume that your report was referring to this project when it explained on page 30 that CJCC attempted to assist MPD, the USAO and Corporation Counsel in a project in 1998 and 1999, but that the "USAO would not agree to participate in the project unless certain

conditions were met, and the project was ultimately suspended." In light of the foregoing explanation of the project and the efforts we took to lay the groundwork for a workable officerless papering system, it is neither accurate nor fair to attribute the failure of the project to our unwillingness to "participate in the project unless certain conditions were met." We participated fully, and the project never materialized because our legitimate recommendations for addressing the deficiencies of police paperwork were never addressed by MPD.

. On page 21, you provide statistics that appear to reflect the amount of time that police officers spent in papering in 1999. In fact, there is not a mechanism in place to ensure the accuracy of those statistics. Officers who are required to paper a case often have other court appearances as well, which may account for some of the time recorded by MPD as time spent in papering. We are working with MPD to establish a system, including the presence of a Sergeant in our intake office, to track and minimize the amount of actual time that an officer spends in papering.

. The Proposed Independent Entity

This Office has been an enthusiastic participant in the CJCC and joins in all efforts to improve coordination among all the agencies in the criminal justice system, such as the working group that is chaired by the Chief Judge, and includes MPD, Court Services, and others, that continually reviews and recommends ways to streamline the intake/initial appearance process. We believe that this cooperation and coordination will enhance our criminal justice system and permit all agencies to better perform their jobs.

However, I have some concern about your proposal that Congress "consider requiring that all D.C. criminal justice initiatives that could potentially involve more than one agency be coordinated through the new independent entity" that would succeed the CJCC (pages 6, 35). While I agree that coordination through a central body is appropriate for those broad initiatives that have major implications for multiple agencies in the system, I question whether such review is necessary for all initiatives that could *potentially* involve more than one agency. Given the interrelatedness of the agencies in our system, it is difficult to think of any initiative -- no matter how limited in scope or application -- that would not fit that definition and require review by that entity. As such, I am concerned that such a requirement would be counterproductive, as it would hamstring each agency's ability to implement policies and practices within its appropriate sphere of activity. It would be the better course to propose that Congress simply recommend that this entity review all initiatives that have a significant impact on multiple agencies in the criminal justice system.

n1 There are many references to officerless papering in the report, including on pages 4, 22, 26, 27-28, 29 and 30.

n2 The report correctly explains that this Office on occasion declines prosecution in cases where the police paperwork may establish evidence of probable cause, because we determine it unlikely that the evidence will satisfy the "beyond a reasonable doubt" standard for conviction at trial. However, it is not accurate to say that we decline those cases because "the prosecutor's goal is to prevail in those cases selected for prosecution" (page 22). Rather, our prosecutors make such decisions because they are ethically bound by the District of Columbia rules and the United States Attorneys' Manual to initiate a prosecution only when we have a reasonable belief that we will be able to prove the case beyond a reasonable doubt.

n3 Having the necessary information at intake is particularly important in misdemeanor cases, since the judges in Superior Court do not conduct pretrial hearings in those cases and we do not generally conduct witness conferences with MPD officers prior to the trial date -- an effort on our part to conserve the use of officer time. As a result, we need to obtain sufficient information at the time of intake -- such as whether the defendant made

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

any statements, whether any evidence was seized and who seized it -- in order to provide discovery to the defense and to prepare for trial.

I trust that you will find these comments helpful. Please feel free to contact me at (202) 514-6600 if you would like additional information.

Sincerely,

Wilma A. Lewis

United States Attorney

### Appendix XII—Comments From the D.C. Corporation Counsel

### GOVERNMENT OF THE DISTRICT OF COLUMBIA

**Office of the Corporation Counsel**

**Judiciary Square**

**441 Fourth Street, N.W.**

**Washington, D.C. 20001**

**Public Protection and Enforcement**

February 27, 2001

Richard M. Stana
Director, Justice Issues
United States General Accounting Office
441 4th Street, N.W.
Washington, D.C. 20548

Dear Mr. Stana:

Thank you for the opportunity to review and provide comments on the GAO draft report on the D.C. Criminal Justice System. The Office of the Corporation Counsel fully supports interagency coordination within the D.C. criminal justice system and the work of the Criminal Justice Coordinating Council. The Office will continue to work with local, federal, and private partners in an effort to identify systemic problems, to promote efficiency within the system without compromising due process, and to develop a coordinated approach to addressing problem areas by balancing competing institutional interests.

The attached editorial comments are offered for purposes of clarity and accuracy. If you have any questions please contact Sharon Styles-Anderson, Senior Deputy for Public Protection and Enforcement on (202) 727-6247.

Sincerely yours,

ROBERT R. RIGSBY
Corporation Counsel

BY: Sharon Styles-Anderson
Senior Deputy Corporation Counsel

RRR/ssa

Attachment

**1449-502103**

0046- 130

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

441 Fourth Street, N.W. 4th Floor North, Suite 460, Washington, D.C. 20001 (202) 727-3500 Fax (202) 727-6546

## Appendix XIV--Comments From the D.C. Corrections Trustee

### District of Columbia

### Office of the Corrections Trustee

John L. Clark
Corrections Trustee

800 K Street, NW, Suite 450

Washington, D.C. 20001

March 12, 2001

Richard M. Stana, Director
Justice Issues
United States General Accounting Office
Washington, D.C. 20548
Attn: William Jenkins
Fax No. (202) 512-8692 Phone No. (202) 512-8757

Re: Agency comments on draft GAO report "D.C. Criminal Justice System: Better Coordination Needed Among Participating Agencies"

Dear Mr. Stana:

Thank you for the opportunity to review and comment on your draft report. The report addresses several significant issues and recommends actions which I fully support, especially your recommendation that ongoing funding and administrative support should be provided so that the D.C. Criminal Justice Coordinating Council (CJCC) can more effectively carry out its important role.

I have previously forwarded both my general comments and a list of detailed suggestions to improve your draft report. As I noted at that time, my comments were designed primarily for your agency's internal use to assist you in implementing the substance of my major concerns. I was quite pleased to learn today from your staff that all my comments were carefully considered, and that the bulk of them was incorporated, at least in substance, in your latest revision.

I look forward with great interest to reading your final report.

Sincerely,

John L. Clark

Corrections Trustee

## Appendix XV--Comments From the Public Defender Service for D.C.

PUBLIC DEFENDER SERVICE

BOARD OF TRUSTEES

ANGELA JORDAN DAVIS CHAIRPERSON
JOHN PAYTON VICE CHAIRPERSON
JOE ROBERT CALDWELL, JR.
EMILIO W. CIVIDANES
FATHER RUSSELL L. DILLIARD
MICHAEL J. MADIGAN
WILLIAM W. TAYLOR, III

**1449-502104**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

NANCY MARIA WARE

FOR THE DISTRICT OF COLUMBIA

633 INDIANA AVENUE, N.W.

WASHINGTON, D.C. 20004

(202) 628-1200

(800) 341-2582

FAX (202) 626-8423

CYNTHIA E. JONES DIRECTOR

S. PAMELA GRAY

DEPUTY DIRECTOR

February 28, 2001

Richard M. Stana
Director, Justice Issues
C/O Mark Tremba
United States General Accounting Office
441 G Street N.W.
Room 2A38
Washington, D.C. 20548

Dear Mr. Stana:

   Attached, please find edits we have made to the draft report, D.C. Criminal Justice System: Better Coordination Needed Among Participating Agencies. Most of the edits made can be found in appendices IV, V and VI of the report. Many edits may be viewed as stylistic; others are more substantive and either represent language we recommend you incorporate to make the report more clear or indicate what we believe to be errors requiring correction. Because the number of these types of edits is too great to itemize in this cover letter, we have simply attached the entire report with our edits/comments for your review.

   More importantly, however, we embrace the recommendations contained in the report calling for the funding of an independent CJCC. As a CJCC representative, I can attest to the value of the function and believe that the type of independent coordination made possible by the existence of the CJCC allows each agency to look beyond "stove-pipe" interests. I would however, recommend that you change one term found on page 35 of the report under the heading "matters for Congressional Consideration" appearing within the first bulleted paragraph. Instead of the CJCC coordinating "operations" I would recommend that the term "identify" be added between the terms "help" and "coordinate" and that the term "operations" be changed to "efforts" so that it remains clear that each director of a D.C. criminal justice entity remain responsible for the coordination of operations within each agency. I also want to make certain that the term "U.S. Code" appearing in the first sentence of the first bulleted paragraph on page 10 be removed as we know of no circumstances under which the Criminal Division of Superior Court would process such matters.

   Due to the delay in our returning the document to your office, I will make every effort to ensure that any additional information you require be provided as quickly as possible. Therefore, please do not hesitate to speak with Gabe Chikes, Chief Administrative Officer, regarding any clarification of our comments or request for additional information. Mr. Chikes may be reached on 202-626-8400.

**AN EQUAL OPPORTUNITY EMPLOYER**

   We appreciate all your efforts in preparing this document and hope that it will lead to meaningful improvements in the District's criminal justice system.

   Sincerely,

   Cynthia E. Jones

**1449-502105**

0046- 132

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

Director

Enclosed: Edited version of D.C. Criminal Justice System: Better Coordination Needed Among Participating Agencies

## Appendix XVI: Comments From the D.C. Pretrial Services Agency

### DISTRICT OF COLUMBIA PRETRIAL SERVICES AGENCY

### 633 INDIANA AVENUE, N.W., SUITE 1120

### WASHINGTON, DC 20004-2903

### (202) 220-5500 * Fax: (202) 220-5655

**SUSAN W. SHAFFER, ESQ.**

**Director**

**PETER A. KRAUTHAMER, ESQ.**

**Deputy Director**

February 27, 2001

Richard M. Stana, Director, Justice Issues
General Accounting Office
Washington, D.C. 20548

Re: D.C. Criminal Justice System:

Better Coordination Needed Among Participating Agencies

Dear Mr. Stana,

The Pretrial Services Agency is very appreciative of the work that went into the GAO's Draft Report on the District of Columbia's criminal justice system. Your staff did a very thorough job of reviewing and analyzing a tremendous amount of material and talking with agencies to ensure a thorough understanding of a myriad number of interrelated issues that impact the functioning of our somewhat unique criminal justice system. Because I was out of town when comments were due, I conveyed a considerable number of editorial suggestions to Mark Tremba by telephone last week, and I appreciate his patience as we went through the report together for what must have been a two-hour phone call.

I am very pleased that your staff recognized the importance of funding an independent CJCC to help coordinate the operations of the D.C. criminal justice system. It is imperative, as you recognized, that the CJCC retain its identity as an independent body with no formal organizational or funding link to any of its participating members. As the Director of a relatively small agency, I particularly appreciate the importance of having a mechanism to ensure that all voices are heard before action is taken that could impact the larger criminal justice system. I am not entirely comfortable with, because I do not fully understand, the recommendation that the CJCC would "ensure that participating agencies share common goals for each initiative, concur on each agency's role, and agree on measures of success." As you can no doubt surmise from the draft report, it is not always the case that all agencies will have common goals for every initiative, nor should that be required. What is important is that every voice be heard before decisions are made. The strength of the CJCC has been that all the relevant agencies are at the table sharing ideas and discussing strategies to address issues of concern to the criminal justice community. That exchange has been invaluable.

### EXECUTIVE COMMITTEE

**HONORABLE ANNICE M. WAGNER, Chief Judge, District of Columbia Court of Appeals, Chair *
HONORABLE HARRY T. EDWARDS, Chief Judge, United States Court of Appeals for the District of
Columbia Circuit * HONORABLE RUFUS G. KING, III, Chief Judge, Superior Court of the District of
Columbia * HONORABLE NORMA HOLLOWAY JOHNSON, Chief Judge, United States District Court for
the District of Columbia * JASPER ORMOND, Interim Director, Court Services and Offender Supervision**

**1449-502106**

GAO Report D.C. CRIMINAL JUSTICE SYSTEM March 30, 2001

**Agency * WILMA A. LEWIS, ESQ., United States Attorney * CYNTHIA E. JONES, ESQ., Director, Public Defender Service**

Again, thank you, and I look forward to collaborating on the many excellent suggestions contained in the report.

Sincerely,

Susan W. Shaffer

**1449-502107**

0046- 134