## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
CARL A. BARNES, *et al.*,                )
                                        )
        Plaintiffs,                      )
                                        )
v.                                       )        Civil Action No. 06-315 (RCL)
                                        )
DISTRICT OF COLUMBIA,                    )
                                        )
        Defendant.                       )
_____)


## <u>MEMORANDUM OPINION</u>

This is a case in which history insists on repeating itself. The subject matter is virtually identical to a prior case before this Court, the arguments are the same, even the same procedural defaults have been made. If the past is prologue, then the result here must be predictable. Before the Court is the District of Columbia's Motion [14] to Dismiss, or in the alternative, its Motion [15] for Summary Judgment, and its Motion [26] for an extension of time to respond to plaintiffs' motion for class certification. As explained more fully below, all of these motions are DENIED, and the plaintiffs' Motion [7] for Class Certification is GRANTED, with the result that the Court certifies this action as a hybrid class action. Finally, plaintiffs' Motions [24 & 30] for Discovery are DENIED as moot.

### I. Background

This case is directly linked to one that previously came before this Court, *Bynum v. District of Columbia*, Civil Action No. 02-956 (RCL). In that case the Court certified a class of some 4,000 former prisoners of the District of Columbia's Department of Corrections ("D.O.C.")

who alleged they had been detained by D.O.C. beyond the point at which their release had been ordered, for periods ranging from an extra day to many days or even months on end.  Also certified was a class of former prisoners who alleged that they were subjected to strip searches after their release had been ordered.  The Court certified an "Overdetention Class" and a "Strip Search Class" representing both types of claimants, which overlapped a great deal, and denied motions by the District to dismiss and for summary judgment.  The parties reached a settlement of that case in August of 2005, which the Court approved in January, 2006.

The problem in *Bynum*, as alleged by plaintiffs in that case and this one, was that "court releases," inmates who were entitled to release after a court appearance, were typically taken from court to the Central Detention Facility ("D.C. Jail") or the Correctional Treatment Facility ("CTF") to await the administrative processing of their release, often called "out-processing."[1] This process, which apparently involves ministerial tasks such as acquiring the release order, checking a prisoner's record to make sure there was no other warrant or order that would justify continued detention, retrieving a prisoner's personal property, and the like.  The class members in *Bynum* were all held at least past midnight on the day their release was ordered, and frequently one day of overdetention turned into two, or a week, or even more.  Because these prisoners were returned to the general population while they awaited outprocessing, they were subjected to strip searches, sometimes multiple times, as it appears that the D.O.C. policy is to strip search everyone who enters the general population from outside.  *See* Second Amended Complaint ("2AC") at ¶¶ 4, 13 [12]; Defendant's Mem. in Support of Motion to Dismiss [14] at 4.

---

[1]The allegations in *Bynum*, and this case, also occasionally involved D.O.C.-run halfway houses throughout the District.

In August of 2005, as *Bynum* neared settlement, D.O.C. adopted a policy of diverting in-custody defendants who had been ordered released or who were otherwise entitled to release to a holding facility on the grounds of D.C. General Hospital. 2AC ¶ 40. D.O.C. administered outprocessing there instead of at D.C. Jail or the CTF, which meant that inmates were not subjected to strip searches absent some individualized suspicion. *Id.* But sometime around December 2005, the cracks in this system began to widen, with more and more inmates who were entitled to release slipping through and being returned to D.C. Jail or the CTF. Once there, they encountered the same dance with D.O.C. that arose in *Bynum*: inmates entitled to release were not released until the next day, or sometimes days or even weeks later, and inmates who were entitled to release were forced to undergo strip searches. The named plaintiffs – who allege they were detained for anywhere from four to 29 days after their release dates – identify almost forty other individuals who were overdetained, strip searched, or both, and allege there are potentially hundreds of other inmates who were subjected to the same treatment.[2]

According to plaintiffs, the recurrence of the overdetention and strip search issues is due to many factors, including computer problems and "the deliberate indifference of the acting warden Patricia Britton and the acting director Elwood York and the resignation of competent managers from the Records Office and the failure to replace them." 2AC ¶ 42. They also allege that D.O.C. staff reported the problems up the chain of command, but that superiors "are disregarding the problem and acquiescing in the current overdetention and strip search problem."

_____

[2]This is not the only case alleging that D.O.C.'s problems resurfaced in the fall of 2005. In *Simmons v. District of Columbia*, Civil Action No. 07-493 (JR), an individual plaintiff has sued the District, alleging, among other things, that he was detained for several weeks after a judge ordered his release, and was subjected to a body cavity search during that time.

2AC ¶¶ 43, 44.

Plaintiffs brought this suit under 42 U.S.C. § 1983, alleging that the overdetention violates the Fourth, Fifth, and Eighth Amendments, while the strip searches violate the Fourth and Fifth Amendments. 2AC ¶¶ 3, 4. They allege that District administrators and policymakers were deliberately indifferent to the rights of inmates while administering the maintenance of inmate records and in imposing the strip search policy. They also allege that it is the practice and custom of the District to overdetain inmates. *Id.* ¶¶ 79-82. Plaintiffs seek damages and declaratory and injunctive relief.

## II. Motion to Dismiss

### A. Alternative Motion for Summary Judgment

The District has moved [14] to dismiss for failure to state a claim, or, in the alternative, for summary judgment. [15] The decision of whether to convert a motion to dismiss to one for summary judgment rests in the discretion of the court. The only extraneous matter the District submitted was an affidavit from a D.O.C. employee which, as plaintiffs point out, suffers from several evidentiary deficiencies. More importantly, this case is at far too early of a state for summary judgment to be appropriate. There has been no discovery and the record is thin.

In *Bynum* summary judgment was rejected where, as here, "it would be premature to consider a motion for summary judgment when the discovery process, which has apparently not even commenced, might yield additional facts that would guide the Court's decision as to the merits of plaintiffs' strip search claims." *Bynum v. District of Columbia*, 215 F.R.D. 1, 4 (D.D.C. 2003). As then, it is still the general rule that "decision by summary judgment is disfavored when additional development of facts might illuminate the issues of law requiring

decision." *Nixon v. Freeman*, 670 F.2d 346, 362 (D.C. Cir. 1982). Nearly every issue in this case would benefit from illumination via the discovery process: the causes for and extent of delayed release, the nature of the strip search policy, where and with whom these problems originated, and a host of other factors the Court must consider are all dependent on facts that have not been developed. For this reason the Court will not treat the District's motion as one for summary judgment, but rather as a motion to dismiss for failure to state a claim, and the Motion [15] for Summary Judgment is DENIED.

**B.  Standard on 12(b)(6) Motion**

When a Rule 12(b)(6) motion is at hand, plaintiffs' factual allegations are presumed true and construed liberally in their favor. *See Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002), *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000), *Alexander v. FBI*, 971 F.Supp. 603, 608 (D.D.C. 1997). "The complaint should be dismissed only if it appears beyond doubt that, under any reasonable pleading, plaintiffs will be unable to prove any set of facts that would justify relief." *Bynum v. District of Columbia*, 257 F.Supp. 2d 1, 1 (D.D.C. 2002).

Plaintiffs bring their claims under § 1983 of the Civil Rights Act of 1871, which creates liability for "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Supreme Court laid out the standard for municipal liability under § 1983 in *Monell v. Department of Social Services*, 436 U.S. 658 (1978): "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that

is alleged to be unconstitutional implements or executes a policy statement, ordinance,

regulation, or decision officially adopted and promulgated by that body's officers," which can

include "constitutional deprivations visited pursuant to governmental 'custom' even though such

a custom has not received formal approval through the body's official decisionmaking channels."

*Id.* at 690; *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970) (discussing

liability predicated on municipal "custom" or practice).

Thus "the plaintiff must prove that the District of Columbia has a 'custom or practice that

is the moving force behind the alleged . . . violations.'" *Zearley v. Ackerman*, 116 F.Supp. 2d

109, 114 (D.D.C. 2000) (quoting *Walker v. District of Columbia*, 969 F.Supp. 794, 797 (D.D.C.

1997)). "Although *Monell* allows claims based upon a well-settled municipal custom, plaintiff

must 'show fault on the part of the city based on a course its policymakers consciously chose to

pursue.'" *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (internal citation

omitted) (quoting *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986). As set

forth by the Court of Appeals for this Circuit:

> The court must determine whether plaintiff has alleged an 'affirmative link,' such that a
> municipal policy was the 'moving force' behind the constitutional violation.  There are a
> number of ways in which a 'policy' can be set by a municipality to cause it to be liable
> under § 1983: the explicit setting of a policy by the government that violates the
> Constitution, the action of a policy maker within the government, the adoption through a
> knowing failure to act by a policy maker of actions by his subordinates that are so
> consistent that they have become 'custom,' or the failure of the government to respond to
> a need (for example, training of employees) in such a manner as to show 'deliberate
> indifference' to the risk that not addressing the need will result in constitutional
> violations.

*Baker v. District of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003) (internal citations

omitted).

**C. Application to Plaintiffs' Claims**

**1. Overdetention**

Plaintiffs allege that the District's conduct amounts to a policy of deliberate indifference to their constitutional rights when it comes to processing the release of court-returned inmates, resulting in inmates being detained past the day on which they are entitled to release, and sometimes much longer. There is a substantial body of law in support of the proposition that a plaintiff who alleges overdetention, sometimes even for a very short period, states a claim for constitutional violations. *See, e.g., Berry v. Baca*, 379 F.3d 764 (9th Cir. 2004); *Lewis v. O'Grady*, 853 F.2d 136 (7th Cir. 1988); *Jones v. Cochran*, 1994 U.S. Dist. LEXIS 20625 (S.D. Fla. 1994); *Parilla v. Eslinger*, 2005 U.S. Dist. LEXIS 34747 (M.D. Fla. 2005); *Arline v. City of Jacksonville*, 359 F.Supp. 2d 1300, 1309-10 (M.D. Fla. 2005).

As in *Bynum*, the District counters only with the excuse that some delays are inevitable due to administrative needs. But evaluating the factors that contribute to delay "are issues of fact, however, not matters of law." *Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004). The record has not been developed to the point where these issues can be addressed. Further, the District is essentially arguing for a rule that certain delays, at least those of a day or two, are per se reasonable. Yet it remains the case that "[c]ourts have not settled on any concrete number of permissible hours of delay in the context of post-release detentions." *Berry*, 379 F.3d at 771. The operative word there is "hours": the great weight of precedent suggests that release must occur within a matter of hours after the right to it accrues, and that after some period of hours – not days – a presumption of unreasonableness, and thus unconstitutionality, will set in.

The District continues to mistakenly rely on *County of Riverside v. McLaughlin*, 500 U.S.

7

44 (1991) as allowing it a 48-hour window in which to tend to administrative matters.  In *McLaughlin* the Court ruled that delays of 48 hours or more between arrest and a probable cause hearing were presumptively unreasonable, and that defendants whose hearings took place less than 48 hours after arrest had to establish unreasonableness on a case-by-case basis.  In the case of probable cause hearings, the administrative burdens on the state are far greater than in this case, and the societal interest at issue – determining whether there is probable cause that a crime has been committed – is far greater than the societal interest in a case like this.  In a case such as this, the *only* societal interests that justify delay are ensuring that prisoners are not released if they have other detainers or warrants, and efficient marshaling of scarce resources.  Furthermore, at issue in *McLaughlin* was the procedural, albeit very important, right to a prompt probable cause hearing.  In a case such as this one, the issue is the prisoner's *absolute* right to freedom.  For these reasons, the point at which overdetention becomes presumptively unreasonable is likely to fall well short of the 48-hour window in *McLaughlin*.  *See Berry*, 379 F.3d at 771-73 (analyzing *McLaughlin* in the context of overdetention); *Brass v. County of Los Angeles*, 328 F.3d 1192 (9th Cir. 2003) (same); *Lewis v. O'Grady*, 853 F.2d 1366 (7th Cir. 1988) (rejecting possibility that there can be a per se reasonable period in overdetention cases).

        Plaintiffs assert that overdetention violates the Fourth, Fifth, and Eighth Amendments.  They do not explain how their factual allegations line up with the elements of these claims, but then again, they need not do so at this stage.  *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).  Most courts that have considered overdetention claims have agreed that they are properly channeled through the Due Process Clause of the Fourteenth Amendment – and the Court construes plaintiffs' invocation of the Fifth

8

Amendment as a reference to the identical provisions of the Fourteenth Amendment, which applies to the States and the District of Columbia. The Court follows those cases in holding that these plaintiffs state cognizable claims for deprivation of liberty without due process of law. *See, e.g., Cannon v. Macon County*, 1 F.3d 1558, 1562-63 (11th Cir. 1993); *Berry v. Baca*, 379 F.3d 764 (9th Cir. 2004); *Lewis v. O'Grady*, 853 F.2d 136 (7th Cir. 1988); *Jones v. Cochran*, 1994 U.S. Dist. LEXIS 20625 (S.D. Fla. 1994); *Parilla v. Eslinger*, 2005 U.S. Dist. LEXIS 34747 (M.D. Fla. 2005); *Arline v. City of Jacksonville*, 359 F.Supp. 2d 1300, 1309-10 (M.D. Fla. 2005).

The Complaint also states a valid Fourth Amendment claim. Plaintiffs allege that, despite being entitled to release, they were taken back into custody and transported to D.C. Jail or CTF. On the face of the complaint, they allege that they essentially were re-arrested or re-seized. These allegations of Fourth Amendment violations are sufficient to survive a motion to dismiss, and further development of the record should disclose whether the seizures were reasonable. *See Arline v. City of Jacksonville*, 359 F.Supp. 2d 1300 (M.D. Fla. 2005); *Jones v. Cochran*, 1994 U.S. Dist. LEXIS 20625, at *13-17 (S.D. Fla. 1994). On the other hand, plaintiffs do not allege that overdetention was imposed as some sort of punishment, and thus do not state a claim under the Eighth Amendment.

Plaintiffs adequately allege that overdetention is the result of District custom or policy for the purposes of § 1983. They allege, in essence, that the inefficient implementation of the District's release procedures is the result of official "acquiescence in a longstanding practice or custom which constitutes the standard operation procedure of the local government entity." *Jett v. Dallas Indep. School District*, 491 U.S. 701, 737 (1989); *see also Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (municipal liability under § 1983 may be

9

founded on "inaction giving rise to or endorsing a custom"). The conduct at issue can be phrased in a variety of ways, such as "a policy of inaction [where] such inaction amounts to a failure to protect constitutional rights." *Berry*, 379 F.3d at 767 (quoting *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)). No matter how it is worded, plaintiffs have clearly alleged a policy or custom that will support municipal liability.

**2. Strip Search**

The Supreme Court has established the Fourth Amendment standard for judging the reasonableness of inmate searches, stressing that "each case requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (analyzing searches in context of prison, not jail). When essentially the same allegations as in this case were presented in *Bynum*, they were deemed sufficient to survive a motion to dismiss. *See Bynum v. District of Columbia*, 257 F. Supp. 2d 1, 2 (D.D.C. 2002). The District has not unearthed any factual distinction or change in the law that would cause the Court to revisit its prior holding.

In *Bynum*, the Court relied largely on the reasoning of *Gary v. Sheahan*, 1998 U.S. Dist. LEXIS 13378 (N.D. Ill. Aug. 20, 1998), in which a 12(b)(6) motion was denied on substantially similar facts: court returns who had been ordered released were instead returned to a central facility and strip searched. More recently, Judge Collyer of this District has noted that there is substantial precedent in other circuits for the proposition that a plaintiff states a claim for violations of the Fourth and Fourteenth Amendments by alleging that jail officials "subjected

putative class members to blanket strip searches and visual cavity searches without a reasonable individualized suspicion that the class members were concealing weapons or contraband." *Johnson v. District of Columbia*, 461 F.Supp. 2d 48, 50 (D.D.C. 2006) (Collyer, J.).

The District argues that the searches are reasonable because they are incident to detention, but does not identify the specific security concerns at issue, or why they apply to all court returns. This assumes that if detention is justified, any strip search is justified without recourse to some individualized suspicion. But several courts have declined to dismiss claims based on blanket strip search policies, whether or not the detention is justified. *See, e.g., In re: Nassau County Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006); *Skurstenis v. Jones*, 236 F.3d 678, 682 (11th Cir. 2000) (joining "every other circuit which has had occasion to review a similar policy" and holding jail's policy unconstitutional because it failed to require reasonable suspicion as a predicate to strip searches); *Doe v. Calumet City*, 754 F.Supp. 1211, 1219 n.20 (N.D. Ill. 1990) ("An indiscriminate strip search policy routinely applied to detainees . . . cannot be constitutionally justified simply on the basis of administrative ease in attending to security concerns"); *Parilla v. Eslinger*, 2005 U.S. Dist. LEXIS 34747 (M.D. Fla. 2005).

## III.  Motion for Class Certification

Plaintiffs have moved [7] for class certification, but the District has not responded, instead asking for thirty days from the time the Court rules on its dispositive motions to file a response to the class certification motion. [26]  Plaintiffs object to this request.  The sole reason the District advances for delaying its response until after dispositive motions are dealt with is that a response may be unnecessary if the Court grants the motions, and if the Court denies them, the District could better tailor its response.

11

This is precisely the justification that this Court rejected when the District declined to respond to the *Bynum* plaintiffs' motion to certify a subclass, based on the District's assumption that if the Court granted its pending summary judgment motion, the subclass certification issue would be mooted. *Bynum v. District of Columbia*, 214 F.R.D. 27, 30 (D.D.C. 2003). The Court holds today, as it did then, that "such an assumption was unwarranted, given the fact that the issue of whether to certify a class (or subclass) proceeds without an examination of the merits of the case . . .." *Id.* Further, Rule 23(c) clearly states that "as soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained."

In *Bynum* the District had eight months in which to respond to the certification motion. This Court ruled that because this was "more than enough time for defendant to have filed a brief in opposition to plaintiffs' motion to certify the subclass, and because the mandate of Rule 23(c) is clear, the Court will not brook any further delay of the certification question." *Id.* The Court denied the District's motion for a further enlargement of time and deemed it to have waived the right to file an opposition brief. *Id.* Here the District has had roughly ten months in which to oppose the certification motion, including one extension of time, and has had the instructive experience of seeing the exact position it takes here rejected in *Bynum*.

Therefore the District's Motion [26] for an extension of time is denied and the District has waived its right to brief any opposition to the certification motion. While the Local Civil Rules generally permit the Court to treat unopposed motions as conceded, *see* L.Cv.R. 7(b), the Federal Rules of Civil Procedure contemplate that the Court must find that the requirements of Rule 23 are satisfied before certifying a class. So, as it did in *Bynum*, the Court will review the

merits of the certification motion without the aid of the District's views.

The class certification determinations in this case are highly similar to those faced as to the class and subclass in *Bynum*, and the Court will refer frequently to the two opinions dealing with those issues. *See Bynum v. District of Columbia*, 214 F.R.D. 27 (D.D.C. 2003); *Bynum v. District of Columbia*, 217 F.R.D. 43 (D.D.C. 2003). It is also worth noting that *Bynum* was hardly novel. There have been a number of class actions dealing with essentially the same overdetention and strip search issues. *See, e.g., Parilla v. Eslinger*, 2005 U.S. Dist. LEXIS 34747 (M.D. Fla. 2005); *Jones v. Cochran*, 1994 U.S. Dist. LEXIS 20625 (S.D. Fla. 1994).

"The party requesting class certification under Rule 23 bears the burden of showing the existence of a class, that all the prerequisites of Rule 23(a) are satisfied, and that the class falls within one of the categories of Rule 23(b)." *Franklin v. Barry*, 909 F.Supp. 21, 30 (D.D.C. 1995) (Green, J.). While the evidence cited in support of class certification may be the same evidence plaintiffs intend to use to prove their case, the class certification analysis is not a merits inquiry. *Bynum*, 214 F.R.D. 27, 31. Plaintiffs must establish a "reasonable basis" for crediting their allegations that the requirements of Rule 23 are met. *Id.* (quoting *Wagner v. Taylor*, 836 F.2d 578, 587 (D.C. Cir. 1987) (internal quotation omitted)); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).

To certify a class under Rule 23, a court first must determine that a class exists, then must decide that the four predicates of Rule 23(a) are satisfied, and finally must find that at least one of Rule 23(b)'s provisions applies. As discussed below, each of these prerequisites has been established.

## A.  Existence of Class

"It is axiomatic that for a class action to be certified a 'class' must exist."  *Simer v. Rios*,

661 F.2d 655, 669 (7th Cir. 1981).  As explained in *Bynum*:

> [A]lthough Rule 23 of the Federal Rules of Civil Procedure does not specifically require
>
> plaintiffs to establish that a class exists, this is a common-sense requirement and courts
> routinely require it.  The requirement that a class be clearly defined is designed primarily
> to help the trial court manage the class.  It is not designed to be a particularly stringent
> test, but plaintiffs must at least be able to establish that the general outlines of the
> membership of the class are determinable at the outset of the litigation.  In other words,
> the class must be sufficiently definite that it is administratively feasible for the court to
> determine whether a particular individual is a member.

*Bynum*, 214 F.R.D. at 31 (quoting *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998)

(Friedman, J.)).

As set forth in the Second Amended Complaint, the Overdetention Class is defined as:

> Each person who has been, is, or in the future will be incarcerated in any District of
> Columbia Department of Corrections facility from September 1, 2005 forward; and who
> was not released, or, in the future, will not be released by midnight on the date on which
> the person is entitled to be released by court order or the date on which the basis for his or
> her detention has otherwise expired.

*See* 2AC at 25; Motion [7] for Class Certification at 12.  The definition of the Strip Search class

is much more lengthy:

> Each person who was, or in the future will be, from September 1, 2005, forward: (i) in the
> custody of the Department of Corrections; (ii) taken to court from a Department of
> Corrections facility; (iii) ordered released by the court or otherwise became entitled to
> release by virtue of the court appearance because the charge on which he had been held
> was no longer pending or was dismissed at the hearing, was ordered released on his own
> recognizance, or had posted bail, was sentenced to time served, was acquitted or was
> otherwise entitled to release; (iv) was not the subject of any other pending cases or cases
> which imposed any condition of release other than personal recognizance; (v) was not the
> subject of any detainer or warrant; (vi) was returned from court to the DC Jail or CTF or
> other District facility, to be processed out of Department of Corrections custody; and (vii)
> was subject to a strip search and/or visual body cavity search without any individualized

finding of reasonable suspicion or probable cause that was concealing contraband or
weapons; before being released, regardless of whether he was overdetained.

*See* 2AC at 26; Motion [7] for Class Certification at 34.

As to the Overdetention Class, its definition is identical to that used in *Bynum*, which the
Court approved because "an individual would be able to determine, simply by reading the
definition, whether he or she was a member of the proposed class." *Bynum*, 214 F.R.D. at 32.
The Court later held the same to be true of the Strip Search class in *Bynum*, which employed the
same definition proffered here. *Bynum*, 217 F.R.D. at 46. The same definitions and extremely
similar facts in this case augur the same result: none of the terms in the definitions require further
clarification or individual hearings to determine class membership, and plaintiffs have
demonstrated the existence of identifiable classes.

## B. Rule 23(a) Requirements

### 1. Numerosity

The first requirement of Rule 23(a) is that "the class is so numerous that joinder of all
members is impracticable." This prong "requires examination of the specific facts of each case
and imposes no absolute limitations." *Bynum*, 214 F.R.D. at 32 (quoting *Gen. Tel. Co. of the
Northwest, Inc. v. EEOC*, 446 U.S. 318, 33 (1980)). As the Court has noted, in most cases a
class of at least forty members presumptively satisfies the impracticability of joinder
requirement, though classes as small as twenty might be appropriate. *Id.* (citing *Consolidated
Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1993) (numerosity presumed at forty
class members)). If a plaintiff can provide a reasonable basis supporting an estimate, this will
suffice instead of an exact figure. *Bynum*, 214 F.R.D. at 32-33 (citing *Kifafi v. Hilton Hotels*

*Retirement Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999) (Kollar-Kotelly, J.); *Pigford v. Glickman*,

182 F.R.D. 341, 347 (D.D.C. 1998) (Friedman, J.); *Vargas v. Meese*, 119 F.R.D. 291, 293

(D.D.C. 1987) (Gasch, J.)).

Plaintiffs have submitted affidavits from almost forty individuals who claim to have been

overdetained, and from roughly thirty who claim to have been strip searched. This alone would

satisfy the tandem numerosity-impracticability requirements, and plaintiffs go further by positing,

as they did in *Bynum*, a rough formula by which they estimate that many more class members

will be found through discovery. With a proposed class containing thirty-some *identified*

members, with many others potentially waiting in the wings, it would be impracticable to try the

matter by joinder.

### 2. Commonality

Under Rule 23(a)(2) there must also be "questions of law or fact common to the class" for

certification to be appropriate. Commonality need not be complete; the class members do not

have to have *every* issue of law and fact in common. *See Bynum*, 214 F.R.D. at 33 (citing

*Forbush v. J.C. Penney, Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993)). If "there is some aspect or

feature of the claims which is common to all," the requirement is met. *Pendleton v. Schlesinger*,

73 F.R.D. 506, 508 (D.D.C. 1977) (Smith, J.), *aff'd*, 628 F.2d 102 (D.C. Cir. 1980). The same

common questions that were raised, and never resolved, in *Bynum* are present in this case and

satisfy the commonality requirement, such as whether the overdetention and strip search practices

were municipal policies and whether either violated the Constitution. *See Bynum*, 214 F.R.D. at

34. Regardless of any minor factual variations that might distinguish one class member from the

next, all members of each class will share those common questions.

### 3. Typicality

The class representatives are the focus of Rule 23(a)(3), which requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "The typicality requirement ensures that the claims of the representative and absent class members are sufficiently similar so that the representatives' acts are also acts on behalf of, and safeguard the interests of, the class." *Littlewolf v. Hodel*, 681 F.Supp. 929, 935 (D.D.C. 1988) (Richey, J.). The requirement, which is liberally construed, *see In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) (Hogan, C.J.), dictates that "[a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member's where his or her claims are based on the same legal theory." *Stewart v. Rubin*, 948 F.Supp. 1077, 1088 (D.D.C. 1996) (Lamberth, J.). Similarly to commonality, typicality is not destroyed simply because there are some factual variations between claims of the representatives and other class members. *See Bynum*, 214 F.R.D. at 34 (citing *Wagner v. Taylor*, 836 F.3d 578, 591 (D.C. Cir. 1987); *United States v. Trucking Employers, Inc.*, 75 F.R.D. 682, 688 (D.D.C. 1977) (Bryant, J.) (collecting cases)).

The claims here are identical to those in *Bynum*. Each plaintiff pursues the same legal theory, with no real variation, and they all allege generally similar facts, with variations only in the length of overdetention or number of cited strip searches. Typicality is satisfied here just as it was in *Bynum*. *Bynum*, 214 F.R.D. at 34-35.

### 4. Adequacy of Representation

The last requirement of Rule 23(a) is a showing that "the representative parties will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). This prong aims to

ensure that the named representatives do not have interests antagonistic to those of the class members they represent, and that they will vigorously pursue the claims of the class through qualified counsel. *Bynum*, 214 F.R.D. at 35 (citing *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997); *National Association of Regional Medical Programs, Inc. v. Mathews*, 551 F.2d 340, 345 (D.C. Cir. 1976)).

In terms of intra-class conflicts, the Court does not identify any that would imperil an adequacy finding. All class members seek substantially similar relief and, at least to date, the range of overdetention periods is relatively small, such that there is little tension between class members who might want to quickly settle small claims versus class members with potentially larger claims. *See Bynum*, 214 F.R.D. at 35-36. Finally, the adequacy of class counsel is well established. In addition to submitting affidavits setting forth the considerable experience of class counsel, both in general and in class action civil rights litigation, the qualifications of counsel are also established by their participation in *Bynum* and other class action litigation dealing with precisely the same factual, legal, and procedural questions at issue in this case. These class counsel were qualified in *Bynum*, and are even more so after that experience. *See Bynum*, 214 F.R.D. at 36-37.

## C. Rule 23(b) Requirements

Once Rule 23(a)'s requirements are met, a putative class must demonstrate that it fits under one of Rule 23(b)'s class types. Plaintiffs seek to certify both the Overdetention Class and the Strip Search Class as "hybrid classes" under both Rule 23(b)(2) and (b)(3).

### 1. Appropriateness of Equitable Relief

To certify a 23(b)(2) class for injunctive or declaratory relief, plaintiffs must demonstrate

18

that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). The provision requires "(1) that defendant's actions are 'generally applicable to the class' and (2) that plaintiffs seek final injunctive relief or corresponding declaratory relief on behalf of the class." *Bynum*, 214 F.R.D. at 37. In *Bynum*, the Court noted that it was sufficient to show that a defendant "has acted in a consistent manner toward members of the class so that his actions may be viewed as part of a pattern of activity." *Bynum*, 214 F.R.D. at 37 (quoting 7A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1775 (2d ed. 1986)); *see also Jones v. Goord*, 190 F.R.D. 103, 112 (S.D.N.Y. 1999) (certifying (b)(2) class of prisoners alleging unconstitutional practice of double-celling, "notwithstanding defendants' argument that matters such as inmate screening is done on a case-by-case basis by different prison officials at different facilities").

In this case, plaintiffs allege systemic failure that results in overdetention, and a system-wide policy of strip searches. Though each violation complained of may have its own unique facts, "the fact remains that, on the facts alleged by plaintiffs, the overdetentions [and strip searches] do not appear to be isolated instances, but instead represent part of a consistent pattern of activity on the part of defendant." *Bynum*, 214 F.R.D. at 38. The policies and practices challenged here are conduct generally applicable to the members of the class.

Rule 23(b)(2) also requires that plaintiffs seek final injunctive relief or corresponding declaratory relief. Plaintiffs do seek such relief, and any question that could be raised about the predominance of money damages claims over the claims of injunctive or declaratory relief, and the attendant risks of damage to class cohesiveness, are addressed by certifying this as a hybrid

23(b)(2) and (b)(3) class, as the Court did in *Bynum*. *Bynum*, 214 F.R.D. at 41; *see also Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997); *Taylor v. D.C. Water & Sewer Authority*, 2007 U.S. Dist. LEXIS 17737 at *43-44 (D.D.C. Mar. 13, 2007) (Kennedy, J.).

### 2. Predominance of Common Questions of Law

To certify a class for money damages under Rule 23(b)(3), the Court must find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Factors to be considered in this calculus are:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3). These considerations can be grouped along two basic lines: predominance and superiority. The first consideration duplicates the commonality analysis in many respects, delving further into an inquiry of the relative importance of the common issues to the case. *See Bynum*, 214 F.R.D. at 39. The dominant issues in this case, as in *Bynum*, go to liability – whether the overdetentions amount to an unconstitutional municipal policy and whether the strip search policy is similarly unconstitutional. *Id.* at 39-40. These issues dwarf whatever unique issues might arise at the damages stage. The common factual and legal issues in this case predominate over any issues applicable to individual members alone.

Superiority is also satisfied here. The second prong of Rule 23(b)(3) militates in favor of

20

class actions where common legal or factual questions allow a court to "consolidate otherwise identical actions into a single efficient unit." *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 12 (D.D.C. 2002) (Oberdorfer, J.) (quoting *Dellums v. Powell*, 566 F.2d 167, 189 (D.C. Cir. 1977)). In cases such as this, involving many extremely similar claims against the same defendant, class certification promises greater efficiency and consistency than serial litigation of nearly identical individual cases. The superiority of the class action device becomes all the more apparent when it is revealed that the potential damages for each award may be small, indicating that the alternative of multiple individual suits may be an impossible way of vindicating the rights at issue. *See Bynum*, 214 F.R.D. at 40; *Anderson v. Cornejo*, 199 F.R.D. 228, 243 (N.D. Ill. 2000); *Smith v. Montgomery County*, 573 F.Supp. 604, 613 (D. Md. 1983).

The manageability of the action is patent on its face: notice to class members can be achieved, in most cases, by mailing notice to the last known addresses provided by D.O.C. databases. *See Bynum*, 214 F.R.D. at 40-41. Notice proceeded relatively smoothly in the *Bynum* class action, and the claims administration in that case appears to have been proceeding with few glitches. Given the experience class counsel received in that and other cases, there is every reason to hope that manageability will be even less of a concern in this case.

For the foregoing reasons, the Court will certify this action as a hybrid (b)(2) and (b)(3) class. Specifically, the Court certifies a (b)(2) class with respect to plaintiffs' claims for injunctive and declaratory relief, and a (b)(3) class with respect to claims for monetary damages. There will be no opt-out right as to the (b)(2) class, but there will be a right to opt-out in the (b)(3) class.

## IV.    CONCLUSION

For the foregoing reasons, the Motions [14 & 15] to Dismiss and for Summary Judgment are DENIED.  The District's Motion [26] for an Extension of Time to respond to the motion for class certification is DENIED.  Plaintiffs' Motion [7] for Class Certification is GRANTED, and the Court certifies this matter as a class action as described above.  Plaintiffs' Motions [24 & 30] for Discovery are DENIED without prejudice, and plaintiffs' Rule 56(f) Motion [20] for extension of time to respond to summary judgment is DENIED as moot.  The parties shall meet and confer within ten days of this date and submit a proposed scheduling order to the Court outlining timetables for discovery and submission of dispositive motions.

A separate Order shall issue this date.

Signed by United States District Judge Royce C. Lamberth, March 26, 2007.