# DEFENDANT'S EXHIBIT 11

# In the Matter of:

# Carl Barnes, et al. v. D.C.

*January 18, 2011*
*Sean R. Day*

Condensed Transcript with Word Index



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Page 41

1  THE WITNESS: Could you restate the question?
2  BY MR. SAINDON:
3  Q. Sure. What would you say is the main difference
4  between your analysis and the District's analysis that
5  the District did in its audit, as far as overdetentions?
6  MR. CLAIBORNE: Let me just interpose my
7  objection and then Mr. Day can answer it. That's
8  outside the scope of Mr. Day's opinion that he's given
9  in the case. That is what's in the District's analysis.
10 He did an analysis of the District's data and summarized
11 the voluminous records.
12 THE WITNESS: Okay, well, let me answer the
13 question as I think I understand it.
14 MR. CLAIBORNE: Okay, because I may be
15 misunderstanding his question.
16 THE WITNESS: In my review of the jackets, I did
17 two things: One is to determine the date on which the
18 person is entitled to release, based upon the
19 documentation that is in the file, such as the
20 expiration of the person's sentence, or the date of a
21 court-ordered release. And that was the date I used for
22 release date.
23 The second thing I did was I attempted to be
24 entirely transparent in what I was doing, show my work
25 so to speak, in the notes section showing exactly why

Page 42

1  and how I arrived at the release date in providing page
2  number references to the jacket so that someone can go
3  in afterwards and see exactly what I did and confirm
4  that what I did was correct.
5  What I saw in the D.C. audit analysis was a
6  merging of the perceived justifications for delay into
7  the release date that was used. For instance, if there
8  was a 10:00 p.m. cut-off missed, or there was lack of
9  staff and they felt they should give themselves another
10 day for that.
11 BY MR. SAINDON:
12 Q. And they being Department of Corrections?
13 A. Right, or whoever created the audit analysis,
14 that they then added a day to the court documents and
15 that would be their release date.
16 The second thing is that a lot of the notes --
17 well, first of all, there are -- there were five -- over
18 5,900 line entries, many of which had no explanation at
19 all, no notes whatsoever, by which anyone could go in
20 afterwards and follow the work and follow the reasoning
21 of the person who did the analysis. In many instances
22 where there are comments, those comments are vague or
23 cryptic or possibly even misleading, and so they cannot
24 be relied upon in judging whether or not the person
25 exited from custody on the day they were entitled to

Page 43

1  release.
2  MR. CLAIBORNE: Okay, just for clarification, I
3  don't object to the question to the extent that it
4  called for that answer.
5  BY MR. SAINDON:
6  Q. Okay, in paragraph 17, you say that in many
7  instances, the District indicated that paperwork was
8  received late, and the District would use the date the
9  paperwork was received as the correct release date,
10 without disclosing the actual date the paperwork was
11 issued. Do you see that?
12 A. Right.
13 Q. Is it your contention that even if the
14 Department of Corrections received the paperwork late,
15 through no fault of its own, that the resulting
16 overdetention is attributable to the District?
17 MR. CLAIBORNE: Objection, that calls for a
18 legal conclusion and it's outside the scope of the
19 opinion.
20 THE WITNESS: Well, I think you say no fault of
21 its own, and I think that's up to interpretation. And
22 I'll leave it to the parties to determine what policies
23 and procedures could be in place to ensure that those
24 types of mistakes do not happen.
25 BY MR. SAINDON:

Page 44

1  Q. But that is included in your paragraph 16 and
2  17, your criticism of the correct release date field.
3  Is that right?
4  A. Well, yeah. Well, right, my criticism is that
5  the D.C. audit analysis is not transparent. If, for
6  instance, you believe you are justified in a delayed
7  release because you received the -- because a court
8  order was issued and a docket entry was made on July
9  1st, but you did not receive the document until July
10 2nd, it's a fairly simple thing to just state that in
11 your analysis, rather than sort of merging the late
12 paperwork into the release date, so that someone coming
13 in afterwards cannot determine why you consider that
14 person was released on time. I just think the analysis
15 could have been more transparent, could have shown the
16 analysis and the work that was being put into the
17 determination, and that's simply missing in many, many
18 of the entries.
19 Q. So, a release that audit analysis indicated was
20 timely, you're saying that in many cases there wasn't
21 enough information there for you to determine on an
22 objective basis whether it was timely or why it was
23 timely?
24 A. That's certainly true in many cases, yes.
25 Q. In paragraph 18, you say, "There were too many

                                                                57

1  when the person exited the halfway house, then that did
2  not count as an overdetention.
3      Q. So, there were some instances where information
4  bearing on the timeliness of an inmate's release was not
5  in the jacket. Is that what you're saying?
6      A. A few instances, right, and those are indicated
7  in the notes on my analysis. But by and large, it can
8  be determined.
9      Q. Were there any cases where information bearing
10 on a timeliness of an inmate's release was not in the
11 jacket or included in your notes, noted in your notes?
12     A. I hope not. I certainly intended for my notes
13 to be comprehensive and transparent and allow anyone to
14 go in afterwards and see what I had done and confirm for
15 themselves if they chose to determine whether or not my
16 analysis was correct in their opinion.
17     Q. Now, it says in paragraph 11 that you recorded a
18 discharge date for each charge and case. Did you do
19 that in a new spreadsheet or add a column to the
20 spreadsheets?
21     A. It's the same spreadsheet. And what that means
22 is, if you're looking at a backing period, a person can
23 be detained in several cases during that same period,
24 and you have to follow each case from beginning to end
25 from the date of commitment to the date of entitlement

                                                                58

1  to release, and you have to make sure -- you have to
2  follow them all to the end, and the last one standing,
3  provided there are no warrants or detainers, is going to
4  be the release date, the date on which the person,
5  according to the paperwork and the jacket, is entitled
6  to release.
7      MR. CLAIBORNE: Sean, can you please speak up or
8  can you all turn up the volume?
9      BY MR. SAINDON:
10     Q. Sure, try it again. All right, that kind of
11 leads me to my next question, paragraph 12 of the
12 declaration, you say, "The last discharge date is the
13 release date, the date on which the person is entitled
14 to release, subject to 'an extension' if there was an
15 outstanding warrant or detainer." Do you see where it
16 says that?
17     A. Yes.
18     Q. Are an outstanding warrant and detainer the only
19 two reasons for what you called an extension?
20     MR. CLAIBORNE: What was that, Andy?
21     BY MR. SAINDON:
22     Q. I asked if the outstanding warrant or detainer
23 were the only two reasons that would be included in
24 extensions by Mr. Day's definition.
25     A. I would say yes, possibly not 100 percent. If

                                                                59

1  there were some discrepancy that was being resolved,
2  there might be an adjustment indicated on my spreadsheet
3  to allow for time for the discrepancy to be resolved.
4      Q. Can you think of any specific examples that you
5  recall?
6      A. Well, one was the example that I pulled and that
7  I referenced earlier that would be▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8  and what happened in that instance, was that▓▓▓▓▓
9  went to court, there was a commitment order setting a
10 bond or perhaps no bond, in that same day there was a
11 court-ordered release, and Mr▓▓▓▓▓went to court on
12 Friday, calls were made to the court on Tuesday, trying
13 to get a clarification, and so I used a release date and
14 I also provided an alternate release date that gave them
15 until the end of the day Monday until midnight Monday
16 for the person to exit.
17     Q. Them being Department of Corrections?
18     A. Right. Although last night I also in reviewing
19 this checked▓▓▓▓▓▓▓▓'s docket online, because in
20 criminal defense practice, it's not uncommon for this
21 sort of scenario to happen, for there to be a bond or a
22 warrant or something issued, and then later in the day
23 it's clarified and then there's a release order. And,
24 so, according to the docket, the commitment order of
25 issued first, and second the court-ordered release was

                                                                60

1  issued.
2          So, if I were to do it over again, I'm not sure
3  that I would have an alternate release date, but that's
4  an example of where possibly there's a discrepancy
5  because you have potentially two court orders, one says
6  the person's committed, one says the person's released,
7  and it might be appropriate to allow some additional
8  time to allow the Department of Corrections to receive a
9  clarification as to what's going on.
10     Q. How was Mr.▓▓▓▓▓classified -- Mr.▓▓▓▓, I'm
11 sorry, classified in your analysis was? Was he listed
12 as overdetained?
13     A. He was, because he was overdetained either way,
14 and I provided both the release date and the alternate
15 release date calculations to Dr. Kriegler for him to use
16 and provide a range of my analysis. But in his
17 instance, first of all, there was no contact with the
18 court until Tuesday. Secondly, they received a
19 clarification, I believe on the Tuesday, but still did
20 not -- he did not exit on the Tuesday, he exited on the
21 Wednesday. So, Mr.▓▓▓▓ is an instance where any way
22 you slice it, he was overdetained, no matter how you
23 look at it.
24     Q. Getting back to paragraph 12 again, Mr. Day, if
25 the Department of Corrections received paperwork late

                                                15 (Pages 57 to 60)

Page 61

1  from a non-District source, would that entitle them to
2  what you call an extension?
3      A. Received paperwork late from a non what source?
4      Q. Non-District source. A federal agency, say.
5      A. I do not believe so. It might be helpful to
6  have an example, but I don't believe so.
7      Q. And I think we might have touched on this
8  before, and what if a third party drug treatment
9  provider was late in picking up an inmate, would that
10 entitle the District to what you call an extension?
11     A. My understanding is that third party releases
12 such as that were removed from any analysis because I
13 just could not tell from the jackets who would be at
14 fault. And I apologize, I know we just took a break,
15 but I need five minutes.
16     Q. Sure, we'll go off the record now and come back
17 in five minutes.
18     (Whereupon, there was a recess in the
19 proceedings.)
20     BY MR. SAINDON:
21     Q. Mr. Day, I think you said you wanted to clarify
22 your last answer?
23     A. Right, we were talking about so-called
24 extensions and what I wanted to explain was my analysis,
25 because it was paperwork driven, if, like in the

Page 62

1  instance with Mr. ███, you have two documents on the
2  same day, that appear to say conflicting things, well,
3  because my analysis is paperwork driven, that would
4  affect my analysis and is something that I would have to
5  take a look at in attempting to determine the release
6  date.
7      Q. Let's take a look at paragraph 14 of that
8  declaration. For immigration detainers, you say you
9  extended the release date by two business days because
10 the detainers are for 48 hours. Is that right?
11     A. They are for 48 hours excluding weekends and
12 holidays.
13     Q. Are immigration detainers only for 48 hours?
14     A. The ones I saw on the face were for 48 hours.
15 If there's a different type of immigration detainer, I
16 did not see it.
17     Q. And do you know where that 48-hour figure comes
18 from?
19     A. I believe on the face of the warrant, there is a
20 citation to the law, and I believe at one point I did
21 actually look up the law.
22     Q. Presumably it's a federal law or regulation that
23 has that time period?
24     A. Right.
25     Q. And in paragraph 14 you say, "With foreign

Page 63

1  warrants and detainers, you extended the release date by
2  two business days." Why did you pick that time period?
3      A. Primarily, Riverside v. McLaughlin, and I
4  believe that two business days would be generous,
5  because I don't believe Riverside accounts for holidays,
6  I think Riverside is just 48 hours, but there was an
7  effort here to be somewhat conservative.
8      Q. And in paragraph 15, you say, "Using the exit
9  time and midnight of the release date, I calculated the
10 length of teach inmate's overdetention (or zero if
11 released on time) for the listed booking period." Do
12 you see that?
13     A. Yes.
14     Q. Were all releases that you listed as zero hours
15 overdetained, in fact, timely?
16     A. Generally, yes. There may be some exceptions
17 such as third party releases and if someone were to go
18 back and look at my work and determine that I gave in my
19 analysis too much time for, for instance, a warrant
20 release or a detainer release, someone might be able to
21 argue that my calculation was too conservative.
22     Q. So, there may be some instances in your analysis
23 where it says zero hours overdetained, but they may, in
24 fact, have been released on a timely basis?
25     A. You mean released on an untimely basis?

Page 64

1      Q. Yes.
2      A. It's possible. Again, I showed all of my work,
3  and if someone were to want to go in afterwards and make
4  adjustments to my work, and I think this would mostly
5  apply or only apply to instances where there are
6  detainers, but to your most typical example, that would
7  probably be true, that if it says zero, the person was
8  not overdetained; however, there might be instances as
9  to any booking where the paperwork is delayed for some
10 reason or there is new paperwork issued.
11     My understanding is that one of the deponents of
12 the government stated that if there was a problem or if
13 there was not a timely release would request a new court
14 order for release, which could affect the analysis.
15     Q. Do you recall which deponent of the government
16 that was?
17     A. No. It may have been Ms. Simmons.
18     Q. Okay, Mr. --
19     A. Basically my analysis is driven by the
20 paperwork. If the paperwork is post-dated, if the
21 paperwork was issued and lost and then re-issued on a
22 later date, then my analysis would be overly
23 conservative.
24     Q. Okay, Mr. Day, you say in paragraph 17, "In a
25 small number of instances where subjectivity might be

16 (Pages 61 to 64)

81

1  that I did and contained DOC and this may be the PDF
2  file that I was provided and for which I asked for an
3  Excel file.
4  **Q. Well, I'll posit that this is the District's**
5  **responses to the contention interrogatory spreadsheet**
6  **that we talked about earlier.**
7     MR. CLAIBORNE: Well, I mean, we can accept that
8  theoretically, but --
9     BY MR. SAINDON:
10 **Q. Sure. Oh, I understand. And you see there's a**
11 **cover email and then some objections and responses to**
12 **the interrogatory after that. Do you see that?**
13    A. And hang on, let me just, if I could, the copy I
14 have, the PDF printout, which I presume is a PDF
15 printout, skips from page 104 to page 153. So, there
16 appear to be some 50 -- well, it then skips from page 53
17 to 102 as well.
18 **Q. Yes.**
19    A. So, I don't know what's going on with this, but
20 it appears that this may be at least part of that PDF
21 file.
22 **Q. Yes, I did not print those pages, so -- and you**
23 **see the spreadsheet or the portions of the spreadsheet**
24 **attached to the back of this. Is that correct?**
25    A. That are on paper format, yes.

82

1  **Q. Do you recognize, there's a column that says,**
2  **"Plaintiffs' Comments," do you recognize any of those as**
3  **yours?**
4     A. I would say nearly all of them are.
5  **Q. Thank you, and we'll probably come to some**
6  **acronyms that I will have you explain as we go through**
7  **it, but I would like to look at some jackets now, if we**
8  **could. I think we are up to Exhibit 5 now, we're going**
9  **to look at the jacket of ▇▇▇▇▇▇▇▇▇▇▇▇R.**
10    (Defendant's Deposition Exhibit Number 5 was
11 marked for identification.)
12    BY MR. SAINDON:
13 **Q. And the DCDC number is ▇▇▇▇. Now, Mr. Day, if**
14 **you will turn to page 38 of the spreadsheet.**
15    MR. CLAIBORNE: What's the name of the file
16 that's got the spreadsheet that you're talking about?
17    MR. SAINDON: The spreadsheet file, I think I
18 called that D.C.'s contention interrogatory responses
19 when I sent it with the two attachments.
20    MR. CLAIBORNE: Well, that is just one page.
21    MR. SAINDON: Yes.
22    MR. CLAIBORNE: There's a Barnes analysis
23 response, is that what you mean?
24    MR. SAINDON: Well, I don't know what Grace
25 called them, it's either that first -- it's probably the

83

1  second PDF, I think that was the larger.  D,
2  supplemental response to interrogs on overdetention
3  sample.
4     MR. CLAIBORNE: A nine-page document?
5     MR. SAINDON: No, this is the big one, it should
6  be 153 pages.
7     MR. CLAIBORNE: So, where are you at in that
8  document?
9     MR. SAINDON: If you are in the spreadsheet, I
10 want to go to page 38.
11    MR. CLAIBORNE: Okay.
12    MR. SAINDON: The very last line.
13    MR. CLAIBORNE: What's the name of the line that
14 you are looking at?
15    MR. SAINDON: The last name, ▇▇▇▇▇▇▇▇▇▇,
16 number▇▇▇▇▇.
17    Do you see that, Mr. Day?
18    THE WITNESS: Yes.
19    BY MR. SAINDON:
20 **Q. Now, this spreadsheet, it says, "Plaintiffs said**
21 **that Mr. ▇▇▇▇ was overdetained by 56.72 hours." Do**
22 **you see that?**
23    A. No.
24 **Q. Okay, what do you see?**
25    A. I see a column that says, "Plaintiffs say late?"

84

1  And for Mr. ▇▇▇▇, it simply says, "Late," and that was
2  a column created by D.C., not me.
3  **Q. And what about the next column to the right?**
4     A. It's blank.
5  **Q. All right. It is fairly faint, let me see if we**
6  **can find a better copy for you. I think it might be a**
7  **different color text, but the copy I have says 56.72**
8  **hours.**
9     MR. CLAIBORNE: What's the name of that column,
10 Andy?
11    MR. SAINDON: The column, the one that's right
12 to the right of "Plaintiffs Say Late," there's a
13 hashmark that says, hashmark of hours of overdetention.
14    MR. CLAIBORNE: Okay.
15    MR. SAINDON: I believe Mr. Day is trying to
16 pull that spreadsheet up on his computer. That might
17 make things easier.
18    MR. CLAIBORNE: Well, just for clarification,
19 this document that we're looking at now is a document
20 that was produced by the District of Columbia. Is that
21 right?
22    MR. SAINDON: Yes.
23    MR. CLAIBORNE: And the District of Columbia
24 took the spreadsheet that Sean Day produced and then
25 added some columns to it. Is that right?

21 (Pages 81 to 84)

105

1  Q. Now, Mr. Day, on Exhibit 4B, on that line for
2  ▓▓▓▓▓▓▓▓ it says, "Number of hours of
3  overdetention," and I have here 1,620.65. Do you see
4  that?
5  A. Yes.
6  Q. Is there any way you could tell from looking at
7  this whether that reflects your last analysis or not?
8  A. No.
9  Q. If you will look at the next column over, it
10  says, "Plaintiffs' Comments," and the first line, it
11  says, "▓▓▓▓▓▓▓▓▓▓."
12  A. Yes.
13  Q. What is that?
14  A. That is a Superior Court case number, 2005 is
15  the year, CMD, criminal division, misdemeanor, 2118 is
16  the case number for that year 2005.
17  Q. And if you'll look at Exhibit Number 6, which I
18  believe we are purporting to be the jacket of ▓▓▓
19  ▓▓▓▓▓, if you'll take a look at page number 4 of that
20  document, and tell me if you recognize it, please.
21  MR. CLAIBORNE: Are you asking him if he
22  recognizes that this is the type of document that it is,
23  or this actually comes out of this ▓▓▓▓▓▓▓▓▓ file?
24  MR. SAINDON: I guess the second question, the
25  first question, the type of document that it is.

106

1  THE WITNESS: This appears to be a release
2  authorization form for ▓▓▓▓▓▓▓▓, and the
3  information that's indicated on here is that she was
4  released from the central detention facility as a result
5  of expiration of sentence and released or exited July
6  3rd, 2007 at 12:40 p.m.
7  BY MR. SAINDON:
8  Q. So, in contrast to the last file, this one does
9  actually have a time of release. Is that right?
10  A. Right.
11  Q. Mr. Day, on that same page, page 4, you said,
12  "Release type was expiration of sentence," and following
13  that, the word expiration over it says, "Releasing
14  authority, FBOP." What does that mean?
15  A. That's a good question. It could either stand
16  for Bureau of Prisons or Board of Parole. And I would
17  probably want to consult other documents in the file to
18  determine which one it is.
19  Q. Do you have any idea what the F stands for?
20  A. I would I believe it would be federal.
21  Q. Okay, let's take a look, if you flip a couple of
22  more pages to page 6 of that file, maybe that will help
23  you answer that question.
24  A. Right, Federal Bureau of Prisons.
25  Q. And do you recognize that document?

107

1  A. Not specifically, but this is of a nature of
2  similar documents that I saw in reviewing jackets for
3  this case.
4  Q. And what is this document? Or what does it say
5  on the face of it?
6  A. It's a federal document that shows a release
7  date for the inmate, release method, and generally
8  speaking those are the -- well, release date is, for my
9  purposes, probably the most important piece of
10  information on this document.
11  Q. And that says, "4/27/2007." Is that right?
12  A. That's correct.
13  Q. The top of the document says, "Notice of release
14  and arrival, U.S. Department of Justice, Federal Bureau
15  of Prisons." Do you see that?
16  A. Yes.
17  Q. Now, I don't know if you can make it out on your
18  copy, at the very top there's a fax line, it looks like
19  it was faxed. It doesn't say to who or -- but can you
20  make out a date on that?
21  A. Not perfectly, but if I were reviewing this
22  document, I would put that as probably July 3rd, 2007,
23  12:49. It is possible that is July 8th in the two parts
24  of 8 are missing, but I would probably go with July 3rd.
25  Q. Thank you, Mr. Day. If you could turn to page

108

1  16 of that document.
2  A. (Witness complied.)
3  Q. And tell me again generally if you recognize
4  that document.
5  A. It's a docket, court docket.
6  Q. And is that from D.C. Superior Court?
7  A. Right, it is from the -- well, actually it's
8  ▓▓▓▓▓▓▓▓▓▓. I'm not an excellent typist, so it's
9  possible on my comments should have been 2007.
10  Q. All right, and the caption of the case, looking
11  at, again, page 16, it says, "United States versus
12  ▓▓▓▓▓▓▓▓▓▓." Is that right?
13  A. That's what it says.
14  Q. Now, if you'll follow, I guess it's about an
15  inch above the number 16, on the bottom of that page,
16  there appears to be a date and time stamp. Do you have
17  any idea where that might have come from? I mean, is
18  that --
19  A. Based upon my analysis in looking at hundreds of
20  these jackets, my interpretation of that stamp is that
21  the Department of Corrections put that stamp there. And
22  that would be presumably a date and time that this
23  document was received. What this does not show is
24  whether or not essentially the same document was
25  received at an earlier date, and perhaps lost or somehow

### Page 109

1  missing. This same document could have been stamped on
2  the back for all I know. But what I can say is that
3  this piece of paper was presumably date and time stamped
4  as received July 2nd, 2007 at 7:47 p.m.
5      Q. Could it have been that the Department of
6  Corrections printed it out that day and then time
7  stamped it right after it printed it out?
8      A. It could have.
9      Q. Thank you, Mr. Day. If you could turn to page
10 21 of that document. Now, based on what you said
11 earlier, tell me if I'm wrong, this appears to be a
12 docket sheet for a different matter involving
13 Ms. Perkins.
14     A. That's correct.
15     Q. And that one is ████████████ Is that right?
16     A. Yes.
17     Q. And that's also captioned United States versus
18 ████████████. Is that correct?
19     A. It is.
20     Q. And if you would tell me, what is the first
21 entry on that document on that sheet? And the date?
22     A. July 19th, 2006, form generated.
23     Q. And what -- go ahead, yes.
24     A. Is that what you're asking for?
25     Q. Yes, sir.

### Page 110

1      A. "Release order: Jail." Sent on July 19th,
2  2006, 11:53:27."
3      Q. Thank you.
4      A. And "Event resulted: Release status case nolled
5  by plea."
6      Q. Thank you, Mr. Day. If you could turn to page
7  50 of that document, please.
8         MR. CLAIBORNE: What page number, Andy?
9         MR. SAINDON: Fifty, 5-0, Chas.
10        MR. CLAIBORNE: Okay, thank you.
11        BY MR. SAINDON:
12     Q. Tell me if you recognize that document.
13     A. It's a type of document that appeared in many of
14 the jackets that I looked at. And it contains sentence
15 expiration information by at least one authority. Many
16 times in the file you'll find different forms all
17 purporting to calculate a sentence expiration, and so
18 you have to look at all of them. If they all say the
19 same thing, that's what I would go with. If for
20 whatever reason some said something different, then I
21 might have to study it a little further.
22     Q. Okay, if you'll look at the very top line of
23 that page, it looks like a fax line. Do you see that?
24     A. Yes.
25     Q. And can you tell me what that says?

### Page 111

1      A. July 2nd, 2007, 12:49.
2      Q. And at the far right, it says, "3 of 3." Is
3  that right?
4      A. Right.
5      Q. Now, if you'll look back, is it possible that
6  this is the third page of the fax that on page 6 of this
7  document that was the second page of the fax?
8      A. It's possible, and generally when I was looking
9  at the files, page 50 would normally follow page 6, but
10 it wasn't unusual when I was looking at the files for
11 pages to be all over the place.
12     Q. Okay, and if you'll just flip one page onto page
13 57, does that appear to be the first page of that
14 three-page fax?
15     A. Page 57?
16     Q. I'm sorry, no, just one page, 51.
17     A. That's a reasonable assumption in this, again,
18 in a more properly arranged file, you would probably see
19 page 51, then page 50, then page 6.
20     Q. Thank you, and does page 51 give you -- tell you
21 who generated this document?
22     A. Well, it's a fax cover sheet from the Federal
23 Bureau of Prisons.
24     Q. And it's from the Designations and Sentence
25 Computation Center. Do you see that?

### Page 112

1      A. I see that.
2      Q. And one more question, on page 51, Mr. Day, what
3  case is the sentence computation for?
4      A. Which page?
5      Q. On page 51. I suppose you could get it from
6  page 50 as well.
7      A. 2██████████2.
8      Q. Thank you.
9      A. And assuming this is my spreadsheet, I actually,
10 my fingers hit the right buttons.
11     Q. Very good.
12        MR. CLAIBORNE: What's that, your fingers hit
13 the right button?
14        THE WITNESS: I said earlier I'm a bad typist,
15 it looks like I may have typed 2005 instead of 2007 for
16 the misdemeanor case for this inmate. I'm sure you
17 could find at least a dozen typos.
18        BY MR. SAINDON:
19     Q. All right, thank you, Mr. Day. If you could
20 flip to page 65, and tell me if you recognize that
21 document.
22     A. This is a release order for ████████ dated
23 May 3rd, 2006.
24     Q. And that's from the Superior Court. Is that
25 correct?

Page 113

1   A. That's correct.
2   Q. And which case?
3   A. I'm sorry, case number [REDACTED].
4   Q. And the next page, page 66, could you tell me
5   what that is, please, if you recognize it.
6   A. This appears to be a sentencing order in which
7   [REDACTED] in case number [REDACTED] on May 3rd,
8   2006, was sentenced to 18 months in jail with a sentence
9   being suspended as to all but time served.
10  Q. Thank you, and one more on page 79 of this
11  document. If you would tell me what that is, please.
12  A. Page 79 appears to be a release order pertaining
13  to [REDACTED] in case number [REDACTED], dated
14  July 19th, 2006, ordering that she be released in that
15  case.
16  Q. Thank you, Mr. Day. Going back to page 4, I
17  think at first you were not -- didn't want to commit as
18  to what the releasing authority, the FBOP stood for and
19  I think you probably feel better about that now, if you
20  want to tell me.
21  A. Federal Bureau of Prisons.
22  Q. And what does that mean, releasing authority?
23  A. Well, I don't know how it -- I would answer that
24  as phrased. I would say that this is -- this person was
25  serving a sentence in a federal prison as opposed to the

Page 114

1   D.C. Jail. But -- or that that was the institution
2   authorizing the detention. Where the person actually
3   served may have been the D.C. Jail.
4   Q. Could someone have served at the D.C. Jail and
5   been sentenced in a federal case?
6   A. Sure. That may have been what happened here.
7   Q. Releasing authority, the Federal Bureau of
8   Prisons, would that entity also be responsible for
9   calculating the sentence?
10  A. It's an interesting question, because in
11  reviewing some jackets, I came upon internal memos in
12  which there appeared to be some dispute between D.C.
13  Department of Corrections and the Federal Bureau of
14  Prisons, and there were references made to a memorandum
15  of understanding that would I believe allocate
16  responsibility for such inmates, because there certainly
17  did appear to be some tension between the two agencies
18  and some instances as to somebody like this, who WAS not
19  released when they should have been released, and I
20  guess the two agencies blaming each other, I would
21  imagine.
22      But, you know, it's really not for me to resolve
23  as to who is responsible. All I can tell you is, based
24  upon the documentation, when the person was entitled to
25  be released, in this case the person was entitled to be

Page 115

1   released and was an inmate at the D.C. Jail, and the
2   D.C. Jail did not release the person on time.
3   Q. Well, if you'll look, Mr. Day, on page 50 of
4   that document, that appears to me to be, it says,
5   "Independent sentence computation," was that done by the
6   federal authorities, can you tell?
7   A. I don't know that I can tell just from this
8   document, but in the course of reviewing hundreds of
9   files, I believe that this is a Federal Bureau of
10  Prisons calculation. The D.C. Department of Corrections
11  appear on a different looking sheet. There may even be
12  one in here, sometimes you'll see an expiration sheet
13  prepared by the D.C. Department of Corrections as well.
14  Q. So, could the D.C. Department of Corrections
15  release an inmate based on its own calculations, or
16  would it have to go with the federal calculation?
17  A. I think if you hold the key for the door and the
18  person is entitled to release, you have to open up the
19  door, and not -- not have some fight about, well, you
20  need to give us documentation. If a person is entitled
21  to release, they're entitled to release, and you're the
22  one holding them. So, I would say, you either open up
23  the door, or you do whatever needs to be done to quickly
24  get whatever documents you think you need to get, rather
25  than sitting around for days, weeks or months with

Page 116

1   somebody in your custody, and you haven't done anything
2   to try to get the person released on time.
3   Q. Thank you, Mr. Day. If you go back and look on
4   Exhibit 4B, the spreadsheet. And we were looking at --
5       MR. CLAIBORNE: What's that, 4 what?
6       MR. SAINDON: 4B, the spreadsheet, I was looking
7   at the spreadsheet entry for [REDACTED].
8       MR. CLAIBORNE: Okay.
9       MR. SAINDON: I just wanted to verify, the
10  spreadsheet overdetention hours says -- I'm sorry,
11  Mr. Day, I said the spreadsheet says 1,620.65 hours of
12  overdetention. Do you see that?
13      THE WITNESS: Yes.
14      BY MR. SAINDON:
15  Q. And I think you said earlier you couldn't tell
16  whether or not that was your final analysis. Is that
17  correct?
18  A. Correct.
19  Q. And can you tell by looking at your comments in
20  the next column over to the right?
21  A. Can I tell what?
22  Q. Whether or not that figure is correct.
23      MR. CLAIBORNE: Objection, vague.
24      THE WITNESS: I had determined, I believe --
25  now, this does -- what I am looking at does not have my

29 (Pages 113 to 116)

                                                                            121

1  Exhibit 7, and there appears to be a continuation of
2  that same printout. About a third of the way down, it
3  says, "Lease type" --
4       MR. CLAIBORNE: What page is that?
5       MR. SAINDON: Page 30, 3-0, of Exhibit 7.
6       MR. CLAIBORNE: And what do you mean when you
7  say it appears to be a continuation of the same
8  spreadsheet?
9       BY MR. SAINDON:
10      Q. From the same document, the PRISM database, it
11 might not be, it just appears to be the same. And my
12 question is about a third of the way down on the page,
13 it says, "Release type: PSA work release (restrictive
14 supervision)." Can you see that?
15      A. I'm looking at page 30?
16      Q. Yes.
17      A. A third of the way down?
18      Q. Yes, just above the -- I guess it's the second
19 circled item.
20      A. I see, "Release Type: PSA work release,
21 (restrictive supervision)." Yes.
22      Q. Does that -- what does that tell you, that
23 entry, if anything?
24      A. Well, according to this document, Mr. ▓▓▓ was
25 issued a work release order dated July, I'm sorry, June

                                                                            122

1  10th, 2005 which would authorize his detention at a
2  halfway house rather than the jail, and looking at my
3  comments as well, my comments indicate June 10th, 2005,
4  WRO, which was my abbreviation for work release order.
5       Q. Thank you, Mr. Day. If we could in a nutshell,
6  that would mean that an offender is sentenced to live at
7  a halfway house, and is released only for the purpose of
8  work?
9       A. Right.
10      Q. And has to report back to the halfway house
11 until the sentence is completed?
12      A. Right.
13      Q. Generally, of course.
14      A. I mean, you use the term live as if it's a
15 house.
16      Q. Right.
17      A. But it's detention. And work release is
18 obviously you get released to go to work and you come
19 back.
20      Q. All right, if you'll look back again on Exhibit
21 4B, Mr. Day, on the line, the entry for Mr. ▓▓▓ under
22 the DOC comments, it says, "Release form faxed to EFEC,
23 halfway house, at 9:41 p.m. inmate not released until
24 11/2/05 at 8:40 a.m. when inmate returned from work."
25 Do you see that?

                                                                            123

1       A. I do.
2       Q. Now, reading that, it seems to me that the
3  inmate, Mr. ▓▓▓ was out on work release when the order
4  was received by the halfway house, and he didn't get it
5  until he got back from work and reported at the halfway
6  house. Is that how you understand that?
7       A. That's what the DOC comments are claiming, yes.
8       Q. Would you be able to tell that from looking at
9  the jacket?
10      A. Possibly.
11      Q. Can you look through this jacket now and see if
12 that's possible to determine?
13      A. Okay, I did not see anything in Defendant's
14 Exhibit 7 that would indicate that when the release
15 authorization form was received by the halfway house
16 that Mr. ▓▓▓ was away at work.
17      Q. Thank you, Mr. Day. Is it possible that the
18 halfway house would have some document saying that and
19 they're just not in the jacket?
20      A. Anything's possible.
21      Q. Thank you, Mr. Day. If you will look at page 21
22 of the spreadsheet, I want to take a look at the jacket
23 of ▓▓▓▓▓▓▓, page 21 of the spreadsheet.
24      A. Okay. And by the way, we were talking about
25 Mr. ▓▓▓.

                                                                            124

1       Q. Yes.
2       A. And I don't know that that was my final
3  analysis.
4       Q. Right.
5       A. And being a halfway house, I believe I would
6  have gone back and changed his exit date and time to
7  November 2nd, 2005 at 8:40 a.m., and the number of
8  overdetention hours would have been adjusted
9  accordingly.
10      Q. Thank you, Mr. Day.
11      A. Now, you wanted me to look at page 21?
12      Q. I'm sorry, page 21, yes, of the spreadsheet,
13 third entry from the bottom, ▓▓▓▓▓▓ is. I have his
14 jacket, I think we will mark as Exhibit 8.
15          (Defendant's Deposition Exhibit Number 8 was
16 marked for identification.)
17          THE WITNESS: Okay.
18          BY MR. SAINDON:
19      Q. If you will take a look at that, please, sir,
20 and let me know if you recognize it.
21      A. Okay, it appears to be a DOC jacket of a nature,
22 similar nature as the hundreds that I review.
23      Q. Now, on this spreadsheet on page 21, the entry
24 for ▓▓▓▓▓▓ is, third up from the bottom, DCDC
25 ▓▓▓▓▓▓▓▓

Page 125

1   A. Yes.
2   Q. In the column Number of Hours of Overdetention,
3   it has 778.45. Do you see that?
4   A. Yes.
5   Q. Can you tell looking at this today whether or
6   not that reflects your final analysis?
7   A. No.
8   Q. In the next column, Plaintiff's Comments,
9   there's an acronym there, HWOB, what does that stand
10  for?
11  A. Held without bond. And before I forget, I want
12  to point out the DOC comments, released on time.
13  Q. Yes.
14  A. I mean, this is an instance where it would be
15  helpful to have more information. Released on time
16  doesn't mean anything to me. Okay, but anyway, HWOB
17  means held without bond.
18  Q. Thank you. What about ESS, that acronym that
19  you use there?
20  A. Execution of sentence suspended.
21  Q. And the numbers in parentheses, are those the
22  page numbers that you referred to in the PDF files?
23  A. Correct.
24  Q. Thank you. If you will turn in Exhibit 8 to
25  page 53, 5-3, please. Tell me what that document is.

Page 126

1   A. Well, it appears to match page 53 of the PDF
2   file that I looked at, it's a release authorization form
3   for Mr. ▆▆▆▆, indicating that he was released from CDF
4   as a result of an expiration of sentence. His exit was
5   11/22/2006 at 10:28 a.m., and this says, Under Releasing
6   Authority, "FBOP."
7   Q. Thank you, Mr. Day. If you will turn to page
8   83, 8-3, and if you can look at that and confirm whether
9   FBOP means the Federal Bureau of Prisons.
10  A. That's correct. And this lists the institution
11  address as the D.C. Jail. So, Mr. ▆▆▆▆ was being held
12  at the D.C. Jail, according to this document.
13  Q. Thank you. If you look at the top line of this
14  document, it appears to be the second of a five-page
15  fax. Can you tell what that line says and when it was
16  sent and by whom?
17      MR. CLAIBORNE: Objection to the statement
18  appears to be a five-page fax, it may or may not be, but
19  object to the question to him testifying.
20      THE WITNESS: All I can say is at the top it
21  indicates a date, a fax date of November 6th, 2006,
22  13:59, BOP, page 2 of 5, and again, this does not mean
23  that this is the only such document in the file or that
24  was received in relation to this particular release
25  date. It may have been that one was sent previously and

Page 127

1   misplaced. But this particular page appears to have
2   been faxed at that date and time.
3       BY MR. SAINDON:
4   Q. Thank you, Mr. Day. If you will look on the
5   second page of that document down, it says, "Release
6   date: 11/22/2006." And then in parentheses, it says,
7   "One day public law." Do you see that?
8   A. Yes.
9   Q. Do you know what that means, one day public law?
10  A. Yeah, it means he got some sort of credit for --
11  it could be for anything. I think I would see somewhere
12  the person would complete some sort of educational
13  program, and would get some credit to his sentence. And
14  in relation to Mr. ▆▆▆▆, I don't know why he was given
15  a day credit, but he was.
16  Q. Thank you. What about the next box to the
17  right, "Release Method," it says, "EXP split." Do you
18  know what that means?
19      MR. CLAIBORNE: What page?
20      MR. SAINDON: Same page.
21      MR. CLAIBORNE: What page?
22      MR. SAINDON: Page 83 of Exhibit 8.
23      MR. CLAIBORNE: Okay.
24      THE WITNESS: In the context of Mr. ▆▆▆▆
25  without looking at more documents, I don't know. And I

Page 128

1   would say, too, I believe on some of these documents --
2   no, I don't have anything to add.
3       BY MR. SAINDON:
4   Q. Thank you, Mr. Day. If you turn to page 86 in
5   the jacket and tell me what that is. Or what you think
6   it is.
7   A. Okay, the document that I looked at previously
8   was page 2 of 5, and this appears to be -- well, really
9   it's the next page, page 87, which appears to be page 1
10  of 5.
11  Q. And the top line, the 105, does that indicate or
12  purport to indicate when it was sent?
13      MR. CLAIBORNE: Objection, lack of foundation.
14      THE WITNESS: The same as before and this
15  appears to be page 1 and we earlier looked at page 2.
16  November 6th, 2006, at 13:58.
17      BY MR. SAINDON:
18  Q. It says in all caps, about a third of the way
19  down, the title I suppose is called Release Documents.
20  Do you see that?
21  A. Right, I see that.
22  Q. And then at the bottom there's I guess a list of
23  categories and some have that X in front of them and the
24  first one says, "Sentence computation copy to inmate."
25  Do you see that?

129

1   A. Yes.
2   Q. All right, Mr. Day, if you would turn to page 89
3   of the jacket, please, and tell me what -- if you
4   recognize that document.
5       MR. CLAIBORNE: Are you asking him whether he
6   recognizes this specific document or just in general
7   what type of document this is?
8       MR. SAINDON: Generally first. This appears to
9   be a Federal BOP sentence computation printout, and the
10  appearance of the document is that it's a screen
11  printout from a computer.
12      BY MR. SAINDON:
13  Q. Okay, Mr. Day, I think we're done with that
14  jacket. If you would turn to page 37 of Exhibit 4B,
15  please. I would like you to take a look at the jacket
16  for ███████████████████████.
17  A. If you don't mind, I just want to look through
18  ████████ file.
19  Q. Certainly, take your time.
20      MR. CLAIBORNE: You know, I don't have ███████
21  ████████ don't think. Let me see if she -- yeah, I
22  don't have ██████████ Andy. Can you send that to
23  me, please?
24      MR. SAINDON: Sure, I will wait and see whether
25  Mr. Day has any more comments on the █████████████

130

1   jacket.
2       MR. CLAIBORNE: Okay.
3       THE WITNESS: What I want to point out, without
4   looking through the whole file, it does appear that the
5   D.C. Department of Corrections did a calculation for
6   Mr. ███████ indicating that on the day of his
7   sentencing, he had served well over 30 days in jail.
8   And this document was initially prepared by the D.C.
9   Department of Corrections on October 24th, 2006.
10      BY MR. SAINDON:
11  Q. Which document are you referring to, Mr. Day?
12  A. I'm looking at page 6 and page 7 of that file.
13  Q. Of Mr. ████████ file?
14  A. And I don't know if that's all that's in the
15  file. Very often, you will find in the file a copy of
16  the form prepared by someone with a blank review
17  signature line. And then you will also find a copy that
18  has been reviewed and signed. But in any event, it
19  appears to relate to the same sentence and Mr. ███████
20  was, in fact, held without bond starting April 28th,
21  2006, sentenced on October 20th, 2006, to just 30 days,
22  so it was plainly obvious that as of the date and time
23  of his sentence, he had already served 30 days.
24  Q. So, Mr. Day, would it be fair to say that the
25  Department of Corrections calculations were different

131

1   than the Federal Bureau of Prisons?
2   A. I would say so, and the -- I don't know the
3   basis of claiming that he's entitled to release November
4   22nd. It appears that D.C. Department of Corrections
5   had it correct, and that it's plainly obvious that on
6   the day he was sentenced, he had enough time to satisfy
7   30 days.
8   Q. Thank you, Mr. Day. Do you have any more
9   comments on Mr. ██████' jacket?
10  A. No.
11  Q. Thank you. All right, Chas, before we break,
12  you said you don't have ████████████, I have just two
13  more jackets I want to make sure you have.
14      MR. CLAIBORNE: Okay.
15      MR. SAINDON: ██████████████ and ███████
16  █████.
17      MR. CLAIBORNE: I have ███████████ and I
18  have ████████████.
19      MR. SAINDON: Great, I will go and try to send
20  you ██████████ again, it might be that the file is
21  so big I will have to break it into pieces, but I will
22  get it to you.
23      MR. CLAIBORNE: Okay, thanks.
24      MR. SAINDON: Give me about five minutes.
25      (Whereupon, there was a recess in the

132

1   proceedings.)
2       BY MR. SAINDON:
3   Q. All right, Mr. Day, I would like you to take a
4   look at page 37 of the spreadsheet, get a look at the
5   jacket of ████████████, and that is the third entry
6   down on that page, DCDC number ███████████ and I am going to
7   have that marked as Exhibit 9, please.
8       (Defendant's Deposition Exhibit Number 9 was
9   marked for identification.)
10      BY MR. SAINDON:
11  Q. If you would take a look at that, please, and
12  tell me if you recognize it.
13  A. Same as before, it appears to be of a nature
14  similar to the DOC jackets that I reviewed.
15  Q. And on the spreadsheet, under the column Number
16  of Hours of Overdetention, it says, "20.41." Do you see
17  that?
18  A. Yes.
19  Q. And in the next column, Plaintiff's Comments, it
20  appears there are two cases being considered there. Is
21  that right?
22  A. Right.
23  Q. And what are those two cases?
24  A. ████████████████ and ████████████████, and I will
25  say right off the bat, that both of them appear to be

33 (Pages 129 to 132)

137

1  1st, 2003. And it says that Mr. ▮▮▮▮▮▮▮ is wanted by
2  the Maryland Park Police, and that's it.
3     Q. For something that we can't figure out what it
4  says, or is it something else?
5     A. Well, that would appear to be resisting arrest,
6  possession of CDS, which is controlled dangerous
7  substance, MJ, I don't know.
8     Q. Thank you. And if you turn to page 7 of that
9  document, Mr. Day, and tell me what that is.
10    A. This is a detainer lift letter to the D.C. Jail
11 indicating that the detainer that we just spoke about,
12 of April 17th, 2007, is being lifted.
13    Q. And what does that mean from a practical
14 standpoint?
15    A. Well, it moots the detainer. The detainer is at
16 this point of no significance.
17    Q. If there was nothing else in the file justifying
18 further detention, the inmate would be entitled to be
19 released. Is that right?
20    A. If not already entitled to release, yes. And I
21 say that because -- and the row of data in Exhibit 4B is
22 not complete, I do not know what I used as a release
23 date, but I may have -- I may have either used April
24 17th, 2007 as the release date, I may have instead used
25 April 13th, 2007 plus two days, applying a new Riverside

138

1  analysis by which he should be sent over to the MPD
2  fugitive unit within two days of his court-ordered
3  release.
4     Q. And if you could turn to page 14, Mr. Day, in
5  the jacket, and tell me what that is, please.
6     A. It is a court order issued in case number ▮▮▮▮
7  by the U.S. District Court dated April 13th, 2007,
8  ordering that Mr. ▮▮▮▮▮▮▮ be released.
9     Q. Now, it appears, doesn't it, Mr. Day, if we go
10 back and look at page 4, that Mr. ▮▮▮▮▮▮▮ was released
11 on April 17th. Is that right?
12    A. Yes.
13    Q. And that's the same day that the detainer of the
14 National Capital Park Police was lifted. Is that right?
15    A. Yes.
16    Q. Now, is it your contention that the Department
17 of Corrections could have let him go on April 13th,
18 according to page 14, when the District Court issued the
19 order to release?
20    A. Well, it may not be so much as letting him go as
21 it is the clock starts ticking and liability may accrue,
22 and that applying a Riverside analysis that he should
23 have been placed into the custody of the fugitive unit
24 for a hearing on the detainer within 48 hours of his
25 court-ordered release.

139

1     Q. On April 13th. Is that right?
2     A. Right, which I don't know what day of the week
3  that is, but if that's, say, a Monday, then I might have
4  used a release date of April 15th at midnight. Which,
5  I'm sorry, would actually be November 16th at midnight,
6  because at midnight the calendar day turns over.
7     Q. Thank you, Mr. Day. One more exhibit, we're
8  going to look at the jacket of ▮▮▮▮▮▮▮▮▮▮, DCDC
9  number ▮▮▮▮▮▮. You'll find the entry on page 23 of the
10 spreadsheet. I am going to have her jacket marked as
11 Exhibit 11.
12    (Defendant's Deposition Exhibit Number 11 was
13 marked for identification.)
14    BY MR. SAINDON:
15    Q. And for the last time, Mr. Day, if you will take
16 a look at Exhibit 11 and tell me if you recognize it,
17 please.
18    A. Okay. This appears to be a document of a nature
19 similar to the DOC jackets that are reviewed in this
20 case.
21    Q. Thank you, Mr. Day. On page 23 of Exhibit 4B,
22 the entry for ▮▮▮▮▮▮▮▮▮▮ it says, "Number of Hours
23 of Overdetention, 0.00," and you indicate in the next
24 column, in the last sentence, "Either way, not
25 overdetained." Do you see that?

140

1     A. Yes.
2     Q. And do you have any way of telling today looking
3  at that whether that reflects your final analysis or
4  not?
5     A. I believe it does. I would need to refer to the
6  final spreadsheet, but I believe I would recall this one
7  if I had made it instead of a zero, if I had put an
8  actual number in there.
9     Q. And if you will follow that over to the last
10 column, it says, "DOC Comments."
11    A. Yes.
12    Q. It says, "Not released early as was speculated.
13 DOT computation did not show the potential jail credit
14 from when the misdemeanor sentence ended. 9/6/06 to
15 10/25/06 equals 51 days." Do you see that?
16    A. Yes.
17    Q. If you could turn to page 3, please, of Exhibit
18 11, and tell me what that document is, please.
19    A. And I don't necessarily agree with the comments
20 that you had me acknowledge.
21    Q. Sure, no, I understand.
22    A. Did you have a question about it?
23    Q. We'll get there.
24    A. Okay. What do you want me to look at now?
25    Q. Page 3 of Exhibit 11, please.

                                                                141

1    A. (Witness complied.)
2    Q. And could you tell me if you recognize that
3    document, please.
4    A. This is a release authorization form for
5    ▅▅▅▅▅▅▅, indicating an exit from CDF on March
6    5th, 2007 at 7:15 p.m.
7    Q. And the release type is what?
8    A. Indicated here, parole. Mandatory
9    release-parole.
10   Q. And the releasing authority is?
11   A. Federal -- well, FBOP.
12   Q. All right, and if we could turn to page 8 to
13   address your skepticism and tell me what FBOP stands for
14   there.
15   A. Probably Federal Bureau of Prisons. And page 8
16   is the cover page of release documents for Ms. Jones.
17   Q. And can you tell were they sent by the Federal
18   Bureau of Prisons?
19   A. I'm sorry?
20   Q. Were they sent or drafted by the Federal Bureau
21   of Prisons, can you tell?
22   A. Well, it's on their letterhead.
23   Q. And what about the top line on that document,
24   can you tell, give me information from there, please?
25   A. Well, that's a fax line indicating fax from U.S.

                                                                142

1    Marshal Service, March 5th, 2007, 8:54. I can tell you,
2    also, in relation to this entry, if I'm calculating this
3    to be zero.
4    Q. I'm sorry, and you're going back to page 23 of
5    Exhibit 4, right?
6    A. Right.
7    Q. Please continue.
8    A. Once I did that, I can't say that I looked at
9    this all that closely. I was comfortable that the
10   person was not overdetained, and I made the entry,
11   whether the person was released early, or on time, is of
12   no significance to the claim in this case. So, it's not
13   something that I would want to waste time on because
14   there would be no purpose.
15   Q. So, would you agree or disagree with DOC's
16   comments that the Federal Bureau of Prisons had done the
17   calculation incorrectly?
18   A. I don't know. I mean, I see the comments here
19   saying that BOP did not show potential jail credit, but
20   if the person gets jail credit, they get jail credit.
21   What I mean by that is if somebody is in custody on a
22   case, that's jail credit that they should be given
23   regardless of whether or not it appears on BOP
24   documents. It may be that BOP erroneously did not give
25   credit to that time. And I think we looked at a file

                                                                143

1    earlier, where it was patently obvious that the person
2    had already served enough time, but may not have been
3    given credit in the Federal Bureau of Prisons
4    calculations, but it seems that everybody should have
5    been aware that there was more than enough time served
6    at the time of sentencing.
7    Q. If you will turn to page 42, please, for me, in
8    Ms. ▅▅▅▅'s jacket, and tell me what that is.
9    A. This appears to be a printout of the calculation
10   performed by the Federal Bureau of Prisons, this would
11   be a printout from a computer screen.
12   Q. And does it indicate anywhere on there when the
13   release date is or should be?
14   A. The expiration date is March 5th, 2007, shown on
15   this document.
16   Q. Thank you, Mr. Day. I would like to take five
17   minutes here, I believe we're done, Chas, so you will
18   indulge me for five minutes, and then we will come back.
19       MR. CLAIBORNE: Okay, great, thank you.
20       (Whereupon, there was a recess in the
21   proceedings.)
22       MR. SAINDON: I have no further questions.
23       MR. CLAIBORNE: Okay. Let me just have a moment
24   with Sean, but I don't think we've got any questions,
25   but let me just have a moment with him, okay?

                                                                144

1        MR. SAINDON: Sure, okay, I will step out and he
2    will come get me when you're ready.
3        (Whereupon, there was a recess in the
4    proceedings.)
5        MR. CLAIBORNE: No, I don't have any follow-up
6    questions.
7        MR. SAINDON: I think we're done.
8        THE WITNESS: I'll read.
9        (Reading and signature reserved.)
10       (Whereupon, at 4:36 p.m., the deposition was
11   concluded.)