1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARCUS BYNUM, ET AL,      .   Docket Number: CV 02-956
                          .
          Plaintiff,      .
                          .
     v.                   .   Washington, D.C.
                          .   August 31, 2005
DISTRICT OF COLUMBIA,     .   9:30 a.m.
                          .
          Defendant.      .

. . . . . . . . . . . . . .

TRANSCRIPT OF HEARING RE: SETTLEMENT MOTION
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        WILLIAM C. CLAIBORNE, III, ESQUIRE

For the Defendant:        MARIA AMATO, ESQUIRE

Court Reporter:           SUSAN PAGE TYNER, CVR-CM
                          Official Court Reporter
                          Room 6824, U.S. Courthouse
                          Washington, D.C.  20001
                          (202) 371-2230

Proceedings reported by stenomask, transcript pr‒
dictation.

Plaintiffs' Ex. 759-1
Barnes v. DC, 06-315 (RCL)

24            MR. CLAIBORNE:  And then the second change is back
25  on page seventeen.

2

P R O C E E D I N G S

THE DEPUTY CLERK: This is the matter of Marcus Bynum, et al, versus District of Columbia, Civil Action 2002, number 956. Mr. Claiborne for the plaintiffs, Ms. Amato for the defendants.

THE COURT: All right. We are here on the joint motion for preliminary approval of the settlement agreement. Let me have the plaintiffs go first with your arguments, and then I have a couple of questions that I wanted to ask you.

MR. CLAIBORNE: Thank you, Your Honor.

Last night we filed an amended --

THE COURT: I haven't seen that.

MR. CLAIBORNE: Very well, I will hand it up. It just makes two minor changes, and I have marked each of them with a tab, and I gave one to Ms. Amato, too.

The first one deals with the allocation formula, and we had transposed some numbers. People who are acquitted should get more points than people who were convicted. That is what that change is.

THE COURT: That is the twenty points versus ten points?

MR. CLAIBORNE: Right.

THE COURT: In the formula, okay.

MR. CLAIBORNE: And then the second change is back on page seventeen.

```
                                                                    3

 1              THE COURT:  Um-hum.
 2              MR. CLAIBORNE:  Part of the deal is that there is a
 3   sum of money that is going to be used to fund the injunctive
 4   relief, and the parties are finalizing a proposal, and we are
 5   asking the court to extend our deadline to September 30th.
 6              THE COURT:  Okay.  I understand.
 7         Now tell me a little bit about the overall
 8   structure.  $5 million will go for actual damages to
 9   individuals.
10              MR. CLAIBORNE:  That is right, Your Honor.
11              THE COURT:  To be allocated by a formula, to be
12   administered by the claims administrator, and you have both
13   still agreed on who the claims administrator will be.
14              MR. CLAIBORNE:  That is right, Your Honor.
15              THE COURT:  Okay.  And the -- explain to me a
16   little more about the $4 million -- up to $4 million in
17   attorney fees and what you are contemplating there.
18              MR. CLAIBORNE:  In terms of?
19              THE COURT:  Application, all that sort of stuff.
20   How is this going to work?
21              MR. CLAIBORNE:  How will the attorneys allocate the
22   fees?
23              THE COURT:  Yes.
24              MR. CLAIBORNE:  There are three -- so there are
25   basically three attorneys.  There is Lynn Cunningham, there
```

```
                                                                    4
 1   is me, and then Barry Litt and his firm.
 2            THE COURT:  Right.
 3            MR. CLAIBORNE:  So we are going to allocate the
 4   fees based on hours worked.
 5            MR. CLAIBORNE:  Okay.
 6            MR. CLAIBORNE:  We have been keeping track of our
 7   hours.  Sometimes a person -- a lawyer may work on something
 8   that turns out to be a dead end might not be compensated for
 9   it, but amongst ourselves, we will allocate the money that
10   way.
11            THE COURT:  And what is the court's role going to
12   be in terms of attorney's fees?
13            MR. CLAIBORNE:  Well, that is one of the things
14   that we wanted to get guidance from you on.
15            The amount that the parties agreed on is within the
16   range of what is generally awarded in this court on the
17   common fund theory.  So the role that we thought was whatever
18   you wanted in the way of an application.
19            Did you want to just say, that is within the range
20   of fair fee awards in this district, and that is it?  Or did
21   you want some kind of a fee application?
22            THE COURT:  Okay.  I guess what I would want is
23   some memorandum about what my options are, what the
24   appropriate role of the court should be, whether I should
25   look at it as common fund and apply that case law, or how I
```

5

1  should look at it.
2           So I would look to the parties for some guidance
3  about how to do that is what I was wondering what you were
4  contemplating.
5           MR. CLAIBORNE: I understand that. Definitely,
6  common fund.
7           THE COURT: Right.
8           MR. CLAIBORNE: Common fund with respect to the
9  class, and then hours worked for the internal allocation.
10          THE COURT: Okay.
11          MR. CLAIBORNE: And then there would also be
12 expenses. We will submit those. Everybody has been keeping
13 expenses we have. I think the major expense there, the
14 person that we retained to be the computer analysis.
15          THE COURT: And the contemplation is that wouldn't
16 address that before final approval? Or would we address that
17 before final approval?
18          MR. CLAIBORNE: Well, we would like that to be
19 addressed before final approval.
20          THE COURT: I guess you have to, because the class
21 members --
22          MR. CLAIBORNE: Right.
23          THE COURT: -- have to have their opportunity to
24 object to that allocation.
25          MR. CLAIBORNE: At our best scenario, what we

6

```
 1  would like to do is to submit authority saying that the
 2  common fund doctrine operates in this court, and the court
 3  awards us a third.
 4          THE COURT:  The common fund doctrine.
 5          MR. CLAIBORNE:  Right.  And we would not have to go
 6  through the process of preparing a fee op.  That is a
 7  lengthy, expensive process.
 8          THE COURT:  Right.  Okay.
 9          MR. CLAIBORNE:  So I mean amongst themselves our
10  parties can do some informal things, so that -- in the best
11  possible world, that is what we would like to do, and we
12  think that that law supports that approach.
13          THE COURT:  Okay.  I don't have any problem with
14  approaching it that way and then seeing if I can approve it.
15          MR. CLAIBORNE:  very well, okay.
16          THE COURT:  Now in terms of the 3 million allocated
17  for the improvements, what is the discussion about there?
18  That is what you still haven't finally agreed upon, I take
19  it, is how that will be done.
20          MR. CLAIBORNE:  We have -- I guess you can say we
21  have a deal in principle.  We have had conversations with Ms.
22  Amato and the folks at the D.C. Jail.  They have outlined two
23  specific projects to us, and these projects are -- I will let
24  Ms. Amato explain them.
25          THE COURT:  All right.
```

SUSAN PAGE TYNER, OFFICIAL COURT REPORTER

Plaintiffs' Ex. 759-7
Barnes v. DC, 06-315 (RCL)

7

1      MR. CLAIBORNE: But these are basically state-of-
2 the-art projects to help the jail with its intake and release
3 procedures and monitoring inmates when they are actually in
4 their custody.
5      That is a really big deal, because part of what
6 clogged the system before was that an inmate would go from
7 the D.C. Jail over to the courthouse, and we would lose
8 track of them. But there are now state-of-the-art devices to
9 keep track of an inmate as he moves through the entire
10 system.
11      THE COURT: Like a piece of inventory.
12      MR. CLAIBORNE: I don't like to say it that way,
13 but that is exactly what we are doing. We are taking the bar
14 code technology --
15      THE COURT: Right.
16      MR. CLAIBORNE: And applying it to people.
17      THE COURT: Right.
18      MR. CLAIBORNE: And now that there are lots of
19 advances in facial recognition, you can identify somebody,
20 and a lot of these techniques can really speed things up. So
21 technology, and they put some physical improvement actually
22 at the jail. So these are really going to have long-lasting
23 impacts.
24      THE COURT: So that has a long-term impact beyond
25 the damages for the individuals here. This is going to be

8

1  designed to protect future people that are in this posture.
2          MR. CLAIBORNE: Absolutely. And I think it will
3  really help the jail.
4          Then another thing, something that I am
5  particularly proud of, is the District has agreed to stop the
6  practice of strip searching in-custody defendants who get
7  release orders.
8          It used to be if you got a release order in one
9  case, they would put you back in the jail, strip search you,
10 and then check to see whether or not you had any other cases.
11 Now the presumption is reverse.
12         You will go to a third location if you have one
13 release order, you know, see if you have any other holds or
14 cases. If you don't, you are free to go without a strip
15 search, and if you do, you go back into the jail.
16         We think that this will speed things up, because
17 you are not going to be putting people back into an already
18 clogged up system. So there is going to be lots of systemic
19 improvement in the jail.
20         THE COURT: Okay, great. Thank you, Mr.
21 Claiborne.
22         Ms. Amato, tell me a little more about how the
23 improvements are going to work, and then also tell me a
24 little more about -- I take it the new facility is ready.
25         MS. AMATO: Yes, Your Honor.

1    One of the reasons that we wanted to hold off on

---

9

1    THE COURT: And we are going to start today?

2    MS. AMATO: Yes, Your Honor. In fact they started

3 a few weeks ago.

4    THE COURT: Okay.

5    MS. AMATO: A pilot program was begun I believe in

6 June for a number of the inmates. It was proceeding very

7 well. So it was implemented in August full-time for all of

8 the inmates.

9    ==If they receive release orders from Superior Court,==

10 ==they are now put in the lock-up at D.C. General Hospital, so==

11 ==they are segregated from the mainstream population.==

12    ==THE COURT: So they are just taken to a different==

13 ==location down at D.C. General?==

14    ==MS. AMATO: Correct. And they don't have to be==

15 ==strip searched. There they now have staff on cite, and the==

16 ==technology to check the records, to see if they have any==

17 ==other detainers, or other matters, and if not, then they are==

18 ==released from the hospital lock up.==

19    There were some architectural improvements made.

20 It was refurbished, repainted. There was a roof repair that

21 was done. There was a small leak. So everything is up and

22 running now, and we are pleased with it, too, because I the

23 court that it really certainly helps with the inmate

24 population in the jail, which as you know can grow at certain

25 times of the day. So we are very pleased with it.

10

1   One of the reasons that we wanted to hold off on
2   this approval until today was so that we could ensure that we
3   don't create an interim class, so we should not have that
4   problem now, which would mean a lot less work for everybody,
5   including the court.
6           THE COURT:  This is ready to work effective today?
7           MS. AMATO:  Yes, it is.  It has been working
8   actually for at least two weeks.
9           THE COURT:  Good.
10          MS. AMATO:  Completely.
11          THE COURT:  Good.  And there have not been any
12  hitches?
13          MS. AMATO:  No.  In fact I was going to invite Mr.
14  Claiborne, if he would like, to come out and see the process,
15  because I will be going out to look at it, too.
16          MR. CLAIBORNE:  Thank you very much.
17          MS. AMATO:  With regard to the reversion, we have a
18  few ideas on the table. I think that with a $3 million
19  payment like this, it is important to use the money in a way
20  that isn't going to just like say fund the operation over at
21  D.C. General Hospital, or something like that.  You know, you
22  don't want to use it on the consumable.  You want to invest
23  in something.
24          And when we had received some moneys in the past
25  and were able to refurbish the records room and put up all of

11

1  the technology, that really took us a long way.  So we would
2  like to do something similar, and we are looking at a couple
3  of things.
4          One would be to get the architectural specs to
5  build a multi-level state-of-the-art processing center that
6  would be extended out of the jail, you know, where the
7  parking lot is.
8          In that it would include things like if an inmate
9  is returned into the population, they could use Glos Chairs.
10 Glos Chairs are chairs that you don't have to do a strip
11 search at all.  The inmate sits in the chair, and it would
12 detect any contraband, so you avoid the search.
13         It would also include much more space, much more
14 room for property so that people could be discharged more
15 quickly.  It would allow for the segregation of the
16 populations.
17         They are also looking at a wireless system within
18 the jail that would work by bar codes, which you heard
19 mentioned, and it would keep much better track of people, and
20 it would do the counts, and where people are.  It just has
21 unlimited potential.
22         Also, if we invest a little bit, we are hoping that
23 when Superior Court gets a little more up and running, we
24 would like to look at, you know -- there are some
25 possibilities, like remote arraignments, things like that.

1  opposition by January 20th, and so on. So you might think
2  about whether --
3              MS. AMATO: I will defer to Mr. Claiborne.

                                                              12

1  So we would like to invest a little bit in the technology at
2  the jail.
3              So we are going to put in a proposal in writing.
4  We had some meetings on it. There is a lot to look at. We
5  would have to look at how we would do the RFP that would go
6  out on some of these plans. So we would like to have until
7  the 30th to get into writing to the court.
8              And just to clarify, the settlement agreement
9  doesn't call for injunctive relief. It merely calls for the
10 reversion, but these are things that we are doing
11 voluntarily, and we actually really appreciate the reversion
12 and the opportunity to do these things, because you know like
13 everyone else, we have a budget that we have to stick to. We
14 had a very cramped situation at the D.C. Jail, and we had a
15 lot of constraints in how we processed inmates. So this is
16 going to go a long way in helping us.
17             THE COURT: Good. I am pleased, actually, with the
18 settlement, and I have to say I would commend both the
19 plaintiffs who have done a good job in negotiating this, and
20 the District of Columbia in agreeing to the settlement.
21             I find on the preliminary information that I have
22 that it should be approved. I will have a fairness hearing,
23 and I will talk to you about the date of that in a minute,
24 and see if there are any objections that I haven't thought of
25 that any of the members of the class might have to it, but I

13

1  have to say one thing, and that is it is a progressive step
2  by the District of Columbia, and it is something that the
3  court appreciates.
4          In prior litigations with the D.C. Department of
5  Corrections, it took years of adverse court rulings, and
6  appeals, and all sorts of other things before we got to this
7  stage of a final settlement in the sex discrimination case
8  regarding the guards and the employees.
9          I have to say from the time of that settlement I
10 have been very pleased with how that settlement has worked.
11 The special master process, and the processing of all of
12 those improvements that came about in the D.C. Department of
13 Corrections I think can be credited to that litigation, and
14 it think it was a good result ultimately, and I really
15 foresee this being a similar result here with a wins for
16 everybody.
17         I think you have all done an extraordinary job in
18 putting this together, and I am pleased to give it my
19 preliminary approval.
20         If I change the fairness hearing to January 30th, I
21 have an eight month jury trial I am starting on February 1st,
22 so I would rather get this out of the way first.  Would there
23 be any other dates that we would need to change if I changed
24 the fairness hearing date to January 30th?
25         I don't think I would, because I still get an

14

1  opposition by January 20th, and so on.  So you might think
2  about whether --
3          MS. AMATO:  I will defer to Mr. Claiborne.
4          MR. CLAIBORNE:  I don't think it would change
5  anything.  I think the only person whose time it would change
6  would be yours.
7          THE COURT:  Would be mine.
8          MR. CLAIBORNE:  Right.
9          THE COURT:  Which wouldn't be a problem.
10         Okay.  Then I will go ahead and calendar that for
11 the fairness hearing on January 30th, at which I will hear
12 any objections, and then hopefully be able to give final
13 approval.
14         MR. CLAIBORNE:  We are going to put these documents
15 on a web site, so we will have to change any document to that
16 date.
17         THE COURT:  All right.  Anything else we should do
18 today?
19         MR. CLAIBORNE:  Nothing for the plaintiffs, Your
20 Honor.
21         MS. AMATO:  No, Your Honor, thank you.
22         THE COURT:  All right, thank you all both for a
23 very nice job.
24         MR. CLAIBORNE:  Thank you, Your Honor.  The court's
25 help was very useful to us.  We probably wouldn't have gotten

1  there so soon.  Thank you.

2       (Whereupon, the proceedings were adjourned.)

3                        - - - - -

4              CERTIFICATE OF COURT REPORTER

5       I certify that the foregoing is a correct transcript of

6  the proceedings in the above-captioned case.

                              _____
                              SUSAN PAGE TYNER, CVR-CM
                              OFFICIAL COURT REPORTER