UNITED STATES DISTRICT COURT

OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARL A. BARNES, et al<br><br>Plaintiffs<br><br>v.<br><br>GOVERNMENT OF THE DISTRICT OF COLUMBIA,<br><br>Defendant | Civil Action No:  **06-315 (RCL)**<br><br>Next Event: None scheduled |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS ON WHICH THERE IS NO DISPUTE MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**THE COURT RETURN[1] CYCLE: SUMMARY OF HOW IN-CUSTODY DEFENDANTS ("COURT RETURNS") GET TRANSPORTED FROM DC JAIL TO DISTRICT OF COLUMBIA SUPERIOR COURT FOR COURT HEARINGS, BACK TO THE JAIL, AND HOW THEY GET RELEASED**

**INITIATING THE COURT RETURN CYCLE**

1.      Every day that court is in session the DOC sends in-custody defendants from the Jail and CTF to the Superior Court in the District Court for court events.   The report by Karen Schneider entitled "**Review of Paperflow Process**

---

[1] Strictly speaking an in-custody defendant is not a "court return" until he begins his trip from the courthouse back to the DC Jail.  However, for ease of reference, the term is used herein to describe an in-custody defendant on both legs of the trip to and from the Superior Court courthouse.  Court returns go from DC Jail to both District of Columbia Superior Court and the District Court.

**between the Superior Court, the United States Marshals (the "**Schneider report" or "Schneider"), page 4.

2.     On any given day the DOC sends about 100 or 150 in-custody defendants ("court returns") to the courthouse for court events.  Ps. Ex. # 112 (DOC newsletter).

3.     On any given day the DOC sends about 100 or 150 in-custody defendants ("court returns") to the courthouse for about 200 to 250 court events.  Schneider, pg. 4, n. 1.

4.     The Superior Court initiates the "court return" cycle - the process of transporting inmates from the DC Jail to the District of Columbia Superior Court and back again to the DC Jail -- by sending a list (called the prisoner transfer request, or "PTR") of inmates (generated by Quality Assurance Branch out of the Superior Court's docketing database) to the Department of Corrections Records Office on the next business afternoon before a court date. Schneider, pg. 4.

5.     The PTR is generated out of CourtView, and the PTR lists all in-custody defendants who have court appearances that day.

6.     The PTR also lists each single case that each in-custody defendants is scheduled2 to go to court on. Cipullo page 78-80.

---

[2] CourtView has a field showing whether a defendant is being held on a charge. Call their release status field that was being populated by the clerks in January of 2006.  Cipullo page 79, 80. Sometimes an in-custody defendant would go to court and would appear before a judge on a case that he was not being held on (for example a case that he was on probation on)  and the judge would change their release status to a commit status, for example by revoking the probation. Cipullo page 80.  In 2006 the Superior Court denied having the system for

7.    Two pages of two different PTRs from October and November 2007 respectively are attached to Ms. Schneider's report as Attachment 1 and Attachment 1A respectively.  (Bates 15344 and Bates 15345 respectively).  The highlighted areas on Attachment 1 (Bates 15344) show inmates with multiple cases listed.

8.    Until 2008 the Superior Court sent the PTR in a paper format by courier to the Records Office.

9.    In 2008 the Superior Court began transmitting the PTR in a hard pdf file via e-mail.  Schneider, pg. 4.

10.    The Superior Court explored sending the PTR in a manipulable format such as an Excel spreadsheet so it could more easily be used as a tracking device but the DOC has not been able to make this work.

**SENDING COURT RETURNS FROM THE DC JAIL TO THE COURTHOUSE**

11.    The Records Office identifies and locates the inmates on the PTR and writes the inmates' housing locations and other data on the PTR.  Schneider, pg.  4.

12.    The Records Office then transmits copies of the annotated PTRs to the housing units so the COs can collect the court returns from their cells so they can go to R&D Control for staging.

---

notifying the DOC that his Superior Court judicial officer had ordered a person held on a case that was not on the PTR.  Schneider discusses how this was corrected. Superior Court added field CourtView which shows word individual is not being held but is being held in the other case (the HOPR field, held other charges PR this case). Cipullo page 83,84.

13.     The Records Office also sends copies of the annotated PTR to the CTF.

14.     CTF pulls in-custody defendants being held and CTF and transports them in the morning to the jails R&D control post for transport to the Superior Court.

15.     The jail also creates an addendum to the PTR adding the names of persons requested by the Superior Court after transmission of the PTR. Schneider, pg. 4.

16.     In the morning about 5 A.M., jail staff collect all of the persons listed on the PTR in the addendum in the R&D control post of the DC Jail and prepare to send them to the courthouse on buses.

17.     The DOC began transporting in-custody defendants to and from the courthouses in July, 2004.  Ps. Ex. # 112, DOC newsletter3, pg. 5.

18.     R&D Control staff print out a "wing card" for new intake when he's booked into DOC which has their name, DCDC, and a photo and which follows the body wherever it goes while in DOC custody.  Watson 1 depo, pg. 140.

---

[3] In 2004, the U.S. Marshals Service entered into an intergovernmental agreement with the District of Columbia Department of Corrections for the transportation of prisoners between the courthouse and the jail/ CTF and the DOC began transporting prisoners to and from the courthouse.  Confirmation hearing testimony of Stephen Conboy, former Superior Court Marshal, page 6.

19.    R&D Control staff send a "wing card" for each "court load" (an in custody defendant bound for court) housed at the DC Jail (but not for court loads housed at CTF who is going to court. 141-142.

20.    Jail R&D staff write down the names of everybody on each bus load going frpm the DC Jail to court onto a Form 40 (a Form 40 is a manifest listing all the names of the inmates on a van or bus) and give the Form 40s to who's ever transporting the load of inmates going to court. Watson 2 p 57.  A copy of a typical Form 40 prepared by jail board deputy to return in-custody defendants from Superior Court is attached as Attachment 2 to Ms. Schneider's report (Bates 15346).

21.    All persons on that load (housed at DC Jail) get "clicked" onto "temporary release4" in JACCS in batch load when they board their bus.  Watson 1, pg, 141.

---

[4] A person on "temporary release" is somebody who is expected back into DOC custody as opposed to somebody who's been permanently released from DOC custody. Watson 2 page, 60.  An inmate is placed on temporary release to show that they are temporarily not in DOC custody.  JACCS has a "temporary release" history table which saves all persons clicked onto and off of temporary release in JACCS.  A person has to be clicked off of temporary release before he can be permanently released.

22.    Wing card goes to court with the body of each of the Jail court loads when they leave the jail for court.  Watson 1, pg. 141-142.

23.    R&D control staff sent a copy of the annotated PTR and addendum to marshal's deputies at the courthouse on the first bus of the morning.

24.    But, when court loads leave the DC Jail to go to court R&D control do not maintain a list of all of the cases that each inmate is going to court on.

25.    Nor, does R&D control, or any other DOC staff, maintain any list for tracking all of the cases an inmate is going to court on, and in which, if any, of these cases a court order has been issued.

26.    It is only when a court order reaches the Records Office and the Records Office staff retrieve the jacket and the Records Office staff looks in the jacket to see whether the court return has any other cases he is being held on that the DOC knows whether the DOC has received an order for every case the court return went to court on.


**COURT RETURNS AT THE SUPERIOR COURT**

27.    Each day in the Superior Court cellblock a deputy of the Superior Court Marshal runs the "jail board" ("jail board deputy").

28.    The DOC began running the jail board after Ms. Schneider's report came out in 2009.

29.    The jail board is the desk where a Superior Court Marshal deputy sits and organizes all of the paperwork received from the DOC regarding court loads such as the PTR, and also serves as the clearing point and organizes and

stages all the court orders and bodies coming down from the court rooms going back to the jail.

30.     The jail board uses the PTR as the tracking form for bodies, court orders, and other paperwork.  Schneider, pg. 4.

31.     Deputies of the Superior Court Marshal ("courtroom deputies") take the bodies from the Superior Court cellblock up to holding cells behind the court rooms.

32.     Courtroom deputies take in-custody defendants from the holding cells to the court rooms sometimes singly and sometimes in groups when their cases are called.

33.     The jail board deputies collect wingcards from DOC transport staff and Gilmore deputies give the wingcards to the courtroom deputies and the courtroom deputies keep the wingcards with the bodies of the in-custody defendants.  Watson 1, pg. 142.

34.     At the courthouse Deputies and DOC use the in-custody defendants' wing card and their arm bands (also with name, DCDC, and photo on them) to track the bodies of the in-custody defendants while they are at court.  Watson 1, pg. 142.

35.     When a body leaves the Superior Court for MHU or the DC Jail their wing card travels with the body.  Watson 1, pg. 143, 146-148.


**THE COURT RETURN IN THE COURTROOM; DOCKET ENTRIES MADE BY THE CLERK**

36.    After the judicial officer makes their ruling(s) ("disposition(s)"), the courtroom clerk makes a docket entry in CourtView of the disposition(s) ordered by the judicial officer.  Cipullo, pg. 19.

37.    Clerks are obligated by the law5 to make the docket entries relating to the dispositions in each case.

38.    CourtView has a disposition field for each charge of each case and the clerk's entries automatically get entered onto the docket.  Cipullo, pg. 23. Attached is the docket sheet for named plaintiff Maurice Williams' traffic case showing the disposition of the traffic case hearing.

39.    The docket itself is the individual record in a case and CourtView is the database which contains all the cases that the Superior Court has. Cipullo pg. 19.  Superior Court Rule of Criminal Procedure 55(a).

---

5 **Rule 55.  Records of the Clerk**

**(a)** The clerk shall make entries in appropriate dockets and records of all papers and documents filed in the clerk's office and of all proceedings of the Court. The entry of an order or judgment shall show the date of the entry is made.

**(b)** For any search for the criminal record of an individual, the clerk shall charge a fee of $10.00. The fee shall not apply to: an individual requesting a search for his or her own record; any governmental agency; or an attorney for or an employee of a non-profit organization located in the District of Columbia that provides legal services for indigent clients without fee or for a nominal processing fee or an attorney appointed pursuant to D.C. Code §§ 11-2602 or 16-2304 or any individual who has been approved by the Court to proceed in forma pauperis who certifies that such a search is necessary pursuant to such an appointment.

Superior Court Rule of Criminal Procedure 55.

40.     The docket entry, or order, in a case is just a reflection of what the judge ruled in a case.  Cipullo, pg. 28, 30.

41.     An entry into CourtView is an entry into the official docket of the Superior Court of the District of Columbia. Cipullo pg. 22.

42.     Docket entries are an official part of the court record.  Cipullo, pg. 27,28.

43.     Docket entries become available on CourtView as each charge is updated.  Cipullo, pg. 26-27, 28.

44.     Clerks make entries into CourtView as close to real time as possible, and the clerk generally makes the docket entries as the judge makes their rulings. Cipullo, pg. 19.

45.     Docket entries accurately reflect the oral rulings of the judicial officers as recorded on the transcript 99.99 % of time.  Cipullo, pg. 42; 61, 62-63.

46.     Clerks enter docket entries accurately enough so the docket entries can be relied on for purposes of calculating the time for appeals.  Cipullo, pg. 64.

47.     A docket entry disposing of a charge or a case does not have an image (order) associate with it.  Cipullo, pg. 43.

48.     The only docket entries that have images associated with them are docket entries reflecting the issuance of an order or other document.  Cipullo, pg. 44.

49.     CourtView  went online and was fully operational in the criminal division of the Superior Court on January 18, 2006. Cipullo, pg. 15.

50.     Now the Superior Court does not even make jackets for cases and the Superior Court stopped putting paper copies of orders in jackets in 2006. Cipullo, pg. 31-32.

51.     Docket entries reflecting a disposition are made before the paper orders reflecting the docket entries are printed out because the paper orders are generated from the docket entries. Cipullo, pg. 39-40, 69.

52.     Docket entries were available to the DOC staff on terminals when CourtView went online in January 2006.  Cipullo, pg. 45.

53.     Training in Courtview by Superior Court was offered to DOC when Courtview went online in January 2006.  Cipullo, pg. 46.

54.     Clerks cannot delete docket entries from the Courtview docket from the courtroom.  Cipullo, pg. 23.

55.     Only supervisors can delete docket entries from the Courtview docket. Cipullo, pg. 23.

56.     An errata entry made in the event of a change in a docket entry.  Cipullo, pg. 33.

57.     Judges do not dictate whether DOC makes releases of in-custody defendants on the basis of docket entries or on the basis of paper orders. Cipullo, pg. 67.

58.     Superior Court does not control the DOC with respect to how the DOC makes its release decisions.  Cipullo, pg. 70.

59.     Neither the chief judge nor the presiding judge of the criminal division ever issued a writing (such as an administrative order in the case of the chief

judge) saying that the DOC should make release decisions on the basis of the paper order as opposed to the docket entry.  Cipullo, pg. 71.

60.    Superior Court and Superior Court Marshal made space available to the DOC for LIEs in the cellblock of the Superior Court in April 2008.  Cipullo page, 170.

61.    Each docket entry in each case and the individual's PDID number and each case the each in custody defendants was going to court on on any given day was listed on the PTR.  Cipullo page,

62.    CourtView generates orders memorializing a disposition based on information in CourtView.  Cipullo page,

63.    therefore, when Courtview generates orders memorializing a disposition based on information in CourtView, CourtView does not make errors such as transposing court case numbers.  Cipullo page,

64.    Sometimes when a judgment and commitment is issued the court does not issue a separate release order. Cipullo page, 132.

65.    The court relies on the DOC to calculate the release date from the judgment and commitment order because the DOC is the agency which has records of time served by the defendant. Cipullo page, 132.

66.    In the Superior Court the goal was to keep court orders with the body so that everyone would know what was happening with that body. Cipullo page, 89.

67.    In 2005 and 2006 typically orders were not faxed to the DOC. Cipullo, page 90.

68.     The Superior Court would fax an order regarding and in custody defendants that appeared in court that day to the DOC if the DOC requested the Superior Court to send an order by fax. Cipullo, page 90.

69.     Superior Court has discussed having orders put directly into CourtView so the orders can be viewed by accessing Courtview.  Cipullo page,

70.     In the DV division, ever since CourtView came online, orders have been scanned in real time into CourtView and orders issued by the DV division are available for viewing in Courtview in basically real-time. Cipullo, page 91.

71.     Docket entries made into CourtView and orders scanned into CourtView are protected by security devices to protect them from being altered by unauthorized persons. Cipullo, page 93-94.

72.     In 2006 orders generated in the courtroom were not reviewed by quality assurance and scanned into CourtView until 24 to 48 hours after the order was generated in the courtroom.  Cipullo, page 98.

73.     And at that time, the Superior Court assumed that the paper copies of orders issued to the courtroom deputies had already arrived at the DOC and that the DOC had already processed the releases based on the paper orders by that time. Cipullo, pages 98, 100 – 101.

74.     Cipullo cannot remember a situation where a docket entry which reflected a release disposition was subsequently changed to a commit disposition. Cipullo, page 109.

75.    The copies of orders the clerks give to courtroom deputies that go from the courtroom to the marshals and on to the DOC do not have any kind of raised stamp on them.  Cipullo depo, pgs 92:5-9.

**THE COURT RETURN IN THE COURTROOM; PAPER ORDERS PRINTED OUT BY THE CLERK**

76.    in Superior Court courtrooms after judicial officer makes their oral rulings the clerk then prepares two copies of a paper order memorializing the dispositions docketed on CourtView.  Schneider, pg.  4.

**HOW PAPER ORDERS AND OTHER PAPERWORK ASSOCIATED WITH IN-CUSTODY DEFENDANTS TRAVELS TO THE DC JAIL'S RECORDS OFFICE**

77.    The clerk keeps one copy of the paper order, and gives the other copy of the paper order to the courtroom deputy. Schneider, pg.  4.

78.    The courtroom deputy then takes the body and the paper order reflecting the disposition made and not by these cases down to the jail board deputy, puts the body in a holding cell, and gives the paper order to the jail board. Schneider, pg.  4-5.

79.    In December 2007 Ms. Schneider described the District's system for transmitting court orders to the DC Jail's Records Office as follows:

    80.    The District's system to transfer commitment and release
    orders from the Court to the DOC for processing is a very lengthy,
    cumbersome, paper-driven process involving multiple agencies.
    When an order is issued in the courtroom, it travels through seven
    hands - the courtroom clerk, to the eputy US Marshal (Deputy)

[courtroom deputy] to the USMS staff at the Jail Board6 post, to
the DOC transport officers, to the Receiving and Discharge (R&D)
control officer at the DC jail, to the DC jail Records Office staff
[posted] in R&D -- before reaching the DC Jail Records Office
where it is processed.

Schneider, pg.  1.

81.    "All parties agree that the paper-laden system currently in use to

transport orders within the court to the DOC is an archaic system that

ultimately needs to be updated using current available technology."  Schneider

report, pages 24 – 25.

82.    It takes several hours, usually until 5 PM or later, for the paperwork

reflecting dispositions in the cases of in custody defendants to get from the

Courthouse to the R&D Control post on the first floor of the DC Jail. Schneider

final report, page 7 count.

83.    Frequently orders issued by judges and other paperwork relating to in

custody defendants does not arrive at the R&D Control until the last bus of the

day which can be 8:00 or 9:00 pm depending when the arraignments

Courtroom goes down.

84.    Courtrooms where criminal cases are heard other than arraignments go

down between 4:30 PM and 5 PM.

85.    In Superior Court only the arraignment courtrooms where arrestees are

arraigned stays open past 5 PM.

---

6 The Jail Board is the USMS post in the court's cellblock bubble. The staff
assigned to this post coordinate the paperwork received from the deputies and
transfer such paperwork to the DOC transport.

86.    Court orders and other paperwork relating to the in custody defendants encounters significant delay in R&D Control were DOC staff receive the paperwork, sort it out, check it against inmates on the bus, and then log orders in a log book and post the data from the orders in JACCS. Schneider report, p. 7.

87.    Ms. Simmons says that from the time the Records Office gets the court orders and other paperwork relating to in custody defendants until the records office staff finish processing the releases takes about 2 ½ hours.  Simmons I, pg. 164.

88.    The DC's outmoded system for managing in custody defendants going from the jailers CTF to the courts has a structure that simply cannot support the weight of the daily flow of inmates going between the courthouses and the DC Jail.

89.    Moreover, the districts inmate management system is poorly administered, mainly because of problems in the DC Jail's Records Office, which compounds the structural problems inherent in the districts "split" inmate management system.

**HOW THE JAIL BOARD DEPUTY TRACKS PAPERWORK AND BODIES AFTER THEIR COURT APPEARANCES**

90.    After courtroom deputies bring in custody defendants down from the courtrooms to the jail board and the cellblock of the Superior Court the jail board deputy checks off on his annotated copy the PTR that the paperwork was

received on the courtroom deputy's list of in-custody defendants presented in his courtroom. Schneider, pg. 5.

91. The jail board deputy also makes the notations on his copy of the PTR that he has received a paper order for each in custody defendants who was returned from the courtroom from a court hearing.

92. According to the Schneider report, "Staff who work the jail board desk do this differently. Some staff draw a line through it, some staff mark it with a check, and some use a parenthesis mark." Schneider, pg. 5, note 7.

93. Moreover, if an in-custody defendant or his paperwork arrive at the jail board and the jail board realizes the in-custody defendant has more than one case, the jail does not forward that paperwork onto the Records Office so the Records Office can begin the release process. Schneider, pg. 5.

94. Instead, the jail board holds the first set of orders or buck slips in a tray until the in-custody defendant has finished all his appearances and all of his paperwork is collected which can be hours later instead of sending paperwork back to the records office on a rolling basis to at least start the release process. Schneider, pg. 5.

95. One reason this is done is to prevent erroneous releases which frequently occur when "orphaned" commit orders arrives after the body. Ps. Ex. # 420, Schneider Preliminary7, pg 8; 10-11.

---

[7] In-custody defendants frequently leave the courtrooms without orders and the orders are generated after the in-custody defendants have left the courtroom and return to court **on the last bus of the day** after the body has already reached the DC Jail. Ps. Ex. # 420, Schneider **Preliminary**, pg at 10-11. This scenario of orphaned paperwork arriving on the last bus of the day

96.     If an inmate is on the PTR for more than one case, the order from his first case is placed in a tray to wait for the inmate's orders in his other cases until after he has finished all of his other hearings.  Schneider, pg.  5.

97.     This means that when an in-custody defendant goes to court on more than one case, all of his orders wait at the Superior Court cellblock till he has gone to all of his scheduled court appearances before any of his orders are sent back to the jail's Records Office.  Schneider, pg.  5.

98.     None of the in custody defendant's orders is sent over to the Records Office at the DC Jail until the body is has completed all of his court appearances and is ready to go back to the jail. Schneider, pg.  5.

99.     For each van or bus load of in-custody defendants heading back to the jail or MHU or CTF the jail board deputy fills out a manifest ("Form 40") listing the names of each prisoner going back to the jail for CTF or MHU and at least one of the case numbers that that prisoner went to court on.  A copy of a typical Form 40 prepared by the jail board listing in-custody defendants leaving the Superior Court dated 11/29/2007 is attached as Attachment 2 to Ms. Schneider's report (Bates 15346).

100.    Until the beginning of 2008, after Ms. Schneider had issued her preliminary report, the jail board deputy listed only one case for each defendant on the Form 40, no matter how many cases that defendant had gone to court on. Schneider, pg. 5 n8.

---

caused at least three of the erroneous releases reviewed by Ms. Schneider in her **preliminary** report.  Id. at pg. 10.

101.   Ms. Schneider recommended in her Preliminary Draft Report, The report by Karen Schneider entitled "Review of Paperflow Process between the Superior Court, the United States Marshals: Preliminary Draft Report" (the "Schneider Preliminary Draft Report"), page 3, n.4, that the courtroom deputy write on the Form 40 not only each prisoner's name, but also each case that the prisoner had gone to court on.

102.   According to Ms. Schneider's final report, the jail board deputies began following the practice of this recommendation. Schneider Report, page 4.

103.   When the jail board deputy and the DOC transportation staff decide that there are enough inmates for a busload or van load, the jail board deputy attaches the orders and the wing cards to the Form 40 and gives the documents and the bodies to the DOC transport officer. Schneider report, pg. 5 – 6.

104.   The DOC transport officer verifies some paperwork is received on each inmate by putting a check next to the names of the defendant on the Form 40. Schneider, pg. 6.

105.   However, since the Form 40 until 2008 listed only one of the cases that in the inmate had gone to court on, the DOC transport officer was not able to verify that he had an order for every case that an in custody defendant went to court on.  Schneider report page 6, note 14.

106.   Ms. Schneider's recommendation in her Preliminary Draft Report (December 2007) was also that the DOC transport officer make a checkmark next to each case number on the Form 40, as opposed to each name, to verify

that the DOC has received an order in each case.  Schneider Preliminary Draft Report, pg 3 n. 6.  Schneider report page 8.

107.   Even after (at Ms. Schneider's recommendation) t is such he jail board deputy began writing on the Form 40 every case that each inmate had gone to court on, as of the date of the final report (May 2008) the DOC transport officer was still making only one checkmark next to each inmate's name, regardless of how many court cases the inmate had gone to court on.  Schneider final report page 6, note 14.

108.   As a result, as of the date of the Final Report, May 2008, the Form 40 still did not serve as a tracking device for the DOC to ensure that each inmate had got a court order for every case that he had gone to court on when he was received by DOC staff because the DOC transport officers were not checking off each case an in custody defendant had gone to court on.  Schneider report page 6, note 14.

109.   Moreover, at all times during the class period certain number of in-custody defendants returned from the courthouse to the jail without orders, or "buck slips" or any paperwork other than the listing of their names on the Form 40 itself.  The Schneider report details her findings that frequently the DC Jail admits court returns into the DC Jail without commitment or release orders.  Ps. Ex. # 406 Schneider report, pages 15-18.

110.   Interviews by Ms. Schneider with DOC and deputies indicated that paperwork regularly goes back to the jail of on the last bus load when the

inmate had already arrived earlier at the jail.  Ps. Ex. # 406 Schneider report, page 18.

111.   Ms. Schneider's report analyzed three separate erroneous releases which occurred because paperwork went back on the last bus after the inmate had already arrived at the jail.  Ps. Ex. # 406 Schneider report, page 18.

112.   Ms. Schneider describes how the DOC's R&D Control staff thwarted her attempts to audit paperwork received from the court reported on the R&D Control's annotated copy of the PTR by simply stopping all annotations on the PTR during her audit period.  Ps. Ex. # 406, Schneider Report, pages 16-17.

**THE BODY (AND SOME PAPERWORK) ARRIVES AT THE DC JAIL'S R&D CONTROL POST**

113.   after the bodies of in custody defendants left the Superior Court the DOC transport staff then delivered the bodies and the paperwork (attached to the Form 40 containing a list of inmates on the bus or van) to R&D control at the DC Jail. Schneider, pg. 6.

114.   The bodies waited in R&D Control while the R&D officer took the Form 40 and the attached orders and went down the list of inmates on the Form 40 to make sure that there was a body for every name on the list and to see whether there was a court order or other paperwork for every body on the list. The R&D checked for an order authorizing each inmate to return to the DC Jail or to MHU if there were a release order.  Schneider report at page 8.

115.   The R&D Control person annotated the R&D copy of the PTR by noting the type of paperwork received for each defendant. Schneider report at page 16.

116.   However, the R&D person recorded only the types of paperwork that returned with each in custody defendant.  Schneider report at page 16.

117.   The R&D person did not us a list of each case a person went to court on to check off whether the jail had received an order from every case that the court return went to court on because the Form 40 did not list each case on which the court return had gone to court, or, the DOC transport officer did not check that an inmate had a court order for every case he gone to court on. Schneider report at page 16.

118.   Therefore, because the Form 40 did not list each case on which the court return had gone to court, or, the DOC transport officer did not check that an inmate had a court order for every case he gone to court on, R&D staff had no way of knowing whether the Form 40 contained a court order for every case that the court return had gone to court on.

119.   Moreover, at all times during the class period certain number of in-custody defendants returned from the courthouse to the jail without orders. The Schneider report details her findings that frequently the DC Jail admits court returns into the DC Jail without commitment or release orders.  Ps. Ex. # 406, Schneider report, pages 15-18.  Ms. Schneider describes how the DOC's R&D Control staff thwarted her attempts to audit paperwork reported on the R&D Control's annotated copy of the PTR by simply stopping all annotations during her audit period.  Ps. Ex. # 406, Schneider Report, pages 16-17.

120.   Both Ms. Graham and Ms. Simmons confirm that court returns returned to the DC Jail during the class period without either orders or "buck slips" or any paperwork other than the listing of their names on the Form 40 itself. Simmons 2 depo, 256-257.

121.   Graham says sometimes people come back into R&D control with all release orders and no commit orders and still got returned to their housing units. Graham, pages 86-87.

122.   In custody defendants who returned from Superior Court or District Court without orders were sent back upstairs to their housing units because R&D Control did not know the total of number of cases that the in-custody defendants went to court on so R&D control did not know whether the court return had release orders on all the cases they went to court on. Graham, pages 86, 87.

123.   Moreover, some in custody defendants return from court without any court order all. These in custody defendants returned from court with nothing but a buck slip. Simmons 2 depo, 256-257.

124.   A buck slip is a form filled out by the deputy, not an order prepared by clerk and signed by a judge, which simply memorializes the fact that the deputies have returned a body the jail.  Simmons 2 depo, 256.

125.   A buck slip does not contain any information about the disposition(s) on the case(s) the in-custody defendants went to court on.  Simmons 2 depo, 256.

126.   Some defendants returning from court to R&D control at the DC Jail did not even have a buck slip with them when they return from court.

127.   The only document memorializing the return of such in custody defendants to the DC Jail was the Form 40.

128.   R&D control had no way of telling at this point (the point when the in custody defendant returned R&D control without a court order or a buck slip) whether the individual in custody defendant had got a release disposition or a commit disposition in any of their cases.  Simmons 2 depo, 256.

129.   During the class period individual in custody defendants who returned to R&D Control on a buck slip or Form 40 were returned to their housing units pending receipt of court orders showing release dispositions. Simmons 2 depo, 256; Graham, pages 86-87.

130.   During the class period individual in custody defendants who returned to the jail on a buck slip or Form 40 without a release order were treated as subject to their original commitment and R&D staff returned them to their housing units pending receipt of court orders showing their release dispositions. Simmons 2 depo, 256; Graham, pages 86-87.

131.   Ms. Graham Graham worked in R&D control on day shift starting in July/ august 2005.  Graham, pages 7-9.

132.   Ms. Graham said that a Court return is an in custody defendant who leaves DOC custody and returns to DOC custody the same day. Graham, pages 13-14.

133.   Ms. Graham confirmed that one in custody defendants left the jail to go to their court appearances that while they were outside of the DC Jail or CTF

R&D Control did not keep track of all the cases that these court returns went to court on.  Graham, pages 26.

134.   Each court return you left the DC jail for one of the courthouses had a wing card as well as being listed on the Form.  Graham, pages 52-55.

135.   When a load of in custody defendants or new intakes reaches R&D control from one of the courthouses the R&D Control officer has to process the paperwork which returned on the transport vehicle with the loaded in custody defendants. Ps. Ex. # 406, Schneider report, pages 6

136.   each one of the persons on the transport vehicle comes up separately to the R&D control window. Graham, p. 57.

137.   When a returning in custody defendant came up to the R&D control window, the R&D control window person would take that person's wing card and hand it to the R&D control person doing JACCS data entry, and the R&D control data entry person would make a JACCS data entry showing that the person was off "temporary release" status. Graham, p. 57.

138.   Taking a person off temporary release means making a JACCS data entry showing that the person has returned to DOC custody.  Graham, pages

139.   After R&D control takes the person off temporary release, the body goes to R&D processing for a strip search. Graham, page 63.

140.   After completing his review of the paperwork the R&D Control officer then gives the paperwork to the jail Records Office person stationed in R&D. Ps. Ex. # 406, Schneider, pg. 6

141.   The jail Records Office staff then logs in each order in a log and enters the data from the order in JACCS.  Ps. Ex. # 406, Schneider, pg. 6

142.   Ms. Schneider reported that even after orders are received at R&D control, there can be a "significant delay" between the time the paperwork is received by the R&D control officer from the time the paperwork reaches the jail's record office staff in the R&D Control post.  Ps. Ex. # 406, Schneider report, pages 7.

143.   The logging of the orders which returned with each load of court returns can take significant time. Ps. Ex. # 406, Schneider report, pages 7.

144.   "Logging the orders into the separate log is very time-consuming and delays the receipt of orders in Jail Records where the actual processing is done."  Ps. Ex. # 406, Schneider, pg. 17.

145.   Ms. Schneider in 2007 recommended that the DOC find an alternative to manually logging orders returning to R&D control with court returns or new intakes into a logbook.  Ps. Ex. # 406, Schneider, pg. 17.

146.   Ms. Schneider in 2007 suggested that since R&D staff were supposed to be annotating their copy of the PTR showing orders received from court that the annotated PTR replace logging the orders again in a separate log book. Ps. Ex. # 406, Schneider, pg. 17.

147.   During the class period after the Records Office staff stationed in the R&D Control finished logging orders into a log and entering them into JACCS they send the orders to the Records Office on the dumbwaiter. Ps. Ex. # 406, Schneider, pg. 6.

148.   Female court returns started returning to R&D control at 11 a.m. Graham, pages 66 – 67.

## WHAT HAPPENS TO THE BODY AT R&D PROCESSING

149.   Meanwhile, bodies with commit orders, or no orders, or no paperwork were sent through R&D Processing for strip searches and then returned to their housing units.  Coleman affidavit.

150.   Virtually every inmate returned to R&D Control went through R&D Processing.  Ps. Ex. # 791, Coleman affidavit.

151.   Every inmate sent through the R&D Processing post got a strip search regardless of his release status.  Coleman affidavit.

152.   Sometimes some of the court returns process through R&D processing and got strip searches would later on the same shift "drop down" into R&D Processing to be released from the jail.  Coleman affidavit.

153.   Each Female court return returning from the courts returned to R&D control with a wing card and a release order went into female R&D processing and got a blanket strip search after being checked in at R&D control. Graham, pages 66 – 67.

154.   Watford says that for a period of time in the early part of the Barnes class period all female court returns returning to R&D control from the courthouses went through R&D control and R&D processing even if they had release orders because there was not enough room in MHU to send both males

and females to MHU and so DOC made the decision to send mails because there were more males than females. Watson, pages

155.   during the class period male court returns returning with the wing card or the buck slip were processed through R&D control and R&D control sent them to male R&D processing. Graham, pages 71-72.

156.   Ms. Graham says she never released any body from the courthouse while she was working her shift, the 8 a.m. to 4 p.m. shift, during the class period. Graham, pages 74 – 75.

157.   Ms. Graham says that during the class period sometimes court returns returning from court came back into R&D control with all release orders and no commit orders and still got returned to their housing units. Graham, pages 86-87.

158.   Sets court returns entitled to release went back upstairs to their housing units because R&D Control did not know the total of number of cases that the court returns had because R&D control doesn't know whether the court return has release orders on all the cases they went to court on. Graham, pages 86, 87.

159.   R&D Male Processing has two cages, one for new intakes and one for court returns. Graham, pages 87-89.

160.   Ms. Graham says one can see the cages from R&D control.  Graham, pages 88-89.

161.   New intakes and court returns are never mingled in R&D male processing cages. Graham, pages 88-89.

162.   Ms. Graham said that she had never heard of males returning to R&D control with only release orders and no commitment orders got held in the cages in R&D Control or R&D processing pending release determinations. Graham, page 91.

163.   Court returns returning to R&D from court get "clicked off" of temporary release as soon as they pass the barrier between R&D control and R&D processing when the R&D Control person working the window hands off the wing card to the R&D Control person making JACCS entries. Graham, pages 92-93.

164.   During that period of time she worked in R&D control after 2005 Graham worked on second shift, all males returning to the jail presented at the R&D control window, and after getting checked in, they were taken off temporary release, they went into the R&D processing cag, entered R&D processing, got strip-searched and went back up to their housing units. Graham, pages 95-96.

165.   During the class period if a court return went into one of the R&D processing cages they got strip-searched. Graham, pages 96.

166.   For both males and female court returns going into the cages during the class period the R&D processing cage was the point of no return for getting a strip-search. Graham, pages 96 – 97.

167.   During the class period there is no place in R&D processing female where female court returns could be held without being strip-searched. Graham depo, page 96.

168.   During the class period when an inmate came from CTF to R&D control in the jail to be released the person got a strip-search when they entered R&D processing as they arrived at the jail. Graham, pages 184.

169.   There is one cage located just inside R&D control and it holds about a busload of people. Graham, pages 186 – 187.

170.   During the class period males and females, and new intakes and court returns, are kept separate from each other in this holding cage while being processed by R&D control. Graham, pages 186-87.

171.   There are no post orders which have been issued by DOC which address how inmates are to be screened for transport to MHU for release.

172.   But, she says paperwork did in fact come back from the courthouse to or in the event upstairs to the records office. Page 129.

173.   "CORs" are different from "court returns" in Graham's terminology. Page 143.

174.   Graham says she never got the paperwork for COR releases. Graham depo page 159.

175.   She says there was never transitional on her shift. Were court returns were held in R&D control while R&D control look to the paperwork and then court returns in, the releases sent over the images. Graham depo, page 159.

176.   During the class period court returns with time served sentences were classified as EXPs and were returned to the jail from court instead of being sent to the MHU for release. Page 144.

177.   There was no program statement in place governing how CORs were sent to MHU before the practice started. Graham depo, 149.

178.   R&D control makes Jack's data entries but R&D process and do not make Jack's data entries. Graham depo, page 151.

179.   When it's busy that R&D control it takes about 5 min. to process everybody in the bus from the time they reach R&D control until the time they get clicked off the temporary release. Graham depo, page 160.

180.   Graham says that before MHU went online all court returns from CTF were returned directly from the courthouse to CTF. Graham depo, page 170.

181.   If the CTF court return were identified as eligible for release, CTF transferred them to R&D control at the DC Jail. Graham depo, page 170.

182.   During the class period bodies were transported from CTF to R&D control over the catwalk, unless something were wrong with the catwalk, in which case they would be transported by vehicles. Graham depo, page 171, 179.

183.   CTF does not make any releases so if the body at CTF is going to be released, the body travels first from CTF to R&D over the catwalk, and it's released out of R&D. Graham depo, page 182.

184.   Bodies sent over from CTF to the jail for release are kept in R&D processing while their release paperwork goes upstairs to the records office and the records office makes a determination about whether the body is to be released. Graham depo, page 183.

185.   Everyone coming from CTF to the DC jail even "for the express purpose of getting released" is still strip searched when they enter R&D processing at the DC Jail because "you don't know he's going to be released" that day. Graham depo, page 184.

186.   The reason bodies coming from CTS to the DC jail for release gets strip-searched R&D processing is the strip-searched every coming from CTF into R&D because not every single one of those inmates will be released.  Graham depo, page 184.

187.   Therefore, R&D processing strip searches all of the inmates coming from CTF to the DC jail even bodies coming from CTF to the jail for release. Graham depo, page 184.

**==SOME COURT RETURNS ENTITLED TO RELEASE ("CRERS") WERE RELEASED ON== ==TIME FROM CDF== AFTER BEING RETURNED TO THEIR HOUSING UNITS AND STRIP SEARCHED**

188.   During the class period some court returns entitled to release were released on time from CDF, based on an analysis of MHU logs.  Ps. Ex. # 192, Kriegler Supplement.

189.   The analysis of MHU logs and Dr. Krigler's examination of JACCS demonstrate that some on-time releases were made from CDF during the first 13+ months of the Barnes class period.  Ps. Ex. # 192,Kriegler Supplement, ¶¶ 5-13;  ¶ 25.

190.   Additionally, JACCS shows that some CRERs were released on time from CDF even after CDF and MHU were distinguishable release locations in JACCS (i.e. after October 2006) during the class period . Kriegler Supplement, ¶ 25.

191.   If the assumptions set forth in paragraph **Error! Reference source not found.**8, of Dr. Kriegler supplemental report, are correct, then during the class period some court returns returned from court to the jail were strip-searched post-release even if they were released on time.

## STEPS IN HOW THE RECORDS OFFICE STAFF PROCESS COURT PAPERWORK INCLUDING RELEASES

192.   The Records Office has one instrument examiner called the "lead" who is the person assigned to handle paperwork coming into the Records Office from R&D Control.

193.   Ms. Simmons worked as the lead during the first year of the Barnes class period.

194.   During this period the only way that released dispositions were to catered from the court to the Records Office was the paper orders hand carried from the courtrooms through the courthouse to the cellblock, and then from the cellblock back to the jail by DOC transport staff.  Simmons one, p. 80.

195.   Paperwork returning to the DC Jail from court with a court return could be a commitment order, a release order, or a buck slip or some other document.

---

[8] if in fact such individuals were returned to their housing unit (as indicated in deposition testimony[8]), and if all such individuals were strip searched before that return (as is indicated in paragraph 52 of my first Expert Report)

196.   The lead sorted through the paperwork which came back from court with court returns returning to R&D control of the DC jail to find release orders brought back to the DC Jail R&D by transport officers to see which court returns were entitled to release .

197.   Court orders issued by Superior Court including release orders and commitment orders have PDIDs not DCDCs written on them because the MPD and the Superior Court use the PDID number as the unique identifier number to identify defendants.

198.   The DOC issues its own identifier, the DCDC number to inmates in its custody and so inmates in DOC custody are identified in JACCS by the DCDC number.

NUMBERS OF OVER-DETENTIONS AND POST RELEASE STRIP SEARCHES

199.   During the first several years of the class period MHU operated as a release location some days but not all days.

200.   During the first year of the class period alone based on the DOC's own data analysis 1,244 court returns entitled to release sent to MHU for release did not get released from MHU on their Release Dates because the DOC could not process releases before 10:00 p.m.  Ps. Ex. # 99.

**Estimated Class Totals by Time Period**

| | Time Period | Overdetentions | Overdetention Hours | Overdetention Post-Release Strip Searches | On-time Post-Release Strip Searches |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| 1. | 9/1/05-8/31/06 | 3,092 | 111,964 | 2,607 | 249 |
| 2. | After 8/31/06 | 1,902 [1] | 131,226 [1] | 1,202 [2] | 770 [3] |
| 3. | Totals | 4,994 | 243,190 | 3,809 | 1,019 |

Sources:   Attachment I of Plaintiffs' Exhibit 190;
Attachments B-1 and C-1 of Plaintiffs' Exhibit 192.

[1]   9/1/06 through 2/25/08.
[2]   9/1/06 through 11/30/07.
[3]   9/1/06 through 3/8/10.

201.  The average period of over-detention during the class period was 48 hours (divide total number of over-detention hours, 243,190, by the total number of over-detentions, 4,994).  Kriegler supplemental report.

202.  The average over-detention period during just the first year of the Barnes class period was 36 hours or two 9 nights (3,092 over-detentions divided by 111,964 over-detention hours).

203.  Dr. Kriegler's numbers are a conservative estimate because Dr. Kriegler's numbers count only persons released to their own custody.

204.  Dr. Kriegler's numbers are conservative because the DOC applied the "Simmons" rule to populating the "discharge date" field when discharging inmates from JACCS where the release order had a date that predated the date Records Office staff processed the release.  Ps. Ex. # 193.

---

[9] Because of the 10 p.m. cut-off rule, every over-detention in the DOC system is an overnight over-detention.

205.   Individual over-detention periods run much higher than the average over detention period for persons over-detained by the DOC during the first year of the Barnes class period.

206.   Named plaintiff Maurice Williams was over-detained for 21 days during the first year of the class period. Ps. Ex. # 4 (affidavit of Maurice Williams re over-detention and strip search).

207.   Class member Jeffrey Owens was over-detained for 96 days during the first year of the class period . Ps. Ex. # 38, ¶ 8 (affidavit of Jeffrey Owens re over-detention and strip search).

208.   Another class member is listed in the DOC's discrepancy reports as having been over-detained for 97 days in 2007 because of a "staff error."  Ps. Ex. # 280.

209.   The LA County Jail System, the largest in the country, books and releases about 200,000 individuals into the jail system in a given year (compared with the District's 19,000 or less) through its Inmate Reception Center. Ps. Ex. # 811, pg 72, The Los Angeles County Sheriff's Department, 17th Semiannual Report, by Special Counsel Merrick J. Bobb and Staff and Police Assessment Resource Center (PARC), November 2003. ("17th Semiannual Report") http://file.lacounty.gov/lac/mbobb17.pdf.

210.   Every weekday nearly 1,300 inmates pass through the Inmate Reception Center from county facilities on their way to 12 Superior Court Districts and 49 courthouses in LA County. 17th Semiannual Report, 17:72.

211.   On any given day, the District sends between 100 to 150[10] court returns to two courthouses[11], the Superior Court house and the District Court courthouse, located across the street from each other, 2.7 miles from the Superior Courthouse and the travel time is 10 minutes.

212.   The LA County Jail instituted a courthouse release program in May 2001, the "In-Court Release and Greenband Program."  17th Semiannual Report, 17-77 (copies of policies implementing In-Court Release and Greenband Program attached as Ps. Ex. # 747-749).

213.   The DOC terminated its courthouse release program in 2000 or 2001, because of the danger of erroneous releases because the DOC's records office could not make reliable release determinations, Ps. Ex. # 758 (email from Chief Judge's executive assistant), and the DOC did not resume courthouse releases until July 2008 and then the courthouse release program operates only Mondays through Fridays on certain designated misdemeanants and civil committees, Superior Court of the District of Columbia Administrative Order No. 08-23 Courthouse Releases-Permanent Implementation.

214.   The following chart shows over detentions in the LA County Jail in the years 1997 to 2003:

| Year | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|------|------|------|------|------|------|------|------|

---

[10] **Ps. Ex. #** 112, DOC newsletter.

[11] The DC jail is located at1901 E Street, SE, Washington, DC 20003. The superior Courthouse is located at 555 Indiana Ave., N.W., Washington, DC 20001. According to Google's "get directions," the jail is 2.7 miles from the Superior Courthouse and the travel time is 10 min. http://maps.google.com/maps?hl=en&tab=wl (last checked 1/27/2011).

| **Over detentions** | 607 | 495 | 269 | 249 | 123 | 81 | 49 |

Ps. Ex. # 811, pg 72, 17th Semiannual Report.

215.  In comparison, the DOC over-detained by its own count over 1,244 court returns just because of the 10 p.m. cut off rule just between September 1, 2005 and August 31, 2006. Ps. Ex. # 9912 (Day summary).

216.  The back drop to the over-detentions/ post-release strip searches in this case is that the District had just paid $12 million to settle a class action case that terminated 8/31/2005 and the District had retained $3 million as part of the Bynum Settlement Agreement to build a stand-alone state of the art Inmate Processing Center to resolve the over-detention/ post-release strip search problems. Bynum v. District of Columbia, 412 F.Supp.2d 73 (D.D.C. 2006)(final approval order); Bynum v. Gov't of the Dist. of Columbia, 384 F. Supp. 2d 342 (D.D.C. 2005) (preliminary approval order).

217.  During the class period it costs the DOC $83 out of pocket to house an inmate overnight. Britton depo, pg. 8.

218.  During the first year of the class period alone by its own analysis the District held 1,244 people overnight because of the 10:00 p.m. rule at a cost of $103,252.

---

[12] Ps. Ex. # 99 has two versions, 99A and 99b.  Version 99A of this Affidavit does not have "B" exhibits which contain inmate information subject to the confidentiality provisions of the Court's protective order (docket # 64).  Version 99B includes those exhibits and is being filed under seal pursuant to the Court's protective order (docket # 64).  For ease of reference in their summary judgment papers plaintiffs cite to Ps. Ex. # 99.

219.   It would have been more cost effective during the first year of the class period to send the orders of court returns entitled to release from the Superior Court back to the Records Office in cabs, one order per cab.

220.   Moreover, at all times during the class period the District has been operating under a population cap, first imposed by court order and then imposed by statute.

221.   The total number of over-detentions during the first year of the class period was 3,092 and the total number of over-detention hours during the first year was 111,964 with an average over-detention period of 36 hours or two nights.

222.   Each one of these persons, if released on time, would have freed up bed space for someone else, and helped the District comply with the caps, or perhaps even obviated the need for the caps.

223.   During the class period the over-detentions and inefficient release practices caused large numbers of court returns entitled to release to be subjected to post release strip searches.

224.   3,809 over-detained court returns entitled to release were subjected to the blanket post release strip searches (2,609 during the first year of the class period) and 1,019 court returns entitled to release released on-time were subject to blanket post release strip searches (249 during the first year of the class period).

225.   One of the goals of the Bynum litigation and the Bynum Settlement Agreement was to stop this revolting practice of subjecting court returns

entitled to release to you blankets to searches after a judge had ordered their release. Ps. Ex. # 759-10, preliminary approval fairness hearing transcript.

226.  The post release strip searches applied to court returns entitled to release held overnight or pending release determinations on the same day are not only unnecessary from a security point of view but unnecessarily degrading because they are conducted in groups. Named plaintiff interrogatory responses, Ps. Ex. ## 844 (David Petersen), 834 (Denard Hawkins), 837 (Toney Malloy), and 850 (Maurice Williams).

Dr. Kriegler's Estimates

227.  Dr. Kriegler's numbers are a conservative estimate because Dr. Kriegler's numbers count only persons released to their own custody.

228.  Dr. Kriegler's numbers do not count over-detained persons released late to the custody of other agencies such as persons released to MPD, drug treatment facilities, FBOP where delay was due to District's slowness to notify or failure[13] to notify the demanding jurisdiction or agency that the inmate was ready for pick up.

229.  The figures are also conservative because the DOC applied the "Simmons Rule" in discharging inmates from JACCS where the release order had a date that predated the date Records Office staff processed the release which hides

---

[13] The DOC held Merle Watson on a parole detainer for fifteen months past the date all his local matters were disposed of because the DC Jail staff did not notify the U.S. Marshall's Office to execute the parole warrant once the local criminal matters were disposed of.  **Ps. Ex. #** 109.

over-detentions in the JACCS data by fudging the date manually entered into the "discharge date field."  (see following two tables).

230.   The "discharge date" field in JACCS is a field in the Charges table in JACCS.

231.   When an inmate is booked into the DOC or when new charges are added every charge he is held on is entered separately into the Charges table.

232.   When those charges are disposed of the Records Office manually enter the date in JACCS to "discharge" the charge in JACCS and the date turns red to show the person is no longer being held on that charge.  Simmons2, 272-273.

233.   The Records Office manual says that the staff should enter the date on the order.  Deposition exhibit 6 to Simmons2 attached to transcript pages, Ps. Ex. # 1054.

234.   Ms. Simmons said her practice was to enter the date on the order in the discharge date field only if the date on the order was the same date as the date she was processing the release.  Simmons2, 289-290, 292.

235.   If the date on the order preceded the date she was processing the release she would call chambers to get a post-dated order.  Id. at 295.

236.   Sometimes she had to delay release of the body waiting for a post-dated release order.  Id. at 297-298. Other Records Office staff did the same.

237.   Both Mr. Williams and Mr. Owens have post-dated orders in their files and the date entered in the discharge date field is the date of the post-dated

order.  See Nichols affidavit summarizing records where the discharge date field
is populated with a date later than the date of the order.  Ps. Ex. # 193.

### Comparison of Selected Overdetainees' Data from DOC Responses to City Council Questions, Class Member Affidavits, and JACCS Database

| Name (Last, First) | DOC's Responses to City Council Questions | | | JACCS | | |
|---|---|---|---|---|---|---|
| | Exit Date | Release Date | Difference (Days) | Exit Date | Last Charge Discharge Date | Difference (Days) |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1. Reaves, John | 4/26/06 | 4/25/06 | 1 | 4/26/06 | 4/26/06 | 0 |
| 2. Robinson, Keenan | 4/17/06 | 4/13/06 | 4 | 4/18/06 | 4/17/06 | 1 |
| 3. King, Stacia | 5/9/06 | 5/4/06 | 5 | 5/9/06 | 5/9/06 | 0 |
| 4. Ramsey, Robert | 6/15/06 | 6/6/06 | 9 | 6/15/06 | 6/6/06 | 9 |
| 5. Roach, Derrick | 8/15/06 | 8/11/06 | 4 | 8/15/06 | 8/11/06 | 4 |
| 6. Thomas, Shalley | 5/10/06 | 5/6/06 | 4 | 5/10/06 | 5/10/06 | 0 |
| 7. Jacobs, Robert | 8/31/06 | 8/24/06 | 7 | 8/31/06 | 8/31/06 | 0 |
| | From Class Member Affidavits | | | JACCS | | |
| 8. Williams, Maurice | 3/1/06 | 2/8/06 | 21 | 3/1/06 | 3/1/06 | 0 |
| 9. Owens, Jeffrey | 3/29/06 | 12/23/05 | 96 | 3/29/06 | 3/29/06 | 0 |

Sources:  Plaintiffs' Exhibit 170, pp. 125-127;
Plaintiffs' Exhibit 190, pp. 25-26 at ¶¶60-61;
Plaintiffs' Exhibit 900;
Attachment A of Plaintiffs' Exhibit 120.

**Comparison of Selected Individuals' Potential Overdetention Lengths
Using Plaintiffs' and Defendant's Potential Overdetention Criteria**

| Name (Last, First) | Exit Date | Using Defendant's Potential Overdetention Criteria | | Using Plaintiffs' Potential Overdetention Criteria | | Included in Plaintiffs' Sampling Design? |
| | | Release Date Proxy | Difference (Days) | Release Date Proxy | Difference (Days) | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1.  Reaves, John | 4/26/06 | 4/25/06 | 1 | 4/26/06 | 0 | Yes |
| 2.  Robinson, Keenan | 4/18/06 | 4/13/06 | 5 | 4/17/06 | 1 | Yes |
| 3.  King, Stacia | 5/9/06 | Missing | Missing | 5/9/06 | 0 | No |
| 4.  Ramsey, Robert | 6/15/06 | 5/30/06 | 16 | 6/6/06 | 9 | Yes |
| 5.  Roach, Derrick | 8/15/06 | 8/11/06 | 4 | 8/11/06 | 4 | Yes |
| 6.  Thomas, Shalley | 5/10/06 | 4/18/06 | 22 | 5/10/06 | 0 | Yes |
| 7.  Jacobs, Robert | 8/31/06 | 8/24/06 | 7 | 8/31/06 | 0 | Yes |
| 8.  Williams, Maurice | 3/1/06 | 2/27/06 | 2 | 3/1/06 | 0 | Yes |
| 9.  Owens, Jeffrey | 3/29/06 | 3/29/06 | 0 | 3/29/06 | 0 | No |

Sources:  Plaintiffs' Exhibit 900;
Attachments C and E of Plaintiffs' Exhibit 190.

**Over-detentions and over-detention hours.** With respect to over-detentions and over-detention

hours, Strata 1-8 specifically correspond to the period 9/1/2005 to 8/31/2006, and Strata 9-16

specifically correspond to the period 9/1/2006 to 2/25/2008. The only stratum that does not

explicitly correspond to one of these two time periods is Stratum 17 (the Extreme Over-detention

Stratum), and there are no projections made based on the jackets examined in this stratum.  Thus,

to estimate over-detention and over-detention totals for the periods 9/1/2005 through 8/31/2006

and 9/1/2006 through 2/25/2008, one needs to split the jackets in Stratum 17 in terms of the Exit

Date in JACCS (i.e., permanently released during the first year of the class period, or

permanently released after the first year of the class period). Then, the respective subtotals from

Stratum 17 can be added to the respective subtotals from Strata 1-8 and 9-16. These calculations

are based on the data underlying Attachments B-1 and B-2 of the Supplemental Expert Report,

Ps. Ex. # 192.

**Overdetained Post-Release Strip Searches.**With respect to overdetained post-release strip

searches, the same steps are taken as in over-detentions and over-detention hours (i.e., split

Stratum 17 accordingly, then add to the subtotals from strata 1-8 and 9-16, respectively). The only difference is that here, the time periods of interest are 9/1/2005 through 8/31/2006, and 9/1/2006 through 11/30/2007. These calculations are based on the data underlying Attachments C-1 and C-2 of the Supplemental Expert Report, Ps. Ex. # 192.

**On-time Post-Release Strip Searches.** On-time post-release strip searches are identified using JACCS, for the period 9/1/2005 through 3/8/2010. Thus, one splits the totals into two groups based on the Exit Date in JACCS, which is either before or after 9/1/2006. Here, the two date ranges are 9/1/2005 through 8/31/2006, and 9/1/2006 through 3/8/2010. These calculations are based on the data underlying Attachment I of the (first) Expert Report, Ps. Ex. # 190.

238.   The District operates a "split" inmate management system because the Superior Court and the Department of Corrections14 ("DOC") operated (and still operates) different computer systems which the District still cannot make communicate15 with each other electronically. Ps. Ex. # 111, pages 15-16 (transcript of Status Hearing, Watson v. Gaines, 01-cv2418, February 13, 2002).

239.   As a result of this "split" structure, the two separate components had to find some other way to communicate with each other.

---

[14] The DOC does not have computers that can communicate with the computers at either the District Court or the Superior Court.  Id.

[15] An example of computer system communicating electronically is the MPD Criminal Justice Information System ("CJIS") system's exporting data daily in "real" time to the Superior Court system, the prosecutors (US Attorney and DC's AG), and PDS.  CJIS generates a PERSLOG file from which CJIS generates four "lock-up" lists in "real" time.  **Ps. Ex. #** 44, pages 7-8. A page of a typical 'lock-up' list is attached as **Ps. Ex. #** 769 showing data reported.

240.   So, the structure of the "split" system creates the problem of how to communicate data, especially release dispositions, between the two systems.

241.   The District's system for communicating release dispositions and making releases is so inefficient that it causes lengthy delays and the District has been deliberately indifferent to the delays.

242.   As described below, many of the problems inherent in this system are exacerbated by the lack of electronic communication between the two systems, which requires that paperwork be hand carried between the two systems, and which inhibits a unified booking system.

243.   The District's system causes delay two ways:  (2) System by its design doomed to cause problems because of the structural problems with the system of having two computer systems linked by a "sneaker network" transferring paperwork between the two systems; and (2)  the system do have poorly administered.

244.   Moreover, several longstanding release practices followed by the DOC (detailed below) effectively meant that Superior Court release dispositions had to be hand carried from the Superior Court courtrooms to the Records Office in the DC Jail (Central Detention Facility).

245.   The DC Jail (Central Detention Facility) located at 1901 D Street, SE, Washington, DC 20003.

246.   The DC Jail is about 2.7 miles from the Superior Court.

247.   Each one of these DOC practices took a problem in the system – two different computers communicating via a sneaker network – and magnified the

problem because the DOC's release system "in toto ... simply delays all releases until the system, in its sweet time, and with the resources it chooses . . . is ready to make releases."  See Berry v. Baca, 379 F.3d at 768.

248.   The practices taken together created a cascade effect in causing delay because the DOC made releases only on the basis of paper orders hand carried from the court to the Records Office.

249.   In fact, the DOC would not even start the release process (checking for other cases, detainers, and warrants) until it received paper orders.  Ps. Ex. # 1052, Simmons1, p. 80.

Efficient Ways Of Transmitting Release Dispositions From The Courtrooms To Records Office Staff

250.   The key to success in terms of efficiently and promptly communicating release dispositions from the courtrooms to Records Office staff is (1) de-linking the delivery system from paper, including court orders, or (2) at least de-linking the paperwork from the body, in order to transmit it as quickly as possible, or (3) simply by posting Records Office staff at the Superior Court and making courthouse releases to minimize the distance the paperwork and the body have to travel.

251.   Ultimately the DOC posted Records Office staff at the courthouse in April 2008.

252.   In July 2008 DOC began making courthouse releases from the courthouse in certain misdemeanor cases.

253.   The fact the DOC did start making courthouse releases in 2008 shows that the DOC did have the ability to make courthouse releases at that time and the fact they did not do it till then shows the District's deliberate indifference to the court returns entitled to release rights to a prompt release.

254.   Ms. Schneider's report specifically identifies the Superior Court Marshal's deputies as an unnecessary, inefficient link in the delivery chain which costs time and manpower.

255.   "Streamlining this process [by eliminating deputies from the delivery chain] so that the order goes directly from the court to the Jail's Records Office would have a huge impact on both manpower and time."  Ps. Ex. # 406, Schneider Report at pg. 37.

256.   Of course, as the District realizes, the best solution to communicating dispositions from Superior Court cases on which DOC inmates are being held is a unified booking system in which all relevant agencies use the same booking system.

257.   A unified booking system is the solution the monitor proposed for LA County (which also operates a "split system") in 1997.

> As we stated to the Board of Supervisors last January, what is needed is a consolidated county-wide justice information system fed by timely and accurate information from the courts, the district attorney, local, state, and federal databases, and data from within the Sheriff's Department itself. In order to perform due diligence on an inmate for all the purposes noted above, it is indispensable to have complete and comprehensive information concerning the individual. We again call on the Board of Supervisors to order a detailed plan for developing that needed automated data system.

Bobb Report, 7th at pg. 5.

258.   The District has known for years that the best way to communicate dispositions from the Superior Court to the DOC is the unified booking computer system in which both the Superior Court and the DOC use the same computerized booking and tracking system. Ps. Ex. # 111 (comments of DOC general counsel in Watson hearing).

259.   But, the District will not commit the resources to a technical solution to the problem of communicating dispositions from the Superior Court to the DOC.

260.   Every other agency in the DC criminal justice system shares data electronically with the computers of other agencies but not the DOC.

261.   The next best solution to a unified booking system shared by the Superior Court and the DOC is electronically exporting dispositions from the Superior Court computer to the JACCS computer in real time, as the DOC's general counsel informed this Court that the DOC and Superior Court were about to do in Watson in February, 2002. Ps. Ex. # 111, pg. 16; Ps. Ex. # 46-25, n. 24, GAO: Management Challenges in DC Jail (August 2004 plans  being developed for transmitting court information to DOC in an automated format, rather than in a hard copy format).

262.   As of 6/2/2002 the MPD was sending data in its CJIS booking system electronically to the Superior Court system and the Pretrial system and the Superior Court was sending its data to Pretrial. Ps. Ex. # 44, JUSTIS report, page 4.

263.   The chart on page 5 shows all the agencies that MPD sent data from CJIS to electronically for the "lock up list" the District of Columbia AG's office. Id. at pg. 5.

264.   The DOC did not participate in the JUSTIS program.

265.   The DOC told Ms. Schneider it intended to develop the PTR into a database so the DOC could add its data to the PTR to facilitate tracking cases and court returns but it never followed through. Schneider report, pg. 26.

266.   Absent a system for sending disposition data electronically from the Superior Court to the Records Office naturally, making release determinations on the basis of dispositions docketed in CourtView would be the fastest way to transmit release dispositions from the courtrooms to Records Office staff.

267.   In the DV division, ever since CourtView came online in January 2006, orders have been scanned in real time into CourtView. Cipullo, page 91.

268.   But, the DOC does not utilize these scanned orders scanned in the courtview in real time to make releases.

269.   There is no legal basis for the DOC to be insisting on paper orders as opposed to docket entries to make releases.

270.   What triggers release on a particular charge prior to verdict is the prosecutor's dismissal pursuant to Superior Court Criminal Rule 42(a)(1) or the judge's oral ruling which results in a "disposition" of the charge.

271.   The dismissals or rulings remain subject to rescission by the prosecutor or the judge until they are entered on the docket by the clerk. Lyles v. U.S., 920 A.2d 446, 448 -449 (D.C. 2007) (trial court's power to rescind an oral order of

dismissal continues at least to the point of entry of the order of dismissal on the court docket).

272.   Docket entries, while primarily ministerial, serve a vital administrative function in documenting the actions of the court. Id.

273.   Docket entries also mark critical dates for appeal and other post-judgment procedures. Id.

274.   Release dispositions in criminal cases such as declinations to prosecute, nolles, dismissals, acquittals become effective upon docketing.

275.   Some of these dispositions do not even require action by the court. For example, prosecutors may terminate a charge based on an information or complaint without leave of court by filing a dismissal or nolle. Superior Criminal Rule 48(a)(1). Ferrell v. U.S., 990 A.2d 1015,1018-1019 (D.C. 2010).

276.   Dismissals by the prosecutor pursuant to . Superior Criminal Rule 48(a)(1) become effective on entry of a docket entry without any action on part of the Court.

277.   Prosecutors in Superior Court do not require leave of court to terminate a prosecution unless a grand jury has returned an indictment. Rule 48(a)(2).

278.   Rule 48(a)(1) gives the Superior Court no continuing role in a case after the prosecutor announces dismissal and, when the prosecutor announces dismissal after trial has commenced, after the defense had agreed to dismissal. 990 A.2d at 1021.

279.   The only terminations of misdemeanor cases that even require court action and Superior Court are dismissals by motion pursuant to Superior Court Criminal Rule 48(b), verdicts, and convictions.

280.   But even dismissals by motion pursuant to Superior Court Criminal Rule 48(b), verdicts, and convictions cannot be rescinded after the disposition has been docketed. While primarily ministerial, docket entries mark critical dates for appeal and other post-judgment procedures. Lyles, 920 A.2d at 448. V

281.   Verdicts of acquittal cannot be withdrawn after docketing because double jeopardy attaches. See Smith v. Massachusetts, 543 U.S. 462 (2005).

282.   Docket entries accurately reflect the oral rulings of the judicial officers as recorded on the transcript 99.99 % of time. Cipullo, pg. 42; 61, 62-63.

283.   The Superior Court clerks enter docket entries into Courtview accurately enough so that the docket entries can be relied on for purposes of appeal. Id. at 64.

284.   Superior Court clerks cannot delete docket entries from Courtview from the courtroom. Id. at 23.

285.   Only supervisors can delete docket entries from Courtview. Id. at 23.

286.   Superior Court Judges do not dictate whether DOC makes releases on basis of docket entries or paper orders. Id. at 67.

287.   The Superior Court does not control the DOC with respect to how the DOC makes its release decisions. Id. at 70.

288.   Neither the chief judge nor the presiding judge of the criminal division of the Superior Court ever issued a writing (such as an administrative order in

the case of the chief judge) saying that the DOC should make release decisions on the basis of the paper order as opposed to the docket entry. Id. at 71.

289.   CourtView went online and was fully operational in the criminal division of the Superior Court on January 18, 2006. Id. at 15.

290.   Training in Courtview was offered to DOC by the Superior Court in CourtView at that time. Id. at 46.

291.   At the very least, Records Office staff could check CourtView for release dispositions for court returns as a way of screening and identifying court returns entitled to release on the basis of the court cases they went to court on.

292.   Then, at least as a preliminary matter, the Records Office could've begun the release process of checking for other cases in which the individual is being held, detainers, or warrants, and resolving discrepancies (e.g. a warrant in NCIC or WALES that might block release; conflicting data on an order) and missing orders.

293.   Until April 2008 when the DOC posted LIEs at the courthouse the Records Office waited for paper copies of orders to reach the Records Office before the DOC even began checking orders for problems that had to be sorted out with chambers or the clerk.

294.   The DOC posted LIEs at the courthouse in April 2008.

295.   Frequently, because orders came back after 5:00 pm, this meant waiting till the next day to resolve issues with orders.

296.   Another procedure the Records Office could have followed to eliminate delay due to transmitting paper orders from the Superior Court in the District

Court via this sneaker network was to send a courier to the courthouse to pick up copies of the orders.

297.   Ms. Schneider's report notes that the Circuit Court of Baltimore County, Maryland uses couriers to run orders between the courthouse and jail of the jail can make releases of court returns. Schneider report, p. 32-33.

298.   Each time the courtroom clerk of the Circuit Court of Baltimore County prints out an order relating to an in custody defendant, a copy of the order automatically prints out in the main clerk's office. Id. at 32.

299.   These copies of orders relating to in custody defendants are held in a bin and on a regular basis a runner from the jail comes over to the clerk's office, picks up the orders, and runs them back to the Baltimore County jail. Id. at 32-33, 35.

300.   The Harris County criminal justice system in Houston, Texas also uses this system of couriers running orders between the courthouse and the jail to handle orders for in-custody defendants. Id. at 35.

301.   Between 900 and 1,000 defendants appear in the Harris County criminal justice system on a typical day. Id.

302.   Courtroom clerks make computer entries and print out orders. Id.

303.   The orders entered by the courtroom clerks printout in a central location in the courthouse. Id.

304.   Runners hand deliver the orders from the central location of the courthouse to the jail which processes the releases. Id.

305.   The sheriff's office staff who receive the orders sign transmittal forms indicating which orders that they have picked up. Id.

306.   Additionally, just as the DOC has access to CourtView and Pacer, jail Records Office staff in Houston have access to the court docketing computer where dispositions are docketed. Id. at 35-36.

307.   Jail Records Office staff in Houston are expected to check the online court docketing system throughout the day and are responsible for knowing the status of cases of in custody defendants and others throughout the day. Id.

308.   According to Ms. Schneider's report, Harris County is moving to a system where orders are generated by the clerk to the courtrooms but printed out directly in the jails Records Office. Id. at 36.

309.   The Spokane County District Court has courtroom clerks scan and e-mail orders from the courtroom to the jail within one to three hours of printing out the paper orders. Id. at 35.

310.   The Spokane County District Court has plans to update their system so that when clerks print orders they would print out automatically in both the courtrooms and the jails Records Office. Id.

311.   Still another procedure for transmitting dispositions from the courtrooms to the jailer, which Ms. Schneider described and recommends for the DOC, but which involves a bit more technology, is that orders printed out by the courtroom clerk at Superior Court could automatically print out a copy in the Records Office. Id. at 37.

312.   Having records printed out by the courtroom clerk of Superior Court automatically print out a copy at the records office is actually very simple technology.

313.   For example, anybody can go online from any place in the world, access Pacer, or CourtView, and with a password, print out a document from CourtView or Pacer.

314.   Anybody in the world can go online and from his home computer print out documents in the local FedEx office from his home computer.

315.   It would be a simple matter to install hardware and software so that every time the courtroom clerk in Superior Court prints out an order in the court room it prints out automatically in the Records Office, or even in the Superior Court cellblock, where the DOC now stations Records Office instrument examiners.

316.   Ms. Schneider's report specifically states that the Superior Court Marshal should be eliminated from the delivery chain to save time and manpower.

317.   "Streamlining this process so that the order goes directly from the court to the Jail's Records Office would have a huge impact on both manpower and time." Id. at 37.

318.   Another time saving method available to the District was to fax orders from the courtrooms or clerk's office to the Records Office. But, in 2005 and 2006 typically orders were not faxed to the DOC. Cipullo, page 90.

319.   The Superior Court would fax an order to the DOC is the DOC requested the Superior Court to send an order by fax. Id.

320.   The goal was to keep the paperwork with the body so that everyone would know what was happening without body. Id. at 89.

321.   Ms. Simmons, who had the job of receiving and sorting paperwork arriving in the Records Office during the first year of the class period, testified that all paperwork traveled to the Records Office via clerks, deputies, and DOC staff by hand. Simmons 1, pg. 159; Simmons 2, pg. 249-250.

322.   JACCS has barcode technology but the DOC still does not use it.

323.   Central booking in Baltimore Maryland came online in 1995 and was using barcode technology since its inception to track arrestees as a mood through its system. Ps. Ex. # 778 (Flanagan Lamont depo).

324.   The DOC's practice of making releases only on paper orders is not reduced to any program statement or post order.

325.   The only rationale ever put forward by any person in the DOC for making release determinations on the basis of paper orders as opposed to docket entries is the testimony of Ms. Britton who stated that the DOC insists on paper copies of orders because the paper copies have raised seals.

326.   Ms. Britton is currently the Deputy Director of the Department of Corrections. Britton depo, p. 13.

327.   Ms. Britton was warden at DC Jail for part of 2000 and 2001. Id. at 7.

328.   "They [Records Office] never release on faxes. You have to have the original court sealed document in hand."  Id. at 123-124.

329.   However, CourtView has built in security functions that prevent unauthorized persons from making alterations to docket entries and orders that have been docketed on to CourtView. Cipullo, p. 93-94.

330.   Docket entries and orders scanned into CourtView are secure to protect them from being altered. Cipullo, p. 93-94.

331.   During the class period DOC release practices magnified structural problems inherent in DC inmate management system

332.   During the class period the District turned a simple matter of transmitting orders from the courtrooms to the Records Office into a chaotic Rube Goldberg machine further adding to the delays.

333.   For example, during the class period the District further slowed the transmission of paperwork by keeping the paperwork with the body at the courthouse.

334.   For example, during the class period if an in-custody defendant or his paperwork arrives at the jail board from a courtroom appearance and the jail board realizes the in-custody defendant has more than one case, the jail does not forward that paperwork onto the Records Office so the Records Office can begin the release process. Schneider, pg. 5.

335.   Instead, during the class period the jail board holds the first set of orders or buck slips in a tray until the in-custody defendant has finished all his appearances and all of his paperwork is collected which can be hours later instead of sending paperwork back to the records office on a rolling basis to at least start the release process. Schneider, pg. 5.

336.   One reason this is done is to prevent erroneous releases which frequently occur when "orphaned" commit orders arrives after the body. Ps. Ex. # 420, Schneider Preliminary16, pg 8; 10-11.

337.   This a perfect example of how the DOC gave great weight to its interests (tracking the body and preventing erroneous releases) and gave practically no weight to "the prisoner's absolute right to freedom" in a prompt release. See Barnes, 242 F.R.D. at 117-118.

338.   Had the DOC maintained a system to track the status of the prisoners and their cases (have the prisoners received orders from each court appearance) the deputies would not have had to hold orders at the courthouse until the body was ready to leave the courthouse and paperwork could have returned to the records office on a rolling basis so the Records Office could at least start the release process.

339.   The DOC further slowed the transmission of paperwork at R&D Control during the class period by logging all orders into a logbook when court returns returned to the DC Jail. Ps. Ex. # 406, Schneider report, pages 7.

340.   "Logging the orders into the separate log book is very time-consuming and delays the receipt of orders in Jail Records where the actual processing is done." Ps. Ex. # 406, Schneider, pg. 17.

---

[16] In-custody defendants frequently leave the courtrooms without orders and the orders are generated after the in-custody defendants have left the courtroom and return to court **on the last bus of the day** after the body has already reached the DC Jail. **Ps. Ex. #** 420, Schneider **Preliminary**, pg at 10-11. This scenario of orphaned paperwork arriving on the last bus of the day caused at least three of the erroneous releases reviewed by Ms. Schneider in her **preliminary** report. Id. at pg. 10.

341.   As Ms. Schneider pointed out, manually logging orders into a logbook during the class period to was a needless duplication of efforts since R&D staff were annotating their copy of the PTR showing orders received from court anyway. Ps. Ex. # 406, Schneider, pg. 17.

342.   This is a classic example of how the DOC's slavish adherence to inefficiently implemented procedures slows the release process for no reason.

343.   When the records office "lead" received the paperwork, records office staff burned up precious time by having to match up orders with the MPD issued PDID number with the same person in the DOC system which used a different unique identifier, the DCDC number.

344.   The jail burned up even more time retrieving the court returns jacket and going to the jacket to check for other cases the court return was being held on detainers because the DOC relied on jackets rather than JACCS to track inmates and their cases and their Release Dates and to process releases.

345.   In fact, five persons were over-detained in 2006 for periods ranging from 1 day to 9 days just because their jackets were misplaced or an order was filed in the wrong jacket. Ps. Ex. # 170, DOC responses to the Committee on Public Safety and the Judiciary's oversight questions dated 3-12-07, pages 125-127.

346.   Mr. Robinson's affidavit summarizing delays due to computations errors, Ps. Ex. # 902, ¶ 4, lists 10 cases where a sentence computation was delayed or failed to occur because of misfiled or lost orders.

347.   What more striking examples of an inefficiently implemented release practice could there be?

348.   In December 2007, two years after termination of the Bynum class period, Ms. Schneider described the District's then-current system for transmitting court orders to the DC Jail's Records Office as follows:

349.   The District's system to transfer commitment and release orders from the Court to the DOC for processing is a very lengthy, cumbersome, paper-driven process involving multiple agencies.

350.   When an order is issued in the courtroom, it travels through seven hands - the courtroom clerk, to the deputy US Marshal (Deputy) [courtroom deputy] to the USMS staff at the Jail Board17 post, to the DOC transport officers, to the Receiving and Discharge (R&D) control officer at the DC jail, to the DC jail Records Office staff [posted] in R&D -- before reaching the DC Jail Records Office where it is processed.

351.   Schneider, pg. 1.

352.   "All parties agree that the paper-laden system currently in use to transport orders within the court to the DOC is an archaic system that ultimately needs to be updated using current available technology." Ps. Ex. # 406, Schneider Report, pages 24 – 25.

353.   As a result of this system orders frequently arrived at the Records Office late or not at all. Ps. Ex. # 406, Schneider Report, pages Simmons 2, 256-257.

354.   DOC release practices

---

[17] The Jail Board is the USMS post in the court's cellblock bubble. The staff assigned to this post coordinate the paperwork received from the deputies and transfer such paperwork to the DOC transport.

355.   Several longstanding release practices followed by the DOC effectively meant that Superior Court release dispositions had to be hand carried from the Superior Court courtrooms to the Records Office in the DC Jail (Central Detention Facility) located at 1901 D Street, SE, Washington, DC 20003, about 2.7 miles from the Superior Court.

356.   Each one of these DOC practices took a problem in the system – two different computers communicating via a sneaker network – and magnified the problem because the DOC's release system "in toto ... simply delays all releases until the system, in its sweet time, and with the resources it chooses . . . is ready to make releases."  See Berry v. Baca, 379 F.3d at 768.

357.   The practices taken together created a cascade effect in causing delay because the DOC made releases only on the basis of paper orders hand carried from the court to the Records Office.

358.   In fact, the DOC would not even start the release process (checking for other cases, detainers, and warrants) until it received paper orders.

359.   First, the District makes releases only on paper copies of orders signed by judges delivered to a Records Office staff, Britton depo, 123-124; MCA response on Lynch, BATES 00419.1-00419.2.

360.   Records Office staff do not generate releases on the basis of docket entries in CourtView and Pacer or orders docketed in CourtView or Pacer. Id. at 127, 129.

361.   Nor did the Records Office staff process releases or start the release process based on faxed orders.

362.   "They [Records Office] never release on faxes18. You have to have the original court sealed document in hand."  Britton depo, 123-124.

363.   Simmons 2 depo 249-250 (describing how during the first year of the class period orders reached the Records Office in hard copy format delivered by deputies and DOC transport staff from the courtroom to R&D Control to the Records Office).

364.   Maria Amato, general counsel for the DOC, told plaintiffs' counsel in an email dated February 18, 2007 regarding the over-detention of Carl Lynch that by law the DOC cannot make releases without a court order. Ps. Ex. # 150.

365.   his means that any release of court returns is delayed in the first instance by however long it takes the paper order to travel from the court room to the Records Office.

366.   Second, until July 7, 200819 when the DOC began a trial program of releasing certain misdemeanant court returns entitled to release from the Superior Court, the DOC made releases of court returns entitled to release solely from the DC Jail or MHU rather than directly from the courthouse. Ps. Ex. # 406

---

[18] The DOC did not begin faxing releases orders for initiating the release process (but not for making releases) until well after the first year of the class period. The DOC began faxing orders to the Records Office intermittently in 2008.  In 2005 and 2006 typically orders were not faxed to the DOC. Cipullo, page 90. The Superior Court would fax an order to the DOC is the DOC requested the Superior Court to send an order by fax. Cipullo, page 90.

[19] Pursuant to Administrative Order No. 08-09 (Courthouse Release Pilot) the DOC began as of July 7, 2008 (pilot project to release eligible defendants in all misdemeanor and traffic courtrooms directly from the courthouse Monday through Friday).  The pilot program was expanded and made permanent effective December 23, 2008 by Administrative Order No. 08-23 Courthouse Releases - Permanent Implementation.

367.   The DOC stopped releasing court returns entitled to release from the courthouse in 2000 or 2001 because the Records Office could not make reliable release determinations promptly and the DOC feared the consequences of erroneous releases. Ps. Ex. # 758, Rainey Ransome Brandt, Executive Assistant to the Chief Judge of the Superior Court, email dated 3-24-04 on courthouse releases.

368.   Third, the DOC did not post LIEs at the Superior Court during the period between 9/1/05 and April 200820.

369.   Therefore, orders and other paperwork associated with court returns were hand-carried from the court house back to the Records Office either with the body or on a different bus typically on the last bus of the day, Ps. Ex. # 420 Schneider Report, Preliminary Review of Paperflow Process-USMS, DCSC & DOC ("Schneider Preliminary Report").

370.   Therefore, until the LIEs were stationed in the Superior Court cellblock in April 2008 all orders had to travel to the Records Office before release processing could begin.

371.   After the DOC stationed LIEs at the courthouse and began releasing misdemeanants from the courthouse release orders only had to travel as far as the cellblock for the release process to begin.

---

[20] The LIEs were stationed in the Superior Court cellblock on April 7, 2008 (**Ps. Ex. #** 406, Schneider Report, page 5.) The LIEs were stationed in the Superior Court cellblock so DOC could start processing release orders as soon as they got to the cellblock. **Ps. Ex. #** 406 Schneider final at page 29.

372.   Therefore, until the LIEs were stationed in the Superior Court cellblock in April 2008 all orders had to travel all the way back to the Records Office before release processing could begin.

373.   None of these practices were dictated by the law or the Superior Court. Nor were any of the practices requiring orders to travel back to the Records Office in hard copy until April 2008 memorialized in any program statements or post orders.

374.   Ms. Britton unaware of any written policy requiring the DOC to make releases on the basis of paper orders. Britton depo, p. 130.

375.   Ms. Britton says they do this because they need an original copy of the order with a seal on it and the judge's original signature placed into the hands of a Records Office staff. Britton depo, p. 126-1127.

376.   Ms. Britton said a DOC transport staff cannot authenticate the orders. Id.

377.   However, the copies the clerks give to courtroom deputies that go from the courtroom to the marshals and on to the DOC do not have any kind of raised stamp on them. Cipullo depo, pgs 92:5-9.

378.   his is the DOC's policy not the court's policy.

379.   Judges do not dictate whether DOC makes releases on basis of docket entries or paper orders. Cipullo, pg. 67.

380.   Superior Court does not control the DOC with respect to how the DOC makes its release decisions. Cipullo, pg. 70.

381.   Neither the chief judge nor the presiding judge of the criminal division ever issued a writing (such as an administrative order in the case of the chief judge) saying that the DOC should make release decisions on the basis of the paper order as opposed to the docket entry. Cipullo, pg. 71.

382.   No system to track in-custody defendants and their paperwork and the status of their cases: no traffic cop for court paperwork to match up in-custody defendants and their court orders to make sure DOC has orders in all cases when to court on

383.   The DOC has no system to track in-custody defendants and their paperwork and the status of their cases.

384.   In order words, the DOC has no "traffic cop" for court paperwork to match up in-custody defendants and their court orders to make sure in real time that DOC has orders in all cases when to court on.

385.   In-custody defendants go to the courthouse each morning on one or more cases and they get dispositions on these cases as they go to each appearance (or sometimes) they do not get dispositions.

386.   The dispositions are docketed in CourtView on pretty much a real time basis (clerk generally makes the docket entry as the judge makes their ruling, Cipullo, pg. 19) with 99.9 % accuracy. Cipullo, pg. 42; 61, 62-63.

387.   But, no one in the DOC tracks the dispositions in anything like real time. Simmons 1, p. 80-13:17.

388.   Nor does R&D Control, nor the Records Office, nor any other DOC post maintain any list for tracking all of the cases an inmate is going to court on, and in which, if any, of these cases a court order has been issued.

389.   The Records Office just waits for the orders to float into the Records Office (or not) and looks up the in-custody defendants' release status in the paper jacket at that time. Id.

390.   It would be easy to track orders/ release status.

391.   The PTR is generated out of CourtView and lists all the cases (including case numbers) an inmate is going to court on.

392.   It would be a simple matter to use the PTR to track dispositions in those cases as they occur.

393.   This system would allow the DOC tell from the PTR (or whatever tracking devise was used) which court returns had got release dispositions on all the cases they went to court on and which they had got one or more commit dispositions on.

394.   Some of the other jurisdictions Mr. Schneider evaluated use the court docketing system to track dispositions of cases in-custody defendants go to court on.

395.   Such a system would enable the DOC to prevent many erroneous releases, accelerate releases by initiating the release process by starting releases before the body reached the Records Office, accelerate releases by screening which in-custody defendants go to MHU, obviate the need to hold

orders at the jail board, identify bodies that come back without orders (such as Mr. Williams and Mr. Owens).

396.   Lack of a system causes DOC to implement polices that would be obviated. For example, if DOC tracked the status of dispositions in the cases the in-custody defendants go to court on would not have to hold orders at the jail board or slow return of bodies and orders by trying to keep the orders with the body.

397.   DOC would not have to send prisoners returning without orders to their housing units pending receipt of paper if DOC tracked orders/ status of hearings.

398.   DOC could also identify persons who needed orders while court still open if DOC tracked orders/ status of hearings.

399.   DOC could start release process before bodies got back with paper if DOC tracked orders/ status of hearings.

400.   A frequent cause of erroneous releases arises when an inmate goes to court on more than one case, and the inmate gets a release order in one case, gets released on that case, and later in the day an "orphaned" commitment order (orphaned because separated from and trailing the body) arrives back at the DOC after the body has already been released.

401.   The would not happen if the DOC used the PTR (or some other document or data source such as CourtView monitors or electronic transmissions from CourtView) to track whether the Records Office had received all the cases the inmate had gone to court on.

402.   All the DOC would have to do is check off each order against the matching case as the orders came down and the DOC received them.

403.   This way the Records Office could monitor in real time on a rolling basis whether an inmate had received orders from all cases on which he went to court or whether DOC should be expecting more orders.

404.   The DOC waits for the body and the order to arrive at R&D, and then for the order to wend its way through R&D and up the dumbwaiter to the Records Office where someone looks up the DCDC number, finds the jacket, and looks inside to see the cases he is being held on.

405.   The DOC's failure to monitor dispositions in real time on a rolling basis means that the DOC does not know whether an inmate has received orders from all cases on which he went to court means that the DOC loses track of that inmate from 5:00 a.m. in the morning until late in the evening when orders come back. During this interval the court returns are off the DOC's radar screen.

406.   Instead of monitoring the status of court returns' case dispositions in real time on a rolling basis the District's solution to ensuring paperwork (the only evidence of disposition the DOC recognizes or uses) in all cases reaches the Records Office before has been to keep the paperwork with the body.

407.   For example, Superior Court judges have issued orders saying that the body cannot leave the courtroom without paperwork. Administrative Order 02-22, dated July 25, 2002.

408.   The goal was to keep the paperwork with the body so that everyone would know what was happening without body. Cipullo page, 89.

409.   This means either the body waits for the paperwork (causing delay in transporting the body to his next hearing or on to his release point) or the body leaves the courtroom without the paperwork (causing delay in transporting the paperwork because such orphaned paperwork typically arrives back at the Records Office on the last bus of the day causing erroneous releases). Ps. Ex. # 420, Schneider Preliminary, pg 8; 10-11.

410.   Moreover, if an in-custody defendant or his paperwork arrives at the jail board and the jail board realizes the in-custody defendant has more than one case, the jail does not forward that paperwork onto the Records Office so the Records Office can begin the release process. Schneider, pg. 5.

411.   Instead, the jail board holds the first set of orders or buck slips in a tray until the in-custody defendant has finished all his appearances and all of his paperwork is collected which can be hours later instead of sending paperwork back to the records office on a rolling basis to at least start the release process. Schneider, pg. 5.

412.   One reason this is done is to prevent erroneous releases which frequently occur when "orphaned" commit orders arrives after the body. Ps. Ex. # 420, Schneider Preliminary, pg 8; 10-11.

413.   This procedure is necessitated by the DOC's failure to track the status of dispositions in the cases in-custody defendants go to court on.

414.   Deputies and DOC staff do not need court orders to keep track of bodies as they travel to and from the DC Jail. Deputies and DOC staff keep track of bodies with wing card's and temporary release entries and annotations on the PTR and on in the Form 40s. Watford 1 depo, pg. 140-143.

415.   R&D Control staff generate a "wing card" for each new intake when he's booked into DOC which has name, DCDC, and a photo and which follows the body wherever it goes on the court return cycle. Watford 1 depo, pg. 140-143.

416.   R&D Control sends a wing card for every body going from the Jail to court. Watford 1 depo, pg. 141-142.

417.   The wing card stays with the body at court. Watford 1 depo, pg. 141-142.

418.   The wing card is collected by the jail board and given back to whoever transports the body back to the DC Jail or MHU Watford 1 depo, pg. 142-143.

419.   Delays caused by DOC continue when the body reaches R&D Control

420.   Delays caused by DOC continue when the body and paperwork reached R&D Control.

421.   Paperwork on its way to the Records Office encounters "significant delay" in R&D Control where staff receive the paperwork, sort it out, check it against inmates on the bus, and mark receipt of the paperwork on the R&D Control's copy of the PTR. Schneider final reports 7.

422.   Even after orders are received at the jail, there can be a "significant delay" between the time the paperwork is received by the R&D control officer from the time the paperwork reaches the Records Office staff who are posted in the R&D Control post. Ps. Ex. # 406, Schneider, pages 7.

423.   Records Office staff log in each order in a log book and enter the data from the order in JACCS. Ps. Ex. # 406, Schneider, pg. 6.

424.   Logging in the orders can take significant time. Ps. Ex. # 406, Schneider, p. 7.

425.   "Logging the orders into the separate log is very time-consuming and delays the receipt of orders in Jail Records where the actual processing is done." Ps. Ex. # 406, Schneider, pg. 17.

426.   Ms. Schneider recommended that since R&D staff were supposed to be annotating their copy of the PTR showing orders received from court that the annotated PTR replace logging the orders again in a separate log book. Ps. Ex. # 406, Schneider, pg. 17.

427.   Booking new intakes and court returns into R&D Control

428.   90% of new intake arrived at R&D control, the sole point of entry for all persons entering DOC custody, from Superior Court or the District Court after having been booked into the MPD CGS computerized booking database within the previous 24 hours.

429.   DOC (against best practices) to reduplicate the booking process for new intakes who have just booked by the MPD, and then the Superior Court. Each new intake booked into DOC must be re-booked even though he was previously booked into MPD/ CourtView within the previous 24 hours.

430.   Reduplicating booking introduces needless errors into the DOC's booking process and burns up precious time and manpower that could be spent on other tasks.

431.   Arrestees booked at one of eight "booking stations" where officers enter name, DOB, and other biographical data into CJIS, the MPD's computerized booking system. Pages 59. 62, Ps. Ex. # 45, D. C. Criminal Justice System: Better Coordination Needed Among Participating Agencies (GAO-01-187, Mar. 30, 2001)("GAO Report on D. C. Criminal Justice System").

432.   MPD positively identified the US lock ups and most traffic lock ups at the Districts using LiveScan optical fingerprinting machines linked to the FBI's automated fingerprint identification system (AFIS), GAO Report on D. C. Criminal Justice System, pg 63, 96.

433.   If the arrestee has never been arrested for a U.S. offense, AFIS assigns the arrestee a new PDID. MPD also ran background checks (twice) using local and national criminal data base systems including WALES, NCIC, and AFIS, GAO Report on D. C. Criminal Justice System p.62; and put wristbands generated out of AFIS with a photo, name, PDID, DOB, race and gender on each lock up, GAO Report 64.

434.   Copy of wristband attached as Ps. Ex. # 101.

435.   USAO employs two to three criminal history analysts who complete a criminal records check on each arrestee on the lockup list. GAO Report on D. C. Criminal Justice System p.71.

436.   Pretrial Services interviews the arrestee in the cellblock (prior to the initial court appearance), and Pretrial Services generate a bail report for each arrestee. GAO Report on D. C. Criminal Justice System p. 77.

437.   The Superior Court and the United States Attorney's Office and the AG's office and several other agencies took advantage of this data by importing into its system biographical data and arrest data about each arrestee so the agency did not have to physically interview each person to obtain the same information and then manually reentered into its computer system.

438.   CJIS generates a PERSLOG file from which CJIS generates four "lock-up" lists in "real" time. Ps. Ex. # 44, pages 7-8.

439.   However the jail disregarded data collected by the MPD and Superior Court and started the booking process all over again when new intakes arrived at the R&D control. Jail staff interviewed each person, wrote down his biographical data and charts data and other data on piece of paper called a "face sheet," and then manually took his fingerprints with ink and rollers re-entered the data into the DOC's computer system JACCS. Ps. Ex. # 791, ¶ ¶ 14-18, Coleman affidavit.

440.   DOC had LiveScan machines in R&D for making positive identifications but did not use them till 2007. Ps. Ex. # 791, ¶ 17, Coleman affidavit.

441.   Moreover, the R&D sally port is too small and causes a backlog of inmates coming into and going out of DOC custody. 2009, DOC responses to Committee questions, question #6.

442.   Lost paperwork and the "Original Commitment" Rule

443.   As a result of the DOC's release practices and the chaotic inefficiencies of the "sneaker network" orders frequently arrived at the Records Office late[21] or not at all. Ps. Ex. # 406, Schneider Report, pages Simmons 2, 256-257.

444.   This problem cascaded because the DOC made releases only on the basis of paper orders hand carried from the court to the Records Office (and would not even start the release process, checking for other cases, detainers, and warrants, until it received paper orders at the Records Office).

445.   The DOC added to the problem of missing or late arriving orders by treating all court returns returning to R&D Control without orders (e.g., court returns returning with buck slips or no paperwork at all besides the Form 40 manifest with lists the names of the court returns on the bus or van) as still subject to their original commitments. Simmons 2 depo, 256; Graham, pages 86-87.

446.   Moreover, the DOC took no steps to run down their release status by checking CourtView or any other source.

447.   The DOC held the inmates until an order arrived or someone called to demand his release.

448.   As Ms. Simmons, the "lead" in the Records Office during the class period, explained, when a court return came back from court to the DC Jail with a

---

[21] Mr. Day's summary shows that in the first year the District identified 215 persons who were, according to the District, over-detained as a result of late paperwork. **Ps. Ex. # 99, ¶ 42.**  At least 170 of those 215 persons were taken to the Jail after they were entitled to be released and held overnight at the Jail, and would have been strip searched.

buck slip (a document issued by the Superior Court Marshal showing transfer of custody of the body) instead of a release order issued by a judge showing the release disposition, the DOC treated the court return as though "that original commitment still stands."  Simpson 2, pages 256-257.

449.   Such persons were returned to their housing units. Simpson 2, page 257. Of course, anyone returned to his housing unit was subject to a blanket strip search. Id.; Ps. Ex. # 791, Coleman affidavit, ¶ 25-28 Simmons 2 depo, 256; Graham, pages 86-87.

450.   The person would be brought back down for release if a release order arrived. Simmons 2 depo, 256-257; Graham, pages 86-87; Ps. Ex. # 791, Coleman affidavit, ¶ 25-28.

451.   Otherwise, as Mr. Williams' case shows, the person remained in the DC Jail until someone called demanding his release.

452.   Had Mr. Williams' lawyer not informed the DOC's general counsel and the District's counsel in Bynum about the over-detention he might still be there today.

453.   If the DOC tracked bodies and dispositions they could keep a running tally of bodies returning without orders (and bodies returning without orders in all cases) and investigate the release status of such bodies.

**Delays in the Records Office: DOC's system for tracking inmates, their cases, their release dates, and detainers and warrants was based on paper**

However, just because an order reached the Records Office did not mean that a body would be released.

454.   Even today the DOC's system for tracking inmates, their cases, their release dates, and detainers and warrants is based on paper. Simmons 1, 62. (check jacket physically).

455.   The DOC has a computer database called JACCS but the Records Office makes all releases on the basis of hard copy institutional folders ("jackets") and the paper orders in the jackets.

456.   "then you have to get the person back - - you have to get the paperwork together, get the person back in custody physically, and then bring him back to the jail for release."  Simmons 1, 65:55-9.

457.   Then you check the jacket physically for other cases and detainers because they may not be in JACCS or may be posted to the wrong person in JACCS.

458.   Warrants have to be run in WALES and NCIC. Simmons 1, 65-68.

459.   "[A]ll this was done manually during that time period [during the first year of the class period]."  Simmons 1, 70.

460.   Ms. Simmons says that the first step Records Office LIEs take in processing a release is manually sorting paperwork brought back with busloads of bodies and taking the PDID numbers off the paperwork and matching it up with the DCDC numbers the DOC uses. Simmons 2, p. 257-258.

461.  After sorting paperwork and looking up the DCDC numbers LIEs have to manually fetch the jackets. Id. at 254, 268.

462.  But, paper gets lost or misfiled.

463.  The following table (data in the table, including the reasons for over-detention, comes from the DOC's own submission22 to the Committee on Public Safety and the Judiciary) shows some examples of persons over-detained for days simply because the Records Office misplaced their folders (jackets) or misfiled their orders in the wrong jackets:

| Name | Over-detention period | Reason |
|---|---|---|
| John Reaves | **1** (4/25/06 to 4/26/06) | folder misplaced. Ps. Ex. # 860, pg. 125. |
| Keenan Robinson | **4** (4/13/06 to 4/17/06) | folder misplaced. Id. |
| Stacia King | **5** days (Release Date 5/4/06; Exit Date 5/9/06) | Folder misplaced. Id. at 126. |
| Robert Ramsay | **9** days (Release Date 6/6/06; Exit Date 06/15/06 | folder misplaced. Id. |

---

[22] (**3-12-07 DOC responses to Committee on Public Safety and the Judiciary's oversight questions).**  Every year the City Council's Committee on Public Safety and the Judiciary (which has oversight over the DOC) poses written questions to the DOC and the DOC responds to the questions.  The Committee periodically asks for lists of over-detentions and erroneous releases.  The DOC's response to questions posed by the Committee dated March 12, 2007 has a list of over-detentions, including the over-detentions listed above.  But, these over-detentions are not described in Ms. Simmons' spreadsheet the way they are described in the DOC responses to the Committee questions nor do they appear in the pdf "Analysis of Potential Late Releases" produced by the District.  Plaintiffs obtained their copy of the DOC's response to questions posed by the Committee dated March 12, 2007 from the Council.  The DOC claims it lost its copy.

This is not the only instance of the DOC withholding information.  Council Member Mendelson states the DOC did not accurately report data to his Committee writing. "However, the Department of Corrections has resisted accountability." **Ps. Ex. #** 205, pg. 2, Mendelson Report on I0:00 PM cut-off.  Ms. Schneider describes how the DOC's R&D Control staff thwarted her attempts to audit paperwork reported on the R&D Control's annotated copy of the PTR by simply stopping all annotations during her audit period.  **Ps. Ex. #** 406, Schneider Report, pages 16-17.

| Derrick Roach | **7** days (8/24/06 to 8/31/06) | judgment and commitment order placed in somebody else's folder. <u>Id</u>. at 127 |
|---|---|---|

464.   Sometimes it took two hours just to find23 a jacket. Id. at 270. Moreover, Ms. Simmons said the Records Office was never adequately staffed with enough people. Id. at 277.

465.   Typical of the paper driven Records Office systems was the system for handling warrant or detainer "discrepancies," that is when a detainer or warrant blocked the release of someone whose charges had been discharged.

466.   If there was a warrant, then the Records Office prepared a release packet and sent the release packet down to R&D to wait for the MPD fugitive unit to come by and pick up the body and the release packet. Simmons 1, 108, 110, 111, 113.

467.   The DOC waited for the MPD to come on their regular rounds, the DOC did not notify the MPD Fugitive Unit to come. Simmons 1, 102, 108, 111, 113.

468.   MPD came some days but not others. Simmons 1, 104.

469.   If MPD did not come then R&D sent the release packet back up. Id. at 111-112. Release packets coming back up was how Records Office staff monitored whether MPD had picked up a release. Id. at 120.

470.   Records Office did not keep log of persons waiting to be picked up by the MPD. Id. Records Office did not enter the discrepancy into the log unless unresolved. Id. at 116.

471.   Warrants left in the jackets till resolved. Id. at 120.

---

[23] If the inmate were housed at CTF his release order had to be faxed to CTF and the records office there had to process the release.  <u>Id</u>. at 268-269.

472.   Unresolved discrepancies and warrants tracked by putting them in baskets and marking emails as unread in the inbox. Id. at 121-22, 362.

473.   Discrepancy coming back from R&D when not picked up should be entered into discrepancy database but was not. Id. at 123.

474.   The evening shift prepared the release packets for inmates held on warrants to be picked up by MPD, but MPD came or did not come on the day shift, and since each Records Office person tracked his own discrepancies (Id. at 120) nothing was done till the next day to check whether MPD had picked up the releasee. Id. at 113-114.

475.   Moreover, the evening shift could not call MPD to come pick up a release because the Fugitive Unit only answered the phone during the day shift. Id. at 118-119.

476.   The jacket remained in a cart in the Records Office till the release packet finally did not come back up. Id. at 121-122.

477.   If the release packet came back up often enough the discrepancy was entered into a database. Id. at 123-124.

478.   When the Records Office had prepared a release packet for someone to be released on his own custody from the DC Jail the Records Office would send the packet to R&D Control who would process the release of the body. Simmons 1, p. 84-85.

479.   If the body were at MHU the release packet had to be hand carried to MHU. Watford 1, 49-50; 128. T

480.   he MHU R&D officer would locate the body, make the release, Watford 1, 128, enter the release on the log, Watford 1, 129.

481.   JACCS terminal did not get installed in MHU and go online till 10/10/2006. Watford 1, 113.

482.   All persons sent to MHU and whether they were released or sent back to the DC Jail or CTF were recorded in a log. Watford, 2 182-183.

483.   Prior to 10/10/2006 all releases whether from MHU or DC Jail were entered into JACCS as released from DC Jail. Ps. Ex. # 190, Dr. Kriegler's 11/15/11 Report, p. 30, ¶ 73.

### District Also Failed To Take Corrective Action It Had Promised To Take Or Implemented The Action Inefficiently

### Inmate Processing Center Still Not Built.

484.   The Bynum Settlement Agreement in the final approval obligated the District to place $3 million of the total $12 million settlement amount and a reversion Fund" to be used to "build a state-of-the-art inmate processing center IPC within the footprint of the DC jail site" to modernize the release process and to resolve over-detentions and post release strip searches. Ps. Ex. # 759 - preliminary approval fairness hearing transcript.

485.   But, the DOC still has not built the Inmate Processing Center ("IPC"). 2010 DOC responses. 2010 pg. 96.

486.   The District has not even broken ground or even provided the construction documents required for bidding. 2010 DOC responses. 2010 pg. 96.

487.   The committee on Public Safety and the Judiciary of the District of Columbia City Council found in a recent report:

488.   In order to eradicate the dual problems of over detentions and erroneous releases from the DC jail, it is necessary to construct a state-of-the-art inmate processing center now, such a center will also provide a greater degree of efficiency and cooperation among DOC departments.

489.   Page 29 of 102, Committee on Public Safety and the Judiciary Fiscal Year 2010 Budget Report, April 28, 2009.

490.   In another report the Committee stated: "The state-of-the- art IPC is supposed to provide adequate processing facilities for intakes, releases, and associated records processing. It will speed up the timely and accurate release of inmates."  Ps. Ex. # 205, Report on Bill 18-424, "District of Columbia Safe Release of Inmates Amendment Act of 2010," dated 1/27/10 ("Mendelson Report on I0:00 PM cut-off").

491.   However, the District still has not constructed, nor even broken ground, on the IPC.

492.   In fact, the DOC is now suggesting putting the Inmate processing Center in the CTF facility that instead of building a new stand-alone center. DOC Responses to Committee questions dated 2/19/2008.

493.   Moreover, as the DOC reports annually to the City Council committee charged with oversight of the DOC, the R&D control area and the R&D processing areas where inmates are received into and released from DOC custody is "extremely congested and poorly designed."

494.   "Modern and efficient business processes cannot be implemented in this area because of layout and paucity of space.

495.   The area needs to be redesigned, expanded and reconfigured."  2009, 32 of 111 (capital improvements)

496.   The area is too small and causes a backlog of inmates coming into and going out of DOC custody. 2009, DOC responses to Committee questions, question #6.

497.   MHU: A Stop Gap Solution.

498.   Court returns entitled to release continue to be subject to blanket post release strip searches after court appearances.

499.   Not only over-detained persons but also same day releases who were returned to DC Jail rather than diverted to MHU because left courthouse without orders.

500.   As part of the Bynum Settlement Agreement the DOC, in lieu of making courthouse releases, promised to divert court returns entitled to release to MHU which is a holding facility on the grounds of the old DC General Hospital.

501.   The idea behind MHU was to obviate the need for strict searching court returns entitled to release after they receive their release dispositions.

502.   Court returns sent to MHU were not subjected to strip searches there unless there was an individual or reasonable suspicion to justify the search.

503.   Sometime in 1995 or 1996 the DOC began diverting some but not all court returns entitled to release on some but not all days the court was in session to MHU for release.

504.

|  | days in the relevant time period in which the release of CORs could have occurred | releases on Saturdays, Sundays or holidays | CORs were released on how many days | Number of CORs were actually released during the relevant time period | Number of CORs returned to the DC Jail or CTF |
|---|---|---|---|---|---|
| 9/1/2005 to 3/26/2006 | 207 | no | from 102 to 105 | 966 to 1,003 | 943 to 977 |
| 3/27/2006 to 10/9/2006 | 139 | no | 121 | 998 | undetermined |

505.   Dr. Kriegler calculated 3,809 members of the strip search class who were over-detained and 1,019 members of the strip search class who were released on-time.

506.   However, the MHU program was hastily introduced and poorly administered poorly administered in large part due to the lack of written program statements or post orders articulating release procedures.

507.  So, many court returns entitled to release were not sent to MHU in the first place, they were sent back to the DC Jail, returned to their housing units, and subjected to blanket post release strip searches.

508.  Dr. Kriegler calculated 1,019 members of the strip search class who were released on-time.

509.  Moreover, any court returns entitled to release sent to MHU who was not released before 10:00 p.m. was returned to the DC Jail or CTF and subjected to blanket post release strip searches.

510.  Dr. Kriegler calculated 3,809 members of the strip search class who were over-detained.

511.  Every court return entitled to release listed on attachment 8 to the Day affidavit (Ps. Ex. # 99) summarizing persons listed on the District Audit Analysis spreadsheet (Ps. Ex. # 860) is (1) a court return entitled to release, (2) returned to the DC Jail or CTF during the first year of the class period, and (3) therefore subjected to a post-release strip search because of the DC Jail's policy and practice of subjecting all persons entering the DC Jail to blanket strip searches and the DC Jail's policy and practice of subjecting all court returns entitled to release transferred from CTF to the DC Jail to blanket strip searches.

512.  Therefore, all 1,949 persons listed on attachment 8 to the Day affidavit (Ps. Ex. # 99) got subjected to blanket post release strip searches just during the first year of the class period.

513.   Furthermore, District did set up MHU to make releases outside of the jail, as promised in the Bynum Settlement Agreement, but, the District said MHU and the hasty and ill-conceived manner and as was only able to make releases from MHU on some but not all days and some but not all persons.

514.   The District did not begin making courthouse releases so July 2008 when it began releasing certain misdemeanors from certain courtrooms on a trial basis.

515.   Prior to 10/10/2006 all releases whether from MHU or DC Jail were entered into JACCS as released from DC Jail. Ps. Ex. # 190, Dr. Kriegler's 11/15/11 Report, p. 30, ¶ 73.

**THE 10 P.M. CUT-OFF RULE**

516.   In one of the most startling developments of the Bynum/ Barnes saga, in 2003, right in the middle of the Bynum case, the City Council enacted a statute which prohibited releasing inmates from the DC Jail (including MHU and CTF) 10:00 pm at night and 7:00 am in the morning. The 10:00 p.m. cut-off rule (D.C. Code § 24-211.2(b)(6))

517.   The City Council enacted the 10:00 p.m. cut-off rule in 2003 as part of the District of Columbia jail improvement act of 2003 (D.C. Law 15-562) and it was codified at D.C. Code § 24-211.2(b)(6) and became effective in 2004.

518.   The law prohibits the District's DOC from releasing inmates, including court returns, after 10 p.m. and before 7:00 a.m. The statue is an over-detention-making machine.

519.   By the District's own attribution, during the first year of the class period alone 1,244 court returns entitled to release were held over at least until the next day because of the 10 p.m. cut-off rule. Ps. Ex. # 99, Day summary of over-detentions in District Audit Analysis.

520.   The effect of the 10:00 p.m. rule is to turn any late release into a guaranteed overnight over-detention.

521.   By the District's own analysis, during the first year of the class period alone, the 10 p.m. cut-off rule caused at least 1,244 court returns entitled to release to be over-detained at least until the next day and also caused them to be subject to blanket strip searches after they had been ordered released by judicial officers of the Superior Court and this Court. Ps. Ex. # 99, Day summary of District Audit Analysis.

522.   As of 3/24/2009 the Attorney General informed Council Member Mendelson in a letter dated 3/24/2009 that about six or seven court returns entitled to release continue to be held over because of application of the 10 p.m. cut-off. Ps. Ex. # Letter from AG Nickles to Council Member Mendelson dated 3/24/2009.

523.   Even the District's own Attorney General opined that the 10 p.m. cut-off Rule as applied is unconstitutional.

> Consequently, on February 17, 2009 **current D.C. Attorney General Peter Nickles wrote Council Chairman Vincent Gray declaring that "...I am prepared to issue an opinion to the Director of the Department of Corrections declaring that the cutoff provision is unconstitutional as applied and advising the Director to cease implementing it.** In my view, a preferable means of addressing this situation is for the Council to ... repeal the cutoff provision." The Council did not act on this ultimatum. Despite an

exchange of correspondence between Mr. Nickles and the Committee's chairman, Mr. Nickles proceeded to issue a March 11, 2009 memorandum to the Director of the Department of Corrections (DOC) stating in part: "...the DOC is hereby advised that the Act, as applied, is unconstitutional and it is further directed to cease compliance with the provisions of the Act...".

524.   Ps. Ex. # 205, "Mendelson Report on I0:00 PM cut-off". (emphasis added)

525.   Even assuming arguendo that the Rule were not unconstitutional on the ground urged by the Attorney general, delay in releasing an inmate attributable to the 10 p.m. cut-off rule is not legitimate permissible delay under the Riverside permissible delay analysis because delaying the release of an inmate otherwise entitled to release merely because neighbors complain is simply granting all the weight to an impermissible governmental interest and no weight whatsoever to an individual's interest in prompt release. 500 U.S. at 56-57.

526.   What's more, the over-detentions and inefficient release practices caused large numbers of court returns entitled to release to be subjected to post release strip searches.

527.   3,809 over-detained court returns entitled to release were subjected to the blanket post release strip searches (2,609 during the first year of the class period) and 1,019 court returns entitled to release released on-time were subject to blanket post release strip searches (249 during the first year of the class period).

528.   One of the goals of the Bynum litigation and the Bynum Settlement

Agreement was to stop this revolting practice. Ps. Ex. # 759-10, preliminary

approval fairness hearing transcript, MCA says have technology there.

## Maurice Williams' Overdetention

Maurice Williams was overdetained in the DC Jail from 2/8/06 to 3/1/06.  Ms

Baker, counsel for the District, errs when she says on page 6 of the District's

motion that Mr. Williams was over detained for only two days.

## 1. District's Account Of Maurice Williams' Overdetention

 Ms. Ireland in her affidavit says the following about Mr. Williams:

**Maurice Williams**. This inmate was held on three charges. He was
sentenced on February 27, 2006 on two charges to time served, but DOC
did not receive that release order until March 1, 2006. That order
indicated a release date of February 8, 2006. Inmate Williams was
released on March 1, 2006. True and correct copies of documents
regarding inmate Williams are attached hereto as Exhibit "E" and made
a part hereof.

Counsel for the District relies on this affidavit to conclude that Mr. Williams

was over detained for 2 days. District's motion at page 6.  Footnote six of the

District's motion tracks the language of Ms. Ireland's affidavit but does not

explain why she concludes that Mr. Williams was over detained only 2 days.

## 2. Plaintiffs' Analysis Of Maurice Williams' Overdetention

An analysis of the publicly available records relating to Mr. Williams'

February 2006 detention indicates that Mr. Williams should have been released

on 2/8/06, and that he was held illegally in the DC Jail from 2/8/06 until

3/1/06. Nothing in the copy of Mr. Williams' Department of Corrections file

provided by counsel for the District to undersigned counsel affects this

analysis. The events resulting from Mr. Williams arrest and incarceration on

2/2/06 in chronological order and the documents establishing the chronology

are:

**February 1, 2006 Background**: As of February 1, 2006 Mr. Williams was on

probation[24] on two cases, 04cmd6502 and 05cmd9764.

**February 2, 2006 arrest, presentment and detention on traffic charge**: On

2/1/06 or 2/2/06 Mr. Williams was arrested and charged with several traffic

offenses in case 06ctf2022.  A copy of the Superior Court docket sheet in case

06ctf2022 is attached as Plaintiffs' Exhibit # 34.  The docket sheet in

06ctf2022 (pages 4, 5, and 6 of Plaintiffs' Exhibit # 34) shows that at

presentment on 2/2/06 the presentment Court (Judge McCarthy) ordered Mr.

---

[24] The Honorable James E. Boasberg of the Superior Court had sentenced Mr.
Williams to probation on these cases on 9/29/05 in a plea deal in which Mr. Mr.
Williams had pled guilty to 04cmd6502 and 05cmd9764 and the government had
dismissed 04cmd5291.

Williams held on a "five day hold" because he was on probation in cases 04cmd6502 and 05cmd9764 at the time of his arrest and presentment in 06ctf2022. Pursuant to D.C. Code § 23-1322(a)(1)(C) the presentment judge must order an arrested person arrested while on probation held for at least 5 business days if the judge finds probable cause and must also direct the prosecuting attorney to notify the probation officer or sentencing court. The docket sheet in 06ctf2022 (page 6 of Plaintiffs' Exhibit # 34) shows that a detention hearing in 06ctf2022 was scheduled for 2/8/06. The detention order in case 06ctf2022 (page 7 of Plaintiffs' Exhibit # 34) shows Mr. Williams was due back in Superior Court on 2/8/06.  The presentment Court also directed the prosecutor to notify Mr. Williams' probation officer of the traffic re-arrest in 06ctf2022.

**February 3, 2006 probation report recommending show cause in misdemeanor cases**: The probation officer in cases 04cmd6502 and 05cmd9764 filed a report dated 2/3/06 with the sentencing judge in cases 04cmd6502 and 05cmd9764 recommending a show cause. Plaintiffs' Exhibit # 35, pages 3-5.  The probation report in cases 04cmd6502 and 05cmd9764 does not recommend incarceration.  Id at page 5.

**February 8, 2006 five day hold dissolved; no detention order on any case; illegal detention begins; illegal strip search**: A five day hold hearing was held pursuant to D.C. Code § 23-1322 (d)(1) on 2/8/06.  Plaintiffs' Exhibit # 34, page 8.  The Court **did not order[25] holds** in either 04cmd6502 or 05cmd9764.  Moreover, the Court ordered Mr. Williams released in 06ctf2022.  Plaintiffs' Exhibit # 34, page 9.  The docket sheet reads: "Release Order – Jail sent on: 2/8/2006 18:51:24." The 2/8/06 release order in 06ctf2022 is at page 10 in Plaintiffs' Exhibit # 34.  At this point, the detention order holding Mr. Williams in 06ctf2022 – the only order holding Mr. Williams – was dissolved by the release order at page 10 in Plaintiffs' Exhibit # 34.  But, the Records Office did not process the release order in 06ctf2022. In fact, the Records Office continued to show Mr. Williams subject to a hold in 06ctf2022.

**February 14, 2006 show cause order issued:** On 2/14/06, Judge Boasberg issued a show-cause order in 05-9764 and a copy was mailed to Mr. Williams' address. The docket sheets for 04cmd6502 (Plaintiffs' Exhibit # 32) and 05cmd9764 (Plaintiffs' Exhibit # 33) show that no detention order for either of

---

[25] It is clear from the docket sheets in 04cmd6502 and 05cmd9764 that Mr. Williams was not ordered held in these cases because the docket sheets do not indicate any holds were ordered.

these two cases had been issued since the 2/2/06 re-arrest in 06ctf2022 or the 2/28/06 five day hold hearing.

**February 27, 2006 Mr. Williams sentenced to time-served on misdemeanor probation cases but not released; illegal detention continues; illegal strip search**:  On 2/27/06 Judge Boasberg sentenced Mr. Williams to time-served and extended his probation on 04cmd6502 (Plaintiffs' Exhibit # 32, page 8) and 05cmd9764 (Plaintiffs' Exhibit # 33, page 3).  But, instead of being released, Mr. Williams was returned to DC Jail, and subjected to a strip search.

**March 1, 2006 Mr. Williams finally released; illegal strip search**

| | |
|---|---|
| Respectfully submitted,<br><br> ___/sig/ William Claiborne<br>WILLIAM CLAIBORNE<br>D.C. Bar # 446579<br>Counsel for the Named Plaintiffs and the Classes<br>717 D Street, NW , Suite 210<br>Washington, DC 20004<br>Phone 202/824-0700 | Respectfully submitted,<br><br> _/sig/ Ralph D. Robinson<br>RALPH D. ROBINSON<br>D.C. Bar #441797<br><br>8160 Skelton Circle<br>Falls Church, VA 22042<br>Phone 703/846-0596 |
| Respectfully submitted | Respectfully submitted, |

| | |
|---|---|
| _____<br>Barrett S. Litt, Esq.<br><u>pro</u> <u>haec</u> <u>vice</u><br>Litt, Estuar & Kitson, LLP<br>1055 Wilshire Boulevard<br>Suite 1880<br>Los Angeles, California 90017<br><br>Phone (213)-482-6310<br>Fax (213)-380-4585 | _____<br>Paul J. Estuar, Esq.<br><u>pro</u> <u>haec</u> <u>vice</u><br>Litt, Estuar & Kitson, LLP<br>1055 Wilshire Boulevard<br>Suite 1880<br>Los Angeles, California 90017<br><br>Phone (213)-482-6310<br>Fax (213)-380-4585 |