**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                     )
                                                     )
**CARL BARNES, *et al.*,**                           )
          **Plaintiffs,**                            )
                                                     )
          **v.**                                     )          **Civil Action No. 06-315 (RCL)**
                                                     )
**DISTRICT OF COLUMBIA,**                            )
          **Defendant.**                             )
                                                     )
_____)

**MEMORANDUM OPINION**

Before the Court are Plaintiffs' Motion [217] for Summary Judgment and Defendant's

Motion [211] for Summary Judgment.   Also before the Court are two motions to strike:

Plaintiffs' Non-Consent Motion [271] to Strike "Defendant's Notice Regarding Correction in

Defendant's Response to Plaintiffs' Statement of Material Facts Not in Dispute, Document

Number 228-7,"[1] and Plaintiffs' Non-Consent Motion [292] to Strike "Defendant's Notice

Regarding Filing Analysis of Late Releases, Document Number 244."   Finally, plaintiffs recently

filed a document titled "Notice [sic] Plaintiffs' Response to Discrepancy Reports Submitted by

the District (docket # 301)."[2]  Pls.' Notice [306], Jun. 21, 2011.  Having carefully considered the

Motions, the Oppositions, the Replies, oral argument of counsel, the entire record in this case,

and the applicable law, the Court will grant in part and deny in part Plaintiffs' Motion for

Summary Judgment, and grant in part and deny in part Defendant's Motion for Summary

---

[1] Subsequent to plaintiffs' Motion to Strike, Pls.' Mot. Strike [271], Apr. 27, 2011, the District filed a Notice of Withdrawal of Defendant's Notice Regarding Correction in Defendant's Response to Plaintiffs' Statement of Material Facts Not in Dispute, Document Number 228-7 and Opposition to Plaintiffs' Motion to Strike.  Def.'s Notice [294], May 23, 2011.  Since the District has voluntarily withdrawn the notice that plaintiffs have requested be struck, the Court will deny plaintiffs' Motion to Strike as moot.
[2] While not a motion requiring a ruling from this Court, the Court will briefly address plaintiffs' comments in the Notice at the end of this opinion.

Judgment.  The Court will also deny both of plaintiffs' motions to strike.  A review of the background of the case, the governing law, the parties' arguments, and the Court's reasoning in resolving those arguments follows.

## I.   BACKGROUND

This case involves overdetentions and strip searches at the District of Columbia's jails. The District's Department of Corrections has custody over thousands of prisoners serving time for various offenses, with jail sentences of varying lengths.  To maintain security within its jails, the DOC strip searches inmates upon admission or commitment to its jail facilities.  D.'s SMF [211-1] ¶ 3.  Each day the DOC shuttles some of its inmates to courts in the District so they can be present at court appearances.  At some of those court appearances inmates receive court orders from judges for their release from the DOC's custody.  At that point the DOC begins an administrative release process that results in the prisoner's actual release from the DOC's custody.  The same release process is begun upon the expiration of an inmate's prison sentence.

While there is no set definition for an "overdetention," it generally means that once a prisoner was entitled to release -- because of a court order, the expiration of a sentence, or otherwise -- the authority having custody over that person held them too long.  This case involves a group of plaintiffs representing a class of prisoners who allege, in essence, that the DOC held them too long after they were ordered released by a court or their sentences expired. In addition, since inmates with release orders from courts in the District were often returned to the DOC's jails while the administrative processing of their releases was undertaken by DOC staff, those inmates were strip searched again pursuant to the DOC's policy.  Therefore the overdetention problem and the strip search problem are interrelated, the one leading to the other.

Since this case involves the DOC's release process and whether it leads to overdetentions or is administered so poorly as to achieve the same result, the Court will first summarize that process. A 2008 report commissioned by the District's Criminal Justice Coordinating Council supplies a helpful breakdown of the flow of paperwork between the various entities involved in the release of DOC inmates and a description of the steps taken by the DOC's Records Office to process releases. Pls.' Ex. 408 ("Schneider Report").

The Schneider Report notes that when a release order issues in a courtroom, "it travels through seven hands . . . before reaching the DC Jail Records office where it is processed." *Id.* at 1. Judges sign two original copies of release orders. *Id.* at 4. One copy is retained by the courtroom clerk and scanned sometime that day into a docket management program used by the Superior Court called "Court View." *Id.* at 4–5. The other signed copy of the release order is given to the staff of the "Jail Board" at the courthouse, which holds onto all the inmates' paperwork and coordinates with the DOC transportation staff to arrange the van or bus transport of inmates and their paperwork to the appropriate places. *Id.* at 5.

Once an inmate's paperwork has arrived at the DC Jail, it is brought to the Receiving and Discharge office, where jail records staff enter each order into a logbook, post each order in the DOC's inmate-management program JACCS, and then send the orders via dumbwaiter to the DC Jail's Records Office for release processing. *Id.* at 6.

Records Office staff -- unfortunately named "Legal Instrument Examiners" ("LIEs") -- then perform the final round of administrative steps that the DOC requires before releasing inmates. *Id.* A LIE first reviews the inmate's actual file or "jacket" and confirms that the release orders match the inmate's cases. *Id.* The DOC will not release an inmate unless it has an actual, signed copy of the release order. The LIE also looks for other pending cases or detainers in the

file.  *Id.*  Next, the LIE checks the DOC's own databases program, JACCS, to make sure that the JACCS data records coincide with the information in the physical file.  *Id.*  The LIE then checks other computer databases to see if there are any warrants out for the inmate's arrest, and checks the Superior Court's database, Court View, to check for any other cases requiring that the inmate be held in custody.  *Id.*  Once this first LIE determines that the inmate is eligible for release, a second, "senior" LIE performs all of the same steps -- again reviewing the inmate's physical file -- and then signs off on the inmate's release.  *Id.*  The process takes from 2 to 2.5 hours to complete.  Simmons Dep. [228-2] 164:15–22.

That the DOC's release procedures, its implementation of them, or both, might be generating unacceptable numbers of overdetentions is something that the District has been aware of for years.  This case is nearly identical to a prior case before this Court, *Bynum v. District of Columbia*, Civil Action No. 02-956 (RCL).  *Bynum*, filed in 2002, involved a class of about 4,000 former DOC prisoners who claimed they'd been detained by the DOC past the point when their releases had been ordered, "for periods ranging from an extra day to many days or even months on end."  *Barnes v. District of Columbia*, 242 F.R.D. 113, 115 (D.D.C.  2007).  In addition to this "overdetention" class, this Court in *Bynum* certified an overlapping "strip search" class.  The District moved for summary judgment, the Court denied that motion, and shortly thereafter the parties settled the case.

The class members in *Bynum* were unable to get through the DOC's release process on the day that their releases were ordered, were held by the DOC past midnight, and overdetained. In addition, because -- as stated above -- the DOC's policy is to strip search anyone who is returned to the general jail population, Def.'s SMF [211-1] ¶ 3, many of the *Bynum* class members were strip searched, in some cases multiple times.

4

The *Bynum* litigation ended on January 25, 2006 pursuant to a settlement agreement that contained a number of components that were designed to remedy the overdetention and related strip search problems at the District's jails.[3] *Bynum*, 412 F. Supp. 2d 73 (D.D.C. 2006).  Of the $12 million settlement amount agreed to by the parties in *Bynum*, $3 million was set aside "to build a state of the art Inmate Processing Center (IPC) within the foot print of the DC Jail site, which will be a project totaling $5 Million."  *Id.* at 83.  The remaining $2 million was to be provided by the District government.  *Id.*  The purpose of the IPC was to create adequate processing facilities for both intake and release of inmates and for the processing of associated records.  *Id.*  Among the reforms associated with the IPC was the requirement that "[c]ourt ordered releases [would] be separated from inmates to be held in custody."  *Id.*  This Court recognized that the settlement promised "significant policy changes in the operation of the Department of Corrections," and noted that the DOC's "policy of strip searching court returnees subject to release has been stopped as a direct result of this litigation."  *Id.* at 85.

However, in the aftermath of *Bynum*, instead of a swift change to the status quo at the DOC, there were years where little if any substantive change was instituted.  In fact, there isn't much in the record indicating any significant reforms for well over a year after the close of the *Bynum* class period.  With the exception of a DOC staff "tour" of "mega jail" facilities in October and November 2006, whose relationship to improving the DOC's release process is entirely unclear from the record, the DOC appears to have done nothing concrete in response to the overdetention problems at its jails until 2007.[4]

---

[3] The *Bynum* overdetention monetary relief class period closed on August 31, 2005, the day before the start of the overdetention class period in the instant case.  *See Bynum*, 412 F. Supp. 2d at 78.

[4] The District says that the DOC has increased the number of staff in the Records Office "substantially" since 2006, Def.'s Mem. [211] 17, but it hasn't indicated when that staffing increase began or how many of those additional employees are Legal Instrument Examiners who might impact the release process.  Also, one senior Records Office employee testified in 2010 that the Records Office has never been adequately staffed.  Simmons Dep. [216-7] 277:15–20.

The Inmate Processing Center, mandated by the *Bynum* settlement, remains to this very day unbuilt.  According to the Interim Director of the DOC, the IPC has been "in the planning stages for several years."  Def.'s Mem. Opp'n Pls.' Mot. Summ. J. [228] Ex. 1 at ¶ 17.  As of March 2010, the District had spent only $788,222 on the project, which now has an estimated cost of $15 million, rather than the $5 million specified in the *Bynum* settlement agreement.  The District hasn't provided an explanation for the extended delay in the IPC project or its currently trebled price tag, although it appears that these may in part be due to the DOC's decision to fold the IPC project into a number of others.  Pls.' Second Mot. Compel [130], July 28, 2010, Attachment 1 at 57–58.  The District's most recent hope is to begin construction of the IPC in January 2012, with a completion date of July 2013.  Def.'s Mem. Opp'n Pls.' Mot. Summ. J. [228] Ex. 1 at ¶ 18.  However, since the District has pushed back the completion date repeatedly, there's reason to doubt whether this facility will be up and running at that time.

As to the DOC's practice of strip-searching court returns entitled to release absent individualized suspicion, the DOC agreed in 2005, as part of the *Bynum* settlement negotiations, to send court returns who had received release orders not to the DC Jail -- where they would be returned to the general jail population and subjected to blanket strip searches -- but to a holding facility at the DC General Hospital called the Medical Holding Unit.  Pls.' Ex. 759 [214-12] 9:9–18.  The administrative processing of those inmates' releases could take place while they were housed at the MHU, and they could be released from that facility, without a strip search.  *Id.* However, since that facility has nowhere for inmates to sleep in the event that their releases are delayed, Def.'s Ex. 1 at ¶ 39, such inmates have been returned to the Jail or Correctional Treatment Facility and subjected to blanket strip searches.  Def.'s Resp. Pls.' SMF [228-7] ¶ 509.  So the persistence of the overdetention problems has led, it seems, to the continuing

6

subjection of court releases entitled to release to blanket strip searches, despite the promises of the *Bynum* settlement.

The DOC's lack of action in the wake of *Bynum* combined with singularly unhelpful action by the DC Council to exacerbate the overdetention problem.  In 2003, with the *Bynum* litigation pending in this Court, the Council passed an ordinance prohibiting the release of inmates between the hours of 10 p.m. and 7 a.m. under any circumstances, also known as the "10 p.m. cut-off" rule. D.C. Code § 24-211.2(b)(6).[5]  This ordinance was allegedly adopted in the best interests of inmates, to prevent "[r]eleasing inmates at midnight out the back door of the jail, into a neighborhood where there is no transportation and no other facilities to assist inmates . . . ."  Pls.' Ex. 207.  However, whatever its intended purpose, the ordinance's effect was to turn delayed releases into automatic, overnight overdetentions in cases where the Records Office was unable to complete the release process by 10 p.m.  The District's own Attorney General notified the DC Council's Chairman in February 2009 that inmates were being overdetained "solely by operation of the cutoff provision" and that the provision was "unconstitutional as applied."  Pls.' Ex. 206 [214-3].

However, the Record does indicate that beginning in 2007 --  more than a year after the instant case was filed -- the DOC and the District began to take some steps to address the overdetention problem.  In July 2007, the DOC instituted a "new training regime" for LIEs that spans "several months," including 44 hours of "Records Office Overview Training" that "focuse[s] on the release process."  Def.'s Mem. [211] 16; Def.'s Ex. 1 at ¶ 9, 10.  Also in 2007, the DOC began -- for the first time -- to track overdetentions at its jails using "discrepancy

---

[5] At the time that the rule became effective in January 2004, it contained no exceptions for exigent circumstances. However, the rule was modified by the "Safe Release of Inmates Amendment Act of 2010," enacted in April 2010, to permit release after 10 p.m. in exigent circumstances, so long as the DOC takes steps to assure that the inmate has appropriate clothing, a place to sleep, and transportation from the jail.

reports," providing the DOC with the means to both monitor and remedy overdetention problems.

Perhaps the single most significant reform occurred on July 7, 2008, when the DOC instituted a "courthouse release" program, which permits inmates charged with misdemeanors to be released directly from the Superior Court, instead of transporting them back to the DC Jail or Correctional Treatment Facility for release processing.  Pls.' Ex. 211 at 77; Def.'s Ex. 1 at ¶ 32. Plaintiffs have "concede[d]" that the District's courthouse release program "solved a lot of the problems causing over-detentions and post release strip searches."  Pls.' Opp'n Def.'s Mot. Summ. J. [229] 30.  Plaintiffs' counsel repeated at the June 2011 hearing on the parties' motions for summary judgment that this change was significant, and that the number of overdetentions -- even according to plaintiffs' own numbers -- have trickled off since then.

A number of less significant, but noteworthy, reforms occurred between 2008 and 2010, including the centralization of the release process for the District's inmates in the Records Office, the improvement of particular forms used by the DOC in the release process, and the institution of weekly audits of inmate-management data by the Records Office's administrator.

It is not surprising, given this absence of activity for well over a year followed by a gradual introduction of reforms in subsequent years of the class period, that the evidence shows a high number of overdetentions in the early part of the class period followed by a decline in the overdetention numbers in subsequent years.

Plaintiffs' numbers indicate thousands of overdetentions, particularly in the early years of the class period.  Pls.' Mem. [217-1] 3.  Plaintiffs estimate that during the first year of the class period there were 3,092 overdetentions, and that another 1,902 occurred from September 2006 to February 2008.  Pls.' Ex. 192 [213-15] ¶ 17.  These estimates are based upon an analysis

8

performed by plaintiffs' statistical expert.  *See* Pls.' Exs. 190, 192.  His analysis took as its starting point a collection of data records from the DOC's inmate-management program called the Jail and Community Corrections System, or "JACCS."  Pls.' Ex. 190 ¶ 34.  Using this JACCS data, plaintiffs' expert generated an over-inclusive list of persons who were potentially overdetained during certain periods.  *Id.* at ¶ 53.  Then, a statistical method called "stratified random sampling" was used to estimate the number of overdetentions and overdetention hours during these periods.  *Id.* at ¶ 58.  In short, instead of physically inspecting every one of the many thousands of inmate files on the potential overdetentions list to confirm whether or not they were actual overdetentions, plaintiffs divided the list into groups, physically examined a random sample of files in each group, and then used those results to project an estimate of overdetentions across the whole population.  *Id.*  Plaintiffs do not have overdetention numbers more current than February 25, 2008.[6]

The District has no numbers at all that this Court can credit for the first 16 months of the class period.  To account for the first year of the class period, the District provided a DOC report[7] titled "Analysis of Releases between September 1, 2005 and August 31, 2006" which indicates that 444 "late releases" occurred.  Def.'s Notice [244], Mar. 23, 2011, Attachment 1.  While 444 is a lot of overdetentions in a year, it is significantly less than the 3,092 indicated by plaintiffs' evidence for that same period.  However, the District's number is inscrutable because it cannot locate an attachment to that DOC report which contained the definition of "late release" used by the DOC to arrive at the report's findings.  Without that definition, it is impossible to

---

[6] Plaintiffs' overdetention figures cover only the period September 1, 2005 to February 25, 2008.  Pls.' Ex. 192 at B-1.
[7] This report is the subject of Plaintiffs' Non-Consent Motion [292] to Strike "Defendant's Notice Regarding Filing Analysis of Late Releases, Document Number 244."  Pls.' Notice [292], May 14, 2011.  For the reasons presented below, plaintiffs' Motion is denied and the Court will consider this evidence.

determine whether what the DOC is calling a "late release" is consistent with the overdetention class definition or with plaintiffs' overdetention definition.

As already noted, the DOC didn't begin tracking overdetentions in a systematic way until January 2007 -- about 16 months into the class period.  Def.'s Mem. [211] 25.  DOC "discrepancy reports" provided to the Court by the District following the June 2011 hearing on the parties' motions for summary judgment, which list individual overdetentions by month and note the reasons, show 302 overdetentions in 2007, 143 in 2008, 56 in 2009, 85 in 2010, and 22 in 2011 through the end of May.  Def.'s Notice [302], Jun. 9, 2011.  In contrast to the DOC's "Analysis of Releases" report discussed above, the District did provide the definition of "overdetention" used to create these DOC discrepancy reports.   The DOC listed as an overdetention "anyone released after 11:59 p.m. on the day they are ordered released, or alternatively, situations where the end of sentence calculation was computed incorrectly." Souverain Decl. [301-2] ¶ 3.  Clearly the District's numbers for the period January 2007 forward show a significant drop in the number of overdetentions in recent years.

Overdetentions appear to be occurring for a variety of reasons.  The District suggests that human errors, the cause of many overdetentions, are inevitable in any complex system such as the DOC.  The District emphasizes that four separate entities can authorize the release of an inmate from DOC custody, including the Superior Court, the U.S. District Court for the District of Columbia, the U.S. Parole Commission, and the Federal Bureau of Prisons.  Def.'s SMF [211-1]  ¶ 4.  The DOC processes between 15,000 and 17,000 releases each year -- an average of between 41 and 47 each day.  *Id.* at ¶ 2.

As to specific reasons for particular overdetentions, some are caused by mistakes by the DOC calculating inmates' jail sentences.  Plaintiffs, summarizing a series of DOC reports, note

that at least 79 overdetentions occurred during the class period because of sentence miscalculations. Pls.' Ex. 902 ¶ 4. In ten of those cases misfiled or lost paperwork played a role. *Id.* At least 75 overdetentions resulted from a failure to calculate inmates' sentences in a timely fashion, such that the release process could not be completed before the District's 10 p.m. cut-off, resulting in overdetentions. *Id.* at ¶ 5. The District claims that some overdetentions were caused by factors "outside the control of the District," including the failure of a federal authority, such as the Bureau of Prisons, to calculate an inmate's sentence correctly. Def.'s Mem. [211] 27–28.

The "10 p.m. cut-off" rule appears to have resulted in a large number of overdetentions, at least according to plaintiffs. Analyzing and summarizing an "Audit Analysis"[8] of thousands of potential overdetentions performed by the DOC during the first year of the class period, plaintiffs identified 1,244 overdetentions that the DOC itself said occurred because of the "10 p.m. cut-off" rule. Pls.' Ex. 99B [221-9] ¶ 17. This indicates that between 3 and 4 persons were overdetained each day during the first year of the class period because of the District's ordinance. The District disputes plaintiffs' "10 p.m. cutoff" number, citing its "Analysis of Releases" report as contrary evidence. Def.'s Resp. Pls.' SMF [228-7] ¶ 200. But, as stated above, that DOC report doesn't contain the definition of "late release" used by the DOC, making the District's contrary numbers useless in terms of raising a genuine fact dispute.

At least 124 persons were overdetained due to a lack of staff or a large volume of releases to be processed on a particular day. Pls.' Ex. 99B [221-9] ¶ 30. At least 151 persons were overdetained due to "late paperwork." *Id.* at ¶ 38. Problems transferring inmates, along with

---

[8] The DOC's "Audit Analysis" and "Analysis of Releases" are two separate documents. The "Audit Analysis" is a spreadsheet containing thousands of potentially overdetained inmates, the reasons for their overdetentions, the duration of their overdetentions, as well as other data. That "Audit Analysis" only contains records for releases in the first year of the class period. The "Analysis of Releases," as explained above, is a report created by the DOC presenting the number of "late releases" during that same period.

their paperwork, from the Correctional Treatment Facility to the DC Jail for release processing resulted in at least 68 overdetentions in the first year of the class period. *Id.* at ¶ 56.

The named plaintiffs in this case -- Carl Barnes, Dernard Hawkins, Toney Malloy, David Peterson, and Maurice Williams -- are all former DOC inmates who claim that the DOC's overdetention and strip-search problems remain widespread post-*Bynum*.[9]   Carl Barnes claims he was ordered released, strip searched, and then overdetained for at least 7 days.   Pls.' Ex. 5, Barnes Aff. 2.   Dernard Hawkins claims that he was entitled to release by a court order, but nevertheless was strip searched and overdetained for 7 days.   Pls.' Ex. 18, Hawkins Aff. 2. David Peterson claims that he was held for 4 days after the expiration of his sentence.   Pls.' Ex. 3, Peterson Aff. 1.   Maurice Williams claims he was ordered released, strip searched, and then held for 21 days.   Pls.' Ex. 4, Williams Aff. 2.

Plaintiffs brought suit under 42 U.S.C. § 1983, alleging that their overdetentions violated the Fourth, Fifth, and Eighth Amendments, while the strip searches violated the Fourth and Fifth Amendments.   Pls.' Second Am. Compl. [12] ¶ 43, 44.   Early on in the litigation, the District filed a Motion [14] to Dismiss, or, in the alternative, for Summary Judgment.   Def.'s Mot. Dismiss [14], July 7, 2006.   The Court denied the District's motion.[10]   *Barnes*, 242 F.R.D. at 114.

At that same time, the Court granted plaintiffs' motion to certify two classes.   The first is an "overdetention" class, defined as:

> Each person who has been, is, or in the future will be incarcerated in any District of Columbia Department of Corrections facility from September 1, 2005 forward; and who

---

[9] Another case before this Court, *Simmons v. District of Columbia*, Civil Action No. 07-493 (RCL), also claims that overdetention and strip-search problems continue at the DOC following the *Bynum* settlement.   This Court stayed Simmons' claims relating to his overdetention pending further proceedings in the instant case.   *Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 44 (D.D.C. 2011).

[10] Upon review, the Court takes notice of the fact that it intended to dismiss plaintiffs' Eighth Amendment claim, since plaintiffs never alleged that their overdetentions were imposed as punishment.   *Barnes*, 242 F.R.D. at 118. Therefore the Court will correct that error *sue sponte* by dismissing the claim in the Order issued today.

was not released, or, in the future, will not be released by midnight on the date on which the person is entitled to be released by court order or the date on which the basis for his or her detention has otherwise expired.

*Id.* at 120.  The second is a more complicated "strip search" class, defined as:

Each person who was, or in the future will be, from September 1, 2005 forward: (i) in the custody of the Department of Corrections; (ii) taken to court from a Department of Corrections facility; (iii) ordered released by the court or otherwise became entitled to release by virtue of the court appearance because the charge on which he had been held was no longer pending or was dismissed at the hearing, was ordered released on his own recognizance, or had posted bail, was sentenced to time served, was acquitted or was otherwise entitled to release; (iv) was not the subject of any other pending cases or cases which imposed any condition of release other than personal recognizance; (v) was not the subject of any detainer or warrant; (vi) was returned from court to the DC Jail or CTF or other District facility, to be processed out of the Department of Corrections custody; and (vii) was subject to a strip search and/or visual body cavity search without any individualized finding of reasonable suspicion or probable cause that was concealing contraband or weapons; before being released, regardless of whether he was overdetained.

*Id.* at 121.

The Court later ordered that the case be bifurcated into liability and damages phases, with damages discovery to be conducted at a later time upon a further order of the Court.  Order [65], Aug. 31, 2009.  All liability phase discovery closed in January 2011.  Soon after the parties filed motions for summary judgment.

## II.   STANDARD OF REVIEW

The Federal Rules of Civil Procedure state that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The standard requires more than the existence of *some* factual dispute: "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48 (1986) (emphasis in original).  A fact is a material fact if, under the applicable law, it could affect the outcome of the case.   *Id.*  A dispute is a genuine dispute for

summary judgment purposes if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Also, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

A nonmoving party, however, must establish more than "the existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). The nonmoving party must present specific facts that enable a reasonable jury to find in its favor. *Id.* If the evidence presented is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

## III.   ANALYSIS

### A.  The Parties' Motions for Summary Judgment

Before the Court are plaintiffs' Motion [217] for Summary Judgment and defendant's Motion [211] for Summary Judgment. Plaintiffs, relying on expert analysis showing that the number of overdetentions have remained high throughout the class period, argue that the DOC and the District have continued to violate prisoners' constitutional rights post-*Bynum*, and maintain that on a record of broken promises and stubborn inaction by the District, a reasonable jury could only find that the District has been deliberately indifferent to these issues, and is thus liable as a matter of law. In response and in support of its own motion, the District points to the falling number of overdetentions, the lack of any official policies that could cause overdetentions, and a number of reforms that have been enacted to argue that no reasonable jury could find that they have been indifferent to these issues, and thus the case must be dismissed.

The Court will discuss these and other arguments in the context of each of the four remaining claims, which the Court shall address in turn.

### 1. Fourth Amendment violations for overdetentions

Before examining whether the District is liable for any constitutional violations, plaintiffs must first demonstrate the existence of such violations in the first place. *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).

Plaintiffs bring a Fourth Amendment challenge to their overdetentions. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although neither party raised this argument in its papers, as is clear from the plain text of the Fourth Amendment, plaintiffs must show that their overdetentions constituted seizures of their persons to make out a violation of that amendment. *See McCoy v. Harrison*, 341 F.3d 600, 605 (7th Cir. 2003).

A "seizure" triggering the Fourth Amendment's protections occurs when a person's freedom of movement is terminated or restrained, either by physical force or a show of authority. *Brendlin v. California*, 551 U.S. 249, 254 (2007). However, plaintiffs were already in custody at the time they were ordered released or their sentences expired. Their freedom of movement had already been terminated. *See Goldhaber v. Higgins*, 576 F. Supp. 2d 694, 718 (W.D. Pa. 2007); *Ratigan v. Trogvac*, No. 4:CV-08-1667, 2009 WL 648931, at *29 (M.D. Pa. Mar. 11, 2009). In addition, plaintiffs haven't presented any facts suggesting that their overdetentions involved fresh "seizures" warranting a Fourth Amendment analysis.

For these reasons, the Court will deny plaintiffs' Motion for Summary judgment as to its claim that the overdetentions violated the Fourth Amendment, and will grant the District's Motion for Summary Judgment as to that claim.

### 2.   Fifth Amendment violations for overdetentions

Plaintiffs also bring a Fifth Amendment challenge to their overdetentions.   Plaintiffs argue that the DOC's system for processing releases is outmoded, adding hours and often days to the release process, and thereby violating plaintiffs' due process right to a "prompt" release. Pls.' Mem. [217-1] 1–2.  They claim that certain longstanding DOC practices, such as refusing to release an inmate until the Records Office receives the physical, signed court order, Def.'s Opp'n Pls.' SMF [228-7] ¶ 328, and operation of a "split" inmate management system where the DOC's and Superior Court's computers cannot share information electronically, invite overdetentions. Pls.' Mem. [217] 15–16.  Plaintiffs ask the Court to impose a "bright line time limit" on the DOC's release process, based upon evidence indicating that the DOC's release process by itself takes no longer than 2.5 hours to complete.  *Id.* at 15.

The District focuses its argument on its contention that plaintiffs cannot show, as a matter of law, that the overdetentions were the result of either a municipal policy or practice or the District's deliberate indifference, and that therefore plaintiffs cannot show that the District is liable under the Supreme Court's framework for Section 1983 municipal liability as laid out in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Def.'s Mem. [211] 10–11.  The District claims that "proactive efforts" by the DOC post-*Bynum* have led to a dramatic reduction in the number of overdetentions, and that its very adoption of those practices "run[s] counter to any conceivable finding of deliberate indifference."  *Id.* at 13.  To challenge plaintiffs' contention that the DOC's release procedures are problematic, the District offers the testimony of a

correctional expert, who opines that the DOC's release process is "effective and efficient, appropriately staffed, and indeed meets best practices." Def.'s Ex. 6 at 5.

### a. Legal standard

The Fifth Amendment states that "[n]o person . . . shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. Ordinarily claims of due process violations by State officials are analyzed under the Due Process Clause of the Fourteenth Amendment, which applies to the States. *Butera v. District of Columbia*, 235 F.3d 637, 646 n.7 (D.C. Cir. 2001). While the District of Columbia is not a state, it is subject to the almost identical provisions of the Fifth Amendment. *Id.* (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).

Overdetentions potentially violate the substantive[11] component of the Due Process Clause by infringing upon an individual's basic liberty interest in being free from incarceration absent a criminal conviction. *See Oviatt*, 954 F.2d at 1474. This liberty interest is deeply rooted: "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). Even if an inmate's initial confinement was justified by a constitutionally adequate basis, that confinement cannot constitutionally continue once that basis no longer exists. *See id.* at 757.

---

[11] Plaintiffs have not indicated whether their overdetentions constitute violations of substantive or procedural due process. The substantive component of the Due Process Clause bars governmental actions "regardless of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). Substantive due process claims require a showing of governmental conduct that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *Cohen v. District of Columbia*, 744 F. Supp. 2d 236, 243 (D.D.C. 2010). Under procedural due process, the government is required to provide individuals with certain procedural rights before it may deprive them of life, liberty, or property. *See Matthews v. Eldridge*, 424 US. 319, 332–33 (1976). Procedural due process traditionally protects an individual's right to be heard "at a meaningful time and in meaningful manner." *Id.* at 333. For these reasons, the Court finds that the plaintiffs' overdetention claims are properly analyzed as violations of the substantive component of the Due Process Clause. *See also Goldberg v. Hennepin County*, 417 F.3d 808, 811 (8th Cir. 2005).

Temporarily retaining custody over an inmate who is entitled to release in order to accomplish administrative tasks incident to that release is not per se unconstitutional. *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) ("We recognize that the administrative tasks incident to a release of a prisoner may require some time to accomplish -- in this case perhaps a number of hours."). However, courts recognize that inmates' due process rights may be violated if they are not released within a reasonable time after the reasons for their detentions have ended. *Brass v. County of Los Angeles*, 328 F.3d 1192, 1200 (9th Cir. 2003); *Goldberg v. Hennepin County*, 417 F.3d 808, 811 (8th Cir. 2005).

Courts have declined to adopt a bright-line rule for the maximum permissible delay in the overdetention context. *Berry v. Baca*, 379 F.3d 764, 771 (9th Cir. 2004). This contrasts with the Supreme Court's approach, in the Fourth Amendment context, to detentions pending probable cause determinations after warrantless arrests, where the Court adopted a 48-hour rule. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).

In *McLaughlin*, the Court recognized that States "have a strong interest in protecting public safety by taking into custody those persons who are reasonably suspected of having engaged in criminal activity, even where there has been no opportunity for a prior judicial determination of probable cause." *Id.* at 53. On the other hand, the consequences of prolonged detention for the arrestee can be severe, potentially imperiling his or her job, source of income, and family relationships. *Id.*

In the overdetention context, the potential consequences for overdetained inmates are similar, while the societal interests involved are very different.[12] Here, there has already been a judicial determination that the inmate is entitled to freedom from imprisonment. In the eyes of

---

[12] The District concedes that the "plight of a new arrestee . . . is not identical to an inmate at the end of a legitimate incarceration." Def.'s Mem. Opp'n Pls.' Mot. Summ. J. [228] 14.

the law, this person is no longer a prisoner.  *Sullivan v. County of Los Angeles*, 527 P.2d 865, 868 (Cal. 1974).  As a result, the jail has every reason to believe that the person's continued detention is unlawful and no reason to believe that some other basis for the detention -- for example, a warrant or detainer in a separate matter -- exists, other than the fact that this person is being held by a correctional institution and at one point was legitimately incarcerated.  While society has an interest in preventing the release of an inmate when an alternative basis for his confinement exists, and in administrative tasks aimed at preventing such releases, these interests are simply not as weighty as the interests involved in the probable cause context, where the individual who is subjected to administrative delays is personally suspected of criminal activity.[13]

Furthermore, the "administrative burden of accelerating the release process -- in particular, running a computer check on wants and holds within less than forty-eight hours -- does not seem as weighty as the burden of establishing probable cause under a tight timeline." *Berry*, 379 F.3d at 772.  This burden is even further reduced given that many, if not most, of the administrative tasks incident to an inmate's release can be undertaken prior to the expiration of a sentence or before a jail's receipt of a paper court order authorizing release -- unlike in the probable cause context, where all of the administrative tasks must necessarily follow the detainee's arrest.

---

[13] The District argues that ensuring that inmates with release orders from a court, or whose sentences have expired, are not "erroneously released" because some other basis for their detention might exist is an "extremely important societal interest" because erroneous releases can have serious consequences.  Def.'s Opp'n Pls.' Mot. Summ. J. [228] 13.  As support for this they cite a federal case concerning whether a parole board's decision to deny a convicted sex offender's release on parole was constitutional.  *Juarez v. Renico*, 149 F. Supp. 2d 319, 321 (E.D. Mich. 2001).  That case provides no support for the District's contention, because it concerned whether to release a particularly dangerous category of criminal *before the expiration of a valid sentence*, not whether to release from prison a person who is entitled, at that very moment, to release, and whom the DOC has absolutely no reason to suspect is the subject of some other basis for continued detention.

In recognition of these facts, courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin*. *Berry*, 379 F.3d at 771–72; *Brass v. County of Los Angeles*, 328 F.3d 1192, 1202 (9th Cir. 2003). "[E]ven a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment." *Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2004). The Eighth Circuit has held that once a judge orders the release of a prisoner, *any* continued detention unlawfully deprives the prisoner of his liberty because "the state has lost its lawful authority" to hold him. *Slone v. Herman*, 983 F.2d 107, 110 (8th Cir. 1993).

Given that plaintiffs' overdetention claims are brought under the substantive component of the Due Process Clause, to show a violation of their constitutional rights, they must demonstrate that the DOC's conduct either interferes with rights "implicit in the concept of ordered liberty," *U.S. v. Salerno*, 481 U.S. 739, 746 (1987), or was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *Cohen v. District of Columbia*, 744 F. Supp. 2d 236, 243 (D.D.C. 2010). In the prison setting, where forethought about the welfare of inmates "is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare," "deliberate indifference can rise to a constitutionally shocking level . . . ." *Lewis*, 523 U.S. at 851, 852. The central question is whether the DOC's conduct manifested deliberate indifference to plaintiffs' and the class members' constitutional rights. *See Goldberg v. Hennepin County*, 417 F.3d 808, 811 (8th Cir. 2005). Courts evaluating due process claims involving overdetentions have found various factors relevant to the analysis, including the delays associated with necessary administrative procedures, the total number of

persons overdetained during the period, the rate of overdetentions given the total number of releases processed, and the duration of individual overdetentions. *See Goldberg*, 417 F.3d at 812; *Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004).

> i. *Overdetentions caused by the DOC's enforcement of the District's "10 p.m. cut-off" ordinance*

Plaintiffs argue that the due process rights of certain overdetained class members were violated as a direct result of the District's "10 p.m. cut-off" ordinance, calling the ordinance an "over-detention-making machine." Pls.' Mem. [217-1] 47. Plaintiffs have offered evidence showing that during just the first year of the class period, over a thousand persons were overdetained because of the DOC's enforcement of that ordinance. Pls.' Ex. 99B at ¶ 17. Overdetentions resulting from enforcement of the ordinance occurred throughout the class period, even according to the District's evidence, Def.'s Notice [302], Jun. 9, 2011, until roughly March 2009, when the DOC ceased enforcement of it on the advice of the District's Attorney General. Def.'s Ex. 1 at ¶ 43.

The District refers only once to the "10 p.m. cut-off" rule in its Memorandum, in the context of its discussion of the DOC's strip search policy. Def.'s Mem. [211] 32. In its Memorandum in Opposition, the District argues that the ordinance's requirement of mandatory overnight detentions for inmates whose releases could not be processed by the DOC by 10 p.m. is "neither unusual nor unreasonable." Def.'s Mem. Opp'n Pls.' Mot. Summ. J. [228] 24.

The District cites for this proposition *Holder v. Town of Newton*, No. 08-cv-197-JL, 2010 WL 432357 (D.N.H. Feb. 3, 2010), which concerned a challenge to the detention of a person who was arrested late at night without a warrant. *Id.* at *1. Instead of being given an immediate bail hearing, Holder was held overnight at the county jail, which was located "in a rural area with dark roads and no taxi service at night." *Id.* at *2. *Holder*, however, is clearly distinguishable

from the facts of this case because not only did that detention involve an arrestee who was first arrested late at night and who did not acquire a release order from a court that evening, but the jail to which he was transported was a rural jail with no taxi service.  In addition, the court in *Holder* specifically noted that if Holder could prove that "the bail commissioner ordered his release on the night of his arrest, but . . . the county jail nevertheless continued to detain him until the next morning," "he might be able to show a due process violation under the Fourteenth Amendment." *Id.* at *10.

In this case, unlike *Holder*, the District's "10 p.m. cut-off" rule operated to detain overnight individuals who already possessed court orders for release.  Furthermore, given the urban location of the DC Jail and Correctional Treatment Facility -- each very short walks from two subway stations and with access to taxi service -- the *Holder* case provides no support for the District's contention that the "10 p.m. cut-off" rule is neither "unusual nor unreasonable."  In fact, the District's ordinance was both unusual and unreasonable to the extent that it categorically prohibited releases after 10 p.m.  The District has provided literally no examples of other urban jails that apply such a policy with inmates entitled to release by court order or otherwise.

Nor has the District offered evidence suggesting that overdetentions caused by the DOC's enforcement of the District's "10 p.m. cut-off" rule were the result of necessary administrative tasks or other reasonable delays.  *See Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) (accepting that delays in the release of inmates of some number of hours are permissible to perform administrative tasks).  Indeed, the "10 p.m. cut-off" rule categorically prohibited the release of a person with a court order entitling him to release, even if that release process was completed at 10:01 p.m.  While the District contends that the rule was for inmates' benefit, Def.'s Opp'n Pls.' Mot. Summ. J. [228] 24, the District could have -- and has, in later

amendments to the ordinance[14] -- promoted this interest in inmate welfare while simultaneously respecting the entitlement of persons with court orders for release to a prompt release.   The District's interest in the welfare of former inmates, who must be released after 10 p.m. because of delays in the DOC's release process, must not be permitted to completely overwhelm their basic right to be free from incarceration when there exists no legal basis whatsoever for the continued deprivation of their liberty.   Once the basis for the person's continued incarceration is gone, the District's authority to simply continue holding them in prison -- even to promote the District's own sense of what's good for them -- is gone as well.   The District's legislative behavior is truly irrational in that the District had just been sued, in this very Court, the year before it enacted a rule that *mandates* overdetentions when the DOC -- as was often the case -- had failed to process inmates' releases in a timely fashion.   The District's legislative act is therefore not only shocking to this Court, but has interfered with the fundamental liberty interests of class members overdetained on account of that ordinance.

Therefore the Court concludes that the DOC's enforcement of the District's "10 p.m. cut-off" rule violated the due process rights of class members who were overdetained, during all parts of the class period, because of that rule.

### ii.   *Overdetentions from September 1, 2005 to December 31, 2006*

The Court will now consider whether the overdetentions that occurred during the first 16 months of the class period violated class members' Fifth Amendment rights.

Looking at the evidence, it is undisputed that the DOC's release process should take from 2 to 2.5 hours to complete.   Simmons Dep. [228-2] 164:15–22; Def.'s Response Pls.'s SMF

---

[14] Later amendments to the ordinance provide an exception for "exigent and unusual circumstances."   D.C. Code § 24-211.2(b)(7) (2011).   Releases past 10 p.m. require the DOC to verify that the inmate has a place to sleep that night, appropriate clothing, any necessary medications, and transportation.   *Id.*   Also, the DOC must give the inmate the "option of remaining within a [DOC] facility until release at 7 a.m."   *Id.* at § 24-211.2(b)(7)(F).

[228-7] ¶ 87.  Given the dozens of administrative steps involved in the DOC's release process, the Court does not find it surprising that the process should take that long.  However, according to plaintiffs, the DOC's release process is both faulty and inefficiently implemented, frequently resulting in large numbers of overdetentions and significant delays beyond 2.5 hours.

At least for the first 16 months of the class period, plaintiffs' view is confirmed by the facts.  In the case of the named plaintiffs, they show overdetentions ranging from 4 to 21 days.  The District has not put forth any evidence disputing these individual overdetentions.  Nor do they appear to be outliers.  Plaintiffs have put forth evidence that, for the first 16 months of the class period, the DOC overdetained inmates in its custody on a routine basis and on an alarming scale.  From September 1, 2005 until August 31, 2006 -- the first year of the class period -- there were 3,092 overdetentions.  Pls.' Ex. 192 [213-15] ¶ 17.  Taking the District's numbers indicating that it processes between 15,000 and 17,000 releases each year, Def.'s SMF [211-1] ¶ 2, the DOC was overdetaining about one out of every five inmates it processed for release.  Dividing the number of overdetention hours found by the plaintiffs for that period (111,964) by the number of overdetentions (3,092) shows that on average these overdetained individuals spent an extra 36 hours at the DC Jail -- more than 10 times longer than the release process is supposed to take.  As stated above, the District's only evidence contradicting plaintiffs' overdetention numbers for this period -- a DOC report titled "Analysis of Releases" -- doesn't raise a genuine issue of fact because that report fails to indicate what overdetention definition was used to create it.  As such it is a conclusory allegation that the plaintiffs' numbers for the first year of the class period are wrong, and nothing more.  And the District has no overdetention figures at all for the 4 months following August 31, 2006.

This roiling overdetention problem at the DOC during the first 16 months of the class period is all the more shocking when the Court considers that the DOC and the District were on notice, via the *Bynum* litigation, that the prevailing release practices were deeply inadequate, and that fundamental change was needed.  The Court would have expected, given that lawsuit, a concerted effort on the part of the District and the DOC to identify and eliminate every major contributing factor to the overdetention problem.  But that's not what happened.  Even when the facts are viewed in the light most favorable to the District, the DOC's first meaningful change to the status quo didn't come until July 2008, when it instituted the courthouse release program, permitting a subset of inmates to be released directly from the Superior Court.[15]  Both parties agree that this was a significant step toward reducing the number and duration of overdetentions. The District's only evidence of steps taken during the first 16 months of the class period -- an affidavit from former DOC Director Devon Brown, stating that the DOC assumed the responsibility for inmate court-to-jail transportation from the US Marshals in 2005, Def.'s Ex. 1 at ¶ 33 -- cannot be credited because Mr. Brown lacks personal knowledge of events prior to his assuming that position in January 2006.  *Id.* at ¶ 2.

Other major changes -- such as the completion of the Inmate Processing Center, a move to a paperless system to process releases rather than a dogged insistence on releasing inmates only upon receipt of paper court orders, or simply permitting releases based upon faxed  (or, to be even more futuristic, scanned and emailed) court orders -- were either rejected by the DOC or

---

[15] The DOC's "courthouse release" program only applies to inmates charged with misdemeanors.  Def.'s Ex. 1 at ¶ 32.  Inmates charged with felonies do not benefit from that program, and therefore presumably are no more likely than before that program was instituted to be released on time by the DOC -- assuming other improvements to the release process haven't occurred.  The District hasn't pointed out to the Court the basis for this misdemeanor/felony distinction, and this Court at least thinks there's reason to question whether the District can legally subject one free individual to an extended release procedure on account of their prior felony conviction, while allowing another free individual a speedy release because they were charged only with a misdemeanor.  While the Court recognizes in this opinion that the courthouse release program has clear significance with respect to the question of the District's Section 1983 liability for constitutional violations as *some* step taken to address the overdetention issue, the Court does not intend thereby to endorse the program's distinction between former prisoners.

remain, to this day, caught in a whirlpool of delays.  In the meantime, free men and women were treated as prisoners, hoping the DOC's paper-bound and Byzantine release process would favor them with an on-time release.

This Court's alarm at the DOC's lack of urgency in responding to this disturbing pattern of overdetentions despite the notice provided by the *Bynum* litigation is further enhanced by the fact that this case deals with prisoners, outcasts in society.  The full brunt of the harm for the DOC's refusal to get its act together falls, not on District employees or influential citizens, but exclusively upon persons with little voice, who are shut away from public view.  It is for these reasons that the Court finds that the DOC's treatment of inmates entitled to release during the first 16 months of the class period is not merely alarming, and deliberately indifferent, but conscience-shocking.

Therefore the Court finds that with respect to overdetentions during the first 16 months of the class period -- September 1, 2005 to December 31, 2006 -- the DOC violated the due process rights of the plaintiffs and the members of the overdetention class who were overdetained during that period by not releasing them by midnight on the day that they were entitled to release.  No reasonable juror could find otherwise.

### iii.  Overdetentions from January 1, 2007 to February 25, 2008

However, for the period January 1, 2007 to February 25, 2008, the Court finds that there exists a genuine issue of material fact as to the number of overdetentions, precluding a finding of summary judgment for plaintiffs or the District as to that period.  The District has produced its own overdetention figures from January 2007 to the present, which, if taken as true, suggest that the DOC has significantly reduced the number of overdetentions in the most recent years of the class period.  *See* Def.'s Notice [302], Jun. 9, 2011.  A reasonable jury, if it believes the

District's numbers, could find that the DOC has addressed the problems resulting in overdetentions on a routine basis.  On the other hand, if the jury believes plaintiff's numbers, it could reasonably conclude that the number of overdetentions during that period -- nearly 2,000 for the period September 2006 to February 2008, Pls.' Mem. [217-1] 3; Pls.' Ex. 192 [213-15] ¶ 17 -- indicate that the DOC was deliberately indifferent to the overdetention problem despite the District's proffer of steps taken during that period to address the overdetention problem.  In short, these factual disputes preclude a finding of summary judgment for plaintiffs or for the District as to due process violations for the overdetentions that occurred from January 1, 2007 to February 25, 2008.

Therefore the Court will deny plaintiffs' Motion for Summary Judgment as to its claim that overdetentions from January 1, 2007 to February 25, 2008 violate the Fifth Amendment, and will deny the District's Motion for Summary Judgment as to that same period. [16]

*iv.  Overdetentions from February 26, 2008 to the present*

Plaintiffs have produced no evidence indicating the number of overdetentions that have occurred after February 25, 2008.  *See* Pls.' Ex. 192 [213-15] at B-1.  Therefore the Court must consider as undisputed the District's overdetention figures for the period February 26, 2008 to the present.  These figures show only 121 overdetentions from March 2008 through the end of the year, 56 during all of 2009, 85 in 2010, and 22 in 2011 through the end of May.  (D.'s Notice [302], Jun. 9, 2011).  The District's overdetention figures for this period, taking into account the number of releases processed by the DOC each year (15,000–17,000), show an overdetention rate that has been found acceptable in other courts that have considered overdetention problems

---

[16] This ruling does not apply to overdetentions that occurred during this period because of the DOC's enforcement of the District's "10 p.m. cut-off" ordinance.  As to those overdetentions, plaintiffs have shown a predicate constitutional violation, for the reasons stated above.

at municipal jails.  *See Mortimer v. Baca*, 478 F. Supp. 2d 1171, 1179 (C.D. Cal. 2007), *aff'd*, 594 F.3d 714 (9th Cir. 2010); *Avalos v. Baca*, 596 F.3d 583, 588 n.4 (9th Cir. 2010).

The significant reduction in the number of overdetentions as of February 2008, alongside the District's implementation in 2008 of measures that even plaintiffs concede have "solved" much of the overdetention problem, leads this Court to the conclusion that the DOC, from February 2008 forward, could not reasonably be found to have been deliberately indifferent to the due process rights of overdetention class members during this period.  No reasonable jury, considering these facts, could conclude that the DOC was aware of, but chose to do nothing about, the overdetention problem during this period.

Therefore the Court will deny plaintiffs' Motion for Summary Judgment with respect to overdetentions that occurred from February 26, 2008 forward, and will grant defendants' Motion for Summary Judgment with respect to the same period.[17]

### b.  The District's liability

To summarize the above conclusions, the Court has determined, as a matter of law, that class members whose overdetentions were caused by the DOC's enforcement of the District's "10 p.m. cut-off" rule have made out a violation of the Fifth Amendment.  Furthermore, the plaintiffs' and class members' due process rights were violated for the period September 1, 2005 to December 31, 2006.  The Court has found genuine issues of material fact precluding a finding of due process violations for overdetentions that occurred from January 1, 2007 to February 25, 2008.  Finally, the Court has found, as a matter of law, that for the period February 26, 2008 to the present, Plaintiffs have failed to show a predicate constitutional violation.  The Court will now consider the question of the District's liability for the remaining periods: the period

---

[17]  Again, this ruling does not apply to overdetentions that occurred during this period because of the DOC's enforcement of the District's "10 p.m. cut-off" ordinance.

September 1, 2005 to December 31, 2006, and the period January 1, 2007 to February 25, 2008. The Court will also consider the District's liability for due process violations that occurred throughout the class period as a result of its "10 p.m. cut-off" rule.

Plaintiffs' overdetention and strip search claims are brought under Section 1983 of the Civil Rights Act of 1871, which creates liability for "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.

Local governing bodies, such as the District of the Columbia, can be sued under Section 1983 when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  "[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution."  *Id.*  However, "local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  *Id.*

There are several different ways that a plaintiff can demonstrate that a city is liable via Section 1983.  The plaintiff can show (1)  "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" or (4) "the failure of the government to

respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

> i.  *The District's liability for overdetentions caused by the DOC's enforcement of the District's "10 p.m. cut-off" rule*

The District's "10 p.m. cut-off" rule directly implicates the District's government in the overdetention problem. That rule, although not enforced since March 2009, is clearly an example of an "express municipal policy" that could lead to Section 1983 liability for the District, whether or not the District was "deliberately indifferent" to the overdetention problem. Section 1983 creates liability for a local government when "the action that is alleged to be unconstitutional implements or executes a[n] . . . ordinance . . . officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. "[E]ven a single decision by a [legislative body] unquestionably constitutes an act of official government policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Overdetentions caused by the District's ordinance are clearly constitutional violations executed in accordance with District policy officially adopted and promulgated by the Council. *See Monell*, 436 U.S. at 690. The District has failed to offer any argument contradicting this conclusion. Consequently, as to overdetentions that occurred at any time during the class period that were caused by the DOC's enforcement of that ordinance, plaintiffs are entitled to summary judgment as to the District's liability.

Therefore the Court will grant plaintiffs' Motion for Summary Judgment as to the District's liability for any overdetentions that occurred during the class period that were caused by the DOC's enforcement of the District's "10 p.m. cut-off" rule, and will deny the District's Motion for Summary Judgment with respect to those particular overdetentions.

ii. *The District's liability for overdetentions from September 1, 2005 to December 31, 2006*

To show that the District is liable for due process violations during this period, plaintiffs must show that these violations were caused by a policy or custom of the District. *Monell*, 436 U.S. at 690. Plaintiffs' primary argument, repeated throughout its Memorandum in Support of its Motion for Summary Judgment, for why the District is liable for the overdetention problems at the DOC is that they were caused by the District's deliberate indifference. In fact, both parties focus their efforts on this one basis for municipal liability in their motions and supporting documents. However, plaintiffs also claim, as a separate basis for Section 1983 liability, that the overdetention problem is the result of official "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." Pls.' Mem. [217-1] 49 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

To show that the District had a deliberately indifferent policy or custom with respect to overdetention problems at the DOC, plaintiffs must demonstrate that the District failed to respond to a need in a manner that "amounts to 'deliberate indifference' towards the constitutional rights of persons in its domain." *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000). Plaintiffs do not have to show that the District subjectively knew about the overdetention problem: the question is whether "the [District] knew or should have known of the risk of constitutional violations, an objective standard." *Baker*, 326 F.3d at 1307. Deliberate indifference means that, "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).

Plaintiffs' argument for the District's deliberate indifference rests primarily on the following contentions: that the District was on notice as early as 2002, via the *Bynum* litigation,

that the DOC had a serious overdetention problem; that the District failed to intervene in any significant way to respond to that problem; that when the District did turn to the DOC's release process, in the form of the "10 p.m. cut-off" rule in 2003, its actions in fact greatly exacerbated the overdetention problem; and that if the District were anything other than deliberately indifferent to the overdetention problem, the disturbing pattern of thousands of overdetentions during the class period would not show up in the evidence.

There is no dispute that the District was aware, or at least should have been aware, of overdetention problems at its jails beginning, at the latest, in 2002, when the *Bynum* lawsuit was filed. The existence of the *Bynum* litigation, involving exactly the same issues, the same defendant (the District), and even some of the same lawyers as this case, clearly put the District on notice that absent significant intervention on its part, a pattern of unconstitutional behavior would almost certainly continue at the DOC. *See Daskalea*, 227 F.3d at 441.

Regarding steps taken by the District to address the overdetention problem, the District argues that plaintiffs cannot, as a matter of law, show deliberate indifference because the District didn't adopt a "policy of inaction" after *Bynum*. Def.'s Opp'n Pls.' Mot. Summ. J. [228] 9. However, as stated above, the District hasn't provided any competent evidentiary support for this claim that would apply to the first 16 months of the class period. With the exception of a DOC staff tour of "mega jail" facilities in October and November of 2006, every "proactive effort" identified by the District and supported by competent evidence occurred in subsequent years of the class period. *See* Def.'s Mem. [211] 10 (New training program for Records Office staff in 2007), 17 (Records Office implements staff "team approach" to release processing in 2007), 18 ("Discrepancy reports" used to track overdetentions beginning in 2007), 19 (Sentence-computation software implemented in 2007), 21 (Courthouse release program implemented in

July 2008), 17 (Responsibility for the release of inmates from the CTF assumed by the Records Office in late 2008), 18 (Records Office "modernized" in 2009), 22 (Assumption from the US Marshals of "jail board" responsibilities at the Superior Court in 2009), 19 (Changes to the Prisoner Transfer Report in "late 2009"), 20 (Weekly audits of JACCS data by Records Office Administrator implemented in 2010). Therefore, even assuming that the District's facts as to remedial efforts taken during the class period are true as required in resolving a summary judgment motion, they are irrelevant to the District's actions during the 16-month period in question -- September 1, 2005 to December 31, 2006 -- because they occurred during later years of the class period. As such, there is no genuine issue of material fact as to whether the District (and the DOC) failed to take action to remedy the overdetention problem during the first 16 months of the class period.

Finally, that overdetentions persisted at the DOC, in large numbers, following the settlement of the *Bynum* litigation, as shown by plaintiffs uncontroverted overdetention figures for the first 16 months of the class period, is unsurprising given that the status quo remained locked in place during that period. While the Court does not have overdetention figures from either party that precisely track the 16-month period September 1, 2005 to December 31, 2006, plaintiffs' numbers for the first 12 months of the class period (September 1, 2005 to August 31, 2006) show that an estimated 3,092 overdetentions occurred. Pls.' Ex. 192 [213-15] ¶ 17. This large number of overdetentions, combined with the District's notice of the problem via the *Bynum* litigation and complete lack of meaningful attention or action concerning the issue during the period, provides specific and detailed evidence of a pattern of unconstitutional conduct that was either condoned or deliberately ignored by the District. *See Daskalea*, 227 F.3d at 441–42.

While ordinarily the question of whether a municipality has a deliberately indifferent policy or custom is for the jury, *see Smith v. District of Columbia*, 413 F.3d 86, 100 (D.C. Cir. 2005), no reasonable jury could find on the basis of these facts that the District had a policy other than deliberate indifference with respect to overdetentions at the DOC during the first 16 months of the class period.  This is not case where some actions of some level of usefulness were taken - - but no action.  Despite its knowledge of overdetentions problems at its jails, the District failed to respond to the need for changes in the DOC's release practices in a manner that shows deliberate indifference to the constitutional rights of persons within its domain.

Nor could a reasonable jury conclude that this deliberately indifferent District policy wasn't the "moving force" behind the constitutional deprivations associated with plaintiffs' overdetentions.  Plaintiffs must prove that the District has a custom or practice that is the "moving force" behind the alleged violations.  *Zearley v. Ackerman*, 116 F. Supp. 2d 109, 114 (D.D.C. 2000).  "A deliberately indifferent policy or custom is deemed to be the moving force of a constitutional injury if the conduct is a substantial factor in bringing about the harm."  *Smith*, 413 F.3d at 102.  The policy or custom must be closely related to the ultimate injury, and courts must consider whether the injury would not have occurred in its absence.  *Id.*

Akin to proximate cause, the question of whether a policy or custom is the moving force behind alleged constitutional deprivations is normally a question for the jury.  *Id.*  Here, however, there exists no genuine issue of material fact regarding the question of whether the District's deliberate indifference was the moving force behind the overdetentions that occurred during the first 16 months of the class period.  Plaintiffs have presented evidence of a disturbing pattern of overdetentions at the District's jails during the period.  *See Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407–08 (1997) ("the existence of a pattern of tortious

conduct by inadequately trained employees may tend to show that the lack of proper training . . . is the 'moving force' behind the plaintiff's injury.").  Combined with the District's awareness of the overdetention problem and its utter failure to intervene, the only reasonable inference that can be drawn is that the District adopted, by condoning, the DOC's misconduct.  In failing to address the problems at the DOC resulting in overdetentions, it was highly predictable that the District's indifference "led directly to the very consequence that was so predictable." *Id.* at 409–10.  As such, there is no genuine issue regarding whether the District's policy of deliberate indifference was the moving force behind these constitutional violations.  Had the District made addressing the overdetention problem a true priority following *Bynum*, the incidence of overdetentions at the District's jails during the early years of the class period would have reached the acceptable levels seen today.

Therefore the Court will grant plaintiffs' Motion for Summary Judgment as to the District's liability for overdetentions that occurred from September 1, 2005 up to and including December 31, 2006, and will deny the District's Motion for Summary Judgment as to that same period.

### iii. The District's liability for overdetentions from January 1, 2007 to February 25, 2008

The next issue concerns whether the District or plaintiffs are entitled to summary judgment as to the District's liability for the period January 1, 2007 to February 25, 2008.  The District argues that it cannot be found to be deliberately indifferent as a matter of law because numerous "proactive efforts" were undertaken by the District to reduce overdetentions.  Def.'s Mem. [211] 13.

With respect to reforms undertaken between January 1, 2007 and February 25, 2008, the District points to the DOC's implementation, in 2007, of a new training program for Records

Office staff and a system for tracking overdetentions as signs that steps have been taken to address and monitor deficiencies in the DOC's release process.  Def.'s Mem. [211] 10, 18.  Also in 2007, to address the problem of sentence miscalculations leading to overdetentions, the Records Office began using sentence-computation software.  *Id.* at 19.  While certainly not as significant as the reforms instituted by the DOC in the later years of the class period, the District has provided some evidence that could lead a reasonable jury to conclude that it had intervened in a substantial way during this period to address the problems resulting in overdetentions.  On the other hand, a jury could reasonably conclude that such efforts were so clearly inadequate as to indicate that the District continued its policy of deliberate indifference.

Furthermore, there exists a significant factual dispute during this period as to the number of overdetentions, as indicated above.  Taking plaintiffs' overdetentions numbers for the period as true, as is required on summary judgment, the evidence shows nearly 5,000 overdetentions occurred from the start of the class period to February 2008, resulting in an average overdetention of about 48 hours.  Pls.' Mem. [217-1] 3; Pls.' Ex. 192 [213-15] at Attachment B-1.  A jury could conclude based upon this evidence that the District continued to avert its eyes to a disturbing pattern of unconstitutional conduct by the DOC.

Therefore the Court will deny both plaintiff's and the District's motions for summary judgment with respect to the District's liability for overdetentions that occurred from January 1, 2007 to February 25, 2008.[18]

In summary, the Court will grant plaintiffs' Motion for Summary Judgment as to the District's liability for overdetentions caused throughout the class period by the DOC's enforcement of the District's "10 p.m. cut-off" rule, and will deny Defendant's Motion for

---

[18] This ruling does not apply to overdetentions that occurred during this period because of the DOC's enforcement of the District's "10 p.m. cut-off" ordinance.  As to those overdetentions, the Court has determined that the District is liable as a matter of law.

Summary Judgment as to that issue.  The Court will also grant plaintiff's Motion as to the District's liability for the overdetentions of the plaintiffs and class members during the period September 1, 2005 to December 31, 2006, and will deny the District's Motion as to that same issue.  With respect to overdetentions that occurred during the next 13-month period -- January 1, 2007 to February 25, 2008 -- that were not caused by the DOC's enforcement of the District's "10 p.m. cut-off" rule, the Court will deny both parties' motions, finding genuine issues of material fact exist with respect to both the predicate due process violations during that period and the District's liability.  Those issues will remain and will be determined at trial.  Finally, for the period February 26, 2008 to the present, and again excluding overdetentions caused by the "10 p.m. cut-off" rule, the Court will grant the District's Motion for Summary Judgment and deny plaintiffs'.[19]

### 3.  Fourth Amendment violations for the strip searches

Plaintiffs also challenge the DOC's policy of strip-searching court returns entitled to release without individualized suspicion, claiming that it violates the Fourth Amendment.  Pls.' Mem. [217-1] 55.  The DOC's policy is to strip search all inmates "upon admission/commitment into the facility . . . ."  Def.'s SMF [211-1], at Ex. 4.  In addition, strip searches may be conducted "where there is a reasonable belief that contraband may be concealed on the person."  *Id.*  One factor listed as providing a reasonable basis for strip searching an inmate is "exposure to public areas."  *Id.*

### a.  Legal standard

---

[19] While the Court has held as a matter of law that the District is not liable for overdetentions that occurred from February 26, 2008 forward that were not caused by the DOC's enforcement of the District's "10 p.m. cut-off" ordinance, this ruling applies only to plaintiffs' and class members' constitutional claims as specified in plaintiffs' Second Amended Complaint.  Pls.' Second Am. Compl. [12].

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment's touchstone is reasonableness, which "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The determination of the reasonableness of a search under the Fourth Amendment is a question of law. *U.S. v. Zapata*, 997 F.2d 751, 756 (10th Cir. 1993).

The Supreme Court, in the leading case in this area, *Bell v. Wolfish*, has stated that the reasonableness test "is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Since the parties do not dispute the reasonableness of the scope[20] of these strip searches or their location, the Court will consider only the second and third *Bell* factors.

### i.    Manner of the search

Plaintiffs present conflicting evidence on the issue of whether the DOC conducts strip searches in groups. According to deposition testimony of a jail guard provided by plaintiffs, a few jail guards are present during strip searches, but the other inmates line up in something

---

[20] The DOC's strip searches of inmates involve the following steps, according to plaintiffs' evidence. Inmates remove their clothes and go through a process called a "dance." Lucas Dep. [235-1] 440:3–16. The inmates run their fingers through their hair and move their ears back. *Id.* at 440:18–21. They open their mouths, lifting each corner with their hands so the guards can see inside. *Id.* at 441:1–3. Then the inmates allow visual inspection of their arm pits and genital areas, and spread their buttocks. *Id.* at 441:5–13. "Once that's done then they lift up their back feet, one, two, and it's over." *Id.* at 441:14–15. The District's account of this process is similar, although it does not indicate that the DOC performs a visual inspection of the inmates' genital areas. Def.'s Mem. [211] 8. These facts suggest a visual body-cavity strip search of a scope that has been found reasonable in numerous cases involving strip searches of arrestees in the prison context. *Bell*, 441 U.S. at 558; *Florence v. Bd. of Chosen Freeholders*, 621 F.3d 296, 299 (3d Cir. 2010), *cert. granted*, 131 S. Ct. 1816 (2011); *Bull v. City and County of San Francisco*, 595 F.3d 964, 968–69 (9th Cir. 2010) (en banc); *Powell v. Barrett*, 541 F.3d 1298, 1301 (11th Cir. 2008) (en banc).

called the "bull pen" waiting their turn to be searched.    Lucas Dep. [235-1] 442:11–16.

Plaintiffs' only support for group searches that this Court can find in the record are the four

affidavits plaintiffs cite in their Memorandum in Support.  Pls.' Mem. [217-1] 59.  But only two

of those affidavits can be understood to suggest that group strip searches were conducted.

On the other hand, the District supplied an affidavit from the DOC's Chief of Security

stating that inmates are not group strip searched.  Watford Decl. [243-2] ¶ 3.  The District's

position is supported by a video of the DC Jail's strip-search process recently provided to the

Court by the District, which clearly shows inmates being searched one-by-one.  Even setting

aside the District's contention that group strip searches of inmates have been upheld in other

circuits, Def.'s Opp'n Pls.' Mot. Summ. J. [228] 24, there exists a genuine dispute as to whether

group strip searches have been or are now used by the DOC.  Therefore the Court must accept,

for summary judgment purposes, the District's facts indicating that the DOC does not conduct

group strip searches.

Plaintiffs' also say that the DOC videotapes strip searches, suggesting that this is an

unreasonable encroachment on the inmates' privacy.  Pls.' Opp'n Def.'s Mot. Summ. J. [229] 44.

It presents the affidavit of a lawyer who says he viewed a videotape of a strip search conducted

at the DC Jail sometime in 2010.  Pls.' Ex. 1090 ¶ 1–3.  It is unclear whether the strip searches

were videotaped covertly or not.  Plaintiffs have not claimed, and have presented no evidence,

that any plaintiff or class member is depicted in any video recording of strip searches at the DC

Jail.

The District says that the DOC began videotaping strip searches in April 2008, in

response to a complaint from a trans-gender inmate.  Godwin Decl. [243-1] ¶ 3. Before the DOC

stopped videotaping strip searches in February 2011 -- after plaintiffs demanded production of

the videos -- the DOC had a policy of storing only the most current 72 hours of video electronically. *Id.*

Courts have found, although outside the prison context, that video surveillance is subject to a greater degree of scrutiny under the Fourth Amendment than a manual search. *U.S. v. Gonzalez*, 328 F.3d 543, 548 (9th Cir. 2003). While prisoners lose many rights when they are legitimately incarcerated, certain fundamental privacy rights are retained: "they are not like animals in a zoo to be filmed and photographed at will . . . ." *Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n.2 (1978). Nevertheless, whatever privacy rights prisoners do retain are severely limited by "what must be considered the paramount interest in institutional security." *Hudson v. Palmer*, 468 U.S. 517, 528 (1984).

The District has presented evidence that the videos were made in response to an inmate complaint, suggesting they were created for the legitimate purpose of monitoring the behavior of correctional officers and prisoners during the strip searches. Plaintiffs have presented no evidence suggesting that the videotaping was excessive or undertaken for the amusement of DOC staff. The reasonableness of the DOC's policy of videotaping strip searches is supported by the District's claim that only 72 hours of video was retained at any given time, limiting the availability of the videos for purposes other than investigating inmate or staff complaints within that time period.

Looking at these facts in the light most favorable to the District for summary judgment purposes, this factor as well weighs in favor of the reasonableness of the DOC's strip-search policy.

ii. *Justification for the search*

This factor is very problematic for the DOC.  Plaintiffs argue that the District hasn't supported the DOC's blanket strip-search policy by identifying the specific security concerns justifying the strip searches of court returns entitled to release absent individualized suspicion. Pls.' Mem. [217-1] ¶ 57.  Plaintiffs go further, stating that the policy "serve[s] no peneological [sic] interest." *Id.*

In response, the District offers the testimony of a correctional system expert.  She concluded that the DOC's policy of strip searching any persons who are returned to the jail following exposure to the public furthers the "legitimate correctional purpose" of protecting the "safety of the public, detainees and staff, as well as the security of the correctional facility." Def.'s Ex. 6 ¶ 26.  The District provided contraband reports, showing various items that inmates have attempted to smuggle into the jail, including razor blades, crack pipes, and makeshift weapons.  Def.'s Ex. 15.  These facts certainly support the reasonableness of a blanket strip-search policy, at least as far as it applies to persons who are legitimately introduced into the general jail population.

The District's only legal support for the DOC's policy as applied to court returns entitled to release are the Ninth Circuit's decision in *Bull* and the Eleventh Circuit's decision in *Powell*. Def.'s Opp'n Pls.' Mot. Summ. J. [228] 24.  The courts in both of those cases upheld against Fourth Amendment challenges prison policies that authorized strip searches of arrestees absent individualized suspicion.  *Bull v. City and County of San Francisco*, 595 F.3d 964, 966 (9th Cir. 2010) (en banc); *Powell v. Barrett*, 541 F.3d 1298, 1300 (11th Cir. 2008) (en banc).  But, as the District concedes, both of those decisions involved blanket strip searches of *arrestees*, not court returns entitled to release.  The assumption in those cases is that jails are processing new inmates

into the general population, and have determined that maintaining adequate security in that population requires a policy of blanket strip searches.

Here, however, the strip search class members are subjected to strip searches solely due to the fact that the DOC has made the unfortunate choice to bring them back into the general inmate population while the Records Office processes their releases, rather than temporarily housing them apart from that population.  That choice creates the security problem that the DOC's strip searches are designed to solve.  The District hasn't offered any penological justification for this choice.  The DOC has other alternatives, which it has either rejected or dragged its feet on, such as segregating court returns entitled to release in a separate area of the jail or in the long-delayed Inmate Processing Center.  These alternatives would remedy the obvious inadequacy of the Medical Holding Unit as a solution to the strip search problem, given that inmates at that facility whose releases are delayed end up back at the DC Jail or the CTF and strip searched anyway because the MHU has no sleeping quarters.  These alternatives would permit the DOC to maintain adequate security among the general inmate population while permitting court returns entitled to release to avoid the humiliation of yet another visual body cavity strip search at the jail.[21]

Courts have found that the more intrusive a search is upon personal rights -- and there can be little doubt that visual body cavity strip searches are among the more intrusive forms of search -- the greater the showing must be from the government that the search is justified.  *Justice v. City of Peachtree City*, 961 F.2d 188, 192 (11th Cir. 1992).  Since there is no adequate

---

[21] The Court also notes that the number of inmates that the DOC would have to accommodate in order to separate them from the general jail population is very low.  Given that the DOC processes between 15,000 and 17,000 releases each year, including both court-ordered releases and sentence expirations, the number of persons who return from court with release orders who would have to be segregated temporarily is less than 47.  Therefore the DOC could respect the privacy rights of persons awaiting release pursuant to the DOC's administrative release process at de minimis cost to the DOC.  Indeed, separating court returns from the general inmate population was one of the very reforms promised by the District pursuant to the *Bynum* settlement agreement years ago.  *Bynum*, 412 F. Supp. 2d 73, 83 (D.D.C. 2006).

justification for the strip searching of court returns entitled to release without individualized suspicion, the Court finds that this factor weighs heavily in favor of the unreasonableness of the DOC's policy as applied to the strip-search class.

This Court is required to balance the need for the DOC's strip searches of court returns entitled to release against the invasion of personal rights that these searches entail. *Bell*, 441 U.S. at 559. Strip searches, particularly body-cavity inspections, constitute significant invasions of inmates' personal privacy. *Id.* at 560; *Florence*, 621 F.3d at 307. Such inspections "are invasive and embarrassing." *Bull*, 595 F.3d at 975. The invasions in this case are particularly suspect given that they are happening to persons who are no longer prisoners in the eyes of the law, who are not individually suspected of carrying contraband, and who are entitled to a restoration of the rights they enjoyed prior to their imprisonment. And the DOC's invasion of their personal rights is balanced against nothing, because the DOC's blanket strip searches of court returns entitled to release are needless, a product of the DOC's insistence on maintaining a policy that subjects free men and women to degrading treatment when reasonable alternatives are readily available.

While the other *Bell* factors weigh in favor of a determination of reasonableness, the utter lack of a reasonable justification for the blanket strip searches of court returns entitled to release is so extreme that a conclusion of unreasonableness is compelled. *See Byrd v. Maricopa County Sheriff's Dep't*, 629 F.3d 1135, 1143 (9th Cir. 2011) (finding that a strip search violated the Fourth Amendment when two *Bell* factors suggested reasonableness while the other two suggested extreme unreasonableness). As such, the DOC's blanket strip search policy, as applied to court returns entitled to release, is unreasonable and violates the Fourth Amendment of the Constitution.

### b.  The District's liability

Plaintiffs can establish the District's liability for the deprivation of constitutional rights involved in their strip searches if they show that these violations were caused by the execution of official policy.  *Monell*, 436 U.S. at 694.   "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986).  Whether an official has authority to make municipal policy is a question of state law.  *Id.* at 483.

The strip search policy in this case wasn't set by a low-ranking municipal employee at the DOC, but by its Director.  Def.'s SMF [211-1] at Ex. 4.  The Director heads the Department of Corrections, and is appointed by the Mayor.  D.C. Code § 24-211.01(a) (2011).  The DOC has the power under District of Columbia law to promulgate rules and regulations for the government of the District's correctional facilities, "with the approval of the Council . . . ."  *Id.* As such, the Director of the DOC has final policymaking authority with respect to the strip search policy at issue in this case.  *See Proffit v. District of Columbia*, 790 F. Supp. 304, 309 (D.D.C. 1991) ("[T]he Director of the D.C. Department of Corrections promulgated the search policy at issue and, under D.C. law, is responsible for its enforcement as the final policymaking authority.").  Nor is there any doubt that the policy caused the constitutional deprivations in this case, since these deprivations flowed directly from, and were mandated by, the policy.  *See Arnold v. District of Columbia*, 211 F. Supp. 2d 144, 150 (D.D.C. 2002) (Noting that proof of causation regarding an official policy requires only evidence of the policy statement itself).

Therefore, because plaintiffs have demonstrated that the DOC's practice of strip searching all court returns entitled to release, without individualized suspicion, violates the Fourth Amendment, and because that policy was promulgated by an official with final authority

to establish such policies for the District and caused plaintiffs' and class members' constitutional deprivations, the District is liable.

For these reasons, the Court will grant plaintiffs' Motion for Summary Judgment as to its Fourth Amendment strip search claim against the District, and will deny the District's Motion for Summary Judgment as to that same claim.  This ruling applies to all members of the strip search class and all parts of the class period.

### 4.   Fifth Amendment violations for the strip searches

Plaintiffs' Fifth Amendment claim as to the strip searches fails.

The Supreme Court has stated that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of governmental behavior, that Amendment, not the generalized notion of substantive due process, must be the guide for analyzing these claims."  *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citations and internal quotations omitted).

The Fourth Amendment, in prohibiting unreasonable searches, is clearly the explicit textual source of constitutional protection against the governmental conduct alleged in this case. Plaintiffs' challenge to the reasonableness of the DOC's strip searches of court returns entitled to release is properly analyzed under the Fourth Amendment, not the Fifth.  *See Conn v. Gabbert*, 526 U.S. 286, 293 (1999); *Lyles v. Micenko*, 468 F. Supp. 2d 68, 73 n.5 (D.D.C. 2006).

Therefore the Court denies plaintiffs' Motion for Summary Judgment in regards to their Fifth Amendment challenge to the strip searches, and grants defendant's Motion for Summary Judgment as to that same issue.

### B.  Plaintiffs' Non-Consent Motion [292] to Strike "Defendant's Notice Regarding Filing Analysis of Late Releases, Document Number 244."

Plaintiffs also move to strike from the record the District's Notice Regarding Filing Analysis of Releases, Def.'s Notice [244], Mar. 23, 2011, as well as Exhibit 1 to that Notice, which is a six-page DOC report titled, "Analysis of Releases between September 1, 2005 and August 31, 2006: Appropriate and Late Release Rates."

The District submitted that Notice and the attached report on March 23, 2011, about three weeks after it filed its Opposition to Plaintiffs' Motion for Summary Judgment. The District says that it inadvertently failed to include the attached document along with its Opposition. Def.'s Notice [244]. The "Analysis of Releases" is referenced several times in the District's Response to Plaintiffs' Statement of Material Facts Not in Dispute, which accompanied the District's Opposition to Plaintiffs' Motion for Summary Judgment. Every indication suggests that the District's failure to include the document was a mere oversight. Also, plaintiffs themselves entered the very same DOC report into the record well over a year ago, as an exhibit to Plaintiffs' Opposition to Defendant's Motion for Protective Order. Pls.' Opp'n Def.'s Mot. Protective Order [91-1], Mar. 3, 2010.

Plaintiffs seek to have the Notice and the attached "Analysis of Releases" report struck on several grounds. First, plaintiffs argue that the District's Notice constitutes a modification of the Court's scheduling order in this case, and therefore should have been filed as a motion upon "good cause" under Rule 16(b)(4) of the Federal Rules of Civil Procedure. Pls.' Mot. Strike [292] 4. Plaintiffs claim that the District, before submitting its "Analysis of Releases," should have asked for leave to reopen discovery. *Id.* This argument is meritless. As an initial matter, motions to strike are generally disfavored, and plaintiffs "must shoulder a formidable burden" for such a motion to be granted. *United States ex. rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 34–35 (D.D.C. 2007). Plaintiffs themselves entered this very document into

the record in March 2010.  The Court is unable to fathom how plaintiffs could possibly be surprised or prejudiced by the District's minor bungle, given that plaintiffs have had the document for well over a year and themselves put it into the record.  Nor have plaintiffs provided any basis for believing that the District's failure to attach the document was anything other than a simple oversight.

Second, plaintiffs argue that the "Analysis of Releases" should be struck because it doesn't qualify as an affidavit under Rule 56 of the Federal Rules of Civil Procedure.  Pls.' Mot. Strike [292] 6.  However, this "Analysis of Releases" doesn't even purport to be an affidavit, declaration, or any type of sworn statement, so none of those requirements are in any way germane.

Third, plaintiffs argue that the "Analysis of Releases" expresses expert opinion testimony, but that the District did not make the expert disclosures required by Rule 26 of the Federal Rules of Civil Procedure.  *Id.* at 7.  But this "Analysis of Releases" doesn't purport to be, and is not, expert witness testimony; it is clearly a report created by DOC staff, dated March 16, 2007.  It summarizes the Records Office's analysis of several thousand inmate jackets to determine how many inmates were released late during the first year of the class period.  While the document does not indicate its author, it says that it was created for the DOC's former Director, Devon Brown.  For these reasons, the document is not an expert report or expert testimony, and so doesn't implicate the disclosure requirements of Rule 26 of the Federal Rules of Civil Procedure.

Therefore plaintiffs' Motion will be denied.

### C. Plaintiffs' Notice [306] in Response to Discrepancy Reports Submitted by the District

At the June 1, 2011 hearing on the parties' motions for summary judgment, the Court asked the District to provide additional evidence concerning the number of overdetentions during the class period in order to correct a rather glaring defect in the District's evidentiary support for its Motion for Summary Judgment.  In particular, the Court requested that the District provide the actual "discrepancy reports" referred to in its Memorandum in Support of its Motion for Summary Judgment.  *See* Def.'s Mem. [211] 25.  The District had only attached to its Memorandum graphical representations of discrepancy report data, which provided no proper evidentiary support for these overdetention numbers.  *See* Def.'s Ex. 7.  The Court also requested that the District provide the definition of "overdetention" used by the DOC to arrive at these overdetention figures.

On June 9, 2011, the District filed a Notice [301] of Filing Additional Evidence, and delivered under seal to both the Court and plaintiffs a large collection DOC "discrepancy report" records of overdetentions for the period January 2007 to May 2011.  Def.'s Notice [302], Jun. 9, 2011.  The District also supplied an affidavit from the DOC's Records Administrator indicating the definition of "overdetention" used in the creation of these records.  Souverain Decl. [301-2] ¶ 3.  The DOC's Records Administrator also stated her familiarity with these discrepancy reports, what they contain, and how overdetentions listed in them are identified.  *Id.*

On June 21, 2011, plaintiffs' filed this Notice [306] to respond to the District's recent submission of additional evidence.  The Court has considered this Notice in its resolution of the parties' motions for summary judgment.

The Court has only a few comments on plaintiffs' Notice.  Plaintiffs incorrectly state that the discrepancy reports cover the period "March 1[,] 2007 to the present,"  Pls.' Notice [306] Jun. 21, 2011 at 2, but if plaintiffs had read a few more pages into the District's evidence they

would have seen that in fact they cover the period January 2007 to May 2011.  Plaintiffs then opine that this evidence is only admissible "against the District" pursuant to Federal Rule of Evidence 801(d)(2)(C) and (D).  *Id.* at 3.  But it is this Court's determination that the discrepancy reports are admissible hearsay pursuant to Federal Rule of Evidence 803(6), which creates an exception to the hearsay rule for business records.  Therefore the discrepancy reports are admissible for all purposes, not just against the District as desired by plaintiffs.

Plaintiffs also apparently object that the reports "by themselves do not establish that these were the only over detentions [sic] during the period," Pls.' Notice [306] 3, but it is unclear what plaintiffs mean by this.  To the extent that plaintiffs' and the District's overdetention numbers come into conflict, the jury can sort out whose numbers are credible.

## IV.    CONCLUSION

For the reasons stated herein, the Court will grant in part and deny in part plaintiffs' Motion [217] for Summary Judgment, and will grant in part and deny in part the District's Motion [211] for Summary Judgment.  The Court will also deny plaintiffs' Non-Consent Motion [271] to Strike "Defendant's Notice Regarding Correction in Defendant's Response to Plaintiffs' Statement of Material Facts Not in Dispute, Document Number 228-7" and deny plaintiffs' Non-Consent Motion [292] to Strike "Defendant's Notice Regarding Filing Analysis of Late Releases, Document Number 244."

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on June 24, 2011.