UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                            )
CARL A. BARNES, *et al.*,                        )
                                                            )
            Plaintiffs,                                  )
                                                            )
    v.                                                      )
                                                            )        Civil Action No. 06-315 (RCL)
DISTRICT OF COLUMBIA,                      )
                                                            )
            Defendant.                                )
_____)

## MEMORANDUM AND ORDER (TRIAL PLAN)

Before the Court are the District's Proposal for Proceeding [317], Oct. 25, 2011, and plaintiffs' Proposed Trial Plan [319], Oct. 26, 2011, as amended by an altered trial plan submitted in November 2011. *See* Pls.' Am. Proposed Trial Plan [326], Nov. 29, 2011. In these submissions, the parties present a number of proposals for going forward with what remains of the liability phase of this case, as well as the subsequent damages phase. Upon consideration of the parties' proposals, their objections and responses, the entire record in this case, and the applicable law, the Court has determined a plan for proceeding while also resolving certain preliminary issues in a manner that will expedite resolution of this litigation.

## I.    BACKGROUND

As is more fully explained in this Court's earlier opinions, *see, e.g.*, *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 265 (D.D.C. 2011), this case involves overdetentions and strip searches at the District's jail facilities. This is the second of two virtually identical class actions filed against the District in the past ten years involving overdetentions and strip searches at its jails. The first one, *Bynum v. District of Columbia*, Civil Action No. 02-956 (RCL), settled in January 2006 pursuant to an agreement containing terms designed to remedy the overdetention and strip-search problems. *Bynum*, 412 F. Supp. 2d 73 (D.D.C. 2006). Among these terms was

a requirement that the District set aside $3 million from the $12 million settlement amount to build a new inmate processing center. *Id.* at 83.

This Court was initially hopeful that the *Bynum* settlement would produce "significant policy changes in the operation of the Department of Corrections." *Id.* at 85. But, as it turns out, the overdetention and strip-search problems continued unabated for well over a year, precipitating the filing of the instant lawsuit. *Barnes*, 793 F. Supp. 2d at 267–68. In February 2006, Carl Barnes and several other named plaintiffs brought suit under 42 U.S.C. § 1983, alleging that their overdetentions and strip searches violated various amendments to the Constitution and the District was liable. Pls.' Second Am. Compl. [12] ¶¶43, 44. The Court later certified the case as a class action. *Barnes v. District of Columbia*, 242 F.R.D. 113, 120 (D.D.C. 2007). Specifically, the Court certified the case as a hybrid class action, with plaintiffs' claims for injunctive and declaratory relief certified under Rule 23(b)(2) of the Federal Rules of Civil Procedure and plaintiffs' claims for "monetary damages" certified under Rule 23(b)(3). *Id.* at 124. The Court defined both an "overdetention" and "strip search" class, *id.* at 120–21, and later ordered that the case be bifurcated into liability and damages phases. Order [65], Aug. 31, 2009.

After discovery as to liability concluded, the parties filed cross-motions for summary judgment, and the Court ruled on those motions in June 2011. *Barnes*, 793 F. Supp. 2d at 273–91. The Court held, *inter alia*, that the District was liable for overdetentions that occurred at its jail facilities from September 1, 2005 up to and including December 31, 2006. *Id.* at 285. The Court determined that genuine issues of material fact precluded a finding of summary judgment for plaintiffs or the District as to the District's liability for overdetentions that occurred from January 1, 2007 to February 25, 2008. *Id.* at 286. As to overdetentions that occurred from February 26, 2008 to the present, the Court found that the District was not liable as a matter of

law.  *Id.*  However, as to any overdetentions caused by the DOC's enforcement of an ordinance dubbed the "10 p.m. cut-off rule," the Court found the District liable during all parts of the class period.  *Id.* at 283.  As to the DOC's policy of strip searching court returns entitled to release, the Court found that such class members' Fourth Amendment rights were violated and that the District was liable.  *Id.* at 291.

Following the Court's issuance of this ruling, and upon the request of the parties, the case was stayed for sixty days and referred to a magistrate judge for mediation.  Order [311] Aug. 9, 2011.  The parties, however, were apparently too far apart and settlement discussions failed. This brings us to the present moment, where a trial of the remaining issue of liability has yet to be scheduled and significant questions remain regarding how the damages phase of the litigation should proceed.  The parties' inability to reach a settlement in this case may be due, at least in part, to lingering uncertainty about these issues.

## II.   STANDARD OF REVIEW

Federal trial courts have broad discretion to manage the conduct of litigation and to structure trials in a manner that expedites the proceedings while achieving the core purposes of a trial and protecting litigants' rights.  As to class actions, which present unique problems of management, Rule 23(d)(1) of the Federal Rules of Civil Procedure states that in conducting a class action, the court may issue orders that "determine the course of proceedings or prescribe measures to prevent undue repetition in presenting evidence or argument."  Fed. R. Civ. P. 26(d)(1).  Trial courts have "both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989).

III.    **ANALYSIS**

A.  **Preliminary Issues**

As an initial matter, plaintiffs have indicated their intent to seek leave to amend their complaint "to clarify their theories of liability[] and the damages flowing from them" and to also file another motion for summary judgment as to the District's liability for overdetentions during the disputed period—*i.e.*, January 1, 2007 to February 25, 2008.  Pls.' Proposed Trial Plan [319] 3.  The Court hereby advises plaintiffs, however, that it will not grant a motion for leave to amend the complaint and will not entertain further motions for summary judgment.

Plaintiffs filed their original Complaint in February 2006, amending it a day later (mostly to add an additional named plaintiff).  *See* Compl. [1], Feb. 23, 2006; Am. Compl. [3] Feb. 24, 2006.  The case then proceeded through a motion-to-dismiss stage, class certification, a round of mediation, a protracted and cantankerous period of fact and expert discovery, motions for summary judgment, and another round of mediation, and only now—six years into the case—do plaintiffs propose to re-amend their Complaint.  While leave to amend pleadings should be freely granted "when justice so requires," Fed. R. Civ. P. 15(a), a court may deny a motion for leave to amend if it finds "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party."  *In re Papst Licensing GmbH & Co. KG Litigation*, 762 F. Supp. 2d 56, 59 (D.D.C. 2011) (quoting *Forman v. Davis*, 371 U.S. 178, 182 (1962)).  Plaintiffs provide no justification for why these additional theories of liability and "clarification" of their requested damages were not pursued in a timely motion for leave years ago, and their failure to seek leave earlier unduly prejudices the District, needlessly taxes this Court's resources, and will delay the resolution of this litigation.  If leave is sought, it shall not be granted.

For similar reasons, the Court will not entertain further motions for summary judgment. Plaintiffs had ample opportunity to explore theories concerning the District's liability in their first, 59-page motion for summary judgment (along with its 93-page Statement of Material Facts and many hundreds of pages of exhibits).  By neglecting, despite its voluminous filings, to fully make their case at that stage, and by seeking now to reopen summary-judgment briefing, plaintiffs would only further protract this already protracted litigation while depriving the District of the opportunity to explore its defenses to these theories in discovery and increasing the litigation expenses of all parties.  Furthermore, plaintiffs offer no legal support for the proposition that after resolution of cross-motions for summary judgment, and absent a showing of compelling circumstances, a party can simply seek a "re-do" of issues already litigated.  If plaintiffs wish, they may file a motion for reconsideration pursuant to Federal Rule of Civil Procedure 54(b) seeking modification of the Court's summary-judgment Order—and plaintiffs have already done so with regard to certain aspects of that Order, *see* Pl.'s Mot. Reconsideration [320], Nov. 1, 2011—but the Court advises plaintiffs that the standard for reconsideration is a stringent one.  *See Ficken v. Golden*, 696 F. Supp. 2d 21, 35 (D.D.C. 2010).

### B.  Liability Trial of the Disputed Period and Additional Discovery

The parties' competing trial plans also address the upcoming liability trial of the disputed period and additional fact and expert discovery that may be required prior to that trial.  This would require the Court to reopen discovery, since liability-phase fact discovery closed on November 5, 2010, Order [176] 3, Dec. 6, 2010, and expert fact discovery closed on December 31, 2010.  Order [185] 4, Dec. 16, 2010.  Although it is not entirely clear from plaintiffs' proposals precisely what additional discovery they need to try the remaining liability issues in this case, the District agrees that discovery should be at least partially reopened prior to the liability trial.  Def.'s Proposal [317] 2.  The District, however—rightly concerned that such

discovery could easily tread on miles of already trodden ground—seeks to limit this discovery to the number of alleged overdetentions during the disputed period that are projected or identified by plaintiffs and the District.  *Id.*  Per its proposal, the District argues than no additional discovery on "process"—*i.e.*, the DOC's practices and procedures resulting in overdetentions or strip searches—or related topics should be permitted.

The Court agrees with the District.  In disposing of the parties' cross-motions for summary judgment, this Court held that there exist genuine issues of material fact regarding how many overdetentions occurred from January 1, 2007 to February 25, 2008 and whether the District showed deliberate indifference to the overdetention problem by failing to make a serious effort to address that known problem during the period.  *Barnes*, 793 F. Supp. 2d at 285–86.  To the extent that any additional liability-phase discovery is necessary at all, it shall be limited to such discovery as will assist each party in determining how many overdetentions occurred during the disputed period.  This number is relevant (aside from its relevance to damages) to the issue of whether, in this Section 1983 case, a predicate constitutional violation occurred that could serve as the basis for the District's liability.  Once the jury determines which party's overdetention figures for the disputed period are the most credible, it will compare that number to other relevant information—such as the number of releases processed by the DOC each year—to determine whether the overdetention class members' due process rights were violated.  *See id.* at 281.  Discovery beyond this narrow issue would needlessly prolong this litigation, since plaintiffs had ample opportunity to probe such areas prior to the close of liability-phase discovery.  Furthermore, the utility of such discovery at this stage of the case would likely be hampered by the passage of time and its effect on witness memories and the availability of relevant evidence.

The District suggests that 120 days would be sufficient to complete this additional discovery, with updates to plaintiffs' expert report served on the District within the first 60 days of this period.  Def.'s Proposal [317] 2.  The Court finds that this constitutes a reasonable proposal and will therefore order that this limited, additional fact discovery period shall close 120 days from the date of this Memorandum and Order.  Any updated expert reports of either party shall be exchanged no later than 60 days from the date of this Memorandum and Order.  However, as to the District's request that the Court refer all remaining liability-discovery issues to a magistrate judge, *id.* at 2–3, that request is denied.

### C.  Damages Discovery and Trial

The parties' most significant disagreement in their proposals concerns how the damages trial in this case will proceed.

There has been some evolution in plaintiffs' views on this issue since the case was filed. In the trial plan submitted by plaintiffs in May 2006, they proposed determining damages via "a single, class-wide damages trial using 'sampling,'" Pls.' Proposed Trial Plan [7-30] 4, May 24, 2006, by which they meant "randomly selecting a fraction of the plaintiffs in the class, trying the damages of each plaintiff in the sample to a jury, extrapolating the sample damage award to determine damages for the class as a whole, and then distributing the class damages among class members according to a formula . . . ."  *Id.* at 5.  Plaintiffs further suggested that "an expert working under the supervision of a special master" could generate the random sample.  *Id.*  Some sort of discovery as to this group of class members would then take place, after which the parties' experts could propose competing extrapolations for the entire class.  *Id.*  Plaintiffs also proposed, as an alternative to random sampling, that damages could be tried by "mini-trials" to judges, without providing any further explanation.  *Id.* at 4.  Plaintiffs, however, emphasized that

random sampling was the best approach, and would produce "substantial savings in time and expense." *Id.* at 10.

As to the type of damages plaintiffs would seek to prove, in this original trial plan, plaintiffs referred to such damages generally as "compensatory damages," *id.*, which included "non-economic damages" as well as damages for intangible injuries such as pain and suffering. *Id.* at 11.  Plaintiffs also indicated that emotional distress damages could also be determined via sampling, indicating that they might be seeking those as well.  *Id.* at 16.  Plaintiffs' Complaint, among other types of relief sought, states that plaintiffs would seek "compensatory" and "consequential damages" and "such other relief as this Court deems just and proper."  Am. Compl. [3] 25.  The scope of the damages sought remained hazy.  Ultimately this Court certified plaintiffs' claims for "monetary damages" under Federal Rule of Civil Procedure 23(b)(3), without indicating which specific damages were included.  *Barnes*, 242 F.R.D. at 120.

The District, in its recently submitted trial plan, sets forth a plan for discovery and trial of damages that is almost exactly the same as plaintiffs' original plan.  The District proposes to take "a statistically valid, random sample . . . of all class members to determine general damages for both the overdetention and strip search classes."  Def.'s Proposal [317] 3.  The most significant difference between plaintiffs' original proposal and the District's current proposal is that plaintiffs' proposed using random sampling for *all* damages, while the District proposes only using such sampling techniques to determine "general" damages.  The District contends that any other method would violate its "due process" rights,  *id.*, and that no matter what method is chosen—*i.e.*, random or non-random sampling—"emotional distress" damages cannot be determined on a classwide basis.  *Id.* at 11 (summarizing *Augustin v. Jablonsky*, 2011 WL 4953982, *1 (E.D.N.Y. Oct. 19, 2011)).  The District also proposes in its plan—in a parallel to plaintiffs' proposal of an "expert working under the supervision of a special master," Pls.'

Proposed Trial Plan [7-30] 5—that the Court appoint a magistrate judge to oversee the selection of an "independent statistician," agreeable to and paid for by both parties, who would determine the size of a statistically valid random sample for the class. *Id.*

However, in plaintiffs' second trial proposal, submitted in October 2011, they put forth a plan for trying damages that was inconsistent not only with the District's recent plan but also plaintiffs' own trial plan from May 2006. Instead of random sampling, plaintiffs proposed putting on a *non*-random sample of "20–30 class members" as well as the testimony of a psychiatric expert and a statistics expert. Pls.' Proposed Trial Plan [319] 21. Plaintiffs stated that, following testimony from this non-random sample of class members, it would ask the jury "to assign damages based on a matrix" keyed to the length of overdetentions (*e.g.*, 0 to 12 hours, 12 to 24 hours, and so forth), and a separate damages assignment for strip searches. *Id.* Plaintiffs believe that there is support for this approach in this Circuit, citing the case of *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977). At least in this second trial plan, plaintiffs appeared to remain on the fence about what damages they were seeking, stating that it would depend on how the Court decided to try the damages case. Pls.' Proposed Trial Plan [319] 28.

In its competing trial plan, the District strenuously objects to plaintiffs' proposed "*Dellums*" method of determining damages, arguing that plaintiffs simply seek to "cherry-pick 20 to 30 class members . . . without even the pretense that such a sample would be 'random' in any meaningful sense or would otherwise be representative of the damages of the class as a whole." Def.'s Proposal [317] 6–7. The District worries that plaintiffs will simply pick a group of testifying class members with "the most compelling stories to tell," thereby inhibiting the jury's effort to accurately determine damages for the class as a whole. *Id.* at 7. For their part, plaintiffs expressed surprise at the District's proposal to use random sampling (at one point even

calling it "cynical"), even though plaintiffs themselves proposed virtually the same plan early in the case.

However, apparently recognizing that the District's arguments in its trial plan necessitated modifications to their second proposed trial plan, plaintiffs proposed a third one at the end of November 2011. Pl.'s Am. Trial Plan [326] 1. In this latest plan, plaintiffs propose to bifurcate the damages trial, trying "general" damages using the *Dellums* method and "special" damages using random sampling. *Id.* at 4. Plaintiffs argue that this approach was recently approved by a federal court in New York, in a case involving a class of prisoners challenging a prison system's strip-search policy. *Id.* (citing *Augustin*, 2011 WL 4953982, at *1). However, while the *Augustin* case did approve the use of a *Dellums*-style non-random sample to determine general damages, plaintiffs appear to have overlooked the fact that that court determined that no classwide method of proof—random or non-random sampling—would suffice to prove the special damages in that case. *Augustin*, 2011 WL 4953982, at *16, *16 n.16.

Upon consideration of the parties' arguments and the applicable law, the Court finds that the most just and expeditious method of trying damages in this case is to use, as plaintiffs suggest in their latest proposal, the *Dellums* method, but only for determining general damages for the class. By "general" damages, the Court means the injury to human dignity that is presumed when a person is strip searched or overdetained. *See Augustin*, 2011 WL 4953982, at *1. In accordance with the *Dellums* method as well as the method used in *Augustin*, *id.* at *2, the parties shall each present the testimony of some members of the overdetention and strip-search classes, up to fifteen in total for each party.

However, because this sample from the overdetention and strip search classes will not be chosen at random, but will be selected by the parties, this sample will not accurately represent the varying circumstances of the absent class members or the varying impacts of the District's

conduct upon them.  The District could select, for example, fifteen career criminals from the class—an unsympathetic group unlikely to be seriously affected by a single strip search or an extra day in jail.  Plaintiffs might pick a group with characteristics designed to elicit the most sympathy from the jury. This would be a trial of the 15 "best" and 15 "worst" cases, and so virtually certain to produce a general-damages award that would not reflect the class members' actual damages.

      To avoid this result, the Court shall place restrictions on the types of testimony that either party may elicit from the witnesses in this non-random sample of class member.  That testimony shall be limited solely to the details of such class members' overdetentions and strip searches— *e.g.*, when they were supposed to be released, whether they had been ordered released by a court or whether their sentences had expired, how long they were overdetained, how the strip search was conducted, and so forth.  No testimony will be permitted that could lead the jury's valuation astray by causing it to believe that the witness' story was typical of the stories of the absent class members.  Therefore, the Court will not permit testimony concerning class members' backgrounds—*e.g.*, their occupations, education levels, criminal histories, family situations, and similar, personal facts.  Because the chosen witnesses will not be selected at random, such testimony would mislead the jury by causing it to project these witnesses' backgrounds onto the class as whole, even though the backgrounds of the absent class members are likely to differ substantially from those of the witnesses selected by the parties.  For the same reason, the Court will not permit testimony concerning the impact of these overdetentions or strip searches on these testifying class members.  One witness might tell a story about the severe physical and emotional injury that he or she suffered as a result of the DOC's conduct, while another witness might testify that this conduct caused them no injury whatsoever.  While this might accurately reflect the level of injury suffered by *those* class members, it could not be relied upon by the jury

11

to accurately value, for the entire class, the injury to human dignity that is necessarily entailed in being overdetained or strip searched.  Nor will expert testimony concerning the emotional or other impact of overdetentions or strip searches on class members be permitted, as the jury is perfectly capable of assessing that generalized injury themselves based on the class members' testimony, the parties' arguments, and their own experiences.  As to the strip searches, the jury will determine a dollar value for each strip search; for overdetentions, the jury will assign damages using a matrix based upon the length of overdetentions—*i.e.*, 0–12 hours, 0–24 hours, 0–36 hours, and so forth.  To assist the jury in assigning values, the Court will allow expert testimony that is limited to explaining the range of general damages that have been awarded by judges or juries in similar cases.

While the District objects to the use of the *Dellums* method for any type of damages in this case, including general damages, it agrees that the D.C. Circuit, in *Dellums*, found that the district court's use of a non-random sample of class members to determine damages was not an abuse of discretion.  Def.'s Proposal [317] 7 (citing *Dellums*, 566 F.2d at 189 n.56).  The District argues, based on out-of-circuit authority, that using non-random samples to determine damages violates "fundamental fairness."  *Id.* at 8 (citing *In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997)).  However, the *Chevron* case is inapposite, since that case involved a "bellwether"[1] trial of both liability and damages for personal injuries sustained from contamination of plaintiffs' property with waste oil.  *Chevron*, 109 F.3d at 1017–18.  The Fifth Circuit decided that the lower court's decision to try liability and damages using the 15 "best" and 15 "worst" cases provided no assurance that the selected cases were representative of the 3,000 plaintiffs.

---

[1] The *Chevron* Court provided a succinct and nicely worded description of the origins of the term "bellwether": "The term bellwether is derived from the ancient practice of belling a wether (a male sheep) selected to lead his flock.  The ultimate success of the wether selected to wear the bell was determined by whether the flock had confidence that the wether would not lead them astray, and so it is in the mass tort context."  *Chevron*, 109 F.3d at 1019.

*Id.* at 1019.   Only a statistically significant random sample of plaintiffs could achieve the necessary representativeness.  *Id.*  Here, however, where a non-random sample of class members will be used to try only general damages, and with testimony concerning the backgrounds and individualized impacts of strip searches and overdetentions on such witnesses precluded, the Court is unable to fathom how using a statistically random sample would perform any useful work whatsoever, while necessarily increasing the complexity and costs of resolving the case. This will not be a trial of the 15 "best" and 15 "worst" cases, but simply the presentation of factual testimony that will help the jury understand the conduct for which the District was found liable.  Furthermore, the District favorably discusses at length the *Augustin* case, which—as the District notes, Def.'s Proposal [317] 10—expressly approved the use of a non-random sample of fact witnesses from the class to determine general damages.  *Augustin*, 2011 WL 4953982, at *1– 2.

      As to "special" damages—such as damages for emotional distress, lost wages, or other types of compensatory damages other than general damages as defined above—the Court will decertify the class as to such individualized damages.   While the Court previously certified plaintiffs' claims for "monetary damages" generally pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, *Barnes*, 242 F.R.D. at 120, plaintiffs' clarification at this stage of their intention to seek special damages on a classwide basis necessitates this Court's clarification that its class certification Order does not extend to such damages.  Because not all members of the strip search and overdetention classes will have been impacted in the same way, because of differences in those experiences as well as differences in class members' backgrounds and personal characteristics, questions affecting individual members of the class will necessarily predominate over any questions of law or fact common to the class.  *See* Fed. R. Civ. P. 23(b)(3).

Therefore certifying such damages under Rule 23(b)(3) is inappropriate.  Adjudication of claims for special damages must proceed on an individual basis.[2]

### D.  Injunctive Relief

In plaintiffs' second trial plan, they indicated their intention to file motions for injunctive relief on various issues.  Pls.' Proposed Trial Plan [319] 6.  First, plaintiffs indicated their intent to seek injunctive relief related to the Court's determination on summary judgment that the DOC's policy of strip searching court releases violates the Fourth Amendment and that the District is liable.  *Id.*  Second, plaintiffs seek "over-detention relief," *id.*, arguing that the District's "10 p.m. cut-off rule" remains in effect.  *Id.* at 12.  Third, plaintiffs seek disgorgement of the $3 million set aside in the *Bynum* settlement to build an inmate processing center, which the District has yet to complete.  *Id.* at 13.  The District generally opposes any injunctive relief, arguing, *inter alia*, that various changes to the DOC's practices render such relief moot.  Def.'s Proposal [317] 12.

The Court finds that these issues related to injunctive relief are untimely and will defer consideration of them until the conclusion of the liability trial on the disputed period.  Any discovery related to plaintiffs' claims for injunctive relief shall take place at the same time as other damages discovery.

---

[2] The Court also notes that contrary to plaintiffs' contention, Pls.' Am. Proposed Trial Plan [326] 11, the use of random sampling to try "all types of compensatory damages" is by no means an accepted method among courts. While plaintiffs cite the Ninth Circuit's decision in *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) to support the use of random sampling to try compensatory damages in a class action, Pls.' Am. Proposed Trial Plan [326] 11, the decision in *Hilao*—by a divided panel and with a vigorous dissent—was justified by the unusual nature of the case, and has in any event been called into question by other courts. *See Augustin*, 2011 WL 4953982, at *16 n.16.  Indeed, the U.S. Supreme Court, in a case that is famous for other reasons, recently disapproved a plan by a Ninth Circuit court to forgo individualized proceedings and try class members' claims for backpay using "Trial by Formula"—that is, the selection by a statistician of a statistically valid, random sample of class members, whose claims for backpay would be tried and then extrapolated to arrive at an aggregate number for the class. *Wal-Mart, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011).  Like plaintiffs in this case, the Ninth Circuit, in approving the random-sampling plan that the Supreme Court recently rejected, relied entirely upon its decision in *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996).  *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 625–28 (9th Cir. 2010), *overruled by Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).

## IV.    CONCLUSION

Accordingly, it is hereby

ORDERED that the Court will permit no further amendments to plaintiffs' complaint; and it is further

ORDERED that no further summary-judgment motions will be permitted; and it is further

ORDERED that limited fact and expert discovery as to liability shall be reopened.   Only such discovery as will assist the parties in determining how many overdetentions occurred from January 1, 2007 to February 25, 2008 will be permitted.   No discovery on "process" and related issues shall be permitted.   This limited discovery period shall begin today and close on April 6, 2012.   Any updates to the parties' expert reports shall be served on the other party no later than February 10, 2012; and it is further

ORDERED that the damages trial shall proceed following the trial on liability and following a period of damages discovery.   The damages trial will concern only general damages, and each party will be permitted to present the testimony of up to fifteen (15) witnesses drawn from the overdetention and strip-search classes.   Testimony from this non-representative sample of class members will be limited solely to the details of such class members' overdetentions and strip searches, and no testimony concerning their backgrounds or the impact of the overdetentions or strip searches upon them personally shall be permitted.   Other than expert testimony concerning the number of overdetentions and strip searches, the only expert testimony that shall be permitted will be such testimony as assists the jury in understanding the range of general damages that have been awarded by judges or juries in similar cases; and it is further

ORDERED that plaintiffs' claims for special damages are decertified and must proceed on an individual basis; and it is further

ORDERED that discovery as to injunctive relief and motions for such relief shall take place following the conclusion of the liability phase of this case.

SO ORDERED.

Signed by Royce C. Lamberth, Chief Judge, on December 7, 2011.