## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CARL A. BARNES**, *et al.*, ) | |
| ) | |
| **Plaintiffs**, ) | |
| ) | |
| **v.** ) | **Civil No. 06-315 (RCL)** |
| ) | |
| **THE DISTRICT OF COLUMBIA** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

### (RESOLVING PARTIES' MOTIONS *IN LIMINE*)

## I.        BACKGROUND AND PROCEDURAL HISTORY

This case concerns the District of Columbia Department of Corrections' ("DOC") practice of overdetaining and strip searching its inmates. The plaintiffs, former inmates subject to overdetentions and strip searches, filed a class action against the District of Columbia ("District") over six years ago. Compl., Feb. 23, 2006, ECF No. 1. This long-running case is virtually identical to a prior case before this Court, *Bynum v. District of Columbia*, Civil Action No. 02-956 (RCL) (filed in 2002). Given this extensive history, the Court assumes familiarity with its prior opinions, which set forth the background of this class-action litigation in greater detail. *See, e.g., Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 265 (D.D.C. 2011) (discussing background of case up to summary judgment stage).

In June 2011, the Court granted plaintiffs' Motion for Summary Judgment as to the District of Columbia's liability for any overdetentions at its jails, throughout the class period, caused by the DOC's application of the so-called "10 p.m. cut-off" rule, and all overdetentions occurring from September 1, 2005 to December 31, 2006. *Id.* at 286. The Court granted the

District's Motion for Summary Judgment as to overdetentions occurring from February 26, 2008 forward that were not caused by the DOC's enforcement of the 10 p.m. cut-off rule. *Id.* The Court denied both parties' motions as to the District's liability for overdetentions that occurred from January 1, 2007 to February 25, 2008 (the "Trial Period") that were not caused by the DOC's enforcement of the 10 p.m. cut-off rule. *Id.* at 286 & n.18. The District's liability for that subset of overdetentions remains undetermined pending trial.

On March 1, 2013, a jury trial regarding the District's liability for overdetentions during the "Trial Period" will commence. Before the Court are the parties' pretrial motions *in limine* to exclude or limit certain evidence from being introduced at the upcoming liability trial. The plaintiffs filed a motion styled as Plaintiffs' Motion *in Limine* No. 1 to Exclude Introduction of Evidence of the District of Columbia's Overdetention Numbers for the Trial Period, Jan. 11, 2013, ECF No. 410. The District has filed an "Omnibus Motion *in Limine*," encompassing five separate motions *in limine*. Def.'s Mot. in Limine, Jan. 11, 2013, ECF No. 409. Upon consideration of these motions, the oppositions and replies thereto, and the record herein, the Court will deny plaintiffs' motion and grant in part and deny in part the District's motion.

## II.   LEGAL STANDARD

While neither the Federal Rules of Civil Procedure nor the Federal Rules of evidence expressly provide for motions *in limine*, the Court may allow such motions "pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Motions *in limine* are "'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'" *Graves v. District of Columbia*, 850 F. Supp. 3d 6, 10 (D.D.C. 2011) (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1070 (3d Cir. 1990)). As Judge Kollar–Kotelly thoroughly explained in *Graves*:

Broadly speaking, the Federal Rules of Evidence permit the admission of "relevant evidence"—that is, evidence that "has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence," Fed. R. Evid. 401—provided it is not otherwise excluded by the Rules, the Constitution of the United States, or an Act of Congress, Fed. R. Evid. 402, and its probative value is not "substantially outweighed by a danger of…unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403.

In light of their limited purpose, motions *in limine* "should not be used to resolve factual disputes," which remains the "function of a motion for summary judgment, with its accompanying and crucial procedural safeguards." *C & E Servs., Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008)….In other words, "[f]actual questions should not be resolved through motions *in limine*," *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 871 (W.D. Mich. 2008) (citation omitted), nor is a motion *in limine* a "vehicle for a party to ask the Court to weigh the sufficiency of the evidence," *Bowers v. Nat'l Collegiate Athletic Ass'n*, 563 F.Supp.2d 508, 532 (D.N.J. 2008). Rather, parties should target their arguments to demonstrating why certain items or categories of evidence should (or should not) be introduced at trial, and direct the trial judge to specific evidence in the record that would favor or disfavor the introduction of those particular items or categories of evidence. *U.S. ex rel. El–Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 19 (D.D.C. 2008). In short, motions *in limine* are a means for arguing why "evidence should or should not, *for evidentiary reasons*, be introduced at trial." *Williams v. Johnson*, 747 F.Supp.2d 10, 18 (D.D.C. 2010) (emphasis in original).

In deference to their familiarity with the details of the case and greater experience in evidentiary matters, trial judges are afforded broad discretion in rendering evidentiary rulings, a discretion which extends to assessing the probative value of the proffered evidence and weighing any factors against admissibility. *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 384 (2008). The trial judge's discretion extends not only to the substantive evidentiary ruling, but also to the threshold question of whether a motion *in limine* presents an evidentiary issue that is appropriate for ruling in advance of trial. [*See, e.g.,*] *United States v. Valencia*, 826 F.2d 169, 172 (2d Cir. 1987)….The trial judge has the "discretion to rule *in limine* or to await developments at trial before ruling." Stephen A. Saltzburg et al., FEDERAL RULES OF EVIDENCE MANUAL § 103.02[13] (9th ed. 2006). "[I]n some instances it is best to defer rulings until trial, [when] decisions can be better informed by the context, foundation, and relevance of the contested evidence within the framework of the trial as a whole." *Casares v. Bernal*, 790 F. Supp. 2d 769, 775 (N.D. Ill. 2011) (citation omitted).

*Id.* at 10–11. While the Court has broad discretion to make judgments about whether proffered

evidence is sufficiently relative or overly prejudicial, *see United States v. Project on Gov't*

*Oversight*, 526 F. Supp. 2d 62, 66 (D.D.C. 2007), the Court should remember that making counsel object to inadmissible evidence at trial may "emphasize[] the evidence before the jury." *Banks v. District of Columbia*, 551 A.3d 1304, 1310 (D.C. 1988); *see also* 75 AM. JUR. 2D. TRIAL § 94 at 306–307 (1991) ("the mere asking of an improper question in the hearing of the jury may prove so prejudicial that, notwithstanding an instruction by the court to disregard the offensive matter, the moving party will be denied his right to a fair trial").

## III.   PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE THE DISTRICT'S OVERDETENTION NUMBERS AND DISCREPANCY REPORTS

The plaintiffs ask this Court to "exclude any testimony, introduction of, or reference to, evidence of the District of Columbia's discrepancy reports (regardless of file type or format), graphs summarizing said reports, as well as any testimony, introduction of, or reference to, the District's overdetention numbers from January 1, 2007 – February 25, 2008 (the "Trial Period"), which are based on the District's discrepancy reports."  Pls.' Mot. in Limine 1.

The plaintiffs claim that (1) "the District's overdetention numbers and discrepancy reports are not supported by reliable methodology and are misleading"; (2) "[t]he District needs expert testimony to establish that the methodology supporting its overdetention numbers and discrepancy reports is reliable" and the District has failed to designate an expert; and (3) witnesses "who testify about the District's total overdetention numbers and discrepancy reports are offering lay opinion testimony or expert opinion testimony…based on unreliable methodology" that could mislead or confuse the trier of fact.  *Id.* 2.

Beginning in January 2007, the District's Department of Corrections began systematically tracking overdetentions through "discrepancy reports"—documents which list individual overdetentions and the purported reasons for those overdetentions.  *Barnes*, 793 F. Supp. 2d at 270.  A declaration filed by Kathy Souverain, the Records Administrator at the DOC

since March 2007, describes the process of creating these discrepancy reports.  Souverain Decl.,

June 7, 2011, ECF No. 301-2.  According to Ms. Souverain:

> I am familiar with the discrepancy reports produced by the DOC from July 2007 forward.  These reports indicate the number of over-detentions that occur each month....In order to identify an over-detention, the DOC runs a "Crystal Report," which identified who have been *potentially* over-detained.  The institutional file of each inmate on this list is then reviewed by hand and a notation is entered into Lotus Notes as to whether the inmate was over-detained or not.  An over-detention is defined as anyone released after 11:59 PM on the day they were released, or alternately, situations where the end of sentence calculation was computed incorrectly.

Souverain Decl. ¶ 2–3.  The DOC creates the discrepancy reports by running a Lotus Notes

query in the institutional file system, JACCS, to identify potential overdetentions, and this

preliminary data is individually reviewed by individual DOC employees who enter a notation

into Lotus Notes.  The discrepancy reports represent the net product of this process, and have

been created contemporaneously on a monthly basis from January 2007 to May 2011.  *See*, *e.g.*,

Souverain Decl.; ECF No. 302 (copies of all discrepancy reports).

The Court is on *well tread* ground here.  The plaintiffs have repeatedly asked the Court to

exclude the District's discrepancy reports, and the Court has refused to do so each time.  The

plaintiffs first challenged the admissibility of the discrepancy reports on June 21, 2011, ECF No.

301; the Court rejected plaintiffs' arguments when resolving summary judgment, and determined

"that the discrepancy reports are admissible hearsay pursuant to Federal Rule of Evidence

803(6), which creates an exception to the hearsay rule for business records" and held that the

discrepancy reports "are admissible for all purposes[.]"  *Barnes*, 793 F. Supp. 2d at 293.  At that

time, the plaintiffs objected to the reports because "by themselves [they] do not establish that

these were the only over detentions [*sic*] during the period," ECF No. 306.  The plaintiffs make a

similar argument in their Motion *in Limine*, repeating it at the most recent pretrial hearing.

When the Court first considered this argument, it decided that "[t]o the extent that the plaintiffs'

and the District's overdetention numbers come into conflict, the jury can sort out whose numbers

are credible." *Barnes*, 793 F. Supp. 2d at 293.  The fact that the District's discrepancy reports do

not include all the overdetentions the plaintiffs think the reports should goes to the *weight* of the

evidence, not necessarily its admissibility.  *Cf. Graves v. District of Columbia*, 850 F. Supp. 2d

6, 11 (D.D.C. 2011) (motions *in limine* should not be used to resolve factual disputes or ask the

court to weigh the sufficiency of evidence).

Thereafter, the plaintiffs asked the Court (for the first time) to reconsider its summary

judgment opinion, in part based on their argument that the discrepancy reports are inadmissible.

Pls.' First Mot. Reconsideration 8–11, Nov. 1, 2011, ECF No. 320.  The Court denied

reconsideration, again rejecting plaintiffs' position on the admissibility of the discrepancy

reports.  Order Denying Mot. Reconsideration 3, Dec. 7, 2011, ECF No. 327.

After discovery, the plaintiffs again attacked the credibility and reliability of the

discrepancy reports through a motion to compel, claiming that the District has not provided the

entire release discrepancy database[1] and other documents and data the District used to generate

the final discrepancy reports.  Pls.' Mot. Compel 5–9, June 25, 2012, ECF No. 362.  The Court

ordered the District to release the database query it used to help generate the reports, but

otherwise found that plaintiffs did not meet their burden of showing that the District's production

was incomplete.  *Barnes v. District of Columbia*, __ F.R.D. __, 2012 WL 4466669, *21–*25

(D.D.C. Sept. 28, 2012).  "The Court urge[d] the plaintiffs to work diligently and quickly, after

receiving the correct query, to determine if any files are missing, so discovery for the liability

phase may finally come to an end."  *Id.* at *25.  The plaintiffs did not use this newly produced

---

[1]   The "release discrepancy database" refers to a set of data, pulled from a database via a specific search query, that the DOC identified as possible overdetentions, and then reviewed in drafting its final discrepancy reports.  *See Barnes v. District of Columbia*, __ F.R.D. __, 2012 WL 4466669, *19–*25 (D.D.C. Sept. 28, 2012).

query to form the basis of a new motion to compel, argue that data was missing, or update expert reports after reviewing the newly produced query. The plaintiffs stated at a pretrial hearing that they did not intend to file any new motions or update their expert reports based on their examination of this query.

On September 7, 2012, the plaintiffs again asked the Court to reconsider its decision to admit the discrepancy reports; they further requested that the Court, upon throwing out the discrepancy reports, enter summary judgment for the plaintiffs. ECF No. 387. The Court *again* rejected this request, finding that the plaintiffs' arguments did not present any new issues, and the plaintiffs were really asking the Court to weigh evidence and resolve factual issues. *See* Mem. Op. & Order Denying Reconsideration 3–6, Oct. 31, 2012, ECF No. 399.

There are many problems with the plaintiffs' so-called motion *in limine*. First, virtually all of the plaintiffs' arguments against the discrepancy reports go to the weight of the evidence, not its admissibility. *Cf. D.L. v. District of Columbia*, 820 F. Supp. 2d 27, 30 (D.D.C. 2011). As contemporaneous business records, representing the DOC's attempt to systematically track overdetentions, the discrepancy reports do not have to meet the same standards for "accepted methodology" that apply to expert reports. Essentially, the plaintiffs ask the Court, yet again, to decide that their expert reports represent the correct total number of overdetentions, and that the District's numbers are inaccurate. The plaintiffs have "cloaked a motion for summary judgment in the form of a motion *in limine*, but the deadline to file dispositive motions has long since passed." *Williams*, 747 F. Supp. 2d at 20; *see also Dunn ex rel. Albery v. State Farm Mut. Auto. Ins. Co.*, 264 F.R.D. 266, 274 (E.D. Mich. 2009) ("[M]otions *in limine* are meant to deal with discrete evidentiary issues related to trial, and are not another excuse to file dispositive motions disguised as motions *in limine*.") (internal quotation marks and citation omitted). The last time

the plaintiffs asked the Court to exclude the District's discrepancy reports, they said that excluding such evidence would require the Court to enter summary judgment for the plaintiffs. Pls.' Second Mot. Reconsideration, Sept. 7, 2012, ECF No. 387.  This indicates that this "new" motion to exclude the discrepancy reports is really a dispositive motion in disguise.  The plaintiffs "misconstrue[] the purpose of a motion *in limine*, which should not be used to resolve factual disputes among the parties." *Williams,* 747 F. Supp. 2d at 20.

Another problem this Court has is that this motion *in limine* is essentially a motion for reconsideration of motion for reconsideration.  On September 7, 2012, the plaintiffs filed a lengthy Motion for Reconsideration of Court's Decision to Admit District's PDF Discrepancy Reports and to Deny Summary Judgment to Plaintiffs' for the Trial Period.  ECF No. 387.  In denying reconsideration, the Court stated:

> Plaintiffs' Motion for Reconsideration relies on many of the same claims the plaintiffs made about the District's production in their Motion to Compel the Release Discrepancy Database.  *Compare* [Pls.' Second Mot. Reconsideration] at 24–41, *with* Pls.' Mot. to Compel Release Discrepancy Database 5–9, June 25, 2012, ECF No. 362.  This Court, denying in part plaintiffs' motion to compel, found the plaintiffs did not meet their burden of showing the District withheld discrepancy reports or otherwise discoverable data relating to the disputed period. *Barnes v. Dist. of Columbia*, __ F. Supp. 2d __, 2012 WL 4466669, *20–*26 (D.D.C. Sept. 28, 2012)….
>
> In finding that the District's Discrepancy Reports raised a genuine issue of material fact [at summary judgment], the Court did not declare that the District's reports accurately reflect the number of overdetentions.  It found—with all reasonable inferences drawn in favor of the District—that a reasonable jury could find these reports credible.  *Barnes*, 793 F. Supp. 2d at 280.  Unlike the Analysis of Releases, the Discrepancy Reports were more than a "conclusory allegation that the plaintiffs' numbers…are wrong, and nothing more." *Id*. at 279….
>
> The plaintiffs stress that the District's Discrepancy Reports are incomplete, based on faulty methods, and underestimate overdetentions.   [Pls.' Second] Mot Reconsideration 24–41.  The plaintiffs are free to make these arguments to a fact-finder and convince a…jury [2] that their numbers are correct.  By denying plaintiffs' Motion for Reconsideration, the Court does not choose between either

---

[2] The Court had originally said "judge or jury," in case the parties later agreed to a bench trial on liability.

parties' overdetention estimates.   It merely holds that the plaintiffs have not convinced the Court that the District's numbers are so flawed, so baseless that they amount to a mere conclusory allegation that plaintiffs' numbers are wrong. If the Court grants reconsideration and enters summary judgment for plaintiffs, in effect it would weigh evidence and resolve factual issues.

Mem. Op. & Order Denying Reconsideration 5–6, Oct. 31, 2012, ECF No. 399.   In that opinion, the Court emphasized that this issue had been *repeatedly* argued:

> The plaintiffs have raised doubts as to the accuracy and completeness of the District's Discrepancy Reports.  *See, e.g.,* ECF Docket Entries 362, 373, 387, 395, 398.  The District has raised objections to the plaintiffs' expert reports and their estimates of overdetentions.  *See, e.g.,* ECF Docket Entries 365, 369, 376-2, 381, 383, 393.  The District has also defended the completeness of its production and the integrity of its Discrepancy Reports.  *See, e.g.,* ECF Docket Entries 369, 376-2, 393, 394.  In order to resolve these disputes, the Court would need to weigh competing evidence and resolve issues of fact.

*Id*. at 6–7.  Other than arguing that the District needs expert testimony to introduce the reports, the plaintiffs' arguments are basically the same as those previously, and repeatedly, rejected by this Court.  Not only are plaintiffs using a motion *in limine* as a backdoor motion for summary judgment, but are also using it as a backdoor motion to reconsider.  The Court is full well aware that the plaintiffs object to its decision to admit the discrepancy reports, as the plaintiffs should be full well aware that this Court believes it is proper for the jury to decide whose overdetention numbers are accurate and credible.

The plaintiffs raise one *new* objection to the discrepancy reports—namely that the "District needs expert testimony to establish that the methodology supporting its overdetention numbers and discrepancy reports is reliable" and any opinion testimony used to support the reports and overdetention numbers would be opinion testimony "based on an unreliable methodology." Pls.' Mot. in Limine 2.

The discrepancy reports are not expert reports.  They are business records—created not in anticipation of litigation, but in the normal course of business—that do not require a Rule

26(a)(2) designated expert to authenticate them.   Like the District's earlier "Analysis of Releases," the discrepancy reports "[do not] purport to be, and [are] not expert witness testimony; [they are] clearly [] report[s] created by DOC staff" summarizing the monthly count of overdetentions.  *Barnes*, 793 F. Supp. 2d at 292.  Testimony from a DOC official familiar with how these reports were generated, what criteria and methodology were used, et cetera, is direct testimony concerning the DOC's business records.  It is not expert testimony.

The Court also agrees with the District's alternative argument that the Court could, if necessary, admit "'lay opinion testimony' to explain and interpret the District's discrepancy reports," Def.'s Opp'n 6.  The opinions or inferences offered by Jeannette Myrick—who has extensive personal experience with reviewing inmate jackets and identifying potential overdetentions—would be "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Hall v. CIA*, 538 F. Supp. 2d 64, 69 (D.D.C. 2008) (quoting Fed. R. Evid. 701).  There is no need for the Court serve as a "gatekeeper"—ensuring that expert testimony is "valued," with conclusions based on "good grounds," *Groobert v. President and Directors of Georgetown College*, 219 F. Supp. 2d 1, 6 (D.D.C. 2002)—"for instances involving lay opinion testimony." *United States v. Eiland*, 2006 WL 2844921, *2 (D.D.C. Oct. 2, 2006).

Lay opinion testimony is admissible if "the specialized knowledge at issue was gained though experience rather than though scientific or technical training," so long as the witness testified "based solely on personal experience with the case at issue."  *Armenian Assembly of Am. v. Cafesjian*, 746 F. Supp. 2d 55, 65 (D.D.C. 2010).  People at different jobs can obtain different kinds of "specialized knowledge" based on their training and experiences at that job.

*See, e.g., United States v. Lawson*, 653 F.2d 299, 303 (7th Cir. 1981), *cert. denied*, 454 U.S. 1150, (1982) (concluding that lay opinion testimony by FBI agents as to defendant's sanity was properly admitted despite fact that the agents had little opportunity to view the defendant); *United States v. Mastberg*, 503 F.2d 465 (9th Cir. 1974) (permitting under Rule 701 the testimony of a customs inspector that the defendant appeared nervous); *State v. Johnson*, 719 P.2d 1248, 1256-57 (Mont. 1986) (holding that, in a prosecution for driving under the influence of alcohol, a police officer was properly allowed to testify as a lay witness on the basis of his own experience as to what generally happens to a car when its power steering fails, where he had worked on vehicles of all kinds for over ten years and had experienced power steering failure several times); *State v. Hall*, 353 N.W.2d 37, 43 (S.D. 1984) (permitting police officers to give lay opinion concerning defendant's intoxicated state, under state rule analogous to Federal Rule of Evidence 701). Any "specialized knowledge" the District's witness would need to comment on how the DOC compiled the discrepancy reports and reviewed inmate jackets would be based on the witness' experience with said reports.  Therefore, even if lay opinion testimony is needed to testify about the discrepancy reports, the testimony of Jeannette Myrick—who has direct experience reviewing inmate jackets and potential overdetentions—would qualify as such.[3]

The discrepancy reports, and testimony about them, are admissible at the liability trial. However, the Court should refine its earlier statement that the discrepancy reports are "admissible for all purposes."  *Barnes,* 793 F. Supp. 2d at 293.  That is not entirely accurate. The District mentioned, at the latest pretrial conference, that it may use the discrepancy reports and related testimony to contest the overdetention numbers provided by the plaintiffs' experts.

---

[3]   Jeanette Myrick's extensive experience with reviewing inmate jackets and tracking overdetentions might have qualified her as an expert witness outright, similarly to how Mr. Day's experience with analyzing overdetention data qualifies him as an expert witness.  *See infra* Part IV.C.  However, the District's failure to timely designate an expert or a rebuttal expert makes this point moot.  *See Barnes*, 2012 WL 4466669, *13.

Certainly it may do so *indirectly*—by presenting its overdetention numbers and explaining how the DOC prepared them, the District may provide a compelling alternative to plaintiffs' numbers, and convince a jury to credit *its* figures over those provided by the plaintiffs.  Ms. Myrick—or any other District witness—cannot speak beyond her personal experience and expertise in tracking overdetentions and preparing reports.  Even if Ms. Myrick were qualified to comment on the statistical methods used by plaintiffs' experts, the District has not designated her as a rebuttal expert.  As noted by this Court:

> [T]he District passed on several opportunities to timely designate a rebuttal expert….On March 6, 2010, the District received Mr. Day's first report on his review of inmate jackets.  Def.'s Reply ISO its Mot. to Strike 2, Aug. 15, 2012, ECF No. 381.  The District did not then designate a rebuttal expert.  On November 15, 2010, Dr. Kriegler released his first expert report, estimating overdetentions based on a stratified random sample of inmate jackets provided by Mr. Day.  *Id.* at 2–3.  The District did not then designate a rebuttal expert.  On December 2, 2010, Dr. Kriegler revised the numbers in his first expert report.  *Id.* at 3.  The District did not then designate a rebuttal expert.  On December 13, 2010, Mr. Day filed a supplemental report based on additional reviews of jackets.  *Id.* at 4.  The District did not then designate a rebuttal expert.  A day later, Dr. Kriegler again revised his first report based on Mr. Day's new report.  *Id.*  The District did not then designate a rebuttal expert.  On December 7, 2011, the Court reopened limited discovery until April 6, 2012; on February 14, 2012 Dr. Kriegler filed his Second Supplemental Report.  *Id.* at 4–5.  The District did not then designate a rebuttal expert.  From April 3, 2012 onwards, the Court extended discovery, eventually setting the deadline for plaintiffs' supplemental expert reports for June 14, 2012.  *Id.* at 5.  The District did not then designate a rebuttal expert.  At no time, in the almost two years since receiving the first report, did the District feel the need to designate a rebuttal expert.  It is only now, after all the extended deadlines have passed and the Court has stated that "[n]o further extensions of discovery will be permitted," Order, Apr. 27, 2012, ECF No. 345, that the District decides it might need an expert witness to rebut Mr. Day and Dr. Kriegler's reports.

*Barnes*, 2012 WL 4466669, *13.  Not having designated an expert to rebut Mr. Day and Dr. Kriegler's reports may prove detrimental to the District, but the Court reminds the District that it passed on several opportunities to designate an expert.  The District cannot correct for this oversight by using Ms. Myrick and its discrepancy reports as ersatz rebuttal expert testimony.

IV.    **DEFENDANT'S MOTIONS** *IN LIMINE*

A.    **Motion to Preclude Mention of Settlement in** *Bynum*

The District moves to exclude all evidence or mention of the settlement in *Bynum v. District of Columbia*, Civil No. 02-956 (RCL).  The *Bynum* case dealt with a virtually identical issue—the class plaintiffs claimed that the District's DOC had a practice of overdetaining and strip searching inmates.  *See* Compl., May 16, 2002, ECF No. 1, 02-cv-956.  In fact, Messrs. Barrett Litt, Paul Estuar, and William Claiborne—attorneys of record in the present action—also represented the plaintiffs in *Bynum*.  This Court approved of a settlement in *Bynum* in January 2006.  *Bynum v. District of Columbia*, 412 F. Supp. 2d 73 (D.D.C. 2006).  The approved settlement provided monetary relief to individual class members who had been overdetained, *id.* at 77–78, and provided the following class-wide prospective relief:

> The parties agree that the injunctive relief objective of this agreement is the elimination of over-detentions and court release strip searches.  To that end, the District will, for a period of two years, provide to Class Counsel annually a report on whether 1) it has strip searched any court returns entitled to release absent individualized reasonable suspicion to do so, and whether 2) it has released any detainees or inmates more than 24 hours after the time they become entitled to release, and the reasons therefore.  In addition, under the terms of this settlement elaborated further on in this Order, the District must invest substantial funds in new renovations that will substantially contribute to processing of inmates in the jail.

*Id.* at 78.  Of the $12 million in settlement funds, $3 million was to "revert to the D.C. Department of Corrections to be spent on programs and services which relate to the subject of this complaint," *id.* at 79, including "build[ing] a state of the art Inmate Processing Center (IPC) within the foot print of the DC Jail site, which will be a project totaling approximately $5 Million.  The additional $2 million required to complete the project will be provided by the District government," *id.* at 83.  The *Bynum* settlement also provided:

> Neither this Final Order of Approval of Settlement, the Settlement Agreement,

nor any of its terms or the negotiations or papers related thereto shall constitute evidence or an admission by the Defendant that any acts of wrongdoing have been committed, and they shall not be deemed to create any inference that there is any liability therefore.  Neither this Final Order of Approval of Settlement, nor the Settlement Agreement, nor any of its terms or the negotiations or papers related thereto shall be offered or received in evidence or used for any purpose whatsoever, in this or any other matter or proceeding in any court, administrative agency, arbitration, or other tribunal, other than as expressly set forth in the Settlement Agreement.

*Id*. at 87.  The District did not admit to any wrongdoing in settling *Bynum*.  *Id*.

The District strongly objects to the introduction or mention of the *Bynum* settlement in the upcoming liability trial, claiming it "fails every test of admissibility under the Federal Rules of Evidence."  Def.'s Mot. in Limine 5 (formatting altered).  According to the District, the *Bynum* settlement is irrelevant, precluded by Federal Rule of Evidence 408(a), and unfairly prejudicial, confusing, and cumulative.  *Id*. at 5–8.

First, the Court must consider whether the evidence is relevant.  The District argues that the "*Bynum* class period ended seventeen months before the start of the Trial Period.  A prior case about events that took place seventeen months previous and ended in a no-fault settlement does not make it any more or less likely that the District had a pattern and practice of overdetention during the Trial Period."  *Id*. at 6.  Certainly, if the plaintiffs sought to use the *Bynum* settlement to prove that the District overdetained inmates prior to 2006 and, thus, was more likely to have overdetained thereafter, the *Bynum* settlement would be of limited probative value.  More important, introducing the settlement for this purpose would violate Federal Rule of Evidence 408(a), which provides that evidence of a settlement is not admissible "to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or impeach through prior inconsistent statement or contradiction."  Therefore, the Court will not allow plaintiffs to use or mention the *Bynum* settlement to suggest that the District had

overdetained inmates during the time covered by the *Bynum* settlement.  To allow otherwise would plainly violate Rule 408(a), and the prejudicial effect of this evidence would outweigh its probative value.

The District's Motion *in Limine* makes assumptions about how plaintiffs will use the *Bynum* settlement, but the plaintiffs aver that they

> do not seek to introduce the *Bynum* settlement for the purpose of arguing that, because the District reached a settlement in the *Bynum* matter they are liable for overdetentions during the *Barnes* Trial Period.  Rather, plaintiffs will introduce the *Bynum* settlement for the purpose of demonstrating 1) the District had long been on notice of the ongoing problem of overdetentions in its jails, 2) the District was to accomplish very specific changes in the way it processed out inmates, 3) the District had committed to various alterations in its practice that went unaddressed, and 4) the District's failure to take steps addressed in the *Bynum* settlement contributed substantially to the ongoing problem of overdetentions. Such evidence is probative of knowledge, deliberate indifference, and custom and policy.

Pls.' Opp'n to Def.'s Mot. in Limine 3.  The plaintiffs' focus on the relevance of the prospective and injunctive provisions of the *Bynum* settlement—in particular its stipulation that DOC use $3 million of the settlement fund to prevent future overdetention problems.  *Id*. at 4.  They also wish to use the fact that the *Bynum* class sued the District to show that the District was on notice of a potential overdetention problem.  *Id*. at 5–6.

For plaintiffs, the issue is not whether DOC was liable for overdetentions prior to the class period, but whether the *Bynum* suit and the settlement's injunctive provisions put DOC on notice of a problem, and whether the District's alleged failure to follow through on the *Bynum* settlement shows deliberate indifference.  When put this way, evidence of the *Bynum* settlement is clearly relevant to the upcoming liability trial.  In fact, this Court found this kind of evidence highly relevant when ruling on summary judgment in this case:

> This rolling overdetention problem at the DOC during the first 16 months of the class period is all the more shocking when the Court considers that the DOC and

the District were on notice, via the *Bynum* litigation, that the prevailing release practices were deeply inadequate, and that fundamental change was needed.  The Court would have expected, given that lawsuit, a concerted effort on the part of the District and the DOC to identify and eliminate every major contributing factor to the overdetention problem.  But that's not what happened.  Even when the facts are viewed in the light most favorable to the District, the DOC's first meaningful change to the status quo didn't come until July 2008, when it instituted the courthouse release program, permitting a subset of inmates to be released directly from the Superior Court….

Other major changes—such as the completion of the Inmate Processing Center, a move to a paperless system to process releases rather than a dogged insistence on releasing inmates only upon receipt of paper court orders, or simply permitting releases based upon faxed (or, to be even more futuristic, scanned and emailed) court orders—were either rejected by the DOC or remain, to this day, caught in a whirlpool of delays.  In the meantime, free men and women were treated as prisoners, hoping the DOC's paper-bound and Byzantine release process would favor them with an on-time release.

*Barnes*, 793 F. Supp. 2d at 279.  In granting summary judgment for the plaintiffs for the first sixteen months of the class period, this Court expressed "alarm at the DOC's lack of urgency in responding to this disturbing pattern of overdetentions despite the notice provided by the *Bynum* litigation."  *Id*.  If the Court found the *Bynum* suit, and the injunctive provisions of its settlement, significant to its ruling on summary judgment, certainly those matters could be relevant to liability for the trial period.[4]

Relevance only gets the plaintiffs so far.  Relevant evidence can still be excluded if it is unduly prejudicial, or otherwise barred by the Federal Rules of Evidence.  Rule 408 applies to this situation, so the Court must determine whether the *Bynum* settlement is being offered "either to prove or disprove the validity…of a disputed claim or to impeach by a prior inconsistent statement or a contradiction," or whether this evidence is being "admit[ted] for another purpose."

---

[4]   The District claims that "the *Bynum* settlement is poor evidence for the District's knowledge during the Trial Period because *Bynum* deals, at best, with the situation in the District's jails seventeen months before that time."  Def.'s Mot. in Limine 8 n.4.  Again, this misconstrues which part of the *Bynum* settlement plaintiffs wish to rely on.  The injunctive provisions of the settlement ordered prospective relief.  These issues are not buried a (mere) seventeen months in the past, but were ongoing obligations of the District to take certain measures to reduce the risk of overdetentions.  The prospective injunctive relief is relevant to knowledge and deliberate indifference during the trial period.

Fed. R. Evid. 408.   Defendant primarily relies on *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) for the proposition that a party may not offer a settlement for a purpose too "closely intertwined" with the substance of the issues before the Court.   In *Trebor*, a party wished to use settlement negotiations to show that that statue of frauds had been satisfied and thus an enforceable contract existed.   865 F.2d at 510.   "Because the question of whether the statute of frauds is satisfied is by its nature inextricably intertwined with the question of whether a contract is enforceable (and thus with the question of liability), the *Trebor* court held that it was not an abuse of discretion to exclude evidence of settlement communications."  *Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 317 (S.D.N.Y. 2011). The District claims that the

> only matters at issue for trial are whether the District was deliberately indifferent to plaintiffs' rights and had a custom and practice of overdetentions during the trial period.  Given the narrow scope of the trial, there are simply no collateral issues that the *Bynum* settlement could be used to prove under FRE 408(b)….Even if the plaintiffs argue that the *Bynum* settlement can be admitted to show that the District knew about problems with overdetentions during that trial period, that issue is clearly intertwined with the central question of deliberate indifference.

Def.'s Mot in Limine.  The District continues this line of argument in its Reply:

> *Barnes* and *Bynum* both allege the same wrongs (strip searches and overdetentions) taking place at the same location (the D.C. Jail) by the same actor (the District) against virtually identical classes of people (prisoners during their respective time periods)….*Bynum* settled, and now the plaintiffs want to use it to show that the District was deliberately indifferent to strip searches and overdetentions during the *Barnes* period because it knew about *Bynum* and the terms of the *Bynum* settlement.

Def.'s Reply 2.

Again, the District misunderstands how the plaintiffs seek to use the *Bynum* case. It would be impermissible for plaintiffs to use the *Bynum* settlement to show that since the District "was liable for a…overdetention that happened on August 31, 2005," this proves that "the exact

thing against the exact same defendant…occurred one day later." Def.'s Reply 2–3 (emphasis omitted).  Once more, plaintiffs are *not* using the *Bynum* settlement to show that an individual overdetention actually happened during the *Bynum* class period, or that any individual overdetention happened during the *Barnes* trial period—and to the extent plaintiffs might have, they are hereby barred from doing so.  The plaintiffs are not arguing that prior overdetentions by the District show a propensity for future overdetentions.  *Cf. Dodson v. CBS Broadcasting Inc.*, 423 F. Supp. 2d 331, 334 (S.D.N.Y. 2006) (evidence of prior suits by EEOC to prove defendant's propensity for sex discrimination irrelevant and prejudicial).  The *Bynum* settlement shows notice of a problem, and a promise by DOC to take specific measures to alleviate the problem.  But proving this does not win the case for plaintiffs if they cannot show that there were any overdetentions, or that the District did not take sufficient measures to address the potential problem.  The defendant's argument that the *Bynum* settlement goes too much to the "heart of the case," and is not sufficiently "collateral," does not prevail.

The District's heavy reliance on *Trebor*—a Second Circuit case from 1989 that has only been cited by two district courts in this Circuit[5]—is unavailing.  Even within the Second Circuit, courts have questioned *Trebor*.  In 2008, the Second Circuit allowed introduction of evidence of settlement communications in order to prove a defense of estoppel by acquiesce.  *PRL USA Holdings, Inc. v. U.S. Polo Assoc., Inc.*, 520 F.3d 109, 112 (2d Cir. 2008).  Most important for this case, the Second Circuit held that "[its] conclusion in *Trebor* that the district court had discretion to exclude the evidence of compromise negotiations did not mean that the district court in *Trebor* was required to exclude that evidence."  *Id.* at 116 (emphasis in original).

---

[5]   One case, *Watt v. All Clear Business Solutions, LLC*, 840 F. Supp. 2d 324, 326–27 (D.D.C. 2012), dealt with a completely different issue within *Trebor*; and another, *C & E Services, Inc. v. Ashford*, 539 F. Supp. 2d 316, 320–21 (D.D.C. 2008) distinguished *Trebor* and allowed plaintiffs to offer a settlement into evidence, with a limiting instruction to the jury.

Furthermore, a court in the Southern District of New York recently held that although it must consider the "public policy behind Rule 408 [in] promoting the compromise and settlement of disputes" this did "not outweigh the need" for evidence of settlement negotiations.  *Faulkner*, 797 F. Supp. 2d at 317.

Within this Circuit, Judge Facciola considered *Trebor*, *PRL*, and Rule 408 in *C & E Services, Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316 (D.D.C. 2008).  His approach is instructive here.  In this case, the General Services Administration conducted a post-award audit on defendant Ashland, and concluded that Ashland had overcharged government customers.  The GSA referred the matter the U.S. Attorney's Office, who began a False Claims Act investigation, which was ultimately resolved by a seven-figure settlement between Ashland and the government.  The plaintiff in that action claimed that Ashland withheld this information from them "as part of a scheme by Ashland to place the defectively priced products into [plaintiff's] GSA contract schedule."  *Id.* at 318.  Plaintiff brought a breach of contract action, and sought to introduce the settlement between Ashland and the U.S. Attorney "as evidence of express misrepresentations, half truths, and deceptions as to the nature of the audit, its conclusions, and the Settlement itself-which they claim led to their injuries."  *Id.* at 321.

Judge Facciola began his discussion by recognizing that "as a magistrate judge who often presides over settlement discussions, I am constantly exposed to the concern of litigants that a settlement may be used by a third party to establish liability.  The very policy underlying Rule 408 would be defeated if it did not operate to preclude the admissibility of settlement discussions in a case involving another party or another claim."  *Id.* at 320.  With this in mind, he considered Rule 408's "other purposes" exception, and *Trebor's* suggestion that "when the claim settled and the claim asserted are inextricably intertwined, the exclusion that permits the use of settlement

discussions for other purposes cannot apply." *Id.* After considering *PRL's* "refine[ment]" of *Trebor*, Judge Facciola allowed plaintiffs to introduce the settlement because "it is not being used to establish the validity of the underlying claims extinguished by the Settlement, but rather for the 'other purpose' of establishing Ashland's misrepresentations upon which *plaintiffs's* allegedly relied." *Id.* at 321.

Following this approach, this Court will allow plaintiffs to mention the *Bynum* settlement because it is not being used to establish the validity of the underlying claims extinguished by the settlement—whether the District had previously acted in deliberate indifference and overdetained inmates—but for the "other purpose" of showing the District had notice of a potential problem, and undertook specific steps to reduce the risk of overdetentions. Following Judge Facciola's approach, this Court will guard against the risk of prejudice or confusion by issuing a limiting instruction to the jury, and "insist[ing] that the evidence pertaining to the settlement be presented as briefly as possible and [hopefully] in the form of a stipulation between the parties." *Id.*

The Court understands the defendant's concerns about the public policy implications of allowing introduction of the *Bynum* settlement. It understands that "[t]he Rule [wa]s drafted to provide every incentive for compromise, and without such a broad rule of exclusion, litigants would be deterred from free-flowing settlement negotiations where multiple suits have been or might be brought." 2 Stephen A. Saltzburg, Michael M. Martin & Daniel Capra, Federal Rules of Evidence Manual § 408.02 at 408-13 (9th ed. 2006). However, in support of the District's position that allowing evidence of the *Bynum* settlement "would have a devastating effect on settlement negotiations, contrary to the purposes of FRE 408," Def.'s Reply 3, the District cites a case that says no such thing. In *Faulkner*, the court stated that "[i]n applying the 'another purpose' exception to Rule 408, 'the trial judge should weigh the need for

such evidence against the potentiality of discouraging future settlement negotiations.'"  797 F. Supp. 3d at 316 (quoting *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir. 1999)).  In *Faulkner*, the court found that these factors *favored* the *plaintiff*, and admitted evidence of the settlement.  *Id*. at 316–17.

When this Court weighs the need for evidence of the *Bynum* settlement against the potentiality of discouraging future settlement, it finds that the interests favor admitting the settlement.  This Court itself found, at summary judgment, that the *Bynum* suit and settlement were relevant evidence of deliberate indifference.  *Barnes*, 793 F. Supp. 2d at 279.  Allowing this settlement to come in, for this limited purpose, would not unduly discourage future settlement negotiations.  A key interest in settlement, especially of class actions, is finality; parties could not be assured of finality if third parties could use the settlement, as an admission of guilt, in subsequent actions.  *Cf.* William B. Rubenstein, *Finality in Class Action Litigation: Lessons from Habeas*, 82 N.Y.U. L. REV. 790, 820–25 (2007) (discussing finality as traditional interest in class action litigation).  The finality offered by settlement is typically *retrospective*, and does not usually foreclose liability for future misdeeds.  A defendant should not be able use a settlement as a shield if it continues to engage in the same unlawful conduct, and new plaintiffs would need to look at the history of the defendant's knowledge and conduct to make their case.  In fact, if Rule 408 operated to curtail the ability of plaintiffs to bring new suits if the defendant continues to injure them in the same way, then this could discourage plaintiffs from settling.  In cases where notice and past practice are key elements, the District cannot simply ask everyone to ignore the prospective obligations it undertook as part of the *Bynum* settlement.

With respect to the *Bynum* settlement, the Court finds that the fact that a suit was filed, and that the District undertook prospective injunctive obligations, are relevant to the issue of

deliberate indifference.   Rule 408 applies, but this limited use of the *Bynum* settlement falls under the "other purposes" exception of 408(b).   To mitigate any possible prejudice, the Court will issue a limiting instruction to the jury, and asks the parties to propose a stipulated jury instruction by the final pretrial conference on Monday, February 25, 2013.   The Court also instructs the parties to attempt to introduce this evidence by stipulation, so it may be presented as briefly as possible.   The plaintiffs are prohibited from introducing the *Bynum* settlement for any reasons other than those described above, including using the *Bynum* settlement to show that the District had previously overdetained inmates in deliberate indifference of their constitutional rights during the *Bynum* class period.

### B.      Motion to Exclude the Testimony of the Individual Class Members

Plaintiffs have indicated that they expect to call up to five class members to testify at the liability trial.   The District argues that "[b]ecause this testimony would be irrelevant to the issues at hand, time-consuming, confusing, duplicative, and prejudicial, the District requests that it be excluded."   Def.'s Mot. in Limine 9.   The plaintiffs intend to call two witnesses—Judith Jameson and Razina Jones—who were allegedly overdetained during the *Barnes* class period, but prior to the trial period currently in dispute.   The plaintiffs also propose to have up to three class members, who were allegedly overdetained during the trial period, testify.   *See* Ex. 1 to Def.'s Mot. in Limine 1–3, 17–18.   These witnesses will testify "about their Commitment Date, their last court date, where they went after last court appearance…, how they were processed back into the DC Jail/CTF, how and when they were ultimately released, and their Release Date."   *Id.* at 17–18.   The plaintiffs argue this "testimony is relevant to the jury's understanding of the release process from the perspective of a person who has been overdetained."   Pls.' Opp'n 15.

The District avers that testimony from class members is irrelevant to the issue of

"whether the District was deliberately indifferent to plaintiffs' rights through a custom and practice of overdetentions during the trial period."  Def.'s Mot. in Limine 10.  The District argues that none of the class members' proposed narratives relates to the factors relevant to deliberate indifference, which include "'the delays associated with necessary administrative procedures, the total number of persons overdetained during the period, the rate of overdetentions given the total number of releases processed and the duration of individual overdetentions.'"  *Id.* (quoting *Barnes*, 793 F. Supp. 2d at 277).  The District also argues that focusing on the individual experiences of class members may be misleading to a jury, suggesting that the length of their overdetentions or experiences may be typical.  The District also argues that individual testimony is a waste of time and duplicative, and that the sympathetic narratives by class members may prove prejudicial to the District.  *Id.* at 12–13.

The plaintiffs respond that the testimony of class members will not cause undue delay, as they expect each witness will only testify for 15–20 minutes on direct examination.  Pls.' Opp'n 15.  They claim that class member testimony is not cumulative or duplicative; while Dr. Kriegler will testify about his opinions on the total number of overdetentions, and the length of those overdetentions, "[h]e will not be able to offer testimony from the perspective of an inmate who was actually released after midnight on the day he or she was entitled to release."  *Id.* at 17.  "By offering testimony of the process of commitment, appearing for court, and release from three different class members, the jury will obtain a complete picture of the process from the perspective of a class member."  *Id.*

The Court agrees that there is value in having representative class members explain the process by which they were overdetained.  The District claims that the testimony of individual class members only proves that five people were overdetained over a 14-month period, and

would be unnecessary in light of plaintiffs' proffered expert testimony.  Def.'s Mot. in Limine 12–13.  Unless the testimony is inadmissible under the Rules, the District cannot dictate the plaintiffs' trial strategy, or how they should present thier evidence.  Using individual stories in conjunction with statistical analysis is one way to present the facts.  Five witnesses, briefly explaining their first-hand experiences, would not waste the Court's time.  *Cf.* CHRISTOPHER MUELLER & LAIRD KIRKPATRICK, 1 FEDERAL EVIDENCE, § 4:15 (3d ed. 2012) ("Not all evidence that is duplicative is therefore cumulative, and evidence should not be excluded merely because it overlaps with other evidence….The corroborative force of overlapping testimony can be important in persuading juries, and multiple witnesses may be more persuasive because they reinforce each other and bring to bear different perspectives or experiences[.]").

The testimony of Judith Jameson and Razina Jones—who were overdetained prior to the trial period, but during the *Barnes* class period—may be relevant to show a pattern and practice of overdetentions, that things did not change at DOC for the people going through the process. This testimony is *only* relevant if the three class members from the trial period testify; if the plaintiffs cannot secure class witnesses from the trial period to testify, the testimony of Jameson and Jones will be excluded as irrelevant.

The District raises concerns about "sympathetic narratives," Def.'s Mot. in Limine 12, that may distract the jury or prejudice the District.  The plaintiffs are permitted to put a "human face" on the harms they allege, as long as the testimony is not inflammatory, or extend beyond matters relevant to the District's liability for overdetentions.  Each witness must limit its testimony to their personal experiences being overdetained, and the process they went through; they are not permitted to discuss strip searches—for the reasons discussed *infra* Part IV.E—or "injury" testimony that would be primarily relevant to the damages stage.  If the plaintiffs are not

willing to limit their witnesses' testimony to these matters, the Court will not permit them to testify, as the probative value would be outweighed by its potential for undue prejudice.

The Court shares the District's concern with the fact that the plaintiffs have yet to name three of their class member witnesses.  The Court understands that it is difficult to locate suitable witnesses—especially when, by definition, all potential witnesses have been "in and out of the system."  But the Court does not agree that the District would suffer little prejudice by plaintiffs providing short notice of who will testify.  *Cf. Elion v. Jackson*, 554 F. Supp. 2d 1, 4–6 (D.D.C. 2008) (discussing standards for considering whether to exclude witnesses not previously named in pretrial disclosures).  The District has a right to investigate whether the class witnesses are reasonably representative of the class, or whether they are "outliers" whose atypical experiences would confuse the jury, prejudice the District, and diminish the probative value of their testimony.  To this end, the Court will order plaintiffs to name their class witnesses within 10 days of this date.  Failure to do so will prevent the plaintiffs from calling any class witnesses, including that of Judith Jameson and Razina Jones, whose testimony would become irrelevant without a comparator witness from the trial period.

### C.    Motion to Exclude Expert Testimony or Evidence from Sean Day

The District asks the Court to preclude the plaintiffs from introducing expert testimony or evidence from Sean Day, and in turn exclude or "severely circumscribe" Dr. Kriegler's reports that were based on data provided by Mr. Day.  Def.'s Mot. in Limine 13, 20.[6]  The District claims that Mr. Day "cannot qualify as an expert, and his testimony would be unfairly

---

[6]  The District gives this reference to, *a fortiori*, excluding the expert testimony of Dr. Kriegler one sentence within a seven-page argument.  Def.'s Mot. in Limine 20 ("Moreover, because Dr. Kriegler's proffered testimony and evidence rests entirely on the 'analysis' provided by Mr. Day,…it, too must be excluded or severely circumscribed.").  This deserves more attention, as excluding *both* Mr. Day and Dr. Kriegler's expert testimony severely undermines plaintiffs' ability to present its case.  Just how plaintiffs' Motion *in Limine* was the functional equivalent of a dispositive motion, this Motion *in Limine* from the District essentially asks the Court to grant summary judgment to the District.

prejudicial, giving the jury an inflated idea of how many overdetentions occurred here." *Id.* at

13.  The District argues that Mr. Day's expert testimony is neither "relevant" or "reliable," and

thus must be excluded.  *Id.* at 14 (quoting *United States v. H & R Block, Inc.*, 831 F. Supp. 2d 27,

30 (D.D.C. 2011)).

Mr. Day is a "lawyer licensed in state and federal courts in Maryland (1995) and the

District of Columbia (1996), with more than 10 years experience in criminal defense and § 1983

litigation."  Day Decl. ¶ 1, March 18, 2010, ECF No. 101-14 ("March 2010 Day Decl.").  He

bases his statements about reviewing inmate jackets upon his "education, training, experience,

expertise, including prior experience in reviewing Dept. of Corrections case jackets, and [his]

review of jackets and data in this case."  *Id.*  ¶ 2.  Mr. Day previously assisted "with the review

of class member claims…in [*Bynum*], which involved reviewing approximately 500 DOC jackets

to determine overdetentions….This was a particularly involved process because [he] reviewed all

bookings for each person during the class period, not just one booking period per person."  *Id.* ¶

3.  Mr. Day's works with plaintiffs' statistical expert Dr. Kriegler to generate expert reports on

the total number of overdetentions occurring during particular periods.  Specifically, Mr. Day

cross-references potential overdetentions generated from the electronically stored JACCS data

with physical inmate jackets.  Mr. Day explains the process in more detail:

> A potential over-detention is a release that has been tagged (electronically through
> JACCS data) using certain criteria developed by the parties.  Each party then
> needs to classify the potential over-detentions as over-detained or on-time (in the
> Plaintiffs' terminology, or as Appropriate, Late, Erroneous, or Other in the
> District's case).  To do this, each side must conduct manual examinations of the
> data in the jackets to make its classifications.  Neither side is able to make a
> classification for a booking with certainty solely by reference to JACCS data;
> information in the person's DOC jacket is also needed.  So, the parties' practice in
> identifying persons held late (whatever the criteria is) is to first run computer
> queries in the JACCS data to identify potential overdetentions, and then to
> examine the person's DOC jacket for further observations about the release.

Suppl. Report of Sean Day 2 n.2, June 11, 2012, ECF No. 360-2.   Mr. Day reviews the

individual, physical inmate jackets to determine whether a potential overdetention flagged by the

database query meets the class definition of an overdetention.  *See id.*

Federal Rule of Evidence 702, which governs testimony by expert witnesses, provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the firm of an opinion or otherwise if:
> (a)   the expert's scientific, technical, or other specialized knowledge will help
>        the trier of fact to understand the evidence or to determine a fact in issue;
> (b)   the testimony is based on sufficient facts or data;
> (c)   the testimony is the product of reliable principles and methods; and
> (d)   the expert has reliably applied the principles and methods to the facts of
>        the case.

Expert testimony must be "both relevant and reliable."  *H & R Block*, 831 F. Supp. 2d at 30.

"The burden is on the proponent of the testimony to show by a preponderance of the evidence

that the proffered expert witness is qualified, that his proposed testimony would be useful to the

finder of fact, and that the testimony is reliable."  *Skyes v. Napolitano*, 634 F. Supp. 2d 1, 5

(D.D.C. 2009 ) (citing *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir 2001)).

"This Court's role is to act as a 'gatekeep[er],' excluding any expert testimony that is not

sufficiently reliable or helpful to the jury."  *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 85 (D.D.C.

2012) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).

Under the traditional *Daubert* standard, the court may consider the following factors to

determine whether expert testimony is admissible under Rule 702:

> (1)   whether the expert's technique or theory can be or has been tested;
> (2)   whether the expert's technique or theory has been subject to peer review and
>        publication;
> (3)   the known or potential rate of error of the technique or theory when applied;
> (4)   the existence and maintenance of standards and controls; and
> (5)   whether the technique or theory has been generally accepted in the scientific
>        community.

*Daubert*, 509 U.S. at 593–94.   However, Courts frequently encounter situations where these

*Daubert* factors do not readily apply.  The Supreme Court has stated that *Daubert* itself "made clear that its list of factors was meant to be helpful, not definitive."  *Kumho Tire Co., Ltd. v Carmichael*, 526 U.S. 137, 151 (1999).  "In matters where [the *Daubert*] factors do not apply, reliability concerns may focus on personal knowledge or experience.  The gatekeeping inquiry is 'flexible' and 'the 'law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'"  *Groobert*, 219 F. Supp. 2d at 9 (quoting *Kumho*, 526 U.S. at 141–42).  Even when applying this 'flexible' standard, the Court must still ensure that the expert testimony is relevant and reliable.  *Id.*

The District's first objection is that Mr. Day's proffered testimony is irrelevant because it "relates to matters of common sense that a jury can decide for itself."  Def.'s Mot. in Limine 15 (quoting *Keys v. WMATA*, 577 F. Supp. 2d 283, 285 (D.D.C. 2008) (internal quotation marks omitted).  The District continues:

> Here, Mr. Day's testimony is irrelevant, as the determination of liability for overdetention is a *legal* question,…and the facts underlying any given inmate's release can be accurately and intelligibly described to the jury, who will be just as capable as Mr. Day (or anyone else) of comprehending the primary facts and drawing the correct conclusion as to whether an overdetention occurred.

*Id.* at 16.  Here, the District seems to suggest that the jury is perfectly capable of running database queries against JACCS data to identify potential overdetentions, and then know how to read an individual inmates' file to determine whether that inmate was overdetained per the class definition, and then repeat this process hundreds of times over.[7]  Certainly, a person with experience and training on how to read inmate jackets—such as Ms. Myrick, or perhaps Mr. Day—could accomplish this task.  Perhaps if the jury were trained as Legal Instrument Examiners, they could do all the work by themselves.  That would be an absurd result, and it also

---

[7]    Even if this task is limited to just cross-referencing the list of potential overdetentions with physical inmate jackets to determine actual overdetentions, this still sounds like a daunting and complicated task.

raises the question:  If the jury is perfectly capable of doing what Mr. Day did on its own, then

why are the District's own overdetention numbers relevant?  With sufficient training, couldn't

the jury figure out for itself how to generate discrepancy reports from the JACCS data?

Next, the District argues that Mr. Day's testimony would be unfairly prejudicial,

confusing, and misleading.  The District worries that "the jury could be misled into the belief that

all the overdetentions 'objectivley' determined by the Mr. Day were the fault of the District."

Def.'s Mot. in Limine 17.  The District claims that "Mr. Day does not view *any* reason for delay

as legitimate or justified, ascribing *all* overdetentions to the District, including instance where

the District received paperwork late from a third-party, or where a federal agency miscalculated

an inmate's sentence." *Id*. (emphasis in original).  In other words, the District thinks "Mr. Day's

'jacket analysis' is [ ] impermissibly overbroad, putting the blame on the District for numerous

overdetentions caused by the actions of third parties."  *Id*. at 18.

Mr. Day's analysis is not undermined, or unduly prejudicial, because he does not exclude

potential overdetentions that the District wants to see excluded—the same way that the District's

discrepancy reports are not inadmissible simply because they exclude potential overdetentions

the plaintiffs want to see included.  Mr. Day cannot be faulted for applying the class definition

when doing his jacket analysis.  The certified class in *Barnes* covers:

> Each person who has been, is, or in the future will be incarcerated in any District
> of Columbia Department of Corrections facility from September 1, 2005 forward;
> and who was not released, or, in the future, will not be released by midnight on
> the date on which the person is entitled to be released by court order or the date
> on which the basis for his or her detention has otherwise expired.

*Barnes*, 242 F.R.D. 113, 121 (D.D.C. 2007).  The class definition does not exclude cases where

the late release was the "fault" of some third party.

Whether the District is at "fault" for certain types of overdetentions is open to some

debate, and the plaintiffs are entitled to provide a report covering all the overdetentions for which they think the District is liable, and take a different position on whether the District is liable for certain late releases. The District has previously taken positions that it was not "at fault" for certain types of late releases, only to have the Court disagree. Most significantly, the District argued that it was not liable for overdetentions caused by the "10 p.m. cut off rule," but the Court decided that "the DOC's enforcement of the District's 10 p.m. cut off rule violated the due process rights of class members who were overdetained, during all parts of the class period, because of that rule." *Barnes*, 793 F. Supp. 2d at 278.

If the District has an issue with how Mr. Day classified certain late releases, it may address this on cross-examination. Disqualification of Mr. Day—and likely, by extension, Dr. Kriegler—is not warranted. *See, e.g.*, *Harris v. Koeng*, 815 F. Supp. 2d 6, 10 (D.D.C. 2011) (Expert's "testimony will unquestionably 'assist the trier of fact,'....Whether or not it is based on 'unreasonable assumptions' will be determined at trial after full cross-examination. Defendant's objections go to the weight, not the admissibility of his Report."); *S.E.C. v. Johnson*, 525 F. Supp. 2d 70, 76 (D.D.C. 2007) ("It is for the jury, not the Court, to determine whether [expert's] opinions are suspect because facts upon which he relied were shown to be inaccurate or unproven."); *cf. Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.").

Finally, the District argues that Mr. Day's methodology is inadmissibly unreliable, and does not withstand scrutiny. Def.'s Mot. in Limine 19 (citing *Groobert*, 219 F. Supp. 2d at 9 (expert testimony is unreliable "when an expert chooses to utilize her own unique methodology rather than the proper analysis which is well-known and respected"); *id*. at 8 ("General

acceptance in the community is an important factor in evaluating an expert's methodology[.]")). The District objects to the *sui generis* nature of Mr. Day's analysis, arguing that it is unreliable because "there is no indication that anyone else has ever used Mr. Day's methodology before." Def.'s Mot. in Limine 19; *but see McReynolds v. Sodexho Marriott Services, Inc*., 349 F. Supp. 2d 30, 45 (D.D.C. 2004) (question is not whether other courts have admitted an expert's testimony in the past, but whether his testimony in the instant case is sufficiently reliable and relevant to warrant admission); *Dyson v. Winfield*, 113 F. Supp. 2d 44, 48–49 (D.D.C. 2000) (expert's failure to publish and subject conclusions to peer review not reason to find expert's methodology unreliable, when there was no reason to publish study because of lack of interest in subject matter).

The fact that the District could not find a reported decision certifying an expert who provides testimony about whether "an overdetention occurred," *id*., suggests that it is inappropriate to use the more rigid *Daubert* framework to determine whether Mr. Day's methods are reliable.  As explained in *Groobert*:

> The defendant fails to recognize, however, that the standard under Federal Rule of Evidence 702 is a liberal and "flexible" one, and that personal experience can be a reliable and valid basis for expert testimony. *Kumho Tire Co.*, 526 U.S. at 149. This is particularly true with non-scientific testimony, where the *Daubert* factors may not apply because the issue is "highly particular and has not attracted scientific scrutiny." *Ambrosini* [*v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996)] (holding that courts must consider "other indicia of reliability" when the *Daubert* factors offer limited assistance in evaluating an expert's testimony); *see also Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245–46 (5th Cir. 2002) (holding that the lack of literature on injection-related infections of the joint did not undermine the expert's hypothesis because the trial court could rely on first-hand observations and professional experience to assess the expert's reliability). The Supreme Court has recognized that "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  *Kumho Tire Co.*, 526 U.S. at 151.

219 F. Supp. 2d at 7.  The Court finds that Mr. Day's testimony—being highly specialized and

specific—is not amenable to analysis under the *Daubert* factors.  It cannot evaluate Mr. Day's

"reliability based on such *Daubert* factors as 'whether the expert's technique or theory has been

tested' or 'whether the technique or theory has been subject to peer review and publication'

because of apparent lack of information on the subject." *Id.* (quoting *Daubert*, 509 U.S. at 590).

As in *Groobert*, this Court finds that "[p]ersonal experience is the proper method of assessing the

reliability" of Mr. Day's expert testimony.  *Id.* (citing *Kumho*, 526 U.S. at 150).

Mr. Day has years of experience—dating back to the *Bynum* litigation—reviewing DOC

inmate jackets and other data to determine whether an inmate was overdetained.  March 2010

Day Decl. ¶¶ 2–4.  He has personally reviewed hundreds of inmate jackets, and has educated

himself on the DOC's system of collecting inmate date.  *Id.*  Rule 702 "allows for experience

such as employment in the field as well as experience in performing tests or studies."  *Groobert*,

219 F. Supp. 2d at 7 (citing *United States v. Ramsey*, 165 F. 3d 980, 984 (D.C. Cir. 1999)

(holding that an expert's testimony regarding the plaintiff's past criminal history satisfied Rule

702 because of his specialized knowledge, education, skill, and expertise as an agent of the Drug

Enforcement Administration); *United States v. Hankey*, 203 F.3d 1160, 1169–70 (9th Cir. 2000)

(holding that the trial court properly admitted expert testimony concerning the plaintiff's gang

membership since the expert was a 21-year veteran of the police department who has devoted

years to working with gangs)).  Given the hyper-specific and narrow nature of Mr. Day's

expertise in analyzing DOC data, his almost ten years of professional experience reviewing

hundreds of inmate files allows him to qualify as an expert through knowledge, skill, experience,

training or education.  *See* Fed. R. Evid. 702.

Several cases have found "expert testimony unreliable when an expert choses to utilize

her own unique methodology rather than the proper analysis which is well-known and

respected." *Groobert*, 219 F. Supp. 2d at 9 (citing *Kumho*, 526 U.S. at 158 (stating that experience-based expert testimony was unreliable because there was no indication that others in the industry used the expert's two-factor test); *Meister*, 267 F.3d at 1131 (holding that an expert lacked reliability when "no reasonable scientist would rely on this methodology in the face of voluminous epidemiological evidence to the contrary"); *Raynor v. Merrell Pharm. Inc.*, 104 F.3d 1371, 1375 (D.C. Cir. 1997) (rejecting expert testimony because an overwhelming body of evidence utilizing a "sound" methodology pointed in the opposite direction)).

In this case, there is no "well-known and respected" "proper analysis" when it comes to determining whether an inmate was overdetained.  General acceptance in the community can be an important factor, but it is only relevant when there is a "community" to accept that methodology.  Basically, it comes down to Mr. Day and Dr. Kreiger's expert reports versus the District's discrepancy reports.  The District has not shown that Mr. Day's methodology is persistently flawed, or that there is "an analytical gap between the data and the opinion proffered."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  At best, the District has offered that it would have—and did in its discrepancy reports—not count certain late releases it did not feel were the "fault" of the District.  *See* Def.'s Mot. in Limine 17–18.  Simply pointing to a possible alternative methodology does not establish that Mr. Day's methodology was unreliable.  *See Capitol Justice LLC v. Wachovia Bank, N.A.*, 706 F. Supp. 2d 34, 41–42 (D.D.C. 2009) (Lamberth, C.J.) (noting that expert could have used alternative method of calculating damages does not render testimony unreliable).

The District's problems with Mr. Day's methodology largely go to the weight of the evidence, not its admissibility, and can be addressed on cross-examination.  *See*, *e.g.*, *Ambrosini*, 101 F.3d at 141 ("[B]y attempting to evaluate the credibility of opposing experts and the

persuasiveness of competing studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a factfinder."); *Groobert*, 219 F. Supp. 2d at 9 ("The only difference between [the defendant's expert's] evaluation and [the plaintiff's expert's] analysis is that [the defendant's expert's] analysis focuses on past income, which goes to the weight of the evidence rather than its admissibility."); *Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 462 (D.N.J. 1999) (holding that an expert's failure to evaluate all available options "neither renders his methodology unreliable nor his report inadmissible but, rather, goes to the weight of his testimony").

The District should not be permitted to exclude Mr. Day's testimony because it disagrees with how he defines "overdetention," or because he is among the first to provide this type of expert testimony. *Cf. Benedi v. McNeil–P.P.C., Inc.*, 66 F.3d 1378, 1385 (4th Cir. 1995) (holding that expert testimony was reliable despite the lack of studies or tests because a "defendant should not be allowed to escape liability simply because…there are, as yet, no epidemiological studies concerning [this specific subject area]"). Nor should the Court force the jury to review hundreds of inmate jackets to determine for themselves whether an inmate was overdetained. Mr. Day's testimony and reports are relevant, not unduly prejudicial, and based on a reliable methodology. His experience reviewing DOC inmate data and making determinations about whether overdetentions have occurred qualifies him as an expert under Rule 702.

###    D.    Motion to Exclude Evidence or Testimony from Karen Schneider

The District asks the Court to preclude the plaintiffs from introducing evidence or testimony from Karen Schneider. Ms. Schneider prepared a report, dated May 2008, titled "Review of Paperflow Process between the Superior Court, the U.S. Marshals Service and the Department of Corrections," ("Schneider Report") commissioned by the District's Criminal

Justice Coordinating Council ("CJCC"), with the concurrence of the D.C. Superior Court, the U.S. Marshals Service, and the DOC. The purpose of the Schneider Report was to review the transfer of court-generated paperwork among these agencies, and suggest ways to make this process more efficient, so as to avoid erroneous and late releases of inmates. Schneider Report 1, Pls.' Ex. 406, ECF No. 221-8 (under seal); *see also* Pls.' Opp'n 28–29. While the report "did not focus on the reasons why the late release of inmates at the DC Jail may occur, it was recognized that some late releases could occur due to problems related to the paperflow process at the Court." *Id*. at 21–22.

First, the District objects to the Schneider Report and her testimony because they "are hearsay, and should be excluded on that ground alone, as they are offered as out-of-court statement for the truth of the assertions contained therein." Defs.' Mot. in Limine 21 (citing *Mahnke v. WMATA*, 821 F. Supp. 2d 125, 154 (D.D.C. 2011) (expert reports and CVs are inadmissible hearsay)). The Schneider Report is not an expert report created in anticipation of litigation. The Schneider Report is either a party admission—and thus not hearsay—or falls under the public records exception to the hearsay rule. The District itself commissioned the study, and Ms. Schneider worked under the direction of the CJCC to focus "on how the process [of transferring court-generated paperwork] can become more efficient so as to avoid erroneous releases and potential overdetention of inmates." Schneider Report 1. Since Ms. Schneider acted as the District's agent in preparing the Report, the Report is a party admission, and therefore not hearsay.[8] *See Niagara Mohawk Power Corp. v, Jones Chemical Inc.*, 315 F.3d 171, 177 n.1 (2d Cir. 2003) (report produced at the direction of a party constitutes a party

_____

[8]  The District claims in its Reply that "the Schneider report is not a party admission" as "Ms. Schneider was never authorized to speak for the district on the subject of potential overdetentions." Def.'s Reply 8. Ms. Schneider—unless she was lying—*certainly* authorized to offer findings and recommendations on the subject of "the transfer of court-generated paperwork among [D.C.] agencies focusing on how the process can come more efficient so as to avoid erroneous releases and *potential overdetention* of inmates." Schneider Report 1 (emphasis added).

admission); *Green v. Baca*, 226 F.R.D. 624, 636 (C.D. Cal. 2005) (outside counsel retained by County of Los Angeles to review Sherriff's Department's operations was County's agent in preparing the reports; therefore the statements contained in the report were party admissions, not hearsay).

The Court also agrees with the plaintiffs' alternative ground for admitting the Schneider Report, that it "meets the public record exception of Fed. R. Evid. 803(8)(A)(iii)." Pls.' Opp'n 31. The plaintiffs explain that the Report "was commissioned by the CJCC, an independent agency of the District of Columbia, with the concurrence of the DC Superior Court, as well as the Department of Corrections. It is a public record of a governmental agency, which sets forth factual findings resulting from an investigation made pursuant to authority granted by law, and as such, is admissible." *Id.*; *see Huthance v. District of Columbia*, 793 F. Supp. 3d 183, 210 (D.D.C. 2011) (Lamberth, C.J.) (hearsay rule does not bar admission of the District's Office of Police Complaints' report that made factual findings and recommendations with respect to wrongful arrests for disorderly conduct, as the report was a public record of a governmental agency within the meaning of Fed. R. Evid. 803(8)(c)).

The Supreme Court held, in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 161–65 (1988), that evaluative reports containing statements of opinion are admissible under Rule 803(8)(c), as the focus of Rule 803(8)(c) analysis is trustworthiness, not whether the report should be deemed "fact" or "opinion." There is no reason to question the trustworthiness of the Schneider Report; it provides a detailed explanation of its underlying methodology, Schneider Report 2–4, and the District gives the Court no reason to doubt her trustworthiness.

Apart from its hearsay objection, the District claims that the Schneider Report is not relevant. The District avers that the purpose of the Schneider Report was "not to determined

*how many* overdetentions occurred, or even *why* overdetentions occurred." Def.'s Mot. in Limine 21. While Schneider indicated that her "study did not focus on the reasons why the late releases at the DC Jail may occur," the Report noticed "that some late releases could occur due to problems related to the paperflow process," and went on to try to "determine if there was a nexus between the late release and the paperflow process," Schneider Report 21–22.[9] The Schneider Report's relevance is evident from its first page:

> The District's system to transfer commitment and release orders from the Court to the DOC for processing is a very lengthy, cumbersome, paper-driven process involving multiple agencies....[I]t is not surprising that paperwork has gotten lost or has no been received at the Jail in a timely fashion. Unfortunately, *lost or delayed paperwork potentially can lead to serious consequences – either the overdetention* or the erroneous release of an inmate.

*Id*. at 1 (emphasis added). The Report's discussion of the District's paperflow process, and how it could result in the overdetention of inmates in D.C. Jails, is clearly relevant to the issue of whether the District had a pattern and practice of overdetaining inmates. Granted, it does not offer a concrete total number of overdetentions, but that is not the only issue remaining. *See Barnes*, 793 F. Supp. 2d at 277, 284 (also relevant, *inter alia*, are "the delays associated with necessary administrative procedures," and whether the District was "on notice that absent significant intervention on its part, a pattern of unconstitutional behavior would certainly continue at the DOC"). The Schneider Report provides a "piece of the puzzle" to explain whether the District is liable for overdetentions during the Trial Period.

Finally, the District states that "there are numerous indications that [Ms. Schneider] studied and reported on events, documents, and procedures that occurred *outside* the Trial Period." Def.'s Mot. in Limine 21. Therefore, the District argues that portions of the Schneider

---

[9]   The Schneider Report used the term "late release" rather than "overdetention" in part because of worries that labeling late releases due to the 10 p.m. cutoff rule as overdetentions "may not be appropriate." Schneider Report 21 n. 35. This Court has already decided that it is entirely appropriate to label late releases due to the 10 p.m. cut-off rule as "overdetentions." *Barnes*, 793 F. Supp. 2d at 282–83.

Report contains irrelevant material, as the "Court has determined that *only* the District's liability during the Trial Period is to be determined at the upcoming trial." *Id*. at 22.  Furthermore, the Report would be confusing to the jury, as the District claims that "[i]t will be exceedingly difficult, if not impossible, for the jury to *only* consider events and situations within the Trial Period, in light of Ms. Schneider's reports and proffered testimony." *Id*.

In response, the plaintiffs make the salient point that "the Schneider Report was issued in May 2008, *at most* 3 months after the end of the Trial Period (February 25, 2008).  Moreover, Ms. Schneider prepared and presented her preliminary report in December 2007, within the Trial Report, indicating that most of her analysis was completed by this time."  Pls.' Opp'n 33–34. This point is well taken.  The parties must remember that the "Trial Period" is an artificial construct—a period demarcated, ex post, by this Court based "on the varying availability of undisputed facts for different periods."  Mem. Op. & Order Denying Reconsideration 2, ECF No. 399.  The Court cannot ask a contemporarily created report to fall neatly within the Trial Period. The fact that the Schneider Report may contain a few months of "irrelevant material" should not disqualify it.  If the District thinks a brief limiting instruction is necessary to mitigate any possible prejudice or confusion, it should submit one by the Final Pretrial Conference.  Since the Schneider Report provides relevant evidence, and is either a party admission or falls under the public record exception to the hearsay rule, the Court will deny the District's motion *in limine* to exclude the Schneider Report or testimony from Ms. Schneider.

### E.     Motion to Preclude Mention of Facts Regarding Strip Searches

The District requests that the Court preclude any mention of strip searches during the trial on liability.  The District argues that the strip search issue is not relevant to liability for overdetentions, and in any event would be overly prejudicial.  Def.'s Mot. in Limine 22–23.

While this Court has said that "the overdetention problem and the strip search problem are interrelated, one leading to another," *Barnes*, 798 F. Supp. 2d at 266, the District is correct that "it is overdetentions that lead to strip searches, not vice-versa," Def.'s Mot. in Limine 22–23. While many overdetained inmates may have been strip searched, many inmates who were *not* overdetained have also been strip searched. Therefore, the relevance of this evidence under Federal Rules of Evidence 401 and 402 is weak. Furthermore, evidence about strip searches—an invasive, embarrassing practice—could be unduly inflammatory, distracting, and prejudicial. Per Federal Rule of Evidence 403, the Court will preclude the plaintiffs from mentioning facts regarding strip searches.

## V.     CONCLUSION

If insanity is doing the same thing over and over again and expecting different results, both parties should be concerned. The plaintiffs ask the Court, for the *fifth* time, to exclude the District's discrepancy reports. For the fifth time, the Court refuses, and will let a jury decide the question of whose overdetention numbers are more credible. The District is embroiled in this litigation because—after settling *Bynum* and agreeing to spend $3 million of *class funds* to help solve the problem—it continued the same unconstitutional practices, and showed no urgency in enacting the kind of major, fundamental changes needed to address the overdetention problem.[10] Now it asks the Court to forbid the plaintiffs from mentioning the District's promises, made in the *Bynum* settlement, to take specific actions to prevent future overdetentions —such as developing an Inmate Processing Center. With an appropriate limiting instruction, the plaintiffs have a right to offer the injunctive provisions of the *Bynum* settlement as proof of notice and deliberate indifference. Understanding the possible prejudicial effect of introducing the *Bynum*

---

[10]   The Court has found, as a matter of law, this was true for at least the first sixteen months of the *Barnes* class period. 793 F. Supp. 2d at 279–80. The District now has a chance to prove that it had made enough progress to preclude liability during the Trial Period.

settlement, the Court asks the parties to consider introducing the relevant provisions via stipulation, and will require the plaintiffs' discussion of the settlement to be brief and focused.

The Court will allow plaintiffs to introduce testimony from up to three class members who were overdetained during the trial period (and two witnesses who were overdetained during the first sixteen months of the class period) so long as: (1) the plaintiffs identify these witnesses within 10 days of this days of this date, and these witnesses should be reasonably representative of the class—offering outliers or extreme cases could lead to preclusion; (2) the witnesses keep their testimony as brief as possible, and only focus on matters relevant to the liability phase— such as the process they went through that led to their overdetainment; the witnesses may not discuss strip searches, and should not offer testimony that is primarily related to individual damages; and (3) if the plaintiffs fail to name Trial Period witnesses by the deadline, they may not call the two witnesses who were detained prior to the beginning of the Trial Period.

The Court will allow the expert testimony and reports of Sean Day.  Mr. Day offers testimony on a very narrow, specific issue—how to determine overdetentions from DOC records—so the lack of peer review and acceptance in the community of his methodology should not be held against him.  His kind of expert testimony is virtually *sui generis*, but he has shown enough professional experience examining DOC records to demonstrate particular expertise in the field.  The District objects to how Mr. Day defines an overdetention, but Mr. Day cannot be faulted for applying the class definition.  Essentially, the District's complaints about Mr. Day's testimony go to its *weight*, not its *admissibility*, and the District will have an opportunity to cross-examine plaintiffs' experts thoroughly at trial.

The Schneider Report examining the paperflow process in the D.C. criminal justice system is clearly relevant to notice and deliberate indifference.  It discusses the systematic and

bureaucratic problems that can lead to erroneous and late releases.  As a document created by an agent of the District and at the direction of the defendant, the Report is a party admission and not hearsay.  Alternatively, the report falls under the public records exception to the hearsay rule.  The Report is not fatally prejudicial because it might cover a few months' worth of events that fell outside of the Trial Period.  The idea of a "Trial Period" was created ex post by this Court, in part because of the varying availability of evidence for differing periods.  The District cannot expect a contemporaneous document to fall neatly within the Trial Period, and any concerns that linger can be dealt with by a limiting instruction to the jury.

The plaintiffs will not be allowed to mention strip searches during the overdetention liability trial.  While the fact that an inmate was overdetained makes it more likely he was strip searched, the fact that an inmate was strip searched does not make it more likely that he was overdetained.  Whatever probative value mentioning strip searches would have is outweighed by the potential for undue prejudice and confusion.  The topic of strip searches is likely to evoke strong reactions in a jury, and the Court need not accept the risk of such emotional reactions when evidence of strip searches proves so little about liability for overdetentions.

A separate order consistent with this memorandum opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on February 14, 2013.